UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 14-CV-21385-LENARD/GOODMAN

WREAL, LLC, a Florida Limited
Liability Company,

      Plaintiff,

vs.

AMAZON.COM, INC., a Delaware
Corporation,

      Defendant.

_____/

**PLAINTIFF'S MOTION, WITH INCORPORATED
<u>MEMORANDUM OF LAW, FOR A PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION…………………………..………………...………......1

II.    STATEMENT OF FACTS…………………………………………...........2

     A.    WREAL Develops its Streaming Video Service…………………..………......2

     B.    WREAL Registers the FyreTV and FyreTV.com Marks…………………………3

     C.    WREAL Launches its FyreTV Streaming Video Service……..……..……..........4

     D.    Amazon Launches a Streaming Video Service and STB and
        Infringes on WREAL's Trademarks by Calling it Fire TV………..……….…......4

        1.    *Amazon's Interest in the Streaming Video Market*…………...…….…......5

        2.    *Amazon Launches Fire TV and Saturates the Market*
            *with Advertising*………..……………...………………………..........5

        3.    *Commentators Quickly Realized the Obvious – Consumers*
            *are Likely to be Confused by Amazon's Illegal Use of Fire TV*…………..6

III.   ARGUMENT……………………………………………………...............7

     A.    Wreal Has a Substantial Likelihood of Success on the Merits…………..……...8

        1.    WREAL Owns and Can Protect the FyreTV and
            FyreTV.com Marks……..…………..……………………............8

        2.    Amazon's Use of WREAL's Marks is Likely to
            Cause Consumer Confusion……………...……….…………….....9

            a.    *Strength of the Marks* ………...………..……………...……10

                i.    *Amazon's Infringing Use of WREAL's Mark in Connection*
                    *With its Own Strong Housemark Increases the Likelihood*
                    *of Confusion*……………….…..….……………………....12

                ii.    *WREAL's FyreTV and FyreTV Marks are*
                    *Strong and Protectable*…………………..…...………….......13

i

       b.    *Fire TV is Confusingly Similar to FyreTV and FyreTV.com*……………………………......……………….............14

       c.    *Fire TV and FyreTV Are Nearly Identical Products*………………….……………………………….……......16

       d.    *The Parties Share Similar Retail Outlets, Trade Channels, Customers, and Advertising Media*…………….......18

       e.    *Amazon Intentionally Ignored WREAL's Rights*……………………...19

       f.    *There is Already Evidence of Actual Consumer Confusion*………...20

  B.    WREAL Will Suffer Irreparable Harm Absent an Injunction…...…….……….....23

  C.    The Balance of the Hardships Tips Strongly in Favor of WREAL…..…...…......25

  D.    The Public has a Strong Interest in Stopping Consumer Confusion…………….25

  E.    The Court Should Require a Minimal Bond Upon Issuance of an Injunction…………….…..………………………….….........................…....25

IV.    CONCLUSION………………….…..……………….…………….….……………....26

# TABLE OF AUTHORITIES

## Cases

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 167 F. Supp. 2d 770 (E.D.Penn. 2001)  14

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198 (3d Cir. 2000)…........ 12, 20

*Alliance Bank v. New Century Bank,* 742 F. Supp. 2d 532, 560 (E.D. Pa. 2010)........................ 21

*Altira Group LLC v. Philip Morris Companies Inc.*, 207 F. Supp. 2d 1193, 1199 (D. Colo. 2002) ....................................................................................................................................... 20

*Ameritech, Inc. v. Am. Info. Techs. Corp.,* 811 F.2d 960 (6th Cir. 1987).................................... 24

*Angel Flight of Ga. v. Angel Flight Am., Inc.,* 522 F.3d 1200 (11th Cir. 2008) ......................... 25

*Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32 (1st Cir. 2006) ................................................. 11, 12

*AutoZone, Inc. v. Strick,* 543 F.3d 923 (7th Cir. 2008)............................................................... 18

*CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, (7th Cir. 2001) ........................................... 18

*Caillon Importers, Ltd. v. Frank Pesce Itn'l Group, Ltd.*, 112 F.3d 1125 (11th Cir. 1997)......... 25

*Chanel, Inc. v. chanel255.org,* No. 12-21762-CIV, 2012 WL 1941598 (S.D. Fla. May 29, 2012) ...................................................................................................................................... 25

*Citibank N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540 (11th Cir. 1984) ..................................... 10

*Council of Better Bus. Bureaus, Inc v. Better Bus. Bureau of S. Fla., Inc,* 200 U.S.P.Q. 282 (S.D. Fla. 1978) ................................................................................................................... 21

*Davidoff & Cie, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1304 (11th Cir. 2001)……………....25

*Dieter v. B & H Indus. of Sw. Fla., Inc.,,* 880 F.2d at 329 (11th Cir. 1989)................................ 11

*Dreamwerks Prod. Group., Inc. v. SKG Studio,* 142 F.3d 1127, 1130 (9th Cir. 1998)......... passim

*E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525 (11th Cir. 1985) . 16, 17, 23

*eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 126 S. Ct. 1837 (2006)................................ 23

*Fisons Horticulture, Inc. v. Vigoro Indus. Inc.*, 30 F.3d 466 (3d Cir. 1994) ............................... 10

*Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330 (11th Cir. 1999) .............. passim

*Gaffigan v. Does 1-10,* 689 F. Supp. 2d 1332 (S.D. Fla. 2010)................................................... 24

*Grotrian v. Steinway & Sons,* 523 F.2d 1331 (2d Cir. 1975). ..................................................... 15

*Helene Curtis Industries, Inc. v. Church and Dwight Co., Inc.,* 560 F.2d 1325 (7th Cir. 1977).. 21

*Imperial Toy Corp. v. Ty, Inc.,* No. 97-C-8895, 1998 WL 601875 (N.D. Ill. 1998) ............. 19, 20

*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079 (7th Cir. 1988) 21

*It's A 10, Inc. v. Beauty Elite Group, Inc.,* 932 F. Supp. 2d 1325 (S.D. Fla. 2013) ................ 8, 25

*John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966 (11th Cir. 1983) ............................. 11

*Lone Star Steakhouse & Saloon v. Longhorn Steaks,* 106 F.3d 355 (11th Cir. 1997)................... 8

*Mont. Prof'l Sports, LLC v. Leisure Sports Mgmt., Inc.*, 422 F. Supp. 2d 1271 (M.D. Fla. 2006)10

*Mystique, Inc., v. 138 Intern., Inc.*, 601 F. Supp. 2d 1320 (S.D. Fla. 2009)........................... 14,15

*N. Am. Medical Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211 (11th Cir. 2008) .................... 23

*Nailtiques Cosmetic Corp. v. Salon Sciences, Corp.*, 41 U.S.P.Q. 1995 (S.D. Fla. 1997).......... 26

*Plus Prods. v. Plus Disc. Foods, Inc.,* 722 F.2d 999 (2d Cir. 1983)............................................ 16

*Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347 (S.D. Fla. 1998) ..... 8

*Rolex Watch U.S.A., Inc. v. Forrester,* 2 U.S.P.Q.2d 1292 (S.D. Fla. 1986).............................. 22

*Ryder Sys., Inc. v. Storage & Moving Servs., Inc*., 2013 WL 3873231(S.D. Fla. July 25, 2013) ....
.................................................................................................................................... 9, 10, 20, 26

*Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 216 U.S.P.Q. 599 (11th Cir.
1982)................................................................................................................................................ 21

*Sands, Taylor & Wood Co v. Quaker Oats Co.*, 978 F. 2d 947 (7th Cir. 1992) ................. 8, 10, 11

*Shields v. Zuccarini,* 254 F.3d 476 (3d Cir. 2001)...................................................................... 14

*Stuart J. Kaufman, M.D. & Assoc., P.A. v. Bausch & Lomb Inc.*, 2013 WL 6154166 (M.D.Fla.
July 25, 2013)................................................................................................................................... 8

*Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.,* 889 F.2d 1018, 1029 (11th Cir. 1989)....................... 23

*Tanel Corp. v. Reebok Int'l, Ltd.,* 774 F. Supp. 49 (D. Mass. 1990) ............................................ 12

*TracFone Wireless, Inc. v. Cabrera*, 883 F. Supp.2d 1220 (S.D. Fla. 2012) .............................. 20

*Trovan, Ltd. v. Pfizer, Inc.,* No. CV-98-00094 LGB MCX, 2000 WL 709149 (C.D. Cal. May 24,
2000).................................................................................................................................................. 21

*TV Land, L.P. v. Viacom Int'l, Inc.*, 908 F. Supp. 543 (N.D.Ill. 1995)................................. 8,16, 20

*Wash. Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 33 F. Supp. 2d 488 (E.D. Va. 1999)  14

*World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482 (5th Cir. 1971) .......... 22

*You Fit, Inc. v. Pleasanton Fitness, LLC,* No. 8:12-CV-1917-T-27EAJ, 2013 WL 521784 (M.D.
Fla. Feb. 11, 2013) ................................................................................................................. 23

**Statutes**

15 U.S.C. § 1057(b) ........................................................................................................................ 9

15 U.S.C. § 1065(3) ............................................................................................. 9

15 U.S.C. § 1115(b) ............................................................................................. 9

15 U.S.C. § 1116(a) ............................................................................................. 7

**Rules**

Fed. R. Civ. P. 65(c) ........................................................................................... 25


**Treatises**

2 McCarthy on Trademarks and Unfair Competition § 11:11 (4th ed.) ....................................... 13

2 McCarthy on Trademarks and Unfair Competition § 23:10 (4th Ed.) ...................................... 19

2 McCarthy on Trademarks and Unfair Competition § 24.51 (4th Ed.)…………………..……18

Plaintiff WREAL, LLC ("WREAL"), which owns the federally-registered marks *FyreTV*® and *FyreTV.com*® for video streaming services (including through its set-top box), moves for a preliminary injunction enjoining Defendant Amazon.com, Inc. ("Amazon") from using the infringing name *Fire TV* for video streaming services through its new set-top box.

## I.   <u>INTRODUCTION</u>

This is a trademark infringement case involving reverse confusion.  Seven (7) years before Amazon debuted its infringing streaming video device, WREAL began using its marks FyreTV and FyreTV.com for its streaming video service, which allows consumers to stream videos (including through the use of its set-top box) to their television sets using an internet connection.  Seven (7) years later, on April 2, 2014, Amazon knowingly began using the confusingly similar name "Fire TV" for its set-top box that allows consumers to stream videos, including pornography, to their television sets using an internet connection.  Given Amazon's dominant market position and superior marketing power, consumers are likely to mistakenly assume that WREAL's FyreTV is somehow affiliated with Amazon or that WREAL is actually the infringer.  Indeed, an analysis of each of the factors considered by Courts in trademark infringement cases points to an overwhelming likelihood of confusion as a result of Amazon's blatant infringement of WREAL's FyreTV brand.  Specifically:

- FyreTV is a strong, arbitrary mark, and consumers are likely to attribute it to a single source.  Its use by Amazon in an immersive advertising campaign means that consumers will associate the name with Amazon, not WREAL.  This is aggravated by Amazon's consistent use of "Fire TV" in conjunction with Amazon's strong house mark, which serves to aggravate the likelihood of confusion.

- Amazon's use of Fire TV is confusingly similar to WREAL's FyreTV mark.  The marks are phonetically identical, and use the same arbitrary word.

1

- Amazon's Fire TV is extremely similar to WREAL's FyreTV, as both are video streaming services, and consumers are likely to attribute them to the same source.

- There is significant overlap in the parties' retail outlets, trade channels, customers, and advertising media.  WREAL and Amazon have marketed their products online and on television, reaching many of the same consumers.

- Amazon ignored WREAL's exclusive right to use the Fire TV name.  It knew that WREAL was marketing a similar product under a nearly identical name, but simply did not care.

- Though neither expected nor required, particularly at this stage and in a reverse confusion case, there is already evidence of actual confusion in the marketplace.

As a result, absent an injunction, WREAL stands to irreparably lose its FyreTV brand and identity, and will lose total control over its goodwill and reputation.

## II.   STATEMENT OF FACTS

### A.   WREAL Develops its Streaming Video Service.

WREAL, a Miami-based company, was formed in 2006 to develop and implement technology known as IPTV, or Internet Protocol Television.  (R. Franco Decl. ¶ 4).[1]  This technology, which is common today, allows consumers to stream high quality video over the internet to their computer, tablet, smartphone, internet-connected television, or traditional television through the use of a set-top box ("STB").  (*Id.* at ¶ 4).  Backed with approximately $20 million in capital, WREAL developed a platform capable of delivering content to a wide variety of streaming media devices, including its own proprietary STB.  (*Id.* at ¶¶ 5, 6).  WREAL's team put together a seamless, unified video-streaming experience, allowing consumers to stream video without experiencing delay. (*Id.* at ¶ 6).  WREAL also perfected the FyreTV proprietary interface, which allows consumers to easily access content through its innovative search engine.

---

[1] The Declaration of Mr. Rodrigo Franco is attached hereto as Exhibit "1".

2

(*Id.* at ¶ 7).

By its nature, WREAL's streaming video service is compatible with **any** type of video content. (*Id.* at ¶ 8). Because WREAL does **not** produce any content of its own, at the same time that it was developing its technology, WREAL also worked to strike licensing deals with content providers. (*Id.* at ¶ 8, 10). However, the technology was in its infancy in 2006, and many were skeptical. (*Id.* at ¶ 10). Thus, to get its technology off the ground, WREAL worked with the one group of content providers – those that produce adult content – that was willing to give the nascent streaming video technology a try. (*Id.* at ¶ 11).

**B.      WREAL Registers the FyreTV and FyreTV.com Marks.**

Early in 2007, WREAL's marketing team, inspired by the explosive, incendiary, and disruptive nature of its new technology and service, coined FyreTV as its brand name. (*Id.* at ¶ 12). WREAL budgeted over $1.3 million to build the FyreTV brand and create an association between the FyreTV brand and WREAL's streaming video service in the minds of consumers. (*Id.* at ¶¶ 5, 20). WREAL also registered the domain names "fyretv.com," and "firetv.com," the latter to ensure that consumers who were confused over the proper spelling of the brand name landed in the right place, inasmuch as "fyretv" and "firetv" sound exactly the same. (*Id.* at ¶¶ 14, 26).

To protect its investment, on July 4, 2007, WREAL applied to register with the USPTO the marks FyreTV, Registration No. 3517534, and FyreTV.com, Registration No. 3517535. (*Id.* at ¶ 13, Ex. A). On October 14, 2008, the USPTO accepted both applications and issued registration numbers for FyreTV and FyreTV.com. (*Id.* at ¶ 13, Ex. B). On December 27, 2013, the USPTO declared both marks "incontestable." (*Id.* at ¶ 13, Ex. C).

3

C.      **WREAL Launches its FyreTV Streaming Video Service.**

In January 2008, WREAL launched its FyreTV streaming video service, which was initially available only through its STB.  (R. Franco Decl. ¶¶ 9, 15).  WREAL invested over $200,000 in its public roll-out at the AVN adult entertainment convention in Las Vegas, Nevada.  (*Id.* at ¶ 15).  As a result, FyreTV was recognized by Gizmodo and Wired Magazine as one of the best new technologies that debuted at that time.  (*Id.* at ¶ 15)

Following its successful launch, WREAL began marketing its streaming video service, showcasing its STB.  Starting in 2008, WREAL ran advertisements in mainstream magazines, including Rolling Stone and Maxim, and on television networks, including Comedy Central and FX.  (*Id.* at ¶¶ 17, 18).  WREAL also advertised FyreTV on the internet through its own website and third parties, including Reddit and Google.  (*Id.* at ¶ 19).

In addition, WREAL has adapted FyreTV to meet the demands of the marketplace.  WREAL developed the capacity to deliver the FyreTV service on other platforms, including tablets, smartphones, internet-connected televisions, and other dedicated STBs such as Apple TV and Roku.  (*Id.* at ¶ 9).  In early 2011, FyreTV made its streaming video service available on its website, FyreTV.com.  (*Id.* at ¶ 9).  Currently, FyreTV has approximately 51,000 subscribers in the United States.  (*Id.* at ¶¶ 5, 24).

WREAL continues to develop its FyreTV service and brand to this day by adding new content to its library and investing to overhaul and re-design its website.  (*Id.* at ¶¶ 16, 21, 22).

D.      **Amazon Launches a Streaming Video Service and STB and Infringes on WREAL's Trademarks by Calling it Fire TV.**

Only a few months after it began its effort to re-design its FyreTV.com website, WREAL was blindsided by Amazon's release of an identically named STB for streaming video.  (R. Franco Decl. ¶ 25).

4

### 1.    *Amazon's Interest in the Streaming Video Market*

Amazon is the world's largest online retailer.  Its website receives approximately 80 million unique monthly users in the United States alone.  (*See* Quantcast Measurement Data attached as Exhibit "2").  Amazon markets digital content, including streaming video.  In September 2008, Amazon announced that its customers could stream movies to their computers or Sony Bravia television sets.  (*See* Amazon's Press Release of September 3, 2008 attached as Exhibit "3").  Much like WREAL, Amazon continued to adapt to market demands in the rapidly developing market for streaming video by later announcing that it was available on "nearly 200 Internet connected TVs, Blu-ray players, and set-top boxes[.]"   (*See* Amazon's Press Release of February 22, 2011 attached as Exhibit "4").

### 2.    *Amazon Launches Fire TV and Saturates the Market with Advertising*

On April 2, 2014, Amazon expanded its foothold in the streaming video market by introducing "Fire TV," which Amazon described as "a tiny box that plugs into your HDTV for easy and instant access…" to streaming video services.  (*See* Amazon's Press Release dated April 2, 2014 attached as Exhibit "5").  Amazon calls Fire TV a "[h]uge, open ecosystem of entertainment" and "a seamlessly integrated service that brings together the features customers expect from Amazon…." *Id.*

Amazon launched its Fire TV with great fanfare.  Amazon dedicated its homepage to its Fire TV launch, ensuring that millions of users would be exposed to Amazon's Fire TV.  (*See* Amazon's home page after the launch of Fire TV attached as Exhibit "6").  Further building the association between Amazon and the name Fire TV, Amazon chose to place its housemark Amazon next to the name "Fire TV" in every instance.  (Composite Exhibit 7 shows a sample of pornographic videos available on Amazon for streaming using Fire TV including those that

advertise Fire TV with Amazon's housemark).  Amazon's Fire TV launch was extensively covered by the press, and featured in nearly every prominent consumer technology blog. Amazon also launched a massive television advertising campaign in order to promote "Fire TV." The highly memorable campaign featured well-known, quirky actor Gary Busey talking to inanimate objects and aired in choice time slots.  (*See* Dkt. No. 10, Amazon's Answer ¶ 34).  The campaign ran until at least June 1, 2014, and Amazon even spun-off the campaign on YouTube. (*See* Exhibit "8").  The campaign ran on several television networks, including some of the same networks that WREAL has advertised FyreTV, such as FX and Comedy Central.  (Exhibit "9"). Clearly, Amazon has sought to leverage its massive size and advertising budget to saturate the marketplace in order to make Amazon's Fire TV a household name.

### 3. *Commentators Quickly Realized the Obvious – Consumers are Likely to be Confused by Amazon's Illegal Use of Fire TV.*

On April 2, 2014, the same day that Amazon launched its Fire TV, CNBC published an article headlined "Amazon TV shares name with online porn site."  (*See* CNBC Report attached as Exhibit "10").  One author questioned whether WREAL "[was] clever enough to imagine that Amazon would be launching its Fire TV," mistakenly implying that WREAL may have been the one that knowingly chose a confusingly similar name to Amazon's Fire TV.  (*See* CNET Article attached as Exhibit "11").  Individuals also pointed out the obvious similarity between the products on social media sites such as Twitter.  (*See* Tweets, including one mistakenly stating that "Amazon starts FyreTV," attached as Exhibit "12").  While some pointed out the likelihood that consumers will be confused, others expressed actual confusion, with one directing a tweet at FyreTV asking:  "Did you guys just merge with Amazon?"  (*Id.*).

The likelihood of confusion should have come as no surprise to Amazon.  Amazon knew of the WREAL's marks at the time it was deciding on the name of Fire TV.  (*See* Dkt. No. 10,

Amazon's Answer at ¶ 47, wherein Amazon "admits that it knew of the Fyre TV and FyreTV.com marks at the time Amazon was deciding on the name of the Amazon Fire TV …").

In addition, if Amazon kept with its past practice, Amazon would have tried to register www.firetv.com, and learned that the marks FyreTV and FyreTV.com were already in use by WREAL.  After all, to ensure that users who search for its products know where to purchase them, Amazon typically registers the domain name for products produced under its Amazon brand.  For example, the website www.kindle.com redirects users to the product page for Amazon's Kindle e-reader.  Likewise, www.kindlefire.com redirects to the product page for Amazon's Kindle Fire tablet, and www.kindlepaperwhite.com redirects consumers to the product page for Amazon's e-reader with a built-in light.  In this case, the domain name www.firetv.com would have directed Amazon, and consumers, to the website of FyreTV, thus showing that the marks were in use by Plaintiff WREAL.

As a result of Amazon's sheer size and marketing ability, the vast majority of consumers will only come to associate the Fire TV name with Amazon, not WREAL, stripping WREAL of the brand and identity it worked tirelessly to build.  WREAL is now forced to ask this Court for injunctive relief to prevent this inevitable and unjust outcome, which will irreparably harm WREAL.

## III.   <u>ARGUMENT</u>

The Lanham Act authorizes injunctions in trademark infringement cases.  15 U.S.C. § 1116(a).  A plaintiff seeking a preliminary injunction must demonstrate (1) a substantial likelihood of success on the merits; (2) irreparable harm should the injunction not be granted; (3) that the threatened injury to the plaintiff outweighs any potential harm to the defendant; and (4)

that granting the injunction would not be adverse to the public interest.  *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 9 F. Supp. 2d 1347, 1352-53 (S.D. Fla. 1998).

### A.     WREAL Has a Substantial Likelihood of Success on the Merits.

To prevail, WREAL must show "(1) that it had prior rights to its mark or name, and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers are likely to confuse the two."  *It's A 10, Inc. v. Beauty Elite Group, Inc.,* 932 F. Supp. 2d 1325, 1330 (S.D. Fla. 2013) (quoting *Lone Star Steakhouse & Saloon v. Longhorn Steaks,* 106 F.3d 355, 358 (11th Cir. 1997)).

This case involves <u>reverse</u> <u>confusion</u>, which occurs when a <u>large</u> <u>junior</u> user, like Amazon, saturates the market with a brand name that is similar or identical to the mark of a <u>smaller</u> <u>senior</u> user, like WREAL.  *TV Land, L.P., v. Viacom Int'l, Inc.*, 908 F. Supp. 543, 550 (N.D.Ill. 1995).  "In reverse confusion, the mark's rightful owner is injured because the public assumes that the owner is somehow affiliated with the larger company or that the owner is actually the infringer."  *Stuart J. Kaufman, M.D. & Assoc., P.A. v. Bausch & Lomb Inc.*, 2013 WL 6154166 *6 (M.D.Fla. July 25, 2013) (citing *Sands, Taylor & Wood Co v. Quaker Oats Co.*, 978 F. 2d 947, 957 (7th Cir. 1992)).  "In such a case … [t]he result is that the senior user loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets."  *TV Land, L.P.*, 908 F. Supp. at 550.  "'[T]he reverse confusion doctrine is presumed to apply in the Eleventh Circuit' under binding Fifth Circuit precedent."  *Stuart J. Kaufman, M.D. & Assoc., P.A.*, 2013 WL 6154166 at *6.

### 1.     WREAL Owns and Can Protect the FyreTV and FyreTV.com Marks.

As discussed above, WREAL owns Federal Registration No. 3517534 for the FyreTV mark and Federal Registration No. 3517535 for the FyreTV.com mark.  This is "*prima facie*

evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate." 15 U.S.C. § 1057(b).[2]

In addition, WREAL has used the marks continuously in commerce in association with its video streaming service. For years, WREAL has been delivering its FyreTV video streaming service to consumers on various platforms, including its own STB.

And the Lanham Act provides that a mark may be declared "incontestable" after it has been registered for five years, and the holder provides an affidavit required under 15 U.S.C. § 1065(3). WREAL met these requirements. (*See* R. Franco Decl. at ¶ 13, Ex. E). This means that the validity, ownership, and WREAL's exclusive right to use are conclusive, and subject only to the limited affirmative defenses provided by the Lanham Act, none of which are applicable here. 15 U.S.C. § 1115(b). Accordingly, WREAL has conclusively established the first element of a trademark infringement claim.

### 2.    Amazon's Use of WREAL's Marks is Likely to Cause Consumer Confusion.

In the Eleventh Circuit, seven factors are analyzed to determine likelihood of confusion: "(1) the strength of the plaintiff's mark; (2) the similarity between the two marks; (3) the similarity of the product or service; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent in using a trademark that is similar to the plaintiff's trademark; and (7) consumers' actual confusion." *Ryder Sys., Inc. v. Storage & Moving Servs., Inc.*, 2013 WL 3873231 (S.D. Fla. July 25, 2013). "These factors 'are not rigidly

---

[2]  The FyreTV® and FyreTV.com®  marks can be used for "[b]roadcasting services and provision of telecommunication access to video and audio content provided via a video-on-demand service via the internet; communications services, namely, transmitting streamed sound and audio-visual recordings via the internet; streaming of video materials on the internet . . . ."

weighed and are merely a guide for the Court to focus on the basic question: likelihood of confusion.'" *Ryder*, 2013 WL 3873231 at *5 (quoting *Mont. Prof'l Sports, LLC v. Leisure Sports Mgmt., Inc.*, 422 F. Supp. 2d 1271, 1278 (M.D. Fla. 2006) (internal citation omitted)); *see also Citibank N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1547-48 (11th Cir. 1984) ("[A] plaintiff need not show all, or even most, of the factors … in any particular case to be successful.").

This is a reverse confusion case, which differs from forward confusion.  Thus, courts in reverse confusion cases apply these factors to determine likelihood of confusion differently. *See, e.g., Fisons Horticulture, Inc. v. Vigoro Indus. Inc.*, 30 F.3d 466, 479–80 (3d Cir. 1994) (recognizing modification to the Third Circuit's ten factor test for likelihood of confusion is necessary in a reverse confusion case); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F. 2d at 960–61  (modifying the analysis of the factors used to determine likelihood of confusion in a reverse confusion case).   In reverse confusion cases, the most important factors are the type or strength of the mark, the similarity of the marks, and the similarity of the products represented by the marks.  *Dreamwerks Prod. Group., Inc. v. SKG Studio,* 142 F.3d 1127, 1130 (9th Cir. 1998) (reversing summary judgment in a reverse confusion case).   In this case, an analysis of these factors shows an overwhelming likelihood of confusion.

a.     ***Strength of the Marks***

In analyzing the strength of the marks, courts examine the type of mark at issue to determine "whether it is strong or weak." *Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999).   Stronger marks receive greater trademark protection.  *Id.* Marks are placed into one of four categories, from weakest to strongest: "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary." *Id.*   Arbitrary marks are those that "bear no relationship to the product (e.g., 'Sun Bank' is arbitrary when applied to banking services) …

10

[and] are the strongest of the four categories." *Id.* at 1335-36 (internal citations omitted).

In addition, courts look at whether third parties use the mark. *Id.* at 1336. "The less that third parties use the mark, the stronger it is, and the more protection it deserves." *Id.* (*citing John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 974-75 (11th Cir. 1983)).

Courts also look to whether the mark is "incontestable." *Id.* If a mark has been declared "incontestable," it is presumed to be a "relatively strong mark." *See Dieter v. B & H Indus. of Sw. Fla., Inc.,*, 880 F.2d at 329 (11th Cir. 1989).

In reverse confusion cases, courts focus on the strength of the mark "in terms of its association with the ***junior*** user's goods." *Sands, Taylor & Wood Co.*, 978 F. 2d at 959 (emphasis added); *see also Dreamwerks,* 142 F.3d at 1130 n.5 ("In a reverse confusion case, however, we must focus on the strength of the *junior* user's mark.") (emphasis in the original). In *Dreamwerks*, the plaintiff, a small organizer of Star Trek conventions, was the senior user of the mark "Dreamwerks," a name later used by the major film studio Dreamworks SKG. *Id.* at 1128-29. In that case, the concern was that "convention-goers will think DreamWorks SKG" was sponsoring the plaintiff's Star Trek conventions. *Id*. at 1130 n.5. Thus, "the greater the power of [the junior user's] mark in the marketplace, the more likely it is to capture the minds of [the senior user's] customers." *Id.*

In our case, WREAL's concern is that consumers will think that its FyreTV product is somehow associated with Amazon, or that WREAL will be seen as the infringer. (R. Franco Decl. ¶ 32.) Thus, the greater the power of Amazon's mark in the marketplace, "the more likely it is to capture the minds" of WREAL's customers and potential customers. *Dreamwerks,* 142 F.3d at 1130 n.5. Indeed, "in a reverse confusion case, the relatively greater strength of a junior user like [Amazon] may hurt, rather than help, its defense." *Attrezzi, LLC v. Maytag Corp.*, 436

11

F.3d 32, 40 (1st Cir. 2006) (citing *A&H Sportswear,* 237 F.3d at 230–31).

      i.        *Amazon's Use of Fire TV in Connection With its Own Strong Housemark Increases the Likelihood of Confusion.*

      Amazon's trademark and trade name have become household names. According to one analyst, Amazon is the largest online retailer in the United States and eleventh largest retailer overall. (*See* NRF's Top 100 Retailers 2013 attached as Exhibit "13"). The Amazon.com mark is arbitrary, just like FyreTV, deserving strong protection. In addition, Plaintiff is not aware of any third party use of the Amazon.com mark in its industry, and Amazon.com is an incontestable federally registered trademark.

      What is more, here Amazon has chosen to "aggravate, rather than mitigate" the confusion it caused by its illegal use of the Fire TV name by consistently using it in conjunction with its Amazon housemark. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 230 (3d Cir. 2000) (explaining in a reverse confusion case that the junior user's use of the word "miracle" exclusively with Victoria's Secret reinforces the association between the two); *see also Attrezzi,* 436 F.3d at 42 (affirming that junior user's use of the Jenn-Air mark in conjunction with the senior user's Attrezzi mark weighed in favor of a finding of a likelihood of confusion).

      The danger here is that consumers who are first exposed to Amazon's Fire TV, which will be the vast majority of them given Amazon's saturation of the market, will conclude that WREAL's FyreTV is either made by Amazon, somehow related to Amazon, or infringing on Amazon's name. In *Tanel Corp. v. Reebok Int'l, Ltd.,* 774 F. Supp. 49 (D. Mass. 1990), the plaintiff was the senior user of the registered trademark "360°" for shoes. *Id.* Defendant Reebok was the junior user, and was a "much larger and longer established enterprise than Tanel." *Id.* at 56. Reebok was "one of the best known names to potential purchasers of footwear," like Amazon is one of the best known names in retail and streaming video services. *Id.* The *Tanel*

court, in evaluating the strength of the mark, looked to Reebok's use of the mark, and held that Reebok's use of the 360° mark had the potential to confuse consumers that first see Tanel's products into believing that Tanel is affiliated with Reebok, warranting an injunction. *Id.* For the same reasons, this factor favors a finding of a likelihood of confusion in this case.

> ii.     *WREAL's FyreTV and FyreTV.com Marks are Strong and Protectable.*

Though WREAL is not nearly as well-known as Amazon, its marks are also very strong. FyreTV and FyreTV.com are arbitrary marks.  "Arbitrary marks comprise those words, symbols, pictures, etc., that are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services."  2 McCarthy on Trademarks and Unfair Competition § 11:11 (4th ed.).  The FyreTV and FyreTV.com marks both contain a stylized version of the word "fire," which is a commonly used word that does not describe WREAL's service and does not suggest a quality or characteristic of the service.  Just like "'Sun Bank' is arbitrary when applied to banking services," FyreTV is arbitrary when applied to streaming video services.  *Frehling,* 192 F.3d at 1335 (internal citations omitted).

There is no significant third-party use of FyreTV, FyreTV.com, or any similarly sounding name, other than Amazon's infringing use of Fire TV, of course.  (R. Franco Decl. ¶ 26). "Where there is a lack of third-party use, the mark's strength is enhanced, as it is more distinctive, and therefore more easily recognized by consumers."  *Frehling,* 192 F.3d at 1336.

Finally, as explained above, WREAL's FyreTV and FyreTV.com marks have both been registered with the USPTO for over six years, and have been declared incontestable.   The fact that the marks are incontestable "serves to enhance [their] strength."  *Frehling,* 192 F.3d at 1336.

In sum, WREAL's FyreTV and FyreTV.com marks are strong because they are arbitrary, registered with the USPTO and incontestable, and not in use by third parties, other than Amazon. Unfortunately, consumers will associate the name with Amazon, due to Amazon's massive advertising campaign, superior marketing power, use of its housemark next to the name, and dominant marketplace recognition.  Accordingly, this critical factor in a reverse confusion case weighs heavily in favor of a finding of a likelihood of confusion.

### b. *Fire TV is Confusingly Similar to FyreTV and FyreTV.com.*

Courts also look to the similarity of the marks, and give this factor stronger weight in a reverse confusion case.  *Dreamwerks,* 142 F.3d at 1130 n.5; *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 167 F. Supp. 2d 770, 800 (E.D.Penn. 2001) ("When highly similar marks are used on directly competing goods, a court may evaluate the likelihood of confusion based on the similarity of the marks alone.").

In analyzing this factor, "the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used."  *Frehling Enters.,* 192 F.3d at 1337.  The marks do not need to be identical.  *See Wash. Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 33 F. Supp. 2d 488, 497 (E.D. Va. 1999), aff'd, 217 F.3d 843 (4th Cir. 2000) ("[A]bsolute identity is not necessary for infringement; all that is necessary is enough similarity between the marks to confuse consumers."); *see also Shields v. Zuccarini,* 254 F.3d 476, 483 (3d Cir. 2001) (finding that internet domain names were confusingly similar, where defendant's domain names "closely resemble[d]" plaintiff's, and differed only because they contained "a few additional or deleted letters, or ... rearrang[ed] the order of the words.").  "[W]ords of similar origins on similar products" are sufficient to establish a likelihood of confusion.  *Mystique, Inc., v. 138 Intern., Inc.*, 601 F. Supp. 2d 1320, 1325 (S.D.

Fla. 2009) (finding likelihood of confusion as a matter of law and granting summary judgment in a trademark cancelation claim).  When, like here, "both sides claim usage of the same word," the similarity is "even more striking" and "likelihood of confusion is apparent."  *Id.*

In *Dreamwerks*, the court compared the senior user's "Dreamwerks" mark with the junior user's "DreamWorks" mark.  The court noted that "[s]ight, sound and meaning is easy."  142 F.3d at 1131.  "There is perfect similarity of sound, since 'Dreamwerks' and 'DreamWorks' are pronounced the same way."  *Id.*  "Moreover, a perceptive consumer who does notice the 'e' and lower-case 'w' in Dreamwerks might shrug off the difference as an intentional modification identifying an ancillary division of the same company."  *Id.*  The court then held that "[w]hile we recognize that spelling matters, we're not sure substituting one vowel for another and capitalizing a middle consonant dispels the similarity between the marks."  *Id.*

In our case, the similarities are even more striking than in *Dreamwerks*.  The mark "FyreTV" and the name "Fire TV" are phonetically identical.  In effect, WREAL and Amazon both make use of the same word, "Fire," in conjunction with "TV" to describe a similar product. Moreover, as one court explained, "trademarks, like small children, are not only seen but heard." *Grotrian v. Steinway & Sons,* 523 F.2d 1331 (2d Cir. 1975).  Here, there is "perfect similarity of sound."  *Dreamwerks,* 142 F.3d at 1131.  FyreTV and Fire TV are pronounced the exact same way. And, the marks share visual similarities.  Amazon and WREAL both use colors that are closely associated with fire – red for WREAL, and orange for Amazon.

Indeed, the marks are confusingly similar.  As in *Dreamwerks*, a perceptive consumer who does notice the "y" and no space between the "e" and the "T" in "FyreTV" might shrug off the difference as an intentional modification identifying an ancillary division of the same company that uses the name "Fire TV" with an "i"  and a space between the "e" and "T."  Or

15

worse, consumers might mistakenly assume that WREAL is an infringer who decided to ride the

coattails of Amazon's release of "Fire TV."  Accordingly, the similarity in the marks also favors

a finding that consumer confusion is likely.

### c.      *Fire TV and FyreTV are Nearly Identical Products.*

"The greater the similarity between the products and services, the greater the likelihood

of confusion."  *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.,* 756 F.2d 1525,

1530 (11th Cir. 1985).  "This factor requires a determination as to whether the products are the

kind that the public attributes to a single source, not whether or not the purchasing public can

readily distinguish between the products of the respective parties."  *Frehling*, 192 F.3d at 1338

(citing *E. Remy Martin*, 756 F.2d at 1530); *TV Land, L.P. v. Viacom Int'l, Inc.*, 908 F. Supp. 543,

551 (N.D.Ill. 1995) ("'[T]he rights of an owner of a registered trademark … extend to any goods

related in the minds of consumers in the sense that a single producer is likely to put out both

goods.'").  For example, the fact that consumers can readily distinguish between wine and

brandy was not relevant to this factor, as the products were related enough that consumers could

attribute them to a common source.  *E. Remy Martin,* 756 F.2d at 1530; *see also Plus Prods. v.*

*Plus Disc. Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir. 1983) (finding reverse confusion and stating

that "related but non-competing products can become associated in consumers' minds").

In *Dreamwerks*, 142 F.3d at 1131, the court noted that "Dreamwerks has carved out a

narrow niche in the entertainment market-place, while DreamWorks controls a much broader

segment."  "Dreamwerks targets trekkies; DreamWorks targets everyone."  *Id.*  Yet the court

held that because entertainment studios like DreamWorks control all sorts of related industries,

"it's easy for customers to suspect DreamWorks of sponsoring conventions at which

merchandise is sold."  *Id.*  Thus, although DreamWorks may have no plans to sponsor

16

conventions, "[p]eople attending Dreamwerks conventions … could easily assume that DreamWorks has spun off a Star Trek marketing division." *Id.* at 1132 n. 10.

Again, the similarities in this case are even more striking than in *Dreamwerks*. The primary functions of FyreTV and Fire TV are exactly the same – they are both services that provide streaming video over the internet.

The similarities are illustrated by the way WREAL and Amazon market their respective services.  Amazon boasts that its Fire TV allows for "instant access to over 200,000 TV episodes and movies, plus all your favorite subscription and streaming services…" and informs consumers: "you can watch what you want, when you want." (*See* Exhibit "14").  FyreTV advertises that its service allows consumers to "watch over 17,000" movies, "anywhere, anytime." (*See* R. Franco Decl. ¶ 13, Ex. D).  And, like Amazon, FyreTV provides subscription services, allowing unlimited viewing of some content, and the ability to purchase individual movies.  *Id.*  Moreover, FyreTV's service is available through its own proprietary STB which provides instant access to a library of streaming video services, just like Amazon's STB.

In fact, it is far more difficult to identify ways in which Amazon's Fire TV and WREAL's FyreTV are dissimilar.  Obviously, Amazon offers a much larger selection of content on its illegally named Fire TV.  And it is likely that consumers can readily distinguish the content typically streamed by FyreTV from the content *typically* streamed over Amazon's Fire TV, just like a consumer can readily taste the difference between wine and brandy.  *E. Remy Martin,* 756 F.2d at 1530.  But the issue is not whether the products are identical.  It is whether the products are related enough such that they can be attributed to the same source.  *Id.*  Given the overwhelming similarities between the two products, that is the case here.  *See Frehling Enters., Inc.,* 192 F.3d at 1338 (upholding injunction where lower court found that consumers

could attribute makers of high-end furniture and ready-to-assemble furniture to the same source); *see also AutoZone, Inc. v. Strick,* 543 F.3d 923, 931 (7th Cir. 2008) (auto parts store and provider of car wash and oil change services could be attributed to the same source).[3]

Moreover, Amazon's Fire TV can be used by consumers to stream adult content, including non-exclusive content that is available from both WREAL and its competitors.  (R. Franco Decl. ¶ 30).  This can be done using the "screen mirroring" feature of Amazon's Fire TV, which Amazon prominently advertises.  (*See* Exhibit "15").  And Amazon has a selection of pornography available to stream on Fire TV, directly from Amazon.  (*See* Composite Exhibit "7").

In sum, as demonstrated by the tweet directed at FyreTV's Twitter account, asking: "Did you guys just merge with Amazon?", given that Amazon's Fire TV is designed to stream video content, and can be used to stream adult content, people using or hearing about WREAL's FyreTV and FyreTV.com could easily assume that Amazon has spun off an adult-content only video streaming service.

### d.   *The Parties Share Similar Retail Outlets, Trade Channels, Customers, and Advertising Media.*

When considering these factors to determine the likelihood of confusion, courts look at "how and to whom" the respective products and services are sold, and the type of advertising media used to promote the products.  *See* McCarthy on Trademarks and Unfair Competition §

---

[3]  The Court should also consider the extremely diverse nature of Amazon's business in determining whether consumers may attribute the products to the same source. *See CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 678 (7th Cir. 2001) (in a forward confusion case, taking into account the diverse nature of the plaintiff's products and services in determining whether consumers are likely to attribute to a common source).  In a reverse confusion case like this one, it follows that where the harm is that consumers will attribute WREAL's service as coming from Amazon, the diverse nature of Amazon's product and services is relevant.  Amazon sells just about *everything*, including consumer electronics and pornography.

24:51.  (4th Ed. 2006).  Here, Amazon and WREAL market their products primarily on the internet.  (R. Franco Decl. ¶ 19).  The only material difference between WREAL's FyreTV and Amazon's Fire TV is the range of content offered by each.  Naturally, it follows that there is some overlap in their respective retail outlets, trade channels, and advertising media.  Both advertise or have advertised their products on TV, and on the same television stations.  Further, the products are similarly priced, and there is significant overlap in WREAL and Amazon's respective target markets.  (R. Franco Decl. ¶ 28).  Amazon and WREAL both offer subscription-based and *a la carte* purchases.  And while Amazon's market is certainly broader than WREAL's at the moment, there is substantial overlap.  In fact, given that Amazon's Fire TV is a mass-market product, all FyreTV users are part of Amazon's target market.

These similarities are more than sufficient to establish a likelihood of confusion.  In *Imperial Toy Corp. v. Ty, Inc.,* No. 97-C-8895, 1998 WL 601875 at *6 (N.D. Ill. Sept. 9 1998), the court found that despite the fact that the senior and junior user targeted largely different retail stores, because there was "some overlap" in the sales of the product, the factor tipped in favor of the senior user.  1998 WL 601875 at *4.  The court found an overlap in sales because both companies "advertise on the internet," use the mark in a similar manner, the products were similarly priced, and the market for the products was similar.  *Id.*  Accordingly, this factor weighs in favor of a finding of a likelihood of confusion.

e. ***Amazon Intentionally Ignored WREAL's rights.***

In a typical trademark infringement case, an infringer acts with bad intent if it used the plaintiff's mark "with the intention of deriving a benefit from the plaintiff's business reputation."  *Frehling,* 192 F.3d at 1340.  That standard does not apply in reverse confusion cases, however, because "the junior user is not trying to take a free ride on the reputation of the senior user's mark…."  2 McCarthy on Trademarks and Unfair Competition § 23:10 (4th Ed.).  Instead, "the

19

appropriate intent inquiry is whether defendant acted carelessly or otherwise culpably in selecting the allegedly infringing name." *Altira Group LLC v. Philip Morris Companies Inc.*, 207 F. Supp. 2d 1193, 1199 (D. Colo. 2002).

This factor also weighs in WREAL's favor because Amazon did not just act carelessly; it intentionally ignored WREAL's rights. In *Imperial Toy Corp. v. Ty, Inc.,* No. 97-C-8895, 1998 WL 601875 at *6 (N.D. Ill. 1998), the court granted the senior user's motion for a preliminary injunction, noting that Ty, Inc. was aware of Imperial's use of the name, but "ignored Imperial's senior rights to the mark." *Id.* at *6. Accordingly, the Imperial court found that the intent factor "weighs in favor of Imperial." *Id.* Like Ty, Inc., Amazon knew that WREAL owned the rights to use the FyreTV and FyreTV.com marks, but decided upon the confusingly similar Fire TV name anyway. (Amazon's Answer ¶ 47).

###        f.        *There is Already Evidence of Actual Consumer Confusion.*

As explained by this Court, "[t]he law is well settled in this circuit that evidence of actual confusion between trademarks is not necessary to a finding of likelihood of confusion." *TracFone Wireless, Inc. v. Cabrera,* 883 F. Supp.2d 1220, 1226 (S.D. Fla. 2012) (Lenard, J.)*; see also TV Land, L.P. v. Viacom Intern.,* 908 F. Supp. 543, 553 (N.D. Ill. 1995) (issuing an injunction in a reverse confusion case despite an absence of actual confusion in the marketplace). Indeed, "[a]ctual confusion by a few is evidence of likelihood of confusion by many." *Ryder*, 2013 WL 3873231 at *6. And, although there is already significant evidence of actual confusion in this case, "marshalling evidence of actual confusion is often difficult…" in reverse confusion cases. *A&H Sportswear,* 237 F.3d at 233. That is because in a reverse confusion case, the question is "whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *Dreamwerks,* 142 F.3d at 1130. Thus, a consumer

confused by Amazon's infringement would not necessarily contact WREAL.  *See Trovan, Ltd. v. Pfizer, Inc.,* No. CV-98-00094 LGB MCX, 2000 WL 709149 at *20 (C.D. Cal. May 24, 2000) (in a reverse confusion case, confused consumers would likely contact the junior user, not the senior user).

Moreover, when the infringement has not been going on for a long time, marshalling evidence of actual confusion is even more difficult.  *See Alliance Bank v. New Century Bank,* 742 F. Supp. 2d 532, 560, 563 (E.D. Pa. 2010) (granting preliminary injunction, and giving no weight to the fact that there was no evidence of consumer confusion in the "few months" of concurrent use because "not enough time has elapsed during which both marks were used.") Amazon began using the Fire TV name a "few months" ago, on April 2, 2014.  *Id.*

However, evidence of actual confusion does exist and this factor weighs heavily in favor of a finding of a likelihood of confusion.  Indeed, "the fact that there has been even one case of actual confusion must be looked upon as convincing evidence that there is a likelihood of confusion."  *Council of Better Bus. Bureaus, Inc v. Better Bus. Bureau of S. Fla., Inc,* 200 U.S.P.Q. 282 (S.D. Fla. 1978); s*ee also Safeway Stores, Inc. v. Safeway Disc. Drugs, Inc.*, 675 F.2d 1160, 216 U.S.P.Q. 599 (11th Cir. 1982) (one misdirected letter to plaintiff from a creditor of defendant and one customer enquiry held "worthy of some consideration"); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1089-90 (7th Cir. 1988) ("[W]hile likelihood of confusion 'can be proven without any evidence of actual confusion, such evidence if available, is entitled to substantial weight.'") (quoting  *Helene Curtis Industries, Inc. v. Church and Dwight Co., Inc.,* 560 F.2d 1325, 1330 (7th Cir. 1977)).  "[A]n almost overwhelming amount of proof would be necessary to refute..." even very little proof of actual

confusion.  *World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir. 1971).

Here, there is already significant evidence that consumers are confused by Amazon's illegally named Fire TV product, even though the product just recently launched.  In fact, consumers were likely confused the moment that they entered the URL www.firetv.com to learn more about Amazon's new product, just as those who would visit www.kindle.com to learn about Amazon's e-reader, or www.kindlefire.com to learn about Amazon's tablet.  Any consumer that searched for Amazon's new product or went to the URL that they mistakenly believed was for Amazon's Fire TV likely saw WREAL's FyreTV.

Given the obvious similarities of the marks as well as the products that they represent, it is not surprising that evidence of actual confusion appeared almost immediately on the internet.  The same day that Amazon launched its product, CNBC noted that Amazon's Fire TV "shares a name" with WREAL's FyreTV.  (*See* Exhibit "10").  A number of users took to Twitter to either express their actual confusion, or to point out the likelihood that others will be confused due to the nearly identical names.[4]  (*See* Exhibit "12").  One directed a tweet at FyreTV's Twitter account, asking: "Did you guys just merge with Amazon?"  (*See* Exhibit "16")  And, apparently unable to shake the association between Amazon and Fire TV even right after launch, one author questioned whether WREAL "[was] clever enough to imagine that Amazon would  be launching its Fire TV."  (*See* Exhibit "11").  This snapshot of actual confusion came immediately after Amazon launched its Fire TV, and is a perfect example of what to expect going forward if Amazon is allowed to continue its infringement on WREAL's marks.

---

[4] "The proper test is 'likelihood of confusion,' and the likely confusion may be on the part of observers, donees, or second-hand purchasers."  *Rolex Watch U.S.A., Inc. v. Forrester*, 2 U.S.P.Q.2d 1292 (S.D. Fla. 1986).

The online reaction to Amazon's illegally named Fire TV product is both evidence of actual confusion and "indicative of potential consumer confusion." *You Fit, Inc. v. Pleasanton Fitness, LLC,* No. 8:12-CV-1917-T-27EAJ, 2013 WL 521784 at *5 (M.D. Fla. Feb. 11, 2013). In *You Fit*, the court granted a preliminary injunction in a trademark infringement case where evidence of actual confusion was derived from anonymous internet postings. *Id.* at *4-5.

In sum, within days of launch, actual consumer confusion was evident. This is remarkable, as typically reverse confusion takes time to develop – the infringing junior user must sufficiently saturate the marketplace so that consumers associate it with the mark, rather than the senior user, who has the exclusive right to use the mark. Amazon's size and marketing power created an instant association between Amazon and Fire TV, confusing consumers. In all likelihood, that confusion will only increase, absent injunctive relief from this Court.

**B.** <u>**WREAL Will Suffer Irreparable Harm Absent an Injunction.**</u>

Because there is a strong likelihood of consumer confusion, it follows that WREAL will be irreparably harmed by that confusion. *See Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.,* 889 F.2d 1018, 1029 (11th Cir. 1989) (citation omitted) (recognizing a presumption of irreparable harm in trademark infringement cases where there is a substantial likelihood of consumer confusion). Indeed, the Eleventh Circuit noted that "a sufficiently strong showing of likelihood of confusion may by itself constitute a showing of substantial likelihood of prevailing on the merits and/or a substantial threat of irreparable harm." *E. Remy Martin,* 756 F.2d at 1530.[5]

---

[5] The Eleventh Circuit recognized that the presumption of irreparable harm in trademark infringement cases has been called into question by the U.S. Supreme Court's patent law decision questioning the same presumption. *N. Am. Medical Corp. v. Axiom Worldwide, Inc.,* 522 F.3d 1211, 1227 (11th Cir. 2008) *citing eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 126 S. Ct. 1837 (2006). The *Axiom* court left open the possibility that a presumption of irreparable harm may be appropriate in particular circumstances. *Id.* at 1228.

Moreover, in reverse confusion cases, the harm stems from the ability of the junior user, Amazon, to saturate the market and overwhelm WREAL. *Ameritech, Inc. v. Am. Info. Techs. Corp.,* 811 F.2d 960, 964 (6th Cir. 1987). As a result, WREAL will lose "the value of [its] trademark[s] – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Id.* Indeed, "where a plaintiff has demonstrated that it will lose control of its reputation as a result of a defendant's activities, a finding of irreparable injury is virtually always made." *Gaffigan v. Does 1-10*, 689 F. Supp. 2d 1332, 1341 (S.D. Fla. 2010).

This is already happening. Amazon launched its product with great fanfare, prominently featuring its infringing product on its home page the day it was launched and then advertising its Fire TV product prominently, at the top right of its home page, directly below the spot where users must click to sign in to their accounts. (*See* Exhibit "17"). This ensured that nearly all of Amazon's approximately 80 million monthly unique US visitors are exposed to its product, which, as always, is advertised in conjunction with Amazon's housemark. And Amazon's launch was accompanied by a deluge of traditional advertising.

The consumer confusion caused by Amazon's infringement of the FyreTV marks will make it difficult for WREAL to acquire new customers, who may balk at investing their time and money in WREAL's service. (R. Franco Decl. ¶ 36). And, WREAL faces the risk that it will be unable to continue to contract with content providers. (R. Franco Decl. ¶ 32). As WREAL's brand becomes more and more associated with Amazon, content providers may come to view WREAL as infringing on Amazon, when the opposite is true. (R. Franco Decl. ¶ 32). Understandably, those companies may be skittish on doing business with a company that has a reputation for trademark infringement – albeit an undeserved one. (R. Franco Decl. ¶ 32).

24

WREAL should not be forced to repeatedly explain that they called their product FyreTV years before Amazon decided to do the same.  But that is exactly what will happen, absent an injunction.

  **C.**  **The Balance of the Hardships Tips Strongly in Favor of WREAL.**

  As explained in Section B *supra,* WREAL will suffer severe, irreparable harm absent an injunction.  By comparison, Amazon will suffer no harm, because it has no right to use WREAL's marks.  *Chanel, Inc. v. chanel255.org,* No. 12-21762-CIV, 2012 WL 1941598 at *6 (S.D. Fla. May 29, 2012) (finding that there is no legitimate hardship to a defendant that is enjoined from using marks that it has no legal right to use).

  **D.**  **The Public has a Strong Interest in Stopping Consumer Confusion.**

  It is well-established that it is in "the public's interest in avoiding unnecessary confusion." *Angel Flight of Ga. v. Angel Flight Am., Inc.,* 522 F.3d 1200, 1209 (11th Cir. 2008); *see also Davidoff & Cie, S.A. v. PLD Int'l Corp.,* 263 F.3d 1297, 1304 (11th Cir. 2001) (finding that an injunction was "not adverse to the public interest, because the public interest is served by preventing consumer confusion in the marketplace").  Because it is likely that the public will be confused, it follows that the public interest will be served by a preliminary injunction preventing that confusion. *See It's A 10,* 932 F. Supp. 2d at 1333 (concluding that the public will be served by an injunction based on its finding of a likelihood of confusion).

  **E.**  **The Court Should Require a Minimal Bond Upon Issuance of an Injunction.**

  Rule 65(c) requires the Court to consider what security should be required in the event that the injunction is overturned.  "The amount of an injunction bond is within the sound discretion of the district court." *Caillon Importers, Ltd. v. Frank Pesce Itn'l Group, Ltd.*, 112 F.3d 1125, 1127 (11th Cir. 1997) (holding that the trial court "may elect to require no security at all.").

In this case, Amazon adopted and used WREAL's registered trademark with full knowledge of WREAL's prior rights.  Thus, "[t]he requested restraint would only protect Plaintiff's rights and would not harm Defendant."  *Ryder*, 2013 WL 3783231 at *8 (granting preliminary injunction in a trademark infringement case, and requiring that the plaintiff post a $5,000 bond as security); *see also Nailtiques Cosmetic Corp. v. Salon Sciences, Corp.*, 41 U.S.P.Q. 1995 (S.D. Fla. 1997) (requiring $10,000 bond in trademark infringement case). Accordingly, if any bond is appropriate in this case, it should be nominal.

**IV.**   **CONCLUSION**

Based on the foregoing, WREAL respectfully asks that this Court issue a preliminary injunction in this case enjoining Amazon from using the Fire TV name.

Respectfully submitted,

WNF LAW, P.L.
*Attorneys for WREAL, LLC*
1111 Brickell Avenue Suite 2200
Miami, Florida 33131
Phone: (305) 760-8500 / Fax: (305) 760-8510

By: */s/  Carlos Nunez-Vivas*
        Carlos Nunez-Vivas  (FL. Bar No.: 128181)
        can@wnflaw.com
        Daniel Foodman (FL. Bar No.: 337160)
        df@wnflaw.com
        Dennis J. Wouters (FL. Bar No.: 28692)
        djw@wnflaw.com
        John G. Marfoe (FL. Bar No.: 101535)
        jgm@wnflaw.com

## CERTIFICATE OF SERVICE

I certify that on September 22, 2014, this document was served by transmission of a

Notice of Filing generated by CM/ECF upon the following:

| | |
|---|---|
| Justin A. Nelson, Esq. | Jamie Z. Isani, Esq. |
| Drew D. Hansen, Esq. | Shannon Shaw, Esq. |
| Patrick C. Bageant, Esq. | *Co-counsel for Defendant* |
| *Co-counsel for Defendant* | Hunton & Williams LLP |
| Susman Godfrey L.L.P. | 1111 Brickell Avenue |
| 1201 Third Avenue | Suite 2500 |
| Suite 3800 | Miami, FL 33131 |
| Seattle, WA 98101 | Tel. 305-810-2500 |
| Tel. 206-516-3880 | Fax 305-810-2460 |
| Fax 206-516-3883 | jisani@hunton.com |
| jnelson@susmangodfrey.com | sshaw@hunton.com |
| dhansen@susmangodfrey.com | |
| pbageant@susmangodfrey.com | |

   */s/  Carlos Nunez-Vivas*

27