REDACTED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 1:14-cv-21385-JAL

WREAL, LLC, a Florida Limited Liability
Company,

      Plaintiff,

v.

AMAZON.COM, INC., a Delaware
corporation,

      Defendant.

JURY TRIAL DEMANDED

**RESPONSE OF AMAZON.COM, INC. TO WREAL, LLC'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

# CONTENTS

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS .........................................................................................2

    A.    WREAL, FyreTV, and the BoXXX........................................................2

    B.    Amazon, Amazon Instant Video and Prime Instant Video, and the "Fire" Family of Multimedia Products ...................................................6

ARGUMENT ...............................................................................................................7

    A.    WREAL Has No Substantial Likelihood of Success on the Merits........................8

        1.    Similarity of marks ...............................................................9

        2.    Distinctiveness of mark.......................................................11

        3.    Similarity of products .........................................................12

        4.    Similarity of sales outlets and customer base ...............................17

        5.    Similarity of advertising .....................................................17

        6.    Intent .................................................................................18

        7.    Actual confusion .................................................................19

    B.    WREAL Will Not Suffer Irreparable Injury if an Injunction Does Not Issue. ..................................................................................................25

    C.    The Harm to Amazon from an Injunction Far Outweighs the Threatened Injury to WREAL. ...........................................................28

    D.    An Injunction Would Not Serve the Public Interest. ............................29

CONCLUSION.........................................................................................................30

# AUTHORITIES

## Cases

*1-800 Contacts, Inc. v. Lens.com, Inc.,*
    722 F.3d 1229 (10th Cir. 2013) ................................................................. 25

*Alabama v. U.S. Army Corps of Engineers*,
    424 F.3d 1117 (11th Cir. 2005) ................................................................. 25

*All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.*,
    887 F.2d 1535 (11th Cir. 1989) ................................................................... 7

*Altira Group LLC v. Philip Morris Cos. Inc.*,
    207 F. Supp. 2d 1193 (D. Colo. 2002) ...................................................... 19

*Amstar Corp. v. Domino's Pizza, Inc.*,
    615 F.2d 252 (5th Cir. 1980) ............................................................. passim

*Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*,
    522 F.3d 1200 (11th Cir. 2008) ................................................................. 30

*Armstrong Cork Co. v. World Carpets, Inc.*,
    597 F.2d 496 (5th Cir. 1979) ..................................................................... 21

*Autozone, Inc. v. Strick*,
    543 F.3d 923 (7th Cir. 2008) ..................................................................... 16

*AWGI, LLC v. Team Smart Move, LLC*,
    No. 8:12-CV-2257-T-17, 2013 WL 1181450 (M.D. Fla. Mar. 14, 2013) ........................ 10

*Chanel, Inc. v. chanel255.org*,
    No. 12-21762-CIV, 2012 WL 1941598 (S.D. Fla. May 29, 2012) .................................. 29

*Cohn v. Petsmart, Inc.*,
    281 F.3d 837 (9th Cir. 2002) ..................................................................... 12

*CORD: USE Cord Blood Bank, Inc. v. CBR Systems, Inc.*,
    No. 6:11-cv-893-Orl-36, 2012 WL 8745157 (M.D. Fla. Nov. 5, 2012) .......................... 29

*Council of Better Bus. Bureaus, Inc. v. Better Bus. Bureau of S. Fla.*,
    No. 78-937-CIV, 1978 WL 21729 (S.D. Fla. Aug. 22, 1978) ........................................ 23

*Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*,
    508 F.3d 641 (11th Cir. 2007) ................................................................. 8, 9

*D & J Master Clean, Inc. v. Servicemaster Co.*,
    181 F. Supp. 2d 821 (S.D.Ohio 2002) ...................................................... 23

*Davidoff & Cie, S.A. v. PLD Int'l Corp.*,
    263 F.3d 1297 (11th Cir. 2001) ........................................................ 30

*DeCosta v. Viacom Int'l, Inc.*,
    981 F.2d 602 (1st Cir. 1992) ............................................................ 28

*Deltona Transformer Corp. v. Wal-Mart Stores, Inc.*,
    115 F. Supp. 2d 1361 (M.D. Fla. 2000) ............................................ 10

*Dreamwerks Prod. Group, Inc. v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998) ................................................... 11, 15

*E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.*,
    756 F.2d 1525 (11th Cir. 1985) ................................................. 16, 25

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ........................................................................ 25

*First S. Fed. Sav. & Loan Ass'n of Mobile, Ala. v. First S. Sav. & Loan Ass'n of Jackson Cnty.,
Miss.*,
    614 F.2d 71 (5th Cir. 1980) ............................................................. 20

*Freedom Card Inc. v. JPMorgan Chase & Co.*,
    432 F.3d 463 (3d Cir. 2005) ............................................................ 18

*Frehling Enters., Inc. v. Int'l Select Group, Inc.*,
    192 F.3d 1330 (11th Cir. 1999) ..................................................... 8, 16

*Gaffigan v. Does 1-10*,
    689 F. Supp. 2d 1332 (S.D. Fla. 2010) ........................................... 27

*George & Co. LLC v. Imagination Entm't Ltd.*,
    575 F.3d 383 (4th Cir. 2009) ........................................................... 23

*Gidatex, S.r.L. v. Campaniello Imports, Ltd.*,
    13 F. Supp. 2d 417 (S.D.N.Y. 1998) ............................................... 26

*Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*,
    116 F. Supp. 2d 405 (S.D.N.Y. 2000) ............................................ 26

*Imperial Toy Corp. v. Ty, Inc.*,
    No. 97 C 8895, 1998 WL 601875 (N.D. Ill. Sept. 9, 1998) ...................................... 17, 19

*It's A 10, Inc. v. Beauty Elite Group, Inc.*,
    932 F. Supp. 2d 1325 (S.D. Fla. 2013) ........................................... 30

*Land-Cellular Corp. v. Zokaites*,
    463 F. Supp. 2d 1348 (S.D. Fla. 2006) ........................................... 27

*Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc.*,
  No. 00 CIV. 574, 2001 WL 1097865 (S.D.N.Y. 2001) ................................................... 26

*Mystique, Inc. v. 138 Intern., Inc.*,
  601 F. Supp. 2d 1320 (S.D. Fla. 2009) ........................................................................... 11

*New Sensor Corp. v. CE Distribution LLC*,
  303 F. Supp. 2d 304 (E.D.N.Y. 2004) ............................................................................. 9

*North Am. Med. Corp. v. Axiom Worldwide, Inc.*,
  522 F.3d 1211 (11th Cir. 2008) ..................................................................................... 25

*Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
  896 F.2d 1283 (11th Cir. 1990) ..................................................................................... 27

*Parfums de Coeur, Ltd. v. Lory Lazarus*,
  83 U.S.P.Q.2d 1012, 2007 WL 683784 (T.T.A.B. 2007) ................................................ 18

*Ross Bicycles, Inc. v. Cycles USA*,
  765 F.2d 1502 (11th Cir. 1985) ..................................................................................... 13

*Ryder Sys., Inc. v. Storage & Moving Servs., Inc.*,
  No. 13-61366-CIV, 2013 WL 3873231 (S.D. Fla. July 25, 2013) ................................... 23

*Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*,
  675 F.2d 1160 (11th Cir. 1982) ..................................................................................... 23

*Sands, Taylor, & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992) ......................................................................................... 18

*Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*,
  188 F. Supp. 2d 1350 (S.D. Fla. 2002) ........................................................... 2, 19, 25, 26

*Shields v. Zuccarini*,
  254 F.3d 476 (3d Cir. 2001) ........................................................................................... 11

*Squirrel Brand Co. v. Barnard Nut Co.*,
  224 F.2d 840 (5th Cir. 1955) ......................................................................................... 22

*Stokley-Van Camp, Inc. v. Coca-Cola Co.*,
  2 U.S.P.Q.2d 1225 (N.D. Ill. 1987) ................................................................................ 29

*Stuart J. Kaufman, M.D. & Assocs. v. Bausch & Lomb Inc.*,
  No. 8:13-CV-461-T-33, 2013 WL 6154166 (M.D. Fla. Jul. 25, 2013) ........................ 8, 12

*Stuart J. Kaufman, M.D. & Assocs. v. Bausch & Lomb Inc.*,
  No. 8:13-CV-461-T-33, Doc. No. 55 (M.D. Fla. Sept. 4, 2013) ..................................... 12

*Sun Banks of Fla., Inc. v. Sun Federal Savings & Loan Assoc.*,
    651 F.2d 311 (5th Cir. 1981) ................................................................. 10, 20

*Sunenblick v. Harrell*,
    895 F. Supp. 616 (S.D.N.Y. 1995) ............................................................ 13

*Tally-Ho, Inc. v. Coast Community College Dist.*,
    889 F.2d 1018 (11th Cir. 1990) ................................................................. 25

*Tana v. Dantanna's*,
    611 F.3d 767 (11th Cir. 2010) ................................................................... 20

*Tanel Corp. v. Reebok Int'l, Ltd.*,
    774 F. Supp. 49 (D. Mass. 1990) ............................................................... 12

*Tiger Direct, Inc. v. Apple Computer, Inc.*,
    No. 05-21136-CIV, 2005 WL 1458046 (S.D. Fla. May 11, 2005) ........................... passim

*Tracfone Wireless, Inc. v. Cabrera*,
    883 F. Supp. 2d 1220 (S.D. Fla. 2012) ...................................................... 19

*Union Carbide Corp. v. Ever-Ready Inc.*,
    531 F.2d 366 (7th Cir. 1976) .................................................................... 24

*United States v. Jefferson Cnty.*,
    720 F.2d 1511 (11th Cir. 1983) ................................................................... 7

*Universal Money Centers, Inc. v. Am. Tel. & Telegraph Co.*,
    22 F.3d 1527 (10th Cir. 1994) ................................................................... 12

*Welding Servs., Inc. v. Forman*,
    509 F.3d 1351 (11th Cir. 2007) ........................................................... 8, 9, 18

*World Carpets, Inc. v. Dick Littrell's New World Carpets*,
    438 F.2d 482 (5th Cir. 1971) .................................................................... 23

*You Fit, Inc. v. Pleasanton Fitness, LLC*,
    No. 8:12-CV-1917-T-27, 2013 WL 521784 (M.D. Fla. Feb. 11, 2013) ........................ 22

**Treatises**

5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
    § 23:3 (2014) ...................................................................................... 9

5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
    § 23:9 (2014) ..................................................................................... 22

6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
    § 32:174 (2014) .................................................................................. 24

6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
§ 32:188 (2014).................................................................................................. 2, 25

6 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION
§ 32:189 (2014).................................................................................................. 25

## INTRODUCTION

Five months after filing its Complaint, plaintiff WREAL, LLC ("WREAL") suddenly decided it was suffering irreparable harm at the hands of defendant Amazon.com, Inc. ("Amazon"), and moved for the extraordinary remedy of a preliminary injunction. WREAL's trademark infringement case is thin: Amazon's Fire TV is a set-top box that plugs into a TV, marketed for viewing general interest content like "Dora the Explorer." WREAL's FyreTV is a "porn pay per view service"—not a set-top box at all—offering graphic and lurid hardcore pornography.[1] Any prospect of confusion is, at best, highly unlikely.

WREAL has failed to meet any of the requisites for a preliminary injunction. *First*, WREAL has *no* likelihood of success on the merits. The products, advertising, target audience, sales channels, and marks' uses in commerce are totally different. WREAL conveniently omits to mention that it was not even selling its own set-top box—the "BoXXX"—at the time it filed its Complaint. In the real world, consumers do not mistakenly believe Amazon offers WREAL's service: although WREAL suggested in its brief that evidence of consumer confusion would be in Amazon's files (rather than WREAL's), a thorough search of all ███ Amazon Fire TV customer inquiries turned up *only four* references to FyreTV, all from consumers who knew perfectly well that Amazon did *not* offer a hardcore streaming pornography service. To eliminate any doubt, Amazon retained Dr. Dan Sarel, a professor at the University of Miami School of Business, to conduct a likelihood of confusion survey. Dr. Sarel's survey shows a *de minimis* 1% confusion rate, far below the threshold required to find likelihood of confusion. According to a leading treatise, *no* reported case has found likelihood of confusion with survey confusion rates below 8.5%. *See* 6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair

---

[1] The Court can see the nature of WREAL's content for itself by viewing screenshots from the fyretv.com website, attached as Exhibits A-D to the Declaration of Patrick Bageant ("Bageant Decl.").

COMPETITION § 32:188 (2014) (hereinafter "MCCARTHY ON TRADEMARKS").

*Second*, WREAL is suffering no irreparable harm. Amazon has offered streaming media under the "Fire" brand through its tablets since 2011, without any complaint from WREAL. After WREAL filed this lawsuit in April 2014, it waited five months before moving for a preliminary injunction. WREAL's delay "tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial." *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355-56 (S.D. Fla. 2002) (Lenard, J.). Although WREAL speculates about harm it might suffer in the future, a preliminary injunction requires a showing of immediate and actual (not speculative) irreparable harm.

*Third*, the balance of hardships is one-sided. An injunction would cost Amazon ███ ███████████████ Amazon would have to retrieve and destroy packaging that uses the Fire TV name, change in-store displays, recode the operating system, and then re-launch under a new brand—losing its initial investment in the Fire TV launch. By contrast, WREAL identifies no compensable injury (much less an irreparable one) it will suffer if an injunction does not issue.

*Fourth*, a preliminary injunction would not serve the public interest. WREAL's own set-top box, the "BoXXX," is all but defunct. WREAL's FyreTV hardcore streaming pornography service is not faring much better. An injunction would force Amazon to pull down and rebrand an actively marketed product, at great expense, based on the purely hypothetical possibility that some tiny number of consumers might eventually confuse it with a failing hardcore pornography pay-per-view service. The Court should deny this motion.

## STATEMENT OF FACTS

### A.      WREAL, FyreTV, and the BoXXX

WREAL is a hardcore pornography company. Its flagship product is a streaming hardcore pornography service called "FyreTV," which WREAL describes as "The Ultimate

2

Adult Video On Demand Experience," a "porn pay per view service," and "the Netflix of Porn." Bageant Decl. Ex. A at 1 & 4. The fyretv.com "categories" page offers nearly 50 different types of lurid hardcore pornography. *Id*. Ex. B. Consumers can purchase FyreTV minutes (which they can use to view pornography by the minute), entire movies, subscription packages to particular XXX studios, or individual hardcore scenes. *Id*. Ex. C & D. WREAL applied for trademark registration for FyreTV and fyretv.com in July of 2007; those marks were registered on October 14, 2008. Franco Decl. Exs. A, D.

When WREAL first offered FyreTV for sale to the public in January 2009, the service was only available through the "BoXXX," WREAL's dedicated pornography set-top box. Bageant Decl. Ex. E; F at 3. ██████████████████████████████████ ██████████████████████████████████████████████████. Bageant Decl. Ex. G. WREAL approached Amazon about selling the BoXXX in 2011, and Amazon refused: it did not want to sell a product where an Amazon customer could ████████████████████████ ████████████████████ *Id*. Ex. H; *see also id*. Ex. I (Jin Dep. 33:25-34:9 (Amazon told WREAL that BoXXX was "inappropriate" for Amazon.com because it delivered "hardcore porn which didn't meet with our content guidelines")).

In 2011, WREAL made the FyreTV streaming pornography service available through other means (including the fyretv.com website), without requiring a BoXXX purchase. *Id*. Ex. F at 4. But WREAL's problems continued. A panicky internal email in mid-2011 said, ████████ ████████████████████████████████████████████████ and warned that ████████████████████████████████████████████████ *Id*. Ex. J. In October 2011, one WREAL businessperson complained, ████████████████████████████████ ████████ (*id*. Ex. K); in December 2011, the same person noted that ████████████████

*Id*. Ex. L. The BoXXX itself was a disaster ██████████████ *Id*. Ex. M (WREAL 30(b)(6) Dep. (Plaza) at 20:10-21:13).

In October 2012, WREAL stopped selling the BoXXX to new customers. *Id*. Ex. N; Ex. F at 4; Ex. O (WREAL 30(b)(6) Dep. (Plaza) at 19:13-17 & 20:10-22).

. *Id*. Ex. Q (WREAL 30(b)(6) Dep. (Plaza) at 47:10-48:20; 49:12-50:10; 52:1-11).

*Id*. Ex. R.

When WREAL filed this lawsuit on April 17, 2014, however, it alleged FyreTV "is available through its own proprietary dedicated STB [set-top box] sold under the FyreTV® brand." Compl. ¶ 9. WREAL even included a color picture of the BoXXX in its complaint, with the FyreTV logo and the words, "From just $89.95." *Id.*

Bageant Decl. Ex. Q (WREAL 30(b)(6) Dep. (Plaza) at 53:25-54:5).

Ex. S.

WREAL's problems are not limited to its failed set-top box. WREAL has never been able

to launch other business ventures for various reasons, ██████████████████████████

*Id*. Ex. T (WREAL 30(b)(6) Dep. (Franco) at 19:23-24:9; 34:1-8). WREAL's total revenues (not

profits) for the entire life of the company are only █████████████ *Id*. at 36:11-17; 38:24-39:7.

Early in its history, WREAL tried to acquire non-pornographic content, but these efforts failed

because ████████████████████████████████ *Id*. Ex. U (WREAL

30(b)(6) Dep. (Plaza) at 71:14-25); *see also* Lehman Decl. ¶ 7 (noting that "Hollywood does not

fund hard-core porn and distances itself from that industry"). Despite alleging in the Complaint

that WREAL "has no intention of limiting the FyreTV® brand to adult content" and that

WREAL "has plans to use the FyreTV® brand to expand its content" (Compl. ¶ 15), WREAL's

Chief Operating Officer, Rodrigo Franco, admitted ██████████████████████

████████████████ Bageant Decl Ex. T (WREAL 30(b)(6) Dep. (Franco) at 32:2-10).

Thus, WREAL's competitors are not general interest media or consumer companies but other

hardcore pornographic websites ███████████████ (*id*. Ex. V (Franco Dep. 67:16-68:8))—

and, of course, the pornography widely available for free on the Internet.

     As WREAL's business has sputtered, it has shut down much of its advertising. ████████

████████████████████████████████████ ██████████████████████

████████████████ *Id*. Ex. T (WREAL 30(b)(6) Dep. (Franco) at 59:9-21) & Ex. V

(Franco Dep. 40:14-19). WREAL cannot advertise through Facebook or Google adwords

because of FyreTV's content.[2] Currently, WREAL advertises FyreTV in only two places:

████████████████████████████████████████████████████████████

████████████ *Id*. Ex. T (WREAL 30(b)(6) Dep. (Franco) at 59:9-61:8).

---

[2] Bageant Decl. Ex. W ████████████████████████████████ *id*. Ex. X
████████████████████████████████████████████████████████████
████████████████████

**B.**     **Amazon, Amazon Instant Video and Prime Instant Video, and the "Fire" Family of Multimedia Products**

Amazon is a Seattle-based company that sells a broad variety of products, including through its home page, www.amazon.com. It is one of the most well-known and trusted sites on the Internet. In 2011, Amazon started using the "Fire" brand to sell multimedia tablets, which stream online video and other content. Baicy Decl. ¶ 3. In 2013, as Amazon was considering the launch of a new set-top box, the naming team decided to leverage and extend the "Fire" brand: it seemed logical that consumers would associate the new set-top box with the family of "Fire" multimedia devices that Amazon had promoted for years. *Id.* Thus, in April 2014, Amazon launched its multimedia set-top box, the "Fire TV." *Id.* Amazon now uses the "Fire" name on other multimedia products as well, such as the "Fire Phone" smartphone and the "Fire TV Stick," a plug-in USB streaming media device. *Id.*

"Fire TV" is *not* Amazon's name for its streaming video service. Amazon's streaming video service is called "Amazon Instant Video," and its subscription service is called "Prime Instant Video." Rather, Amazon's Fire TV is a set-top box through which users can stream video content. Amazon markets the Fire TV for viewing general interest content—"instant access to Netflix, Prime Instant Video, WatchESPN, YouTube, and more"—including selections like "Star Trek: Into Darkness" and "Dora the Explorer" for video, and Spotify and Pandora for music. Bageant Decl. Ex. Y. Amazon particularly touts the Fire TV's family-friendly features, advertising that the "FreeTime" service "revolutionizes parental controls—parents can choose what your kids see and set time limits for types of content and times of day." *Id.* Although some content available through Amazon Instant Video is not suitable for all ages,[3] Amazon proactively

---

[3] There is some non-pornographic erotica available on Amazon Instant Video (akin to what is shown on general cable channels) but even this content only accounts for ███████████████ ███████████████████████████████████████ Martinelli Decl. ¶ 6.

removes pornographic content from the service. Martinelli Decl. ¶ 3. In fact, when Amazon found out during the naming process that "FyreTV" was used on a pornographic website, the naming team discussed and dismissed the possibility that there would be any real association because hardcore pornography is so far from what Amazon does as a company. Amazon has *never* marketed any of the "Fire" family of devices for viewing pornography; that is simply not part of the company's identity or business strategy. Baicy Decl. ¶ 4.

Amazon is spending significant sums on the initial launch of the Amazon Fire TV products, including a national television campaign. Baicy Decl. ¶ 5 & Ex. A. It would cost Amazon ███████████████████████████████████████████████████████ ███████████████████████ Amazon would lose its initial investment in the launch; it would have to remove the "Fire" name from packaging and in-store displays and recode the operating system; and then Amazon would have to spend even more than its initial investment to re-launch both products under new brands. Baicy Decl. ¶¶ 6-7; Gupta Decl. ¶ 8.

## ARGUMENT

A district court may grant injunctive relief only if the movant shows "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party, and (4) that if issued the injunction would not be adverse to the public interest." *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989). However, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *Id.* at 1537 (quoting *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983)) (internal quotation marks omitted). Here, WREAL has failed to "clearly establish[]" (*id.*) its burden of persuasion on any of the four requisites.

7

## A.     WREAL Has No Substantial Likelihood of Success on the Merits.

A plaintiff in a trademark infringement case must demonstrate that: (1) its mark has priority, and (2) the defendant's mark is likely to cause consumer confusion.[4] Likelihood of confusion is assessed according to the following factors: "(1) distinctiveness of the mark alleged to have been infringed, (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public." *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007).[5] WREAL's only liability theory is reverse confusion (not traditional forward confusion), where the theory is that consumers will mistakenly believe that the junior user (here, Amazon) is actually the source of the senior user's product (here, FyreTV). *See* Br. at 8.

Under either a forward or a reverse confusion theory, the relevant test is *likelihood* of confusion, not the mere possibility of confusion. "[R]ecovery under the Lanham Act requires, at a minimum, that 'confusion, mistake, or deception be 'likely,' not merely 'possible.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 651 (11th Cir. 2007) (quoting *Sears, Roebuck & Co. v. All States Life Ins. Co.*, 246 F.2d 161, 168 (5th Cir. 1957)). A plaintiff must show "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be

---

[4] *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). Although WREAL's complaint pleads state-law claims, WREAL only argues it has a substantial likelihood of success on its federal trademark infringement claims. *See* Br. at 8-23.

[5] Although WREAL argues these factors should differ in a reverse confusion case (Br. at 10), it cites no Eleventh Circuit support for that proposition. At least one magistrate judge in this Circuit (in a case WREAL cites, Br. at 8) has applied the same Eleventh Circuit forward confusion factors in a reverse confusion case. *See Stuart J. Kaufman, M.D. & Assocs. v. Bausch & Lomb Inc.*, No. 8:13-CV-461-T-33EAJ, 2013 WL 6154166, at *7 (M.D. Fla. Jul. 25, 2013), *recommendation adopted by* No. 8:13-CV-461-T-33, Doc. No. 55 (M.D. Fla. Sept. 4, 2013).

misled, or indeed simply confused, as to the source of the goods in question." *Custom Mfg.*, 508 F.3d at 651 (quoting *New Sensor Corp. v. CE Distribution LLC*, 303 F. Supp. 2d 304, 310-11 (E.D.N.Y. 2004)). WREAL cannot meet this requirement. Although WREAL argues repeatedly that certain speculative scenarios of confusion are possible,[6] this is not sufficient for WREAL to prevail on the merits, much less to meet its heightened burden for a preliminary injunction. "Likelihood of confusion is synonymous with 'probable' confusion—it is not sufficient if confusion is merely 'possible.' An injunction that is based on a finding that there is only a possibility of confusion will be reversed." MCCARTHY ON TRADEMARKS § 23:3.

### 1.   Similarity of marks

WREAL argues the marks are similar by comparing the spelling and sounds of the two words standing alone ("Fire" versus "Fyre"), disconnected from their actual use in the marketplace.[7] But marks are not compared in the abstract. The test is "the commercial impression created by the mark as a whole." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 261 (5th Cir. 1980). In *Amstar*, the Fifth Circuit reversed as clearly erroneous a trial court's finding of likelihood of confusion between two nearly identical word marks for food—"Domino" and "Domino's"—finding "little similarity" between the two marks based on the "total effect" of their use in commerce. *Id.* at 261. Courts in the Eleventh Circuit routinely find marks with identical or nearly identical words dissimilar based on their use in the marketplace.[8] When Judge

---

[6] *See, e.g.*, Br. at 15 ("A perceptive consumer . . . might shrug off the difference (between the spelling of the two marks) as an intentional modification identifying an ancillary division of the same company . . . ."); *id.* ("[C]onsumers might mistakenly assume that WREAL is an infringer who decided to ride the coattails of Amazon's release of 'Fire TV'"); *id.* at 18 ("[P]eople using or hearing about WREAL's FyreTV and FyreTV.com could easily assume that Amazon has spun off an adult-content only video streaming service.").

[7] *See* Br. at 15 ("'FyreTV' and the name 'Fire TV' are phonetically identical. In effect, WREAL and Amazon both make use of the same word, "Fire," in conjunction with "TV" to describe a similar product.").

[8] *See, e.g.*, *Welding Servs.*, 509 F.3d at 1361 (affirming summary judgment for defendant; "WSI"

9

Lenard denied a preliminary injunction motion in *Tiger Direct, Inc. v. Apple Computer, Inc.*, No. 05-21136-CIV, 2005 WL 1458046 (S.D. Fla. May 11, 2005), a trademark infringement case involving two uses of the word "Tiger" for computer-related products (one by Apple and one by the discount retailer Tiger Direct), she engaged in a detailed comparison of the two marks' use in commerce. *See id.* at *16. A similar analysis is appropriate here.

The marks' presentation in commerce could not be more different. The Amazon Fire TV appears on Amazon's home page in a drop-down menu with the "Fire Tablets," "Fire TV," and "Fire Phone." Bageant Decl. Ex. AB. Like the Tiger operating system, which was "nestled in an Apple-branded environment, with other Apple products" (*id.*), the Amazon Fire TV is nestled in an Amazon-branded environment with other Amazon-branded products, so a consumer can easily identify Amazon as its source. Amazon's "Fire" store, like the rest of Amazon, does not sell hardcore pornography. Martinelli Decl. ¶ 5. Other sales outlets like Best Buy and Staples also clearly identify the Fire TV as an Amazon product and sell it in a general retail environment similarly free of hardcore pornography. Bageant Decl. Exhs. AC & AD.

The FyreTV mark, by contrast, appears on a page littered with dozens of explicit pornographic images. *Id.* Ex. A. This is similar to *Tiger Direct*, where the plaintiffs' TigerDirect mark was presented in a "crowded market of product choices across multiple brand names."

---

and "WTI" marks for welding services were dissimilar based on their use in commerce even though there was "undisputed" similarity of services, sales methods, and advertising methods); *Sun Banks of Fla., Inc. v. Sun Federal Savings & Loan Assoc.*, 651 F.2d 311, 317-18 (5th Cir. 1981) (reversing as clearly erroneous trial court's finding of likelihood of confusion; two "Sun" bank names with orange colors were presented differently in commerce); *AWGI, LLC v. Team Smart Move, LLC*, No. 8:12-CV-2257-T-17, 2013 WL 1181450, at *4 (M.D. Fla. Mar. 14, 2013) (denying preliminary injunction and finding two "Smart Move" moving company marks were not similar despite "identical words" because of the "markedly different graphics" used in commerce); *Deltona Transformer Corp. v. Wal-Mart Stores, Inc.*, 115 F. Supp. 2d 1361, 1369 (M.D. Fla. 2000) (two companies' use of identical words "Battery Tender" were not similar because they were presented differently in commerce).

*Tiger Direct*, 2005 WL 1458046, at \*16. WREAL's font and graphics further distinguish the "FyreTV" mark: WREAL shows "FyreTV" as one word (not two, as with Amazon's Fire TV) in a stylized font. Bageant Decl. Exhs. C & AJ. WREAL cites authorities for the proposition that similarly spelled words may be confusing, but each involved situations where there was no indication that the marks were presented differently in commerce.[9] Here, however, the consumer experience for the two marks could not be more different: Amazon's Fire TV in a streamlined, Amazon-branded environment; WREAL's FyreTV in a website jam-packed with lurid, explicit depictions of hardcore pornography.[10]

### 2. Distinctiveness of mark

Both "FyreTV" and Amazon's own use of "Fire TV" are distinctive. WREAL's core argument concerning this factor is that Amazon's practice of linking the "Amazon" brand with the "Fire TV" product heightens the danger of reverse confusion. Br. at 12-13. WREAL cites various out-of-Circuit authority for the proposition that such use makes confusion more likely. Br. at 12. However, a judge from this Circuit (in a case WREAL cites, though not for this point) has held in a reverse confusion case that the use of a house mark *reduces* the likelihood of

---

[9] *See Shields v. Zuccarini*, 254 F.3d 476 (3d Cir. 2001) (Br. at 14) (use in commerce was exclusively in domain names that differed by a few letters); *Mystique, Inc. v. 138 Intern., Inc.*, 601 F. Supp. 2d 1320 (S.D. Fla. 2009) (Br. at 14-15) (two marks with the exact same word ("Mystique") for the exact same product (women's shoes) with no indication that the presentation in commerce will differ). In *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998) (Br. at 14-15), there was no indication that the marks were presented in commerce in such a dramatically different way as they are here—in a general retail environment like Amazon on the one hand and in an environment littered with hardcore pornography on the other. Also, the Ninth Circuit in *Dreamwerks* was reviewing a district court's grant of summary judgment to defendants, and so the Ninth Circuit drew all inferences in plaintiff's favor: a fact the Ninth Circuit said was "important" to its analysis. *Id.* at 1130 n.3. That is the opposite of the case here, where WREAL has the burden and is entitled to no inferences in its favor.

[10] *See Tiger Direct*, 2005 WL 1458046, at \*16 ("([A] consumer would not confuse the source or the use of the Tiger mark in the Apple-branded, streamlined environment, with the TigerDirect mark utilized by the Plaintiff in a crowded retail marketplace, featuring competing brands at discount prices.").

confusion. *See Stuart J. Kaufman*, 2013 WL 6154166, at *7 (Br. at 8). That is surely correct: clearly associating a mark with its true source tends to reduce confusion as to its source. Ironically, WREAL's principal authority on this point—*Tanel Corp. v. Reebok Int'l, Ltd.*, 774 F. Supp. 49 (D. Mass. 1990) (Br. 12-13)—observed that "the fact that both plaintiff and defendant use these marks *in conjunction with their names* does nevertheless tend to *decrease* the likelihood of confusion between the marks." *Id.* at 54 (emphasis added). This authority is more consistent with the Lanham Act's goal of preventing consumer confusion than the other cases WREAL cites.

In the real world, users must sign up for WREAL's FyreTV streaming service through the fyretv.com website—which, of course, does not mention Amazon—whereas customers can purchase Amazon's Fire TV set-top box on the Amazon-branded home page or through retail outlets that display Amazon's name prominently next to the product's name. Bageant Decl. Exhs. Y, AC, AD. In these circumstances, it is very unlikely that consumers would believe Amazon is the source of WREAL's FyreTV, or vice versa. *See Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) ("critical factor" in reverse confusion case that both parties used their house marks; "[t]he emphasis on these housemarks has the potential to reduce or eliminate likelihood of confusion.") (internal quotation marks omitted); *Universal Money Centers, Inc. v. Am. Tel. & Telegraph Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994) ("distinctive . . . house mark" reduces possibility of confusion). This factor thus weighs in Amazon's favor.

### 3.    Similarity of products

WREAL says the two products are "nearly identical" (Br. at 16): "The primary functions of FyreTV and Fire TV are exactly the same—they are both services that provide streaming video over the internet." Br. at 17. But this is wrong even at the most basic level: Amazon's Fire TV is a set-top box; FyreTV is not a set-top-box—it is a streaming service for hardcore

12

pornography. Amazon's own non-pornographic streaming services are Amazon Instant Video and Prime Instant Video. The relevant comparison, if there is one, is not between Amazon's Fire TV and WREAL's FyreTV but between Amazon's Fire TV and WREAL's all-but-defunct "BoXXX," the failed hardcore pornography set-top box that WREAL stopped selling before filing its Complaint.

The content distinguishes the products further. Amazon's Fire TV offers a wide variety of general interest content such as "Dora the Explorer," and touts the Fire TV's family-friendly features. Bageant Decl. Ex. Y. WREAL's "FyreTV" service is a "porn pay per view service" peddling lurid and explicit hardcore pornography. *Id.* Exhs. A & B. These products are not only not "related," as WREAL claims (Br. at 16), they are clearly not "so similar as to be likely to cause confusion." *Ross Bicycles, Inc. v. Cycles USA*, 765 F.2d 1502, 1507 (11th Cir. 1985) (quoting district court's opinion). In *Ross*, the Eleventh Circuit affirmed a district court's finding that confusion was not likely between "Ross" bicycles and "Boss Cruiser" bicycles—although the products had "an inherent degree of similarity" because they were both bicycles, they were "not so similar as to be likely to cause confusion" because of "obvious differences" such as size of tubing, style of wheels, pedals, seats, kickstands, and difference in frame angles. *Id.* at 1507 (quoting district court's opinion). Similarly, in *Amstar*, the products were pizza (on the one hand) and sugar, salt, mustard, and ketchup (on the other hand)—all similar in that are food—but the Fifth Circuit "fail[ed] to see any great similarity" between the products. *Amstar*, 615 F.2d at 261; *see also Sunenblick v. Harrell*, 895 F. Supp. 616, 628-29 (S.D.N.Y. 1995) ("UPTOWN RECORDS" for rereleases of "lost or forgotten" jazz music not a similar product to "UPTOWN RECORDS" for rap; the former product was directed at a "somewhat esoteric market," and even though the two products were sold in the same stores they were "not sold side-by-side; rather,

they are featured in different sections of the stores in which they are sold").

WREAL argues the products are similar because the Amazon Instant Video store (which Fire TV users can stream) includes "a selection of pornography." Br. at 18. But WREAL's Mr. Franco admits that ███████ █████████████ ███████ █████████████ ███████ ███████ ████████████████████████████ Bageant Decl. Ex. V (Franco Dep. 10:22-11:25). Amazon's expert, Professor Peter Lehman, a scholar who has published extensively about pornography, confirms this admission: hardcore pornography is its own distinct genre; it is not the same as even other erotically charged content.[11] Lehman Decl. ¶¶ 1 & 3-4. Non-pornographic erotic content (such as that available on general cable channels) is very different: Amazon users expressly recognize that much of the allegedly pornographic content WREAL cites in its brief is *not* explicit. *See* Bageant Decl. Ex. AE (for *NSFW*: "I was looking for something with a lot more nudity and sex"); AF (for *Double-D Avenger*: "no real nude scenes"; AG (for *Bazookas the Movie*: "This is NOT, I REPEAT, NOT any type of T&A movie"). To be sure, very few Amazon Instant Video users care to view even this (much milder) content: ████████████████

█████████████████████████████████████████

█████████████████████████████████████████

██████████████████████ *Id.* Ex. AH;. Martinelli Decl. ¶ 6. █████████████

█████████████████████████████████████████

██████████████████████ *Id.* ¶ 8. These low levels are not surprising: Amazon excludes

---

[11] WREAL claims that "Amazon's Fire TV can be used by consumers to stream adult content" (Br. at 18), pointing to the "screen mirroring" feature in which a consumer can use Amazon Fire TV to view content that the consumer views on the tablet. *Id.* WREAL thus speculates that consumers might view hardcore pornography on their tablet and then use the "screen mirroring" feature to reflect that image through Amazon's Fire TV. Needless to say, WREAL does not claim that any appreciable number of consumers have used Amazon's product in this fashion, and—in light of Amazon's exclusion of pornography from the Amazon Instant Video store—it is very clearly not how Amazon markets the Fire TV.

pornography from Amazon Instant Video (Martinelli Decl. ¶ 3); and Amazon's Fire TV does not allow installation of applications for viewing hardcore pornography (Gupta Decl. ¶ 7).

WREAL has (in depositions) pointed to what it believes to be pornographic titles in Amazon's DVD store. However, pornographic DVDs are also against Amazon's policy; third parties selling pornographic DVDs on Amazon's site will be told to take them down. Martinelli Decl. ¶ 5. Moreover, DVDs are irrelevant because the Fire TV does not have a DVD tray, nor does it have a web browser that would allow users to access Amazon's retail website to view DVD listings or purchase DVDs. Gupta Decl. ¶ 6.

WREAL's Mr. Franco states in his declaration that Amazon sells adult toys (Franco Decl. ¶29); presumably, WREAL wishes to argue that FyreTV customers will think Amazon produces hardcore pornography because those customers know they can buy adult toys at Amazon (a novel theory neither pleaded in the Complaint nor argued in the preliminary injunction brief). Not only has WREAL produced no actual evidence for this far-fetched theory, but it is unbelievable on its face: as Professor Lehman explains, hardcore pornography websites have a look and feel that is totally different from sites like Amazon or Wal-Mart, which might sell adult toys but do not sell hardcore pornography. Lehman Decl. ¶ 11. Adult toys have nothing to do with this litigation: WREAL does not sell adult toys and it has not sued Amazon for selling "Fire TV" adult toys. Bageant Decl. Ex. T (WREAL 30(b)(6) Dep. (Franco) at 22:10-14, 32:2-34:8). It is thus no surprise that Professor Lehman concludes that consumers "would be highly unlikely to confuse fyretv.com with Amazon or any other mainstream site." Lehman Dec. ¶ 16.

WREAL's principal authority in its brief—*Dreamwerks*, 142 F.3d at 1127—illustrates the difference between the products here. In *Dreamwerks*, the products were (in the Ninth Circuit's words) "complementary": movies on one hand and conventions selling "movie and TV

collectibles and memorabilia" on the other. *Id.* at 1131-32. But here, there is a clear difference between a set-top box designed to stream video content *other than* pornography—Amazon's Fire TV—and a pay-per-view service dedicated *exclusively* to hardcore pornography like WREAL's FyreTV.

WREAL itself has acknowledged it operates in a separate market: WREAL boasts it is the "Netflix of Porn" (Bageant Decl. Ex. A at 4), expressly recognizing a difference between a general-interest streaming media product (like Netflix) and a specialized "porn pay per view service" (like FyreTV).[12] Amazon does not compete with FyreTV or WREAL in any market at all.

Thus, WREAL makes the obvious concession: "[I]t is likely that consumers can readily distinguish the content typically streamed by FyreTV from the content *typically* streamed over Amazon's Fire TV . . . ." Br. at 17. This is precisely the point. Consumers can easily distinguish "Ross" bicycles and "Boss Cruiser" bicycles even though both are bikes (*Ross*), pizza and sugar even though both are foods (*Amstar*), and rap and jazz even though both are music (*Sunenblick*). Similarly, consumers can easily distinguish a streaming service for hardcore pornography (FyreTV) and set-top box hardware for viewing general interest content like "Dora the Explorer" (Fire TV)—just as they can distinguish a movie theatre showing "Frozen" from a XXX theatre (even though they're both movie theatres) and a striptease from the ballet (even though they're both dances).

---

[12] WREAL's authority (Br. at 16-18) involves products much more similar than the two here: two sets of "furniture pieces, designed for the home," with "Italian design" and "the capability to house electronic equipment" (*Frehling*, 192 F.3d at 1338); French wine and brandy distilled from French wine (*E. Remy Martin & Co. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985)); and auto parts and auto services businesses (*Autozone, Inc. v. Strick*, 543 F.3d 923, 926-28 (7th Cir. 2008)).

###### 4.  Similarity of sales outlets and customer base

Amazon sells Fire TV on the Amazon home page and through certain other retail outlets such as Best Buy and Staples. Bageant Decl. AC & AD. Amazon does not sell the BoXXX and in fact rejected it due to its "inappropriate" content. *Id.* Ex. I (Jin Dep. 33:25-34:9). WREAL sells FyreTV on the FyreTV home page. *Id.* Ex. V (Franco Dep. 82:22-83:6). No overlap in the retail outlets exists at all. Amazon.com is one of the most well-known and trusted sites on the internet; WREAL's FyreTV.com is a highly specialized site for dedicated hardcore pornography users.

On customer base, WREAL asserts that "there is significant overlap in WREAL and Amazon's respective target markets" because "given that Amazon's Fire TV is a mass-market product, all FyreTV users are part of Amazon's target market." Br. at 19. But the Fifth Circuit rejected exactly this type of argument in *Amstar*, where Amstar (the holder of the "Domino" mark) sought a "national audience" while Domino's pizza targeted only a subset of that audience: "young, male college students," which the Fifth Circuit described as "rather a specialized set of consumers." *Amstar*, 615 F.2d at 261-62.[13] The same is true here: hardcore pornography is a distinct and specialized market. Lehman Decl. ¶ 11.

###### 5.  Similarity of advertising

WREAL argues that the advertising channels are similar because "Amazon and WREAL market their products primarily on the internet." Br. at 19. But this is insufficient.[14] Amazon

---

[13] The only authority WREAL cites in this section of its brief involved a "virtually identical" audience of preteen girls confronting nearly identical products—two beanbag toy lions, both named "Roary"—sold at "comparable" retail prices. *Imperial Toy Corp. v. Ty, Inc.*, No. 97 C 8895, 1998 WL 601875, at **1, 4 (N.D. Ill. Sept. 9, 1998) (Br. at 19).

[14] "[T]he mere fact that goods and services may both be advertised and offered through the Internet is not a sufficient basis to find that they are sold through the same channels of trade. The Internet is such a pervasive medium that virtually everything is advertised and sold through the Internet. We therefore need something more. . . ." *Parfums de Coeur, Ltd. v. Lory Lazarus*, 83

advertises the Fire TV online on Amazon's home page (one of the most visited and trusted websites on the Internet), surrounded by other Amazon-branded products. Bageant Decl. Ex. Y. FyreTV advertises its service in only two places: █████████████████████████

████████ █████████ ████████ ████ ██ ████████ █████████ ████████ ████████ ████ ████

████████████████ *Id.* Ex. T (WREAL 30(b)(6) Dep. (Franco) at 59:9-61:8). No one would confuse the pornographic online ads for FyreTV with Amazon's Fire TV advertising on the Amazon.com home page.[15] The companies do not even use the same advertising channels for non-Internet advertising. Although WREAL claims both companies "advertise or have advertised their products on TV, and on the same television stations" (Br. at 19); in fact, Amazon advertises the Fire TV in television and in print (Baicy Decl. ¶ 5), but FyreTV's television, print, and radio campaigns no longer exist. ████████████████████████████████

████████████ (Stmt. of Facts § A), two years before Amazon launched the Fire TV.

###### 6.   Intent

The Eleventh Circuit has not yet established whether the intent inquiry should differ in a reverse confusion case from the typical intent inquiry, which asks whether the alleged infringer intended "to misappropriate the proprietor's good will." *Welding Servs., Inc.,*, 509 F.3d at 1360 . Other courts have dealt with this question in varying ways: the Seventh Circuit held intent is "essentially irrelevant" to reverse confusion (*Sands, Taylor, & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir. 1992)); the Third Circuit held the test is whether the junior user acted with "deliberate intent to push the senior user out of the market" (*Freedom Card Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 479 (3d Cir. 2005)); and WREAL's preferred test is

---

U.S.P.Q.2d 1012, 1021, 2007 WL 683784 (T.T.A.B. 2007).

[15] *See Amstar*, 615 F.2d at 262 ("[H]ardly anyone would confuse a 'Domino' sugar ad with a 'Domino's Pizza' sales pitch, nor would they likely believe the two advertisements emanated from the same source, considering the significant differences between the advertisements in message content and presentation.").

whether the "defendant acted carelessly or otherwise culpably in selecting the allegedly infringing name," (Br. at 20 (quoting *Altira Group LLC v. Philip Morris Cos. Inc.*, 207 F. Supp. 2d 1193, 1200 (D. Colo. 2002)) or "ignored [the senior user's] rights to the mark" (Br. at 20 (quoting *Imperial Toy Corp.*, 1998 WL 601875, at *6)).

Under the Eleventh Circuit standard in a typical (not reverse) confusion case, it is difficult to see how Amazon could misappropriate WREAL's goodwill: any association with a hardcore pornography company would hurt rather than help Amazon. Regardless, whatever the standard, Amazon has no nefarious intent. Elizabeth Baicy states Amazon selected the "Fire TV" brand name to leverage and extend Amazon's existing "Fire" brand from its multimedia tablets. Baicy Decl. ¶ 3. Amazon knew about the "FyreTV" pornography site at the time when it was deciding on the name of the Amazon Fire TV, but concluded any association was unlikely because hardcore pornography was so different from what Amazon does as a company. Baicy Decl. ¶ 4. There is no bad faith in using "Fire TV" for a totally different product, marketed to a totally different audience, where there is no realistic likelihood that an appreciable number of consumers will confuse the two.[16]

### 7.    Actual confusion

Actual confusion is "the best evidence of likelihood of confusion." *Amstar*, 615 F.2d at 263.[17] WREAL would like to pretend that occasional instances of actual confusion suffice (Br.

---

[16] WREAL's authorities provide no support for its intent argument: In *Imperial Toy Corp.*, on which WREAL relies (Br. at 20), one could easily infer nefarious intent: the junior user (the maker of "Beanie Babies") decided to put out a beanbag toy lion named "Roary" while knowing full well that another company had trademark rights to "Roary" for beanbag toy lions. *Id.* at *6. In *Altira*, the plaintiffs did *not* show the requisite wrongful intent. *Altira*, 207 F. Supp. 2d at 1200 (Br. at 19-20).

[17] *See Seiko*, 188 F. Supp. 2d at 1354 (denying preliminary injunction, noting "The most persuasive evidence of a substantial likelihood of confusion is proof of actual confusion. Plaintiff has presented no evidence of actual confusion.") (citation omitted). WREAL cites *Tracfone Wireless, Inc. v. Cabrera*, 883 F. Supp. 2d 1220 (S.D. Fla. 2012), for the proposition that actual

20-21), but that is not the law. "[I]n considering actual confusion we look not only to the existence but also to the extent of such confusion." *Tana v. Dantanna's*, 611 F.3d 767, 779-80 (11th Cir. 2010) (affirming summary judgment for defendants in trademark infringement case despite two incidents where customers inquired as to possible affiliation between "Dan Tana's" restaurant and "Dantanna's" restaurant). The Eleventh Circuit has repeatedly dismissed occasional instances of actual confusion as *de minimis* and insufficient to raise a triable fact issue even on summary judgment—much less to satisfy the high threshold for a preliminary injunction.[18]

WREAL's purported actual confusion evidence (Br. at 22-23) is actually evidence that consumers were *not* confused. WREAL's first example is a CNBC article about how Amazon's Fire TV "shares a name" with WREAL's FyreTV. *Id.* at 22. But it is confusion among actual or potential *consumers*, not media outlets, that is relevant to a Lanham Act claim.[19] And CNBC is clearly not confused: its article notes customers will find "something very different" from Amazon at fyretv.com; namely, a "video-on-demand pornography service." *Id.* at Ex. 10.

---

confusion evidence is not necessary (Br. at 20), but the facts in *Tracfone* made confusion all but certain: a former employee fraudulently sold Tracfone phones and airtime, clearly violating Tracfone's trademarks. *See id.* at 1222-23, 1226-27.

[18] *See Sun Banks*, 651 F.2d at 319 (reversing as clearly erroneous trial court's finding of likelihood of confusion; employee reports of incidents of confusion and testimony from four fact witnesses inquiring about relationship dismissed as "isolated instances of uncertainty"); *Ross*, 765 F.2d at 1508 (inquiries from "an undetermined number of potential customers" held to be "no clear evidence" of actual confusion) (quoting district court's opinion); *Amstar*, 615 F.2d at 263 n.10 (two verbal inquiries asking whether Domino's Pizza was related to Domino sugar and a letter to a Domino's Pizza employee misaddressed as to "Domino Sugar" dismissed as "isolated instances of actual confusion" that were "insufficient to sustain a finding of likelihood of confusion."); *First S. Fed. Sav. & Loan Ass'n of Mobile, Ala. v. First S. Sav. & Loan Ass'n of Jackson Cnty., Miss.*, 614 F.2d 71, 72 (5th Cir. 1980) (affirming trial court finding of no likelihood of confusion under common law even though "[a]ctual confusion of the names of the two institutions has occurred on several occasions").

[19] *See Sun Banks*, 651 F.2d at 319 (dismissing purported instances of confusion in part because "none of the remarks was made by a potential customer considering whether to transact business with one or the other of the parties").

WREAL's second example is a set of Twitter posts that WREAL characterizes as either "express[ing] actual confusion, or . . . point[ing] out the likelihood that others will be confused due to the nearly identical names." *Id*. at 22 (Ex. 12). WREAL apparently believes one of these tweets to be tremendously probative, as it quotes it repeatedly in its brief: "Did you guys just merge with Amazon?" (*Id*. at 6, 18, 22 (Ex. 16)). This tweet hails from a user under the handle "@ScorchingImages," who currently goes by "GanjaGoddessTV" and whose self-described avocation is to provide a "Photo/video Internet program for the cannabis community." Bageant Decl. Ex. AI. It is impossible, from the seven-word tweet, to determine whether GanjaGoddessTV is in fact confused, making a joke, or under the hazy influence of the product he or she celebrates. The Fifth Circuit held exactly this type of evidence insufficient to show actual confusion in *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979) (dismissing "commentary in a trade magazine that purportedly suggests that [plaintiff] might have acquired [defendant]" as "practically useless": "It is . . . impossible to determine whether the author of the comments was actually confused, merely speculating, or attempting to be humorous about whatever it was he or she was writing about.").

The other tweets in WREAL's Twitter collection (Br. Ex. 12) are even less probative: misspellings or people noting the names sound similar but making clear they are *not* confused— for example, "Amazon's new set top box 'FireTV' not to be confused with existing set top box for streaming porn 'FyreTV'" (from @zcutlip); "FireTV.com is NSFW and is NOT a link for Amazon's new streaming service" (from @EpicWolverine); "FireTV.com is NOT a link for Amazon's new streaming service. You might not want to click on it at work." (from @CNET) (*id*.). Merely noting two names are similar is not confusion.[20] These Twitter users are not

---

[20] "'Confusion' means more than that the junior user's mark merely 'calls to mind' the senior

confused: they know Amazon's Fire TV is very different from WREAL's streaming hardcore pornography service.[21]

WREAL's third example is a CNET article similar to the CNBC article. *Id.* at Ex. 11. But once more, the author is plainly *not* confused, describing FyreTV as "a site whose diversions lurch into perversions and whose streaming is not for office consumption." *Id.*

And that, from WREAL, is all: a tweet from "GanjaGoddessTV," and several tweets and media articles from people who are plainly not confused. Mr. Franco's declaration states under penalty of perjury that "right after Amazon announced its own 'Fire TV' product, a number of people, including . . . customers . . . noticed the similarity between Amazon's Fire TV name and the FyreTV mark." (Franco Decl. ¶ 27). In fact, under examination at his deposition, Franco admitted █████████████████████████████████████████████████████████ ████████████████████ Bageant Decl. Ex. V (Franco Dep. 58:22-59:9).

Perhaps realizing the thinness of its purported actual confusion evidence, WREAL turns to various excuses. The first is that "in a reverse confusion case, confused customers would likely contact the junior user, not the senior user" (Br. at 21). However, Nathaniel Fuller, an Amazon manager responsible for customer service inquiries about Fire TV, searched the ██████████████████████ Amazon Fire TV customer service inquiries and found only four mentions

---

user's mark." MCCARTHY ON TRADEMARKS § 23:9. As the Fifth Circuit has explained: "[F]undamentally, deception, actual or probable, is the essence of an action for infringement or unfair competition. The test is whether there is a probability that the average person will be so confused by the use of the device complained of as to believe that the products offered by the infringer were produced by the trademark owner—that there is likelihood that prospective purchasers will be misled to [plaintiff's] damage." *Squirrel Brand Co. v. Barnard Nut Co.*, 224 F.2d 840, 844 (5th Cir. 1955).

[21] WREAL cites *You Fit, Inc. v. Pleasanton Fitness, LLC*, No. 8:12-CV-1917-T-27, 2013 WL 521784 (M.D. Fla. Feb. 11, 2013), for the proposition that an "online reaction" can show potential consumer confusion (Br. at 23), but the online evidence in *You Fit* was from consumers who were actually confused (one literally wrote: "I am soo confused.") *Id.* at *4.

of FyreTV (one in a tweet directed at Amazon), mostly from people who wanted to call Amazon's attention to the fact that there was a *different* product from a *different* company offering hardcore pornography. *See* Fuller Decl. ¶¶ 9-12 & Ex. A. One customer inquired about "adult entertainment" and asked "if you were to spell Fire a different way, in your search, once I got the device, how would I do that," and went on further to explain "I saw it on TV the ad for Amazon Fire yesterday, I thought I understood, I heard, that if you spell Fire somehow with a 'y' that adult content comes up." *Id*. Ex. B. But any confusion here is about how to use the device rather than confusion as to source; the customer never suggests he thinks Amazon is the source of the "Fyre" adult content. *Id*. ¶ 11. Even if this single inquiry suggests confusion, it is only one out of ██████ for a confusion percentage around ██████████████████████, a *de minimis* level.[22]

---

[22] *See George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 398–400 (4th Cir. 2009) (affirming summary judgment for defendants in trademark infringement case; four instances of consumer confusion where defendant sold 500,000 products per year was "at best *de minimis*"); *D & J Master Clean, Inc. v. Servicemaster Co.*, 181 F. Supp. 2d 821, 828–29 (S.D.Ohio 2002) (denying motion for preliminary injunction; purported actual confusion evidence consisted of over 20 phone calls over 4 months from customers confused between "MASTER CLEAN" and "ServiceMASTER Clean"; court found insignificant in light of total call volume because less than one percent of all calls were from customers supposedly confused). WREAL's in-Circuit authorities on actual confusion all involved real instances of actual confusion, with surrounding facts that made confusion all but certain. *See Council of Better Bus. Bureaus, Inc. v. Better Bus. Bureau of S. Fla.*, No. 78-937-CIV, 1978 WL 21729, at *15 (S.D. Fla. Aug. 22, 1978) (Br. at 21) (confusion "virtually certain" where defendant Better Business Bureau of South Florida had been affiliated with plaintiff Council of Better Business Bureaus for 25 years, let its membership lapse, but then continued using the "Better Business Bureau" name); *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1162, 1167 (11th Cir. 1982) (Br. at 21) (actual confusion from a supplier and a customer where the two parties both operated retail stores with overlapping products); *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971) (Br. at 20-21) ("uncontradicted" actual confusion evidence); *Ryder Sys., Inc. v. Storage & Moving Servs., Inc.*, No. 13-61366-CIV, 2013 WL 3873231, at **2-3 (S.D. Fla. July 25, 2013) (Br. at 20) (defendant intentionally used the name "Ryder Moving and Storage" to mislead customers into thinking they were dealing with RYDER moving trucks; several customers contacted RYDER to complain about poor moving services provided by Ryder Moving and Storage).

WREAL's next excuse is that the "infringement has not been going on for a long time" (Br. at 21) and so, presumably, consumers haven't yet learned about Amazon's Fire TV. But this contradicts WREAL's assertions about Amazon's Fire TV launch, which WREAL describes as "extensively covered by the press," with a "massive television advertising campaign" that was "highly memorable." Br. at 6. WREAL cannot have it both ways: it cannot simultaneously claim Amazon engaged in a "massive" advertising effort and yet it is too soon to assess consumer confusion.[23]

Consumer survey evidence further demonstrates that no likelihood of confusion exists. WREAL presented *no* survey evidence in its preliminary injunction motion. Amazon, however, offers survey evidence from Dr. Dan Sarel, a professor at the University of Miami School of Business and an expert in consumer surveys. Dr. Sarel performed an "Ever-Ready" survey, named after the survey design approved in *Union Carbide Corp. v. Ever-Ready Inc.*, 531 F.2d 366 (7th Cir. 1976).[24] In an *Ever-Ready* survey in a reverse confusion case, respondents view a mark as it appears in commerce (here, WREAL's use of "FyreTV" on its website) and then respond to a series of open-ended questions—in this survey, "Who puts out or offers the adult video on demand product or service on the web pages you just saw?" Sarel Decl. ¶¶ 27, 43.

The results are unambiguous. Only 2 out of 200 respondents in the survey mentioned "Amazon" at all when presented with WREAL's use of FyreTV in commerce, for a *de minimis* confusion level of 1%. *Id.* ¶¶ 51–52 & tables 1–4. This falls far below the required threshold: a leading treatise states *no* reported case has found likelihood of confusion with consumer survey

---

[23] *See Tiger Direct*, 2005 WL 1458046, at *21 ("Given the substantial press garnered by Apple's Tiger, the Court does not credit TigerDirect's argument that it is too early to assess whether there is actual confusion in the marketplace . . . .").

[24] *See* MCCARTHY ON TRADEMARKS § 32:174 (*Ever-Ready* survey is a "standard and widely accepted format to prove the likelihood or non-likelihood of confusion.").

results below 8.5%. MCCARTHY ON TRADEMARKS § 32:188; *see also 1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1249 (10th Cir. 2013) (citing treatise, holding survey showing 7% confusion insufficient to sustain likelihood of confusion finding). In fact, the 1% *de minimis* confusion level is evidence that confusion is *not* likely. *See* MCCARTHY ON TRADEMARKS § 32:189 (survey results below 10% can be affirmative evidence that confusion unlikely).

**B.   WREAL Will Not Suffer Irreparable Injury if an Injunction Does Not Issue.**

"[P]reventing irreparable harm in the future is the sine qua non of injunctive relief." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1133 (11th Cir. 2005) (internal quotation marks omitted). WREAL argues for a presumption of irreparable injury on a showing of likelihood of confusion. Br. at 23-24. Not only is the validity of WREAL's authority in question after the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006),[25] but a presumption requires either a "particularly high likelihood of confusion or potential danger to customers' health and safety." *Seiko*, 188 F. Supp. 2d at 1355.[26] WREAL has made no such showing.

Even if a presumption were to apply, it is more than rebutted by the evidence that WREAL is not suffering irreparable injury. *First*, Amazon has used the "Fire" name since 2011 on tablets with streaming media functionality essentially identical to Fire TV's streaming capabilities. Baicy Decl. ¶ 3. WREAL never objected to that use or indicated it believed consumers would be confused with its own "Fyre" streaming hardcore pornography product.

---

[25] In *eBay*, the Supreme Court reversed a Federal Circuit doctrine presuming irreparable harm on a finding of patent infringement. The Eleventh Circuit has held *eBay* applies in trademark infringement cases but reserved the question whether the presumption could still apply. *North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227-28 (11th Cir. 2008).

[26] The pre-*eBay* cases WREAL cites make this clear: *E. Remy-Martin* required a "sufficiently strong showing of likelihood of confusion" (*E. Remy-Martin*, 756 F.2d at 1530) (Br. at 23), and in *Tally-Ho, Inc. v. Coast Community College Dist.*, 889 F.2d 1018 (11th Cir. 1990) (Br. at 23), it was "undisputed that there was a substantial likelihood of confusion." *Id.* at 1029.

Then, after filing this lawsuit in April 2014, WREAL waited for over five months (nearly six months since Amazon's Fire TV launch) before moving for a preliminary injunction. During those five months, WREAL did nothing in this litigation. It served no document requests. It propounded no written discovery. It asked for no depositions. "[A] plaintiff's delay in seeking an injunction in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Seiko*, 188 F. Supp. 2d at 1355-56 (internal quotation marks and citation omitted).[27]

"[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998).[28] WREAL has waited far too long. And it has never offered any explanation for why—if there is such an urgent need for injunctive relief—it did nothing for several years when Amazon started using "Fire" for multimedia tablets beginning in 2011, and then even after filing this lawsuit sat on its rights for over five months before making its motion. WREAL's delay in moving for a preliminary injunction after it filed its Complaint is particularly inexcusable because its purported actual confusion evidence—the various media articles and

---

[27] In *Seiko*, the plaintiff knew about the product for around a year, but during that period was sending cease-and-desist letters and thus the Court gave plaintiff "credit for attempting to reach a settlement without litigation." 188 F. Supp. at 1356. But even after that period, "there remain[ed] a three-month delay between Plaintiff's last communication with Defendants and commencement of this suit." *Id.* at 1356. The Court noted: "Plaintiff's dilatory prosecution of its rights somewhat vitiates the notion of irreparable harm," citing to a case with a "three-month delay since parties' last communication," before concluding: "The Court finds that this unexplained delay undercuts any sense of urgency and, therefore, Plaintiff has failed to demonstrate sufficient need for a preliminary injunction." *Id.*

[28] *See, e.g.*, *Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc.*, No. 00 CIV. 574, 2001 WL 1097865 (S.D.N.Y. Sept. 19, 2001) (denying preliminary injunction in face of 3-month delay); *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*, 116 F. Supp. 2d 405 (S.D.N.Y. 2000) (denying preliminary injunction in face of 4-month delay).

Twitter posts—was all available to WREAL *five months ago, at the time it filed its Complaint on April 17. See* Br. Exs. 10-12 (media articles from April 2 and April 3 and Twitter posts from April 2-8); *see TigerDirect*, 2005 WL 1458046, at *22 (plaintiff's failure to show actual confusion after waiting nine months to seek injunction undermined any claim of irreparable harm). This delay alone demonstrates no irreparable harm and by itself supports denying WREAL's motion.

*Second*, even apart from the delay, WREAL's claimed irreparable harm all is speculation about how WREAL *might* suffer in the future.[29] However, "[e]stablishing a risk of future irreparable harm is not enough; rather the movant must make a showing of *immediate* irreparable injury." *Land-Cellular Corp. v. Zokaites*, 463 F. Supp. 2d 1348, 1357 (S.D. Fla. 2006) (Lenard, J.).[30] WREAL's self-serving claim that its "reputation" might suffer (Br. at 20) is incredible on its face: WREAL offers no evidence that it—a hardcore pornography vendor—has such a sterling reputation that it could, somehow, be tarnished. Further, WREAL's business was not

---

[29]For example, WREAL says it may lose control of its reputation (Br. at 24), speculating that "content providers" (that is, pornography studios) "may come to view WREAL as infringing on Amazon," and "may be skittish on doing business with a company that has a reputation for trademark infringement." Br. at 20. WREAL can identify no instances where this has actually occurred. Bageant Decl. Ex. V (Franco Dep. at 70:15-72:9) (neither Amazon nor WREAL's reputation mentioned in single instance where content provider would not work with WREAL). WREAL further speculates that customers "may balk at investing their time and money in WREAL's service" (Br. at 20)—but once more, WREAL can identify no instance where this has happened. Bageant Decl. Ex. V (Franco Dep. at 82:17-21) (" ███████████████████████████████████████████████████ And if WREAL actually does lose customers or suppliers, then the proper remedy is money damages for any lost sales; the injury is not "irreparable." *See Northeastern Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990), *rev'd on other grounds* 508 U.S. 656 (1993) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.").

[30] The single case WREAL cites for the proposition that a loss of reputation can lead to a finding of irreparable injury—*Gaffigan v. Does 1-10*, 689 F. Supp. 2d 1332 (S.D. Fla. 2010) (Br. at 24)—was a counterfeiting case where the defendants were selling false Tiffany goods, which clearly threatened Tiffany's reputation. *See id.* at 1335-1338, 1340-41.

27

going well long before Amazon's Fire TV launch (Stmt. of Facts §A), and thus it is unsurprising that WREAL cannot identify business harm attributable to Amazon.

Third, even if consumers and content providers eventually do refuse to do business with WREAL because they believe it is infringing on Amazon's trademarks, WREAL has not suffered an injury compensable by trademark law. Judge (now Justice) Breyer wrote that it did "not correctly state the law of trademarks" to argue that a plaintiff in a reverse confusion case may recover for "harm suffered . . . not because the buying public may wrongly believe that the defendant makes or sponsors the plaintiff's product, but simply because the public wrongly believes that the plaintiff copied the defendant's name." *DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 609 (1st Cir. 1992). Consumers are not confused; they know that the junior user is not the source of the senior user's goods. As then-Judge Breyer explained: "If 'falsely being thought a pirate' were an actionable harm, no one could safely use a mark ever previously used by another, no matter how different the product, place of sale, or class of buyer." *Id.* And thus, WREAL has identified *no* compensable trademark injury—irreparable or otherwise—it will suffer if an injunction does not issue.

## C.     The Harm to Amazon from an Injunction Far Outweighs the Threatened Injury to WREAL.

The balance of hardships is clearly in Amazon's favor. An injunction would cost Amazon ████████████████████████████████████████████████████████ Fire TV and Fire TV Stick launches, it would have to destroy packaging with the "Fire" name, alter in-store displays, and recode the operating system to remove references to "Fire," and then Amazon would need to spend ███████████████ to re-brand and re-launch the products under new names. Baicy Decl. ¶¶ 6-7; Gupta Decl. ¶ 8. This process would confuse consumers and

muddle Amazon's message in the marketplace.[31] Baicy Decl. ¶ 8.

There is almost nothing on the other side of the scales.[32] ████████████

████████████████████████████████████████████████████████████████████

████████████████     Its only claimed harm (falsely being thought a pirate) is not a harm that

trademark law recognizes. Courts facing similar balances have concluded that a one-sided

balance of hardships is reason to deny an injunction.[33] It is even more one-sided when WREAL's

five-month delay in moving for an injunction is taken into account.[34]

**D.    An Injunction Would Not Serve the Public Interest.**

The public interest is not served by an injunction where there is no likelihood of success

on the merits, no compensable injury, and a balance of hardships that tips sharply against its

entry.[35] Here, an injunction would disserve the public interest rather than serve it: it would force

---

[31] This intangible loss is properly taken into account in assessing the burden of an injunction. *See Tiger Direct*, 2005 WL 1458046, at *23 (denying preliminary injunction in part because of the balance of hardships; "Apple may appear to have a disjointed or muddled marketing message at the very time its product is being launched on the marketplace. It is difficult, if not impossible, to know the extent of harm that Apple might suffer from this break in its marketing momentum and messaging.")

[32] In the single case WREAL cites on the balance of hardships, *Chanel, Inc. v. chanel255.org*, No. 12-21762-CIV, 2012 WL 1941598, at *6 (S.D. Fla. May 29, 2012) (Br. at 25), the balance of hardships clearly weighed in the plaintiff's favor: the defendant was selling counterfeit Chanel goods under various fake domain names ("chanel-replica.us" and "fakechanel.us"), and hence was likely to damage Chanel's reputation through counterfeiting. *Id.* at **2-3, 6.

[33] *See, e.g.*, *Tiger Direct*, 2005 WL 1458046, at *23; *CORD: USE Cord Blood Bank, Inc. v. CBR Systems, Inc.*, No. 6:11-cv-893-Orl-36, 2012 WL 8745157, at *7 (M.D. Fla. Nov. 5, 2012) (denying preliminary injunction in part because balance of hardships favored defendant, noting: "While the Plaintiff claims Defendant's continued use of [mark] will damage its reputation or sales, the issuance of an injunction would force Defendant to actually remove signage, advertising materials, and other company property already in existence.").

[34] *See, e.g.*, *Stokley-Van Camp, Inc. v. Coca-Cola Co.*, 2 U.S.P.Q.2d 1225 (N.D. Ill. 1987) (denying preliminary injunction when plaintiff waited three months to sue, priority was closely balanced, and irreparable harm to defendant exceeded that to plaintiff).

[35] *See, e.g.*, *Tiger Direct*, 2014 WL 1458046, at *24 (public interest is not served by an injunction when there is no likelihood of confusion, in part because the parties use their respective marks "in distinctly different marketplace environments."). WREAL's authorities on the public interest factor all involved extraordinarily high likelihoods of confusion. *See Angel*

Amazon to take down and re-brand, at great expense, a product it has actively marketed for many months, when there is no real likelihood that any appreciable number of consumers will confuse it with WREAL's hardcore pornography service. An injunction would not preserve WREAL's business, which is faltering for reasons that have nothing to do with Amazon's Fire TV. Stmt. of Facts § A. The public interest does not favor issuing an injunction to reward a feigned injury: ██████████████████████████████████████████████████████████████ only after filing this lawsuit. *Id.* An injunction would simply award WREAL a windfall, permitting it to hold hostage Amazon's ████████████████ investment in one of its flagship products. This wealth transfer would not serve the public interest.

## CONCLUSION

For the foregoing reasons, WREAL's request for a preliminary injunction should be denied.

Dated: November 25, 2014                    Respectfully submitted,

By: */s/ Jamie Zysk Isani*

Jamie Zysk Isani (Florida Bar No. 728861)
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500

---

*Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1206 (11th Cir. 2008) (Br. at 25) ("self-evident" risk of confusion where two companies "used the same mark in the same territory directed to the same entities by the same means"); *Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1302-03 (11th Cir. 2001) (Br. at 25) (plaintiff defaced the defendant's products and resold them, "degrad[ing] the appearance of the product and creat[ing] a likelihood of confusion"); *It's A 10, Inc. v. Beauty Elite Group, Inc.*, 932 F. Supp. 2d 1325, 1329, 1333 (S.D. Fla. 2013) (Br. at 25) (products were so similar that the defendant *voluntarily* stopped using the allegedly infringing label and the court properly granted an injunction directed at residual inventory).

Facsimile: (305) 810-1675
jisani@hunton.com

Justin A. Nelson *(pro hac vice)*
Drew D. Hansen *(pro hac vice)*
Patrick C. Bageant *(pro hac vice)*
SUSMAN GODFREY L.L.P.
1201 Third Ave, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
jnelson@susmangodfrey.com
dhansen@susmangodfrey.com
pbageant@susmangodfrey.com

*Counsel for Defendant Amazon.com*

## CERTIFICATE OF SERVICE

**I CERTIFY** that on November 25, 2014, a true and correct copy of the foregoing was served by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.

_____/s/Jamie Z. Isani_____

Jamie Zysk Isani

## SERVICE LIST

Carlos Nunez-Vivas
can@wnflaw.com
Daniel Foodman
df@wnflaw.com
Dennis J. Wouters
djw@wnflaw.com
John G. Marfoe
jgm@wnflaw.com
WNF Law, P.L. - Waserstein Nunez & Foodman
1111 Brickell Avenue, Suite 2200
Miami, Florida 33131
Tel.: (305) 760-8500
Fax: (305) 760-8510

*Attorneys for Plaintiff WREAL, LLC*