UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 14-CV-21385-LENARD/GOODMAN

WREAL, LLC, a Florida Limited
Liability Company,

      Plaintiff,

vs.

AMAZON.COM, INC., a Delaware
Corporation,

      Defendant.

_____/

**PLAINTIFF'S PROPOSED REPORT & RECOMMENDATION PURSUANT TO
THE DECEMBER 31, 2014 ORDER STRIKING MOTION TO DE-DESIGNATE
DEPOSITION TRANSCRIPTS AND OUTLINING AMENDED POST HEARING
BRIEFING SCHEDULE ON WREAL'S MOTION FOR PRELIMINARY INJUNCTION**

This matter is before the Court on referral from United States District Court Judge Joan A. Lenard of Plaintiff Wreal, LLC's ("Wreal") Motion for Preliminary Injunction (DE # 28 & 35). The court has reviewed Wreal's motion, Amazon.com, Inc.'s ("Amazon") response (DE # 76), and Wreal's reply (DE # 83), as well as the submissions that accompanied those documents. The Court also held a full day evidentiary hearing on December 30, 2014, and heard live testimony from Mr. Rodrigo Franco and Mr. Raul Plaza from Wreal, and Ms. Elizabeth Baicy, Mr. Anthony Martinelli, and Mr. Nathaniel Fuller from Amazon. Amazon also presented expert testimony from Dr. Peter Lehman[1] and Dr. Dan Sarel, and Wreal put forth rebuttal expert testimony from Dr. Thomas Maronick.

For the reasons detailed below, I recommend that the District Court grant Wreal's motion for preliminary injunction, and issue an injunction as set forth in Section III below.

## I.    BACKGROUND

### A.    The Parties

#### 1.  *Wreal*

Wreal is a Miami-based technology company that was formed in 2006 to develop a platform for "IPTV," or Internet Protocol Television. (Tr. 52:13-19). IPTV allows users to stream video content over the internet and watch it on a television screen or other device. (*Id.* 52:19-22). Wreal has spent over $20 million in developing its technology and markets its service

---

[1] At the evidentiary hearing, Amazon tendered Dr. Lehman as an expert in the field of pornography, and not as an expert in customer confusion or in marketing. (Hearing Transcript ("Tr.") 271:21 to 274:13). Indeed, Dr. Lehman admitted to not having a degree in psychology or marketing. (Tr. 273:2-7). Thus, the Court allowed Dr. Lehman to testify that the FyreTV website is a "hardcore porno site." (Tr. 295:25 to 296:11). However, the Court excluded Dr. Lehman's testimony on likelihood of confusion. (Tr. 302:16 to 303:13; 306:5-12). I excluded the testimony because it is improper for an expert to apply facts in the record to the seven-factor likelihood of confusion test. *Drew Estate Holding Co., LLC v. Fantasia Distribution, Inc.,* 875 F. Supp. 2d 1360, 1369 (S.D. Fla. 2012) (citing *Omar v. Babcock,* 177 Fed. Appx. 59, 63 n. 5 (11th Cir. 2006) (holding that a party "cannot rely on legal conclusions articulated by an expert to meet his burden of coming forward with relevant evidence.")). Dr. Lehman neither conducted a survey (Tr. 300:1 to 301:16), nor was he qualified to opine on consumer psychology.

under the service marks FyreTV® and FyreTV.com®. (*Id.* 52:23-25; 56:22 to 57:1). FyreTV® and FyreTV.com® were registered with the United States Patent and Trademark Office on October 14, 2008, and Wreal has continuously used the marks in commerce since 2007. (P.X. 2; Tr. 60:4 to 61:25).   Significantly, among the uses allowed for the registered marks are telecommunications access to video and audio content provided via a video on demand service via the internet, as well as transmitting stream sound and audio visual recordings via the internet. (Tr. 60:14 to 61:17).   In sum, the marks FyreTV and FyreTV.com are registered for streaming video over the internet.

FyreTV® provides its customers with access to pornographic content. (Tr. 58:23 to 59:2). However, Wreal's FyreTV video streaming platforms are content agnostic, meaning they can be used to stream any video content, including Hollywood movies.   (*Id.* 58:12-25; 82:2-18). FyreTV® was first available only through Wreal's own proprietary set-top box, and later available through other devices as well such as the Roku set top box, and on the web at www.fyretv.com and www.firetv.   (*Id.* 54:9 to 56:21; 78:2-4; 97:13-22).[2] Wreal's set-top box is marketed and sold under the name FyreTV®, though Wreal occasionally refers to its set-top box as either the FyreBoXXX or the FyreTV Box. (*Id.* 62:1 to 63:13).

Wreal has advertised FyreTV® through various channels, including magazine ads, television commercials, trade shows, and online. (Tr. 63:21 to 64:19). Currently, Wreal

---

[2] Wreal never stopped selling its FyreTV set top box.   Although it stopped selling it to new customers for a period of time to channel them to use the new FyreTV video streaming platforms, it always made its FyreTV set top box available to current customers.   It only briefly stopped selling its set top box to anyone for a period of about three weeks in 2014 due to battery leaks.   After fixing the battery leak problem, it re-started selling it to all customers.   (Tr. 57:2 to 58:4; 124:11-15; 167:19 to 170:3).   In addition, it is clear that Wreal never stopped streaming video to its proprietary FyreTV set top box.   (Tr. 57:16-9).

advertises FyreTV® online through the use of banner advertisements. (P.X. 4). Wreal also relies on "word-of-mouth" advertising. (*Id.* 77:14 to 78:6).

    2.  *Amazon*

Amazon is a large and well-known online retailer. It also manufactures its own hardware, including e-readers under the Kindle® brand, and tablets under the name Kindle Fire. (Tr. 207:15 to 209:1). By late 2012 or early 2013, Amazon was working to expand its product line into new categories, including a streaming video device that would eventually become Fire TV. (*Id.* 209:5-16). And around the same time, Amazon began considering how it would brand its new streaming media player. (*Id.*) At some point during those branding discussions, Amazon became aware of Wreal's FyreTV® service. (*Id.* 211:6-9). Though Amazon was aware of Wreal's marks, it decided upon the Fire TV name anyway. Amazon did not contact Wreal about its plans to use the Fire TV name, which is why Wreal was shocked upon learning of Amazon's Fire TV. (*Id.* 90:20 to 91:1).

On April 2, 2014, Amazon released its Fire TV streaming video set top box and service. (Tr. 86:11-16). That was the first time Amazon released a streaming video platform under the name "Fire TV." (*Id.* 247:5-9).  Amazon advertises Fire TV with other brand names that stream video through the device, including Netflix, Hulu, WatchESPN, Crackle and Showtime Anytime (which can be used to stream pornography). (*Id.* 87:12-22; 88:4-10; 180:14-17; P.X. 6). Amazon markets its Fire TV as both a gadget and a service. (P.X. 7).[3]

On April 17, 2014, fifteen days after Amazon launched Fire TV, Wreal sued Amazon, alleging that Amazon's use of the name "Fire TV" for a streaming video set-top box and service infringes on its FyreTV® and FyreTV.com® marks.  (Tr. 128:23 to 129:7).

---

[3] Amazon later released a similar device called "Fire TV Stick."

II.     **ANALYSIS**

A.     **Preliminary Injunction Standard**

Injunctions are specifically authorized by the Lanham Act in trademark infringement cases. 16 U.S.C. §1116(a). In order to obtain a preliminary injunction, Wreal must demonstrate (1) a substantial likelihood of success on the merits; (2) irreparable harm should the injunction not be granted; (3) that the threatened injury to the plaintiff outweighs any potential harm to the defendant; and (4) that granting the injunction would not be adverse to the public interest. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

B.     **Likelihood of Success on the Merits**

To prevail on its trademark infringement claim, Wreal must demonstrate (1) that its mark has priority and (2) that Amazon's mark is likely to cause consumers confusion. *See Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999); *see also* 15 U.S.C. § 1114(1). The priority of Wreal's marks is not in dispute, and thus the only issue is whether Amazon's Fire TV mark is likely to cause consumer confusion.

In the Eleventh Circuit, the following seven factors are weighed in determining the likelihood of confusion between a plaintiff's mark and the name being used by the defendant: "(1) the strength of the plaintiff's mark; (2) the similarity between the two marks; (3) the similarity of the product or service; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent in using a trademark that is similar to the plaintiff's trademark; and (7) consumers' actual confusion." *Ryder System, Inc. v. Storage & Moving Services, Inc.*, 2013 WL 3873231 *5 (S.D.Fla. July 25, 2013).

This is not a passing off case. Rather, Wreal alleges that Amazon's use of the Fire TV moniker results in reverse confusion, which occurs when a large junior user like Amazon

saturates the market with a brand name that is similar or identical to the mark of a smaller, senior user like Wreal. *TV Land L.P. v. Viacom Int'l, Inc.*, 908 F. Supp. 543, 550 (N.D. Ill. 1995). In reverse confusion cases, the resulting harm is "that the senior user loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Id.*

I will now analyze each factor.

1. *Strength of the Marks*

In analyzing this factor, the court must examine the type of mark at issue to determine "whether it is strong or weak." *Frehling,* 192 F.3d at 1335.  In reverse confusion cases, courts focus on the strength of the junior user's mark because the alleged harm is that consumers are likely to associate the mark with the junior user's goods or services. *See Sands, Taylor & Wood. Co.*, 978 F.2d 947, 959 (7th Cir. 1992); *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1130 n. 5 (9th Cir. 1998) ("In a reverse confusion case, however, we must focus on the strength of the *junior* user's mark."). Wreal contends that the marks are strong, arbitrary marks, and Amazon concedes that the marks are distinctive. (DE # 28 at 10-12; DE # 76 at 11).

While there is no dispute as to the strength of the mark as used by either party, the parties differ as to the effect of Amazon's decision to place its housemark "Amazon" alongside "Fire TV." Wreal argues that this serves to aggravate the likelihood of reverse confusion by creating a strong association between Amazon and Fire TV. (DE # 83 at 3 (citing *Sands*, 978 F.2d at 960)). Amazon disagrees, and suggests that this practice reduces the likelihood of confusion because, according to Amazon, "clearly associating a mark with its true source tends to reduce confusion as to its source." (DE # 76 at 12).

However, Amazon, as the junior user, is not the "true source" of the mark. This means

5

that Amazon heightens the risk of reverse confusion when it places its housemark next to "Fire TV," which, as Amazon concedes, clearly creates an association between "Fire TV" and Amazon. Thus, it is difficult for the Court to conclude that Amazon's practice of placing "Amazon" alongside "Fire TV" somehow mitigates confusion. Rather, Wreal is correct that Amazon's use of its housemark aggravates the likelihood of confusion by reinforcing the connection between "Amazon" and the name "Fire TV" in the minds of consumers. *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006) (holding that the junior user's linkage of the mark with its more recognized housemark in a reverse confusion case actually aggravates the threat to the senior user); *TV Land, L.P.*, 908 F. Supp. at 551 ("In any event, … under the circumstances of [a reverse confusion case], the linking of the plaintiff's mark with the defendant's brand name is an aggravation, not a justification.").[4] Thus, I find that this factor weighs heavily in favor of a finding of likelihood of confusion.

2. *Similarity of the Marks*

In evaluating the similarity of the marks, courts "consider the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985).

Sound is the easiest, and there is no dispute that FyreTV® and Fire TV sound the same. The Eleventh Circuit has held that aural similarities are "particularly important" where a consumer simply speaks the name of the mark. *E. Remy Martin,* 756 F.2d at 1531 ("The F.

---

[4] Amazon argued otherwise, citing two reverse confusion cases, *Stuart J. Kaufman, M.D. & Associates, P.A. v. Bausch & Lomb Inc.*, No. 8:13-CV-416-T-33, 2013 WL 6154166 (M.D. Fla. Sept. 4, 2013) and *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002). These cases do not support Amazon's position, however, because in each of those cases ***both*** plaintiff and defendant used the mark in conjunction with their respective housemark. That is not the case here, as Wreal does not use its name "Wreal" with "FyreTV", and thus this authority does not help Amazon.

REMY mark is *nearly* identical and REMY *is* identical to Remy Martin's registered REMY mark … This may be particularly important where, as testimony in the record here shows, much REMY MARTIN cognac or brandy is consumed by the glass at bars or restaurants, where a consumer simply orders a 'Remy.'"). Wreal's COO, Rodrigo Franco, testified that one important way FyreTV® attracts new customers is by word-of-mouth, or by recommendations from friends. (Tr. 77:14 to 78:4). Mr. Franco said that this is especially true given the nature of FyreTV®'s content, as its customers are less likely to recommend FyreTV® over social media, and more likely to do so in person, where the mark would be recommended audibly. (*Id.*)

The marks also share the same meaning or connotation, in that they both combine a variant of the arbitrary word "Fire" with the descriptive "TV." In other words, "[n]either literally means anything…," apart from the shared use of "TV." *Dreamwerks,* 142 F.3d at 1131.

The marks share some visual similarities as well. They both use the same word with a slightly different spelling, and use colors associated with fire – red for Wreal, orange for Amazon, though Amazon occasionally uses red as well. (P.X. 10). And while the parties currently use different fonts and graphics to depict the marks visually, neither party has offered evidence that consumers have strong associations with their marks as they appear visually. *See Masters Software, Inc. v. Discovery Comm's, Inc.*, 725 F. Supp. 2d 1294, 1302 (W.D. Wash. 2010) ("Neither Masters nor Discovery has offered evidence that consumers have strong associations with their marks as they appear visually").

Amazon urges the court to focus on the way the mark is presented on the parties' respective web pages, claiming that its Fire TV is presented in a streamlined, Amazon-branded environment, whereas the FyreTV® mark appears on a page with explicit imagery. (DE # 76 at 10). Thus, Amazon argues, the marks are presented differently in commerce. (*Id.*) Wreal points

out that Amazon customizes its landing page, and that a customer visiting amazon.com that had recently searched for pornography will be exposed to the Fire TV mark alongside a selection of pornography and other products. (DE # 83 at 5).

In that regard, Wreal presented evidence in the form of a screenshot taken of the amazon.com homepage. (Tr. 102:6 to 103:25; P.X. 10). The page featured a red banner advertisement for Fire TV, along with other items for sale, including pornographic magazines by other brands. (*Id.* 103:12-104:25). Thus, the evidence contradicts Amazon's explanation of how its Fire TV name appears in commerce. Because Amazon customizes its landing page, its Fire TV mark will be presented differently to different customers. One that is interested in pornography, and thus is likely a part of Wreal's target market, may be exposed to Amazon's Fire TV mark alongside pornographic magazines or other adult oriented items.

In addition, Amazon advertises Fire TV with other brand names that stream video through the device, including Netflix, Hulu, WatchESPN, Crackle and Showtime Anytime (which can be used to stream pornography). (Tr. 87:12-22; 88:4-10; 180:14-17; P.X. 6).

Overall, I find that the impression that the marks create is similar, and that an analysis of this factor weighs heavily in favor of a finding of likelihood of confusion.

### 3. *Similarity of the Products and Services*

"In assessing this factor, the court must determine whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products and services of the respective parties." *Tiger Direct, Inc. v. Apple Computer, Inc.*, No. 05-21136, 2005 WL 1458046 *17 (S.D. Fla. May 11, 2005) (Lenard, J.) (citing *Frehling*, 192 F.3d at 1338; *E. Remy Martin & Co.*, 756 F.2d at 1530). This standard applies in the context of reverse confusion as well. *See TV Land, L.P. v. Viacom, Int'l, Inc.* 908

F. Supp. 543, 551 (N.D.Ill. 1995) ("[T]he rights of an owner of a registered trademark … extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.").

Wreal argues that the primary functions of FyreTV® and Fire TV are exactly the same in that each provide streaming video over the internet. (DE # 28 at 17). Wreal also presented evidence that there is some overlap in the type of content. (Tr. 87:12 to 88:10; 99:14 to 102:1; 180:14-25). Wreal acknowledges that the content typically streamed over Amazon's Fire TV differs from the content streamed over its FyreTV®. (DE # 28 at 17). But it argues that this distinction is irrelevant as the proper inquiry is whether the products or services at issue are of the kind that the public attributes to the same source, not whether they are identical. (*Id.* at 17). Wreal put forth competent and substantial evidence that mainstream movies and adult content are complementary in that well-known content providers such as Comcast offer a full spectrum of pay-per-view movies, including mainstream and adult content. (Tr. 82:10 to 83:25).[5]   *See Dreawerks Prod. Group, Inc.*, 142 F.3d at 1131 (relatedness of goods extends to goods that are complementary).

In an effort to show that the marks are used for dissimilar products, Amazon put forth expert testimony from Dr. Peter Lehman, an expert on pornography, who testified in great detail on the fact that Wreal's FyreTV® streams pornography, even though that fact was not in dispute. Amazon also put forth evidence that it does not permit pornography on its Fire TV or on the amazon.com website, and argued, essentially, that any pornography found on its website is there accidentally.

---

[5]   Amazon did not dispute this point. In fact, its expert on pornography, Dr. Peter Lehman, testified that hardcore pornography can be rented from large hotel chains that also offer mainstream and kids movies. (Tr. 307:1-14).

However, Amazon conceded that it does not make consumers aware of that policy. (Tr. 264:6-22). Moreover, Wreal presented competent and substantial evidence that Amazon offers for sale a great deal of adult content, including pornographic DVDs, books, and sex toys.[6] Wreal also presented competent and substantial evidence that pornography can be streamed over Amazon's Fire TV.  (Tr. 87:12 to 88:10; 180:14-17).[7]

The evidence that Amazon put forth only establishes that FyreTV® and Fire TV stream non-identical content. But there is no dispute that consumers can readily distinguish the content, just as consumers can readily distinguish between wine and brandy. *E. Remy Martin,* 756 F.2d 1525 (reversing denial of preliminary injunction and finding that wine and brandy were sufficiently similar such that consumers could "easily conclude" that they come from the same source); *see also Masters Software,* 725 F. Supp. 2d at 1304 (holding in a reverse confusion case that a television show about a cake bakery and cake management software are sufficiently related to cause a likelihood of confusion). Thus the evidence that Amazon put forth fails to address the relevant question, which is whether a reasonable consumer could attribute them to the same source.

---

[6] On this point, Wreal had one of Amazon's witnesses, Mr. Anthony Martinelli, open a package that was recently purchased on Amazon's website. (*See* Tr. 261:17 to 264:2; P.X. 11). The package contained a DVD that Mr. Martinelli admitted was hardcore pornography. (Tr. 264:1-2).

[7] Amazon also argued that the proper comparison is between Wreal's FyreTV® set-top box and Amazon's Fire TV hardware. Amazon presumably takes this position because Wreal stopped selling set-top boxes to new customers in 2012, and because Wreal's set-top box was briefly unavailable for its current customers for a few weeks in early 2014 due to a battery leak issue. However, the evidence is clear that Wreal did resume selling its set top box to current (and new) customers after the battery leak was resolved.  (*See* footnote 2 *supra*).  In addition, it is clear that Wreal never stopped streaming video to its proprietary FyreTV set top box.  (Tr. 57:16-9).  It appears that Amazon half-heartedly wants to make the argument that Wreal abandoned the use of its FyreTV® mark, at least with respect to its set-top box. But Amazon did not raise abandonment as an affirmative defense. Even if it had, it did not establish that Wreal abandoned its marks. *See Cumulus Media, Inc. v. Clear Channel Comms., Inc.*, 304 F.3d 1167, 1170 (11th Cir. 2002) (affirming order enjoining radio station from using the name "The Breeze" over a year after the plaintiff had changed its name from "The Breeze" to "Star 98.").

Looking at the evidence, it is clear that FyreTV® and Fire TV are sufficiently similar such that reasonable consumers can attribute them to the same source. Wreal and Amazon each use the mark in connection with streaming video services. While the content is different, it is nevertheless complementary, which heightens the danger of consumer confusion. *E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir. 1992) ("Where goods are related or complementary, the danger of consumer confusion is heightened."). And while Amazon suggested that consumers would not attribute FyreTV® to *Amazon* because Amazon is not in the pornography business, the evidence overwhelmingly proves otherwise. Amazon sells pornographic DVDs, books, and magazines, and even streams adult content over its Fire TV.  It also sells hundreds of thousands of sex toys.  Consumers can and do shop for pornographic content on Amazon. A reasonable consumer could easily conclude that FyreTV® and Fire TV come from the same source, and thus this factor weighs heavily in favor of a finding of a likelihood of confusion.

4.  *Similarity of the Parties' Trade Channels and Customers*

In analyzing this factor, the court looks at "where, how, and to whom the parties' products are sold." *Frehling,* 192 F.3d at 1339. Wreal argues that there is significant overlap between the parties' respective target markets because Amazon's Fire TV is a mass-market product. Amazon argues that Wreal's FyreTV® is not available for sale on Amazon or any retail outlets that sell Fire TV, and thus the parties do not share retail outlets.

The evidence shows that the parties target the same customers. Mr. Franco testified that Wreal targets adults over the age of 20 with disposable income and access to the internet, "the same type of customers that will buy erotica, toys, hardcore pornography magazines from Amazon or hardcore pornography DVD's from Amazon's web site." (Tr. 78:10-15; 79:2-13).

11

Indeed, a customer shopping on Amazon's website for pornographic material may be exposed to a Fire TV advertisement alongside advertisements for pornographic content. (P.X. 10).

Moreover, Amazon identified Roku as a top competitor of Fire TV, and Ms. Elizabeth Baicy testified that it targets Roku's customers by purchasing paid internet search ads containing Roku as a search term. (Tr. 212:6-18). Wreal's FyreTV® is available on Roku, thus to the extent that Amazon targets Roku users, it also targets FyreTV®'s users.

And while it is true that Wreal's FyreTV® set-top box and service cannot be purchased on Amazon's website, this argument misses the mark. As the Ninth Circuit recently explained, "[m]arketing channels can converge even when different submarkets are involved so long as 'the general class of ... purchasers exposed to the products overlap.'" *Pom Wonderful LLC v. Hubbard*, No. 14-55253, 2014 WL 7384391 *8 (9th Cir. Dec. 30, 2014) (citation omitted). Thus, I find that this factor weighs heavily in favor of a finding of a likelihood of confusion.

5. *Similarity of Advertising Media*

"This factor looks to each party's method of advertising." *Frehling*, 192 F.3d at 1339. Wreal argues that the parties advertise over the same media, pointing out that it has advertised in mainstream magazines, and on television. Amazon argues that Wreal now limits its advertising to online advertising, and thus there is no overlap.

Overlap is not necessary in a reverse confusion case, however. That is particularly true, as here, where the junior user has significant market power and can "permeate[] virtually every marketing channel, even channels that [the junior user] has not specifically targeted." *Masters Software*, 725 F. Supp. 2d at 1305. For example, someone who comes across one of Wreal's banner advertisements might assume that it is connected to Amazon even if Amazon never advertised on that particular website. *See id.* ("For example, a reader of CakeCentral magazine,

one of the periodicals in which Masters advertises CakeBoss, might well assume a connection to *Cake Boss* even if Discovery never advertised in the magazine."). And there is uncontroverted evidence that Wreal advertised on the same media as Amazon in the past. Should Wreal decide to do so in the future, then the similarity of advertising media will only increase.

Finally, there is evidence that Wreal relies on word-of-mouth advertising. (Tr. 77:10 to 78:6). This type of marketing is particularly susceptible to confusion given that the names are aurally identical. On balance, I find that this factor weighs in favor of a finding of likelihood of confusion.

    6. *Actual Confusion*

        i. <u>Wreal Presented Evidence of Actual Confusion.</u>

The law in this Circuit is clear that evidence of actual confusion is the best evidence of a likelihood of confusion. *Frehling,* 192 F.3d at 1340. It is also "well settled in this circuit that evidence of actual confusion between trademarks is not necessary to a finding *of likelihood* of confusion." *TracFone Wireless, Inc. v. Cabrera,* 883 F. Supp. 2d 1220, 1226 (S.D.Fla. 2012) (Lenard, J.). Courts recognize that, in reverse confusion cases, "marshalling evidence of actual confusion is often difficult." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,* 237 F.3d 198, 233 (3rd Cir. 2000). This is especially true in this case, where a confused consumer would be contacting Amazon to ask about adult content. And not many would call because, as Amazon's expert on pornography admitted, many people use pornography, but do not admit it. (Tr. 306:23-25).

I find that Wreal put forth competent and substantial evidence of actual confusion, particularly an audio recording of an Amazon customer who called Amazon's customer support shortly after Amazon launched its Fire TV. That individual called Amazon to inquire about its Fire TV, and asked specifically how to access adult content on the device. (Tr. 180:1-4). The

caller was under the impression that he could access adult content through Amazon's device by spelling F-Y-R-E. (Tr. 180:14 to 181:1).

Amazon unconvincingly argues that this customer was not confused. But when asked what actual consumer confusion would look like, Amazon's 30(b)(6) representative (Mr. Fuller) testified that a confused caller would contact Amazon to ask how to access the "streaming service Fyre, with a Y, streaming service." (Tr. 188:15-21).[8] Wreal also put forth evidence of actual confusion in the form of tweets, including one directed at FyreTV® asking if it merged with Amazon. (P.X. 8).  Another one stated that "Amazon starts FyreTV."  (P.X. 9).

Amazon argues that this evidence is *de minimis.* But the Eleventh Circuit has held that "the quantum of evidence needed to show actual confusion is relatively small." *Caliber Automotive Liquidators, Inc. v. Premier Chrysler Jeep, Dodge, LLC,* 605 F.3d 931, 937 (11th Cir. 2010) (citing *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 845 (11th Cir.1983) (holding that two instances of actual confusion were sufficient evidence of actual confusion to be worthy of some consideration)); *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.,* 675 F.2d 1160, 1167 (11th Cir. 1982) (holding that two instances of actual confusion, one involving a customer, were sufficient evidence of actual confusion to be worthy of some consideration). Thus, based on the evidence of actual confusion that the court has seen at this stage, this factor weighs heavily in favor of a finding of likelihood of confusion.

ii.   <u>Amazon's Consumer Survey is Fatally Flawed.</u>

To rebut the evidence of actual confusion, Amazon hired Dr. Dan Sarel, who conducted a

---

[8] Amazon argued that it could not find any other evidence of consumer confusion in its records. However, Amazon conceded that its search had some limitations. (Tr. 319:22 to 320:7).

consumer survey that purportedly found an absence of confusion.[9] (Tr. 323:20-22). Wreal argues that Dr. Sarel's survey suffers from numerous methodological flaws, and that Dr. Sarel did not properly follow his own methodology. To that end, Wreal retained Dr. Thomas Maronick to analyze Dr. Sarel's survey. Dr. Maronick concluded that the survey was so flawed that it cannot be used to support Dr. Sarel's opinion that there is no likelihood of confusion. (Tr. 367:7-25). I agree.

Dr. Maronick identified a number of flaws, but there is one flaw in particular that renders Dr. Sarel's survey irrelevant to this case, which is Dr. Sarel's failure to survey the correct universe. "Selection of the proper universe is one of the most important factors in assessing the validity of a survey and the weight that it should receive because 'the persons interviewed must adequately represent the opinions which are relevant to the litigation.'" *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1323 (N.D.Ga. 2008) (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980)). "Selection of a proper universe is so critical that 'even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'" *Id.* (citing *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F.Supp.2d 734, 767 (E.D. Mich. 2003)).

Dr. Sarel specifically defined the relevant universe as "consumers over 18 years of age

---

[9] Amazon also points out that Wreal did not proffer its own consumer survey. "This Circuit, however, has moved away from relying on survey evidence." *Frehling Enterprises, Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1341 n.5 (11th Cir. 1999) (citation omitted). Thus, the fact that Wreal did not put forth survey evidence "is not damaging to [its] case." *Id.* Nor is it damaging to Wreal that its expert did conduct a consumer survey just after Amazon's Fire TV was released, as the level of awareness of Amazon's Fire TV in the marketplace was low at that time (Tr. 238:1-11), and "a survey cannot be run in a reverse confusion case prior to the junior user's saturation of the market with its mark because, until that time, consumers have not been exposed to the relatively large advertising and promotion of the junior user that is the hallmark of a reverse confusion case." 4 McCarthy on Trademark and Unfair Competition § 23:10 (4th ed. 2011).

who paid for, or are willing to pay for, adult porn video-on-demand (VOD) streaming services."
(Tr. 346: 23-24 (Dr. Sarel's Likelihood of Confusion Study at ¶ 32); 326:4-6). The fatal problem
is that Dr. Sarel did not sample that universe, which is something Dr. Sarel was forced to
concede. The reason is that the screening questions that Dr. Sarel used only screened for those
who had visited or intend to visit adult websites that require users to pay to access, and **_not_** for
those that actually paid for access or were willing to pay for access. (Tr. 347:19 to 350:9). Dr.
Sarel admitted that it is possible to visit the FyreTV.com® website without paying to access, and
that he personally visited the FyreTV.com® website without paying to access in designing his
survey. (*Id.*) Thus, Dr. Sarel was forced to concede that a respondent could qualify for his survey
without having ever paid to access an adult content website and without being willing to pay to
access such content. (*Id.*).

   This means that Dr. Sarel's universe fails to match the one that he defined as proper, as it
includes those that have merely visited an adult content website that requires payment to access
streaming video, regardless of whether they have paid or have any intention of paying to access.
Mr. Franco testified that only 1 out of 1000 visitors to the FyreTV.com® website actually pay to
view content during their visit. (Tr. 78:23 to 79:1; 369:3 to 370:16).[10] As a result, Dr. Sarel's
universe is extremely overbroad, and its results are irrelevant. *Smith*, 537 F. Supp. 2d at 1323.

   While Dr. Sarel's failure to survey the correct universe standing alone renders his survey
irrelevant, the undersigned finds that there were other serious methodological flaws identified by
Dr. Maronick that would otherwise severely diminish its probative value. In particular, Dr.
Maronick explained that Dr. Sarel's survey used inappropriate questions designed to push

---

[10] This testimony was uncontroverted, and means that it is possible, indeed highly likely, that
none of the 200 respondents that took Dr. Sarel's survey make up the universe that Dr. Sarel
defined as the proper one.

respondents into thinking about pornography, that Dr. Sarel's survey failed to replicate market conditions[11], and that Dr. Sarel failed to follow his own methodology in coding respondents as confused. (Tr. 368:2 to 369:2; 370:17 to 371:12; 372:6 to 373:12; 374:6 to 376:20). Thus, even if Dr. Sarel had used the proper universe, the court would give the survey little, if any, weight.

7.   *Amazon's Intent*

Typically, courts look to an infringer's intent to determine if it used the plaintiff's mark "with the intention of deriving a benefit from the plaintiff's business reputation …." *Frehling*, 192 F.3d at 1340. Wreal argues that this standard does not apply in reverse confusion cases, and Amazon acknowledges as much. Wreal posits that the appropriate inquiry is whether the defendant acted carelessly or otherwise culpably in selecting the allegedly infringing name. Amazon argues that intent is either irrelevant, or that the court should look to whether Amazon acted deliberately to push Wreal out of the market.

While it is unclear from the record whether Amazon acted deliberately to push Wreal out of the market, it is undisputed that Amazon knew of Wreal's use of the FyreTV® marks, but chose to ignore Wreal's senior rights to the marks. *See Imperial Toy Corp., Inc. v. Ty, Inc.,* No. 97-C-8895, 1998 WL 601875 *6 (N.D. Ill. 1998) (finding that the intent factor weighed in favor of a likelihood of confusion where the junior user deliberately ignored the senior user's rights). Thus, I find that Amazon clearly acted, at minimum, in knowing disregard of Wreal's senior rights to the marks. This factor weighs in favor of a finding of likelihood of confusion.

8.   *There is a Significant Likelihood of Confusion.*

---

[11] A survey must be "designed to examine the impression presented to the consumer by the accused product. Therefore, [it] must use the proper stimulus, one that tests for confusion by replicating marketplace conditions." *Fancaster, Inc. v. Comcast Corp.,* 832 F. Supp. 2d 380, 405 (D.N.J. 2011) (citing *Conopco, Inc. v. Cosmair, Inc.*, 49 F.Supp.2d 242, 253 (S.D.N.Y.1999))

Evaluating the overall balance of the seven factors, I find that Wreal demonstrated a significant likelihood of confusion. I conclude that each factor weighs in favor of Wreal, and that factors one, two, three, four, and six weigh heavily in favor of a finding of likelihood of confusion. Thus, I conclude that there is a significant likelihood of confusion, and that Wreal has shown a substantial likelihood of success on the merits.

## C.    Irreparable Harm

1.   *Wreal put Forth Substantial Evidence of Irreparable Harm.*

Trademark infringement "by its nature causes irreparable harm." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 986 (11th Cir. 1995) (citing *Tally-Ho, Inc v. Coast Community College District,* 889 F.2d 1018, 1029 (11th Cir. 1989)). Thus, because Wreal has shown a substantial likelihood of success on the merits, the court finds that irreparable harm is presumed. *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1286 (S.D. Fla. 2010) ("The Eleventh Circuit explained that it has repeatedly held that 'a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may itself constitute a showing of … [a] substantial threat of irreparable harm.'").

Even without the benefit of the presumption, Wreal put forth substantial evidence that it will be irreparably harmed. Mr. Franco testified that if consumers come to associate the FyreTV® name with Amazon, Wreal would lose control of its brand and its destiny. (Tr. 92:4-18). Mr. Franco referred to a scandal involving Amazon where a guide for child molesters was available for sale on Amazon's Kindle devices. (*Id.*) He then explained that a scandal like that could destroy his business, if consumers associate Wreal's FyreTV® with Amazon. (*Id.*).  Thus, even absent the presumption of irreparable harm that applies in this Circuit, Wreal has demonstrated that it will suffer irreparable harm.

18

At the hearing, Amazon did not put forth any evidence to rebut the presumption of irreparable harm, nor did it challenge the evidence of irreparable harm that Wreal put forth. Instead, Amazon suggested that Wreal has suffered no tangible, monetary harm as a result of Amazon's infringement.[12] Amazon's argument "misses the point," however, because "[t]he harm arising from reverse confusion is not likely to be tangible; it is instead the senior user's loss of 'the value of [its] trademark, its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'" *Masters Software*, 725 F. Supp. 2d at 1307 (quoting *Ameritech, Inc. v. Am. Info Techs. Corp.,* 811 F.2d 960, 964 (6th Cir. 1987).

2.   *Wreal Did Not Wait Too Long to Move For a Preliminary Injunction.*

Amazon also argues that Wreal, by filing its motion for preliminary injunction five months after Amazon launched its Fire TV, waited too long to move for a preliminary injunction, thus neutralizing any presumption of irreparable harm. (DE # 76 at 25-27). In support, Amazon principally relies on this Court's decision in *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.,* 188 F. Supp. 2d 1350, 1354 (S.D.Fla. 2002) (Lenard, J.). Amazon also relies on cases from the Second Circuit, where district courts expect plaintiffs to move more quickly than in the Eleventh Circuit. However, Amazon did not cite to any case in this Circuit holding that a five-month (or less) delay is fatal.[13] In fact, the only authority from this Circuit that Amazon relied on is the *Seiko* decision, which the court will now analyze.

---

[12] Amazon also argued that Wreal has no reputation to protect because its FyreTV® provides access to pornographic content. (DE # 76 at 27). Amazon presented no evidence to support this argument. To the contrary, the Court can infer from the record that Wreal does have a reputation to protect, as it relies heavily on word of mouth to attract new customers. (Tr. 77:14 to 78:6).

[13] District Courts in this Circuit grant motions for preliminary injunction filed more than five months after the infringement was noticed. *See, e.g., Bellsouth Adver. & Publ'g Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 784-5 (M.D. Fla. 1991) ("The evidence before this Court establishes that Plaintiff first learned of Defendants' insertion directory in January 1991. The Court finds that Plaintiff's delay of ***seven to eight months*** is ***not*** an unreasonable amount of

In *Seiko,* the plaintiff sued the defendants for trademark infringement, complaining that the defendants were selling SEIKO and PULSAR watches in counterfeit watch boxes. *Seiko*, 188 F. Supp. 2d at 1352-53.  Plaintiff claimed "that it first became aware of Defendants' activities as a result of seizures conducted by Plaintiff of counterfeit SEIKO watches and related goods and documents pursuant to an order of this Court in an action filed in July of 2000." *Id.* at 1353. "On November 9, 2000, Plaintiff's counsel sent a letter to Defendants demanding that Defendants cease and desist from selling reproductions of Plaintiff's SEIKO and SEIKO (stylized) trademarks." *Id.*  "After correspondence and conversations with Defendants regarding the alleged differences between the parties' watch boxes, Plaintiff sent a second cease-and-desist letter on February 15, 2001, demanding that Defendants provide written confirmation that they would cease and desist from selling unauthorized watch box reproductions." *Id.*  "Defendants did not respond as Plaintiff requested." *Id.*  Thus, "[o]n May 2, 2001, Plaintiffs filed a Complaint, along with a Motion for Preliminary Injunction and Expedited Discovery." *Id.*

After finding that the plaintiff failed to establish a substantial likelihood of success on the merits, this Court went on to hold that the "unexplained delay undercuts any sense of urgency and, therefore, Plaintiff has failed to demonstrate sufficient need for a preliminary injunction." *Id.* at 1355-6.  The unexplained delay was that "Plaintiff waited until May 2, 2001, ***almost a full year*** after it admits to knowing about Defendant's activities, to file this lawsuit." *Id.*  (emphasis added).  In sum, in *Seiko*, the plaintiff delayed almost 12 months in filing the complaint and motion for preliminary injunction after learning of the infringement. Thus, "Plaintiff's dilatory prosecution of its rights somewhat vitiates the notion of irreparable harm." *Id.*

---

delay, and does not necessitate the preclusion of a finding of irreparable injury.") (emphasis added); *Bulova Corp. v. Bulova do Brasil Com. Rep. Imp. & Exp. Ltda.,* 144 F. Supp. 2d 1329, 1332 (S.D. Fla. 2001) (granting preliminary injunction motion after 4 1/2 year delay).

The unique facts of *Seiko* clearly distinguish it from this case. There, this court found rather decisively that there was no likelihood of success on the merits. Here, Wreal has demonstrated a substantial likelihood of success on the merits. Wreal has also shown that it will suffer immediate irreparable harm, something this court did not find in *Seiko*. Also, in *Seiko*, the plaintiff admittedly knew about the defendants activities approximately a year before it filed suit. Here it is undisputed Wreal learned of Amazon's Fire TV on April 2, 2014, the same day that Amazon announced it to the world. Wreal filed suit fifteen days later; it didn't wait a year like the plaintiff in *Seiko*.  Wreal then filed its motion for preliminary injunction on September 22, 2014, only five months later, which is not an unreasonable delay in this Circuit. (DE # 28).  *See Bellsouth Adver. & Publ'g Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 784-5 (M.D. Fla. 1991) ("The evidence before this Court establishes that Plaintiff first learned of Defendants' insertion directory in January 1991. The Court finds that Plaintiff's delay of ***seven to eight months*** is ***not*** an unreasonable amount of delay, and does not necessitate the preclusion of a finding of irreparable injury."); *see also See Boldface Licensing + Branding v. Tillett*, 940 F. Supp. 2d 1178, 1196-7 (C.D. Cal. 2013) (granting motion for preliminary injunction filed eight months after infringement noticed).

Importantly, and contrary to Amazon's position in this case, Judge Lenard did not hold that a delay in filing suit is *per se* fatal. Rather, Judge Lenard explained that "[a]lthough a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it ***may*** still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Id.* at 1356 (emphasis added). Then, the court described the uniquely long one-year delay in *Seiko* as one that "undercuts any sense of urgency ...." *Id.* (citation omitted). Thus, I will decline Amazon's invitation to recommend that the District Court take the

unprecedented step of denying Wreal's motion for preliminary injunction based solely on what Amazon perceives to be an unreasonable delay.

Thus, the Undersigned does not agree with Amazon that the time it took for Wreal to file its motion supports that I recommend that the District Court deny Wreal's motion.

### D.       Balance of Hardships

The court must also consider whether the injury to Wreal outweighs the harm a preliminary injunction may cause to Amazon. Amazon argues that it will cost it an extremely large amount of money to rebrand its Fire TV family of products. Even if that were the case, it is insufficient to avoid an injunction. Otherwise, "an injunction would never be available in a reverse confusion case." *Masters Software,* 725 F. Supp. 2d at 1307.

Because Wreal has a substantial likelihood of success on the merits, it is substantially likely that Amazon will suffer no harm because it has no right to use Wreal's marks. *Chanel, Inc. v. chanel255.org*, No. 12-21762-CIV, 2012 WL 1941598 *6 (S.D.Fla. May 29, 2012) (finding that there is no legitimate hardship to a defendant that is enjoined from using marks that it had no legal right to use).

### E.       Public Interest

The public interest will also be served by a preliminary injunction in this case. The law in this Circuit is clear that the public interest is served by avoiding confusion. *Ferrellgas Partners, L.P. v. Barrow,* 143 Fed.Appx 180, 191, 2005 WL 1736276 *8 (11 Cir. July 26, 2005).

### III.     PRELIMINARY INJUNCTION AND BOND

Based on the foregoing, the Undersigned recommends that this court enter an order preliminarily enjoining Amazon, its officers, subsidiaries, parents, affiliates, divisions, agents, servants, employees, and attorneys, and those persons in active concert or participation with it,

from infringing upon Wreal's trademark rights by using the names Amazon Fire TV, Fire TV, Fire TV Stick, and any other derivation of the Fire TV name that would likely cause consumer confusion.

Fed. R. Civ. P. 65(c) requires the court to consider what security should be required in the event that an injunction is overturned. "The amount of an injunction bond is within the sound discretion of the district court." *Caillon Importers, Ltd. v. Frank Pesce Intern. Group, Ltd.*, 112 F.3d 1125, 1127 (citing *Corrigan Dispatch Co. v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1979) (holding that the trial court "may elect to require no security at all.")).

Prior to the hearing on Wreal's motion for preliminary injunction, the Undersigned ordered the parties to brief the issue of what bond would be appropriate, and held a hearing on that matter. Amazon sought a significant bond, while Wreal argued that any bond should be minimal given that it had a substantial likelihood of success on the merits. Wreal also argued that Amazon failed to present specific evidence of potential financial loss.

Courts in this Circuit routinely require only a nominal bond, or none at all, upon a sufficient showing of a likelihood of success *in trademark infringement cases*. *Ryder System, Inc. v. Storage & Moving Services, Inc.*, Case No. 13-61466-CIV, 2013 WL 3873231 at *8 (S.D.Fla. July 25, 2013) (granting preliminary injunction in a trademark infringement case, and requiring the plaintiff to post a $5,000 bond); *Nailitiques Cosmetic Corp v. Salon Sciences, Corp.*, 41 U.S.P.Q. 1995 (S.D.Fla. 1997) (requiring $10,000 bond in trademark infringement case); *see also TracFone Wireless, Inc. v. Washington*, 978 F. Supp. 2d 1225, 1235 (M.D. Fla. 2013) (not requiring a bond where the court determined that the plaintiff had a high probability of success on the merits); *Sylvan Learning Inc. v. Learning Solutions, Inc.*, 795 F. Supp. 2d 1284 (S.D.Ala. 2011) (issuing an injunction in a trademark infringement case and requiring no bond).

This case likewise calls for a nominal bond, particularly due to the fact that any harm Amazon will endure is entirely self-inflicted. *See Ryder Systems, Inc.*, 2013 WL 3873231 at *8.

Moreover, "[t]he 'burden is on the party seeking security to establish a rational basis for the amount of a proposed bond." *VAS Aero Services, LLC v. Arroyo,* 860 F. Supp. 2d 1349, 1364 (S.D.Fla. 2012) (quoting  *Cont'l Group, Inc. v. KW Prop. Mgmt., LLC,* 2009 WL 3644475, at *6 (S.D.Fla. Oct. 30, 2009)). Amazon failed to meet its burden, as it presented only speculative, unsubstantiated estimates of its potential harm, much of which seems to be arbitrary.  Amazon only submitted a summary chart of Amazon's past and projected advertising expenditures without producing to Wreal or the Court the backup documents, which must otherwise be admissible in evidence.  (Tr. 217:25 to 222:14).  *See* Fed. R. Evid. 1006 ("The proponent may use a summary, chart or calculation to prove the content of voluminous writings … that cannot be conveniently examined in court.  The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place."); *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004) ("Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible.").  Based on the unsubstantiated summary chart, Amazon's Ms. Baicy only vaguely concluded that Amazon would have to spend a substantial amount in additional advertising if the injunction were entered. (Tr. 231:10-13).  Yet, she did not have complete documentation to support her conclusion (Tr. 233:2 to 234:13), and she failed to take into account the additional (and apparently substantial) revenues that the extra advertising expenditures would generate for Amazon in sales if the injunction were entered.  (Tr. 238:19 to 242:17).  This omission by Amazon in its evidence is fatal, given that the substantially similar amount spent in advertising in 2014 generated revenues far exceeding the expenditures.  (Tr. 223:9-12; 238:19 to 240:7).  Thus, I am unable to give any

24

weight to the unsubstantiated, vague and incomplete estimates relied upon by Amazon. *See Masters Software,* 725 F. Supp. 2d at 1309 (in a reverse confusion case, setting bond at $10,000 because the defendant provided only the vaguest evidence of the costs of complying with the injunction in support of its failed request for a $10 million bond).

Thus, the Undersigned recommends that, given the substantial likelihood of success on the merits that Wreal has shown, that the District Court require Wreal to post a nominal $10,000 bond.

## IV.    CONCLUSION

The Undersigned respectfully recommends that the District Court grant Wreal's Motion for Preliminary Injunction, and enter a preliminary injunction consistent with this report.

## V.    OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(a), the parties have fourteen (14) days after being served with a copy of this Report and Recommendation to serve and file written objections, if any, with the District Court. Failure to timely file objections shall bar the parties from a de novo determination by the District Court of an issue covered in this Report and Recommendation and from attacking on appeal the factual findings contained herein. *Resolution Trust Corp. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir.1993).

**RESPECTFULLY RECOMMENDED,** in Chambers, at Miami, Florida this ___ day of _____, 2015.

_____
**JONATHAN GOODMAN**
**UNITED STATES MAGISTRATE JUDGE**

Respectfully submitted,

WNF LAW, P.L.
*Attorneys for WREAL, LLC*
1111 Brickell Avenue Suite 2200
Miami, Florida 33131
Phone: (305) 760-8500 / Fax: (305) 760-8510

By: ___/s/__Carlos Nunez-Vivas_____
        Carlos Nunez-Vivas  (FL. Bar No.: 128181)
        can@wnflaw.com
        Daniel Foodman (FL. Bar No.: 337160)
        df@wnflaw.com
        Dennis J. Wouters (FL. Bar No.: 28692)
        djw@wnflaw.com
        John G. Marfoe (FL. Bar No.: 101535)
        jgm@wnflaw.com

## CERTIFICATE OF SERVICE

      I certify that on January 26, 2015, this document was served by transmission of a Notice

of Filing generated by CM/ECF upon the following:

Justin A. Nelson, Esq.
Drew D. Hansen, Esq.
Patrick C. Bageant, Esq.
*Co-counsel for Defendant*
Susman Godfrey L.L.P.
1201 Third Avenue
Suite 3800
Seattle, WA 98101
Tel. 206-516-3880
Fax 206-516-3883
jnelson@susmangodfrey.com
dhansen@susmangodfrey.com
pbageant@susmangodfrey.com

Jamie Z. Isani, Esq.
Shannon Shaw, Esq.
*Co-counsel for Defendant*
Hunton & Williams LLP
1111 Brickell Avenue
Suite 2500
Miami, FL 33131
Tel. 305-810-2500
Fax 305-810-2460
jisani@hunton.com
sshaw@hunton.com

    ___/s/__Carlos Nunez-Vivas_____
        Carlos Nunez-Vivas