|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | IN THE UNITED STATES DISTRICT COURT                          |
|     | SOUTHERN DISTRICT OF FLORIDA                                 |
| 2   | MIAMI                                                        |
|     | CASE NO. **14-CV-21385-JAL**                                 |
| 3   | ──────────────────────────────────────                      |
| 4   | **WREAL, LLC, A FLORIDA LIMITED**                            |
| 5   | **LIABILITY COMPANY,**                                       |
| 6   | Plaintiff                                                    |
| 7   | vs.                              Tuesday, December 30, 2014  |
| 8   | **AMAZON.COM, INC., A DELAWARE**                             |
| 9   | **CORPORATION,**                                             |
| 10  | Defendant.                                                   |
| 11  | ──────────────────────────────────────                      |
| 12  | **EVIDENTIARY HEARING ON PRELIMINARY INJUNCTION**            |
| 13  | BEFORE THE HONORABLE **JONATHAN GOODMAN**,                   |
| 14  | UNITED STATES DISTRICT COURT MAGISTRATE JUDGE                |
| 15  | ──────────────────────────────────────                      |
|     | A P P E A R A N C E S                                        |
| 16  |                                                              |
| 17  | FOR THE PLAINTIFF:    **CARLOS NÚÑEZ-VIVAS**, ESQ            |
|     |                      DANIEL FOODMAN, ESQ.                    |
|     |                      JOHN G. MARFOE, ESQ.                    |
| 18  |                      PAUL BAGLEY, ESQ.                       |
|     |                      Waserstein, Núñez, and Foodman, PL      |
| 19  |                      1111 Brickell Avenue, Suite 2200        |
|     |                      Miami, Florida 33131                    |
| 20  |                      (305) 760-8500                          |
|     |                      Can@wnflaw.com                          |
| 21  |                                                              |
| 22  | FOR THE DEFENDANT:    **JUSTIN A. NELSON**, ESQ              |
|     |                      DREW D. HANSEN, ESQ                     |
| 23  |                      PATRICK C. BAGEANT, ESQ                 |
|     |                      Susman Godfrey, LLP                     |
| 24  |                      1201 Third Avenue, Suite 3800           |
|     |                      Seattle, WA  98101                      |
| 25  |                      (206) 516-3880                          |
|     |                      Jnelson@susmangodfrey.com              |
|     |                      and                                     |

```
 1                           JAMIE ISANI, ESQ, ESQ
                             Hunton & Williams, LLP
 2                           1111 Brickell Avenue, Suite 2500
                             Miami, FL  33131
 3                           (305) 810-2500
                             Jisani@hunton.com
 4
      REPORTED BY:           GIZELLA BAAN-PROULX, RPR, FCRR
 5                           United States Court Reporter
                             400 North Miami Avenue, Suite 8S32
 6                           Miami  FL  33128
                             (305) 523-5294
 7                           gizella_baan-proulx@flsd.uscourts.gov

 8    Also present:
              Laura Rogers, in-house counsel for Amazon
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              <u>I N D E X</u>

2    **OPENING STATEMENT** BY:                        PAGE:

3          MR. NÚÑEZ:                                24

4          MR. NELSON:                               37

5

6    EXAMINATION OF **RODRIGO FRANCO** BY:            PAGE:

7          MR. NÚÑEZ: (DIRECT)                       50

8          MR. NELSON: (CROSS)                      107

9    EXAMINATION OF **RAÚL PLAZA** BY:               PAGE:

10         MR. NELSON: (DIRECT)                     150

11         MR. BAGLEY: (CROSS)                      154

12   DEPO READING OF NATHANIEL FULLER:              177

13   EXAMINATION OF **ELIZABETH BAICY** BY:          PAGE:

14         MR. HANSEN: (DIRECT)                     206

15         MR. FOODMAN: (CROSS)                     232

16   EXAMINATION OF **ANTHONY MARTINELLI** BY:       PAGE:

17         MR. BAGEANT: (DIRECT)                    249

18         MR. FOODMAN: (CROSS)                     261

19   EXAMINATION OF DR. **PETER LEHMAN** BY:         PAGE:

20         MR. NELSON:  (DIRECT)                270, 274

21         MR. FOODMAN:  (VOIR DIRE)                272

22         MR. FOODMAN:  (CROSS)                    306

23   EXAMINATION OF **NATHANIEL FULLER** BY:         PAGE:

24         MR. BAGEANT: (DIRECT)                    308

25         MR. FOODMAN: (CROSS)                     319

1          MR. BAGEANT: (REDIRECT)                    320

2     EXAMINATION OF **DAN SAREL** BY:                 PAGE:

3          MR. HANSEN: (DIRECT)                        322

4          MR. MARFOE: (CROSS)                         336

5          MR. HANSEN: (REDIRECT)                      361

6

7     **REBUTTAL**

8     EXAMINATION OF **THOMAS MAROMICK** BY:           PAGE:

9          MR. MARFOE: (DIRECT)                        364

10         MR. HANSEN: (CROSS)                         378

11

12    **PROFFER**

13    EXAMINATION OF **DR. PETER LEHMAN** BY:          PAGE:

14         MR. NELSON: (DIRECT)                        401

15         MR. FOODMAN: (CROSS)                        419

16

17

18

19

20

21

22

23

24

25

| | P L A I N T I F F ' S   E X H I B I T S | |
|---|---|---|
| NUMBER | MARKED | ADMITTED |
| 1 | 54 | 54 |
| 2 | 59 | 60 |
| 3 | 64 | 69 |
| 4 | 72 | 76 |
| 5 | 80 | 80 |
| 6 | 86 | 87 |
| 7 | 88 | 89 |
| 8 | 93 | 95 |
| 9 | 95 | 96 |
| 10 | 98 | 99 |
| 11 | 261 | 265 |

| | D E F E N D A N T ' S   E X H I B I T S | |
|---|---|---|
| NUMBER | MARKED | ADMITTED |
| RFX 202 | 109 | |
| RFX 204 | | 115 |
| RFX 205 | | 115 |
| RFX 206 | | 116 |
| RFX 207 | | 117 |
| RFX 208 | | 117 |
| RFX 209 | | 118 |
| RFX 4 | | 125 |
| RFX 210 | | 132 |

| | NUMBER | MARKED | ADMITTED |
|---|---|---|---|
| 1 | | | |
| 2 | RFX 214 | | 133 |
| 3 | RFX 215 | | 135 |
| 4 | PLAZA 5 | | 165 |
| 5 | BAICY 1 | 222 | |
| 6 | BAICY 2 | 228 | 228 |
| 7 | MARTINELLI BINDER TAB 1 | | 250 |
| 8 | MARTINELLI BINDER TAB 2 | | 253 |
| 9 | MARTINELLI BINDER TAB 3 | | 255 |
| 10 | MARTINELLI BINDER TAB 5 | | 259 |
| 11 | LEHMAN 1 | | 295 |
| 12 | FULLER BINDER TAB 3 | | 313 |
| 13 | FULLER BINDER TAB 2 | | 317 |
| 14 | SAREL 1 | | 328 |
| 15 | SAREL 3 | | 332 |
| 16 | LEHMAN REPORT | | 347 |
| 17 | LEHMAN PROFFER 1 | 406 | |
| 18 | LEHMAN PROFFER 2 | 408 | |
| 19 | LEHMAN PROFFER 3 | 410 | |
| 20 | LEHMAN PROFFER 4 | 411 | |
| 21 | LEHMAN PROFFER 5 | 414 | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

P R O C E E D I N G S

(The following proceedings were held in open court.)

            THE COURT:  Hi.  Good morning, folks.  Everybody,
please be seated and make yourself comfortable.

09:42           Bear with us just a minute, folks.

            (Thereupon, there was a brief pause.)

            THE COURT:  Okay.  Excellent.  Excellent.  So go
ahead and call that case.

            THE COURTROOM DEPUTY:  Calling the case Wreal, LLC,
09:44 versus Amazon.com, Incorporated, Case No. 14-21385, Civil,
Judge Leonard.

            Counsel, please state your appearances for the
record.

            THE COURT:  Starting first for the Plaintiff.

09:44           MR. NÚÑEZ-VIVAS:  Carlos Núñez for the Plaintiff.
Also --

            THE COURT:  Just a minute.  I'm actually doing a
little seating chart here, so we have, left to right, Carlos
Núñez.  Yes?

09:45           MR. NÚÑEZ-VIVAS:  And to my left is my partner
Daniel Foodman, and to his left is John Marfoe, and to his
left is Paul Bagley, and then, finally, to his left is Dennis
Wouters.

            THE COURT:  Would you say that last name one more
09:45 time, please?  Dennis.

1      MR. NÚÑEZ-VIVAS:  Wouters, W-O-U-T-E-R-S.

2      THE COURT:  All right.  Thank you so much.  I see.

3  Oh, thank you.  So Maedon has given me what we call an

4  artifical cheat sheet.  So thank you for that, Maedon.  And

09:45   5  for the Defense?

6      MR. NELSON:  Good morning, Your Honor.  Justin

7  Nelson from Susman Godfrey.

8      THE COURT:  Next chair?

9      MR. NELSON:  With me, I have Drew Hansen, Patrick

09:45  10  Bageant.

11      THE COURT:  And then we have the number 2 slot.

12  Okay.  Number 3?

13      MR. NELSON:  Patrick Bageant.

14      THE COURT:  Good morning.

09:45  15      MR. BAGEANT:  Good morning.

16      MR. NELSON:  Jamie Isani.

17      THE COURT:  Number 4.  Okay.

18      MR. NELSON:  And I have, from Amazon.com, Laura

19  Rogers, who is not admitted to the case, but she is in-house

09:46  20  counsel for Amazon.

21      THE COURT:  Well, Ms. Rogers, if there's room at

22  the table, you're more than welcome to join your colleagues.

23  It's fine by me, but it's entirely up to you.  If you want to

24  stay there, that's fine.  If you want to come up to the

09:46  25  counsel table, that's fine.

1    You know, sometimes, clients like to pass notes to

2  their lawyers during the hearing, give them advice on what to

3  do, and then the lawyer tries to act like they're listening

4  to what they're saying, but maybe they're not really

09:46    5  listening too much, but either way, you're certainly free to

6  come up if you'd like.

7           **MS. ROGERS.**  Thank you, Your Honor.

8           **MR. NELSON:**  And finally, Judge Goodman, in the way

9  back, we have Ms. Shaw, from Hunton Williams as well.

09:46  10           **THE COURT:**  All right.  So that will be in position

11  number 6.  All right.  And then there's somebody named Edgar

12  Sergeant.  Is that right?

13           **MR. NELSON:**  He's not here today, Your Honor.

14           **THE COURT:**  All right.  Very well.  So welcome all

09:47  15  of you, especially you folks who traveled from across the

16  country.

17           So we're here for an evidentiary hearing on the

18  Plaintiff's motion for a preliminary injunction, and I have

19  already issued some orders, some administrative orders,

09:47  20  letting you folks know how this is going to proceed, how much

21  time, that sort of thing.

22           But before we get to the actual hearing, I gave you

23  all an opportunity, if you'd like, to make opening

24  statements.  But before we get to that, like any good

09:47  25  injunction hearing, we always have our 11th hour, last-minute

1    flurry of filings, and so this case is no exception.

2         And last night, we received Wreal's motion to

3    dedesignate deposition transcripts of Amazon's employees that

4    Amazon designated as highly confidential, and then within two

09:47  5    or three hours after that, we got Amazon's motion to strike

6    Wreal's motion to dedesignate.

7         So I think we ought to take a look at that.  The

8    way I understand how the facts evolved -- and I'll certainly

9    give you folks an opportunity to correct me if I'm wrong, but

09:48  10    late yesterday afternoon, apparently around 4:00, there was

11    an e-mail sent about the use of a deposition transcript, and

12    then there was no response within an hour, so Wreal filed its

13    motion to dedesignate.

14         Basically, Wreal is complaining about the fact that

09:48  15    at actually 2:30 in the afternoon, Amazon indicated that it

16    was designating the entire deposition transcripts of all of

17    Amazon witnesses as highly confidential, attorneys' eyes

18    only.

19         Wreal described that as nothing more than an

09:49  20    attempt to end run Magistrate Judge Goodman's clear ruling

21    that Amazon's request to close the courtroom for the hearing

22    is overbroad.

23         And then there was the required local rule

24    certification, saying that Wreal attempted to resolve the

09:49  25    matter, but as you folks may know, the local rule requires

1    you to specify what efforts were made in case you didn't have

2    the opportunity to confer.  There's nothing here in your

3    certification to comply with that.

4           And then in response, Amazon says, first of all,

09:49   5    you didn't do a good-faith effort -- didn't make a good-faith

6    effort to confer.  They say the local rule certificate is

7    defective because you didn't specify what efforts you made,

8    including the date and the time.

9           They accuse you of violating the confidentiality

09:50   10   protective order by revealing, in a public filing,

11   information that it has designated as highly confidential,

12   attorneys' eyes only.

13          And the mere fact that the Plaintiff believes that

14   that confidential information has been released publically

09:50   15   elsewhere, according to Amazon, doesn't give you the right to

16   unilaterally violate the terms of the protective order and

17   disclose in a public filing the very information that Amazon

18   deems to be protected.

19          So does that about sum up where we are here on this

09:50   20   issue?  So first of all, who is going to be the lead lawyer

21   on this issue for the Plaintiff?

22          **MR. NÚÑEZ-VIVAS:**  I will be, Your Honor.  Carlos

23   Núñez.

24          **THE COURT:**  All right.  So, Mr. Núñez, first, let's

09:51   25   talk about the error or the alleged error that Amazon has

 1    pinpointed concerning the certification.  What is your

 2    response to that?

 3            By the way, I'm hearing a weird hissing noise.  I

 4    don't know if you all hear it, but I do.

 5            (Thereupon, there was a brief pause.)

 6            **THE COURT:**  Can you folks hear it out there?  A

 7    hissing noise?

 8            **MR. NELSON:**  Yes, Your Honor.

 9            **THE COURT:**  Let's do our best.  So what about that,

09:52  10   Mr. Núñez?

 11           **MR. NÚÑEZ-VIVAS:**  Does that help?

 12           **THE COURT DEPUTY:**  Yes.

 13           **MR. NÚÑEZ-VIVAS:**  I just realized that my

 14   microphone was close to my computer.

09:52  15           **THE COURT:**  Thanks.  So what about that?

 16           **MR. NÚÑEZ-VIVAS:**  We actually -- we sent an e-mail,

 17   and I understand that there is a -- that you confer by phone

 18   or in person.

 19           We did send an e-mail asking them to please

09:52  20   designate the specific parts of the transcript that -- of the

 21   deposition transcripts that would be considered highly

 22   confidential.  I did talk to Justin this morning about -- and

 23   I asked him what exactly --

 24           **THE COURT:**  Mr. Nelson?

09:52  25           **MR. NÚÑEZ-VIVAS:**  Mr. Nelson, yes.  I talked to

1    Mr. Nelson this morning, and I asked him exactly what is it

2    about those transcripts that is highly confidential, and he

3    says, well, it's just chock full of confidential information.

4         Well, it isn't.  In fact, a lot of the transcripts,

09:53  5    for example, going to -- into screenshots of Amazon's sex

6    store, and that is public information.  It's out there on the

7    web site, and so, you know, we did confer, and we didn't get

8    anywhere.

9         THE COURT:  I guess -- I'm sorry for interrupting.

09:53  10   I guess I asked a bad question.  Let me try to sharpen my

11   question.

12        MR. NÚÑEZ-VIVAS:  Sure.

13        THE COURT:  Because I'm not really getting into the

14   merits of your motion about whether the information is

09:53  15   confidential or not.  The first point is:  Did you comply

16   with the local rule certification procedure?

17        MR. NÚÑEZ-VIVAS:  We communicated by e-mail, Your

18   Honor.

19        THE COURT:  So --

09:53  20   MR. NÚÑEZ-VIVAS:  We received an e-mail from them,

21   and we responded by e-mail.

22        THE COURT:  So your view is that the certification

23   is adequate?

24        MR. NÚÑEZ-VIVAS:  Given the circumstances, the late

09:53  25   hour of their request, yes.  In fact, we didn't get any

         1   response e-mail until very late in the evening from them,

         2   saying, Please call us, and that was it.  So, yes, I mean,

         3   given the circumstances, the late hour, I believe we did.

         4       THE COURT:  Doesn't the rule require you to specify

09:54    5   what efforts you made?

         6       MR. NÚÑEZ-VIVAS:  If the certification -- I'm

         7   sorry.  My memory may not be certainly correct, but if the

         8   certification did not say what I just said, then we did not.

         9       THE COURT:  So now, let's shift to another issue,

09:54   10   not yet the merits about whether the depositions are

        11   confidential or not or all of them are confidential or not.

        12       What about the fact that in your motion, on your

        13   own, you decided to publically disclose some of the

        14   information that Amazon has deemed to be confidential?

09:54   15       Is it your view that, despite a protective order,

        16   lawyers can unilaterally, willy-nilly, decide whether that

        17   confidential information has already been made public and, if

        18   he or she thinks that it has been, they just can go ahead and

        19   file the information publically and not worry about the

09:55   20   existing protective order?

        21       Is that your view of how protective orders work?

        22       MR. NÚÑEZ-VIVAS:  No, Your Honor, but -- no, but

        23   that's not what happened.  We're talking about two -- the

        24   issue here is the supposed disclosure of two code names for

09:55   25   the two products at issue, what -- that was obtained from

```
 1    public record.
 2            Now, how that is obtained is key.  That is obtained
 3    through the over-the-air codes that Amazon sends to its
 4    products.  Amazon puts that out there, and so it's obtained
 5    from them.
 6            In fact, Mr. Nelson admitted that one of them
 7    specifically was put out by Amazon.  The other one we
 8    consider also is put out by Amazon over -- through these
 9    over-the-air updates that they send to their box, so it's not
10    a secret.
11            It's not a secret because Amazon puts it out there,
12    and it was just put in the public domain by people who
13    actually look at the code.
14            THE COURT:  Mr. Nelson?
15            MR. NELSON:  Actually, if it's okay with the Court,
16    Mr. Bageant will deal with this issue.
17            THE COURT:  Sure.
18            MR. BAGEANT:  Your Honor, Patrick Bageant.
19            On your first point, our position is that it's not.
20    Frankly, Your Honor, I did not have an opportunity to respond
21    to them, and that's the purpose of the meet-and-confer.
22            The other party has the position that the request
23    from us to designate came late and, given the timing, that an
24    hour was the best they could do, and I want to correct the
25    record on that.
```

09:55  5
09:56  10
09:56  15
09:56  20
09:56  25

1          Three of these depositions were designated in their

2     entirety over a month ago.

3          **THE COURT:**  I know that.  I saw you -- your

4     response pointed that out.

09:56   5          **MR. BAGEANT:**  In our view, a good-faith

6     meet-and-confer would have required more than an hour's

7     notice, Your Honor.

8          On the second part of the meet-and-confer, the

9     local rules do require --

10          **THE COURT REPORTER:**  Could you slow down just a

11     little bit, please?

12          **MR. BAGEANT:**  Yes, ma'am.

13          **THE COURT REPORTER:**  Thank you.

14          **MR. BAGEANT:**  The local rules do require a

09:57  15     certification of the attempts that were made.  Nothing in

16     their motion says that they sent me, one attorney, an e-mail

17     an hour before the unilateral deadline.  That's what they

18     did, Your Honor, and our position is still that that's not a

19     good meet-and-confer.

09:57  20          On the second issue, the confidentiality issue,

21     there's a procedure for this, and the procedure is that if

22     they disagree that something is confidential, they can first,

23     Your Honor, come and meet and confer with us.

24          And if they had done that, as Mr. Núñez mentioned a

09:57  25     moment ago, we would have made some concessions on one of

1    those disclosures.  We agreed with them, after they showed us

2    their evidence, that we don't have a good-faith basis to

3    maintain confidentiality on one of those codes.

4         But the test for whether a protection order applies

09:57    5    is not an after-the-fact explanation of how they obtained the

6    information.  It's to come to us, to meet and confer, and if

7    we can't reach a resolution is to ask Your Honor.

8         So our position is still that there hasn't been a

9    good-faith meet-and-confer and that there has been a

09:58    10   protection order violation.

11   **THE COURT:**  Setting aside all of those procedural

12   issues, what about the merits of Wreal's position that their

13   unilateral assessment of whether these two code names are

14   actually confidential is correct?

09:58    15   They say that these two code names are, in fact,

16   not confidential.  They have been put out there, in fact, by

17   Amazon, and therefore, they suggest that you are unreasonably

18   demanding that these earlier code names remain confidential

19   and under seal.

09:58    20   What about that issue?  Did Amazon put those two

21   code names out there in the public domain?

22   **MR. BAGEANT:**  Well, I think it's important to be

23   clear what about it means for something to be in the public

24   domain.  Developer speculation about, you know, a noun that

09:58    25   appears in software code is certainly not my client's

1   authentication and validation of what that code name is.

2       THE COURT:  So it wasn't Amazon that put it out

3   there, it was somebody else who was commenting?

4       MR. BAGEANT:  Somebody went through Amazon's

09:59   5   product, went through software code, and was able to identify

6   his name in the code.

7       I don't think that that's a public disclosure by

8   Amazon, and I certainly don't think that that's such a public

9   disclosure to obviate the need to, number 1, meet and confer

09:59   10   with us and, number 2, seek to have the Court's order sealing

11   that information reconsidered and, number 3, to talk about

12   this before unilaterally disclosing it themselves.

13       THE COURT:  So, Mr. Núñez, the procedure to

14   challenge the designations are found in the order governing

09:59   15   the protection and use of confidential information, which is

16   docket entry 67 and, in particular, on page 13, numbered

17   paragraph 15 entitled, "Challenging the Designations."

18       And in particular, paragraph C says, Any party may

19   move for a ruling that a document or a category of documents

10:00   20   designated as confidential or highly confidential, attorneys'

21   eyes only, is not entitled to such status and protection.

22       Here is the next important language:  But the

23   document or category of documents shall be treated as so

24   designated until such time as the designating party may agree

10:00   25   otherwise -- Amazon hasn't -- or as the Court may otherwise

1    ordered.  And I have not, nor has Judge Leonard.

2         So assume for the sake of discussion that you're

3    correct, that somehow Amazon put out these code names into

4    the public by embedding the information in the software and

10:00    5    some technically savvy third party looked through the

6    software, pinpointed that information, and posted on a blog

7    or otherwise.

8         So let's assume all that happened, and therefore,

9    it's not public.  Did you follow the procedure here of

10:01   10    treating the information as confidential until Amazon agrees

11    or until the Court orders otherwise?

12         MR. NÚÑEZ-VIVAS:  Your Honor, we would have

13    followed the procedure, had we used anything they designated

14    confidential, but we didn't.  What we did, we put what is in

10:01   15    the blog, and so that's not confidential.  What it's in the

16    blog -- we just pointed out what's in the blog.  That's not

17    something they have designated confidential.

18         We did not use any information -- and that's what I

19    want to be clear about.  We did not use any information that

10:01   20    they designated confidential in this case at all.  The blog

21    is out there, and we basically pointed it out to the Court.

22    That's not confidential.

23         If we had used anything from the deposition or any

24    documents that they produced and designated confidential,

10:01   25    absolutely, I agree with you, we should have -- we would

1    have, we would have followed procedure, but that's not

2    because if something is in the public domain and we put it in

3    our motion, that's not using their information that they

4    designated confidential, and so the procedure isn't

10:02   5    applicable.

6              THE COURT:  Your comments, sir?

7              MR. BAGEANT:  Your Honor, their complaint is that

8    this -- the code name is sealed by the Court in Ms. Baicy's

9    deposition, and they took the web site, and they said, hey,

10:02   10   Your Honor, you see that seal on Ms. Baicy's deposition, here

11   it is in the public domain.  And they identified it

12   publically.

13             This is not the situation -- and I don't think the

14   test is how they came by the information.  The test is

10:02   15   whether the information was under seal.  If they came by it

16   through a public means and they have a concern with the

17   reason that it was sealed under the protective order, they

18   come to us, we meet and confer, and we discuss that.

19             But what they did in their motion, Your Honor, was

10:02   20   identify some information that they allege is in the public

21   domain and then tie it to the information that was under

22   seal -- was ordered sealed.

23             THE COURT:  In any event, Mr. Núñez, I don't view

24   this as a great start.  I'm a little bit troubled by what you

10:03   25   did.

1        Perhaps from a hypertechnical basis, you may have

2   come right up to the line and not technically gone over it,

3   but I find it to be, quite frankly, sharp practice.  I think

4   that you violated, if not the letter, the spirit of the

10:03   5   protective order.

6        You could have done a lot of different things other

7   than what you did, and let's put aside the procedural

8   irregularities and the meet-and-confer because I realize that

9   time was short, and even though this deposition has been

10:03  10   designated for a month, the triggering event for you was the

11   notice filed just yesterday by Amazon.

12        So I'm not going to get too jazzed up about the

13   failure to follow the appropriate procedures of the local

14   rule, but the fact that you disclosed this information in a

10:03  15   publically filed document, to me, is problematic.

16        I understand your argument that it's technically

17   out there, and we're not revealing the confidential

18   information.  We're simply revealing what somebody else has

19   put out there.

10:04  20        Maybe you would have been able to persuade me of

21   that argument, had you approached me beforehand.  Maybe you

22   would have been able to persuade Amazon of that, had you

23   approached Amazon beforehand.

24        Maybe you could have phrased your argument in this

10:04  25   motion in a way to not disclose the information.  So, for

1    example, instead of filing a motion where you reveal the

2    actual names of the code words for the Amazon product, you

3    could have simply said the two code words -- not mentioning

4    what they are -- the two code words are now public and

10:04   5    Amazon's position to the contrary is illogical and belied by

6    the public record.

7            And then you could have dropped a footnote that

8    said the two code names are available for public viewing at

9    web sites which the court will hear about at a hearing or

10:05   10   something like that.

11           So you could have made known to me the fact that

12   this information was out there without actually pulling the

13   triggering and blurting out the code names.

14           See what I mean?

10:05   15       MR. NÚÑEZ-VIVAS:   (Nodding affirmatively.)

16       THE COURT:   So I find that to be pushing the

17   envelope, and so I'm going to go ahead and grant Amazon's

18   motion to strike docket entry 115.

19           So now let's get to the actual hearing.

10:05   20       MR. NELSON:   Your Honor, as a procedural matter,

21   would the court mind, also, doing this as a motion to strike,

22   then expunge it from the record, if people want to go back

23   and view it?  Or do we need a separate motion to seal the

24   docket number 115?

10:05   25       THE COURT:   Well, I've only been doing this four

| | | |
|---|---|---|
| | 1 | and a half years, so that's a good question.  Maedon, you |
| | 2 | have been here for more than four and a half years, what is |
| | 3 | your advice?  Maedon is my de facto consigliere today.  So |
| | 4 | what do you think, Maedon? |
| 10:06 | 5 | **THE COURT DEPUTY:**  That you're going to strike 115? |
| | 6 | **THE COURT:**  Right. |
| | 7 | **THE COURT DEPUTY:**  I think that order granting |
| | 8 | that, when the docket clerk dockets that, it would -- she |
| | 9 | would have that sealed or restricted. |
| 10:06 | 10 | **THE COURT:**  All right.  Here is what I'll do: |
| | 11 | We're going to go ahead and enter an order granting the |
| | 12 | motion to strike.  The order will, in fact, strike the |
| | 13 | offending submission. |
| | 14 | I'll have my law clerk contact chamber support to |
| 10:06 | 15 | find out if that order -- the order striking is in and of |
| | 16 | itself sufficient to expunge it, obliterate it, put it under |
| | 17 | seal, or some other way make it completely unavailable to |
| | 18 | members of the public. |
| | 19 | And if not, then we'll put in whatever additional |
| 10:07 | 20 | rhetoric we need to accomplish that purpose. |
| | 21 | **MR. NELSON:**  Thank you, Your Honor. |
| | 22 | **THE COURT DEPUTY:**  Yes, Judge. |
| | 23 | **THE COURT:**  All right.  So opening statements, each |
| | 24 | side gets 15 minutes, so you want to take advantage of that |
| 10:07 | 25 | opportunity? |

| | |
|---|---|
| 1 | **MR. NÚÑEZ-VIVAS:**  Yes, Your Honor. |
| 2 | **THE COURT:**  All right. |
| 3 | |
| 4 | ***OPENING STATEMENT*** |
| 10:07  5 | **MR. NÚÑEZ-VIVAS:**  I will start by quoting from |
| 6 | DreamWorks, Your Honor, a reverse confusion case.  And I |
| 7 | quote -- |
| 8 | **THE COURT REPORTER:**  I'm sorry.  Is your microphone |
| 9 | on? |
| 10:08  10 | (Thereupon, there was a brief discussion off the |
| 11 | record.) |
| 12 | **THE COURT:**  And one other suggestion, the court |
| 13 | reporter was being a little bit diplomatic, but speak a |
| 14 | little more slowly and clearly. |
| 10:08  15 | **MR. NÚÑEZ-VIVAS:**  Sure.  Better?  Okay.  I will |
| 16 | start the quote again. |
| 17 | **THE COURT:**  I'll give you a new start.  10:08. |
| 18 | **MR. NÚÑEZ-VIVAS:**  Thank you.  I will start the |
| 19 | quote again. |
| 20 | A clever new trademark diversifies both the |
| 21 | marketplace and the marketplace of ideas; a takeoff or copy |
| 22 | of a mark, even if accidental, adds nothing but confusion. |
| 23 | This dispute could have been avoided had DreamWorks been more |
| 24 | careful, or a tad more creative, in choosing its name. |
| 10:09  25 | Likewise, this case could have been avoided had |

1    Amazon been a tad more creative -- just a tad bit more

2    creative -- in choosing a name other than Fire TV.  As a

3    result, Wreal seeks a preliminary injunction to have Amazon

4    stop using the name.

10:09   5          Now, the issue is not whether Amazon's Fire TV

6    set-top box is a copy of Wreal's set-top box.  The issue is

7    not whether a consumer may think that Wreal's FyreTV.com web

8    site is Amazon's web site.  That is -- this is not a passing

9    off case.  This is a reverse confusion case.

10:09   10         The actual issue is whether a consumer may think

11   that Wreal's Fire TV video streaming service as a whole is

12   somehow -- somehow -- connected with Amazon as a result of

13   its Fire TV platforms that provide video streaming services.

14         To make this determination of likelihood of

10:10   15   confusion, the Court is asked to balance seven factors

16   including the type of mark, the similarity of the marks, the

17   similarity of the products and services associated with the

18   marks, the similarity of customers, the similarity of

19   advertising methods, the Defendant's intent, and finally,

10:10   20   actual confusion.

21         In this case, the overall balance of these factors

22   weighs heavily in favor of Wreal.  Now, Wreal is a small

23   technology company from Miami that has invested about $20

24   million since its inception in its FyreTV business.

10:10   25         Recently, beginning in 2013, it spent about

1    $250,000 to redesign its entire web site.  But it all started

2    back in 2007, when Wreal launched its FyreTV.com web site

3    with the brand FyreTV.  In January 2008, Wreal introduced its

4    set-top box, designed to stream video over the internet.

5    10:11        Although the design streams any content, Wreal only

6    streams pornography.  Wreal called its service FyreTV and its

7    web site FyreTV.com.  These brand names have been registered

8    trademarks since 2008.

9            Wreal now streams video via the internet through

10:11 10    its set-top box, sometimes called the Fyre BoXXX, with a

11    triple X at the end, sometimes referred to as the FyreTV

12    BoXXX.

13            Wreal also developed and uses other platforms,

14    including its web site; the FyreTV application for Roku, for

10:11 15    example; tablets; and smartphones.  Wreal has continuously

16    used the FyreTV marks as the brand for its streaming video

17    service.

18            On April 2nd, 2014, and since then, Amazon launched

19    its platforms to stream video via the internet.  It's

10:12 20    platforms are a set-top box and what it calls a stick.  They

21    named them Fire TV.  It added its well-known housemark Amazon

22    for good measure, to ensure that the name is associated with

23    it.

24            In launching its gadgets, which Amazon describes as

10:12 25    easy-to-use, seamless, end-to-end service for customers,

1    Amazon saturated the market with advertising.

2         Wreal filed its complaint within two weeks of

3    Amazon's launch.  Only five months later, Wreal timely filed

4    its motion for preliminary injunction.  The 11th Circuit does

10:12  5    not require Plaintiffs to streak to the Court house to seek a

6    preliminary injunction.  Motions filed 8 to 10 months after

7    the filing of the complaint have been granted.

8         In this case, all the factors of the Court must

9    weigh must balance weighed in favor of Wreal.  First as to

10:13  10   the validity of the mark and type of mark, Fire TV and

11   FyreTV.com are federally-registered arbitrary marks.  They

12   are valid and strong marks.

13        In addition, in reverse confusion cases, courts

14   also focus on the strength of the Defendant's housemark.  By

10:13  15   linking the housemark to the product and service at issue in

16   a reverse confusion case, as Amazon did, the Defendant

17   aggravates the confusion.

18        Amazon relied on a case to say otherwise, where

19   both the Plaintiff and the Defendant used the housemark.

10:13  20   That's not the case here.  Does the validity and type of mark

21   factor weigh heavily in favor of Wreal?

22        The names, both names are identical in sound and

23   spelled virtually the same.  As in DreamWorks, while spelling

24   matters, substituting one letter for the other that sounds

10:14  25   the same and putting a space between the word "fire" and "TV"

1    does not dispel the strong similarities between the marks.

2            In fact, years ago, Wreal acquired the domain name

3    FireTV.com with an I because of those similarities.  Both

4    addresses, FireTV.com with an I and FyreTV.com with a Y, take

10:14   5    a user to Wreal's web site.

6            As to site, both Wreal and Amazon use colors

7    associated with fire.  Wreal uses white and red.  Amazon uses

8    orange.

9            Finally, both Wreal and Amazon use the name Fire TV

10:15   10   on their web sites with product choices across multiple

11   brands, including pornography; thus this factor weighs in

12   favor of Wreal.

13           As to the products and services, their similarity,

14   the issue is -- and I quote from the TV Land case -- whether

10:15   15   the products are the kind that public attributes to a single

16   source.

17           As held in the DreamWorks case, this happens when

18   they complement each other, as in this case.  Both stream

19   video content via the internet through various platforms.

10:15   20   The difference is that Wreal streams pornography; Amazon

21   streams Hollywood movies and some pornography.

22           Yet pornography and Hollywood movies are part of

23   the same movie concept spectrum -- same line of business.

24   For example, Comcast and hotel chains provide the entire

10:16   25   spectrum.  Amazon's own expert, Peter Lehman, said in his

1    book -- and I quote -- Most large hotel chains offer Pay Per

2    View adult movies, and many video stores have adult movie

3    selections.

4         He is right.  In the minds of consumers, mainstream

10:16  5    content and adult content are, in fact, complementary.  In

6    addition, Amazon already provides the full spectrum on its

7    online store.  Amazon is one of the largest -- if not the

8    largest -- purveyor of pornography DVDs and books, dildoes,

9    vibrators, anal sex toys, and other get fetish accessories.

10:16  10        A consumer may think that Amazon's Fire TV is the

11   Hollywood movie section, while FyreTV with a Y is a separate,

12   affiliated adult content section.

13        Now, Amazon will argue that this is impossible.

14   Elizabeth Baicy said in her sworn declaration that Amazon did

10:17  15   not think -- and I quote -- People would associate Amazon

16   with hardcore pornography because it was so far away from

17   what the company stands for.

18        Really?  Amazon offers for sale over 22,000

19   dildoes; 91,000 vibrators; 15,000 masturbators and dolls;

10:17  20   35,000 anal sex toys; and 10,000 penis rings.  And there is

21   plenty of porn in Amazon's web site and Amazon's Fire TV.

22        Amazon will also say that it has a policy against

23   pornography; yet it does not publish this policy.  In fact,

24   it designated it highly confidential, thus it is irrelevant

10:17  25   because it cannot affect consumer's perceptions.

10:18
1          Also, based on its status as a great purveyor of

2    pornographer, sex toys, and fetish accessories, Amazon

3    clearly does not even follow its own secret policy.  This

4    factor, similarity of products and services, weighs heavily

5    in favor of Wreal.

6          As to overlap of customers, consumers who buy sex

7    toys, pornography, and fetish accessories in Amazon's sex

8    store are within the target market of Wreal.  In addition,

9    Amazon admits that Roku is a competitor.  Amazon targets

10:18
10   Wreal's customers because Wreal streams FyreTV through Roku;

11   thus this factor also weighs in favor of Wreal.

12         As to advertising methods, Wreal has advertised on

13   television, print media, and radio, especially some years

14   back when it started.  Currently, Wreal uses banner ads in

10:18
15   adult content web sites and relies on word of mouth.  Wreal's

16   target market, therefore, are first exposed to the marks

17   through one of these marketing methods.

18         As to Amazon, for now, because they're also early

19   on in their product launch, advertises on television, for

10:19
20   now, and uses banner adds in the internet.  Amazon also

21   relies on word of mouth.  Because both parties have used

22   similar channels, this factor tips in favor of Wreal.

23         As to the intent factor, Amazon admitted knowing of

24   Wreal's marks when deciding on a name; thus it decided to use

10:19
25   its housemark, so that consumers could only -- could only --

1   associate the name Fire TV with its housemark.  This factor

2   then also weighs in favor of Wreal.

3         And the final factor is actual confusion.  In the

4   11th Circuit, it is unnecessary to show actual confusion to

10:19   5   prove a likelihood of confusion.  Also, case law in Florida's

6   federal courts holds that one incident of actual confusion is

7   significant and convincing evidence of likelihood of

8   confusion.

9         In this case, there has been at least three known

10:20   10   incidents of actual confusion.  One person Tweeted at

11   FyreTV's Twitter account and -- I quote -- said, Did you guys

12   just merge with Amazon?

13         Another person Tweeted -- and I quote -- Apple

14   delivers Apple TV.  Amazon delivers FyreTV.  The person

10:20   15   spelled FyreTV with a Y and no space between the E and the.

16   T.  Clearly, these people believe Wreal's FyreTV is

17   somehow -- somehow -- connected to Amazon.

18         But the clincher -- the clincher -- is the customer

19   who called Amazon asking how to find adult content on

10:20   20   Amazon's Fire TV by spelling the word fire with a Y.  This is

21   convincing evidence of actual confusion.

22         Understanding this precarious position, Amazon

23   submitted a biased and flawed consumer survey that cannot be

24   given any weight, Your Honor.

10:21   25         Dr. Sarel's survey used an unreliable sample,

1    failed to survey the appropriate universe of people defined

2    by himself, and he failed to signal any real-world market

3    conditions and used biased questions designed to guide

4    respondents into thinking about pornography in a way away

10:21    5    from Amazon.

6            Even worse for Dr. Sarel, he failed to follow his

7    own methodology.  Had he done that, the rate of actual

8    confusion would have been a lot higher.  Unfortunately, no

9    one can rely on that because the survey and his testimony

10:21   10    have to be excluded.

11            The survey has substantial design defects and its

12    execution was defective, and this is not new for Dr. Sarel.

13    Only three years ago -- only three years ago -- in the case

14    of Innovation Ventures LLC, Dr. Sarel's survey on confusion

10:22   15    and his testimony were excluded.

16            These reasons -- the reasons were -- and I quote --

17    multiple flaws, which resulted in an unreliable scientific

18    foundation for its conclusions.  The Court held -- and I

19    quote -- that the reliability of this survey is so

10:22   20    questionable and it is not appropriate material to assist the

21    jury in deciding issues in this case.

22            In that case, Dr. Sarel reported on the likelihood

23    of confusion between two marks used in energy drinks.

24    Instead of providing participants with actual bottles that

10:22   25    they could touch, he provided them with pictures -- pictures.

         1    Because participants were not able to touch them, as they

         2    would in the real world, the Court held that Dr. Sarel failed

         3    to replicate market conditions.  In addition, the Court held

         4    that Dr. Sarel's questions were improperly leading and -- I

10:23    5    quote -- infected the objectivity of the study.

         6            In this case, Dr. Sarel's survey suffered from

         7    similar flaws and then some.

         8            THE COURT:  Mr. Núñez, just to give you a heads up,

         9    one minute remaining.

10:23   10            MR. NÚÑEZ-VIVAS:  Okay.  So given the incidence of

        11    actual confusion, I think that factor also weighs in favor of

        12    Wreal.

        13            Irreparable harm, Your Honor, it's every time we

        14    see an ad for Amazon's Fire TV, it's another step taken

10:23   15    against Wreal being able to control its own brand, and that

        16    cannot be measured.  Every single ad, every time that they

        17    put out an ad, that happens.

        18            And the balance of the harms, well, Wreal will

        19    continue to lose control of its marks.  In fact, in a TV Land

10:23   20    case, the Court weighed that that -- you tip that balance of

        21    the harms in favor of the Plaintiff because he said the

        22    Defendant knew about the product, the mark, and the use of it

        23    before it put out its own product with the same name;

        24    therefore, you knew what you were doing, you took your own

10:24   25    risk.

1          As to the public interest, obviously, protecting

2    trademarks is in the public interest, and the bond, Your

3    Honor, has been briefed, argued, before.  It should be set at

4    a maximum of $500,000.

5          Thank you.

6          **THE COURT**:  Before I give Amazon an opportunity,

7    let me just ask you one or two follow-up questions because

8    some of the things that you told me here in the opening

9    statement, I have questions about, based on reading all of

10   the briefs and getting ready for the hearing.

11          So you talked about your client's set-top box.  I

12   was under the impression that Wreal no longer had that box

13   available to consumers because consumers didn't want to pay

14   the fee.  As of the time that you filed the lawsuit, the box

15   wasn't even available to consumers.  Is that true?

16          **MR. NÚÑEZ-VIVAS**:  This is what -- can I give you a

17   brief timeline on this?  What happened is in about 2011,

18   2012, when Wreal was coming out with new platforms to stream

19   video content over the internet, then what it decided to do

20   was to get the new customers to go to those platforms and not

21   give them set-top boxes -- more efficient -- cost efficient,

22   obviously.

23          Then current customers at the time, if they wanted

24   another set-top box, it would be provided to them, and Wreal

25   continued always, always continued to stream video over the

1   internet over the set-top boxes.  Never stopped, that never

2   stopped.

3          So the new customers were being provided with the

4   new platforms.  Come later on -- I believe it may have been

10:25  5   2013, 2014, I'm not quite clear on the date.  I don't

6   remember it exactly.  There was an issue with battery leaks

7   on the set-top box.  At that point -- and that's in the

8   testimony.  That's actually in Mr. -- in the depositions of

9   our client.

10:26  10          At that point, it stopped giving any set-top boxes

11   because they had to fix the battery leak issue.  When that

12   was fixed, again, it became available for the current

13   customers at that time.  Okay?

14          Now, when Amazon launched its Fire TV set-top box

10:26  15   device and service, then my client decided to put it out

16   there again for everyone, to protect it, because at the end

17   of the day, Your Honor, the set-top box and the web site are

18   the only two platforms that my client actually controls.

19          They do have another platform, for example, which

10:26  20   is an application for Roku, but if Roku decides that it's not

21   going to allow the application tomorrow, then my client has

22   to have -- and has -- these two platforms that it controls.

23          I mean, this is actually a set-top box, and it

24   streams, it has a lot of user interface, it's a great box.

10:27  25   Now, that's the reason -- that's basically the timeline

 1  related to the set-top box.

 2        **THE COURT:**  Although a court here and there might

 3  enter injunctive relief in response to a motion filed one or

 4  two years after the lawsuit was filed, isn't it correct, as

 10:27  5  Amazon points out in its memoranda, that most courts take the

 6  position that a five-month delay is fatal?  Isn't that the

 7  overwhelming majority of the case law?

 8        **MR. NÚÑEZ-VIVAS:**  Quite the contrary, Your Honor.

 9  That's actually 2nd Circuit.  The 2nd Circuit is alone on

 10:27  10  that point, and if you notice, all the cases that Amazon

 11  cites are in the 2nd Circuit.  The 11th Circuit doesn't hold

 12  that, and other circuits don't.  In fact, we cited plenty of

 13  cases where that's not the case.

 14        **THE COURT:**  And you said to me that both your

 10:28  15  client and Amazon use colors associated fire.  This was an

 16  argument you were advancing to me to show similarities and

 17  confusion, and you say, My client uses white and red, and

 18  Amazon uses orange.  Doesn't that show that they're

 19  different, not the same?  I mean, white and red seems

 10:28  20  completely different than orange.  Correct?

 21        **MR. NÚÑEZ-VIVAS:**  They are different colors, no

 22  doubt about it, Your Honor, but it is a minor -- if even its

 23  perceived by a consumer, it is a minor, minor difference.  I

 24  think the fact that it's associated with a name is more

 10:28  25  important.  It's a fire.  The idea is of an incendiary

```
 1    nature, and what it evokes, we believe, is the same thing:

 2    fire.

 3              THE COURT:  And finally -- my final follow-up

 4    question before I hear from Amazon in an opening statement is

10:29    5    that you said that Dr. Sarel -- S-O-R-E-L?

 6              MR. NÚÑEZ-VIVAS:  S-A.

 7              THE COURT:  S-A-R-E-L?

 8              MR. NÚÑEZ-VIVAS:  Yes.

 9              THE COURT:  Sarel, I guess.  You said that

10:29   10    Dr. Sarel failed to follow his own methodology.  How?  How

11    did he fail to follow his own methodology?

12              MR. NÚÑEZ-VIVAS:  Okay.  Yes.  The reason I didn't

13    mention it in the opening is because he's right here, and

14    we're going to address it in cross.

10:29   15              THE COURT:  Ah, you want to -- you want to keep

16    your powder dry?

17              MR. NÚÑEZ-VIVAS:  Yes.

18              THE COURT:  You want to -- you want to question him

19    on it, on the spot.  You don't want to tip him off.  All

10:29   20    right.  That's a fair response.  I'm more than happy to let

21    you keep that in check until you have an opportunity to

22    question him.  Thank you so much.

23              Let me hear from Amazon.  It is now 10:29, sir.

24

10:29   25                        _OPENING STATEMENT_
```

          1            **MR. NELSON:**  Good morning, Judge Goodman, and may

          2    it please the Court.  Justin Nelson for Amazon.com, Inc.

          3            I want to start by stating the issue in front of

          4    this Court.  By its own admission, Wreal is arguing only a

10:30     5    reverse confusion trademark case.  The reverse confusion

          6    inquiry is whether users of the senior mark -- in this case,

          7    pornography customers of Wreal's FyreTV.com -- would somehow

          8    believe that the alleged junior user -- in this case,

          9    Amazon -- is offering this hardcore pornography web site.  In

10:30    10    other words, would customers believe that this web site is

         11    offered by Amazon?

         12            Both common sense and the evidence lead to the same

         13    answer:  no.  Wreal cannot come close to establishing the

         14    necessary likelihood of confusion sufficient to obtain any

10:30    15    relief.

         16            And Wreal's burden is even heavier here.  Wreal is

         17    seeking a preliminary injunction.  As Judge Leonard said in

         18    the TigerDirect case, a preliminary injunction is an

         19    extraordinary and drastic remedy not to be granted unless the

10:31    20    movant clearly establishes the burden of persuasion as to the

         21    four requisites.

         22            Wreal must clearly establish each evidence --

         23    excuse me, element.  Wreal must clearly establish substantial

         24    likelihood of success on the merits.  Wreal cannot make the

10:31    25    showing for any element.  It cannot establish that it will

1    suffer irreparable injury, unless the injunction issues.

2         It cannot clearly establish that the threatened

3    injury to Wreal outweighs the damage that an injunction would

4    cause Amazon, and it cannot clearly establish that an

10:31  5    injunction is in the public interest.

6         On the first factor, Wreal cannot establish a

7    substantial likelihood of success on the merits.  Consumers

8    are not likely to believe that Amazon is the sponsor of this

9    web site.  This is from the web site, as we scroll through.

10:32  10    Wreal's evidence is insufficient to survive summary

11    judgement, let alone to clearly establish a substantial

12    likelihood of success here.  While the parties have briefed

13    this issue, I want to emphasize a few points.

14         First, Wreal must clearly establish a likelihood of

10:32  15    confusion.  This means more than possible, or speculative, as

16    most of Mr. Núñez's opening argument was.  As the 11th

17    Circuit stated in the Custom Manufacturing case, a Plaintiff

18    must clearly establish a likelihood that an appreciable

19    number of ordinarily prudent purchasers are likely to be

10:32  20    misled or, indeed, simply confused as to the source of the

21    goods in question.

22         Second, Wreal itself recognizes that its hardcore

23    pornography site is a different market from Amazon and other

24    mainstream sites.  It calls itself the "Netflix of porn,"

10:33  25    recognizing the discrete market in which it operates, and

1    markets itself for XXX movies.

2         Third, Wreal's hardware for streaming products is

3    not called Fire TV; it is called the FyreBoXXX.  From

4    paragraph 9 of its complaint, Wreal alleged that it has its

10:33  5    own proprietary dedicated STB, set-top box, sold under the

6    FyreTV brand.  That statement is, at best, highly misleading.

7         At the time of this complaint, Wreal admits in its

8    interrogatory response that it was not selling any set-top

9    boxes and, in fact, had not been selling any set-top boxes to

10:33  10   new customers since 2012.  Its set-top box is not called Fire

11   TV; it is called FyreBoXXX.  This is picture is from Wreal's

12   web site taken last month, FyreBoXXX.

13        Fourth, Wreal ignores the different nature of the

14   sales outlets and advertising.  As a preliminary matter, a

10:34  15   user accesses Wreal's service through its web site.  That web

16   site is F-Y-R-ETV.com, typing in the Y.  Wreal's only current

17   advertising, in addition to its web site, is on hardcore

18   pornographic sites.

19        Its advertising is always with the distinctive

10:34  20   coloring, as we see on Wreal's site and as Mr. Núñez

21   admitted.  Amazon, by contrast, does not advertise on

22   pornographic sites.  Its product, Fire TV spelled with an I,

23   is presented with the Amazon name.

24        Fifth, Wreal's unsupported allegations about

10:34  25   Amazon's intent are of no help here.  Initially, courts are

```
        1   split on whether intent even matters in a reverse confusion
        2   case.  If it does, however, that inquiry does not help Wreal.
        3   Amazon's witness, Elizabeth Baicy, is a principal marketing
        4   manager at Amazon and was involved with the decision to name
10:35   5   Amazon Fire TV.  Ms. Baicy, please stand up.  Thank you.
        6           She will testify that the decision to name Amazon
        7   Fire TV --
        8           THE COURT:  I think Ms. Baicy is waiting for you to
        9   tell her to sit down.
10:35  10           MR. NELSON:  I'm sorry.
       11           THE COURT:  Sort of like a courtroom version of
       12   Simon says.
       13           MR. NELSON:  Exactly.  She will testify that the
       14   decision to name Amazon Fire TV was not made to try to
10:35  15   appropriate Wreal's good will.  Just the opposite.  Amazon
       16   knew about Wreal's product and decided on Amazon Fire TV, in
       17   spite of Wreal's pornographic service, because it believed
       18   customers would not associate Amazon with hardcore
       19   pornography.
10:35  20           Ms. Baicy will explain that Amazon Fire TV was a
       21   natural extension of Amazon's Fire line of consumer hardware,
       22   which had been in existence for years and which itself was an
       23   extension of Amazon's first hardware product, the Amazon
       24   Kindle.  Amazon named that product in 2006, well before Wreal
       25   named its pornographic service.
```

1          Sixth, Amazon does not allow pornographic

2     applications on Amazon Fire TV.  Wreal has pointed to various

3     DVD that third parties sell on Amazon and erotic videos that

4     a user can access through Amazon Instant Video.  Amazon

10:36   5     Instant Video, not Amazon Fire TV, is the name of Amazon's

6     streaming service, and Amazon does not allow hardcore

7     pornography on Amazon Instant Video or in DVD sales.

8          We will present the testimony of Amazon employee

9     Tony Martinelli, who is responsible for worldwide program

10:37   10     management at Amazon Instant Video.

11          Mr. Martinelli, please stand up.  Thank you.

12          **THE COURT:**  He sat down on his own.

13          **MR. NELSON:**  Exactly.  Exactly.

14          **THE COURT:**  We're learning.

10:37   15          **MR. NELSON:**  He will testify about Amazon's

16     policies to prevent the type of content on Wreal's site from

17     appearing on Amazon.

18          While, on rare occasions, a third party will sell a

19     hardcore DVD on Amazon, Amazon tries to take those down

10:37   20     immediately, and those isolated instances do not make Amazon

21     a pornography company; likewise, the fact that Amazon sells

22     sex toys among millions of its products does not mean that

23     users will associate Amazon with a hardcore pornography site.

24     Indeed, other online drugstores, like CVS and Walgreens,

10:37   25     shown here, routinely sell the same type of sexual wellness

1    products as Amazon.

2           Amazon will also be presenting an expert in

3    pornography, Dr. Peter Lehman.

4           Dr. Lehman, please stand up.  Thank you.

10:38  5           Dr. Lehman is a tenured professor and the director

6    for the Center for Film, Media, and Popular Culture at

7    Arizona State University.  He also served as the president of

8    the Society for Cinema and Media Studies, which is a national

9    organization of film scholars.  He has written extensively on

10:38  10   pornography, including serving on the advisory board of the

11   Academic Journal of Porn Studies.

12          He will testify that a user who visits Wreal's

13   FyreTV.com would be highly unlikely to confuse it with any

14   mainstream web site, including Amazon.

10:38  15          Seventh, Wreal has, at best, shown de minimus

16   levels of actual confusion.  Indeed, Wreal admits that not a

17   single one of its 51,000 customers has been confused.  This

18   is not surprising, given its web site.

19          In its opening brief, it argued that evidence of

10:39  20   confusion would lie with Amazon.  Amazon will present the

21   testimony of Nate Fuller, the program manager for digital

22   devices for customer service at Amazon.

23          Mr. Fuller, please stand up.  Thank you.

24          He will testify that Amazon receives about REDACTED

10:39  25   customer inquiries per day and has received about REDACTED

1   Amazon Fire TV related inquiries.  Of those, even one only

2   arguably shows any type of confusion.  We don't think that

3   one inquiry actually shows confusion, but even if it did, REDACTED

4   ▇▇▇▇▇▇ REDACTED ▇▇▇▇▇▇ is insufficient as a matter

10:39   5   of law to show actual confusion.

6          Finally, on the fundamental inquiry of whether any

7   likelihood of confusion exists, Amazon's survey expert,

8   Dr. Dan Sarel, confirms that the answer is a resounding no.

9          Dr. Sarel, please stand up.

10:40   10          Dr. Sarel received his doctorate of marketing from

11   Harvard and is a tenured professor here at the University of

12   Miami.  He routinely performs surveys both for court and for

13   non-litigation clients.  He performed a survey here measuring

14   how Wreal's product is actually presented in commerce,

10:40   15   whether Wreal's product is associated with Amazon, and found

16   a one percent confusion rate which was, in his words,

17   statistically nonexistent.

18          As McCarthy on Trademarks describes, no reported

19   case has found a likelihood of confusion with a confusion

10:40   20   rate below 8.5 percent, let alone one percent; and indeed,

21   any rate below 10 percent is affirmative evidence that

22   confusion is unlikely.

23          Wreal's only response is to criticize Dr. Sarel's

24   study.  Not only are these criticisms misguided, notably,

10:41   25   Wreal does not offer any of its own survey evidence.  Wreal

1   also cannot establish irreparable injury for at least four

2   different reasons.

3          First, Wreal's revenues have remained steady, with

4   a slight downward trend from before and after the release of

10:41   5   Amazon's product.  This slide shows the first three months of

6   Wreal's revenue in 2014 at a little over $250,000 --

7   $272,450, to be exact.

8          If revenues were constant, we would expect to see

9   two times that amount over the next six months, a little over

10:41   10   $500,000, and that is almost exactly what we see.  In fact,

11   looking at the trend line of Wreal's revenues, for the year

12   before Amazon released its product, it shows a slight

13   downward trend.  The dotted line shows the projection based

14   on that trend line.  And, in fact, Wreal's actual revenue

10:42   15   since the Amazon launch follow the prelaunch trend line

16   almost exactly.

17          Second, Wreal waited over five months before filing

18   this preliminary injunction motion.  Courts, including Judge

19   Leonard in the Seiko case -- which is not in the 2nd Circuit

10:42   20   last time I checked -- have held that even an unexplained

21   three-month delay is sufficient to deny a motion for

22   preliminary injunction because it somewhat vitiates the

23   notion of irreparable harm and undercuts any sense of

24   urgency.

10:42   25          Third, Wreal has given no concrete examples of how

1   Amazon Fire TV is tarnishing Wreal's reputation or damaging

2   Wreal's goodwill.  Its only alleged harm is all speculation.

3           Fourth, the harm that Wreal complains about,

4   falsely being thought a pirate because the public wrongly

10:43   5   believes it copied Amazon's name is not an actionable harm.

6   Then Judge Krier (ph.) made that point clear.

7           Wreal also cannot clearly show that the balance of

8   the harms favors an injunction as discussed at the bond

9   hearing in detail.  Ms. Baicy will present evidence of

10:43  10   Amazon's costs of complying with an injunction and the harm

11   that Amazon will suffer.

12           On the other side of the ledger, Wreal's harms are

13   minimal at best.  It has no lost sales, as we just saw, and

14   as discussed before, it admits that it was not even selling a

10:43  15   set-top box when it filed its complaint.

16           Finally, the public interest does not clearly favor

17   an injunction for all of the reasons discussed above.  The

18   public interest does not favor giving a windfall to a company

19   already in decline at significant expense to Amazon by

10:43  20   granting the extraordinary remedy of a public injunction.

21           In short, neither the evidence nor common sense

22   favors Wreal here.  This Court should recommend denying

23   Wreal's motion.  Thank you.

24           **THE COURT:**  Mr. Nelson, you just created judicial

10:44  25   history.  Do you know why that is?  You have a minute left.

1    You have stopped short of your allocated time.  So everyone,

2    make a note of today's date, at 10:43, Defense counsel

3    stopped, even though he had more time.  Thank you so much.

4         **MR. NELSON:**  Thank you, Judge Goodman.

10:44  5         **THE COURT:**  All right.  So let's turn to the

6    Plaintiff.  We're going to start with your first witness, and

7    as I indicated, each side has a certain allocated amount of

8    time, today, to be divided up however you see fit -- direct,

9    redirect, cross, you name it.

10:44  10        So starting first, you're the movant, you go first.

11   Please call your first witness.

12        **MR. NÚÑEZ-VIVAS:**  Yes, Carlos Núñez.  I call

13   Mr. Rodrigo Franco.

14        **THE COURT:**  Thank you.

10:44  15        **MR. NELSON:**  I'm sorry.  You are invoking the rule?

16        **MR. NÚÑEZ-VIVAS:**  Yes.

17        **MR. NELSON:**  We have -- Your Honor, may I approach?

18        **THE COURT:**  Sure.

19        **MR. NELSON:**  We have two fact witnesses.  One of

10:44  20   our fact witnesses will be our corporate representative, in

21   addition to Ms. Rogers, the in-house attorney.  The other two

22   fact witnesses, Mr. Fuller and Mr. Martinelli, I think,

23   should be excused now.

24        Is there a place where they can hang out until

10:45  25   they're called?  Or should they be in the hallway?  Or what

1    is the best way to -- or the cafeteria downstairs?

2           **THE COURT:**  Well, there are some seats around the

3    corner where you can wait.  There's also a small room, I

4    think it's called the attorney conference room, which is also

10:45 5    around the corner.  If you open up that door, there will be a

6    small conference table in there.  There is a cafeteria on the

7    second floor.  So those are some possible hangout locations.

8           So you are invoking the witness sequestration rule,

9    so therefore, all witnesses other than corporate

10:45 10   representatives need to be excluded until their testimony is

11   complete.  You mentioned to me the folks on your team who

12   will be need to be excluded.

13          Is there anybody from the Plaintiff's side who will

14   need to be excluded?

10:46 15          **MR. NÚÑEZ-VIVAS:**  Yes, Mr. Plaza.

16          **THE COURT:**  I'm sorry.  Say again?

17          **MR. NÚÑEZ-VIVAS:**  Mr. Plaza.  He left already.

18   He's outside.

19          **THE COURT:**  Sure.  All right.  So you folks who

10:46 20   need to leave, please do so.

21          So your first witness is Mr. Franco, Rodrigo

22   Franco.  Mr. Franco, if you would come up to the witness box,

23   please?

24          **MR. NÚÑEZ-VIVAS:**  Your Honor, as to exhibits, will

10:46 25   it be okay to give the witness a bundle of the exhibits, so

|   | |
|---|---|
| 1 | we don't have to be walking back and forth? |
| 2 | **THE COURT:**  Sure. |
| 3 | **MR. NÚÑEZ-VIVAS:**  And how would you like -- do you |
| 4 | want me to give you also another bundle and provide opposing |
| 5 | counsel the other bundle, so we can all just keep track of |
| 6 | it? |
| 7 | **THE COURT:**  Yes, that's a wonderful suggestion.  So |
| 8 | I appreciate the organization, and let me ask one more |
| 9 | question, to see if you are super-organized.  So you have a |
| 10 | copy for me a copy, a copy for the witness, a copy for |
| 11 | Amazon.  Do you also have an extra copy for my law clerk? |
| 12 | **MR. NÚÑEZ-VIVAS:**  I do not.  He mentioned it |
| 13 | actually to me.  I do not. |
| 14 | **THE COURT:**  And I guess, when he mentioned it this |
| 15 | morning, you said, "Ah." |
| 16 | **MR. NÚÑEZ-VIVAS:**  Yes. |
| 17 | **THE COURT:**  So next time.  That mistake is not |
| 18 | uncommon.  We had the same situation apply just yesterday and |
| 19 | the day before.  So for next time, if you're going to bring |
| 20 | exhibits to a court, always bring an extra copy for the law |
| 21 | clerk, so that he or she can read along. |
| 22 | **MR. NÚÑEZ-VIVAS:**  Yes. |
| 23 | **MR. NELSON:**  On that note, we have copies of our |
| 24 | opening slides.  We do have an extra copy for the law clerk. |
| 25 | May we approach and give him the extra copy? |

10:46 (line 5)
10:47 (line 10)
10:47 (line 15)
10:47 (line 20)
10:47 (line 25)

```
 1            THE COURT:  Sure.  Sure.

 2            MR. NÚÑEZ-VIVAS:  May I approach?

 3            THE COURT:  Yes.  So you have a copy for the

 4   witness and also a copy for me?

 5            MR. NÚÑEZ-VIVAS:  Yes.

 6            THE COURT:  All right.  Very nice.  Thank you very

 7   much.

 8        Thereupon,

 9                      RODRIGO FRANCO,

10   having been duly sworn by the Clerk, testified as follows:

11            THE WITNESS:  I do.

12            THE COURTROOM DEPUTY:  Please state and spell your

13   name for the record, sir.

14            THE WITNESS:  Rodrigo Franco, R-O-D-R-I-G-O,

15   F-R-A-N-C-O.

16            THE COURT:  So it is now 10:47, sir.

17

18                   *DIRECT EXAMINATION*

19   BY MR. NÚÑEZ-VIVAS:

20   Q.  Okay.  Good morning.  Mr. Franco, can you give your full

21   name?

22   A.  Rodrigo Franco.

23   Q.  Do you have a college degree, sir?

24   A.  Yes, I do.

25   Q.  What is your degree in?
```

```
        1    A.   Finance.

        2    Q.   From where?

        3    A.   Loyola University, New Orleans.

        4         THE COURT REPORTER:  I'm sorry.  What university?

10:48   5    A.   Loyola University, in New Orleans.

        6         THE COURT REPORTER:  Thank you.

        7    BY MR. NÚÑEZ-VIVAS:

        8    Q.   If you want to bring the microphone towards you, so you

        9    don't have to actually, every time you answer --

10:48   10        THE COURT:  Actually, unfortunately, the microphone

       11    itself doesn't go in that direction, so the witness will --

       12    it might be helpful to lean forward a little bit.

       13    A.   I can sit a little closer.

       14        THE COURT:  Sort of like a courtroom version of a

10:49  15    roller coaster, the edge of your seat.  All right.

       16    BY MR. NÚÑEZ-VIVAS:

       17    Q.   Where are you employed?

       18    A.   Wreal.

       19    Q.   How long have you been at Wreal?

10:49  20    A.   I've been at Wreal since 2007.

       21    Q.   And what is your job title there, sir?

       22    A.   I am chief operating officer of the company.

       23    Q.   And as the chief operating officer, what are your duties,

       24    sir?

10:49  25    A.   I am responsible for managing all studio relationships.
```

1   As chief operating officer, I'm responsible for managing and

2   carrying out the day-to-day operations of the company and

3   make sure that those operations are carried most efficient as

4   possible.

10:49   5       I am responsible for identifying new revenue

6   streams for the company.  I am responsible for creating and

7   proposing advertising for the company and overseeing that

8   advertising.

9   Q.  Okay.  Are you familiar then with Wreal's trademarks?

10:49   10   A.  Yes, I am.

11   Q.  Are you familiar with Wreal's use of those trademarks?

12   A.  Yes, I am.

13   Q.  When was Wreal created, sir?

14   A.  Wreal was created in 2006.

10:50   15   Q.  And why was Wreal created?

16   A.  To develop a IPTV platform.

17   Q.  What does IPTV stand for?

18   A.  Internet protocol television.

19   Q.  And what does it do?

10:50   20   A.  It allows you to stream content over the internet and

21   watch it on a television screen or on other streaming cable

22   devices.

23   Q.  Okay.  How much has Wreal spent in developing all its

24   technology in its business since its creation?

10:50   25   A.  Over $20 million.

```
        1    Q.   Now, given the investment, was Wreal able to develop

        2    IPTV?

        3    A.   Yes, we were.

        4    Q.   When was that?

10:50   5    A.   2007.

        6    Q.   Okay.  What did Wreal develop in 2007?

        7    A.   Wreal developed a scaleable platform that is content

        8    diagnostic --

        9         THE COURT REPORTER:  Excuse -- I'm sorry.  You're

10:50  10    going to have to slow down.  If I don't get it --

       11         THE COURT:  I'll help you out here.

       12         THE COURT REPORTER:  Thank you.

       13         THE COURT:  We have a wonderful court reporter,

       14    she's very experienced, but she's not a superwoman, and when

10:51  15    you speak very quickly, especially when a witness has an

       16    accent, it makes it difficult for the court reporter to take

       17    it down.

       18         And in addition, if you tend to garble or swallow

       19    your words a little bit, then it makes it even more

10:51  20    difficult.  Unfortunately, you have all three of those

       21    circumstances swirling around your testimony, so you need to

       22    speak slowly, speak clearly, and try to articulate.  All

       23    right?

       24         So we didn't get that last answer.  I know I

10:51  25    certainly didn't get the last answer.  So if you would repeat
```

1    it.

2    A.  **Wreal developed a scaleable platform that is content**

3    **diagnostic, that allows the streaming of content through the**

4    **internet, to be viewed in streamable capable devices.**

10:51    5    **BY MR. NÚÑEZ-VIVAS:**

6    Q.  Now, what was the platform that Wreal developed at that

7    time?

8    A.  **Repeat your question, sir.**

9    Q.  What was the platform that Wreal developed at that time?

10:51    10    A.  **It's a proprietary set-top box.**

11              **MR. NÚÑEZ-VIVAS:**  Your Honor, on this one, I will

12    need to approach him.  This is Exhibit Number 1.

13              **THE COURT:**  Sure.  All right.

14              (Thereupon, the aforementioned exhibit was

10:52    15    introduced into evidence.)

16              **MR. NELSON:**  No objection.

17              **MR. NÚÑEZ-VIVAS:**  I would like to offer it in

18    evidence, Your Honor.  There's no objection to it.

19              **THE COURT:**  Without objection, Exhibit 1 will be

10:52    20    admitted.

21              (Thereupon, the aforementioned exhibit was admitted

22    into evidence.)

23    **BY MR. NÚÑEZ-VIVAS:**

24    Q.  Now, Mr. Franco, do you recognize that?

10:52    25    A.  **Yes, I do.**

|       |    |                                                                  |
|-------|----|------------------------------------------------------------------|
|       | 1  | Q.   That's the set-top box that is sold?                        |
|       | 2  | A.   **Yes, I do.**                                              |
|       | 3  | Q.   Okay.  Can you actually take it out and show it to the      |
|       | 4  | Court, please?                                                   |
| 10:52 | 5  | A.   **(Complies.)**                                             |
|       | 6  | Q.   Can you show the packaging?  The packaging says what?       |
|       | 7  | What name is on the packaging?                                   |
|       | 8  | A.   **FyreTV.com.  FyreTV.**                                    |
|       | 9  | Q.   Okay.  And what's in the box itself?  You can take it       |
| 10:53 | 10 | out.                                                             |
|       | 11 | A.   **A user guide.**                                          |
|       | 12 | Q.   Okay.  The user guide.  Can you open it?  What is the --    |
|       | 13 | in the user guide, what is the -- how do you refer to the       |
|       | 14 | set-top box?                                                     |
| 10:53 | 15 | A.   **FyreTV set-top box.**                                    |
|       | 16 | Q.   Okay.  And what are the contents that go along with        |
|       | 17 | set-top box?                                                     |
|       | 18 | A.   **You have here a remote, power adapter.**                 |
|       | 19 | Q.   Can you take it out for the Court?                          |
| 10:53 | 20 | A.   **(Complies.)  Remote control, the set-top box.**          |
|       | 21 | Q.   Okay?                                                       |
|       | 22 | A.   **Fire stickers.**                                         |
|       | 23 | Q.   Okay?                                                       |
|       | 24 | A.   **Internet cable, composite cable, HDMI cable, wifi**      |
| 10:54 | 25 | **antenna, power adapter.**                                     |

1    Q.   Okay.  Great.  Thank you very much.

2              THE COURT DEPUTY:  Counsel, what did you call that?

3              MR. NÚÑEZ-VIVAS:  The set-top box.

4    A.   **Set-top box.**

5              THE COURT DEPUTY:  **Okay.**

6              MR. NÚÑEZ-VIVAS:  **S-E-T, T-O-P, and then box.**

7              THE COURT DEPUTY:  **Thank you.**

8    BY MR. NÚÑEZ-VIVAS:

9    Q.   Now, other than the set-top box, did Wreal develop other

10:54  10   platforms?

11   A.   **Yes, we did.**

12   Q.   What other platforms did Wreal develop?

13   A.   **Wreal developed Roku, Boxee, Google TV, Android, iOS.**

14   Q.   Now, when you mentioned that you developed Roku, did you

10:54  15   develop Roku itself or applications that are used in Roku.

16   A.   **No, we developed a FyreTV application for each of these**

17   **third-party set-top boxes.**

18   Q.   Okay.  Any other platforms that are used?

19   A.   **Web site.**

10:54  20   Q.   The web site.  Okay.  When were these launched?

21   A.   **These were launched in 2011.**

22   Q.   Okay.  And under what marks were those platforms

23   launched?

24   A.   **FyreTV and FyreTV.com.**

10:55  25   Q.   And how do you spell FyreTV?

1   A.   **F-Y-R-E-TV.**

2   Q.   Now, as a result of the development of these new

3   platforms, did Wreal stop selling the set-top box?

4   A.   **No, we have never stopped selling the set-top box to our**

10:55   5   **old consumers.**

6   Q.   How about new customers at that time?

7   A.   **I'm sorry?**

8   Q.   How about new customers at that time?

9   A.   **Like I said, we have always made it available to all**

10:55   10   **subscribers.**

11   Q.   At the time, though, to new customers as well?  Or only

12   to old customers?

13   A.   **No, just to old customers.**

14   Q.   I see.  When did that happen?  Do you remember?

10:55   15   A.   **October 2012.**

16   Q.   Did there come a time when Wreal stopped streaming video

17   through its set-top boxes?

18   A.   **No, we have never stopped streaming video to our**

19   **proprietary set-top box.**

10:56   20   Q.   Did there come a time when Wreal started selling the

21   set-top boxes again to new customers?

22   A.   **Yes.**

23   Q.   When was that?

24   A.   **After Amazon announced its new movie streaming service**

10:56   25   **and decided to call it Fire TV.**

```
 1   Q.  Why did Wreal start selling, again, the set-top box when

 2   Amazon made the announcement?

 3   A.  Because we wanted to protect the company and the use of

 4   still being able to use FyreTV.

10:56  5   Q.  Did you -- okay.  Who produces the movies that are

 6   streamed by FyreTV?

 7   A.  Individual companies, third-party companies.

 8   Q.  Does Wreal produce the films?

 9   A.  No, it does not.

10:56 10   Q.  How does Wreal obtain its content?

11   A.  Through licensing agreements.

12   Q.  Okay.  What type of video content can Wreal stream

13   through its platforms, including the set-top box, web site,

14   and applications?

10:56 15   A.  Wreal can stream any type of content.  It's content

16   diagnostic.

17   Q.  What type of video content has Wreal actually streamed?

18   A.  Italian mainstream movies and adult.

19   Q.  Okay.  Italian mainstream, when was that?

10:57 20   A.  We developed that starting in 2010.

21   Q.  Okay.  Was that in the United States or abroad?

22   A.  In the United States.

23   Q.  Okay.  But today, what contents does Wreal actually

24   stream?

10:57 25   A.  Adult.
```

1    Q.   Okay.  Would that be pornography?

2    A.   **Yes.**

3    Q.   Okay.  How many movies does Wreal currently offer for

4    video streaming over the internet?

10:57   5    A.   **About 15,000.**

6    Q.   Under what brand name does Wreal market its video

7    streaming devices?

8    A.   **FyreTV and FyreTV.com.**

9    Q.   Is the brand name a trademark?

10:57   10   A.   **Yes, it is.**

11            **MR. NÚÑEZ-VIVAS:**  Now, Your Honor, I would like

12   to --

13   **BY MR. NÚÑEZ-VIVAS:**

14   Q.   Actually, Mr. Franco, can you look at Exhibit Number 2?

10:57   15   A.   **Yes.**

16            (Thereupon, the aforementioned exhibit was

17   introduced into evidence.)

18            **MR. NELSON:**  No objection.

19            **MR. NÚÑEZ-VIVAS:**  I'd like to offer them into

10:58   20   evidence, Your Honor.  It's the trademarks.  There's no

21   objection.

22            **THE COURT:**  Yes.  But what particular exhibit

23   number?  Plaintiff or --

24            **MR. NÚÑEZ-VIVAS:**  Exhibit Number 2 -- Plaintiff's

10:58   25   Exhibit Number 2.

         1              THE COURT:  Is that the one that says "RF Number

         2     2"?

         3              MR. NÚÑEZ-VIVAS:  Yes.

         4              THE COURT:  All right.  So Plaintiff's Exhibit

10:58    5     Number 2, without objection, is admitted, and those are the

         6     service marks.  Correct?

         7              MR. NÚÑEZ-VIVAS:  Yes.

         8              (Thereupon, the aforementioned exhibit was admitted

         9     into evidence.)

10:58   10              THE COURT:  All right.

        11     BY MR. NÚÑEZ-VIVAS:

        12     Q.   Now, I'd like to -- Mr. Franco, I'd like for you to take

        13     a look at the first page.

        14              MR. NÚÑEZ-VIVAS:  Your Honor, just to move things

10:58   15     along, I'd like to publish it quickly myself, since its in

        16     evidence.

        17              THE COURT:  Sure.

        18              MR. NÚÑEZ-VIVAS:  It's from the United States

        19     Patent and Trademark Office, registered October 14th, 2008,

10:58   20     Service Mark, Principal Register, FyreTV is the mark,

        21     F-Y-R-E-TV, all consecutively without a space.  And it's for

        22     the following uses:  For broadcasting services and provision

        23     of telecommunications access to video and audio content.

        24              THE COURT:  Slowly, please.

10:59   25              MR. NÚÑEZ-VIVAS:  Absolutely.

|    |    |                                                                      |
|----|----|----------------------------------------------------------------------|
|    | 1  | **THE COURT:**  The more you start reading, they tend                 |
|    | 2  | to speak more quickly.                                                |
|    | 3  | **MR. NÚÑEZ-VIVAS:**  Let me start then.                              |
|    | 4  | **BY MR. NÚÑEZ-VIVAS:**                                               |
| 10:59 | 5  | Q.  For broadcasting services and provision of                     |
|    | 6  | telecommunications access to video and audio content provided         |
|    | 7  | via a video on demand service via the internet.                       |
|    | 8  | Communications services namely transmitting stream sound and          |
|    | 9  | audio visual recordings via the internet.  Streaming of video         |
| 10:59 | 10 | material on the internet in class 38.  For entertainment            |
|    | 11 | services, namely providing a web site featuring photographic          |
|    | 12 | audio, video, and prose presentations featuring adult                 |
|    | 13 | entertainment in class 41.                                            |
|    | 14 | That's what it says, sir?                                             |
| 10:59 | 15 | A.  **Yes, it is.**                                                 |
|    | 16 | Q.  As to the next one is the service mark FyreTV.com was             |
|    | 17 | registered on the same date, and it also is for the same use.         |
|    | 18 | Now, why was the name FyreTV.com registered?                          |
|    | 19 | A.  **We -- when we first started developing this technology,**       |
| 11:00 | 20 | **this technology --**                                              |
|    | 21 | Q.  I'm sorry.  The FyreTV.com name, not the FyreTV name.             |
|    | 22 | A.  **For the web site.**                                            |
|    | 23 | Q.  For the web site?  Now, has Wreal used or not used these          |
|    | 24 | trademarks continuously since 2007?                                   |
| 11:00 | 25 | A.  **Yes, it has.**                                                |

1    Q.   Now, have you heard of the name FyreBoXXX, with a XXX at

2    the end?

3    A.   **Yes, I have.**

4    Q.   How do you spell that?

11:00    5    A.   **F-Y-R-E-B-O-X-X-X.**

6    Q.   And what -- how was that name used by Wreal?

7    A.   **It was a name that was proposed by our marketing**

8    **department, and it sometimes was used to refer to our service**

9    **in our box.**

11:01   10    Q.   Was that name trademarked at all?

11    A.   **No, it was not.**

12    Q.   Now, what other names have been used for the set-top box?

13    A.   **FyreTV box.**

14              THE COURT:   I'm sorry.  Can you say that one more

11:01   15    time, please?

16    A.   **FyreTV box.**

17    BY MR. NÚÑEZ-VIVAS:

18    Q.   In fact, can you take out the user guide?

19    A.   **(Complies.)**

11:01   20              MR. NÚÑEZ-VIVAS:   May I approach, Your Honor?

21              THE COURT:   Sure.

22              MR. NELSON:   I'm sorry, Your Honor, we have not

23    seen a copy of that at all.

24              MR. NÚÑEZ-VIVAS:   Let me take it to them then.

11:01   25              THE COURT:   Sure.

```
 1            MR. NÚÑEZ-VIVAS:  (Complies.)

 2    BY MR. NÚÑEZ-VIVAS:

 3    Q.   Mr. Franco, I'm going to show you that --

 4            THE COURT:  Do me a favor, and when you're going to

11:02  5    be speaking, wait until you get back to the microphone.

 6    Otherwise, the court reporter has difficulty picking up what

 7    you are saying.  And I think, in a prior life, I used to be a

 8    court reporter, so...

 9            MR. NÚÑEZ-VIVAS:  I will.

11:02 10   BY MR. NÚÑEZ-VIVAS:

11   Q.   Mr. Franco, below the picture of the set-top box, what's

12   the name that Wreal puts there for the set-top box?

13   A.   FyreTV box.

14   Q.   Can you show that to the Court, please?

11:02 15   A.   (Complies.)

16           THE COURT:  I see.  Thank you.

17   BY MR. NÚÑEZ-VIVAS:

18   Q.   Let's talk about advertising.  Does Wreal use its marks

19   in advertising?

11:02 20   A.   Yes, it has.

21   Q.   What marketing methods has Wreal used?

22   A.   We tried -- we have done everything.  We do -- we have

23   done ads on very popular magazines, such as Maxim, Rolling

24   Stone, Vibe.  We did one-page ad and two-page ads in

11:03 25   magazines.
```

```
 1           We launched a very aggressive TV campaign, when we
 2      put together 30 seconds and 60 seconds spots with the studios
 3      and aired these commercials in renowned networks, such as
 4      Comedy Central, Country Network, Spike, FX, Speed Network,
 5      and the NFL Network.
 6      Q.  When did you guys -- when did Wreal actually put out
 7      these TV ads?
 8      A.  Throughout 2012.
 9      Q.  Okay.  And what about the print media?
10      A.  Print media, we started in 2000 -- 2008.
11      Q.  Have you guys done any trade shows?
12      A.  Yes, we have.
13      Q.  What kind of trade shows?
14      A.  When we first announced our product to the industry and
15      to the technology world, we debuted our service at the AVN,
16      the Adult Video News Convention.  I would say it's one of the
17      most important conventions for this industry.  We basically
18      sponsored the entertainment obviously of some show, this
19      page, in 2008, 2009, 2010, and 2011.
20      Q.  Okay.  You did mention the magazine ads.  I'd like to --
21      for you to take a look at what has been marked as Plaintiff's
22      Exhibit Number 3.
23           (Thereupon, the aforementioned exhibit was
24      introduced into evidence.)
25           MR. NELSON:  Excuse me, Your Honor, as I told
```

11:03   5
11:03   10
11:03   15
11:04   20
11:04   25

1    Mr. Núñez beforehand, those have not been produced in

2    discovery.

3            **MR. NÚÑEZ-VIVAS:**  The ones that --

4            **THE COURT:**  Well, first of all, let's take it one

11:04   5    step at a time.  The fundamental question:  Are you objecting

6    to Plaintiff's Exhibit Number 3?  Are you objecting to the

7    intent to introduce it into this hearing as an exhibit?  If

8    the answer is no, I'm not really concerned about the other

9    comments.

11:05   10           **MR. NELSON:**  Yes, we are, unless he can make a

11   representation that it has been produced in discovery.

12           **THE COURT:**  Well, why would that necessarily

13   matter?  Was it requested in discovery?

14           **MR. NELSON:**  Yes, it was.

11:05   15           **THE COURT:**  How so?  What particular request

16   prompted or would have prompted the production of Exhibit

17   Number 3?

18           **MR. NELSON:**  We made a request for all

19   advertisements that Wreal has done.

11:05   20           **THE COURT:**  So that would cover it.  So what about

21   that?

22           **MR. NÚÑEZ-VIVAS:**  The ones that I want to admit are

23   two that actually were produced, so --

24           **THE COURT:**  Wait.  Now, I think you were calling my

11:05   25   attention to Exhibit Number 3.  Weren't you?

1          **MR. NÚÑEZ-VIVAS:**  Yes.  There are two

2     advertisements that are in Exhibit 3 that were actually

3     produced, so I'm willing to take the other ones out and just

4     have the two that have been produced from that pile from that

11:05  5     bundle.

6          **THE COURT:**  All right.  Well, Exhibit Number 3 is a

7     multipage composite exhibit.  So far, to me, it looks like

8     they're all advertisements from Maxim.

9          **MR. NÚÑEZ-VIVAS:**  There's another one too, yeah,

11:06 10     but mostly Maxim.

11          **THE COURT:**  Mostly Maxim.

12          **MR. NÚÑEZ-VIVAS:**  It's for use in commerce,

13     obviously, the relevance is the use in commerce, that they

14     have used it in commerce.

11:06 15          **THE COURT:**  I understand.  Do you know which of

16     these two --

17          **MR. NÚÑEZ-VIVAS:**  Yes.

18          **THE COURT:**  -- advertisements were, in fact,

19     produced?

11:06 20          **MR. NÚÑEZ-VIVAS:**  I do, Your Honor.  Let me just

21     coordinate it quickly with Mr. Nelson.

22          **THE COURT:**  Sure.  Sure.

23          **MR. NÚÑEZ-VIVAS:**  What I will do, Your Honor, then,

24     is to have these ones marked as evidence then because these

11:07 25     have been produced.

1        THE COURT:  I may be a little bit neurotic about

2   stuff like this, but when you say "these," these will be

3   produced.  I don't know what you're talking about.

4        MR. NÚÑEZ-VIVAS:  May I approach, so I can have the

11:07  5   witness --

6        THE COURT:  Yeah.  Maybe you can identify them by

7   the month of the magazine or page 6 or somehow, so that in

8   case anyone ever reviews this record, they'll know what the

9   heck we're talking about.

11:07 10        MR. NÚÑEZ-VIVAS:  The first one is July 2008 issue

11   of Maxim, and it has Marissa Miller on the cover.  And the ad

12   in there shows Ron Jeremy showing the FyreTV and the FyreTV

13   box.

14        THE COURT:  So how many pages deep into Exhibit

11:07 15   Number 3?

16        MR. NÚÑEZ-VIVAS:  That one is only --

17        THE COURT:  So it's Marissa -- here it is.  I see.

18   Marissa Miller, July 2008, I see that.  All right.  So this

19   is a two-page exhibit, a cover of Maxim showing Marissa

11:08 20   Miller and the advertisement for FyreTV featuring a man who

21   you represent to be Ron Jeremy, and it, in fact, says Ron

22   Jeremy in the middle of the page.

23        MR. NÚÑEZ-VIVAS:  Yes.

24        THE COURT:  All right.  Next exhibit?

11:08 25        MR. NÚÑEZ-VIVAS:  The next one is the April 2009

1   Maxim, and it says, Watchmen's sexiest superhero.

2            THE COURT:  And who is on the cover?

3            MR. NÚÑEZ-VIVAS:  Well, it says Malin Akerman.

4            THE COURT REPORTER:  I'm sorry.  Say that again?

5            MR. NÚÑEZ-VIVAS:  Malin -- I think that is how you

6   pronounce it.  It's M-A-L-I-N, Akerman.

7            THE COURT:  Well, since my prior firm was Akerman

8   Senterfitt, we're going to pronounce this Akerman.  That's

9   April 2009, sir.

11:09  10          MR. NÚÑEZ-VIVAS:  Yes.  And the following page,

11  which is the ad in that magazine.

12           THE COURT:  Yes.

13           MR. NÚÑEZ-VIVAS:  Also showing the use of the

14  FyreTV mark.

11:09  15          THE COURT:  Right.  I see that.

16           MR. NÚÑEZ-VIVAS:  And the final one, Your Honor --

17  actually, there's three that we're producing in that bundle.

18           THE COURT:  Three.  Yes.

19           MR. NÚÑEZ-VIVAS:  The other one would be the

11:09  20  December 2008 issue of Maxim.

21           THE COURT:  December 2008.  Who is on the cover?

22           MR. NÚÑEZ-VIVAS:  Olga Kurylenko, I believe her

23  name is.

24           THE COURT REPORTER:  Spell it, please.

11:09  25          MR. NÚÑEZ-VIVAS:  Of course.  It's

1    K-U-R-Y-L-E-N-K-O.

2           THE COURT:  Let me see.  How far -- I see it.

3    Okay.  It's -- December 2000 --

4           MR. NÚÑEZ-VIVAS:  '8.

11:09   5           THE COURT:  2008.  All right.

6           MR. NÚÑEZ-VIVAS:  It also has -- the subsequent

7    page is the ad.  It says FyreTV.

8           THE COURT:  Right.  It says FyreTV, and then

9    underneath, it says, The hottest BoXXX --  B-O-X-X-X --

11:10   10   you'll ever experience.  I see that.

11          MR. NÚÑEZ-VIVAS:  Yes.  And it has the Christmas

12   theme.

13          THE COURT:  Right.  All right.  So those three

14   exhibits, which are a total of six pages, Amazon, you're not

11:10   15   object to those.  Correct?

16          MR. NELSON:  Correct, Your Honor.

17          THE COURT:  Okay.  So without objection, those

18   portions of what we previously marked as Exhibit 3 will be

19   introduced, and at the end of the hearing, if you would

11:10   20   simply make sure that you pull out the pages that have not

21   been admitted, so that we're clear what has been admitted and

22   what has not been admitted, I'd appreciate that.

23          (Thereupon, the aforementioned exhibit was admitted

24   into evidence.)

25          MR. NÚÑEZ-VIVAS:  In fact, which ones will you want

1    to have marked for the Court?

2         THE COURT:  Only the ones that have been admitted.

3         MR. NÚÑEZ-VIVAS:  No, no, but do you have the

4    bundle that you will provide because I have a bundle that

11:10  5    only has those, so if I can exchange it with you, that's fine

6    because then --

7         THE COURT:  All right.  Well, I'm only going to be

8    looking at the courtesy copy.  The version that is officially

9    part of the record, have you given a copy to the clerk?  Or

11:11  10   are you talking about the one that the witness has?

11        MR. NÚÑEZ-VIVAS:  No.  In fact, can I give you

12   these, so they can be marked appropriately?

13        THE COURT:  By "these," you mean --

14        MR. NÚÑEZ-VIVAS:  Exhibit 2 and Exhibit 3, with

11:11  15   only the ones that we just talked about.

16        THE COURT:  Well, perhaps, but let's just take it

17   one step further.  Part of the bundle that you just gave to

18   me included other exhibits beyond 2 and 3.

19        MR. NÚÑEZ-VIVAS:  Yes, we'll get to those.

11:11  20        THE COURT:  All right.  So Maedon, with your

21   permission, let's have Exhibit Number 2 tendered to you.  I

22   don't think there was any objection to that.

23        MR. NÚÑEZ-VIVAS:  No.

24        THE COURT:  And then Exhibit Number 3 will be only

11:11  25   those three two-page excerpts that we mentioned, July 2008,

```
 1  April 2009, and December 2008.
 2          All right.  So Maedon is keeping a running tally of
 3  the actual exhibits, as opposed to the initially proposed
 4  exhibits.  Please continue.
11:12  5          MR. NÚÑEZ-VIVAS:  Yes.  As to the box, can I hand
 6  it over for marking?
 7          THE COURT:  Sure.
 8          MR. NÚÑEZ-VIVAS:  Thank you.  (Complies.)
 9          MR. NELSON:  Your Honor, may we get access to that
11:12 10  quick start guide, which we have not seen before, at least to
11  observe, before it goes to the Court?
12          MR. NÚÑEZ-VIVAS:  Sure.
13          THE COURT:  That's fine.
14          MR. NÚÑEZ-VIVAS:  (Complies.)
11:12 15          MR. NELSON:  Thank you.
16          MR. NÚÑEZ-VIVAS:  Would you like me to go on or
17  wait?
18          THE COURT:  I would.  I think they have several
19  team members that can review the pamphlet while you're
11:12 20  questioning the witness.
21          MR. NÚÑEZ-VIVAS:  Fair enough.
22  BY MR. NÚÑEZ-VIVAS:
23  Q.  How about advertising online?  Has Wreal down that?
24  A.  Yes, we have.
11:13 25  Q.  And can you take a look at Plaintiff's Exhibit Number 4?
```

1              (Thereupon, the aforementioned exhibit was

2    introduced into evidence.)

3    **BY MR. NÚÑEZ-VIVAS:**

4    Q.   Marked Plaintiff's Exhibit 4?

11:13   5              **MR. NELSON:**  We object, Your Honor, to Plaintiff's

6    Exhibit 4 for the same reason.  This was not produced in

7    discovery.  I think their argument is going to be that they

8    showed it to us at mediation, that took place after

9    discovery, after it was closed.

11:13   10             **THE COURT:**  Why don't we wait for them to make

11   their own argument, rather than you paraphrasing, which I

12   don't want either one of you to do.

13             So right now, your objection to Exhibit Number 4,

14   which is a one-page exhibit, is that it wasn't produced in

11:13   15   discovery, and what was the response -- I'm sorry, what was

16   the request that you propounded, which you believe would have

17   accomplished this exhibit, a request for all marketing --

18             **MR. NELSON:**  Marketing and advertising.

19             **THE COURT:**  Marketing and advertising.

11:13   20             **MR. NELSON:**  And, Your Honor, we also have

21   additional objections as well, if Your Honor would like to

22   hear them --

23             **THE COURT:**  Might not be necessary.  Let's just

24   take it one step at a time.  What about that?

11:14   25             **MR. NÚÑEZ-VIVAS:**  Your Honor, actually, this is a

1    screenshot of an adult site that holds the banner of FyreTV,

2    and it was actually taken right around the mediation time,

3    and that's why it was shown at mediation.  It wasn't produced

4    before because it wasn't -- you know, this is a banner ad

11:14   5    that appears on the internet.

6         So you have to go to the internet, to that web

7    site, the banner comes up.  We took a screenshot at that time

8    for the mediation, and we showed it to them at that time.  So

9    it wasn't that we had it somewhere -- you know, tucked away,

11:14   10   and we just didn't produce it.

11        It is basically a banner ad that shows the use in

12   commerce of the mark and a method of advertising that Wreal

13   is using, so that's why I would like to offer it into

14   evidence.

11:14   15        **THE COURT:**  So the banner ad in here is a

16   screenshot taken on a particular day.  It must have been some

17   day either the day of the mediation or sometime before.  And

18   so what do you say about that, Mr. Nelson?

19        **MR. NELSON:**  Well, two points.  Number 1 is we

11:15   20   haven't -- presumably, we could have gotten a copy of the

21   advertisement itself, which we never got.  At least to my

22   recollection, we haven't.

23        But second of all, even moving beyond that, they

24   certainly could have at least Bates-numbered it and told us

11:15   25   they were going to rely on it, which they never did, and then

1    of course, there's the substantive objection, which is this

2    is a screen -- since there's no authentication for this.

3           This is a screenshot from a web site that -- and

4    they're using it, I guess, to prove the truth of the matter

11:15  5    asserted as well, so there's hearsay issues which is that if

6    this actually appeared on the web site so -- and we have no

7    way to test any of that during discovery, which relates back

8    to our original objection as well.

9           MR. NÚÑEZ-VIVAS:  Your Honor?

11:15  10          THE COURT:  Go ahead.

11          MR. NÚÑEZ-VIVAS:  Authenticity, I can answer

12   questions to authenticate.  As to hearsay, it actually has a

13   legal independent significance because its use of the mark in

14   commerce, obviously, so legal independent significance is

11:16  15   obviously not hearsay.

16          THE COURT:  Mr. Nelson, do you challenge the fact

17   that this was produced to you at the mediation?

18          MR. NELSON:  No, Your Honor, this was produced at

19   the mediation.

11:16  20          THE COURT:  All right.  Well, even though the

21   better procedure would certainly have been to have produced

22   it in response to the Request For Production, for purposes of

23   this hearing, I'm going to overrule Amazon's objection having

24   to do with not previously produced in discovery.

11:16  25          I'm going to reserve ruling on the authentication

1    objection, subject to you attempting to generate the

2    requisite predicate, either through this witness or some

3    other witness.

4               MR. NÚÑEZ-VIVAS:  Sure.

11:16   5    BY MR. NÚÑEZ-VIVAS:

6    Q.   Now, Mr. Franco, can you look at Plaintiff's Exhibit

7    Number 4?  Do you recognize that document?

8    A.   **Yes, I do.**

9    Q.   How do you recognize that document?

11:16  10    A.   **It's a screenshot.  I've seen this, a screenshot of an**

11    **adult web site where we advertise.  I've seen this as to this**

12    **screenshot.**

13               MR. NÚÑEZ-VIVAS:  Okay.  Now, I'd like to move it

14    into evidence.

11:17  15               MR. NELSON:  Your Honor, we still object to it.  He

16    didn't come close to saying -- he didn't evidently take the

17    screenshot himself.  I don't think he even testified that he

18    saw the web site.

19               THE COURT:  Mr. Nelson, I don't know what the

11:17  20    procedures are in the Seattle courts, like you normally

21    appear in front of, but all I can say is what the practice is

22    here, and the practice here is no speaking objections.

23               So if you have an objection, such as the little

24    mini-speech that you just gave, it would be, objection, lack

11:17  25    of foundation, objection, insufficient authentication,

1   period.

2          MR. NELSON:  Thank you, Your Honor.

3          MR. NÚÑEZ-VIVAS:  Your Honor, he just said that he

4   did take the screenshot.

5   BY MR. NÚÑEZ-VIVAS:

6   Q.  Now, does it accurately reflect what you were looking at

7   the computer?

8   A.  **Yes, it is.**

9          MR. NÚÑEZ-VIVAS:  I think that is proper

11:18 10  foundation, Your Honor.

11          THE COURT:  I'm not sure if I heard him say that he

12   took the screenshot.  I may have misheard or not, but why

13   don't you ask that question one more time?

14   BY MR. NÚÑEZ-VIVAS:

11:18 15  Q.  Did you take the screenshot?

16   A.  **Yes, I took the screenshot.**

17          MR. NÚÑEZ-VIVAS:  I move it into evidence, Your

18   Honor.

19          THE COURT:  I understand.  Exhibit Number 4 will be

11:18 20  admitted.

21          (Thereupon, the aforementioned exhibit was admitted

22   into evidence.)

23   BY MR. NÚÑEZ-VIVAS:

24   Q.  Now, let's take a look at Exhibit Number 4.  You see at

11:18 25  the top, is that one of the banner ads of Wreal?

```
     1    A.   Yes, this is one of the banner adds that we displayed on

     2    different web sites.

     3    Q.   And what does it say?

     4    A.   It says, Join now for free, FyreTV.

11:18  5         MR. NÚÑEZ-VIVAS:  Okay.  May I hand it to the

     6    clerk, Your Honor?

     7         THE COURT:  Yes.

     8         MR. NÚÑEZ-VIVAS:  (Complies.)

     9    BY MR. NÚÑEZ-VIVAS:

11:18 10    Q.   Now, what other -- does Wreal rely on any other method of

    11    marketing?

    12    A.   Word of mouth.

    13    Q.   Why word of mouth?

    14    A.   I would say word of mouth is the most important form of

11:19 15    advertising for us due to the nature of the content and,

    16    obviously, how the name is pronounced.

    17    Q.   How would a customer hear from -- as to word of mouth?

    18    A.   Well, because of the nature of our content, people are

    19    very unlikely to post on their social media the FyreTV movie

11:19 20    they watched or their interaction that they have with the

    21    system, so you would tell a close friend or someone, Come

    22    watch this great service, FyreTV.  You can check that star,

    23    that actress, at FyreTV.  You can watch this on FyreTV.

    24         So obviously, people would say this by word of

11:19 25    mouth, and this is how, obviously, we come across current
```

1   subscribers.

2   Q.   Is that one of the reasons or not one of the reasons you

3   acquired the FireTV.com name with an I?

4   A.   **Yes.**

11:20  5   Q.   Now, in 2014, what marketing channels did Wreal rely on?

6   A.   **Online advertising and word of mouth.**

7   Q.   Let's talk about Wreal's customers.  How much subscribers

8   does the FyreTV mark brand have?

9   A.   **Approximately 51,000 in the U.S.**

11:20  10   Q.   Who does Wreal target as a customer?

11   A.   **We target male and females, 20 years or older, with**

12   **disposable income and access to internet, the same type of**

13   **customers that will buy erotica, toys, hardcore pornography**

14   **magazines from Amazon or hardcore pornography DVDs from**

11:21  15   **Amazon's web site.**

16   Q.   What percentage of your customer base is in the 18 to 24

17   age group?

18   A.   **Very few, I would say maybe three percent.**

19          THE COURT REPORTER:   How much?

20   A.   **3 percent.**

21          MR. NÚÑEZ-VIVAS:   Three percent.

22   BY MR. NÚÑEZ-VIVAS:

23   Q.   And as to unique visitors, how many of unique visitors to

24   the FyreTV.com web sites actually pay to view content during

11:21  25   their visit?

1    A.  **I would say one in a thousand.**

2    Q.  Does Wreal believe that its target market overlaps with

3    Amazon's target market?

4    A.  **A hundred percent.**

11:21  5    Q.  Why?

6    A.  **Because the same consumer that is aware that Amazon**

7    **provides a movie streaming service and they can watch erotica**

8    **content there is also aware that, as a consumer, that they**

9    **can purchase explicit adult sexual material, bondage and**

11:21  10   **fetish gear material from Amazon's web site, being toys,**

11   **hardcore pornography DVDs, hardcore pornography magazines, it**

12   **would be the same type of customer that Wreal's FyreTV would**

13   **target.**

14   Q.  How do you know whether Amazon offers pornography and sex

11:22  15   toys on its online store?

16   A.  **I personally conducted searches.**

17   Q.  Now, has Wreal made any investments in Wreal's platforms

18   during the last year and a half?

19   A.  **Yes, we have.**

11:22  20   Q.  What investment has been made?

21   A.  **We have invested over $250,000 to rehaul our web site and**

22   **technology and redesign the web site to increase online**

23   **traffic conversion.**

24   Q.  Okay.  Was there a redesign of the web site done?

11:22  25   A.  **Yes.**

```
 1    Q.   When was that?

 2    A.   We started last year in October, and we introduced and

 3    released the new web site in October or end of September this

 4    year.

11:22 5    Q.   I'd like to take your attention to what has been marked

 6    as Plaintiff's Exhibit Number 5.

 7              (Thereupon, the aforementioned exhibit was

 8    introduced into evidence.)

 9    BY MR. NÚÑEZ-VIVAS:

11:23 10   Q.   Do you know what that is?

11    A.   Yes, I do.

12    Q.   What, is it?

13    A.   They're screenshots of Wreal's FyreTV web site.

14    Q.   And does it truly and accurately reflect parts of your

11:23 15   web site?

16    A.   Yes, it does.

17              MR. NÚÑEZ-VIVAS:   I move it into evidence.

18              MR. NELSON:   No objection.

19              THE COURT:   Without objection, Exhibit Number 5

11:23 20   will be admitted, and so after you're done questioning the

21    witness about that, you can pass it up to Maedon, please.

22              (Thereupon, the aforementioned exhibit was admitted

23    into evidence.)

24    BY MR. NÚÑEZ-VIVAS:

11:23 25   Q.   Sure.   I'd like to first -- please take a look at the
```

1  first page.  At the top, it says, Join FyreTV free, right?

2  A.  **Yes.**

3  Q.  And on the top left, it says FyreTV and uses the white

4  color and the red color, right?

11:23  5  A.  **Yes.**

6  Q.  Now, please move to -- after that one, counting that one

7  as the first page, the landing page, 1, 2, 3 -- the fourth

8  one.  Please go to the fourth one.

9        At the bottom, do you see that black box there that

11:24  10  says FyreTV and it has a lot of options.  It gives options

11  like join free, take a tour, unlimited viewing?

12  A.  **Yes, I do.**

13  Q.  Do you see on the third column, it says, Frequently Asked

14  Questions?

11:24  15  A.  **Yes, I do.**

16  Q.  Can you go to the next page?  Do you see that section

17  called Frequently Asked Questions?

18  A.  **Yes, I do.**

19  Q.  Is that -- are those in the Wreal FyreTV web site?

11:24  20  A.  **Yes, it is.**

21  Q.  Thank you.

22        **MR. NÚÑEZ-VIVAS:**  May I approach to give to the

23  clerk, Your Honor?

24        **THE COURT:**  Yes.

11:24  25        **MR. NÚÑEZ-VIVAS:**  (Complies.)

1   BY MR. NÚÑEZ-VIVAS:

2   Q.   Now, you mentioned that Wreal is agnostic as to content.

3   Could Wreal's platform be used or not used to stream

4   Hollywood movies?

11:25   5   A.   **Of course, the platform is content agnostic.**

6              THE COURT REPORTER:  Platform?

7   A.   **Platform agnostic.  It's indifferent to the type of**

8   **content.**

9   BY MR. NÚÑEZ-VIVAS:

11:25   10   Q.   Would, say, Hollywood movies complement or contradict

11   FyreTV's adult streaming service?

12   A.   **It would complement.**

13   Q.   Why would it complement?

14   A.   **Because just like Comcast, TimeWarner, AT&T U-verse, Dish**

11:25   15   **Network, DIRECTV, in order to really provide a full range of**

16   **entertainment among history, faith-based content, children's**

17   **programming, mainstream movies, adult is part of that**

18   **spectrum of a fuller range of content.**

19   Q.   Now, let's talk about Comcast.  Are you familiar with

11:26   20   Comcast?

21   A.   **Yes, I am.**

22   Q.   What does Comcast provide a consumer to be able to watch

23   the full spectrum of movie content?

24   A.   **It provides them with a set-top --**

11:26   25              THE COURT:  Sorry.  I don't know if anyone

| | |
|---|---|
| 1 | explained to you, but one of the basic rules in the court is |
| 2 | if the other lawyer objects, you have to stop talking. |
| 3 | A.   **I didn't hear.** |
| 4 | **THE COURT:**  I'm not blaming you or anything, but |
| 11:26  5 | there's been an objection, so let's wait to figure out what |
| 6 | the objection is, and then we'll get a ruling.  Yes, sir, |
| 7 | your objection? |
| 8 | **MR. NELSON:**  Objection, lack of foundation, |
| 9 | hearsay, and expert testimony. |
| 11:26  10 | **MR. NÚÑEZ-VIVAS:**  May I?  I asked him if he was |
| 11 | familiar with Comcast and how a consumer would actually get |
| 12 | to watch, and that's pretty common knowledge, Your Honor, if |
| 13 | he is aware of the Comcast service -- |
| 14 | **THE COURT:**  Why don't you rephrase your question? |
| 11:27  15 | **BY MR. NÚÑEZ-VIVAS:** |
| 16 | Q.   Are you familiar with how Comcast -- what device Comcast |
| 17 | provides to a consumer to watch full spectrum of movies? |
| 18 | A.   **Yes, I do.** |
| 19 | Q.   How are you familiar with that? |
| 11:27  20 | A.   **I am a customer.** |
| 21 | **MR. NÚÑEZ-VIVAS:**  And then I asked him how does -- |
| 22 | **BY MR. NÚÑEZ-VIVAS:** |
| 23 | Q.   What exactly does Comcast provide to the customer, like |
| 24 | yourself, to watch the full spectrum of movies? |
| 11:27  25 | A.   **It provides a set-top box.** |

1    Q.   Thank you.  Now, has Wreal tried to obtain content other

2    than adult content?

3    A.   **Yes, we have, since day 1.**

4    Q.   What has Wreal done in order to obtain content -- video

11:27   5    content, other than adult video content?

6    A.   **Since day 1, when we decided to obviously develop this**

7    **technology, it wasn't our intent to acquire adult content.**

8    **We made several efforts to approach and persuade mainstream**

9    **content owners, such as Time Warner, Universal, among other**

11:28   10   **well-known mainstream content providers.**

11          **We were having difficulty acquiring that content**

12   **because, at that point in time when we started developing**

13   **this technology, most of these content owners didn't know if**

14   **this technology would be a threat to them or would it create**

11:28   15   **a new revenue stream.**

16          **So after several time and efforts and wasting**

17   **resources in trying to acquire this content, we decided that**

18   **we were not getting anywhere, and we needed to acquire**

19   **content to further develop our technology, then we decided to**

11:28   20   **acquire adult content.**

21   Q.   Now, at the time, was this a new technology, or was it

22   common?

23   A.   **No, it was a new technology.**

24   Q.   Okay.  Now, when was -- these efforts were early on?

11:28   25   A.   **These efforts, like I mentioned, started early on before**

|         | 1  | we licensed adult and continues.  I personally, throughout |
|         | 2  | many years, and have continuously tried to acquire other type |
|         | 3  | of content being mainstream content, faith-based content |
|         | 4  | extreme sports, outdoors content, Italian movies. |
| 11:29   | 5  | Q.  Now, has Wreal tried to obtain content other than video |
|         | 6  | content? |
|         | 7  | A.  Yes, we have. |
|         | 8  | Q.  What has Wreal tried? |
|         | 9  | A.  I identified an opportunity to generate a new revenue |
| 11:29   | 10 | stream for us besides monetizing content through our system. |
|         | 11 | I thought that integrating and offering adult toys to our |
|         | 12 | service would be a complement.  Therefore, I created a |
|         | 13 | relationship with a gentleman named Fred Petrenko.  He's the |
|         | 14 | owner of EdenFantasys that provides toy white label services. |
|         | 15 | THE COURT REPORTER:  He provides a? |
|         | 16 | A.  Fred Petrenko. |
|         | 17 | THE COURT:  Right, but you said Mr. Petrenko |
|         | 18 | provides what type of service. |
|         | 19 | A.  White label service. |
|         | 20 | THE COURT:  White label? |
|         | 21 | MR. NÚÑEZ-VIVAS:  White label. |
|         | 22 | A.  I can explain. |
|         | 23 | THE COURT:  All right.  Sure. |
|         | 24 | A.  It's basically, through his current service, I would be |
| 11:30   | 25 | able to have access to all the items that he sells on |

1    EdenFantasys' web site, which are adult toys, so I would

2    integrate these toys offering into my user interface, so

3    FyreTV -- that way, Wreal's FyreTV customers could actually

4    purchase these toys and get it sent to them, and the

11:30   5    fulfillment would be done by EdenFantasys.

6    BY MR. NÚÑEZ-VIVAS:

7    Q.   Has that been done?

8    A.   No, it hasn't.

9    Q.   Has Wreal ruled that out for the future?

11:30   10   A.   No, we have an executed licensing agreement with them.

11   Q.   Let me take you back now to April 2nd, 2014.  Do you

12   recall what happened on that day?

13   A.   Yes, I do.

14   Q.   What happened?

11:30   15   A.   Amazon decided to announce its new movie streaming

16   service and decided to call it Fire TV.

17   Q.   How did you find out?

18   A.   It was all over the place.  It was in the media, friends,

19   investors, co-workers, studio partners, made me aware of it.

11:31   20   Q.   Let me show you what has been mark as Plaintiff's Exhibit

21   Number 6?

22        (Thereupon, the aforementioned exhibit was

23   introduced into evidence.)

24        MR. NELSON:  No objection.

11:31   25        MR. NÚÑEZ-VIVAS:  I move it into evidence, Your

1    Honor.

2            THE COURT:   Without objection, Exhibit Number 6

3    will be admitted into evidence, but just for purposes of

4    briefly identifying it for Maedon, how would you describe it,

11:31   5    Exhibit 6?

6            (Thereupon, the aforementioned exhibit was admitted

7    into evidence.)

8            MR. NÚÑEZ-VIVAS:   It is a screenshot of the Amazon

9    home page on the day of the launch.

11:32   10           THE COURT:   You can continue.

11   BY MR. NÚÑEZ-VIVAS:

12   Q.   Now, Mr. Franco, can you take a look at Exhibit Number 6?

13   The Amazon Fire TV set-top box is shown on that screenshot,

14   correct?

11:32   15   A.   **Yes, it is.**

16   Q.   And above that, the Amazon Fire TV set-top box is shown

17   with other brand names; is that right?

18   A.   **Yes, it is.**

19   Q.   Now, from what I can see, it shows Netflix, Amazon

11:32   20   Instant Video, Hulu, WatchESPN, SHOWTIME ANYTIME, Crackle,

21   and others.  Correct?

22   A.   **Correct.**

23   Q.   Now, and it also says, Fire TV is a tiny box that plugs

24   into your HD TV.  It's the easiest way to enjoy Netflix,

11:32   25   Prime Instant Video, Hulu Plus, WatchESPN, low-cost video

```
      1   rentals, and more.  Now, one of the brands it shows is
      2   SHOWTIME ANYTIME, right?
      3   A.  Yes, it is.
      4   Q.  Are you familiar with SHOWTIME ANYTIME?
11:33 5   A.  Yes, I am.
      6   Q.  How are you familiar with SHOWTIME ANYTIME?
      7   A.  I sometimes use it.
      8   Q.  And can you or can you not stream pornography with
      9   SHOWTIME ANYTIME?
11:33 10  A.  Yes, it can.
      11        MR. NÚÑEZ-VIVAS:  May I approach the clerk and give
      12  her the exhibit?
      13        THE COURT:  Yes.
      14        MR. NÚÑEZ-VIVAS:  (Complies.)
11:33 15  BY MR. NÚÑEZ-VIVAS:
      16  Q.  Now, Mr. Franco, you mentioned that you saw many things
      17  in the media the day of the launch; is that right?
      18  A.  Yes.
      19  Q.  I direct you to Plaintiff's Exhibit Number 7.
11:33 20        (Thereupon, the aforementioned exhibit was
      21  introduced into evidence.)
      22        MR. NELSON:  Your Honor, we object to this on
      23  authentication and hearsay grounds.
      24        MR. NÚÑEZ-VIVAS:  Okay.  May I?
11:34 25        THE COURT:  Thank you for your anticipatory
```

1    objection.  Let's just take it one step at a time.  First of

2    all, you're offering Exhibit Number 7.  And what is Exhibit

3    Number 7?

4              MR. NÚÑEZ-VIVAS:  Yes, I can go through the

11:34    5    authentication with the witness, Your Honor.

6              THE COURT:  All right.  Please try to do that

7    first.

8    BY MR. NÚÑEZ-VIVAS:

9    Q.  Mr. Franco, do you recognize what has been marked as

11:34   10    Exhibit Number 7?

11   A.  **Yes, I do.**

12   Q.  What is that?

13   A.  **It's a screenshot of Amazon's press release.**

14   Q.  Where was this taken from?

11:34   15   A.  **Their web site.**

16   Q.  Who took it?

17   A.  **I did.**

18   Q.  Okay.  And --

19              MR. NÚÑEZ-VIVAS:  Your Honor, I mean, that's --

11:34   20              MR. NELSON:  Objection withdrawn, Your Honor.

21   Objection withdrawn.

22              THE COURT:  Thank you.  So without objection,

23   Exhibit Number 7 is admitted.

24              (Thereupon, the aforementioned exhibit was admitted

11:35   25   into evidence.)

```
 1          MR. NÚÑEZ-VIVAS:  I would like to read, Your Honor,
 2    from the press release of Amazon.
 3          THE COURT:  All right.
 4          MR. NÚÑEZ-VIVAS:  It says, Seattle, April 2nd,
11:35  5    2014.  Kindle revolutionized reading by making it possible to
 6    think of a book and be reading it in less than 60 seconds.
 7    Kindle Fire put the world's largest selection of movies, TV
 8    shows, songs, apps, games, books, audiobooks, and magazines
 9    in the palm of your hand.  In each case, Amazon integrates
10    the hardware, software, and the content into an easy-to-use,
11    seamless, end-to-end service for customers.  Today, Amazon is
12    excited to unveil its newest innovation -- Fire TV, a tiny
13    box that plugs into your HDTV for easy and instant access to
14    Netflix, Prime Instant Video, Hulu Plus, WatchESPN, SHOWTIME,
15    low-cost video rentals, and much more.
16          May I approach, Your Honor, to --
17          THE COURT:  Yes.
18          MR. NÚÑEZ-VIVAS:  (Complies.)
19    BY MR. NÚÑEZ-VIVAS:
11:36 20    Q.  What was Wreal's reaction to this announcement?
21    A.  We were shocked.
22    Q.  Why?
23    A.  We were shocked because we couldn't believe that a
24    company with the vast amount of resources such as Amazon
11:36 25    would not be aware that a company based in Miami, Florida,
```

1    had registered trademarks for that name.

2    Q.   Now, does the name Fire TV used by Amazon sound the same

3    or different to Wreal's FyreTV?

4    A.   **Sounds the same.**

11:36  5    Q.   Now, is it or isn't it problematic for Wreal that they

6    sound the same?

7    A.   **Very, very problematic.**

8    Q.   Why?

9    A.   **Because word of mouth is the most important form of**

11:36  10   **advertising for us and if someone were to share to someone**

11   **the name you, obviously, would think that it's spelled with**

12   **an I as the word fire with a Y doesn't exist in the English**

13   **dictionary, so most people, when they come to our service,**

14   **they type fire with an I.**

11:37  15   Q.   Is there any other problem with actually having the name

16   similarity?

17   A.   **Yes.  Customers very likely think, you know, that it's**

18   **the same product.**

19   Q.   I mean, well, you know, how would you be damaged?  How

11:37  20   would Wreal be damaged if a consumer associates the name

21   FyreTV with Amazon?

22   A.   **We are damaged because reputation is something very**

23   **important to us, our company's reputation.  If consumers**

24   **would come to believe that Wreal's FyreTV is imitator or a**

11:38  25   **pirate service from Amazon's Fire TV movie streaming service,**

```
         1   they would be very unlikely to sign up to my service and,

         2   therefore, making it very difficult for me it acquire

         3   subscribers and generate revenue.

         4   Q.  So the only problem would be that somebody would think

11:38    5   that you would be an infringer?

         6   A.  No, there's other problems.

         7   Q.  What other problems?

         8   A.  I lose control of my brand --

         9          THE COURT:  I'm sorry, sir.  Can you --

        10          MR. NÚÑEZ-VIVAS:  Slow down.

        11          THE COURT: -- just repeat those first few words

        12   again?

        13   A.  I lose control of my brand and my destiny.  Also, if

        14   Amazon has another scandal, like the one they had when a guy

11:38   15   to child molestation -- like a code of conduct to child

        16   molestation was published on the Kindle Fire would happen

        17   again, that would completely destroy my company.  People

        18   associate my company being connected one way or another.

        19   BY MR. NÚÑEZ-VIVAS:

11:39   20   Q.  I see.  Now, are you aware of anyone who has made

        21   associations between FyreTV and Amazon?

        22   A.  Yes.

        23          MR. NELSON:  Objection, Your Honor, question calls

        24   for hearsay.

11:39   25          THE COURT:  Your response?
```

1    MR. NÚÑEZ-VIVAS:  Actually, what this is leading

2    to, Your Honor, is the Tweets that were made.  That's not

3    hearsay because it goes to the customer mind, set of mind

4    [sic], so it is not hearsay.

11:39   5        It is relevant what they -- what people were

6    thinking, what the public was thinking is relevant, whether

7    it's true or not.  In fact, one of the Tweets say, Did you

8    merge with Amazon?  That's not hearsay.  It's not being

9    introduced for the truth of the matter.

11:39   10       THE COURT:  Overruled.

11       MR. NÚÑEZ-VIVAS:  Thank you.

12   BY MR. NÚÑEZ-VIVAS:

13   Q.  Well, let's talk about -- what -- did you take a look at

14   some Tweets?

11:40   15   A.  **I looked at some Tweets.  I also looked at some of the**

16   **comments on the articles that were published by the media.**

17   Q.  Okay.  Let me -- please take a look at what has been

18   marked as Plaintiff's Exhibit Number 8.

19       (Thereupon, the aforementioned exhibit was

11:40   20   introduced into evidence.)

21   BY MR. NÚÑEZ-VIVAS:

22   Q.  Do you recognize that document?

23   A.  **Yes, I do.**

24   Q.  What is that document?

11:40   25   A.  **It's a screenshot.**

```
     1   Q.   Of what?

     2   A.   Of a Tweet on FyreTV's handle account.

     3              MR. NÚÑEZ-VIVAS:  I'd like to move it into

     4   evidence.

11:40 5              MR. NELSON:  Objection, Your Honor, hearsay --

     6              THE COURT:  Can you speak a little louder?

     7              MR. NELSON:  Excuse me.  Objection, Your Honor,

     8   hearsay and authentication.

     9              THE COURT:  Well, I'll reserve ruling on the

11:40 10  authentication.  Do you have any additional questions you'd

    11   like to ask the witness for authentication purposes?

    12   BY MR. NÚÑEZ-VIVAS:

    13   Q.   You mentioned that this was a screenshot of a Tweet

    14   account on FyreTV?

11:40 15  A.   Yes, I do.

    16   Q.   Do you know who made this screenshot?

    17   A.   I did.

    18   Q.   Does it accurately and correctly reflect what was on the

    19   screen when you made the screenshot?

11:41 20  A.   Yes, it does.

    21              THE COURT:  And, now, Amazon, you're objecting to

    22   hearsay?

    23              MR. NELSON:  No, Your Honor -- well, excuse me, can

    24   I -- is the representation that it was directed towards him

11:41 25  personally?
```

1          **THE COURT:**  Well --

2          **MR. NÚÑEZ-VIVAS:**  No, no.

3          **THE COURT:**  I'm sorry.  Right in the middle, we're

4     not going to give you an opportunity to cross-examine the

11:41  5     lawyer.  Are you objecting?

6          **MR. NELSON:**  Yes, on hearsay and authentication.

7          **THE COURT:**  Overruled on both grounds.  Please

8     continue.  Exhibit 8, over objection, is admitted.

9          (Thereupon, the aforementioned exhibit was admitted

11:41  10     into evidence.)

11     **BY MR. NÚÑEZ-VIVAS:**

12     Q.  Mr. Franco, I'm going to read what the Tweet says.  Did

13     you guys just merge with Amazon?  Is that what it says?

14     A.  **Yes, it is.**

11:41  15     Q.  And that was the question made to Wreal, right?

16     A.  **Yes, it was.**

17          **MR. NÚÑEZ-VIVAS:**  May I approach the clerk, Your

18     Honor?

19          **THE COURT:**  Yes.

11:41  20          **MR. NÚÑEZ-VIVAS:**  (Complies.)

21     **BY MR. NÚÑEZ-VIVAS:**

22     Q.  Now, I'd like to show you what has been marked as Exhibit

23     Number 9.

24          (Thereupon, the aforementioned exhibit was

11:42  25     introduced into evidence.)

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       | 1  | BY MR. NÚÑEZ-VIVAS:                                         |
|       | 2  | Q.  Do you recognize that document?                        |
|       | 3  | A.  **Yes, I do.**                                         |
|       | 4  | Q.  And what is it?                                         |
| 11:42 | 5  | A.  **It's a screenshot.**                                 |
|       | 6  | Q.  Screenshot of what?                                     |
|       | 7  | A.  **Of another Tweet.**                                  |
|       | 8  | Q.  And this screenshot, who took it?                      |
|       | 9  | A.  **I did.**                                             |
| 11:42 | 10 | Q.  And does it accurately and correctly reflect what was on |
|       | 11 | the screen when you took this screenshot?                  |
|       | 12 | A.  **Yes, it does.**                                      |
|       | 13 | MR. NÚÑEZ-VIVAS:  I'd like to move it into               |
|       | 14 | evidence.                                                  |
| 11:42 | 15 | THE COURT:  Any objection?                                 |
|       | 16 | MR. NELSON:  Yes, Your Honor, objection, still, on        |
|       | 17 | authentication and on hearsay.                             |
|       | 18 | THE COURT:  Same ruling as before.  Over objection,       |
|       | 19 | Exhibit 9 will be admitted.                                |
| 11:42 | 20 | (Thereupon, the aforementioned exhibit was admitted       |
|       | 21 | into evidence.)                                            |
|       | 22 | BY MR. NÚÑEZ-VIVAS:                                         |
|       | 23 | Q.  Mr. Franco, I'm going to read what has been marked as  |
|       | 24 | Plaintiff's Exhibit 9 in evidence.  It says, Apple delivers |
| 11:43 | 25 | Apple TV.  Amazon starts FyreTV.  Google reinventing Google |

```
 1    TV into Android TV.  Roku still chugging.  This is no longer

 2    a hobby.  How did this person spell FyreTV?

 3    A.   With a Y.

 4    Q.   Is there a space between the E and the T?

 5    A.   No, there is not.

 6             MR. NÚÑEZ-VIVAS:  May I approach, Your Honor?

 7             THE COURT:  Yes.

 8             MR. NÚÑEZ-VIVAS:  (Complies.)

 9    BY MR. NÚÑEZ-VIVAS:

10    Q.   Now, is the person correct, that Amazon started FyreTV

11    with a Y?

12    A.   No, he is confused.

13    Q.   Prior to Amazon's launch of its Fire TV, did you ever use

14    the search engine Google to search Fire TV with an I?

15    A.   Yes, I did.

16    Q.   And what results did you get?

17    A.   It populated results to our web site.

18    Q.   And after Amazon's launch of its Fire TV, did you use the

19    search engine Google, again, to search Fire TV with an I?

20    A.   Yes, I did.

21    Q.   And what were the results?

22    A.   You would come across Amazon's Fire TV service.

23    Q.   Now, since its launch, have you become familiar with

24    Amazon's Fire TV?

25    A.   Yes, I have.
```

11:43 (line 5)
11:43 (line 10)
11:43 (line 15)
11:44 (line 20)
11:44 (line 25)

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Q.  Now, how so?                                             |
|       | 2  | A.  **I am a customer.**                                      |
|       | 3  | Q.  You bought one?                                          |
|       | 4  | A.  **Yeah, I did.**                                          |
| 11:44 | 5  | Q.  Does the set-top box sold by Amazon say Fire TV on the   |
|       | 6  | gadget itself?                                              |
|       | 7  | A.  **No, it does not.**                                      |
|       | 8  | Q.  What does it say?                                        |
|       | 9  | A.  **Amazon.**                                               |
| 11:44 | 10 | Q.  Did you search for adult content on Amazon's web site?  |
|       | 11 | A.  **Yes, I have.**                                          |
|       | 12 | Q.  What did you find?                                       |
|       | 13 | A.  **I found several hardcore pornography DVDs that they sell,** |
|       | 14 | **that some of them are also featured on my service.**       |
| 11:44 | 15 | Q.  I would like for to you take a look at what has been    |
|       | 16 | marked as Plaintiff's Exhibit Number 10.                    |
|       | 17 | (Thereupon, the aforementioned exhibit was                  |
|       | 18 | introduced into evidence.)                                  |
|       | 19 | **BY MR. NÚÑEZ-VIVAS:**                                       |
| 11:45 | 20 | Q.  Do you recognize these documents?                       |
|       | 21 | A.  **Yes, I do.**                                            |
|       | 22 | Q.  What are they?                                          |
|       | 23 | A.  **They're screenshots.**                                  |
|       | 24 | Q.  And who took these screenshots?                         |
| 11:45 | 25 | A.  **I did.**                                                |

         1    Q.   Do these screenshots truly and accurately reflect what

         2    you saw on Amazon's web site based on your searches?

         3    A.   **On its web site and on its movie streaming service.**

         4              MR. NÚÑEZ-VIVAS:   I offer Plaintiff's composite

11:45    5    Exhibit 10 into evidence, Your Honor.

         6              MR. NELSON:   Objection.

         7              THE COURT:   Any objection?

         8              MR. NELSON:   Yes, Your Honor, as to authentication.

         9              THE COURT:   Overruled.   Exhibit 10 will be

11:45   10    admitted.

        11              (Thereupon, the aforementioned exhibit was admitted

        12    into evidence.)

        13    **BY MR. NÚÑEZ-VIVAS:**

        14    Q.   Now, let's go over these screenshots.   Let's go to the

11:45   15    first page.   Now, it depicts -- it says, Amazon Instant

        16    Video, right?

        17    A.   **Yes, it does.**

        18    Q.   And it says -- the title is Catching the Fire, right?

        19    A.   **Catching the Fever.**

11:46   20    Q.   I am sorry.   Catching the Fever.   Now, what is shown on

        21    the cover?

        22    A.   **What appears to be a girl standing to her back, with her**

        23    **behind.**

        24    Q.   Is she naked?   Does she appear to be naked?

11:46   25    A.   **She appears to be wearing just panties.**

1    Q.   Okay.  And it's available on Amazon Instant Video,

2    according to this, right?

3    A.   **And Amazon Fire TV.**

4    Q.   Well, in the middle, it says, Introducing Amazon Fire TV.

11:46   5    Watch Amazon Instant Video and more on your HD TV with Amazon

6    Fire TV, correct?

7    A.   **Correct.**

8    Q.   Can you go to the next one, please?

9    A.   **(Complies.)**

11:46   10   Q.   It says, Crazy Chicks and Party Tricks; is that right?

11   A.   **That is right.**

12   Q.   And what is shown on the cover there, women doing?

13   A.   **It shows a girl flashing her breasts.  It also shows**

14   **another girl on top, showing her behind, and it also shows**

11:46   15   **another girl that appears to be lifted by a crowd and also**

16   **flashing her breasts.**

17   Q.   It's also available on Amazon Instant Video, according to

18   this, correct?

19   A.   **Yes, it is.**

11:47   20   Q.   And Amazon Fire TV, right?

21   A.   **Yes, it is.**

22   Q.   Now, can you please take a look at the next page.  It's

23   entitled, Nude girls exposed.  Meet Tatiana, Grace, Stacy,

24   and Jenny.  Do you see that?

11:47   25   A.   **Yes, I do.**

           1   Q.   And that's also available on Amazon Instant Video?

           2   A.   **Yes, it is.**

           3   Q.   And also available on Amazon Fire TV?

           4   A.   **Yes, it is.**

  11:47     5   Q.   Let's take a look at the next one.  It's called, Rocco

           6   True Anal Stories 7, Italian Import.  Do you see that?

           7   A.   **Yes, I do.**

           8   Q.   And that's available on Prime service of Amazon, correct?

           9   A.   **Yes.**

  11:47    10   Q.   And it says that they have two in stock, right?  Towards

          11   the middle of the page, it says, Only two in stock?

          12   A.   **Yes.**

          13   Q.   Please go to the next page.

          14   A.   **(Complies.)**

  11:47    15   Q.   And then the subsequent one.

          16   A.   **Complies.)**

          17   Q.   Go to editorial reviews, please.

          18   A.   **(Complies.)**

          19   Q.   It describes this film as:  Rocco really hits his stride

  11:48    20   in this one in terms of relentless ass f...ng.  Is that what

          21   it says?

          22   A.   **Yes, it is.**

          23   Q.   All right.  In editorial reviews, correct?

          24   A.   **Yes.**

  11:48    25   Q.   Let me move on to the next one, which is the one that

```
        1   has --

        2         MR. NELSON:  Your Honor, if I may?  We object on

        3   hearsay to the reviews.

        4         THE COURT:  Overruled.

11:48   5   BY MR. NÚÑEZ-VIVAS:

        6   Q.  Now, please go to the one that has the banner ad of

        7   Amazon Fire TV.

        8   A.  (Complies.)

        9   Q.  Now, you will note -- are you there?

11:48  10   A.  Yes, I'm here.

       11         MR. NÚÑEZ-VIVAS:  Your Honor?

       12         THE COURT:  I'm not sure.  Tell me what is on top

       13   of the page?

       14         MR. NÚÑEZ-VIVAS:  It has a banner ad.  It's red,

11:49  15   and it has the Fire TV box in the middle.

       16         THE COURT:  Bear with me just a minute.

       17         MR. NÚÑEZ-VIVAS:  Sure.

       18         THE COURT:  Yes, where it says, Shop year-end

       19   deals, is that it?

11:49  20         MR. NÚÑEZ-VIVAS:  Yes.

       21         THE COURT:  Right in the middle of the page, Shop

       22   year-end deals.

       23         MR. NÚÑEZ-VIVAS:  Yes.

       24         THE COURT:  All right.

11:49  25   BY MR. NÚÑEZ-VIVAS:
```

```
 1   Q.  Do you notice the banner ad that Amazon has for its Fire
 2   TV?
 3   A.  Yes, I do.
 4   Q.  And can you read what's on the set-top box itself, the
 5   name of it?
 6   A.  On the hardware?
 7   Q.  Yes.
 8   A.  Amazon.
 9   Q.  It doesn't say Fire TV?
10   A.  Not on the hardware.
11   Q.  Right.  And it is shown, again, with other brand names
12   like SHOWTIME, correct?
13   A.  Yes, it is.
14   Q.  Just like the other ad that has SHOWTIME, correct?
15   A.  Yes.
16   Q.  And below that, it shows pictures of items that you
17   viewed, right?
18   A.  Yes.
19   Q.  And what are those items?
20   A.  It appears to be here some pornographic magazines,
21   Hustler and Buttman.
22            THE COURT REPORTER:  And what?
23   A.  Buttman.
24            MR. NÚÑEZ-VIVAS:  Buttman.
25            THE COURT:  B-U-T-T-M-A-N.
```

1    BY MR. NÚÑEZ-VIVAS:

2    Q.  Can we go to the next one, please?  The next one is a

3    screenshot of a search, anal sex toys; is that right?

4    A.  **Yes.**

11:50   5    Q.  And the category up there, in the -- up in the search

6    section for Amazon, it says, anal sex toys; is that right?

7    A.  **Yes, it is.**

8    Q.  And some of the names here are Trinity anal beads, Doc

9    Johnson crystal jellies anal delight trainer kit --

10           **THE COURT REPORTER:**  I'm sorry.  Slow down.  I

11   don't have the paper in front of me.

12           **MR. NÚÑEZ-VIVAS:**  I'm sorry.  I actually want to go

13   fast.

14   BY MR. NÚÑEZ-VIVAS:

15   Q.  Doc Johnson crystal jellies anal delight trainer kit,

16   purple.  It also, on the next page, shows more of these

17   items.  It says jewel butt plug, Doc Johnson -- at the

18   bottom, Doc Johnson glow thick vibrating anal plug.

19           Let's now take a look at the next document.  Can

11:51   20   you go to where the magazines are shown?  The category at the

21   top says, it says, men's adult magazines.  Do you see that?

22   A.  **Yes, I do.**

23   Q.  And it says -- one of the first magazines is Hustler

24   Extreme Orgies?

11:51   25   A.  **Yes.**

```
        1   Q.   And what does it show?

        2   A.   It appears to be a girl sitting on top of a male and then

        3   another girl, what it appears to be side-by-side by her, like

        4   pretending like they're going to kiss.

11:52   5   Q.   Is she showing breasts?

        6   A.   Yes, it does.

        7   Q.   Now, the next one says, MILF Mania; is that right?

        8   A.   Yes.

        9   Q.   And it says, XXX, right?

11:52  10   A.   Yes.

       11   Q.   What's XXX stand for?

       12   A.   Adult content.

       13   Q.   What kind of adult content?

       14   A.   Pornography, hardcore pornography.

11:52  15   Q.   Now, you mentioned that you bought Amazon's Fire TV,

       16   right?

       17   A.   Yes.

       18   Q.   Have you had the opportunity to use the screen mirroring

       19   technology?

11:52  20   A.   Yes, I have.

       21   Q.   How does that work?

       22   A.   It's basically a feature that you're able to replicate

       23   whatever you're watching on the Kindle Fire and watch that on

       24   your television screen.

11:52  25   Q.   Were you able to use the screen mirroring technology of
```

```
 1   the Amazon Fire TV to watch pornography on your TV?
 2   A.  Yes, I was.
 3            MR. NÚÑEZ-VIVAS:  Thank you, Your Honor.
 4            THE COURT REPORTER:  Are you saying "screen
 5   mirror"?
 6            MR. NÚÑEZ-VIVAS:  Screen mirroring, yes.
 7            THE COURT:  So when you are saying, "Thank you,
 8   Your Honor," that means you're done with your direct
 9   examination?
10   MR. NÚÑEZ-VIVAS:  Yes, Your Honor.  Thank you,
11   Mr. Franco.
12            THE COURT:  All right.  So -- I'm sorry?
13            MR. NÚÑEZ-VIVAS:  Thank you, Mr. Franco.
14            THE COURT:  Well, Mr. Franco is not going anywhere.
15            MR. NÚÑEZ-VIVAS:  Yes.  No, no.
16            THE COURT:  I am sure Amazon has some questions.
17   So for time purposes, you ended your examination -- let me
18   see here -- at 11:53, so you have used one hour and six
19   minutes, from your three hours.  And so, now, we're going to
20   give Amazon the opportunity to question Mr. Franco, and it is
21   now 11:53.
22            THE COURT DEPUTY:  Judge, I am sorry.  Did we admit
23   Plaintiff's 10?
24            MR. NELSON:  May I approach the witness while that
25   happens?
```

```
 1              THE COURT:  Not yet.  Just let me get this squared

 2    away first.  Exhibit Number 10, it's a good question.  My

 3    notes don't say admitted or not.  Did you offer Exhibit 10?

 4              MR. NÚÑEZ-VIVAS:  Yes, I offered it into evidence.

 5              THE COURT:  All right.  Was there an objection?

 6              MR. NELSON:  No objection.

 7              THE COURT:  Without objection, admitted Exhibit

 8    Number 10 -- composite Exhibit 10 is admitted without

 9    objection.

10              THE COURT DEPUTY:  Thank you, Counsel.

11              THE COURT:  Thank you, Maedon.  We're actually

12    starting at 11:53.  Yes, sir.

13              MR. NELSON:  May I approach the witness, Your

14    Honor, and the Court with copies of exhibits, demonstratives?

15              THE COURT:  Yes.

16              MR. NELSON:  (Complies.)  Here are two for the

17    Court.

18              THE COURT:  One for me and one for the law clerk?

19              MR. NELSON:  Yes, Your Honor.

20              THE COURT:  There you go.

21              MR. NELSON:  May I approach the witness?

22              THE COURT:  Yes, of course.  Thank you.

23

24                        *CROSS EXAMINATION*

25    BY MR. NELSON:
```

```
          1    Q.   It is still good morning, Mr. Franco.

          2    A.   Sorry?

          3         THE COURT:  He said it was still good morning, but

          4    in six minutes, it will be good afternoon.

11:55     5    A.   Oh, good morning.

          6    BY MR. NELSON:

          7    Q.   Your web site FyreTV.com exclusively offers pornographic

          8    content, correct?

          9    A.   It offers a wide range of adult content.

11:55    10    Q.   And I'm sorry, your counsel had an opportunity to ask you

         11    some questions.  If you can answer yes or no to my questions,

         12    I would really appreciate it, if you can answer yes or no.

         13    If you can't, you can tell me that too, and I'm sure if you

         14    have anything to add, your counsel can ask you on redirect.

11:56    15    Is that okay?

         16    A.   Yes.

         17    Q.   Thank you.  FyreTV is a service offering adult content,

         18    correct?

         19    A.   Correct.

11:56    20    Q.   Since the beginning of your service, you have streamed

         21    only pornographic content, correct?

         22    A.   I have streamed adult content, yes.

         23    Q.   Do you agree that it's pornographic?

         24    A.   It's adult content, yes.

11:56    25    Q.   You can stream adult content on various platforms; isn't
```

         1   that right?

         2   A.  **Right.**

         3   Q.  Let's go, please -- I think this was actually your

         4   Exhibit 5, but we have done other demonstratives.  I believe

11:56    5   this is our Exhibit 202, which is the same thing?

         6           (Thereupon, the aforementioned exhibit was

         7   introduced into evidence.)

         8   **BY MR. NELSON:**

         9   Q.  Is this your web site?

11:56   10   A.  **That is my web site.  It's my new web site.**

        11           **THE COURT:**  I'm sorry.  Your new web site?

        12   A.  **Yes.**

        13   **BY MR. NELSON:**

        14   Q.  The only movies that you stream are XXX content; isn't

11:57   15   that right?

        16   A.  **Repeat your question.**

        17   Q.  The only movies that you stream are XXX content?

        18   A.  **Adult movies, yes, everything from instructional --**

        19   Q.  I'm sorry, sir.  Please answer yes or no.  Are the only

11:57   20   movies you stream XXX content?

        21   A.  **No.**

        22           **MR. NÚÑEZ-VIVAS:**  Your Honor, may I object?  To the

        23   instructions.  I mean, if the witness wants to explain his

        24   answer, he's perfectly allowed to explain his answer.

11:57   25           **THE COURT:**  So let me give you some general

1    instructions.  Actually, what Mr. Nelson said, you need to

2    respond to every question yes or no, that's only if he's

3    asking you a question that calls for a yes or no answer.

4              So for the sake of discussion, if he had asked you

11:57    5    what's your name, you wouldn't say yes, you'd have to give a

6    different answer.  Assuming that he does ask you a question,

7    which is capable of being answered yes or no, to the extent

8    that you know the answer or don't remember, you should answer

9    yes or no or I don't know or I don't recall, if that's the

11:58    10    situation, and then if you think it necessary to explain, you

11    may.

12              However, let me just give you a little friendly

13    advice.  You don't need to give an explanation as to every

14    single yes answer or an explanation as to every no answer

11:58    15    because, keep in mind, your lawyer will have the opportunity

16    to question you again.

17              So to the extent your lawyer thinks it's necessary

18    that you explain one of your previous yes or no answers, he

19    may do so, but while you're there in the witness box and you

11:58    20    feel it's necessary, in context, to give an explanation, you

21    may do so.  You're raising your hand which suggests to me

22    that you have a question.

23    A.   **To you.**

24              **THE COURT:**  To me.

11:58    25    A.   **I just want to make sure that -- the way that he**

1    structured the question, **I just want to make sure it's clear**

2    **and I am able to -- and he said -- can you repeat the**

3    **question?**

4              THE COURT:  Right.  Listen, if you don't understand

11:58    5    the question, for whatever reason, it's ambiguous, it's

6    confusing, he spoke too fast, he used a word that you didn't

7    know, the question is compound, you temporarily spaced out

8    and weren't paying attention, whatever the reason, all you

9    have to do is say, "Sir, please rephrase the question."  Any

11:59   10    other questions I can answer for you?

11    A.  **No, Your Honor.**

12              THE COURT:  All right.  So just to give you an

13    example, in other words, you don't have anymore questions,

14    correct?

11:59   15    A.  **Sorry.**

16              THE COURT:  Thank you.  I was hoping he would say

17    yes, but what can I do?  All right.  Please ask your

18    question.

19              MR. NELSON:  Thank you, Your Honor.

11:59   20    BY MR. NELSON:

21    Q.  The movies you stream are hardcore pornography, correct?

22    A.  **The movies I stream are adult-oriented content, yes.**

23    Q.  Are they hardcore?

24    A.  **Not all of it is hardcore.**

11:59   25    Q.  Most of it is hardcore?

```
        1   A.   I would say I offer that category as well.

        2   Q.   The vast majority of what you offer is hardcore

        3   pornography?

        4   A.   It's part of the range of entertainment that I offer with

11:59   5   the service.

        6           THE COURT:   Excuse me just a minute.  We're going

        7   to be here a really long time today, if you continue with

        8   this pattern of answering questions.  You're sort of fighting

        9   with the lawyer.  You're quibbling.  You're parsing hairs.

12:00  10   His question is:  Isn't it true that most of the offerings

       11   that you offer are hardcore pornography?  Yes or no.

       12   A.   Yes.

       13           THE COURT:   See how easy that is?  Go ahead.

       14           MR. NELSON:   Thank you, Your Honor.

12:00  15   BY MR. NELSON:

       16   Q.   You don't stream any mainstream movies, do you?

       17   A.   No.

       18   Q.   Do you believe your web site is pornographic?

       19   A.   It's adult, yes.

12:00  20   Q.   There is an adult content warning that was just added.

       21   Can we go to slide 204, please?  That's now part of your web

       22   site, correct?

       23   A.   Yes.

       24   Q.   When did you add that?

12:00  25   A.   I believe we added that right after we conducted some
```

```
        1    testing, AV testing for our new web site.
        2    Q.  So when we went there a few weeks ago, that was not
        3    there.  You added that in the past few weeks?
        4    A.  Yes.
12:01   5    Q.  Your web site offers categories of content; is that true?
        6    A.  Yes.
        7    Q.  Let's go to slides 205 and 206, please.  These are some
        8    of the categories that you offer?
        9    A.  Yes.
12:01  10          MR. NÚÑEZ-VIVAS:  Objection, Your Honor, this is
       11    not in evidence.
       12          THE COURT:  Objection sustained.
       13          MR. NELSON:  Your Honor --
       14    BY MR. NELSON:
12:01  15    Q.  Is this representative of what you see on your web site
       16    under the categories page?
       17    A.  Yes.
       18          MR. NELSON:  I move to admit slide 205.
       19          THE COURT:  Well, let's talk about a logistical
12:01  20    issue.  You are showing me something on the screen which is a
       21    composite of several color photographs, and so it's on the
       22    screen, but you're offering it into evidence, and so it's --
       23    right now, it's just on the screen.  There's some image
       24    that's on a laptop computer that's projecting it on the
12:02  25    screen, so how do we actually admit that into the evidence?
```

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Phrased differently, do you have an actual printout                |
|       | 2  | of this particular page, so we can offer that into evidence?       |
|       | 3  | MR. NELSON:  Yes, I do, Your Honor.                                 |
|       | 4  | THE COURT:  Good.                                                   |
| 12:02 | 5  | MR. NELSON:  And it is already with Your Honor.                     |
|       | 6  | THE COURT:  All right.  And where would I find                     |
|       | 7  | that?                                                               |
|       | 8  | MR. NELSON:  It is under the screenshots.  There                   |
|       | 9  | should be a tab at the very end.  At the very end you will         |
| 12:02 | 10 | see RFX, and it's 205.  It's not actually a tab.  It's the         |
|       | 11 | very last part of the binder that Your Honor has.  You will        |
|       | 12 | see PowerPoint demonstratives.                                     |
|       | 13 | THE COURT:  All right.  Well, I see that.  So right                 |
|       | 14 | now, we're looking at something which is called 2-0 --             |
| 12:02 | 15 | MR. NELSON:  205, Your Honor.                                       |
|       | 16 | THE COURT:  205, PowerPoint 205.  Let's back up.                   |
|       | 17 | The first exhibit that you put up on the screen was the adult      |
|       | 18 | content warning.  That was not admitted into evidence.  There      |
|       | 19 | was not an objection to questions about it.  Are you               |
| 12:03 | 20 | admitting or seeking to admit RFX 204, the adult content          |
|       | 21 | warning, into evidence?                                            |
|       | 22 | MR. NELSON:  Yes, Your Honor, I move to admit that.                |
|       | 23 | THE COURT:  Any objection to it?                                   |
|       | 24 | MR. NÚÑEZ-VIVAS:  None.                                             |
| 12:03 | 25 | THE COURT:  How would you like to designate that?                  |

         1              MR. NELSON:  Can we designate it RFX 204?

         2              THE COURT:  Maedon, is that something you can do,

         3    call it RFX 204?  Or would you rather it be something like

         4    Defendant's Exhibit 1 or something like that?

12:03    5              THE COURT DEPUTY:  Judge, we can keep it like this.

         6              THE COURT:  So RFX 204, that was the adult content

         7    warning, is admitted without objection.

         8              (Thereupon, the aforementioned exhibit was admitted

         9    into evidence.)

12:03   10              THE COURT:  Now, we're on RFX 205?

        11              MR. NELSON:  Yes, Your Honor.

        12              THE COURT:  Any objection to RFX 205?

        13              MR. NÚÑEZ-VIVAS:  No, Your Honor.

        14              THE COURT:  All right.  Without objection, RFX 205

        15    is admitted.

        16              (Thereupon, the aforementioned exhibit was admitted

        17    into evidence.)

        18              MR. NELSON:  And while we are there, can we get RFX

        19    206 --

        20    BY MR. NELSON:

        21    Q.  And this is also from the bottom part of the categories

        22    page, Mr. Franco?

        23    A.  Yes.

        24              MR. NELSON:  I move to admit 206.

12:04   25              THE COURT:  Any objection?

```
         1              MR. NÚÑEZ-VIVAS:  No.

         2              THE COURT:  Admitted without objection.

         3              (Thereupon, the aforementioned exhibit was admitted

         4      into evidence.)

12:04    5      BY MR. NELSON:

         6      Q.  Let's back go back to 205, and let's go down to 206.  By

         7      the way, Mr. Franco, this appears to be the categories page

         8      on your web site, correct?

         9      A.  Yes.

12:04   10      Q.  What, for example, is cream pie?

        11      A.  Excuse me?

        12      Q.  What is cream pie?

        13      A.  It's a category.

        14      Q.  What does cream pie mean?

12:04   15      A.  It means a form of ejaculating.

        16      Q.  What is -- on the next line, what is double pen?

        17      A.  It's a form of sexual interaction.

        18      Q.  What does it mean?

        19      A.  It usually means when two males interact with one male --

12:05   20      I mean one female.

        21      Q.  You allow viewers to pay by the minute; isn't that right?

        22      A.  Yes.

        23      Q.  You allow viewers to pay by the scene; is that right?

        24      A.  Yes.

12:05   25      Q.  Can we go -- and let's just admit 207 and 208, please.
```

1           (Thereupon, the aforementioned exhibit was

2    introduced into evidence.)

3    BY MR. NELSON:

4    Q.   This is from your web site, correct?

12:05   5    A.   Yes.

6             THE COURT:  Any objection to 207 or 208?

7             MR. NÚÑEZ-VIVAS:  No.  In fact, if I may, are there

8    any like these that you want to admit into evidence?

9             MR. NELSON:  I would prefer to admit -- yes, at

12:05  10    least I would prefer to admit through 214 from your web site.

11            MR. NÚÑEZ-VIVAS:  All the way to 214?

12            THE COURT:  So right now, you're seeking to

13    introduce 207 through RFX 214?  Any objection to that?  214

14    is a page that says, Frequently Asked Questions.

12:06  15            MR. NÚÑEZ-VIVAS:  I object to 213.  I don't know

16    where that --

17            THE COURT:  So right now, there's no objection to

18    207 through 212, correct?

19            MR. NÚÑEZ-VIVAS:  No.  I have an objection, also,

12:06  20    to 210.  There is something redacted there.  That

21    obviously --

22            THE COURT:  Let's take it a step at a time.  No

23    objections to RFX 207, 208, and 209, correct?

24            MR. NÚÑEZ-VIVAS:  208, 209 -- Mr. Nelson, is that

12:06  25    from the FyreTV web site also, 209?

1          MR. NELSON:  Yes.

2          MR. NÚÑEZ-VIVAS:  No objection to those.

3          THE COURT:  All right.  So without objection, those

4    are admitted.

12:06  5          (Thereupon, the aforementioned exhibit was admitted

6    into evidence.)

7          THE COURT:  Now, you have on objection to 210?

8          MR. NÚÑEZ-VIVAS:  Correct.

9          THE COURT:  What's the basis of the objection?

12:06  10         MR. NÚÑEZ-VIVAS:  Well, it's redacted.  There's

11   something redacted, and I don't know what that is.  That's

12   not something we would show on the web site, so I doubt that

13   the witness will be able to authenticate that.

14         MR. NELSON:  Your Honor, if I may?

12:07  15         THE COURT:  Sure.

16         MR. NELSON:  That is simply a user's account

17   information.

18         THE COURT:  So why don't you question the witness

19   about RFX 210 and we will see what the witness says about it,

12:07  20   since it's his own web site?

21         MR. NELSON:  Thank you, Your Honor.  If I may, that

22   will come later in the testimony.

23         THE COURT:  Fine.

24   BY MR. NELSON:

12:07  25   Q.  You advertised spankingly low prices, correct?  This

1  won't be on your web page.  Do you advertise spankingly low

2  prices?

3  A.  **We advertise a lot of things, so I would have to see it.**

4  Q.  Let's go to Wreal native 4669?

12:07  5          THE COURT:  Which one is this, RFX?

6          THE COURT DEPUTY:  Is this under RFX.

7          MR. NELSON:  This is RFX 1.

8          THE COURT:  RFX 1.  Is this at the beginning of all

9  the screenshots?

12:08  10          MR. NELSON:  It is at the beginning of all the

11  screenshots.

12          THE COURT:  Where would that be?

13          THE COURT DEPUTY:  At the beginning of the book,

14  Judge.

12:08  15          THE COURT:  At the beginning of the book?

16          THE COURT DEPUTY:  Yes, sir.

17          THE COURT:  Thank you, Maedon.  So that would be --

18  bear with me just a minute.  All right.  RFX 1.  Any

19  objection to RFX 1?

12:08  20          MR. NÚÑEZ-VIVAS:  Yes, on foundation.

21  **BY MR. NELSON:**

22  Q.  Is this a FyreTV document that has been produced in

23  litigation, Mr. Franco?

24          THE COURT:  Mr. Franco, are you going to answer the

25  question?

```
 1   A.  I'm sorry.  I didn't --

 2           THE COURT:  The question is -- first of all, are

 3   you looking at RFX 1?  All right.  So the question is:  Is

 4   RFX 1 a document that has been produced in litigation?

 5   A.  Yes.

 6           MR. NELSON:  Your Honor, this is taking up a fair

 7   amount of time.  I'll withdraw this.  We'll just go on.

 8           THE COURT:  All right.

 9   BY MR. NELSON:

10   Q.  You call yourself the Netflix of porn; isn't that right?

11   A.  We have used that advertising.

12   Q.  You call yourself the Netflix of porn because you are in

13   a different market from Netflix, but both you and Netflix

14   offer streaming video?

15   A.  Right.

16   Q.  Netflix is a mainstream site and you are a hardcore

17   pornographic site, right?

18   A.  I'm an adult provider, yeah.

19   Q.  Netflix isn't your competitor, is it?

20   A.  No, not at the time.

21   Q.  You don't think you infringe any trademarks by using

22   Netflix's name, correct?

23           MR. NÚÑEZ-VIVAS:  Objection, Your Honor.  Calls for

24   a legal conclusion from the witness.

25           THE COURT:  You can answer.  Overruled.
```

1    A.   **Repeat the question.**

2    BY MR. NELSON:

3    Q.   You don't think you infringe any trademarks by using

4    Netflix's name, do you?

12:10   5    A.   **I'm not an attorney.**

6    Q.   Do you think, sitting here, you infringe any trademarks?

7    A.   **No.**

8    Q.   Your competitors are other hardcore streaming sites like

9    HotMovies, correct?

12:10   10   A.   **That's one of our competitors.**

11   Q.   Your competitors are hardcore streaming sites, right?

12   A.   **Anybody that offers adult content.**

13   Q.   It's not just hardcore streaming sites?

14   A.   **Not just hardcore.**

12:10   15   Q.   Is Amazon your competitor?

16   A.   **Yes, it is.**

17   Q.   Let's go to your individual deposition, line 67 [sic].

18   You see page 67, line 16?

19            **THE COURT:**  Where is that, sir?

12:10   20            **MR. NÚÑEZ-VIVAS:**  Do you have a copy of that,

21   please?

22            **MR. NELSON:**  We're going to put it on the screen.

23   We're not going to introduce it --

24            **THE COURT:**  I understand the concept of

12:10   25   impeachment, Mr. Nelson.

1    **BY MR. NELSON:**

2    Q.   Line 16:  Is HotMovies a direct competitor to Wreal?

3              Answer:  Yes.

4              What do they compete for?

12:11  5         Answer:  Adult content.

6              Who else are your primary competitors?

7              HotMovies, AVN, ADVN.

8              Do you see that?

9    A.   **Yes.**

12:11 10   Q.   Let's stroll through 68:8.  And, again, we're confirming

11   those are your primary competitors, correct?

12   A.   **Yes.**

13   Q.   Those other hardcore streaming sites are your primary

14   competitors, right?

12:11 15   A.   **Yes.**

16         **MR. NÚÑEZ-VIVAS:**  Your Honor, I object to this line

17   of questioning.  That's improper impeachment.

18         **THE COURT:**  Sustained.  Mr. Nelson, the question

19   was, of the witness here in court today, is Amazon a

12:11 20   competitor?  The witness said no.  So when you went to the

21   deposition transcript, I was expecting to see a question such

22   as, Is Amazon a competitor, and I expected to have the

23   witness say no.

24         So far, you haven't pointed to that question and

12:12 25   answer, so what you're showing me now is not impeachment.  Is

 1    there a question in this deposition transcript of the

 2    witness, Is Amazon a competitor?

 3              MR. NELSON:  No, Your Honor.  Let me rephrase my

 4    question.

12:12  5    BY MR. NELSON:

 6    Q.   Is Amazon a primary competitor of yours?

 7    A.   **Yes.**

 8    Q.   When we asked to you identify your primary competitors,

 9    you did not identify Amazon.com, did you?

12:12  10   A.   **It's not my primary competitor.**

 11   Q.   Okay.  Let's talk about your set-top box.  You stopped

 12   selling the set-top box in October of 2012; isn't that right?

 13   A.   **We never stopped selling it.  We just stopped offering it**

 14   **to new subscribers.**

12:12  15   Q.   Let's go to your interrogatory response, answer one.

 16   Let's go to that second to last sentence.  And I am reading,

 17   it says, From October of 2012 through April 2014, Wreal

 18   stopped selling a set-top box, but continued to support the

 19   set-top box.

12:13  20   A.   **Yes.  I wasn't clear on I think --**

 21             MR. NÚÑEZ-VIVAS:  Hold on.  Objection, Your Honor,

 22   improper impeachment.  It's not what it says -- I mean, if

 23   you read the whole sentence, it's exactly what he said.

 24             THE COURT:  Folks, I can read what it says because

12:13  25   it's only three -- it's actually two sentences, so I take it

1   I'm looking at a sworn interrogatory answer; is that right,

2   Mr. Nelson?

3           **MR. NELSON:**  Yes, Your Honor.

4           **THE COURT:**  And who on behalf of Wreal signed these

12:13  5   answers?

6           **MR. NELSON:**  I believe it was Mr. Franco.

7           **MR. NÚÑEZ-VIVAS:**  It was Mr. Franco, Your Honor.

8           **THE COURT:**  So I consider that to be proper

9   impeachment.  Next question.

12:13  10  **BY MR. NELSON:**

11  Q.  At the time you filed this lawsuit, you were not even

12  selling the set-top box to existing customers, isn't that

13  right?

14  A.  **We never stopped selling our set-top box.  We just**

12:14  15  **stopped offering it to new subscribers for a period of time.**

16  Q.  Let's pull up, please, the Plaza deposition Exhibit 8,

17  which is marked as RFX 4?

18          **THE COURT:**  Where can I find that in my binder?

19          **MR. NELSON:**  It's under tab marked Plaza Depo Ex.

20  8.

21          **THE COURT:**  That's RFX 8?

22          **MR. NELSON:**  RFX 4.

23          **THE COURT:**  It's RFX 4.  And the binder tab says

24  Plaza Depo Exhibit 8.  All right.

12:14  25          **MR. NELSON:**  I move to admit RFX 4.  This is an

1  e-mail from Fabio Vasco at Wreal to Team Wreal.

2  **BY MR. NELSON:**

3  Q.   Team Wreal includes you, right?

4  A.   **Yes.**

12:14  5           MR. NELSON:  Move to admit.

6           THE COURT:  Any objection?

7           MR. NÚÑEZ-VIVAS:  No.

8           (Thereupon, the aforementioned exhibit was admitted

9  into evidence.)

12:15  10  **BY MR. NELSON:**

11  Q.   You see on the second paragraph -- by the way, you're

12  addressing a current retail customer, correct, this e-mail

13  is?

14  A.   **Let me read here.  A Beta customer.**

12:15  15  Q.   He's a current customer, correct?

16  A.   **A Beta customer, yeah.  It says here he hasn't used any**

17  **minutes or made any purchases.**

18  Q.   And you tell -- or Fabio Vasco at Wreal says, in the

19  second paragraph, We don't sell STBs anymore; is that right?

12:15  20  A.   **Yes.  I think he's mistaken.**

21           THE COURT REPORTER:  I think he's what?

22           THE COURT:  "I think he's mistaken."

23  A.   **Mistaken.**

24           THE COURT REPORTER:  Oh.

12:15  25           THE WITNESS:  I don't agree.

1    **BY MR. NELSON:**

2    Q.   Let's go, please, to -- you understand Mr. Plaza was

3    deposed as a corporate representative in this case?

4    A.   **Yes.**

12:15   5    Q.   Let's go to his corporate testimony, page 47, line 10.

6             Question:  Isn't it true that, as of April 8th,

7    2014, Wreal didn't sell STBs anymore?

8             Yeah.  There was an issue with the boxes we had.

9             That's what Mr. Plaza said as the representative of

12:16   10   your company, correct?

11            **MR. NÚÑEZ-VIVAS:**  Objection, Your Honor, that

12   cannot be used for impeachment, and that's not in evidence.

13            **THE COURT:**  Well, when you're impeaching someone,

14   the impeaching material is not produced into evidence.  They

12:16   15   don't have to introduce it.  You just say, Isn't it true that

16   your 30(b)(6) witness said, We don't sell STBs anymore, as of

17   April 8th, 2014?

18            **MR. NÚÑEZ-VIVAS:**  But it was -- Mr. Plaza is a

19   30(b)(6) witness, yes.

12:16   20            **THE COURT:**  As a 30(b)(6) witness, doesn't he bind

21   the corporation?

22            **MR. NÚÑEZ-VIVAS:**  That's fine, Your Honor.

23            **THE COURT:**  So you're withdrawing your objection?

24            **MR. NÚÑEZ-VIVAS:**  Yes, I withdraw the objection.

12:16   25            **THE COURT:**  All right.  Please continue.

```
      1   BY MR. NELSON:

      2   Q.  Is Mr. Plaza mistaken?

      3   A.  Yes.  We had an issue --

      4        THE COURT:  Well, you both can't talk at the same

12:17 5   time.  That's pretty clear.  So I don't know who interrupted

      6   who --

      7   BY MR. NELSON:

      8   Q.  My question is:  Was Mr. Plaza mistaken or are you

      9   mistaken?

12:17 10  A.  No, I think it just needs a little bit of explanation.

      11  Q.  Well, your counsel can do that.

      12  A.  The explanation is that --

      13  Q.  Excuse me, sir.  Let me ask the questions.

      14        MR. NÚÑEZ-VIVAS:  Your Honor, I would object.  He

12:17 15  would like to explain his answer.

      16        THE COURT:  Overruled.  There's no question

      17  pending.  You may clear that up later.

      18  BY MR. NELSON:

      19  Q.  You had not allowed existing users to purchase

12:17 20  refurbished boxes since late 2013 or 2014; isn't that right?

      21  A.  Yes, new users could not use -- could not purchase.

      22  Q.  Existing users couldn't either between late 2013 and May

      23  of 2014; isn't that right?

      24  A.  Yes, they could.

12:17 25  Q.  Let's go to Mr. Plaza's deposition, again, as corporate
```

1    representative, page 48, line 6 through 14.

2         You don't remember when the decision was made to

3    stop selling the new boxes because of the battery leak?

4         Answer:  Yes.  Because of that issue, it was

12:18  5    somewhere in early 2014 or could be -- you know, close to --

6    you know, 2013 or -- yeah, in late 2013 or early 2014, the

7    decision was made to -- yeah, somewhere, yeah.

8         Isn't that right, that in this answer, Mr. Plaza is

9    confirming that no boxes were on sale to anybody between late

12:18  10   2013 or early 2014 and May of 2014?

11   A.  **As he said here and mentioned here, we stopped selling it**

12   **because obviously we had a problem with battery leaks.**

13   Q.  I'm not asking for the reason.  I'm asking for the fact

14   that you did not actually sell them, no one could buy your

12:18  15   box, right?

16   A.  **What period?**

17   Q.  From this timeframe.

18   A.  **I don't recall exact dates, but there was a period of**

19   **time when we stopped offering the box because we had problems**

12:19  20   **with the batteries leaking, so obviously, we didn't want to**

21   **send something to a customer that doesn't work or is faulty.**

22   **It would ruin our reputation.**

23   Q.  You filed this complaint on April 17th, 2014; is that

24   right?

25   A.  **Say again?**

| | |
|---|---|
| 1 | Q.  You filed this complaint on April 17th, 2014; isn't that |
| 2 | right? |
| 3 | A.  **I don't recall the exact date.** |
| 4 | Q.  All right.  Let's bring up the complaint, page 1.  Let's |
| 12:19  5 | go to the top.  You see that it says April 17th of 2014? |
| 6 | Does that refresh your recollection? |
| 7 | A.  **Yes.** |
| 8 | Q.  Okay.  Let's go to paragraph 9 of your complaint.  And |
| 9 | you state that, It's available through your own proprietary |
| 12:19  10 | dedicated STB sold under the FyreTV brand.  Do you see that. |
| 11 | A.  **Yes.** |
| 12 | Q.  At the time of the complaint, on April 17th, 2014, |
| 13 | nobody -- no existing user, no new user -- could buy your |
| 14 | box; isn't that right? |
| 12:20  15 | MR. NÚÑEZ-VIVAS:  Objection, Your Honor, improper |
| 16 | impeachment.  The question was whether the set-top box was |
| 17 | being sold when the complaint was filed.  That's not what |
| 18 | that says.  It says that it was available through a set-top |
| 19 | box, which it was. |
| 12:20  20 | THE COURT:  It's impeachment.  He's entitled to ask |
| 21 | this witness, Didn't your complaint allege, in paragraph 9, |
| 22 | that the service was available through a proprietary |
| 23 | dedicated set-top box sold under the FyreTV brand?  Is that |
| 24 | what your lawsuit alleged? |
| 12:20  25 | A.  **Yeah, that's right.** |

|       |    |                                                            |
|-------|----|------------------------------------------------------------|
|       |  1 | **THE COURT:** All right. And if you want to bring up       |
|       |  2 | that issue, you may certainly do that yourself.            |
|       |  3 | **BY MR. NELSON:**                                          |
|       |  4 | Q. My question is whether it's true that on April 17th,     |
| 12:20 |  5 | 2014, anybody -- new customer or existing customer -- could |
|       |  6 | buy the FyreBoXXX?                                          |
|       |  7 | A. **Yeah, if someone called, asking that -- if they had an** |
|       |  8 | **issue with their box or if they wanted another one, we would** |
|       |  9 | **send them one.**                                         |
| 12:21 | 10 | Q. You couldn't purchase it on the web site, could you?     |
|       | 11 | A. **I don't recall the date that we started offering it** |
|       | 12 | **again.**                                                  |
|       | 13 | Q. And you can only purchase the FyreBoXXX if you're already |
|       | 14 | a member of FyreTV; isn't that right?                       |
| 12:21 | 15 | A. **Previously, yes.**                                     |
|       | 16 | Q. Even right now, you can only purchase the box if you are |
|       | 17 | a member of FyreTV, right?                                  |
|       | 18 | A. **Yes, you have to be a customer, you have to have an**  |
|       | 19 | **account.**                                               |
| 12:21 | 20 | Q. By the way, to be a customer, you have to go to your web |
|       | 21 | site, right?                                                |
|       | 22 | A. **Correct.**                                            |
|       | 23 | Q. And let's go to A 210, please. And this is from your web |
|       | 24 | site, sir?                                                  |
| 12:21 | 25 | **THE COURT:** Is this also in the book?                    |

1          MR. NELSON:  It is in the book.  We talked about

2     this beforehand.

3          THE COURT DEPUTY:  It is towards the back.

4          THE COURT:  All right.  Let's see --

12:21   5          MR. NELSON:  It says RFX --

6          THE COURT:  This is the one they had an objection

7     to because some language was redacted.  So Mr. Nelson --

8     wait, wait.  Before you start reading the contents of the

9     exhibit, which you may not do because it's not yet in

12:22  10     evidence -- so, first, are you offering RFX 210 into

11     evidence?

12          MR. NELSON:  Yes, Your Honor.

13          THE COURT:  Any objections?

14          MR. NÚÑEZ-VIVAS:  Yes, foundation.

12:22  15          THE COURT:  All right.  What is your response?

16          MR. NÚÑEZ-VIVAS:  Because of the redaction.

17          THE COURT:  I understand.  What's your response?

18          MR. NELSON:  My response is this was redacted.

19     BY MR. NELSON:

12:22  20     Q.  Do you understand, Mr. Franco, that where the black boxes

21     are, are personal account information details; is that right?

22     That's where they would appear?

23     A.  **Yes.**

24     Q.  And this is a true and accurate representation of what

12:22  25     would appear on your personal, except for personal

```
      1   identifiable information, right?

      2   A.  Yes.

      3           MR. NELSON:  I move its admission.

      4           THE COURT:  Over objection, RFX 210 is admitted.

12:22 5           (Thereupon, the aforementioned exhibit was admitted

      6   into evidence.)

      7           THE COURT:  I understand that there are, in fact, a

      8   few words that are redacted that relate to account

      9   information, and that's not the purpose of this particular

12:23 10  exhibit, so RFX 210 is admitted over objection.

     11   BY MR. NELSON:

     12   Q.  And it's highlighted there, Purchase a FyreBoXXX,

     13   correct?

     14   A.  Yes.

12:23 15  Q.  And so you're advertising not FyreTV box or FyreTV, you

     16   are saying purchase the FyreBoXXX, correct?

     17   A.  Here, yes.

     18   Q.  Let's please go to the frequently asked questions page on

     19   your web site, which is demonstrative 214.

12:23 20          THE COURT:  RFX 213?

     21           MR. NELSON:  214, Your Honor.

     22           THE COURT:  214.  And you're offering 214?

     23           MR. NELSON:  I offer 214, Your Honor.

     24           THE COURT:  Any objections?

12:23 25          MR. NÚÑEZ-VIVAS:  No.
```

                    **THE COURT:**  Without objection, RFX 214 is admitted.

                    (Thereupon, the aforementioned exhibit was admitted

into evidence.)

**BY MR. NELSON:**

Q.  In your web site and frequently asked questions, you call

it the FyreBoXXX, correct?

A.  **Yes.**

Q.  You have never sold the box through any web site other

than FyreTV.com, correct?

A.  **We tried, at one point in time, to sell through Amazon.**

                    **THE COURT REPORTER:**  To have it what?  I'm sorry.

A.  **To sell it through Amazon.**

**BY MR. NELSON:**

Q.  My question, sir, is:  Have you ever sold a box through

any other web site besides FyreTV.com?

A.  **No.**

Q.  YOU never sold a box at any physical brick-and-mortar

store, correct?

A.  **No.**

Q.  You cannot identify a single lost sale of the box that

has occurred because Amazon launched its Fire TV product,

correct?

A.  **I don't know.**

Q.  You understand that Amazon Fire TV is the hardware

device, correct?

 1   A.   **Yes.**

 2   Q.   You don't have a trademark to F-Y-R-E, do you?   Fyre,

 3   spelled that way?

 4   A.   **We own the domain.**

 5   Q.   Do you --

 6          **THE COURT REPORTER:**   You what?   Sorry.

 7          **THE COURT:**   Wait, wait.   Stop, stop.   "We own the

 8   domain."   Please continue.

 9   BY **MR. NELSON:**

12:24  10   Q.   Do you have a trademark to Fyre.com?

11   A.   **Like I said, we own the domain.   I don't think we have**

12   **the trademark.**

13   Q.   You don't have a trademark to FireTV, do you?

14   A.   **With an I, no, we don't have that.   Just the domain.**

12:25  15   Q.   Okay.   You don't have a trademark to FyreBoXXX, do you?

16   A.   **No, we do not.**

17   Q.   Since you restarted selling the FyreBoXXX in May, isn't

18   it true that you only sold four of them?

19   A.   **I don't know the exact number of items because we get**

12:25  20   **boxes sent back and shipped out all the time.**

21   Q.   So let's go to RFX 215.   We took this -- you produced

22   this in discovery.   This looks like the spreadsheet --

23          **THE COURT:**   Excuse me.   You're offering it this

24   into evidence?

12:25  25          **MR. NELSON:**   Not quite yet.   I'm going to establish

1    foundation.

2              THE COURT:  Go ahead.

3    BY MR. NELSON:

4    Q.   You produced a spreadsheet in litigation.  Does this look

12:25    5    like the spreadsheet?

6    A.   **Yes.**

7              MR. NELSON:  Okay.  I move to admit A 215.

8              THE COURT:  Any objections?

9              MR. NÚÑEZ-VIVAS:  Where is it in the binder.

12:25   10              THE COURT:  It's towards the back.  It's a roll of

11   screenshots that we were looking at before.  RFX 215.

12              MR. NÚÑEZ-VIVAS:  No objection.

13              THE COURT:  All right.  Without objection, RFX 215

14   is admitted.

12:26   15              (Thereupon, the aforementioned exhibit was admitted

16   into evidence.)

17   BY MR. NELSON:

18   Q.   You see, Mr. Franco, we have highlighted in green the

19   sales and the reds the returns, and once you net those out,

12:26   20   there are only four that have been sold in all of 2014; is

21   that correct?

22   A.   **Well, it says here set-top box purchase refurbished**

23   **and -- which is not accounted in that math, and there's**

24   **another one here, if you see entry number 16, it says set-top**

12:26   25   **box purchase and refurbished.  This is entries for boxes that**

```
         1    get sent out and back to the company.

         2    Q.  I understand.  So number 16, you see on the far column

         3    in, it has a zip code 90007 as a box, right?  And then there

         4    is a corresponding return on line 28, correct?  They all net

12:27    5    out.

         6    A.  Yes.

         7    Q.  So once you net out those that have been returned, there

         8    are only four boxes, correct?

         9    A.  From what this document shows, yes.

12:27   10    Q.  Let's go please to demonstrative 217.

        11         THE COURT:  Mr. Nelson, I'm sorry.  What period of

        12    time is this chart or spreadsheet referring to?

        13         MR. NELSON:  All of 2014, Your Honor.

        14    BY MR. NELSON:

12:27   15    Q.  Let's go to demonstrative RFX 217.  And your spreadsheet

        16    produced listed your revenue by month or all your revenues

        17    from the time you first started in December of 2008 through

        18    October 1st, 2014, correct?

        19    A.  Correct.

12:27   20    Q.  And you have about 5.2 million in sales revenue total

        21    from December 2008 through October 1, 2014, correct?

        22    A.  Correct.

        23    Q.  We summed the first three months of 2014 and got a number

        24    of 272 thousand --

12:28   25         MR. NÚÑEZ-VIVAS:  Objection, Your Honor.
```

BY MR. NELSON:

Q.  -- 450 dollars.  Mr. Franco --

         THE COURT:  Please stop.  There's an objection.

         MR. NÚÑEZ-VIVAS:  Your Honor, this is not in

12:28  evidence.  He's reading from the screen.

         THE COURT:  Right.

         MR. NÚÑEZ-VIVAS:  The information on that screen.

         THE COURT:  That's right.  So are you offering this

into evidence?

12:28          MR. NELSON:  I was trying to establish the

foundation before he objected, Your Honor.

         THE COURT:  So you're trying to get this witness to

authenticate your chart?

         MR. NELSON:  Yes, Your Honor.

12:28          THE COURT:  You can ask questions on that issue.

BY MR. NELSON:

Q.  Do you have any reason, sir, to doubt that in the first

three months of 2014, Wreal's revenues were $272,450?

         MR. NÚÑEZ-VIVAS:  Objection, Your Honor.  That's

12:28  not proper foundation for the screen that they made.

         THE COURT:  Overruled.

A.  **Can you repeat the question?**

BY MR. NELSON:

Q.  Do you have any reason to doubt that when you sum up the

12:28  total of the spreadsheet that you testified about in your

        1    deposition for the first three months of 2014, the number you

        2    get is $272,450.16?

        3    A.  **Yes.**

        4           THE COURT:  I'm sorry.  Yes, you doubt it; or, yes,

12:29   5    that's the revenue from the first three months?

        6    A.  **If he's summed up the revenue for those months from the**

        7    **spreadsheet that we turned over to him, I guess this is the**

        8    **number they come up with.**

        9           THE COURT:  Okay.

12:29  10           MR. NÚÑEZ-VIVAS:  Objection, Your Honor, lack of

       11    foundation.  He doesn't know.

       12           THE COURT:  Sir, don't do that.  That's not what

       13    the witness said.  You're familiar with the no coaching rule?

       14           MR. NÚÑEZ-VIVAS:  Yes.

12:29  15           THE COURT:  Stick to it, please.  Okay.  Ask him

       16    additional questions.

       17    BY MR. NELSON:

       18    Q.  Sir, if you sum up the revenue from January through March

       19    of 2014, do you have any reason to dispute that that number

12:29  20    is $272,450.16?

       21    A.  **No.**

       22    Q.  Thank you.  And you did testify to the spreadsheet in

       23    your deposition, correct?

       24    A.  **Yes.**

12:30  25    Q.  And you said that the way to do it was to sum up numbers,

1    correct?

2    A.  **Yes.**

3    Q.  Let's go to the next one.

4           THE COURT:  So are you offering this?

12:30  5           MR. NELSON:  Not quite -- not yet, sir.

6           THE COURT:  All right.

7           MR. NELSON:  But we'll get there.

8    BY MR. NELSON:

9    Q.  Do you have any reason to dispute, Mr. Franco, that for

12:30  10   the next six months, from April 1st, 2014 through October 1,

11   2014, the revenues were $502,304?

12   A.  **Yes.**

13   Q.  Yes, you dispute it, or, no, you don't?

14   A.  **No, it comes from the spreadsheet.**

12:30  15   Q.  So fair enough.  And if the way to -- for any month, you

16   would take your spreadsheet and sum up the numbers; is that

17   right?

18   A.  **Right.**

19   Q.  Okay.  Let's go, please --

12:31  20          MR. NELSON:  I do move to admit RFX 218.

21          THE COURT:  What about 217?

22          MR. NELSON:  And 217.

23          THE COURT:  Objections?

24          MR. NÚÑEZ-VIVAS:  Yes, Your Honor.  It's not the

12:31  25   best evidence.  The underlying documents would be the best

140 of 431

```
 1    evidence appropriately to actually show these numbers, not a

 2    graph prepared by counsel.

 3           THE COURT:  I'm going to sustain the objection.

 4    RFX 217 and 218, for the present purpose, are not admitted.

 5           MR. NELSON:  Okay.  Thank you, Your Honor.

 6    BY MR. NELSON:

 7    Q.   Let's go, please, to RFX 220, and I'm using this

 8    demonstrative purposes only.

 9           Do you dispute, Mr. Franco, that your revenues were

10    slightly declining from April 2013 through March 2014, as

11    shown on this demonstrative?

12    A.   Yes.

13    Q.   You dispute that your revenues were declining --

14    A.   No.

15    Q.   Okay.  And you don't dispute, either, that as to the best

16    of your recollection, the numbers as displayed in bar form on

17    this demonstrative are accurately reflected if we summed them

18    up from the spreadsheet that you produced in discovery,

19    correct?

20    A.   Correct.

21    Q.   Okay.  You think your pricing is outdated as compared to

22    your competitors, don't you?

23    A.   Can you repeat the question?

24    Q.   Do you think your pricing is outdated as compared to your

25    competitors?
```

12:31 (line 5)
12:31 (line 10)
12:31 (line 15)
12:32 (line 20)
12:32 (line 25)

1   A.   **Why would you say that?**

2   Q.   Let's go, please, to Wreal 3350.

3            **THE COURT:**  Excuse me.  We didn't get an answer to

4   that question.  So one of the rules of being in court is when

12:32  5   the lawyer asks you a question, even though you're dying to

6   ask a question back -- that would be pretty cool if you had

7   the opportunity to ask the lawyer questions.  It doesn't

8   really work that way.

9            So he asked you a question, and then instead of

12:32  10  giving an answer, you gave -- you asked him a question back:

11  Why would you say that?

12           So the question is:  Do you think that your pricing

13  is outdated as compared to your competitors?

14           Are you able to answer that question?

12:33  15  A.   **Yes.**

16           **THE COURT:**  What is the answer to that question?

17  A.   **Yes.**

18           **THE COURT:**  Okay.  There you go.

19  **BY MR. NELSON:**

12:33  20  Q.   Okay.  Thank you.  Is there anything in your sales

21  numbers that suggest any loss of business due to the Amazon

22  Fire TV?

23  A.   **Can you repeat the question?**

24  Q.   Is there anything in your sales numbers that suggests any

12:33  25  loss of business due to the Amazon Fire TV?

```
 1   A.   I wouldn't know.

 2   Q.   Can't point to any lost sales, right?

 3   A.   I wouldn't know.

 4   Q.   Okay.  You can't point to a single customer who stopped

 5   their subscription because of Amazon Fire TV, right?

 6   A.   Yes, I have not received that call.

 7   Q.   Okay.  You haven't receive a single call from any of your

 8   51,000 customers, correct, about Amazon TV?

 9   A.   You see, they would be calling you, not me.

10   Q.   Yes or no, sir, have you received a single call from any

11   one of your 51,000 customers about Amazon Fire TV?

12   A.   I don't believe we have.

13   Q.   You currently only advertise only on the internet; is

14   that right?

15   A.   Currently.  Yes.

16        THE COURT:  Mr. Nelson, give me a feel for how much

17   more time.

18        MR. NELSON:  Five minutes, Your Honor.

19        THE COURT:  All right.  Because I'm sensing that,

20   number 1, we need to take a lunch break and, number 2, we

21   need to give our wonderful court reporter a break.  So we'll

22   do that after you complete your examination, and then we'll,

23   of course, give the Plaintiff the opportunity to redirect.

24   Please continue.

25   BY MR. NELSON:
```

|       | 1  | Q.   Your advertisements appear only on pornographic tube |
|-------|----|-----------------------------------------------------------|
|       | 2  | sites; isn't that right?                                  |
|       | 3  | A.   **In adult-related sites, not just tube sites.**     |
|       | 4  | Q.   Okay.  Let's go to your corporate deposition, page 60, |
| 12:35 | 5  | line 22.  And that sums up your testimony.  And we asked  |
|       | 6  | you -- actually, let's go up to page 60, line 7 and line 3. |
|       | 7  | I partner with different tube sites and display           |
|       | 8  | banner ads on the pages.                                  |
|       | 9  | You are talking about tube sites, correct?               |
| 12:35 | 10 | A.   **Yes, I believe I misspoke.  It's all adult-related sites.** |
|       | 11 | Q.   You misspoke.  You don't maintain any social media   |
|       | 12 | presence like Facebook or Twitter, correct?              |
|       | 13 | A.   **Say again.**                                        |
|       | 14 | Q.   Do you maintain any social media presence?          |
| 12:35 | 15 | A.   **We have those accounts, but just nobody manages them.** |
|       | 16 | Q.   You don't maintain them, right?                      |
|       | 17 | A.   **Yeah, they're active, just no one manages them.**  |
|       | 18 | Q.   And you have never sold any sex toys, right?         |
|       | 19 | A.   **Sorry?**                                            |
| 12:35 | 20 | Q.   Have you ever sold any sex toys on your web site?    |
|       | 21 | A.   **No, we have not.**                                  |
|       | 22 | Q.   When you tried to market to mainstream studios a few |
|       | 23 | years ago, you did not use the FyreTV name; isn't that right? |
|       | 24 | A.   **I approached many of through Wreal, but in some cases,** |
| 12:36 | 25 | **where I felt and they felt, too, that it could complement,** |

|        |    |                                                                              |
|--------|----|------------------------------------------------------------------------------|
|        | 1  | yeah, the idea was to incorporate if, obviously, it made                     |
|        | 2  | sense.                                                                        |
|        | 3  | Q.  You talked about a number of mainstream sites in your                    |
|        | 4  | direct testimony; do you recall that?                                        |
| 12:36  | 5  | A.  Yes.                                                                      |
|        | 6  | Q.  For those, that was under the brand name Wreal, correct?                 |
|        | 7  | A.  Yes.                                                                      |
|        | 8  | Q.  You have no current plans to expand the FyreTV brand                     |
|        | 9  | beyond adult content; isn't that right?                                      |
| 12:36  | 10 | A.  No.  I tested years and vast amounts of resources to                     |
|        | 11 | develop these relationships.  I've been developing these                     |
|        | 12 | relationships since 2007.                                                     |
|        | 13 |          In the future, if I wanted to pursue that and if I                   |
|        | 14 | feel, at that point in time, my company would have better                    |
| 12:36  | 15 | leverage in acquiring this content because we would have more                |
|        | 16 | eyeballs to obviously make it more appealing to another                      |
|        | 17 | content provider to give us their content, I would obviously                 |
|        | 18 | take the initiative to those reengage those relationships                    |
|        | 19 | that I obviously spent many years in developing.                             |
| 12:37  | 20 | Q.  Right now, you have no current plans to expand the FyreTV                |
|        | 21 | brand beyond adult content, correct?                                         |
|        | 22 | A.  Yes.  Right now, I am not doing other things.                            |
|        | 23 | Q.  Okay.  And not a single one of your 51,000 customers has                 |
|        | 24 | contacted you regarding any confusion they have had with                     |
| 12:37  | 25 | Amazon?                                                                       |

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | **MR. NÚÑEZ-VIVAS:**  Asked and answered, Your Honor. |
|       | 2  | **THE COURT:**  Sustained. |
|       | 3  | **MR. NELSON:**  No further questions. |
|       | 4  | **THE COURT:**  Thank you, Mr. Nelson.  It is now |
| 12:37 | 5  | 12:37.  So you began your cross at 11:58, and it is now |
|       | 6  | 12:37.  So you used up 39 minutes.  I am sorry.  You have |
|       | 7  | used up 41 minutes. |
|       | 8  | **MR. NELSON:**  I am sorry, Your Honor.  I have 58 -- |
|       | 9  | yes, Your Honor.  That's correct. |
| 12:38 | 10 | **THE COURT:**  Right.  41 minutes.  All right.  So |
|       | 11 | we'll take a lunch break, and we'll give the court reporter a |
|       | 12 | chance to take a break as well.  Why don't we come back here |
|       | 13 | at 1:45? |
|       | 14 | But when I say come back here at 1:45, I literally |
| 12:38 | 15 | mean everybody back in their seats, ready to go.  I don't |
|       | 16 | mean out in the hallway or wandering in or outside, to use |
|       | 17 | the proper legal phrase, kibitzing, none of that. |
|       | 18 | I want you here in the courtroom, so that, at 12:45 |
|       | 19 | and one second, I can say, "Redirect examination."  All |
| 12:38 | 20 | right?  We'll be in recess until 12:45.  Thank you, folks -- |
|       | 21 | I mean 1:45.  Sorry.  Otherwise, we have a six-minute break. |
|       | 22 | 1:45.  Thank you. |
|       | 23 | (Whereupon, at 12:48 p.m., a luncheon recess was |
|       | 24 | taken.) |
|       | 25 | *          *          * |

<u>**A F T E R N O O N   S E S S I O N**</u>

(1:46 p.m.)

**THE COURT:**  Mr. Núñez, it's 12:45 [sic].  You may resume your redirect.

01:46      **MR. NÚÑEZ-VIVAS:**  Your Honor, I have no further questions.

**MR. NELSON:**  Your Honor, a matter of housekeeping, just before --

**THE COURT:**  Just as a matter of administrative suggestion, don't use the word "housekeeping" -- didn't we cover this already in the prior hearing?  I think we did.

**MR. NELSON:**  That very well may be true, Your Honor.

**THE COURT:**  Only because there are some judges who
01:46 take offense to that.  In fact, I had been admonished early in my career by a Judge Willa Nesbitt (ph.) -- remember this anecdote?  No?

It was maybe a different evidentiary hearing -- where I used that very term, and Judge Willa Nesbit was very
01:46 agitated that I used such a term.  She thought it was demeaning.

So you may want to amend your standard courtroom vocabulary and use the phrase "an administrative matter." It's up to you.  I am just giving you a helpful tip.

**MR. NELSON:**  Thank you, Your Honor.  I appreciate

1    it.

2              THE COURT:  Mr. Franco, you may step down.

3              MR. NELSON:  Actually, it involves Mr. Franco.

4    Before Mr. Franco leaves the stand, I would like to admit the

01:47  5    huge native file spreadsheet that we talked about.

6              We did not have it on flash drive, and we have it

7    on flash drive now to give to the Court on -- so it is Wreal

8    7092, and it is the underlying data that was discussed, and

9    so we would move its admission.

01:47  10             MR. NÚÑEZ-VIVAS:  Objection, Your Honor.  From my

11   understanding from Mr. Nelson, it contains a lot of pages, a

12   lot of documents that were not actually discussed during the

13   cross-examination of Mr. Franco.  They were not discussed

14   during the direct examination of Mr. Franco.

01:47  15             And so there's been no foundation established for

16   those -- in fact, I don't even know what's on that drive.

17             THE COURT:  So, Mr. Nelson, I mean, unless the

18   Plaintiff agrees, how would you even authenticate this

19   document with this witness?  You hold up a flash drive and

01:48  20   say, sir, do you know what this is?  And the witness would

21   say, I don't have any idea what that is.

22             How would he you even remotely lay the predicate to

23   admit that?

24             MR. NELSON:  What we do, Your Honor, is show him

01:48  25   through the flash drive the spreadsheet and take it out of

1    the computer and show the Court.  If you recall, Mr. Franco

2    testified that -- about the underlying data that would be

3    represented in the spreadsheet, and so we are trying to make

4    our evidentiary record about the underlying data of all the

01:48   5    revenues on a yearly basis.

6          And we don't see any other way to do it besides

7    admitting the actual document that contains all of the data,

8    and we have, obviously, his testimony on that, but for a full

9    record, we would like to admit the underlying spreadsheet.

01:48   10    Mr. Franco was a 30(b)(6) witness on it.

11          Obviously, others can testify to it as well, but

12    for a full record, we would like to admit the Excel

13    spreadsheet at Wreal 7092.

14          **THE COURT:**  Denied.  First of all, there was no

01:49   15    redirect, so you don't get recross.  You didn't lay the

16    necessary predicate on his direct examination.

17          Plus, who the heck knows what's on that flash

18    drive?  Even if I were to allow you to question this witness,

19    I don't think you would be able to do it.  So in any event,

01:49   20    denied.

21          **MR. NELSON:**  Thank you, Your Honor.

22          **THE COURT:**  You may step down, sir.  Call your next

23    witness.

24          **MR. NÚÑEZ-VIVAS:**  Yes.  Mr. Raul Plaza.

01:56   25          (Thereupon, there was a brief pause.)

1    **THE COURT:**  So on the record now.  Gigi, please

2   take down what I am about to say.

3        Folks, we're apparently getting another visit from

4   Mr. Murphy, the creator of Murphy's law.  I'm having

01:56  5   technical difficulties up here.  We made special arrangements

6   to get a real-time court reporter here.

7        For some reason, it's not working right now,

8   following the lunch break.  We had some difficulties this

9   morning before the hearing started, which was why we started

01:56  10   it late.  So perhaps my presence up here is causing some

11   undue pressure on Gigi or maybe I just have some bad mojo

12   right now or maybe the moon is not in line with Aquarius.

13        Whatever the situation may be, I'm going to be

14   stepping off the bench for a few minutes.  I'm going to give

01:56  15   Gigi the opportunity to work whatever technical magic she

16   needs to do, calling up computer services, chanting whatever

17   songs court reporters do to invoke relief.

18        And then, once you get it, give me a call back in

19   my chambers, and I will come back.  If it takes more than 10

01:57  20   minutes, let me know because I'm not going to postpone this

21   more than 10 minutes.  So I'm taking a brief recess, and you

22   continue to try to get this set up.  All right?

23        (Thereupon, a brief recess was taken from 1:57 p.m.

24   to 2:07 p.m.)

02:06  25    **THE COURT:**  All right.  Folks.  Thank you for your

```
         1   patience.  Please be seated.  Can we post a security officer
         2   at the door to make sure that Mr. Murphy doesn't enter this
         3   courtroom again?
         4            (Laughter.)
02:07    5        Thereupon,
         6                          RAÚL PLAZA,
         7   having been duly sworn by the Clerk, testified as follows:
         8            THE WITNESS:  Yes.
         9            THE COURT DEPUTY:  Please have a seat, sir, and
02:07   10   state and spell your name for the record.
        11            THE WITNESS:  Hello.  My name is Raul Plaza.
        12   P-L-A-Z-A.
        13            THE COURTROOM DEPUTY:  Thank you.
        14            THE COURT:  And it is now 2:07.
02:07   15
        16                    DIRECT EXAMINATION
        17   BY MR. NÚÑEZ-VIVAS:
        18   Q.  Good afternoon, Mr. Plaza.  Let's start by asking you
        19   about your education.  Do you have a college degree?
02:07   20   A.  Yes.
        21   Q.  From when?
        22   A.  Blue Hill College.
        23   Q.  With is your degree in?
        24   A.  In business.
02:07   25   Q.  And are you familiar with Wreal?
```

1    A.   **Yes.**

2    Q.   Were you -- do you work for Wreal?

3    A.   **Yes, I did some work for Wreal.**

4    Q.   In what capacity?

02:08   5    A.   **I was acting as the CTO, the chief technology officer.**

6    Q.   Are you familiar with Wreal's set-top box?

7    A.   **Yes, I am.**

8    Q.   Do you know how the set-top box works?

9    A.   **Yes.**

02:08   10   Q.   Can you please describe for the Court how the set-top box

11   works, including the interface and the consumer experience?

12   A.   **Yes.   The set-top box is basically a view**

13   **recorder that --**

14            **THE COURT:**  I'm sorry.  Could you speak, sir, just

02:08   15   a little more slowly and try to just speak a little more

16   clearly because I'm only about two or three feet from you,

17   and I am having a difficulty understanding you.  So slowly,

18   all right?  Thank you.

19   A.   **Okay.   Yes.   A set-top box is essentially a view**

02:08   20   **recorder.   It's a machine designed to play video on the**

21   **television.   It's been used by cable providers like a long**

22   **time ago.   What is different now, this is an IP set-top box.**

23   **It works through the IP networks.**

24            **In our case, we wanted to -- the IP set-top boxes**

02:09   25   **are the ones that are, right now, have been used on the**

1    internet.  So the set-top box has a cheap element, which is

2    from factories, designed to record videos.

3          And there is a, I guess, two components.  There is

4    a client and the server or software.  On the server side, the

02:09    5    server will communicate with the box and provide a list of

6    elements that can be a content library or different things

7    that was requested.

8          On the client side, there is a graphical user

9    interface and, of course, remote control for the user to be

02:10    10    able to command this -- the actions, so.

11    BY MR. NÚÑEZ-VIVAS:

12    Q.  What kind of actions can a consumer take when it has the

13    interface on?

14    A.  So as a set-top box -- a modern set-top box that's

02:10    15    working for the IP is more interactive.  It's basically works

16    for on-demand video.

17          So I guess most common things is to push video

18    elements for the user to navigate through these elements can

19    be different -- those are like kind of view windows or

02:10    20    recommendations or things that -- they may be preconfigured

21    or by the graphical interface, and there's also a lot of

22    searching involved.

23          A searching functionality is very common on IP

24    set-top boxes.

02:11    25    Q.  What kind of searches can a consumer do with a FyreTV

```
 1   set-top box?

 2   A.   Search by genres, actors, dates -- what else?  Actors,

 3   movie names, of course, yeah, that sort of thing.

 4            MR. NÚÑEZ-VIVAS:  No further questions.  Your

 5   Honor.

 6            THE COURT:  2:11.  You used up a full four minutes.

 7            THE COURT REPORTER:  What university did you go to?

 8   A.   Bluehill College.

 9            THE COURT REPORTER:  Bluehill.

10            THE COURT:  Blue?

11   A.   Bluehill.

12            THE COURT:  Bluehill?

13   A.   One word.

14            THE COURT:  All one word?  Bluehill College?

15   A.   Yes.

16            THE COURT:  Okay.  Thank you.

17            MR. BAGEANT:  Your Honor, I'm Patrick Bageant for

18   Amazon.  What I'd like do with is, with the Court's

19   permission, distribute the stack of exhibits to Your Honor,

20   the clerk, the witness, and opposing counsel and just work

21   with those throughout the cross-examination.

22            THE COURT:  Sure.

23            MR. BAGEANT:  May I approach?

24            THE COURT:  Yes.

25            MR. BAGEANT:  May I approach the witness, Your
```

02:11  5

02:12  20

02:12  25

1    Honor?

2              THE COURT:  Yes.

3              MR. BAGEANT:  (Complies.)

4

5                        *CROSS EXAMINATION*

6    BY MR. BAGEANT:

7    Q.  Mr. Plaza, I'm Patrick Bageant.  I represent Amazon.com.

8    You remember me from your deposition; don't you?

9    A.  **Yes.**

02:12  10   Q.  And you were an employee of Wreal LLC and also its

11   30(b)(6) witness; isn't that right?

12   A.  **Can you repeat that question?**

13   Q.  You were an employee of Wreal LLC, and you were also its

14   corporate representative witness at that deposition; isn't

02:13  15   that right?

16   A.  **I did work for Wreal LLC, but it's not my employer.**

17   Q.  Not your currently your employer, but you did at one

18   time?

19   A.  **Yes.**

02:13  20   Q.  And you testified on Wreal's behalf in a deposition on

21   November 11th; didn't you?

22   A.  **Yes.**

23   Q.  Thank you.

24              Now, when Wreal first started out in 2006, its

02:13  25   brand was not FyreTV.  It was TV for Adults; is that right?

1          **MR. NÚÑEZ-VIVAS:**  Objection, Your Honor, beyond the

2     scope of cross.

3          **THE COURT:**  Overruled.  I think you mean beyond the

4     scope of direct.  I understood.

02:13  5          **MR. NÚÑEZ-VIVAS:**  Beyond the scope of direct.

6          **THE COURT:**  I understood.  Right, but overruled in

7     any event.

8     A.  **I think you had the date incorrectly.  I believe it was**

9     **2007 on the brand of TV for Adults.**

02:13  10    **BY MR. BAGEANT:**

11    Q.   TV for Adults was in 2007?

12    A.  **Yes.**

13    Q.   The FyreTV brand was born in about June of 2007; isn't

14    that right?

02:14  15    A.  **Yeah.**

16    Q.   Wreal picked that name because it was a hot and sexy logo

17    for the type of content that it was representing and because

18    Wreal didn't want to be compared to other more explicit brand

19    names in the adult industry.  That's what you explained in

02:14  20    your deposition?

21    A.  **In addition to -- yes.  In addition to the technology**

22    **part also, which I already added to the deposition, that it's**

23    **a -- we wanted to show fresh technology, so that name will**

24    **have to added to it.  The name had to add this technology**

02:14  25    **component as well.**

```
 1    Q.   Let's talk about what the FyreTV brand is, Mr. Plaza.

 2    FyreTV is an adult content service --

 3            THE COURT:   Sir, could you get a little closer to

 4    the microphone?   Thank you.

 5    BY MR. BAGEANT:

 6    Q.   FyreTV is an adult content service, isn't that right,

 7    that customers can use to stream content through different

 8    hardware platforms?

 9    A.   Yes.

02:14  10   Q.   Like a computer web browser?

11    A.   Correct.

12    Q.   Or a mobile telephone or tablet using a web browser

13    technology?

14    A.   Yes.

02:15  15   Q.   It could also be the FyreTV BoXXX?

16    A.   Primarily, the FyreTV BoXXX because -- or let me just say

17    that the FyreTV BoXXX because that's how we call it --

18            THE COURT REPORTER:   The what?

19    A.   The FyreTV BoXXX, that's the name we used it -- we used

02:15  20   to describe it.   Primarily that because that was a

21    fundamental thing that we created.

22    BY MR. BAGEANT:

23    Q.   Mr. Plaza -- I'm sorry, sir.   You can use the FyreTV

24    BoXXX --

02:15  25           THE COURT:   Counsel, the witness was involved in
```

|   | 1 | answering this question.  So let him finish, and then you can |
|---|---|---|
|   | 2 | ask your a next question.  Mr. Plaza, please continue. |

3  A.  **Sorry.  I lost my train of thought, but let's continue.**

4  BY MR. BAGEANT:

02:15  5  Q.  My question was whether you could use the FyreTV BoXXX to

6  access FyreTV service?

7  A.  **Yes.**

8  Q.  You could also use Roku or Apple TV?

9  A.  **Yes, in addition to other things, yeah.**

02:16  10  Q.  The FyreTV service is adult video content, and it is

11  delivered to various types of hardware; isn't that right?

12  A.  **I'm sorry.  Repeat the question.**

13  Q.  So my question is -- we were just talking about the

14  various types of hardware that you can access FyreTV through,

15  correct?

16  A.  **Yes.**

17  Q.  So on the one hand, there's the hardware, and on the

18  other hand, there's the FyreTV service; isn't that right?

19  A.  **I explained earlier that there's a server component and**

02:16  20  **the client component.  There's one that's software, and the**

21  **other one is hardware.**

22  Q.  Well, the server is not called FyreTV?

23  A.  **The what?**

24  Q.  The server is not called FyreTV; is it?

02:16  25  A.  **The server doesn't have a name.  It's the same.  It's all**

1  software.

2  Q.  On the hardware side, let's talk in particular about the

3  FyreTV BoXXX.  It's true that Wreal's first marketing

4  director called it the FyreTV BoXXX?

02:17  5          MR. NÚÑEZ-VIVAS:  Objection, Your Honor.  It's

6  beyond direct.

7          THE COURT:  Overruled.

8  A.  **He used the term for some ads, I guess.  Yeah, he used to**

9  **call it sometimes that.**

02:17  10  BY MR. BAGEANT:

11  Q.  Then, internally, I think you testified that you called

12  it other things, right?

13  A.  **Yeah.**

14  Q.  You called it the FyreBoXXX or the FyreTV BoXXX or the

02:17  15  FyreTV set-top box, if I recall; isn't that right?

16          THE COURT REPORTER:  I'm sorry.  What was the last

17  one?

18          MR. BAGEANT:  The FyreTV set-top box.

19  A.  **Yes.  I mean, the FyreTV BoXXX, actually.  Set-top box is**

02:17  20  **such a long name.**

21  BY MR. BAGEANT:

22  Q.  Can we pull up RFX 210 that was used with Mr. Franco?

23          THE COURT:  Is this in the group of exhibits that

24  you just handed me or the prior exhibits?

02:18  25          MR. BAGEANT:  Your Honor, it's in the prior

           1   exhibits that were used with Mr. Franco.

           2          THE COURT:  All right.  And what is the exhibit

           3   number that you're referencing now?

           4          MR. BAGEANT:  This is RFX 210.

    02:18   5          THE COURT:  Thank you.

           6   BY MR. BAGEANT:

           7   Q.  Mr. Plaza, do you see that exhibit on your screen?

           8   A.  Yes.

           9   Q.  Do you see the red circle around the words purchase the

    02:18  10   FyreBoXXX?

          11   A.  Yes.

          12   Q.  That's the FyreTV BoXXX you were referring to, right?

          13   A.  Yes.

          14   Q.  This FyreTV BoXXX is for sale on Wreal's web site; is

    02:18  15   that your understanding?

          16   A.  Yes.

          17   Q.  Apart from Wreal's own web site, isn't it true that in

          18   2009 to 2010, Wreal tested out selling the BoXXX in a few

          19   adult sex shops?

    02:18  20   A.  The dates are not very fresh.  Maybe closer to 2010.  We

          21   tried to create a -- technically, I was involved on a feature

          22   called set-top box retail activation.

          23          The primary goal was to sell these boxes on retail

          24   outlets, but the adult shops was kind of like, you know,

    02:19  25   let's test this feature before we push it through a big

1    commercial -- an online retailer, and that was actually

2    Amazon.

3         We pushed that, we wanted so bad to put a big

4    inventory of boxes we had to be sold inside Amazon.  But we

02:19   5    tested this feature in retail boxes in adult shops.

6    Q.  You didn't ultimately make any move past the test stage

7    with the adult shops, did you?

8    A.  The -- I mean, the system worked, so whoever got it from

9    these shops, they might still be using it, but the feature

02:20  10    was designed to do it, you know, online mostly, so we wanted

11    to sell it inside Amazon.  That was the objective of that

12    feature.

13    Q.  Let's talk about how the box developed.  In 2008, the box

14    was available only to customers who were interested in beta

02:20  15    testing; isn't that right?

16    A.  They were -- yeah, 2008, they were -- they would

17    subscribe to the beta, and then we will ship them a box

18    after, I guess -- they had to pay for shipping if I'm -- if I

19    remember correctly.

02:20  20         And we needed a credit card as a guarantee for

21    them.  They will be returning the box after the beta or test

22    was over.

23    Q.  Mr. Plaza, my question was, back in 2008, the BoXXX was

24    available only to customers when they were interested in beta

02:21  25    testing; is that correct or not correct?

1    A.   **Probably not correct because we didn't have our test as**

2    **beta.   It was just, you know, try the service, and I guess**

3    **whoever knew what beta was, they would understood that it was**

4    **a beta, but majority of them was just, you know, hey, try**

02:21    5    **this service.**

6    Q.   Did you charge them for the service, Mr. Plaza?

7    A.   **Sorry?**

8    Q.   Did you charge them for the service at that time,

9    Mr. Plaza?

02:21    10    A.   **No, we did not.**

11    Q.   No.   Beta testing is a -- strike that.

12        Wreal did not actually charge any of its beta

13    testers of FyreTV any money until January of 2009, right?

14    A.   **It was optional.   If they wanted to keep the box, they**

02:21    15    **will have to be converted to rental customers.**

16    Q.   Mr. Plaza, my question was:   Wreal did not start charging

17    its beta customers any money for FyreTV until January of

18    2009; isn't that right?

19    A.   **Yeah, but only -- that doesn't mean that we will charge**

02:22    20    **everybody.   So you're generalizing.   That's why I made the**

21    **distinction.   You had the option to either keep the box and**

22    **be converted, and then you would be charged.   Otherwise,**

23    **you'll have to just return the product.**

24    Q.   I didn't mean to generalize.   My only point was that you

02:22    25    didn't start charging until January of 2009, and you would

```
     1    agree with me on that?

     2    A.  Yes.

     3    Q.  Thank you.  Now, in 2008 -- well -- in early 2011, Wreal

     4    made it possible for the customers to stream from the web

02:22 5    site without the BoXXX, right?

     6    A.  Yes.

     7    Q.  And, in fact, over the next few years, Wreal worked hard

     8    to channel its FyreTV customers toward hardware platforms

     9    other than the BoXXX, right?

02:23 10   A.  Repeat that.  Repeat the question.

     11   Q.  Starting in 2011, sir, isn't it true that Wreal started

     12   exploring other hardware platforms besides the BoXXX?

     13   A.  Yes, the opportunities of the boxes that were emerging on

     14   the market.

02:23 15   Q.  So the answer is yes?

     16   A.  Yes.

     17   Q.  Thank you.

     18        Mr. Plaza, could you turn in your binder to the tab

     19   that says Plaza Exhibit 4?  Mr. Plaza, in 2011, Wreal was

02:24 20   working hard to make FyreTV.com web site less focused on the

     21   set-top box; am I correct?

     22   A.  The -- yeah.  I mean, the new customers that we were

     23   bringing in, we wanted to, you know, provide -- I mean,

     24   provide to existing customer and new customers the new

02:24 25   platforms.
```

1    Q.   And the new platform was less focused on the FyreTV

2    set-top box or the BoXXX, right?

3    A.   **It was -- the idea was to replicate the exact features of**

4    **the FyreTV BoXXX in the other platforms, so they wouldn't**

02:24   5    **feel that they were missing out anything, but it was a very**

6    **difficult thing to do -- to, you know, to make it exactly**

7    **look the same way as the FyreTV set-top box.**

8    **But the idea was that was how the development was**

9    **based on, on the original designs on the box.**

02:25   10   Q.   Mr. Plaza --

11   **MR. BAGEANT:**  Your Honor, I'm going to move to

12   strike the last answer as nonresponsive and ask the question

13   again.

14   **BY MR. BAGEANT:**

02:25   15   Q.   Isn't it true that in 2011, Wreal was working to make the

16   FyreTV.com web site less focused on the BoXXX?

17   **THE COURT:**  Counsel, don't you want a ruling?

18   **MR. BAGEANT:**  I do, Your Honor.  Thank you.

19   **THE COURT:**  Denied.

02:25   20   **MR. BAGEANT:**  Well, I guess I'll move to the next

21   question.

22   **BY MR. BAGEANT:**

23   Q.   Is it true, Mr. Plaza, that in about the same time in

24   2011, Mr. Torres, the director of business development, wrote

02:25   25   an e-mail to the Wreal team about the urgency of the need to

```
 1   move past the FyreTV set-top box?
 2   A.  Yes, I remember that conversation we had in the
 3   deposition.
 4   Q.  Do you remember that e-mail?
 5   A.  Yes.
 6   Q.  Could you turn to the tab that reads Plaza Exhibit 5?
 7   A.  (Complies.)
 8   Q.  Is this that e-mail, sir?
 9        MR. BAGEANT:  In particular, Mr. Polis, could you
10   call out the paragraph above the words P.S.?
11        THE VIDEOGRAPHER: (Complies.)
12        THE COURT:  Counsel?  First of all, take that down
13   off of the screen.
14        MR. BAGEANT:  I shouldn't have published this.  I'm
15   sorry, Your Honor.
16        THE COURT:  Has this been in evidence?
17        MR. BAGEANT:  No, Your Honor.
18        THE COURT:  So first, you need to get the exhibit
19   introduced.  Are you seeking to introduce this exhibit Plaza
20   Exhibit Number 5?
21        MR. BAGEANT:  Yes, sir.
22        THE COURT:  Is there any objection?
23        MR. NÚÑEZ-VIVAS:  No, Your Honor.
24        THE COURT:  Okay.  Without objection, Plaza Exhibit
25   Number 5 is admitted.
```

02:26 (lines 5, 10, 15, 20, 25)

1           (Thereupon, the aforementioned exhibit was admitted

2    into evidence.)

3           THE COURT:  Please continue.

4           MR. BAGEANT:  That's all I wanted to do with that

5    exhibit, Your Honor.

6    BY MR. BAGEANT:

7    Q.  Mr. Plaza --

8           THE COURT:  Now, it's been admitted, you want to

9    call my attention to something?  Do you want to call the

02:27  10   witness' attention to something?  What is it that you want me

11   to do with this particular exhibit, other than admit it?

12          MR. BAGEANT:  That is what I wanted to do, Your

13   Honor.

14          THE COURT:  Take it down from the screen.  The

02:27  15   attorney has no further use of that exhibit.

16   BY MR. BAGEANT:

17   Q.  Mr. Plaza, isn't it true that at the end of 2013 Wreal

18   was experiencing battery problems and difficulties with the

19   BoXXX hardware device?

02:27  20   A.  In 2013?

21   Q.  Yes, sir.

22   A.  It was an event that we had -- we fixed I think within

23   less than a month three weeks I think we fixed.  We had an

24   issue -- yeah.  I said yes.  We had an issue that we fixed.

02:27  25          After we -- I mean we discovered, based on the

1    customers's complaining, we -- we were serving boxes to

2    customers, and then they were complaining about the -- that

3    they were getting boxes that had like -- at first a smell,

4    like a smell or something, and once we figured out it was

02:28   5    caused by the battery leak that you mentioned, that it was

6    destroying the inside of the -- some parts of the box, of the

7    carton itself, the shipping box.

8            THE COURT:  Mr. Plaza, excuse me.  We only have

9    limited time here today, and we're going to be here all day

02:28   10   if you give a long speech in response to a very simple

11   question.

12           Here is the question:  Mr. Plaza, isn't it true

13   that at the end of 2013, Wreal was experiencing battery

14   problems and difficulties with the box hardware device?  That

02:28   15   was the question.  Yes?

16   A.   The date, the date you said, end or beginning of 2013?

17           THE COURT:  He said the end of 2013.

18   A.   That's correct.

19           THE COURT:  So the way to handle that, just to give

02:29   20   you a suggestion to save time, is:  We did have experience

21   with the batteries, but it wasn't the end of 2013.  It was

22   whatever the date was -- 2012.  Middle of 2012.  But you went

23   on and on and on and on, which if we were here in a five day

24   trial, maybe that would be okay.  But everybody has

02:29   25   limited --

1    A.   **I'm make it quicker.**

2         **THE COURT:**  And all the time is being allocated or

3    subtracted from each side.  So by giving long answers, you're

4    impinging on their ability to move the hearing along.  Do you

02:29   5    understand?

6    A.   **It was not my intention.**

7         **THE COURT:**  I'm not saying it was your intention,

8    but that's the result.  And now I'm talking too much, so

9    let's get on with the next question.

02:29   10   **BY MR. BAGEANT:**

11   Q.   Around the end of 2013, Wreal was not selling new BoXXXs

12   to new customers, isn't that right?

13        **MR. NÚÑEZ-VIVAS:**  I'm going to object, Your Honor,

14   because I don't --

02:30   15        **THE COURT:**  Excuse me.  Sounds like you have you're

16   going to give me a speech.  Basis of the objection.

17        **MR. NÚÑEZ-VIVAS:**  Beyond the scope of direct.

18        **THE COURT:**  Overruled.

19   A.   **So let me answer question that the date that the battery**

02:30   20   **thing happened -- because you keep saying end or beginning of**

21   **2013.  What happened is around beginning of 2000 -- sorry,**

22   **2014.  Sorry was around that time.  February, March.  I don't**

23   **remember.  But it was around that time.**

24   **BY MR. BAGEANT:**

02:30   25   Q.   So in February or March, around that time of 2014, it is

1   true that Wreal was not selling the FyreTV BoXXX to new

2   customers?

3   A.   **Correct.**

4   Q.   It is also true that because of the battery leaks that

02:30   5   affected all the inventory it was not selling the BoXXX to

6   its existing customers at that time either, was it?

7   A.   **Yes.**

8   Q.   And it is also true that at the time that Amazon released

9   the Fire TV -- Amazon Fire TV product you had not resolved

02:31   10   the battery leaks problem?

11   A.   **Incorrect.   Incorrect.**

12   Q.   That is incorrect?

13   A.   **Yes.**

14   Q.   Is it your testimony here today that at the time that

02:31   15   Amazon released Amazon Fire TV you were selling the BoXXX to

16   your existing customers?

17   A.   **That is correct.**

18   Q.   Is it your testimony here today that you were selling the

19   BoXXX in April 2nd of 2014 to brand new customers?

02:31   20   A.   **I remember the event happened earlier.   So to be honest,**

21   **you're showing me right now e-mails that I don't see the**

22   **dates.   I don't remember the exact date, but I know the**

23   **sequence of the events and that came way up later.   Probably**

24   **a month later that Amazon released the thing to the public.**

02:32   25   **At least when we heard it, it was May or April.   I don't**

1    remember when exactly it was Amazon that released the --

2    announced the FyreTV BoXXX.

3    Q.  Well, let's talk about the sequence.  Isn't it true you

4    that the reason that Wreal started selling the BoXXX again in

02:32    5    2014 was after Amazon Fire TV and in response to Amazon Fire

6    TV?

7    A.  Yes.  But you have incorrect the fact that the only --

8    the new customers we brought it up right after Amazon

9    released their FyreTV BoXXX.  But the existing customers were

02:32   10    never related to this effect of, you know, let's push our box

11    out there.  There were customers, one thing the box, and we

12    needed to serve them.  So we have to fix the battery leak

13    after it happened.  We had to get new materials in order to

14    be able to repack it and then we were able to ship them again

02:33   15    once we fixed it.

16    Q.  Mr. Plaza, I understand you fixed the battery leak.  My

17    last question, my only question for you is didn't you tell me

18    in you are deposition that the reason that Wreal started

19    selling the BoXXX again in May of 2014 was because of and in

02:33   20    response to Amazon.com's Fire TV product?

21    A.  I told you to new customers, but I also told you that --

22    the question you say is the Fire TV start selling the box to

23    their new customers, they haven't sold in 2012, I told you,

24    yes.  Those customers.  But the old customers, the ones that

02:33   25    are in rental, they can buy the box and they can have more

1   boxes.  And we never stopped serving them, only when the

2   battery leak event happened, and we fix it within three

3   weeks, I believe.

4           MR. BAGEANT:  Your Honor, I have no further

02:33   5   questions.

6           THE COURT:  Thank you.  It is now 2:32.  Any

7   additional questions on redirect?

8           MR. NÚÑEZ-VIVAS:  No, Your Honor.

9           THE COURT:  All right.  Mr. Plaza, thank you for

02:34  10   your time.  You may step down.  So you took 21 minutes on

11   cross.  Call your next witness, please.

12           MR. NÚÑEZ-VIVAS:  Yes, Your Honor.  I actually

13   would like to publish portions of the deposition transcript

14   of Mr. Nathaniel Fuller, who was a 30(b)(6) witness.

02:34  15           THE COURT:  Well, what do you mean you want to

16   publish them?  You want to read them out loud here in court?

17           MR. NÚÑEZ-VIVAS:  Yes.

18           THE COURT:  And that will be going against the time

19   allocation.

02:34  20           MR. NÚÑEZ-VIVAS:  Yes.

21           THE COURT:  All right.  So this is a deposition?

22           MR. NÚÑEZ-VIVAS:  It's the deposition of Nathaniel

23   N-A-T-H-A-N-I-E-L Fuller F-U-L-L-E-R.

24           THE COURT:  Yes?

02:35  25           MR. NÚÑEZ-VIVAS:  Dated November 17th, 2014.

1          **THE COURT:**  Yes, and he was a 30(b)(6) witness?

2          **MR. NÚÑEZ-VIVAS:**  He was a 30(b)(6) witness

3     designated by Amazon to testify on his behalf to topic number

4     8, which is Amazon's knowledge of actually consumer confusion

02:35  5     between Fire TV and Wreal's FyreTV.

6          **THE COURT:**  Alright, you can do that.

7          **MR. NELSON:**  Can I object briefly?

8          **THE COURT:**  What's the basis?

9          **MR. NELSON:**  Although rule 32 does allow --

10          **THE COURT REPORTER:**  I can't --

11          **MR. NELSON:**  Although rule 36 does allow -- rule 32

12     does allow general 30(b)(6) testimony to be used any for any

13     purpose.  Mr. Fuller is here in person and for expediency we

14     would submit that he can ask any persons to Mr. Fuller in

02:35  15     person.

16          **THE COURT:**  You're right, he can.  But he

17     apparently chooses not to.  For whatever strategic reason he

18     would rather read this deposition rather than have in-person

19     live testimony.  That's his strategic call, and I'm not

02:36  20     interfering with that.  And when it comes time for your

21     cross-examination, you can either read in some other portions

22     or you can call him live.

23          **MR. NELSON:**  Thank you, Your Honor.  Rule 32 does

24     give us the right to have for completeness.  We have not seen

02:36  25     what he's going to play or -- and also, although I don't see

1    anybody who is not within this case here, we haven't objected

2    to confidentiality either on --

3            THE COURT:  Well, let's first of all, ask one or

4    two background questions.  Are you planning on playing a

02:36  5    video or are you going to be reading questions and answers

6    like we used to do in the old days, like old school-type

7    where you have somebody in the witness stand and you read the

8    question and somebody place the role of Mr. Fuller and reads

9    the answer?

02:36  10           MR. NÚÑEZ-VIVAS:  I'm actually going to play an

11   audio that was played at Mr. Fuller's deposition and I will

12   read from his transcript so that I can authenticate the

13   audio.  And the follow-up questions after the audio is

14   played.

02:37  15           THE COURT:  So you have somebody in the witness box

16   doing the reading or are you --

17           MR. NÚÑEZ-VIVAS:  I'm just going to read it.

18           THE COURT:  You're going to play the role of the

19   questioner and the deponent?

02:37  20           MR. NÚÑEZ-VIVAS:  Yes.

21           THE COURT:  And is there anything in the transcript

22   that you're going to be reading or in the audio that you will

23   be playing which will implicate information which either side

24   is designated as confidential under the principles

02:37  25   established by the protective order?

1        **MR. NÚÑEZ-VIVAS:**  The entire transcript, I believe,

2   has been designated confidential, as to the audio -- let me

3   address first the audio, because we agreed that we're going

4   to omit the name of the customer in the audio, and the rest

02:37   5   can be played without any issues.  As to --

6        **THE COURT:**  Who was it that made the designation?

7        **MR. NÚÑEZ-VIVAS:**  Counsel for Amazon.

8        **THE COURT:**  So it's fine that you say that the rest

9   of it can be safely played, but it's really not completely

02:38   10   your call right now.  Amazon has designated this audio as

11   confidential, is that correct?

12        **MR. NELSON:**  Correct, Your Honor.

13        **THE COURT:**  Alright, and you want to play that

14   audio.  You say to me, Judge, there's only one word or one

02:38   15   phrase that we can remove and once we remove that, it's okay

16   to play it.  Maybe that's true, but let's hear from Amazon to

17   see if it agrees.  Do you agree with that statement?

18        **MR. NELSON:**  I do, Your Honor.

19        **THE COURT:**  Alright, fine.  Alright.  So do you

02:38   20   have somebody who is technologically savvy enough and skilled

21   enough and who is wearing a sign saying go away, Mr. Murphy,

22   so that we're not going to have the name inadvertently

23   blurted out in court.

24        **MR. NÚÑEZ-VIVAS:**  Mr. Wouters is going to play it.

02:39   25   I don't know if he has that background.  I don't think so.

1   The name is mentioned at the beginning of the audio.  The

2   first, I believe, eight seconds or 10 seconds.  So we were

3   going to start it 10 seconds ahead to prevent the name of the

4   customer to be identified.

02:39   5        **THE COURT:**  I have a suggestion.  Before you

6   actually start playing it out loud, do you have some way to

7   listen to it very quietly yourself, either with earphones or

8   a very, very low volume?

9        **MR. NÚÑEZ-VIVAS:**  We have cued up past the name and

02:39   10   address of the customer.

11       **THE COURT:**  Alright, fine.  And so that concerns

12   the audio.  What about the deposition transcript that you're

13   going to be reading in?  Those portions?  Anything about that

14   confidential under the designations?

02:39   15       **MR. NÚÑEZ-VIVAS:**  I don't believe so, Your Honor,

16   because it's really about the call and what the caller said

17   and --

18       **THE COURT:**  Wait, wait, wait.  This is really not a

19   question of opinion.  It's a question of fact.  There's a

02:40   20   deposition transcript that's in existence.  Mr. Fuller's

21   transcript, correct?

22       **MR. NÚÑEZ-VIVAS:**  Yes.

23       **THE COURT:**  Somebody, maybe Amazon, has designated

24   it as confidential or not.  That's a fact.  It's not an

02:40   25   opinion, it's a fact.  So Amazon you've designated that

```
 1    transcript as confidential?

 2              MR. NELSON:  Yes, Your Honor.

 3              THE COURT:  Do you know what pages counsel is

 4    intending to play?

 5              MR. NELSON:  No, Your Honor.  We asked, and they

 6    have not told us and if we can perhaps tell us what they

 7    were, we can quickly resolve this issue.

 8              THE COURT:  You're looking perplexed in response to

 9    that comment.  Is that true?  Have you told Amazon?  What

10    page are you --

11              MR. NÚÑEZ-VIVAS:  I haven't told them, Your Honor.

12              THE COURT:  So how would they know whether to

13    object or not?

14              MR. NÚÑEZ-VIVAS:  You're right.  Can I just take a

15    couple of minutes?

16              THE COURT:  Take a minute.  Go ahead.

17              (Thereupon, there was a brief pause.)

18              MR. NELSON:  Your Honor, if I may?

19              THE COURT:  You may.

20              MR. NELSON:  We have no objection to the

21    confidentiality that -- we withdraw that confidentiality

22    designation, so it may be played in open court.

23              THE COURT:  As to the audio?

24              MR. NELSON:  As to the -- no, as to what they have

25    told us.
```

02:40  5
02:40  10
02:40  15
02:42  20
02:42  25

```
 1              THE COURT:  As to the transcript of the witness?

 2              MR. NELSON:  As to the transcript of the witness,

 3   yes, Your Honor.

 4              THE COURT:  All right.  Fine.

 5              MR. NELSON:  There is, under rule 32, they are

 6   playing about two and a half pages.

 7              THE COURT:  By playing you mean reading?

 8              MR. NELSON:  Reading, excuse me.  In the middle,

 9   they're cutting off about half a page which we believe as

10   part of the reading, we, under rule 32, have a right to

11   optional completeness to the part that thorough omitting.

12              THE COURT:  Sure, I understand that principle.

13   What are your comments?

14              MR. NÚÑEZ-VIVAS:  Your Honor, he's free to actually

15   read whatever he thinks will be proper to read.

16              THE COURT:  I know but, Mr. Núñez, it's a little

17   bit disjointed for to you read something, leave out in the

18   middle half a page, then read another page and a half, then

19   to have Mr. Nelson come back and circle back and read the

20   missing half paragraph.

21              I'm not that smart.  It's a lot easier to he in to

22   have it come out in the ordinary course.  So --

23              MR. NÚÑEZ-VIVAS:  I'll read it.

24              THE COURT:  Why don't you just do that?

25              MR. NÚÑEZ-VIVAS:  It's not a big deal.
```

02:42 (line 5)
02:43 (line 10)
02:43 (line 15)
02:43 (line 20)
02:43 (line 25)

1          **THE COURT:**  Alright, so it is now 2:43.  Go ahead

2     play your audio.

3          **MR. NELSON:**  The confidential parts of the

4     transcript that you told me you are planning to read into the

02:44  5     record, so that it is -- you can reread it in open court.

6     That's parts of the transcript.

7          **THE COURT:**  Are you doing the audio first or the

8     reading of the deposition?

9          **MR. NÚÑEZ-VIVAS:**  I'll read first from the

02:44  10    deposition a little bit and then the audio.

11

12              ***DEPOSITION OF NATHANIEL FULLER*** (READ)

13         **MR. NÚÑEZ-VIVAS:**  Page 16, line 19, no, line 22.

14    Page 16, line 22.

02:44  15         Question:  Okay.  I'm going to play for --

16         **THE COURT:**  Since you're reading, you're going to

17    be speaking more quickly.  Please crank it down about two

18    notches.

19         **MR. NÚÑEZ-VIVAS:**  Okay.

02:44  20         Question:  Okay.  I'm going to play for you an

21    audio recording that we received from Amazon.  I believe on

22    Friday.

23         Answer:  Okay.

24         Page 17.  Line 1:

02:44  25         Question:  In the Bates number is 159363.  For the

1    record, and we'll make that Exhibit Number 2, obviously, I

2    can't produce the MP3 file, but we have the Bates number to

3    refer to, and I'll play this entire recording.  It's about

4    eight or nine minutes, I think.

02:45  5             Answer:  Okay.  Exhibit 2 was marked for

6    identification.

7             Then it says:

8             By Mr. Foodman, question:  So bear with me I need

9    to you listen to it and then I'll ask you some questions.

02:45  10            Answer:  Okay.

11            I would like now to play the audio.

12            THE COURT:  So now we're done with the transcript?

13            MR. NÚÑEZ-VIVAS:  No.  Then I'll read more of the

14   transcript.

02:45  15            THE COURT:  I see.

16            PHONE:  Yes, I was wondering if you or someone else

17   there can help me.  I just have a few questions about Amazon

18   Fire.  I just saw the commercial on TV yesterday, and I did

19   pull up some information on my cell phone about Amazon Fire,

02:45  20   but I just wanted to get this straight.  Once I order Amazon

21   Fire, I think it's not even a box, right?

22            GIRL:  Correct.

23            PHONE:  Ok, once I order it and hook up it to my

24   TV, there's no monthly charge for that, right?

02:46  25            GIRL:  No.  There is not a monthly charge.  What it

1    is, is that if you wanted to, say, watch Hulu on it, then

2    there would be Hulu's monthly charge, like 7.99 or something.

3    Netflix, their monthly charge.

4         Or also if you had Amazon Prime, then that's a

02:46   5    yearly charge.  So it doesn't cost anything -- there's no

6    sort of subscription or anything specifically that comes with

7    the Fire, it's just the device.  So that $99 you're paying

8    for is the device.

9         **PHONE**:  Oh, now, I see.  I see now.  Because, with

02:46   10   Netflix, when I ordered Netflix, they said I needed a Roku.

11   With this, I just need this device and a remote, and then I

12   can contact, let's say Netflix --

13        **GIRL**:  Right.

14        **PHONE**:  -- and pay whatever the monthly fee is to

02:47   15   that, right?

16        **GIRL**:  Correct.  The Amazon Fire is comparable to

17   the Roku.  So Roku is just the device that would stream the

18   content through the internet to your TV.  The Fire is the

19   same thing.

02:47   20        It's the device that streams the content from

21   whichever provider you choose, whether it be Netflix or

22   Amazon or Hulu or any other streaming television provider.

23   So they have their monthly cost -- you know, like Netflix,

24   but it's just the device through which you stream that

02:47   25   content.

1      **PHONE**:  Okay.  All right.  Now, as far as adult

2  entertainment, I understood that if you were to install Fire

3  a different way in your search device and -- how I would do

4  that?  How would I obtain that?

02:47   5      **GIRL**:  Okay.  Hold on.  Since this is a new device,

6  I have to like pull up information on it because I don't know

7  it off the top of my ahead, so hold on a second.

8          (Pause.)

9          (Typing.)

02:48  10      **GIRL**:  Okay.  Let me just read through my stuff

11  here.  That's the content.  Sorry.  Like I said, this is a

12  brand-new item.

13      **PHONE**:  I understand.  Sure.

14      **GIRL**:  Stream live.  Okay.  I don't think there's a

02:50  15  specific way, as far as selling it.  I mean, you can

16  definitely get adult content through the providers.  I mean,

17  there's so many like SHOWTIME -- let's see.  What else do you

18  have here?

19      **PHONE**:  I saw it on TV, the ad for Amazon Fire, I

02:50  20  didn't -- I thought I understood and I heard that if you

21  spelled Fyre, somehow, with a Y --

22      **GIRL**:  Right.

23      **PHONE**:  -- that if you put in F-Y-R-E, I think,

24  that the adult --

02:50  25      **GIRL**:  Content comes up?

1          **PHONE**:  Yes.

2          **GIRL**:  Okay.  Hold on.  I haven't even seen the

3    commercial yet.  You know far more about it than I do.  Let

4    me search my information here.  I wonder if it would be under

02:51  5    the parental control portion.  Let me put you on hold for a

6    second, okay?

7          **PHONE**:  Okay.

8          (Pause.)

9          (Typing.)

02:53  10          **GIRL**:  Okay.  Thanks for holding.  So I was able to

11    confirm that we don't have anything like that.  You can

12    definitely access that sort of entertainment through a third

13    party, you know, like through a provider on the Fire, but

14    just like the provider would be Netflix.  There are specific

02:53  15    providers that you can stream over that device, but there

16    isn't a way to access it like that way, even with the

17    spelling difference.

18          **PHONE**:  Is there a different between the Amazon

19    Fire and the Roku using it for a selection of various

02:54  20    channels that you can subscribe to or is it basically the

21    same?  It's just that with the Amazon Fire, are you going

22    get -- well, I don't know I guess it's just -- it just seems

23    to be so compartmentalized.  You know you get the remote

24    and -- and I don't know if you get a remote with the Roku or

02:54  25    not, but I was wondering if -- I can look up on it to find

1    out.

2             **GIRL**:  Well, I can give you that information.  I

3    can definitely compare for you.  It is superior to the Roku

4    in lots of ways.  The Amazon Fire has a voice search where

02:54   5    you speak into the remote instead of having to like type

6    everything out, which the remote with the Roku if you wanted

7    to search with the remote you would have to hit every letter.

8             It does have 1080P high definition, which the Roku

9    does, but it also comes with certified Dolby Digital plus

02:55   10   surround sound, which the Roku does not.  It also has an

11   optical audio-out source, which the Roku does not.  It has a

12   quad-core processor, as opposed to the Roku dual-core, which

13   makes it twice as fast at streaming.

14            It also has two gigabytes memory, which is way more

02:55   15   than the Roku's 512 millibytes.  It has a dual-band dual

16   antenna, which is the same as the Roku.  It has the remote.

17   It has many more popular services, like on the Amazon Fire

18   you can get HBO, you can get SHOWTIME, you can get ESPN, you

19   can get way more providers than you can through the Roku.

02:56   20            It has games, a hundred, plus thousands more

21   coming.  You can play games on it.  You can also get a game

22   controller sold separately with it, if you were to use it for

23   gaming.

24            **PHONE**:  How much -- how much is the game

02:56   25   controller?

1      **GIRL:**  Let's see if I can find that out.

2      **PHONE:**  I can look that up.  That's okay.  You've

3  given me enough information.  I appreciate it so much.  Thank

4  you very much.

02:56   5      **GIRL:**  You're welcome.  You have a great day.

6      **PHONE:**  Okay.  You too.

7      **GIRL:**  Alright, thanks.  Thank you for calling.

8      **THE COURT:**  So I need ask you a few questions about

9  what we just listened to before you start reading from the

02:56  10  transcript again.  First of all, who are these people?  I

11  heard two voices, a man and a woman.  Who are they?

12      **MR. NÚÑEZ-VIVAS:**  One is -- the woman is the

13  accountant -- the representative -- customer representative

14  of the Amazon.

02:57  15      **THE COURT:**  Their 30(b)(6) witness?

16      **MR. NÚÑEZ-VIVAS:**  Not the woman.  Not the woman.

17  But whatever she says, she's an employee of Amazon.

18      **THE COURT:**  Hang on just a minute.  So this person

19  on the phone is simply an Amazon customer service support

02:57  20  person?

21      **MR. NÚÑEZ-VIVAS:**  Yes.

22      **THE COURT:**  Somebody who works presumably in a call

23  center?

24      **MR. NÚÑEZ-VIVAS:**  Yes.

02:57  25      **THE COURT:**  And who is the man?

1        **MR. NÚÑEZ-VIVAS:**  The man is a consumer calling to

2   make an inquiry about --

3        **THE COURT:**  Who?  What's the person's name?

4        **MR. NÚÑEZ-VIVAS:**  That's what we omitted, Your

02:57   5   Honor, because --

6        **THE COURT:**  Oh, I see.  That's the part that's

7   confidential.  Alright.  Now is this a deposition or is this

8   simply somebody, this man, whose name has not yet been

9   disclosed, calling up and having a conversation as a

02:57   10   prospective customer of Amazon Fire TV and getting answers

11   from some anonymous Amazon customer service representative?

12        **MR. NÚÑEZ-VIVAS:**  Yes.  He's asking about adult

13   content.  He's asking about how to access the adult content

14   on the Amazon Fire TV.  He's asking whether he understood

02:58   15   that he spelled Fire with a Y that he could access adult

16   content.

17        **THE COURT:**  Now this particular audio, was it

18   recorded by and as Amazon as part of its normal business

19   operations or was it recorded by this person who called up.

02:58   20        **MR. NÚÑEZ-VIVAS:**  Amazon.

21        **THE COURT:**  Amazon recorded it and so I'm guessing

22   now that Amazon produced it to you in discovery.

23        **MR. NÚÑEZ-VIVAS:**  Correct.

24        **THE COURT:**  All right.  So you don't know the name

02:58   25   of -- well let me ask you.  Do you know the name of the

1    Amazon customer service person, the woman who was speaking?

2    I'm not asking for the name right now.  But do you know who

3    the person is?  If not --

4         **MR. NÚÑEZ-VIVAS:**  If you give me a minute because I

02:59   5    think there was something disclosed by Amazon, a transcript

6    of a the phone call and I believe that she may be identified

7    in that transcript.

8         **THE COURT:**  So my next comment is going to be, do

9    you have a transcript of the portion of this recorded

02:59  10    telephone call that you just played?

11        **MR. NÚÑEZ-VIVAS:**  Yes.

12        **THE COURT:**  What I'd like you to do is at the end

13   of the hearing, I want to coordinate with Gigi and give her a

14   copy of that transcript because in my natural affinity for

02:59  15   court reporters everywhere, I was commenting to myself, gosh,

16   this is going it to be very difficult for the court reporter

17   to take down.

18        I feel badly that she has to do this.  So we're

19   going to try to make her job easier by giving her the

02:59  20   transcript.

21        **MR. NÚÑEZ-VIVAS:**  Absolutely.

22        **THE COURT:**  All right.  And I take it that this

23   phone call, which was recorded by Amazon, was done with the

24   consent of the person who called.  Is that right, Mr. Nelson?

03:00  25        **MR. NELSON:**  Yes, I assume it's --

|   |   |
|---|---|
|   | 1 |

       1         **THE COURT:**  In other words, one of these things

       2   where the person calls up and the call service center says

       3   this call is protected for your convenience, or something

       4   like that.

03:00     5         **MR. NELSON:**  Or this call may be monitored.

       6         **THE COURT:**  Right.  The old monitored.

       7         **MR. NELSON:**  So I assume that, although I have not

       8   personally listened to the introductory part of it that

       9   Amazon complied with all applicable regulations before

03:00   10   recording this.

     11         **THE COURT:**  I understand.  So now I know what the

     12   heck this call is all about and now you want to read to me

     13   some portion of the deposition of Mr. Fuller after he

     14   listened to exactly what we listened to here in court.

03:00   15         **MR. NÚÑEZ-VIVAS:**  Correct.

     16         **THE COURT:**  All right.  And remember since you're

     17   reading, slowly please.

     18         **MR. NÚÑEZ-VIVAS:**  Absolutely.

     19         Is it starts on page 17, line 14.

03:01   20         Let me know, Mr. Fuller, if you can't hear this,

     21   and I'll be happy to play it off of my phone.  I think the

     22   speaker is a little louder than the computer.  I apologize.

     23         Answer.  Okay.

     24         And then on page 17 line 21:

03:01   25         Back on the record.

1          Mr. Fuller, you just listened to Exhibit Number 2,

2  which is Bates number 159363.  Have you heard that recording

3  before?

4          Answer:  Yes.

03:01   5          Question:  And you would agree that my client Wreal

6  FyreTV is spelled F-Y-R-E, right?

7          Answer:  Yes.

8          Question:  You would also agree that the customer

9  is calling with a question about playing adult content on

03:01  10  Amazon's Fire TV?

11          Answer:  Yes.

12          Question:  And he wanted to know whether he could

13  somehow type in F-Y-R-E into your set-top box to access

14  content, correct?

03:01  15          Mr. Bageant:  Objection to form.

16          The witness:  Correct.

17          By Mr. Foodman, question:  How do you take the

18  position then that you have not found any confusion between

19  the two products based on listening to the audio recording?

03:02  20          Mr. Bageant:  Object to the form.

21          The witness:  There is no indication that it was

22  confused between the two products.  He was just asking how to

23  search the content based on a commercial or something he had

24  seen.  So he didn't necessarily that saying FyreTV with a Y

03:02  25  that he was confused about.

1           Mr. Foodman:  Do you understand that Wreal's FyreTV

2    is a search screening service?

3           Answer:  Yes.

4           Question:  And Amazon's Fire TV is a streaming

03:02    5    service, correct?

6           Correct.

7           Question:  So you don't agree if he, when he asked

8    if he could type in F-Y-R-E into your set-top box to access

9    adult content, that he wasn't confused about the streaming

03:02   10    service?

11           Mr. Bageant:  Object to form, argumentative.

12           The witness:  I can't say whether he was confused

13    or not.  He didn't state in the call he was confused about

14    it.

03:03   15           Mr. Foodman:  What would you define if someone was

16    confused?

17           Mr. Bageant:  Object to the form.

18           The witness:  You know, if he came out and said

19    I -- you know, I want to access adult content and I have seen

03:03   20    this streaming service before, how do I access the streaming

21    service Fyre, with a Y, streaming service.

22           That's it, Your Honor.

23           **THE COURT:**  One or two more questions about this

24    phone call.  Question 1:  When it was the phone call made?

03:03   25           **MR. NÚÑEZ-VIVAS:**  That's a good question.  I do not

1    know the answer to that.

2         THE COURT:  Anybody from Amazon know when that

3    phone call was made?

4         MR. FOODMAN:  We can get it for you, Your Honor.

03:03    5         THE COURT:  And the person who called up, I don't

6    want to know his or her name.  I guess his name.  I don't

7    want to know his name.  But is that person completely

8    unconnected to Wreal TV, in other words, it's not an agent of

9    Wreal or somebody who works for you or a buddy or someone who

03:04   10    was asked to make a call, this was simply some person who

11    phoned up and then Amazon happened to turn it over in

12    discovery?

13         MR. NÚÑEZ-VIVAS:  Your Honor, absolutely no doubt.

14    But just to add to that, I believe in the beginning, if I

03:04   15    recall correctly, because I didn't hear it this time Amazon

16    actually I think identified the person doesn't it?  Doesn't

17    it ask -- I think it asks him his account.  So I think that

18    person actually said an Amazon customer.

19         MR. FOODMAN:  Your Honor, the date was April 4th as

03:04   20    you asked.  2014, Your Honor.

21         THE COURT:  Thank you very much.  April 4th, 2014.

22    When did Amazon announce launch of its Fire TV product?

23         MR. NÚÑEZ-VIVAS:  April 2nd.

24         THE COURT:  And so the paragraph, Mr. Nelson, that

03:05   25    you were concerned, under the rules of completeness, that

1   was, in fact, read?

2          MR. NELSON:  Yes, Your Honor.

3          THE COURT:  All right.  Great.  So anything further

4   from this witness, Mr. Fuller?

03:05  5          MR. NÚÑEZ-VIVAS:  No.

6          THE COURT:  All right.  And do you have any cross

7   of Mr. Fuller, so to speak?

8          MR. NELSON:  We're calling Mr. Fuller live.

9          THE COURT:  Right I understand.

03:05  10          MR. NELSON:  And so with respect to this --

11   actually, if I may, I'll just read 20 seconds into the

12   record, just a follow up question.

13          THE COURT:  All right.  So hang on just a minute.

14   2:43 to 3:04.  And now you're going to be on

03:05  15   cross-examination.  This will be 3:04, probably to 3:04.  Go

16   ahead.

17          MR. NELSON:  Question:  How is that not confusion?

18          Objection to form, argumentative.

19          The witness:  He may know about the different

03:05  20   services and wants to see if he can access it on that set-top

21   box as well.

22          THE COURT:  3:04.  All right.  Fair enough.  Call

23   your next witness, please.

24          MR. NÚÑEZ-VIVAS:  Yes, Your Honor.  I have a

03:06  25   question.  Did you count the minutes when we're exchanging?

1    Does that count?

2         THE COURT:  Did I count the minutes when we were

3    exchanging?

4         MR. NÚÑEZ-VIVAS:  When we were communicating to

03:06   5    each other?  I was just wondering --

6         THE COURT:  When who was communicating to each

7    other?

8         MR. NÚÑEZ-VIVAS:  You and I. When we were

9    communicating.

03:06   10        THE COURT:  No, I started counting once you

11   actually started playing the tape and reading the transcript,

12   not the earlier comments about the rule of completeness and

13   so forth.

14        MR. NÚÑEZ-VIVAS:  Got it.  Thank you.

03:07   15        (Thereupon, there was a brief pause.)

16        MR. NÚÑEZ-VIVAS:  Your Honor, I want to read a

17   portion of the deposition of Anthony Martinelli.  There is an

18   issue there though.  In addition --

19        THE COURT:  Okay.  Well, let me go over it.  First

03:07   20   of all -- well, you know your case better than me, so you may

21   think offhand that I know who Anthony Martinelli is.  But

22   perhaps I did know and I've forgotten who is Mr. Anthony

23   Martinelli?

24        MR. NÚÑEZ-VIVAS:  He is one of the persons

03:07   25   designated by Amazon to answer certain questions.

1          THE COURT:  He's a 30(b)(6) Amazon witness.

2          MR. NÚÑEZ-VIVAS:  Yes.

3          THE COURT:  All right.  And have you let Mr. Nelson

4    or his team know what pages you intend to read?

03:07   5          MR. NÚÑEZ-VIVAS:  I will do that, but I just want

6    to point out one thing.  The portion that I do want to talk

7    about, the whole deposition has been designated confidential.

8    The only portion that I want to talk about is one where we

9    showed him certainly screenshots of Amazon, and he answered

03:08  10    certain questions about that.  We take the position that's

11    not confidential, but the other one is he relates to his

12    30(b)(6) capacity.  Amazon objected to providing him as a

13    30(b)(6) on certain categories that we did not -- we did not

14    agree with them that they could object as to those

03:08  15    categories.  So I'm trying to -- to make the argument, I need

16    to discuss what's in it, so if I can just have a minute with

17    Mr. Nelson --

18          THE COURT:  How many pages are you talking about

19    here?

03:08  20          MR. NÚÑEZ-VIVAS:  It's not much, Your Honor.

21    It's -- I just need to confer.

22          THE COURT:  Okay.  Take your time.  How many pages

23    are we talking about?

24          MR. NÚÑEZ-VIVAS:  Three.

03:11  25          (Thereupon, there was a brief pause.)

1        **MR. NELSON:**  May we confer with our client, Your

2   Honor?

3        **THE COURT:**  Sure.  Okay.

4        (Thereupon, there was a brief pause.)

03:11   5        **THE COURT:**  Mr. Núñez while Amazon is reviewing

6   your three pages, is there any reason you couldn't have told

7   them this before the hearing, so we could have avoided this

8   in court?  You couldn't say Amazon, we intend to introduce

9   pages X through Y, Mr. Martinelli's deposition, so they could

03:12   10  have reviewed it beforehand instead of taking up precious

11  court time.  Is there any reason why you couldn't have done

12  that?

13       **MR. NÚÑEZ-VIVAS:**  Your Honor, we actually did send

14  an e-mail out about a week ago asking them if they would have

03:12   15  an anyway objections to a list of categories of documents

16  that we wanted to introduce into evidence and to please

17  discuss it with us so that we can streamline the process.  We

18  only got an answer about a week later saying no.  You know, I

19  realize -- I agree with you.  It is better to do that.  I

03:12   20  understand that.  And I wish we would have done it.  And we

21  didn't and I apologize.

22       **THE COURT:**  It's one thing to say do you have any

23  position if we try to introduce these categories or subjects.

24  That's sort of vague and nebulous.  If you tell them, page 1,

03:12   25  line 5 through page 6, line 21, then they know exactly what

1   you're talking about and they can tell you, yes, we object

2   or, no, we don't or we object to this page and this line

3   instead of wasting this valuable time.

4        MR. NÚÑEZ-VIVAS:  I apologize.  I agree.  We'll do

03:13  5   that next time.

6        THE COURT:  At the next injunction hearing against

7   Amazon.com.  We'll make a mental note about that.  What's

8   Amazon's position about the three pages?

9        MR. BAGEANT:  Your Honor, our position -- we do

10  object to these --

11       THE COURT:  Microphone, please.

12       MR. BAGEANT:  We do object to these three pages,

13  Your Honor.  This is not 30(b)(6) testimony.  On the

14  substance of the testimony is not 30(b)(6) testimony so we

03:13  15  have an objection there.

16       THE COURT:  Hang on.  What do you mean it's not

17  30(b)(6) testimony?  I thought Mr. Martinelli was, in fact,

18  one of Amazon's 30(b)(6) designees.  Am I incorrect in that

19  assumption?

03:13  20       MR. BAGEANT:  That is correct, but he was not a

21  designee, Your Honor, on this subject area -- subject matter.

22  So, if I may --

23       THE COURT:  So were there separate depositions?  In

24  other words, first, Mr. Martinelli was deposed in his role as

03:14  25  a 30(b)(6) witness and then later you said he took a second

1    deposition as a fact witness?

2         **MR. BAGEANT:**  Close, Your Honor.  Here is what

3    happened.  He was designated as a corporate representative on

4    topics related to certain content on Amazon's site.  Among

03:14    5    the noticed topics by Wreal was sex toys and something they

6    called adult paraphernalia.

7         We objected on the grounds that we didn't think it

8    was relevant, that it would be unduly burden burdensome to

9    prepare a witness, and we didn't understand what adult

03:14   10   paraphernalia meant.  We had a long series of meet and

11   confers.

12        We weren't able to resolve the issue.  Wreal told

13   us it was considering filing a motion and took no further

14   action before this deposition.  During the deposition, we

03:14   15   made repeated scope objections to this testimony arguing it

16   was outside the scope.

17        That we didn't have a duty to prepare a witness on

18   this topic and that we weren't able to.  Under the case law,

19   under rule 30(b)(6), that means, I believe Your Honor, that

03:14   20   this testimony is in his individual capacity.

21        We have, in fact -- we made an objection, we stood

22   on our objection and because he's not properly noted and it's

23   not properly before the court reporter as a 30(b)(6)

24   deposition on this topic, he's an individual witness on the

03:15   25   topics of sex toys, which is the subject of this testimony

1   is.

2           THE COURT:  What is your view?

3           MR. NÚÑEZ-VIVAS:  Your Honor, I'm a little bit

4   taken aback by him saying that there was no obligation to

03:15  5   produce a 30(b)(6) witness on a topic that we designated.

6   Given Mr. Fuller -- I'm sorry, Mr. Martinelli was there to

7   talk about pornographic content on DVDs and stuff like that,

8   and we added -- well, I can't say it.

9           THE COURT:  Well, then don't say it yet.  But what

03:15  10  you're saying is, and I hear you, that whatever objection

11  Amazon had was insufficient and therefore you consider

12  Mr. Martinelli's testimony to be 30(b)(6) testimony, is that

13  your position?

14          MR. NÚÑEZ-VIVAS:  Yes.

03:16  15          THE COURT:  Interestingly enough.  I don't know how

16  this happened.  Perhaps, for two reasons.  During the break,

17  I was just reading an article on a case about 30(b)(6)

18  testimony, and it happened to be a situation where a party

19  objected to some of the topics on a 30(b)(6) notice, but they

03:16  20  didn't file a motion for protective order.  And they simply

21  said we object.

22          The party who noticed the 30(b)(6) deposition

23  showed up at the deposition and started to ask questions.

24  The questions that were lists as the 30(b)(6) topics, some of

03:16  25  those which were subject to an objection.

1       The party then gave the entity which designated the

2   30(b)(6) witness then objected to those questions and

3   instructed the witness to not answer the questions.

4       Ultimately, the Court determined that that was an

03:16   5   improper procedure and the proper procedure when you receive

6   a 30(b)(6) notice with topics that the receiving party, the

7   designating party, deems to be improper is, first, after a

8   good-faith effort to resolve it and confer that doesn't work

9   out, you file a motion for protective order.

03:17   10       Otherwise, the party noticing the deposition, the

11   30(b)(6) deposition, expects a designee or designees to be

12   appearing on all those topics.  So it sounds like you can do

13   that.

14           MR. BAGEANT:  Your Honor, may I be heard?

03:17   15           THE COURT:  Yes.

16           MR. BAGEANT:  I do think the situation is a little

17   bit different for a couple of reasons.  First, they did

18   notice the topic.  We did object to the topic in writing.  We

19   met and conferred about it.  Those meet and confers broke

03:17   20   down, so I agree that the next proper step would have been to

21   seek resolution from the court.  The upshot of those meet and

22   confers was that Wreal was considering filing a motion to

23   compel.

24           Now, I understand that another motion option is a

03:18   25   motion for protective order by us, but the result would have

1   been the same.  It would have been contested practice before

2   Your Honor about what the proper scope of the notice is.

3   That's the first observation I have.

4          The second observation is that, you know, my

03:18  5   understanding and my interpretation of the local rules and

6   some of the case law from here is that protective orders are

7   disfavored in this situation.  Now, I may be mistaken about

8   that, but if this is your ruling I would like an opportunity

9   to brief it.  Third point, Your Honor --

03:18  10         **THE COURT:**  So you want me to adjourn the hearing

11  on this particular issue, don't have the deposition testimony

12  read, give you an opportunity to submit a brief, a week from

13  now, and then if I rule against you, then have this three

14  pages read back into the record?  That's what you'd like?

03:18  15         **MR. BAGEANT:**  No, Your Honor, I would propose the

16  opposite if we prevail on the brief that the three pages be

17  struck from the record.

18         **THE COURT:**  So basically -- or what I hear you

19  saying is it would be sort of conditionally admitted with a

03:18  20  reservation that I'll give you the opportunity to brief it.

21  If I agree with you, that three pages or the reading of the

22  three pages will be stricken.  If I disagree with you, it

23  will remain.  But that only has to do with the procedural

24  issue of whether or not this deposition testimony is 30(b)(6)

03:19  25  and therefore it can bind the corporation.  We have the other

1    issue of is it subject to your confidentiality designation,

2    what are your thoughts on that?

3         **MR. BAGEANT:**  May I make one other brief point on

4    the protective order, Your Honor?

5         **THE COURT:**  Yes.

6         **MR. BAGEANT:**  We improvised and instructed the

7    witness not to answer, another important distinction to this

8    situation, Your Honor.  We did not unilaterally make the

9    protective order.

03:19   10         **THE COURT:**  All right.  So let me make sure I

11   understand you.  Wreal issues a 30(b)(6) notice with many

12   topics, some of which you object to.  You had many meet and

13   confers, maybe some things were worked out, but many things

14   were not.

03:19   15         Some of the issues which were not worked out are

16   the ones that Mr. Núñez mentioned to me the content of sex

17   toys and other topics.  You repeated your objection at the

18   deposition.  You never instructed Mr. Martinelli not to

19   answer the question.  But he did give answers.

03:20   20         **MR. BAGEANT:**  (Nodding affirmatively.)

21         **THE COURT:**  Correct, so far?

22         **MR. BAGEANT:**  Correct.

23         **THE COURT:**  But your view is he gave them as an

24   individual witness not as a 30(b)(6) designee?

03:20   25         **MR. BAGEANT:**  That was the objection we made at

1    that time, Your Honor.

2         **THE COURT:**  I understand.  So I'll give you the

3    opportunity, after this hearing, to submit a brief brief on

4    that issue.  And after the hearing is over, make a mental

03:20  5    note this is going to be one of the administrative matters

6    that we're going to be dealing with so that we can each give

7    you all a homework assignment, but now let's talks about just

8    the confidentiality issue.

9         The three pages that you have now been shown, is

03:20  10   there any objection to that or can we indeed designate it,

11   subject to the later ruling on whether there is 30(b)(6)?

12        **MR. BAGEANT:**  That's correct, Your Honor.  We're

13   okay with that.

14        **THE COURT:**  So since this is only tentatively being

03:21  15   admitted provisionally, subject to a later ruling of whether

16   Mr. Martinelli's answers here are 30(b)(6) witness answers as

17   opposed to on an individual employee.  What are the lines and

18   pages that you plan on reading?

19        **MR. NÚÑEZ-VIVAS:**  Just one minute, please.

03:21  20        **THE COURT:**  Sure.

21        **MR. NÚÑEZ-VIVAS:**  I'm just going to give you the

22   pages, that's it?

23        **THE COURT:**  Yes.

24        **MR. NÚÑEZ-VIVAS:**  It would be page 8, lines 10

03:22  25   through 17.

1          THE COURT:  Yes.

2          MR. NÚÑEZ-VIVAS:  I'm sorry.  16.

3          THE COURT:  Yes.

4          MR. NÚÑEZ-VIVAS:  And page 66, lines 18 through 25.

03:22   5   Page 67, lines 1 through 25.  And page 68, 1 through 10.

6          THE COURT:  All right.

7          MR. NELSON:  Your Honor, if I may?

8          THE COURT:  Yes.

9          MR. NELSON:  One of those was not what we conferred

03:22  10   about.  He just came over and said -- the addition is the

11   topic that they noticed.  If he wants to read it into the

12   record, that's fine.

13          We're not going to put in all the times that we

14   objected to that.  So I assume we are going to brief the

03:22  15   issue about whether that's proper.  Thank you, Your Honor.

16          MR. NÚÑEZ-VIVAS:  Your Honor, the reason I am

17   wanting to read the topic is for you to hear is.

18          THE COURT:  Please proceed.  Slowly.

19          MR. NÚÑEZ-VIVAS:  On page 8 starting on line 10,

03:22  20   these are the topics, Your Honor.

21          Number 7, the number of searches on a monthly basis

22   for adult videos, sex toys, paraphernalia, or accessories on

23   the Amazon.com web site.  Number 14, Amazon's policies

24   regarding the sale of adult videos and sex toys,

03:23  25   paraphernalia or accessories, including Amazon's

1    understanding of consumer awareness of those policies.

2           Then page 66, line 18:

3           By Mr. Foodman, question:  Showing you what's been

4    marked as Exhibit Number 13 under search, at the top of the

03:23   5    page what does it say.

6           Answer:  It says sex toys.

7           Question.  And to the left of that?

8           Anal sex toys.

9           Question:  And is that the category that you would

03:23   10   find it?

11          Mr. Sergeant:  Objection, scope, answer if you

12   know.

13          The witness:  To my personal knowledge those are --

14   that should indicate a category to the best of my knowledge,

03:24   15   yes.

16          By Mr. Foodman, question:  And at the very top, it

17   says, across the top, Amazon.com sex toys, anal sex toys, sex

18   toys, health and personal care.  Do you see that?

19          Answer:  I do.

03:24   20          Question:  Okay.

21          **THE COURT:**  I'm sorry.  Just a minute.  We started

22   this at 3:21.  Go ahead.

23          **MR. NÚÑEZ-VIVAS:**  Question:  Okay.  Do you know how

24   many adult toys Amazon currently has for sale?

03:24   25          Mr. Sergeant:  Objection, scope.

 1              The witness:  I do not.

 2              By Mr. Foodman:  Do you see on the left column is

 3      says those results for?

 4              Answer:  I do.

03:24    5              Question:  And then it says adult toys and games.

 6              Answer:  I do.

 7              Question:  How many dildoes does it indicate there?

 8              22,563.

 9              How many vibrators are indicated there?

03:24   10              91,212.

11              How many sex toys are listed there?

12              228,837.

13              Question:  How many masturbators and dolls?

14              15,172.

03:25   15              Question:  How many anal sex toys?

16              Answer:  35,119.

17              Question:  How many sex games?

18              664.

19              Question:  And how many penis rings?

03:25   20              Answer:  10,609.

21              Thank you, Your Honor.  That's it.

22              **THE COURT:**  This is in what period of time?

23              **MR. NÚÑEZ-VIVAS:**  November 10th, 2014.

24              **THE COURT:**  Well I'm not asking for the date of the

03:25   25      deposition.  But these tallies that you were talking about,

1     the number of products, was that for the week, or the month,

2     the year, the decade, what are we talking about?

3              MR. FOODMAN:  Available as of November.

4              THE COURT:  Just products that are simply available

03:25   5     on the Amazon web site on that particular day?

6              MR. NÚÑEZ-VIVAS:  Correct.

7              THE COURT:  Understood.  Thank you.  But those are

8     not the actual number of purchases, it's just the number of

9     products available.

03:26  10              MR. NÚÑEZ-VIVAS:  Yes.

11              THE COURT:  Understood.  All right.  So it is now

12     3:26, do you, Amazon, have any cross so to speak of

13     Mr. Martinelli?

14              MR. NELSON:  No, Your Honor, we'll save it for live

03:26  15     testimony.

16              THE COURT:  I'm sorry, you'll save it for what?

17              MR. NELSON:  His live testimony.

18              THE COURT:  Understood.  Next witness?

19              MR. NÚÑEZ-VIVAS:  We rest.

03:26  20              THE COURT:  All right.  So --

21              MR. NÚÑEZ-VIVAS:  Your Honor?  Sorry.  We're going

22     to have a rebuttal witness.  That's it.

23              THE COURT:  Let's go ahead and tally up the times,

24     so we know where you are.  Somebody have a calculator or a

03:26  25     phone I'll tell you where we are.  So we have here Plaintiff:

```
 1   One hour and six minutes.  I think that's in the Plaintiff's

 2   category.

 3        Then we have defense:  41 minutes.  And we have

 4   Plaintiff for 14 minutes, defense 21 minutes, Plaintiff 21

 5   minutes.  Defendants, 30 seconds.

 6        MR. NELSON:  Can we round down?

 7        THE COURT:  Five minutes for the Plaintiff.  All

 8   right.  That's where we are.  So you are resting for the time

 9   being.  So Amazon?

10        MR. NÚÑEZ-VIVAS:  Yes.  I'm sorry.

11        MR. HANSEN:  Thank you, Your Honor.  Drew Hansen

12   for the Defense.  Amazon calls its corporate representative,

13   Elizabeth Baicy.

14        Thereupon,

15                     ELIZABETH BAICY,

16   having been duly sworn by the Court, testified as follows:

17        THE WITNESS:  I do.

18        THE COURT DEPUTY:  Please have a seat, ma'am, and

19   state and spell your name for the record.

20        THE WITNESS:  My name is Elizabeth Baicy.  The last

21   name is spelled B-A-I-C-Y.

22        THE COURT:  3:27, sir.

23        MR. HANSEN:  Thank you, Your Honor.

24        THE COURT:  3:28, actually.

25        MR. HANSEN:  Thank you, Your Honor.
```

03:27 (line 5)
03:28 (line 10)
03:28 (line 20)

|   |   |
|---|---|
| 1 | *DIRECT EXAMINATION* |
| 2 | **BY MR. HANSEN:** |
| 3 | Q.  Good afternoon, Ms. Baicy. |
| 4 | A.  **Good afternoon.** |
| 03:29  5 | Q.  What do you do for a living, ma'am? |
| 6 | A.  **I'm the principal marketing manager at Amazon.com.** |
| 7 | Q.  Did you have any involvement with the branding of |
| 8 | Amazon's Fire TV? |
| 9 | A.  **Yes, I led that.** |
| 03:29  10 | Q.  We will get to that, but let's talk a little bit about |
| 11 | first about your background.  Where are you from originally? |
| 12 | A.  **Colorado.** |
| 13 | Q.  Where did you go to college? |
| 14 | A.  **University of Washington.** |
| 03:29  15 | Q.  What did you study? |
| 16 | A.  **Psychology and communication.** |
| 17 | Q.  Can you give us a brief outline of your work history |
| 18 | beginning when you graduated from college? |
| 19 | A.  **I started in the wireless industries, spent 13 years** |
| 03:29  20 | **there.  I started as an RF engineer and then --** |
| 21 | THE COURT REPORTER:  Could you slow down just a |
| 22 | little bit? |
| 23 | A.  **Sure.** |
| 24 | THE COURT REPORTER:  RF engineer and what? |
| 03:29  25 | A.  **Network engineer.  And then moved into product** |

|||
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:29 | 5 |

1  management.  Then moved into business strategy at Sprint

2  managing multiple brands and then most recently marketing at

3  Amazon.

4  BY MR. HANSEN:

03:29  5  Q.  So when did you start working at Amazon?

6  A.  Three years ago.

7  Q.  Give us a sense of what your role at Amazon has been if

8  you don't mind from three years ago when you started up to

9  today?

03:30  10  A.  Sure.  When I started, I was in charge of packaging,

11  branding, naming, how we represent in brick and mortar stores

12  for our Kindle product line.  Then I moved into managing

13  product marketing for our emerging products, which included

14  the Amazon Fire phone and the Amazon Echo.

03:30  15  Q.  Let's talk about some of those products.  Now, are you

16  familiar with the Amazon Kindle?

17  A.  Yes.

18  Q.  What is that?

19  A.  Kindle is an E-reader that we launched in 2007.

03:30  20  Q.  At some point did Amazon started using the Fire in

21  association with the Kindle?

22  A.  Yes.

23  Q.  Roughly, when did does that happen?

24  A.  That happened in 2011.

03:30  25  Q.  Why did Amazon decide to start using the Fire brand in

     1    association with the Kindle?

     2    A.  **So we launched the Fire brand with the first color**

     3    **E-reader slash tablet that we created in 2011, which was the**

     4    **Kindle Fire.  Essentially, the reason we created the Fire was**

03:31  5    **to show that there was an evolutionary step from Kindle into**

     6    **this new world of being the color E-reader slash tablet.**

     7    Q.  So did those Fire tablets back in 2011, did they have

     8    streaming video capability?

     9    A.  **Yes, they did.**

03:31 10    Q.  Were you in the courtroom for opening statements today,

    11    ma'am?

    12    A.  **Yes.**

    13    Q.  And you heard the Plaintiff's counsel say, On April 2,

    14    2014 and since then, Amazon launched its platforms to stream

03:31 15    video via the internet, you heard him say that, right?

    16    A.  **Yes.**

    17    Q.  I mean, is that right?

    18    A.  **No, that's not right.**

    19    Q.  So when did Amazon actually launch A platform streaming

03:31 20    video under the Fire name?

    21    A.  **That would be the Kindle Fire.**

    22    Q.  Back on what day?

    23    A.  **2011.**

    24    Q.  So between 2011 and 2014, how many generations of these

03:31 25    Fire tablets had Amazon released?

|   | 1 | A.  **Up until April 2013, three generations.** |

A.  **Up until April 2013, three generations.**

Q.  So let's talk about the Fire TV product, in particular,

all right?

A.  **Okay.**

03:32  Q.  When was the first time you were involved in discussions

about branding or naming the Amazon the product that became

the Amazon Fire TV?

A.  **That would be the late 2012 to early 2013.**

Q.  Were you thinking of branding for that one product or

03:32  were you thinking about a number of products?

A.  **We actually were thinking on a number of products.  At**

**that time 2013 to 2014, we were introducing a number of new**

**categories.  We also needed to define what Kindle meant**

**versus what Fire meant, and so we were looking at an entire**

03:32  **brand new architecture across multiple categories of some**

**things that became the phone, the Echo, and the Fire TV.**

Q.  So let's go back to the product categories.  So you just

said you were looking at a new phone possibility, is that

what you said?

03:32  A.  **Yes.**

Q.  And was there a new generation of tablets involved?

A.  **There was a new generation of tablets.**

Q.  And then third, this product that becomes the Fire TV, do

I have that right?

03:33  A.  **That's correct.**

         1    Q.   So what brand did Amazon decide to associate with this

         2    whole family of products?

         3    A.   **That would be the Fire.**

         4    Q.   And why did Amazon decide to do?

03:33    5    A.   **Essentially, we had already started building a brand.  We**

         6    **had a brand that we were leveraging called the Fire that**

         7    **meant multimedia.  And that had we had been developing for**

         8    **multiple years, so we wanted to leverage that brand as we**

         9    **went into new categories.**

03:33   10    Q.   Did you also use the Amazon name in association with this

        11    Fire TV product?

        12    A.   **Yes.**

        13    Q.   Why did you do that?

        14    A.   **Typically, as we launched new categories we would take**

03:33   15    **the housemark of Amazon and include it, so we did that with**

        16    **the Fire phone.  We did that with the Amazon Echo.  We also**

        17    **did that with the Amazon Fire TV.**

        18         THE COURT:  Ma'am, just if you could just bring it

        19    down maybe about 15 miles per hour.  That would be helpful.

03:34   20    A.   **Sorry.**

        21         THE COURT:  Listen, it's very tough being a

        22    witness.  You're in another city.  You're in a court room.

        23    There's court reporters are here, so people get a little

        24    nervous and people tend to talk quickly.

03:34   25    A.   **I talk quickly anyway.**

                    **THE COURT:**  So just try to make a mental note to

speak a little more slowly than usual.  So that will bring

you back down to normal.

A.  I'll try.

03:34    BY MR. HANSEN:

Q.  Perfect.  So at some point in the branding discussions

did you become aware of the Plaintiff's F-Y-R-E TV

pornographic web site?

A.  Yes.

03:34    Q.  How did you first become aware of the Plaintiff's

pornographic web site?

A.  As we were in a business discussions reviewing naming,

we -- somebody at the table had Googled Fire TV and came

across it and mentioned it in the meeting.

03:34    Q.  Was there any discussion at that meeting, and again

business, not about lawyers asking for legal advice, but the

F-Y-R-E TV pornographic web site?

A.  Yes.

Q.  Tell us a little bit about the nature of that discussion.

03:35    A.  We discussed what potential negative connotations it

could have if we were associated with something that was

pornographic since it was very far away from what we do

today.  So there was conversations on if that would be bad

press and would those potential implications would be.  As we

03:35    discussed those implications basically we allayed our fears

1    because we felt like Amazon was so far way away from being

2    anything related to porn and pornography that that would be

3    something that we didn't have to deal with.

4    Q.   Do you have a general understanding of what paid ads are?

03:35    5    A.   Yes.

6    Q.   Did Amazon invest in paid search ads -- internet search

7    ads, paid internet search ads in connection with the Fire TV

8    products?

9    A.   Yes.

03:35   10    Q.   With a did the company do?

11    A.   We do what we typically do on launches where we buy our

12    brands.  We also buy things that are similar to the product

13    we're launching.  So for instance streaming house of cards,

14    we would purchase so that customers could find us as they

03:36   15    were searching for, you know, those benefits.  We also buy

16    things such as competitors, so we would buy words as Roku and

17    comparisons just to be able to enter that.  Customers who are

18    looking for us could find us.

19    Q.   Did Amazon buy paid internet ads for key words around

03:36   20    FyreTV?

21    A.   No, we did not.

22    Q.   Did Amazon buy paid ads for its own Fire TV for keywords

23    around pornography?

24    A.   No.

03:36   25    Q.   Why not?

 1   A.   That's not something that we would do.

 2   Q.   Does Amazon market its Fire TV as a device for viewing

 3   pornography?

 4   A.   No.

03:36   5   Q.   As far as you are aware does Amazon market any of the

 6   Fire devices, I mean the tablets, the phone, as devices for

 7   viewing pornography?

 8   A.   No.

 9   Q.   Does -- in fact, does any of Amazon's marketing of the

03:36  10   Fire TV, specifically target families like parents of young

 11   kids?

 12   A.   Yes.  Actually, one of our primary's target segments is

 13   what we call tech-savvy families.  And one of the key

 14   features that we highlight, starting back with the tablets in

03:37  15   2012, was it a service called "free time" and that also ruled

 16   into the Fire TV product and this is essentially something

 17   that is age-curated content for kids, along with parental

 18   controls.

 19         MR. HANSEN:  Your Honor, I'm about to move into

03:37  20   highly confidential, attorneys' eyes only testimony for Ms.

 21   Baicy's examination and will need five to eight minutes, so I

 22   respectfully request -- I don't know what the Court's

 23   procedure is.  Do we close the courtroom or clear it or what.

 24   But this is the consolidate sections --

03:37  25         THE COURT:  So after you finish this, this is

1    pretty much the end of your direct examination of Ms. Baicy?

2         MR. HANSEN:  That's correct, Your Honor.

3         THE COURT:  And without disclosing any actual

4    confidential information, can you give me a general feel for

03:37    5    the nature of the testimony, for example, does it relate to

6    the costs of advertising, the cost of marketing, breaking it

7    down into various cub categories of marketing?

8         MR. HANSEN:  Yes, Your Honor, has precisely

9    anticipated the type of evidence we will be presenting.  It

03:38   10   relates to Amazon's specific expenditures on advertising and

11   marketing and specific costs it would incur if it had to

12   comply with an injunction, all of which is information that

13   is closely guarded within the company.

14        THE COURT:  I understand.  And Ms. Baicy's

03:38   15   deposition is already designated with some type of

16   confidentiality label, either confidential or attorneys' eyes

17   only?

18        MR. HANSEN:  That's correct.

19        THE COURT:  What is your view on the request to

03:38   20   temporarily exclude people from the courtroom?

21        MR. FOODMAN:  Your Honor, I spoke with Mr. Nelson

22   earlier in the day about my cross-examination of Amazon's

23   witnesses and indicated that there would be items that they

24   might deem as attorneys' eyes only or confidential and so I

03:38   25   had no objection for purposes of my cross-examination of

1    their witnesses to clear the courtroom.  So that would apply

2    as well to Ms. Baicy.

3           THE COURT:  And how about this particular request

4    now.  Any objection to that request?

03:39   5        MR. FOODMAN:  Given my request to do it for hers,

6    no, Your Honor.

7           THE COURT:  Just so we can know which folks out in

8    the courtroom to ask to be excused, obviously we don't need

9    to excuse Amazon's own counsel.  What about expert witnesses?

03:39  10        MR. HANSEN:  Your Honor, we have approved -- as

11   being able to see highly confidential, attorneys' eyes only,

12   on the protective order --

13          THE COURT:  Is there another expert witness in the

14   court as well?

03:39  15        MR. HANSEN:  On our side, we have Mr. Sarel and Mr.

16   Lehman.  We do not object to their presence in the courtroom.

17          THE COURT:  All right.  And what about the

18   Plaintiff, Plaintiff's COO?

19          MR. HANSEN:  Yes, we do object to any business

03:39  20   personnel of the Plaintiff, for that matter anyone else who

21   is in the courtroom who is not an attorney for exactly the

22   reason that this is highly confidential attorneys' eyes only.

23          THE COURT:  I understand.  So actually it may only

24   be one or two people who would need to be excluded.  So --

03:40  25        MR. HANSEN:  I suppose that's right.

1          **THE COURT:**  So if anyone in the courtroom is not an

2     employee of Amazon or an attorney for Amazon or an expert

3     witness for Amazon or an expert witness for Wreal who has

4     already signed the confidentiality designation, then I'm

03:40   5     going to ask you folks to temporarily leave the courtroom

6     until the direct examination is over and the

7     cross-examination is over.

8          And I'll make a mental note when the

9     cross-examination is done, we'll take a brief breather so you

03:40  10    can be called in, alright?  So the record will reflect that I

11    believe two people left the courtroom under that rule.

12         **MR. HANSEN:**  Thank you, Your Honor, and

13    mechanically after this is finished for the transcript we

14    would just respectfully request an opportunity to redact the

03:40  15    transcript in some way before it's filed, but we can do deal

16    with that afterwards according to your preference.

17    **BY MR. HANSEN:**

18    Q.   Thank you for your patience, Ms. Baicy.  Let's now talk

19    about the launch of the Fire TV in April 2014, all right?  In

03:41  20    fact, let's talk about all of 2014 because there's not -- is

21    there another Fire TV product called Fire TV stick?

22    A.   **Yes.**

23    Q.   Could you describe that product?

24    A.   **That is a mini version of our Fire TV that is focused on**

03:41  25    **just plugging into the TV itself.**

1  Q.  When did Amazon launch that product?

2  A.  **Sorry.  The date is escaping me, but I believe it was**

3  **October.**

4  Q.  Did Amazon spend money in advertising in connection with

03:41  5  both the Fire TV product and the Fire TV stick?

6  A.  **Yes.**

7  Q.  And do you have an exhibit that breaks down how that

8  money was spent?

9  A.  **I do.**

03:41  10       **MR. HANSEN:**  May I approach, Your Honor.

11       **THE COURT:**  You can.  By the way I just realized I

12  believe the COO or CEO or chairman of Amazon is a fellow

13  named Jeff Bezos, correct?

14       Jeff Bezos went to the same high school as I did,

03:42  15  Palmetto High School here in Miami, many years after I did,

16  but because of that, I afraid that I'm going to have to

17  disqualify myself.

18       **MR. HANSEN:**  We're done here.

19       (Laughter.)

03:42  20       **THE COURT:**  Take down on the record that I'm only

21  joking, a little mid-afternoon humor.  Please continue.

22       **MR. HANSEN:**  May I approach, Your Honor?

23       **THE COURT:**  You may.

24  BY MR. HANSEN:

03:42  25  Q.  So we are not going to see this yet.  I'm handing you

1    what's is marked as Baicy 1.  It is Exhibit A to the

2    declaration you submitted in this case.

3         For the record, the Bates number is AMZN 159366.

4    Do you have that, ma'am?

03:43  5    A.   **Yes.**

6    Q.   What is this document?

7         **MR. FOODMAN:**  Your Honor, may I interpose an

8    objection, please?  As to the best evidence, and I can

9    explain if you want an explanation.

03:43  10        **THE COURT:**  All right.

11        **MR. FOODMAN:**  Your Honor, as we mentioned in the

12   hearing, that we had a couple of weeks ago on the issue of

13   the bond, we argued that this was insufficient evidence for

14   the Court to determine the amount of the bond necessary in

03:43  15   this case and again this is the same document that was

16   introduced to the Court, at that time, without any supporting

17   information that we objected at that point.

18        And for the same reason we argue today it's still

19   not the best evidence to determine the financial information

03:43  20   they're trying to prove in court.

21        **THE COURT:**  I understand.  That objection is

22   overruled.  You have preserved your objection.  I understand

23   the nature of your objection.  But you haven't persuaded me.

24   You'll have plenty of leeway on cross-examination to probe

03:43  25   all of the specifics under lying this summary-type chart.

1        But for the present purposes, I'm going to overrule

2  that objection.  And I take it you're seeking -- this is

3  already filed under seal, but for purposes of this hearing

4  you're seeking to introduce it.

03:44  5        **MR. HANSEN:**  I would, Your Honor, move its

6  admission.

7        **MR. FOODMAN:**  Your Honor, and if I may lay one

8  other objection on the record, please?

9        **THE COURT:**  Yes.

03:44  10        **MR. FOODMAN:**  Which is we did not receive any of

11  the underlying documents in order to be able to cross-examine

12  the witness on any of the items on this document.  So how can

13  we have a summary when we don't have the underlying

14  documents, Your Honor?

03:44  15        **MR. HANSEN:**  May I respond, Your Honor?

16        **THE COURT:**  Yes.

17        **MR. HANSEN:**  Ms. Baicy was designated as a

18  corporate representative on the topic of the advertising

19  expenditures.  That was not a 30(b)(6) but a subpoena duces

03:44  20  tecum.  As far as I know there was no document request for

21  all of Amazon's advertising expenditures documents.  As the

22  Court knows we had discovery on an incredibly compressed

23  period in this case, in a matter of weeks.

24        And as a practical matter what we did, Ms. Baicy

03:44  25  prepared to testify for her deposition by compiling this

1    summary exhibit, which she then testified about.  She didn't

2    testify about the topic of which she testified at her

3    deposition and she's here again to testify about it at trial.

4         I think just given the nature of the expedited

03:45   5    discovery and the nature of the proceeding we're having here,

6    if we were to produce and call witnesses for all the

7    underlying documents that are possibly related to Amazon's

8    advertising expenditures, this would be a lengthy

9    proceedings.

03:45   10        We respectfully request --

11        **THE COURT:**  I think when it came up before at the

12    hearing concerning whether or not I should, at that time,

13    have set the bond amount.  I don't believe you were here, but

14    Mr. Nelson was here and I believe one of the comments was

03:45   15    made was listen we don't really need to produce thousands and

16    thousands of invoices and receipts to show the actual

17    expenses.  I think that was one of the points you made,

18    Mr. Nelson.  But concerning the actual exhibits from which

19    this summary was derived.  Did the Plaintiff make the

03:46   20    specific request for the backup documents for the advertising

21    and marketing costs.  You tell me no.  I'm not disbelieving

22    you, but let me hear what the Plaintiff said.  Did you make a

23    request for those documents?

24        **MR. FOODMAN:**  Your Honor, it's our position that

03:46   25    they have the obligation to provide the backup documents in

1    order to utilize the summary, Your Honor.  It's not our

2    obligation.  It's their obligation if they're going to use a

3    summary in court, to provide the backup documents.  We don't

4    have any of those documents, Your Honor.

03:46    5    THE COURT:  So when were we here last for that

6    hearing on the bond?  Was it two weeks ago?  Something like

7    that it?

8    MR. FOODMAN:  I believe it was the 17th, Your

9    Honor, approximately.

03:46   10    THE COURT:  So a little more than two weeks ago.

11    So at that time you were referencing this same chart.  So

12    since that time did you say to Amazon, listen, please get us

13    the backup documents?

14    MR. FOODMAN:  Your Honor, in speaking with

03:46   15    co-counsel, no.  We didn't specifically ask for it because it

16    is their obligation to produce it, number 1.  And number 2,

17    we did raise this very issue in that court hearing that we

18    had not received any of the underlying documents.  They were

19    put on notice even though it was their proactive obligation

03:47   20    to rely documents if they were going to use a summary in

21    court.

22    THE COURT:  I understand your objection for the

23    purposes for today.  I'm going to overrule the objection.

24    I'm going to allow the exhibit to be introduced for whatever

03:47   25    weight I decide to give it.  I may decide to give it very

1   little weight because we don't have the back up documents and

2   maybe you're unduly handcuffed, but for intents and purposes

3   it will be admitted over objection.

4          **MR. FOODMAN:**  Thank you, Your Honor.

03:47   5          **MR. HANSEN:**  Thank you, Your Honor.  Could you

6   please put up Exhibit A, which is now Baicy 1?

7          (Thereupon, the aforementioned exhibit was

8   introduced into evidence.)

9   **BY MR. HANSEN:**

03:48   10   Q.  Ms. Baicy what is this document?

11   A.  **This is a compilation of our past spend and projected**

12   **spend for 4Q that I compiled.**

13   Q.  What did you do to compile the figures on this document,

14   both the external ones and the internal?

03:48   15   A.  **So for the external costs, I met with the media team to**

16   **review their budget and their current spends and their plans.**

17   **I also, for internal, reviewed what the current production**

18   **costs were as well as did a sanity check --**

19          **THE COURT:**  What was the word?

20   A.  **Sanity.**

21          **THE COURT:**  All right.  Sanity.  Sanity check?

22   **BY MR. HANSEN:**

23   Q.  Ms. Baicy what, if anything, did Amazon accomplish?  I'm

24   sorry what's the total amount of spending that's reflected on

03:48   25   your Exhibit A?

1           **THE COURT:**  Meaning past spending or projected?

2           **MR. HANSEN:**  Let me ask the witness.

3    **BY MR. HANSEN:**

4    Q.  Ms. Baicy what is the -- in terms of time period what

03:49  5    does this document reflect?

6    A.  **So if you look at what we call the Fire TV launch or**

7    **what's listed here as** REDACTED **(ph.), that is what had**

8    **occurred in the past.  The 4Q media is what is occurring now.**

9    Q.  So ballpark if you take all 2014 spending by Amazon on

03:49  10   the Fire products, for advertising how much is it

11   approximately?

12   A.  REDACTED

13   Q.  What did Amazon get from this REDACTED investment?

14   A.  **We spent** REDACTED **to get brand awareness.**

03:49  15   Q.  Let's say Amazon had to rename the product, okay?  Call

16   the Amazon hurricane TV or something else, would Amazon still

17   be getting the same benefit as it gets now from this REDACTED

18   REDACTED investment?

19   A.  **No.**

03:49  20   Q.  Why not?

21   A.  **A majority of what we do for advertising is to build**

22   **brand awareness, and that's how we measure is the emotional**

23   **connection as well as brand recall, and so it's brand**

24   **awareness that we're building.**

03:50  25   Q.  Now did Amazon advertise particular features of the

 1    product in its advertising, like voice search?

 2    A.  **Yes.**

 3    Q.  So I mean, how come Amazon doesn't still get the benefits

 4    of that features-based advertising, just it's a new name.

03:50  5    Why isn't that spend getting you just as much bang for the

 6    buck as it did under the old name?

 7    A.  **Because when you do advertising you only have a few**

 8    **seconds to grab attention, so you need to focus on building**

 9    **the brand and building that emotional connection.  If we get**

03:50 10    **the feature communicate inside there, that's great.  But it's**

11    **not actually how it works.  Typically, customers don't assume**

12    **a feature and then go back to a house brand and it's just**

13    **asking too much for advertising to do.**

14    Q.  So let's say Amazon were ordered to stop using the Fire

03:50 15    brand in connection with the Fire TV, and had to start using

16    a new name for those products.  Would Amazon incur costs in

17    association with that process?

18    A.  **Yes.**

19    Q.  Do you have a slide about those costs?

03:50 20    A.  **I do.**

21         **MR. HANSEN:**  And this is for demonstrative

22    purposes, Your Honor, and I'll lay the foundation as I go

23    through with her, if that that's acceptable with the Court?

24         **THE COURT:**  Yes.

03:51 25         **MR. HANSEN:**  Thank you Mr. Bowels.  Ms. Baicy,

1    let's start with the first line, cost of relaunching products

2    under a new brand, at least REDACTED

3          MR. FOODMAN:  Your Honor, I have an objection and I

4    know that.

03:51   5          THE COURT:  Counsel can I make a suggestion?

6    Instead of saying you have an objection.  Just say objection.

7    And then tell me what it is.  You couldn't need to introduce

8    it.

9          MR. FOODMAN:  Your Honor, this is not in evidence.

03:51  10          THE COURT:  I know, he said it was for

11   demonstrative purposes.

12          MR. FOODMAN:  I don't think it should be up there

13   then, Your Honor.  That's my objection.  Without any

14   underlying documents, Your Honor.

03:51  15          THE COURT:  Overruled.  Please continue.  And you

16   may go into that in cross-examination.  And if you want them

17   to put that chart back up on the screen, so you can question

18   the witness about it, I'll make them do that.

19   BY MR. HANSEN:

03:51  20   Q.  Ms. Baicy, if there's no court order in this case, will

21   Amazon spend some amount of money promoting the Fire TV brand

22   with the Fire TV products in 2015?

23   A.  **Yes.**

24   Q.  How much, ballpark, will Amazon spend on Fire TV

03:52  25   advertising in 2015?

1    A.   **Our current rough estimate is** REDACTED

2    Q.   So if Amazon were ordered to stop use Fire TV as the name

3    and rebrand with a new name, would Amazon have to spend any

4    new money, over and above what it's spending anyways, over

03:52    5    and above that REDACTED

6    A.   **Yes.**

7    Q.   How much approximate, ballpark, do you think Amazon would

8    have to spend in this hypothetical rebranding and renaming

9    process?

03:52   10    A.   **Right now, the best estimate is at least the** REDACTED

11    Q.   And I mean, based on what?

12    A.   **Essentially, we have -- that would be a huge hurdle for**

13    **us to overcome.  So we have to spend** REDACTED **in building**

14    **a brand that we currently have today.  If we were to go into**

03:52   15    **having to relaunch we would not only relaunch with the same**

16    **product we wouldn't have a new product to be a new hook,**

17    **which would be very difficult for us to have reviewers go**

18    **back and review the device et cetera.**

19    **We would have to create a new brand.  So in this**

03:53   20    **instance, we've spent** REDACTED **in 2014 with the current**

21    **brand that we had spent** REDACTED **dollars in**

22    **multiple years with the Fire brand so we were able to**

23    **leverage that and spent** REDACTED **from this year.**

24    **If we were to build a new brand, we would have to**

03:53   25    **spend even more to create the brand, since we don't have is a**

1    **brand that we would leverage, as well as we would have to**

2    **create the association of customers who had the Fire TV brand**

3    **into the new brand and make sure that there was no customer**

4    **confusion.**

03:53  5    Q.  So the total amount Amazon would expect to spend on this

6    whole hypothetical rebranding process is that REDACTED plus

7    the REDACTED that it's already spending that would all go

8    into that pot, or is that what you are saying?  Or are you

9    saying something else?

03:53  10   A.  **Yes, that's correct.**

11   Q.  So with this rebranding and relaunching would that be

12   harder, easier, or about the same?

13   A.  **It would be much harder.**

14          MR. FOODMAN:  Objection, speculation.

03:53  15          THE COURT:  Overruled.

16   **BY MR. HANSEN:**

17   Q.  So next line is packaging, about REDACTED do you see

18   that, ma'am?

19   A.  **Yes.**

03:54  20   Q.  What's that represent?

21   A.  **So that represents, basically, the inventory that we have**

22   **currently in brick and mortar stores.  The inventory that we**

23   **have in the fulfillment centers and the inventory that's**

24   **currently coming off the factory line.  We would need to**

03:54  25   **replace -- we would have to take        REDACTED        worth of**

```
 1   that inventory, tear it apart, put it back together, and

 2   repackage it for customers.

 3   Q.  So --

 4        MR. HANSEN:  May I approach, Your Honor?

 5        THE COURT:  Yes.

 6   BY MR. HANSEN:

 7   Q.  I'm going to hand you what we'll eventually mark as Baicy

 8   2.  It is an Amazon Fire TV in its box.  I'm sorry we don't

 9   have multiple ones.  Ms. Baicy, do you recognize that?

10   A.  Yes.

11   Q.  What is it, for the record, and will be marked as Baicy

12   2?

13   A.  It is our Amazon Fire TV packaging.

14        (Thereupon, the aforementioned exhibit was

15   introduced into evidence.)

16        MR. HANSEN:  Move for its admission.

17        THE COURT:  Any objections?

18        MR. FOODMAN:  No, Your Honor.

19        THE COURT:  Without objection, Baicy 2 will be

20   admitted.

21        (Thereupon, the aforementioned exhibit was admitted

22   into evidence.)

23   BY MR. HANSEN:

24   Q.  Does that have the Fire TV brand anywhere on it?

25   A.  Yes, it has it here.
```

03:54  5
03:54  10
03:54  15
03:55  20
03:55  25

```
 1    Q.  You have to describe it for the record?

 2    A.  Oh, I'm sorry.  It has it on the front.  It has it on the

 3    sides, on the outside of the packaging.

 4    Q.  So if Amazon were ordered to discontinue use of the Fire

 5    TV name, couldn't it print out some stickers and pop it over

 6    that Fire TV with a new name on it?

 7    A.  No.

 8    Q.  Why, wouldn't you do that?

 9    A.  So there's multiple places inside and on the QSG, which

10    is inside this that also has the name, so we would have to

11    take it completely apart to replace it.

12    Q.  Why can't you sticker all of them, just put little

13    stickers over all of them?

14    A.  That's not something we would do.

15    Q.  Why do you say that?

16          THE COURT REPORTER:  Would you slow down just a

17    little bit?  You're kind of cutting each other --

18    A.  Sorry.

19          MR. HANSEN:  My fault.  My apologies.

20          THE COURT REPORTER:  Why can't you just put a

21    sticker over all of them?

22    A.  Because that is not something we would do.

23    BY MR. HANSEN:

24    Q.  Why is that?

25    A.  It's not the best customer experience.  We actually spend
```

03:55 (lines 5, 10, 25)

1     a lot of time building our packaging, laboring over all the

2     different pieces to ensure that the best customer experience

3     happens.

4            And so if we put this in a customer's hands, we

03:56   5     would want it to be the best representation of us.  We

6     wouldn't just sticker over it.

7     Q.   The next line is things for display for REDACTED, what is

8     that?

9     A.   That is material and labor cost to go to the Best Buys

03:56   10    and Staples of the world.  We have point-of-purchase

11    merchandising there that would need to be taken down and

12    replaced with a new brand.

13    Q.   And finally, the programming cost of REDACTED what is

14    that?

03:56   15    A.   So this was compiled by Sandy Gupta who looked at our two

16    different operating systems.  We have a number of man-hours

17    that it would take for us to recode the operating systems

18    with the new brand, as well as to test and re-release it.

19    Q.   So Amazon updates the Fire TV software already from time

03:56   20    to time with something called an over-the-air or OTA update;

21    is that right?

22    A.   Yes.

23    Q.   Is recoding the operating system to eliminate the Fire as

24    easy as an OTA update, harder, or about the same?

03:57   25    A.   It's harder.

1    Q.   Why is that?

2    A.   **Essentially, you would be touching multiple different**

3    **places in the operating system.  For an OTA, you take one**

4    **piece of functionality and you improve it, and we have a lot**

03:57   5    **of time to plan for it, and we have a lot of time to release**

6    **it.**

7              **For a very quick turnaround, for something that**

8    **touches multiple places of the operating system, it would**

9    **take a wholesale release of both operating systems.**

03:57   10   Q.   What is your best estimate then of the total cost to

11   Amazon of eliminating the use of the Fire names and the Fire

12   TV products?

13   A.   **So it's about**  REDACTED

14   Q.   Are there other costs Amazon would likely incur in that

03:57   15   process that aren't shown on this slide?

16   A.   **Absolutely.**

17   Q.   Give us some examples of what they may be?

18   A.   **There would be a ton of customer confusion of how to**

19   **translate the difference of Fire TV to a new name and the**

03:58   20   **support that they would receive for that new potential brand.**

21   **There's potential lost sales because of that confusion of**

22   **customers who heard somebody, who had a Fire TV that they**

23   **loved it, that they could no longer find it without**

24   **necessarily knowing that there is a new brand.  So there's a**

03:58   25   **number of different customer elements that can apply.**

1   Q.   So is your **REDACTED** estimate a conservative estimate

2   of this cost, a liberal estimate, somewhere in between?

3   Where is it?

4   A.   **I think it's very conservative.**

03:58   5   Q.   Thank you Ms. Baicy.

6          **THE COURT:**  So it is now 3:57, and we're going to

7   give Wreal the opportunity for cross-examination.  Give me a

8   minute to just write down the time here.  Bear with me.  So

9   that took 29 minutes.

03:58   10         So now, we have Wreal's cross-examination of

11   Ms. Baicy starting at 3:58.

12

13               *CROSS EXAMINATION*

14   BY MR. FOODMAN:

03:59   15   Q.   Good afternoon, Ms. Baicy.  Do you still have a first

16   exhibit which is has a cover page of Exhibit A, filed under

17   seal in front you?

18   A.   **I believe so.  This one, right?**

19   Q.   The name says launch in the top corner.

03:59   20   A.   **Yes.**

21   Q.   Going bullet point by bullet point, can you give me the

22   date that you reviewed and the title of every document that

23   you reviewed to come up with each number there?

24   A.   **I don't is know about the exact title of the document,**

03:59   25   **but I can give you the general document that I reviewed.**

```
 1   Q.  Please.

 2   A.  Sure.  The commercial production that is something that

 3   happened, pretty typical, the rough estimate here of REDACTED

 4        THE COURT:  Ms. Baicy, my standing reminder, In

 5   fact, if you would just, from time to time, just look at the

 6   back of the court reporter's head, and when you see smoke

 7   kind of coming out of her ears, just kind of slow down, okay?

 8        That's what happens when people read, they just

 9   crank it up to 50 miles per hour.

10   A.  Okay.  So the first line, TV commercial production, this

11   was the production of a number of spots which ended up

12   becoming the Gary Busey's spot with him sitting on the couch

13   as he watched the Fire TV.

14   BY MR. FOODMAN:

15   Q.  What is the title of the document that you looked at and

16   what document specifically did you look up to come up with

17   that number?

18   A.  So that wasn't a document.  That was an e-mail that I

19   reviewed with the TV and advertising team on what their total

20   cost from their agency was.  And it was a rough estimate of

21   REDACTED

22   Q.  So you didn't review any of the underlying documents to

23   come up with that REDACTED

24   A.  This is pretty typical in my past we have done multiple

25   TV productions and REDACTED is actually pretty typical for
```

making.

Q.  So is that a no, that you did not look at the documents?

A.  **There is no document.  We typically would could a do a**
**creative brief, which doesn't have any funds in it that would**
**go to an agency.  And we would work through typically through**
**e-mail with these agencies as costs were incurred to elect**
**what we had given them.**

Q.  Did you have an invoice?

A.  **We will have an invoice I'm sure.**

Q.  You don't have one now?

A.  **I don't have one in my possession.**

Q.  Did you look at one?

A.  **I did not.**

Q.  Go to the next bullet point, please.

A.  **So TV commercial media.  So this is the** REDACTED
**spent that we spend with our advertising agency for media**
**flighting.**

Q.  And what underlying documents did you look at to
determine the amount that you are going provide to the Court?

A.  **There were multiple.**

Q.  Tell me what they were, please.

A.  **So one of them is the projected advertising budget spent**
**for the year, which is called the** REDACTED **for 2014.**
**Then I looked at the actual comparison of spend that we had**
**spent based on the media flighting, which is the TV**

1   advertising spend invoice tracker, I'm not exactly sure of

2   that the name.

3   Q.   Is that a summary document or is there an underlying

4   document that you reviewed?

04:02   5   A.   **That is the document.**

6   Q.   Anything else?

7   A.   **For that second bullet?**

8   Q.   Yes.

9   A.   **No.**

04:02   10   Q.   So those two items gave you a total of   REDACTED

11   A.   **Correct.   So it's a tracker of all the invoices that we**

12   **paid to media, so it actually is how we track our media spend**

13   **against specific creative flighting.**

14   Q.   When did you look at those documents?

04:02   15   A.   **It was before the deposition so early November.**

16   Q.   Is that something that's readily available to be

17   produced?

18   A.   **I'm not sure what that means.**

19   Q.   Well, did you read it off of a printout or an e-mail or

04:03   20   did you actually go into an internal database?

21   A.   **I have it in an e-mail.**

22   Q.   Okay.   The next bullet point?

23   A.   **So print campaign production.   This is actually -- we do**

24   **this internally, so it's a combination of man-hours it takes**

04:03   25   **to create these print campaigns.**

1    Q.   Digital media,  REDACTED  how did you

2    come up with that number?

3    A.   **With he have a digital plan.  We did full episode player**

4    **kind of -- I'm sorry.  I skipped ahead.  The digital media I**

04:03   5    **don't recall specifically, but there was a strategy document.**

6    **I don't know the name of it.  That we reviewed that broke**

7    **down exactly how that spend was happening and exactly where**

8    **it went.**

9    Q.   Was that a summary document or was that including

04:04   10   underlying information?

11   A.   **It includes underlying information.**

12   Q.   And you reviewed that personally?

13   A.   **Yes.**

14   Q.   Is there advertising for Fire TV effective?

04:04   15   A.   **What's difficult about answering that is there's multiple**

16   **measures of effective, but the measures that we care about,**

17   **which is how we connect to customers and break through, yes,**

18   **it was.**

19   Q.   What was your unaided awareness of the approximately

04:04   20   September 2014?

21   A.   **As of September -- so we did two wave studies that kind**

22   **of bridges that gap and I don't remember if it was sent.  The**

23   **first one, unaided awareness, was  REDACTED   The second --**

24            THE COURT REPORTER:  Could you please slow down a

25   bit?

```
 1   A.  REDACTED  the second wave was  REDACTED

 2   BY MR. FOODMAN:

 3   Q.  And when did you come up with number of  REDACTED

 4   A.  That was in the most recent wave, which happened in late

 5   October I believe.

 6   Q.  Have you analyzed that since you've increased spending

 7   for the holidays?

 8   A.  No, we typically do that      REDACTED

 9   Q.  When will you have that information?

10   A.  We would typically have that    REDACTED

11   Q.  Do you expect that number to increase after spending REDACTED

12   REDACTED  in 2015?

13   A.  Yes.

14           (Thereupon, there was a brief pause.)

15           THE COURT:  Thank you for your patience.

16           MR. FOODMAN:  Sure.  May I continue?

17           THE COURT:  Yes.

18   BY MR. FOODMAN:

19   Q.  Do you remember giving a deposition on November 18th,

20   2014 in Seattle with me?

21   A.  Yes.

22   Q.  Do you remember testifying that one of Fire TV's biggest

23   challenges is unaided awareness currently in  REDACTED

24   A.  Yes.

25   Q.  Okay.  I believe you just testified it was  REDACTED
```

1    A.   I'm sorry, I heard you say aided awareness.   Unaided?

2    Q.   Unaided.   Unaided awareness.

3    A.   Our aided awareness was REDACTED   Our aided awareness

4    at that time was REDACTED

04:06  5    Q.   REDACTED   And that was after the second wave?

6    A.   No, that was the first wave.

7    Q.   Okay.   And after the second wave?

8    A.   I believe we came up to REDACTED

9    Q.   You do you expect that unaided awareness to increase in

04:07  10   2015 after spending REDACTED

11   A.   Yes, that's our hope.

12   Q.   Now, some of the advertising for Fire TV came right after

13   launch, correct?

14   A.   Correct.

04:07  15   Q.   And that included television ads, magazines ads, buying

16   sponsored links on Google, and bidding on search terms,

17   correct?

18   A.   Correct, yes.

19   Q.   As of November 18th, 2014, Amazon had sold just shy of

04:07  20   REDACTED units if, I recall correctly from your

21   deposition; is that correct?

22   A.   That's correct.

23   Q.   Do you know what your sales are as of the holiday season?

24   A.   Yes.

04:07  25   Q.   And what are they?

    1  A.   REDACTED

    2  Q.   So you only sold an additional approximately REDACTED

    3  units?

    4  A.   **It was a little over that.  About** REDACTED **, yes.**

04:07  5  Q.   And when you say that are you limiting that to the Amazon

    6  Fire TV and the Fire TV stick or just the Fire TV?

    7  A.   **Both.**

    8  Q.   So combined, between both units, there was an additional

    9  REDACTED units in sales?

04:07 10  A.   **Correct.**

   11  Q.   In terms of REDACTED units sold, is that about ■

   12     REDACTED   dollars of revenue generated?

   13  A.   **So what's difficult about that question is that it's not**

   14  **a complete translation into revenue.**

04:08 15  Q.   Well, do you sell the units?

   16  A.   **We sell the units, yes.**

   17  Q.   And they're sold for approximately $99?

   18  A.   **No.**

   19  Q.   The Fire TV?

04:08 20  A.   **Yeah the Fire TV is sold for $99.  The Fire TV stick is**

   21  **sold anywhere from $20 to $39.**

   22  Q.   So at the time that I asked you the question you had sold

   23  about REDACTED Fire TV boxes, correct?

   24  A.   **Correct.**

04:08 25  Q.   All right.  So then if my math is correct that's about a

1        REDACTED

2   A.  **Yes.  That is correct.  It's not necessarily all revenue,**

3   **but yes, we sold --**

4   Q.  What do you call sales?  You don't it's not viewed as

04:08   5   revenue in your company?

6   A.  **Yes.  That's --** REDACTED **of revenue.**

7   **That's fine.**

8   Q.  Well, it probably is more, correct?

9   A.  **It probably is more at this point yes.**

04:09   10   Q.  And so of that REDACTED you've spent, presumably some

11   of your revenue covers that, correct?

12   A.  **That's not necessarily correct.**

13   Q.  No?  Why not?

14   A.  **Because we typically sell at** REDACTED

04:09   15   REDACTED.

16   Q.  Do you believe that it's Wreal's problem that REDACTED

17        REDACTED when you talk about the harm to

18   Amazon?

19   A.  **I don't see how that a is a conclusion, I'm sorry.**

04:09   20   Q.  Well, you've told the Court that it's harm to Amazon that

21   it spent REDACTED in advertising, and it would be a harm

22   for Amazon if it were enjoined and wouldn't be able to sell

23   this product anymore, correct?

24   A.  **I say -- it's correct in the sense that it would take us**

04:09   25   **that amount of money, if not more, to rebrand a product.**

```
 1   Q.   Right.  And so Amazon took the decision though to REDACTED
 2        REDACTED  correct?
 3   A.   Correct.
 4   Q.   REDACTED
 5   A.   Correct.
 6            THE COURT:   I'm sorry what did you say REDACTED
 7   REDACTED
 8   A.   REDACTED
 9            THE COURT:   REDACTED   Thank you very
10   much.
11   BY MR. FOODMAN:
12   Q.   You said in your declaration that Amazon had changed the
13   name of the device, it would cost far more than the REDACTED
14   REDACTED Amazon spent on the Fire TV and the Fire TV stick; is
15   that correct?
16   A.   Yes.
17   Q.   And how many more devices do you anticipate selling after
18   spending another REDACTED in 2015?
19   A.   I'm not sure exactly what our total spend is for the
20   2015, but I believe it's at least   REDACTED   .
21   Q.   Right, but I said you were anticipating spending REDACTED
22   REDACTED ?
23   A.   You asked how many units.
24   Q.   Right.  So it's   REDACTED   ?
25   A.   Yes.
```

04:10 (line 5)
04:10 (line 10)
04:10 (line 15)
04:10 (line 20)
04:11 (line 25)

1    Q.   And how do you break that up between the box and the
2    stick?
3    A.   **I'm sorry, I don't have those numbers.**
4    Q.   Do those numbers exist?
04:11  5    A.   **They do exist.**
6    Q.   But you certainly expect significant revenue from that
7    REDACTED spent, correct?
8    A.   **Yes.**
9    Q.   And to revenue to exceed the REDACTED correct?
04:11  10   A.   **Not necessarily, but if we're gaining** REDACTED **then**
11   **yes.**
12   Q.   Did you say to                    REDACTED
13   REDACTED
14   A.   **Total.**
04:11  15   Q.   So you're expecting to sell between     REDACTED
16   REDACTED more units?
17   A.   **Correct.**
18   Q.   And you don't know the mix between --
19   A.   **I don't and I don't know the exact numbers.**
04:11  20   Q.   Now Fire TV does not appear anywhere on the device
21   itself, correct?
22   A.   **Not on the hardware.**
23   Q.   On the device?
24   A.   **Not on the hardware.**
04:11  25   Q.   And it doesn't appear on the stick as well, correct?

1   A.   **No.**

2   Q.   I think you said there was Fire TV inside the device?

3   A.   **Inside the packaging.**

4   Q.   But nowhere on the device itself not in the internal

04:12   5   portion of the mechanical portion of the device there's

6   nowhere where Fire TV is referenced, correct?

7   A.   **No.**

8   Q.   So when you say you can't put stickers, you're talking

9   about you can't put stickers anywhere on the packaging the

04:12   10   paper packaging, correct?

11   A.   **Correct.**

12   Q.   Now in paragraph 8 of your declaration, you say that

13   Amazon would have to continue to provide support and help

14   promote the old products and the new products under new

04:12   15   names?

16   A.   **Correct.**

17   Q.   Is --

18       **THE COURT:**  Sir you're reading.  You know what

19   happens?

04:12   20       **MR. FOODMAN:**  Too fast?  I apologize, Your Honor.

21   **BY MR. FOODMAN:**

22   Q.   But there wouldn't be two different products with two

23   different names would there?

24   A.   **There would still be products out there that people refer**

04:12   25   **to it as the Fire TV.**

1    Q.  Right, but the product would still remain the same?

2    A.  **Correct.**

3    Q.  I think you said earlier on in your testimony that you

4    did not think people associated with Amazon with hardcore

04:13    5    pornography because it was so far away from what the company

6    stands for in the experience customers have every day on our

7    site?

8    A.  **Yes.**

9    Q.  You're aware that your company does sell hardcore DVD

04:13    10    pornography DVDs?

11    A.  **I've been made aware of that through this process.**

12    Q.  You're aware that your company sells hardcore

13    pornographic books?

14         **MR. HANSEN:**  Objection.  I'm sorry.

04:13    15         **THE COURT:**  No.  What's the nature of the

16    objection?

17         **MR. HANSEN:**  I have a delayed objection to the last

18    answer to the extent it involves anything she has learned to

19    or from counsel or in preparation, I did not know what she

04:13    20    was going to say, so that is the basis of the objection.  And

21    same, if I may continue.

22         **THE COURT:**  Isn't this your 30(b)(6) witness?

23         **MR. HANSEN:**  It is, Your Honor.

24         **THE COURT:**  Well, she those get the information

04:14    25    from somewhere.

1          **MR. HANSEN:**  Your Honor, she was not the 30(b)(6)

2    on Amazon's content or DVDs or Amazon Instant Video.  That is

3    Mr. Tony Martinelli, who has been excluded from the

4    courtroom.  He will testify about that.

04:14   5          **THE COURT:**  Objection overruled.

6          **MR. HANSEN:**  Thank you, Your Honor.

7    BY MR. FOODMAN:

8    Q.  Are you aware that Amazon sells hardcore pornography

9    books?

04:14  10   A.  **I mean, no.  Not that I know of.**

11   Q.  Would it surprise you to know that they do?

12   A.  **Yeah.  It would.**

13   Q.  Would you like to see some of those books?

14   A.  **Not particularly.**

04:14  15   Q.  Are you aware that Amazon sells hardcore sex toys of

16   varying nature?

17   A.  **I saw what you presented today.**

18   Q.  How do you take the position then that Amazon is a

19   company that stands -- excuse me how would you take the

04:14  20   position that you don't think people would associate Amazon

21   with hardcore pornography when Amazon sells hardcore

22   pornography DVDs, hardcore books, and sex toys?

23   A.  **So I deal with customers a lot.  We work on Amazon**

24   **perception and what the perception of the brand is and in**

04:15  25   **many different focus groups, never once has pornography ever**

 1   come up in a free association with the brand.

 2           Typically, it is two-day shipping, it's Prime, it's

 3   Instant Video.  So from our perspective, customers do not

 4   associate us with pornography.

04:15  5   Q.  Did you before issuing that statement in your

 6   declaration, did you bother to determine whether Amazon sold

 7   any of the things that I just mentioned?

 8   A.  No.

 9   Q.  Didn't you think it would have been important to actually

04:15  10  determine whether your company sells hardcore pornography?

 11  A.  In the statement, I was referring to the conversation we

 12  had from a business perspective of naming the Fire TV.  And

 13  in that statement, I stated that we agreed that it was so far

 14  away from what we do as that business discussion for us to

04:16  15  continue moving forward with the Fire TV.

 16  Q.  And are you aware that, in a recent quarter, REDACTED

 17                          REDACTED

 18  A.  I'm not aware of that.

 19  Q.  Are you aware that            REDACTED

04:16  20  REDACTED   times on your web site?

 21  A.  I'm not aware of that, no.

 22  Q.  I have no other questions.

 23          THE COURT:  It is now 4:15.  So bear with me just a

 24  minute while I jot that down.  So you've used up a total of

04:16  25  17 additional minutes.

247 of 431

1          **MR. FOODMAN:**  Your Honor, can I ask one other

2     question?

3          **THE COURT:**  Yes.

4     **BY MR. FOODMAN:**

04:16   5     Q.  When did Amazon first introduce the public platform to

6     stream video content under the name Fire TV?

7     A.  **Under the name Fire TV?**

8     Q.  Yes?

9     A.  **April 2nd, 2014.**

04:16  10          **MR. FOODMAN:**  Thank you, Your Honor.

11          **THE COURT:**  Does Amazon have any redirect questions

12     for Ms. Baicy?

13          **MR. HANSEN:**  We do not, Your Honor.

14          **THE COURT:**  Thank you, ma'am.  You may step down.

04:17  15          **Call your next witness.**

16          **MR. HANSEN:**  Your Honor, I think one of our

17     witnesses that we are calling is excused.  Can you give us a

18     moment?

19          **THE COURT:**  So actually we should call back all

04:17  20     those other folks that are excused because we are now

21     reopening the courtroom to the public.

22          **MR. BAGEANT:**  Your Honor, our next witness will be

23     Mr. Tony Martinelli, and I'm going to start with the

24     confidential portion of his examination.  So it may be more

04:17  25     one more person today.

1          **THE COURT:**  So don't call these other folks back

2    yet.

3          (Thereupon, there was a brief pause.)

4          **THE COURT:**  There is a witness who is directly

04:18   5    under the clock.  Is that permissible?  That would be you,

6    ma'am, in the orange blouse.

7          **MS. SHAW:**  No.  I'm counsel for Amazon.

8          **THE COURT:**  Very well.  So I think everybody who is

9    here is entitled to be here.  Please swear in the witness.

04:18  10        Thereupon,

11                          **TONY MARTINELLI,**

12   having been duly sworn by the Clerk, testified as follows:

13        **THE WITNESS:**  I do.

14        **THE COURT DEPUTY:**  State your name for the record

04:18  15   and spell your name.

16        **THE WITNESS:**  Tony Martinelli, T-O-N-Y,

17   M-A-R-T-I-N-E-L-L-I.

18        **THE COURT:**  4:17, sir.

19        **MR. BAGEANT:**  Your Honor, I'd like to continued the

04:18  20   procedure with the binders.  May I approach?

21        **THE COURT:**  Yes.

22        **MR. BAGEANT:**  I would like to use the same

23   procedures with the binders.

24        **THE COURT:**  Had I known what was happening in this

04:19  25   hearing, I would have invested money in a loose leaf binder

1  manufacturing company.

2

3                    *DIRECT EXAMINATION*

4  BY MR. BAGEANT:

04:19  5  Q.   Who is your employer?

6  A.   **Amazon.com.**

7  Q.   How long have you worked for Amazon?

8  A.   **Approximately 15 years.**

9  Q.   What is your current position?

04:19  10  A.   **I manage program management for worldwide Amazon Instant**

11  **Video.**

12  Q.   Do you sometimes refer to Amazon Instant Video adds AIV?

13  A.   **Yes, sir I do.**

14  Q.   And does AIV include the video content that is available

04:19  15  on Amazon Fire TV?

16  A.   **Yes.**

17  Q.   Mr. Matter is pornography available on Amazon Fire TV?

18  A.   **No, we have a policy against selling pornography.**

19  Q.   Mr. Martinelli, could you turn to tab 1 in your binder,

04:20  20  please?

21  A.   **(Complies.)  Okay.**

22  Q.   Do you recognize the document that's at tab 1?

23  A.   **I do.**

24  Q.   What, is it?

04:20  25  A.   **This is the offensive content policy and process for**

1    Amazon Instant Video.

2           **MR. BAGEANT:**  Your Honor, we move admission of tab

3    1 of Mr. Martinelli's binder.

4           **THE COURT:**  Any objection?

04:20   5           **MR. FOODMAN:**  No, I don't have any objection, Your

6    Honor.

7           **THE COURT:**  All right.  Without objection, tab 1 to

8    the Martinelli binder is now admitted.

9           (Thereupon, the aforementioned exhibit was admitted

04:20   10   into evidence.)

11   **BY MR. BAGEANT:**

12   Q.   Mr. Martinelli, what did, if anything, did you have to do

13   with the composition of this document?

14   A.   **I helped author much of it.**

04:20   15   Q.   Approximately when did you begin the process of authoring

16   what became in document?

17   A.   **About five years ago when I worked with our**

18   **self-publishing team for our books.**

19   Q.   Have you been involved with this document ever since?

04:21   20   A.   **Yes, sir.**

21   Q.   The very first page of this document contains a series of

22   tenets, are you familiar with those?

23   A.   **I am.**

24   Q.   The first one reads -- tenet number 1 reads:   REDACTED

04:21   25                        REDACTED

```
 1              REDACTED

 2

 3                    Do you see those words?

 4    A.   I do.

04:21 5    Q.   What do they mean?

 6    A.           REDACTED

 7

 8

 9    Q.   When you say pornography, in specific terms, what kinds

04:21 10   of content are forbidden by this policy?

 11   A.            REDACTED

 12

 13   Q.   Any other specific examples that this policy would

 14   forbid?

04:21 15   A.         REDACTED

 16   Q.   Am I correct, this policy applies in the AIV store across

 17   the board?

 18   A.      REDACTED

 19

04:22 20   Q.   Does this policy apply to the content that would be

 21   available on Amazon Fire TV?

 22   A.   Yes, of course, it does.

 23   Q.   Does Amazon have a DVD store?

 24   A.   We also have a DVD store, that is correct.

04:22 25   Q.   What the DVD store?
```

1    A.   That is a store where customers can buy digital video

2    disks.  So those are physical disks that play movies.

3    Q.   Physical disks.  Can you stream a physical DVD disk to

4    your computer from Amazon.com?

04:22   5    A.   Of course not, it's a physical disk.

6    Q.   Can you play a DVD on your Amazon Fire TV?

7    A.   No, you definitely can't.  There is no DVD tray, so you

8    can't play a DVD on a streaming device.

9    Q.   Can you shop at the DVD store and access the material

04:22  10    from the DVD store your Amazon Fire TV?

11    A.   Not to my knowledge, no.

12    Q.   Is there a policy that governs the content of the DVD

13    store?

14    A.   There is a separate policy, correct.

04:22  15    Q.   Could you turn to tab 2 in your binder, please?

16    A.   (Complies.)

17    Q.   Do you recognize the document that's at tab 2?

18    A.   Yes, sir I do.

19    Q.   What, is it?

04:23  20    A.   This is the U.S. DVD content standards.

21    Q.   Is this the DVD policy we just discussed a moment ago?

22    A.   Yes, this is that policy.

23            MR. BAGEANT:  Your Honor, I would move to admission

24    of tab 2 of Mr. Martinelli's binder.

04:23  25            THE COURT:  Any objection?

1      **MR. FOODMAN:**  No, Your Honor.

2      **THE COURT:**  Without objection, tab 2 from the

3   Martinelli binder will be admitted.

4          (Thereupon, the aforementioned exhibit was admitted

5   into evidence.)

6      **MR. BAGEANT:**  Just for the record, this is the

7   Bates number AMZN 0001641.  Should have done that a moment

8   ago with tab 1 which bears the Bates AMZN 0001656.

9   **BY MR. BAGEANT:**

04:23  10   Q.  Mr. Martinelli, does this policy permit pornography in

11   the DVD store?

12   A.  **No, it does not.**

13   Q.  What types of content does this -- specific types of

14   content does this policy forbid?

04:24  15   A.                   REDACTED

16                   

17   Q.  How, if at all, does this content policy differ from the

18   Amazon Instant Video policy that is attached at Exhibit 1?

19   A.          REDACTED

04:24  20         

21   Q.  Why is that?

22   A.  **So you have to understand it's really a matter of**

23   **accessibility.  The Amazon Instant Video store is a FyreTV**

24   **BoXXX that's available in the customer's living room, and**

04:24  25   **anybody in the family, generally, would have free access to**

1    play videos from it.  The DVD store is very different.  You

2    have to go to the DVD store, buy a DVD, log into your

3    account, get it shipped to you, open it up, place it into the

4    DVD player.  There's a whole bunch of additional steps that

04:24    5    you have to go through.  It's very different process than the

6    accessibility is completely much more difficult.

7    Q.    REDACTED

8    

9    A.    Yeah, we are.  But in both cases, to be clear, we don't

04:25    10    sell pornography.

11    Q.    Thank you.  Could you please turn to tab 3 of excuse me

12    tab 3 of your binder, sir?  Is tab 3 is printout does it

13    appear to be a printout from Amazon.com's DVD store?

14    A.    Yes, it does.

04:25    15    Q.    This printout was actually used in your deposition wasn't

16    it Mr. Martinelli?

17    A.    I believe so, yes.

18    Q.    Do you have any reason to doubt that it's a printout from

19    Amazon.com?

04:25    20    A.    No, I do not.

21            MR. BAGEANT:  Your Honor, I'd like to moved

22    admission of tab 3, which is in Martinelli's binder.

23            THE COURT:  Any objection?

24            MR. FOODMAN:  No objection.

04:25    25            THE COURT:  Without objection, tab 3 to the

1   Martinelli binder will be admitted, and it looks like it was

2   used at Mr. Martinelli's November 17th, 2014, deposition from

3   the stamp in the lower right hand corner.

4            (Thereupon, the aforementioned exhibit was admitted

04:26   5   into evidence.)

6   **BY MR. BAGEANT:**

7   Q.  Mr. Martinelli, according to this exhibit, is this a DVD

8   for sale in the DVD store?

9   A.  **Yes, it has a buy new button on the top right.  It says**

04:26   10  **two left in stock.**

11  Q.  Based on the experience with the DVD store policy, does

12  this title violate the policy?

13  A.  **It's impossible to tell without viewing the movie, but**

14  **from the cover image itself,** REDACTED

04:26   15  **and what looks**

16  **like the lady who might be covering herself under her panties**

17  **or might be touching herself, it's unclear.**

18            REDACTED

19

04:26   20

21

22  Q.  Is Amazon the seller of this DVD?

23  A.  **No, we are not.  So this is sold by Italian Objects, it**

24  **says it on the top, right there.**

04:27   25  Q.  Mr. Martinelli, could you turn to tab -- hold on for a

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
|          | 1  | second.  I'm sorry.  Mr. Martinelli, does Amazon's content               |
|          | 2  | policy allow pornographic apps on Amazon Fire TV?                        |
|          | 3  | A.  **Not to my knowledge.**                                             |
|          | 4  | Q.  Have you ever seen a pornographic application on Amazon              |
| 04:27    | 5  | Fire TV?                                                                 |
|          | 6  | A.  **No, I have not.**                                                  |
|          | 7  | Q.  Does Amazon's anti-pornography policy apply across the               |
|          | 8  | board in the company?                                                    |
|          | 9  | A.  **Yes.  The no-pornography policy is very longstanding and**         |
| 04:27    | 10 | **has been in place for years.  And that applies to all of the**        |
|          | 11 | **stores and you can see from a couple of exhibits that we**             |
|          | 12 | **looked at, that there minor differences based on the store,**          |
|          | 13 | **but no pornography is a common theme across all of those.**            |
|          | 14 | Q.  Is it correct that much of the content of the DVD store              |
| 04:27    | 15 | is actually sold think by third parties and not Amazon?                  |
|          | 16 | A.  **That is true.**                                                    |
|          | 17 | Q.  Do you know how many submissions to the Amazon.com store             |
|          | 18 | from third parties Amazon gets related to DVDs in any time               |
|          | 19 | period?                                                                  |
| 04:27    | 20 | A.  **I don't know within any particular time period.  I do**            |
|          | 21 | **know we have about a million listings, so it's a very, very**          |
|          | 22 | **large number of listings.**                                           |
|          | 23 | Q.  How many videos in a day do you think you could find.               |
|          | 24 | A.  **I don't know the exact number,** REDACTED                          |
| 04:28    | 25 | **They come up and down.  People**                                       |

 1   will remove and add them over time.

 2   Q.  Is it possible for Amazon staff personnel to watch

 3   thousands of DVDs a day?

 4   A.  **No, we don't have the DVD, so we can't watch them, so**

04:28   5   **that's not possible and then the sheer volume make**

 6   **impractical.  We'll get thousands in a batch from an**

 7   **individual seller in many cases, so that's not something**

 8   **we're able to do.**

 9   Q.  What do you do as soon as you discovered that there's

04:28  10   pornography in the DVD store?

11   A.               REDACTED

12   Q.  Mr. Martinelli, do you have any knowledge of whether sex

13   toys are available on Amazon.com?

14   A.  **I do.**

04:28  15        THE COURT:  Excuse me for a minute.  You can tell

16   me at the beginning of his question questioning that all of

17   this was going to be highly confidential and therefore we had

18   to exclude some folks.  Are we still in the highly

19   confidential area?

04:29  20        MR. BAGEANT:  Thank you, Your Honor.  We're right

21   now moving out it of.  The confidential portion was the

22   application of the policy and specific titles.  So this is an

23   appropriate time to bring people back.

24        THE COURT:  So someone can go out and ask if

04:29  25   anybody who wants to come in they may.  Just --

1          MR. BAGEANT:  Subject to the rule to the

2     sequestration.

3          THE COURT:  Subject to the witness sequestration

4     rule.  That's correct.  Let's wait until folks who want to

04:29  5     come in enter the courtroom.

6     BY MR. BAGEANT:

7     Q.  Mr. Martinelli, I just asked if you had any knowledge of

8     Amazon.com has sex toys on its web site?

9     A.  **Yes, I do.**

04:29  10     Q.  What is the extent of your knowledge about that?

11     A.  **We do sell some sex toys, that is true.**

12     Q.  Mr. Martinelli, do you have knowledge about whether any

13     other web sites sell sex toys?

14     A.  **Yeah, I mean it's common.  I think many sites sell them.**

04:30  15     Q.  Can you turn to tab 5 in your binder, please?

16     A.  **Yes, sir.**

17     Q.  Do you recognize the document that is at tab 5?

18     A.  **Yeah, I took this screenshot yesterday.**

19     Q.  Where did you take this screenshot?  What is it a

04:30  20     screenshot of?

21     A.  **This is a screenshot of Walgreens.com, a drug store.  An**

22     **national drug store chain.  And you can see that they sell**

23     **numerous sex toys as well.**

24     Q.  You went to Walgreens.com and took the screenshots?

04:31  25     A.  **Yes, I did.**

1          **MR. BAGEANT:**  We would move for admission of tab 5

2     of the binder which is --

3          **MR. FOODMAN:**  No objection, Your Honor.

4          **THE COURT:**  Without objection, tab 5 to the

04:31  5     Martinelli finder is admitted.

6          (Thereupon, the aforementioned exhibit was admitted

7     into evidence.)

8     **BY MR. BAGEANT:**

9     Q.   Mr. Martinelli, you mentioned that this Walgreens exhibit

04:31  10    includes sex toys including -- tell me what sex toys it

11    contains.

12    A.   **So one second.  The screen just flashed.  You can see the**

13    **California Exotic Novelties Love Rider strapless strap-on.**

14    **The Joy Pure Wand --**

04:31  15         **THE COURT REPORTER:**  I'm sorry.  Wait just a

16    minute.  That's not --

17         **THE COURT:**  I'm guessing that many of these words

18    are not in the court reporter's prearranged dictionary.

19    A.   **Let me simplify --**

04:31  20         **THE COURT:**  Just read them off, but do it slowly,

21    as if you're writing on a clean slate.  Maybe these are new

22    terms for the court reporter's vocabulary, her computer

23    vocabulary.

24    A.   **Thank you.  So this is in a section entitled dildoes.**

04:32  25    **You can see the Doc Johnson Delight Jellie Purple, the Berman**

 1    **Center Intimate Basics Vesta Lavender dildo.**

 2    **BY MR. BAGEANT:**

 3    Q.   Mr. Martinelli, do you consider Walgreens.com to be an

 4    adult novelty shop?

04:32  5        **THE COURT:**  Excuse me.  He's in the middle of

 6    reading the products.  And you just decided to cut him off.

 7    Why don't you let him finish the answer?

 8        **MR. BAGEANT:**  I'm sorry.

 9        **THE COURT:**  Please read the last few products, sir.

04:32 10    A.   **The California Exotic Novelty's Love Rider, the strapless**

 11    **strap-on.  And lastly, the Njoy Pure Wand.**

 12    **BY MR. BAGEANT:**

 13    Q.   Mr. Martinelli, you saw these products at Walgreens.com?

 14    A.   **I did.**

04:32 15    Q.   Do you view Walgreens.com as an adult only novelty store?

 16    A.   **No, they sell many items.**

 17    Q.   Do you believe that Walgreens.com is an erotic boutique?

 18    A.   **No, I do not.**

 19    Q.   Do you believe that your customers at Amazon.com come

04:33 20    looking at Amazon.com for pornography?

 21    A.   **No, I do not.**

 22    Q.   Okay.

 23        **MR. BAGEANT:**  Thank you.

 24        **THE COURT:**  All right.  So now 4:32, so you have

04:33 25    used up, Amazon, 15 minutes there.  Now we have

| | |
|---|---|
| 1 | cross-examination by Wreal starting at 4:32. |
| 2 | |
| 3 | ***CROSS EXAMINATION*** |
| 4 | **BY MR. FOODMAN:** |
| 5 | Q.  Going to your testimony about Walgreens, is one of the |
| 6 | things that Walgreens sell or does streaming video over the |
| 7 | internet, like Amazon does? |
| 8 | A.  **Not to my knowledge, no.** |
| 9 | Q.  All right.  Does Walgreens sell pornography DVDs like |
| 10 | Amazon does? |
| 11 | A.  **Well, Amazon doesn't sell pornography DVDs.** |
| 12 | Q.  Really?  Okay. |
| 13 | **MR. FOODMAN:**  May I approach the witness, Your |
| 14 | Honor? |
| 15 | **THE COURT:**  Yes. |
| 16 | **BY MR. FOODMAN:** |
| 17 | Q.  Mr. Martinelli, I just handled you what I'm going to mark |
| 18 | for identification purposes -- I don't know what exhibit |
| 19 | number we're on. |
| 20 | **THE COURT:**  Well, we're really not on exhibit |
| 21 | numbers.  Normally, you have Exhibit 1, 2, 3.  Here we've got |
| 22 | all sorts of numbers and designations, and so you can -- |
| 23 | **MR. FOODMAN:**  11. |
| 24 | (Thereupon, the aforementioned exhibit was |
| 25 | introduced into evidence.) |

04:33 (line 5)
04:33 (line 10)
04:34 (line 15)
04:34 (line 20)

|      |    |                                                                          |
|------|----|--------------------------------------------------------------------------|
|      | 1  | BY MR. FOODMAN:                                                           |
|      | 2  | Q.  If you could take a look at the receipt that I placed on             |
|      | 3  | top of the item?                                                         |
|      | 4  | A.  **Yes, sir.**                                                        |
| 04:34 | 5 | Q.  What is written on that receipt?                                     |
|      | 6  | A.  **It says, Rocco's True Anal Story 17, Hard XXX DVD,**              |
|      | 7  | **Italian import, $20, Rocco Siffredi DVD -- should I continue?**       |
|      | 8  | Q.  Yeah, please.                                                        |
|      | 9  | A.  **P3-W194A32X000LNR44H, sold by Italian Objects.**                  |
| 04:35 | 10 | Q.  And what is the name of the company on the top of that              |
|      | 11 | label?                                                                   |
|      | 12 | A.  **Amazon.com.**                                                     |
|      | 13 | Q.  And can you open up the packaging?                                   |
|      | 14 | A.  **Yes, sir.  (Complies.)**                                          |
| 04:35 | 15 | Q.  Sorry, we just got that in the mail today.                          |
|      | 16 | A.  **Is this Amazon packaging?**                                       |
|      | 17 | Q.  I don't know.  It came from Amazon.  I have no idea.  It            |
|      | 18 | doesn't look like it's the frustrating free packaging from             |
|      | 19 | Amazon, but it came from Amazon.                                         |
| 04:36 | 20 | A.  **Okay.**                                                           |
|      | 21 | Q.  Is it -- can you actually access the DVD?                            |
|      | 22 | THE COURT:  Apparently wrapped in holiday paper.                        |
|      | 23 | BY MR. FOODMAN:                                                          |
|      | 24 | Q.  Do you have any reason to believe that that item was not            |
| 04:36 | 25 | shipped from Amazon, based on the receipt that you have in              |

1   front of you from Amazon?

2   A.  **Well, the packaging is not Amazon packaging, so I can say**

3   **this didn't ship from one of Amazon's fulfillment centers.**

4   Q.  Okay.

5   A.  **With great certainty.**

6   Q.  Was it sold by Amazon?

7   A.  **No, in fact, it says the seller was the -- it says sold**

8   **by Italian Objects.**

9   Q.  So it's your position that when that was purchased from

04:36  10   Amazon, it wasn't sold by Amazon?

11   A.  **This was sold by Italian Objects as stated on the**

12   **receipt.**

13   Q.  What is the title on the top of the receipt, it says

14   Amazon.com, doesn't it?

04:36  15   A.  **It says Amazon.com.**

16   Q.  So how do you take the position that it didn't come from

17   Amazon?

18   A.  **So this would have been an item listed for sale on our**

19   **web site by the seller, sold by Italian Objects.**

04:36  20   Q.  All right.  So someone could purchase that on the Amazon

21   web site?

22   A.  **It appears so, yes.**

23   Q.  And that violates your DVD policy, doesn't it?

24   A.  **This -- I haven't watched the movie, but this appears to**

04:37  25   **be something that would violate our policy, that's correct.**

```
     1   Q.  And that would be hardcore pornography, wouldn't it?

     2   A.  This appears to be hardcore pornography, yes.

     3   Q.  Okay.  Would you be surprised to find out there are many,

     4   many more videos on your web site in DVDs that are hardcore

04:37 5   pornography?

     6   A.  I would be surprised to find many, many more.  As our

     7   policy states,            REDACTED

     8

     9   Q.  You don't share your DVD or your internet video policy

04:37 10  with your customers, do you?

    11   A.  Just the fact that we don't sell pornography, that's

    12   public.

    13   Q.  Is your policy provided to your customers?

    14   A.  The full policy is not provided to customers, no.

04:37 15  Q.  Do you recall testifying that Amazon has about 240,000 to

    16   250,000 movies available on its web site?

    17   A.  Yes, I do.

    18   Q.  And do you remember also testifying that Amazon currently

    19   sells over 220,000 adult sex toys?

04:38 20  A.  Yes, I do.

    21   Q.  So it's about the same amount, correct?

    22   A.  Those are approximately similar amounts.

    23           MR. FOODMAN:  I'd like to move into evidence that

    24   DVD.

04:38 25          THE COURT:  Any objection?
```

1          **MR. BAGEANT:**  Yes, Your Honor.  I think there are

2     authenticity problems.

3          **MR. FOODMAN:**  Your Honor, he acknowledged that

4     could be -- that was purchased on Amazon's web site.

04:38  5          **MR. BAGEANT:**  Your Honor, may I be heard?

6          **THE COURT:**  Yes.

7          **MR. BAGEANT:**  He testified it didn't look like

8     Amazon's packaging.  He testified that it was sold by someone

9     else, and he testified that he doesn't have any personal

04:38  10    knowledge of this exhibit himself.  Someone placed an order,

11    someone did something, someone sent it, and then this thing

12    arrived here.  I don't think that this witness can

13    authenticate it.

14         **MR. FOODMAN:**  The receipt comes from Amazon.com,

04:38  15    Your Honor, he acknowledged that.

16         **THE COURT:**  Objection overruled.  I'll admit it for

17    what it's worth, and I recognize all the caveats that you

18    just pointed out, because I was here listening to the

19    witness's testimony.  So for whatever it's worth, maybe

04:39  20    nothing, maybe something, who knows.  I'll admit it over

21    objection.

22         (Thereupon, the aforementioned exhibit was admitted

23    into evidence.)

24         **MR. FOODMAN:**  I have no other questions, Your

04:39  25    Honor.

1          THE COURT:  No more questions?  All right.  So you

2    are finishing at 4:38.  And by the way, when you give that

3    exhibit to our courtroom deputy, make sure that it's the DVD,

4    the Christmas wrapping paper, the invoice, and anything else

04:39   5    that you disassembled.

6          MR. FOODMAN:  Your Honor, how many minutes was

7    that?  I'm sorry.

8          THE COURT:  That was 4:32 to 4:38, so it's a total

9    of six minutes.  So if I was billing, that would be a .1.

04:40   10          MR. FOODMAN:  Unfortunately for you, you're not.

11          THE COURT:  I am in a metaphysical sense.

12          MR. BAGEANT:  Your Honor, Amazon has no redirect.

13          THE COURT:  All right, thank you, sir.  You may

14    step down.  Next witness?

04:40   15          MR. NELSON:  Amazon calls Dr. Peter Lehman.

16          THE COURT:  Thank you.

17          MR. FOODMAN:  Your Honor, before Mr. Lehman

18    testifies, I have an objection to this witness.

19          THE COURT:  Sure.

04:40   20          MR. FOODMAN:  Your Honor, Mr. Lehman is testifying

21    about, first of all, items that are completely irrelevant,

22    that have -- that he gives a legal opinion, which the Court

23    does not need any assistance with.  And he also gives an

24    opinion on something that's not even in the standard for

04:40   25    reverse confusion cases that we're dealing with in this case,

1    Your Honor.

2         **THE COURT:**  I'm going tell you that, based on what

3    I have heard, it's a little vague to me what the witness is

4    going to be testifying about, or the nature of your

04:41  5    objection.

6         I'm going to take a guess that Dr. Lehman, you told

7    me he is an expert witness, that he's going to be offering

8    expert opinion testimony.  So let's take it a step at a time.

9    Are you objecting to his qualifications as an expert?

04:41  10        **MR. FOODMAN:**  Well, I would like to voir dire him

11   on one particular issue, which is on his lack of background

12   in psychology and marketing, Your Honor.

13        **THE COURT:**  You've taken the man's deposition

14   already?

04:41  15        **MR. FOODMAN:**  No.

16        **THE COURT:**  You have not?

17        **MR. FOODMAN:**  No, I did not get that opportunity.

18        **THE COURT:**  So you may object to his credentials.

19   Any other objections such as the nature of the opinion,

04:41  20   methodology, the helpfulness?

21        **MR. FOODMAN:**  I don't know what methodology was

22   employed, Your Honor, because there was nothing in his

23   declaration.

24        **THE COURT:**  I understand.  So what would you like

04:41  25   me to do at this point?  Would you like me to say I agree

 1 with you?

 2        MR. FOODMAN:  Go for it.

 3        THE COURT:  I mean, how would I do that?  I haven't

 4 heard from the man yet.

04:42  5        MR. FOODMAN:  Okay.  Your Honor, we'll go through

 6 that process.

 7        THE COURT:  No, but I mean, logistically, how would

 8 I do it?

 9        MR. FOODMAN:  It's based on his declaration, Your

04:42 10 Honor, so I mean --

11        THE COURT:  All right.  So he will be able to give

12 some testimony.  Before they try to elicit some opinions that

13 you believe you want to voir dire him on his credentials,

14 I'll allow you to do that.

04:42 15        And then assuming that I find him to be a

16 sufficient expert with the appropriate experience and

17 methodology and helpfulness, then whatever his opinions will

18 be will be admitted for whatever they're worth and then

19 you'll get to cross-examine.  But right now, I can't make a

04:42 20 ruling in a vacuum.

21        MR. FOODMAN:  I understand, Your Honor.

22        THE COURT:  You're preserving your objection, which

23 is fine.  I don't object to you doing that.  I just can't

24 make a ruling right now, because I have no idea.  Doctor,

04:42 25 take the stand, please.

1           THE WITNESS:  (Complies.)

2       Thereupon,

3               PETER LEHMAN, PH.D.

4   having been duly sworn by the Clerk, testified as follows:

04:43   5           THE COURTROOM DEPUTY:  Please state and spell your

6   name, sir.

7           THE WITNESS:  Peter Lehman, P-E-T-E-R, L-E-H-M-A-N.

8           THE COURT:  4:42, sir.

9           MR. NELSON:  Well, first, Your Honor, may we show a

04:43  10   demonstrative not for admission, a demonstrative about

11   Dr. Lehman's credentials?

12           THE COURT:  Any objection?

13           MR. FOODMAN:  I haven't seen it, Your Honor, so

14   I --

04:43  15           THE COURT:  I'm guessing it's your resume or CV or

16   something like that?  It's a bullet point list of

17   Dr. Lehman's background and credentials, the highlights.

18           MR. FOODMAN:  Right.  I mean, I think he needs to

19   be questioned on these points, Your Honor.

04:44  20           THE COURT:  That's true.  But for purposes of

21   demonstrative exhibits, not to be admitted into evidence,

22   just to help the questioning, do you have any objection to

23   that?

24           MR. FOODMAN:  Your Honor, the reason I have a

04:44  25   problem with it is because you can read from it.

```
 1          THE COURT:  I'm sorry?

 2          MR. FOODMAN:  He can read from it.

 3          THE COURT:  Yes.  And --

 4          MR. FOODMAN:  It's an aid for him.  Your Honor, if

04:44  5  you're inclined to allow it, then that's fine.

 6          THE COURT:  Well, this is his own background.  So

 7  it's not like we're feeding information to another witness,

 8  it's the man's own life.  I assume he doesn't need a list to

 9  tell us what he's accomplished in his life.

04:44 10          So based on that ground, the objection is

11  overruled.  Please continue.

12          MR. NELSON:  Thank you, Your Honor.

13

14                    DIRECT EXAMINATION

15  BY MR. NELSON:

16  Q.  Dr. Lehman, can you please tell the Court your

17  credentials?

18  A.  Yes, I have a Ph.D. in film studies from the University

19  of Wisconsin Madison.  I am currently a tenured full

04:45 20  professor in the film and media studies program at Arizona

21  State University, where I also serve as the director of the

22  Center For Film Media and Popular Culture.

23          I'm a former president of the Society for Cinema

24  and Media Studies, which is the national organization for

04:45 25  film and media scholars.  One of my major research areas is
```

1    gender studies, sexuality, and pornography in the media.

2            I have published 13 books, one of which is

3    Pornography Film and Culture published through Rutledge

4    University Press, and I serve on the editorial board of the

04:45  5    Academic Journal of Porn Studies published by Rutledge

6    University -- excuse me, Rutledge Press, and I've also

7    published numerous articles and book chapters on pornography.

8    Q.   And have some of those articles and book chapters

9    specifically related to pornography on the internet?

04:46  10   A.   Yes.

11   Q.   And is this the introduction to the Pornography Film and

12   Culture book that you referred to?

13   A.   Yes.

14   Q.   And have you, Dr. Lehman, taught classes where you have

04:46  15   taught the subject of pornography?

16   A.   Yes.

17   Q.   And that has been for a period of years?

18   A.   Pardon?

19   Q.   For a period of years?

04:46  20   A.   Yes.

21           MR. NELSON:   Your Honor, at this point, we move to

22   qualify Dr. Lehman as an expert in pornography.

23           MR. FOODMAN:   Your Honor, I'm going to object on a

24   few grounds.   Relevance, number 1.   Number 2, on the expert

04:46  25   opinion that he's about to provide, there is a case Omar v.

1   Babcock, 177 Fed.Appx 59, Eleventh Circuit, 2006 case.  It's

2   a trademark case, where the holding was the party cannot rely

3   on any conclusion --

4           **THE COURT:**  You're talking too fast for the court

04:47  5   reporter to take that all down.  By quite frankly, sir, if

6   you don't mind me saying so, your objection is premature.

7   You're starting to object to about the merits of his opinion.

8           Right now, we're dealing with the issue of Amazon's

9   request to have this man designated as an expert, based on

04:47 10  the qualifications and background that he has just told us

11   about.

12           So you can say no objection, you can objection and

13   tell me why, you can say, I'd like an opportunity to briefly

14   voir dire him on his credentials.  Those are basically the

04:47 15  possibilities right now with this issue.

16           **MR. FOODMAN:**  Your Honor, I'd like to briefly voir

17   dire him on just the a question or two regarding his

18   background.

19           **THE COURT:**  All right.  So right now, we're going

04:48 20  to knock it off at 4:47 for Amazon, and then we're going to

21   start the clock running for the Plaintiffs on a brief voir

22   dire on Dr. Lehman qualifications at 4:47.  So please

23   proceed.

24

25                      ***VOIR DIRE EXAMINATION***

1    BY MR. FOODMAN:

2    Q.   Dr. Lehman, good afternoon.

3    A.   **Good afternoon.**

4    Q.   Do you have a degree in psychology?

04:48   5    A.   **No, I don't.**

6    Q.   Do you have a degree in marketing?

7    A.   **No, I don't.**

8    Q.   What is your expertise, then, in being able to provide a

9    an opinion on consumer confusion?

04:48   10   A.   **My expertise is in critical analysis of film and media**

11   **and media popular culture.**

12           MR. FOODMAN:  Those are my questions, Your Honor.

13           Your Honor, if I can go back to this mic to

14   continue my objection.  Based on the fact that he has no

04:48   15   background to be able to apply any consumer confusion, I

16   still maintain the same position that he shouldn't be

17   permitted to testify on consumer confusion as he's opined

18   into his declaration, Your Honor.

19           THE COURT:  You are far wiser man than I am,

04:49   20   Mr. Foodman, because you are predicting -- I guess you have

21   some insight into what the Doctor will say.  Right now,

22   Amazon is simply tendering him as an expert in the field of

23   pornography.  Mr. Nelson didn't say an expert in customer

24   confusion.  He didn't say an expert in marketing.  All he

04:49   25   said is an expert in pornography.  That was the subject

1   matter of the request.  So if you have any objection to him

2   providing expert opinion testimony about pornography?

3        MR. FOODMAN:  Your Honor, I really don't know what

4   his experience is in pornography, but -- so I do have an

04:49   5   objection on that ground as well.

6        THE COURT:  Well, I'm giving you the opportunity to

7   voir dire him.  You want to question him more about his

8   background in the proffered area of pornography, you may do

9   so.

04:49   10        MR. FOODMAN:  I'll hold off on that, Your Honor.

11   Thank you.

12        THE COURT:  Well, then based on that, your

13   objection is overruled.

14        MR. FOODMAN:  That's fine.

04:50   15        THE COURT:  So then if we get to a couple of

16   questions down the line and there is a question that

17   doesn't -- well, we'll just take it to a question at a time.

18   We're back now for Amazon at 4:49.

19

04:50   20            *DIRECT EXAMINATION* (CONTINUED)

21   BY MR. NELSON:

22   Q.   And, Dr. Lehman, you have written and have experience in

23   how consumers consume pornography over the internet and

24   popular culture, correct?

04:50   25   A.   Correct.

1    Q.   Dr. Lehman, did you have a chance to review Wreal's web

2    site at FireTV.com?

3    A.   **Yes, I did.**

4    Q.   And what else -- actually -- and what did you find on

04:50    5    FireTV.com?

6           **MR. NELSON:**   Your Honor, this is a demonstrative

7    that has already been admitted.   This is some of the web

8    sites.

9    A.   **The first thing I found was the warning, adult content**

04:50    10   **slide that you currently are showing which basically cautions**

11   **that in addition to being 18 years of age, you have to be**

12   **sure that it's legal for you in the locality in which you're**

13   **looking at the web site, and you have to click on yes, to**

14   **take responsibility for that before you enter.**

04:51    15   **BY MR. NELSON:**

16   Q.   Did you click yes?

17   A.   **Yes, but I have to tell you that it was only within the**

18   **last couple of days that -- when I revisited the site that I**

19   **came upon this warning.**

04:51    20   Q.   And what then did you find?

21   A.   **Okay.   What you're seeing now is the top of the home page**

22   **after you --**

23           **MR. FOODMAN:**   Objection, Your Honor.

24           **THE COURT:**   Based on?

04:51    25           **MR. FOODMAN:**   It's totally irrelevant.   This entire

     1   line of questioning.

     2          THE COURT:  Overruled.

     3   A.  You're seeing the top of the home page, which has several

     4   things that typify hardcore porn.  The first thing I would

04:52  5   point to is the set of images above the title, "Epic Asses,"

     6   and that shows very graphic penetration, in this case because

     7   of that title, anal penetration, a series of those graphic

     8   images which I'll return to, which are characteristic of

     9   hardcore porn.

04:52  10          I would also bring attention to when you go down to

    11   the first row of images below, there is the XXX rating, which

    12   is the rating that the porn industry uses itself to identify

    13   hardcore porn, which is not part of the Motion Picture

    14   Association of America rating system.  It's a self identified

04:52  15   rating system for hardcore porn.

    16   BY MR. NELSON:

    17   Q.  And then, Dr. Lehman, what else does the home page show

    18   as you scroll down?

    19   A.  One of the things that's typical as you're scrolling and

04:53  20   I would appreciate if you stop with this one for a moment.

    21   But these rows of images of the kind of pornographic images

    22   that we're seeing is typical of what you see on hardcore porn

    23   web sites, but there's a point I'd like to make about the one

    24   on your on the far left now, which is on the first full row

04:53  25   that you're seeing called the Afterschool Program.

1            And I think when you're talking about hardcore

2    pornography, it's important not to talk just in the abstract,

3    but to be a little bit more specific, and to look at things

4    like where the camera position is.

04:53  5            And if you look at this image.  You see that the

6    camera is positioned in a way that foregrounds in a very

7    graphic way, the manner in which the large penis is

8    penetrating in this case the woman from behind in a very

9    prominent manner, so that you can't just talk about

04:54  10    penetration as an act in the abstract.

11            You have to pay careful attention to things like

12    composition.

13    Q.   And did you go to the categories page?

14    A.   Yes, I did go to the categories page.  Now we're looking

04:54  15    at the categories page, and one of the things that typifies

16    hardcore pornography is to place their offerings in the

17    internet hardcore porn sites place -- almost all of them

18    place their offerings within categories.

19            So what you're looking at here are typical of such

04:54  20    categories.  For example, I'll read some of them across.

21    Amateur Anal and Big Boobs, Big Butts, Blonde, Blow Job,

22    Cream Pie, you get the idea, and it keeps going.

23    Q.   What is your conclusion after having looked at the web

24    site?

04:54  25    A.   I would conclude that any viewer or user --

1          **MR. FOODMAN:**  Objection, Your Honor, to any opinion

2     that he's going to give at this point.

3          **THE COURT:**  First of all, let's wait just a minute.

4     You started to mention to me a few minutes ago, it was a

04:55   5     little bit early, but the time has now ripened.  You started

6     to mention to me a case.

7          You were citing a case which you didn't have the

8     opportunity to completely explain to me what that was about,

9     and why you were citing it.  So I think that was the case

04:55  10     that you were citing to support your objection to

11     Dr. Lehman's expert opinion testimony.  Right?

12          **MR. FOODMAN:**  Yes, sir.

13          **THE COURT:**  So tell me the name of that case.

14          **MR. FOODMAN:**  All right.  So the case is Drew

04:55  15     Estate Holding Company.

16          **THE COURT:**  I'm sorry, what's the first word again?

17          **MR. FOODMAN:**  Drew, D-R-E-W, Estate Holding Company

18     LLC.

19          **THE COURT:**  Yes.

04:55  20          **MR. FOODMAN:**  Versus Fantasia Distribution Inc.

21     875 F.Supp. 2D 1360.  Southern District of Florida, 2012

22     case.

23          **THE COURT:**  Who is the judge presiding?

24          **MR. FOODMAN:**  Citing to the case Omar versus -- I

04:56  25     have to get that for you, Your Honor, just give me a moment

1    and I'll give you the name of the judge, citing to the case

2    Omar versus Babcock.

3              **THE COURT:**  Yes.

4              **MR. FOODMAN:**   177 Fed.Appx.59, Eleventh Circuit,

04:56   5    2006.  Drew Estate Holdings was a trademark case, I believe,

6    Your Honor.  And in the Omar case, it held that a party

7    cannot rely on legal conclusions articulated by an expert.

8              **THE COURT:**  Mr. Foodman.  Slow down.

9              **MR. FOODMAN:**  Okay.  I apologize.

04:56   10             **THE COURT:**  A party can't --

11             **MR. FOODMAN:**  Not rely on legal conclusions

12   articulated by an expert to meet his burden of coming forward

13   with relevant evidence, and I'm going to get you the name of

14   the judge in one moment.

04:57   15             **THE COURT:**  So this is a quote from the Omar case

16   or from the Drew Estate case.

17             **MR. FOODMAN:**  That is the holding of the Omar case.

18   The Drew case from 2012 is referencing the Omar case, Your

19   Honor.

04:57   20             **THE COURT:**  And is the Omar case a trademark case?

21             **MR. FOODMAN:**  No.  That case is not.  The Drew case

22   is, Your Honor.  And I'm getting the judge in one moment,

23   Your Honor.

24             **THE COURT:**  You don't need to get me the judge's

04:57   25   name.  It was just a matter of curiosity --

1          **MR. FOODMAN:**  The judge is Altonaga.

2          **THE COURT:**  Thank you.  So in the Drew case, which

3      is a trademark case, what happened there, and why is it

4      relevant to your objection this afternoon?

04:58   5          **MR. FOODMAN:**  In that case, they were going to

6      bring an expert who was going to opine on the likelihood of

7      confusion, Your Honor.  Give me one second.

8          In that case, they were trying to apply the facts

9      in the record to the seven factors likely to lead to

04:58  10      confusion test for a legal opinion.

11          **THE COURT:**  And what happened?

12          **MR. FOODMAN:**  And the Court would not consider

13      that.

14          **THE COURT:**  So the Court -- Judge Altonaga said, I

04:58  15      will not consider an expert's opinion testimony on likelihood

16      of confusion?

17          **MR. FOODMAN:**  Yes, Your Honor.

18          **THE COURT:**  Do you have an extra copy of that case?

19          **MR. FOODMAN:**  No, Your Honor.  I apologize.  It was

04:58  20      just presented to me.  I could certainly pull it up on a

21      computer right now for you, Your Honor, but I don't have it

22      in front of me.

23          **THE COURT:**  Give me just a minute, please.

24      Actually, why don't you pull that up, and then print it out,

04:59  25      one for me.  And did you folks over there at Amazon have a

1    printer available?

2          MR. NELSON:  We do, Your Honor.  Response?

3          THE COURT:  Not yet.  I have to take a look at

4    that.  Wouldn't you like to take a look at it?

04:59  5          MR. NELSON:  We would.  I think there is a

6    threshold response here, which is that I don't think the

7    question that I was asking -- he will eventually opine on

8    some of these issues, but the question that he was going -- I

9    think the answer that he was going to give does not revolve

04:59  10   around likelihood of confusion at all.

11         THE COURT:  What was the pending question?

12         MR. NELSON:  What did you conclude by looking at

13   the web site.

14         THE COURT:  So this is basically a his fact based

04:59  15   conclusions after observing the web site.

16         MR. NELSON:  That's right.

17         THE COURT:  So there may be a few questions before

18   testimony concerning likelihood of confusion.  So do you have

19   any objection to that?

05:00  20         MR. FOODMAN:  I do have another objection, yes.

21         THE COURT:  What's the objection?

22         MR. FOODMAN:  Relevance.  It doesn't go to any of

23   the issues in this case.  It's completely and wholly

24   irrelevant.  What he thinks is on that web page, Your Honor,

05:00  25   the Court can make that determination on its own.

1          It doesn't need Professor Lehman to determine

2     whether that web page is hardcore pornography or not.  Just

3     like it doesn't need his opinion to determine whether the

4     DVD, like the one they introduced, is hardcore pornography or

05:00   5     not.

6          **THE COURT:**  On that basis, the objection is

7     overruled.  So you may answer the question, but in about a

8     minute or so, we're going to take a look at this case and

9     then we'll have some additional argument on it.  Do you know

05:00   10    what the question is now?

11    A.   **Yes, I do.**

12          **THE COURT:**  Great.

13    A.   **I think I do.**

14          **THE COURT:**  Go ahead.

05:00   15    A.   **So I would conclude that any viewer or user who came**

16    **across this web site would quickly conclude that this web**

17    **site sold primarily hardcore pornography.**

18    **BY MR. NELSON:**

19    Q.   Is hardcore pornography a different market or genre

05:01   20    anything else?

21    A.   **Yes.**

22    Q.   Are there any stylistic devices that are common to

23    hardcore pornography?

24    A.   **Yes.  There are several.  But I'll give you an example of**

05:01   25    **two that are widely identified within the industry which they**

1    refer to as the meat shot and the money shot.

2         And the meat shot refers to repeated close-ups of

3    penetration of the penis thrusting, and now I take examples

4    from heterosexual porn, the penis thrusting in and out of the

05:01   5    vagina, but it's a close-up shot and it's important to

6    understand that it's repeated, not just within the shot but

7    repeatedly going back to that shot throughout the sex scene.

8         And the other is -- that is referred to as the

9    money shot is the male performer withdrawing from whatever

05:02   10   form of penetration he's engaged in, whether it be anal,

11   oral, vaginal, before he begins to ejaculate, and positioning

12   himself to ejaculate upon the woman's body.

13        And then that's emphasized visually, usually in

14   close-ups, sometimes with slow motion, but always showing the

05:02   15   complete process of ejaculation and emphasizing it by making

16   the ejaculation visible and having it land on the woman's

17   body.

18   Q.   And is depiction of penetration or ejaculation necessary?

19   A.   No, it is not.

05:02   20   Q.   What is important?

21   A.   What's important to define hardcore pornography is that

22   the spectator feel that they are seeing something that

23   somehow documents for them that the performance or actually

24   engaging in the sexual act, whereas in soft core pornography,

05:03   25   it's simulated sex.

1    Q.   Does the fact that a movie may be sexually arousing or

2    even depict nudity mean that it is hardcore pornography?

3    A.   **No.**

4    Q.   Are there differences in how hardcore pornography is

05:03   5    consumed?

6    A.   **Yes.   Hardcore pornography is frequently made and**

7    **marketed and consumed in a manner that's conducive to solo**

8    **masturbation.**

9    Q.   Is there anything about Wreal's FyreTV that made you

05:03  10    think Wreal is gearing its product towards that end?

11   A.   **Yes.**

12   Q.   And what is that?

13   A.   **There are two things that I noticed.   The first one --**

14   **this is the slide that we're looking at now, where it says --**

05:04  15        **MR. FOODMAN:**  Your Honor, I object.

16        **THE COURT:**  Basis?

17        **MR. FOODMAN:**  He doesn't know what Wreal's

18   intention is or isn't.  This is pure speculation.  And he

19   doesn't know what the consumer is doing when they go on that

05:04  20   web site either.  That is also complete speculation.

21        **THE COURT:**  Rephrase your question, please.

22   **BY MR. NELSON:**

23   Q.   Sir, based on your experience as an expert on pornography

24   and the internet and how pornography is consumed, having

05:04  25   looked at Wreal's FyreTV site, do you have an opinion about

```
          1   what that suggests to you as an expert in the field of -- the

          2   academic field of pornography?

          3   A.   Yes.   Scholars in the field of pornography have spent

          4   much time discussing the relationship between hardcore

05:04     5   pornography and masturbation.   And one of the things that

          6   this suggests to me is that being able to view, rent, or in

          7   some cases, buy by the minute, rather than by the entire film

          8   or video is conducive --

          9          MR. FOODMAN:   Your Honor, I have the same

05:05    10   objection.

         11          THE COURT:   Overruled.

         12   A.   It's conducive to using the site for masturbation,

         13   because once one has completed that, there's no motivation to

         14   continue watching the film.

05:05    15          MR. FOODMAN:   Your Honor, if I can raise one more

         16   objection on the record.

         17          THE COURT:   Remember what we spoke about earlier?

         18   You don't need to say, can I make an objection, just say

         19   objection and then I'll ask you what's the objection and you

         20   can tell me.

         21          MR. FOODMAN:   Your Honor, he was tendered as an

         22   expert on pornography.   He was specifically only tendered on

         23   that.   He was not tendered as an expert on psychology.

         24          So how he would know what people are going to do on

05:05    25   the web site, including masturbating, I don't know.   He's not
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | an expert on what people do and what goes on in their minds. |
|       | 2  | **THE COURT:**  That will be fodder for                      |
|       | 3  | cross-examination, but the objection is overruled.           |
|       | 4  | BY MR. NELSON:                                                |
| 05:05 | 5  | Q.  Dr. Lehman, did you also observe the scenes portion?     |
|       | 6  | A.  **Yes.  That's the second point that I'd like to bring up.** |
|       | 7  | **The site offers -- here we have a slide that illustrates that** |
|       | 8  | **you can also choose to pay just to watch individual scenes** |
|       | 9  | **rather than entire films, and that fits into the same pattern** |
| 05:06 | 10 | **that we just spoke about, since the viewer may choose a scene** |
|       | 11 | **that they find particularly erotic and just purchase that** |
|       | 12 | **scene.**                                                   |
|       | 13 | Q.  And what are we looking at here as it mouses over?       |
|       | 14 | A.  **Here what we're looking at is a technique that many --** |
| 05:06 | 15 | **MR. FOODMAN:**  Objection, Your Honor.                     |
|       | 16 | **THE COURT:**  Yes?                                         |
|       | 17 | **MR. FOODMAN:**  This is not in evidence.                   |
|       | 18 | **MR. NELSON:**  Well, first of all, it's a                  |
|       | 19 | demonstrative.  And second of all, I'm actually about to try |
| 05:06 | 20 | to move into a slide to do that, but it can still be used as |
|       | 21 | a demonstrative about what he observed.                      |
|       | 22 | **THE COURT:**  Well, why don't we first see if you can      |
|       | 23 | get it into evidence.  How are you going to do that?         |
|       | 24 | BY MR. NELSON:                                               |
| 05:07 | 25 | Q.  Dr. Lehman, did you go to the site FyreTV.com?           |

1    A.   **Yes, I did.**

2    Q.   Is this what you observed?

3    A.   **Yes.**

4         **THE COURT:**  Well, I guess my question is,

05:07  5   Mr. Nelson, this is a dynamic exhibit, it's not a static

6    exhibit.  As I'm looking at it, there are 12 images on this

7    screen, and they are changing one at a time, so it's

8    constantly fluid.  So how are you going to admit this into

9    evidence if it's changing every second?

05:07  10        **MR. NELSON:**  Well, Your Honor, I think it would be

11   the static image as it is on the actual slide.  We can

12   certainly pause it, so that it is a static image.  I don't

13   think that is an issue.  This is what Dr. Lehman, I think,

14   testified he observed when he went to the Wreal.com --

05:07  15   FyreTV.com web site.

16        **THE COURT:**  All right.  So how are you going to

17   make it into a static exhibit?  You just print out this one

18   page?  You have that one page there?

19        **MR. NELSON:**  I do.  It's actually attached to --

05:08  20   there's a second page which we are about to admit as well,

21   and maybe if the Court doesn't mind, we'll admit that one

22   too, it's on the same page.

23        **THE COURT:**  Well, first, let's mark these documents

24   so everybody knows what we're talking about.

05:08  25        **MR. NELSON:**  I mark it as Lehman 1, which is a

1    document consisting of two static images, the first from

2    FyreTV.com and the second, which can be redacted if it's not

3    admitted, is another screenshot that Dr. Lehman is going to

4    discuss in a second.

05:08    5         THE COURT:  So that's Lehman 1, and then you said

6    you had a second static?

7         MR. NELSON:  Yes, Your Honor, well, the next slide

8    is actually not static, but the image, we'll admit is static.

9         THE COURT:  All right.  So the image that you're

05:09   10    seeking to admit is what, Lehman 2?

11         MR. NELSON:  No, Your Honor, the image I'm seeking

12    to admit is Lehman 1.

13         THE COURT:  Which is how many pages?

14         MR. NELSON:  One page.

05:09   15         THE COURT:  So that's the only document right now

16    that you're seeking to introduce, a one-page document that

17    you labeled Lehman 1?

18         MR. NELSON:  Yes, Your Honor.

19         THE COURT:  Any objection?

05:09   20         MR. FOODMAN:  On number 1, I'd like to look at it.

21         I believe it's printed out by counsel, so

22    Mr. Lehman didn't pull those images himself, or authenticate

23    this document himself.  So I would object to it being

24    introduced on that basis as well.

25    BY MR. NELSON:

```
 1   Q.  Dr. Lehman, I think you just testified to this.  Did you

 2   go to FyreTV web site and see this image?

 3   A.  Yes.

 4   Q.  Is this what you saw when you went to the FyreTV web

 5   site?

 6   A.  Yes.

 7           THE COURT:  Hang on just a minute.  Mr. Nelson, is

 8   what we're looking at on the screen exactly what's depicted

 9   in Lehman 1?
```

05:10  10           MR. NELSON:  Yes, Your Honor.  If I hold up Lehman

```
11   1, Lehman 1 -- the top of Lehman 1 is -- and I'm sorry,

12   you're going to have it in one second.

13           THE COURT:  And the upper left-hand corner of

14   Lehman 1 should be a picture with a head line called Axel
```

05:10  15   Braun's Naughty Neighbors; is that right?  Is that what it

```
16   shows?

17           MR. NELSON:  That is correct, Your Honor.

18           THE COURT:  So just to avoid confusion, why don't

19   you hand that exhibit, Lehman 1, up to Dr. Lehman, and ask
```

05:10  20   him about that one particular piece of paper which we have

```
21   called Lehman 1.

22           MR. NELSON:  May I approach?

23           THE COURT:  Yep.

24           MR. FOODMAN:  Your Honor, can I get a copy?
```

05:10  25           THE COURT:  Yes.  That would be nice.

1          MR. FOODMAN:  Your Honor, if I can make a couple --

2          THE COURT:  I think Mr. Nelson was going to ask the

3     witness a question or two about this exhibit.

4          MR. FOODMAN:  I have objections to the exhibit

05:11  5     before he even asks him the questions.

6          THE COURT:  All right.

7          MR. FOODMAN:  Number 1, Your Honor, and I don't

8     know if Your Honor has it in front of you, there is no time

9     and date stamp as you would typically find from the web site.

05:11  10         So I have no idea whether I can even determine

11     whether this is what Dr. Lehman actually looked at.  It could

12     be what was printed out today.  Number 2, it has another web

13     site, I believe, You Porn, so -- which has nothing do with my

14     client.  So I have an objection to this exhibit on multiple

05:11  15     grounds.

16          MR. NELSON:  This is your Lehman 1.  This is the

17     old page.

18          MR FOODMAN:  That was not Lehman 1?

19          MR. NELSON:  May I approach?

05:11  20         THE COURT:  Folks, you're having a private

21     conversation, the two of you.  The court reporter can't

22     possibly pick up what you're saying.  But it appears to me

23     from the tenor of the comments that maybe you handed

24     Mr. Foodman the wrong exhibit, is that what happened?

05:12  25         MR. FOODMAN:  No, Your Honor, I don't believe this

1   is in evidence either, this entire document.

2          **MR. NELSON:**  If Mr. Foodman would let me get a word

3   in edgewise.

4          **THE COURT:**  No.  No.  No, I wanted you to show the

05:12   5   witness a document called Lehman 1.  Mr. Foodman said, you, I

6   would like to see Lehman 1.  You said you were going to show

7   him the document.  Then it appeared to me as though there was

8   some confusion about whether you handed him what you thought

9   was Lehman 1 or some other document.  Has there been some

05:12   10   confusion about what you handed counsel?

11          **MR. NELSON:**  No, Your Honor, what happened was --

12   if I may explain.  While we were finding the full page print

13   outs, I gave him my own copy of that slide, which had two

14   screenshots on it, one of which is on the screen.  So he

05:12   15   could see it.

16          We then got the full page printouts, and I handed

17   him the full page, of which 507 is the full page, which

18   Dr. Lehman has in his hand, and I'm about to ask the Court

19   permission to approach, so that the Court also may have

05:13   20   copies of his demonstratives which include what I'm about

21   to --

22          **THE COURT:**  So Foodman 1 would should be a one-page

23   exhibit [sic], correct?

24          **MR. NELSON:**  Yes, Your Honor.

05:13   25          **THE COURT:**  Plaintiff's counsel now has a copy?

1          **MR. NELSON:**  Yes, Your Honor.

2          **THE COURT:**  He has a copy of the document that

3     Dr. Lehman has?

4          **MR. NELSON:**  Yes, Your Honor.

05:13  5          **THE COURT:**  All right.  So let me have a copy.

6          **MR. NELSON:**  Thank you, Your Honor.

7          **MR. FOODMAN:**  Your Honor, I don't know what

8     Dr. Lehman has, because I have the document here with those

9     pages.

05:13  10          **THE COURT:**  Why don't you come up, take a look at

11     what he has in his hand, and then you'll be able to make an

12     objection.  Come on, guys.  This is just silly.  This is not

13     the way to run a hearing.

14          **MR. FOODMAN:**  Sorry, Your Honor.

05:13  15          **MR. NELSON:**  It is exactly like he has in his hand.

16          **THE COURT:**  Why don't we let the witness testify,

17     Mr. Nelson.  So Mr. Foodman, you've had the opportunity to

18     inspect what Dr. Lehman has in his hand, and you can compare

19     it to the document that you have in your hand.  Is it the

05:14  20     same exhibit or not?

21          **MR. FOODMAN:**  It appears to be, Your Honor.

22          **THE COURT:**  So do you have any questions to ask

23     Dr. Lehman about Foodman -- I'm sorry, about Lehman 1.

24          **MR. FOODMAN:**  And I raise the same objection I just

05:14  25     cited before, Your Honor, which was that the document that I

```
 1    had in front of me before as well as the one that I have in

 2    front of me now, there's no identifying marks on this

 3    document to know when this printout was made, and to

 4    determine whether Dr. Lehman is the one who did this or his

 5    counsel.

 6             THE COURT:  I suspect that Mr. Nelson may try to

 7    establish that right now.

 8    BY MR. NELSON:

 9    Q.  Dr. Lehman, did you go to the web site in the past couple

10    of days and look at this very web page at FyreTV?

11    A.  Yes, I did.

12    Q.  And did you --

13             THE COURT:  I'm sorry, Mr. Nelson, what page number

14    are we looking at?

15             MR. NELSON:  A 507.

16             THE COURT:  507 is also known now as Lehman 1.  Do

17    I have that right?

18             MR. NELSON:  Yes, Your Honor.

19             THE COURT:  Okay.  Go ahead.

20    BY MR. NELSON:

21    Q.  Dr. Lehman, did you or somebody at your direction capture

22    this to put on the slide?

23    A.  Yes.

24    Q.  Thank you.

25             MR. FOODMAN:  I don't know if that's the completion
```

05:14   5
05:15   10
05:15   15
05:15   20
05:15   25

```
 1   of his questions, but that's not proper foundation.
 2            THE COURT:  So that would be an objection?
 3            MR. FOODMAN:  Yes.
 4            THE COURT:  Okay.  So far I don't think you've
 5   established necessary foundation.  So why don't you ask some
 6   additional questions.
 7            MR. NELSON:  Thank you, Your Honor.
 8   BY MR. NELSON:
 9   Q.  Dr. Lehman, does this accurately represent what you saw
10   on the web site?
11   A.  Yes.
12   Q.  And can you please explain how it got to be a slide that
13   we are now looking at as Lehman 1?
14   A.  To be honest, during all this break, I lost the flow of
15   where we were.  If you can go back.
16   Q.  Let me rephrase.  Was -- did you, under your direction,
17   our videographer, Matt Bowles, capture what you looked at so
18   we could put it in slide format, so that you could say what
19   exactly you looked at on this page?
20   A.  Yes.  But what I'm saying is I lost the flow of how we
21   got it this page during all this --
22   Q.  Well, I think we'll get back to that in a second.
23   A.  Sorry.
24            THE COURT:  So in other words, is this piece of
25   paper that we're looking at, Doctor, it has a 507 in the
```

05:15    (line 5)
05:15    (line 10)
05:16    (line 15)
05:16    (line 20)
05:16    (line 25)

 1    right hand corner, it has -- it's got 12 images.  Is this a

 2    fair and accurate copy of what you saw when you visited the

 3    FyreTV, F-Y-R-E, TV, web site a few days ago.

 4    A.  **Yes.**

05:17   5         THE COURT:  All right.  Any objections to the

 6    introduction of Lehman 1, a.k.a. 507.

 7         MR. FOODMAN:  No, I think based on your questions,

 8    Your Honor, it's been properly authenticated.

 9         THE COURT:  All right.  So without objection,

05:17  10   Lehman 1 is now finally admitted.

11         (Thereupon, the aforementioned exhibit was admitted

12    into evidence.)

13    BY MR. NELSON:

14    Q.  Dr. Lehman, as we are looking at it on the screen, is

05:17  15   what we're looking at representative of -- let me rephrase

16    it.  Tell us what this is representative of with respect to

17    what we're looking at?

18    A.  **I think the rows of images like this are typical of the**

19    **kinds of displays that you typically see on internet hardcore**

05:17  20   **porn web sites.**

21    Q.   And Dr. Lehman, have you looked at other hardcore

22    pornography sites and are they similar to the layout and look

23    and feel of FyreTV?

24    A.  **I have.**

05:18  25         THE COURT:  Mr. Nelson, let me make an observation.

1   You have a limited amount of time available for all of your

2   witnesses and cross-examination.  Now, I allowed Dr. Lehman

3   to testify about certain things over objection, such as the

4   fact that this is a hardcore porno site.  The objection was,

05:18   5   gee, Judge, you can figure that out yourself.

6          I think you have established the point that this

7   particular web site, FyreTV, F-Y-R-E, TV, is a hardcore porno

8   site.  If you want to spend more of your precious time with

9   this expert witness establishing what I already knew from

05:18   10  looking at it myself, you can do that.  But I don't think

11  it's an efficient use of your time.

12          MR. NELSON:  Your Honor, I was about to move on.

13  Thank you.

14  BY MR NELSON:

05:18   15  Q.  My next question, sir, is, does the fact that Amazon

16  sells sex toys mean that it is a hardcore pornography site?

17  A.  **No.**

18  Q.  Why not?

19  A.  **Hardcore porn defines a film and video genre, and it**

05:19   20  **bears no relationship to selling other goods.**

21  Q.  Do you think, in your expert opinion, that a customer

22  would confuse Wreal for Amazon because Amazon sells sex toys

23  or a few hardcore DVDs?

24  A.  **No.**

05:19   25          MR. FOODMAN:  Objection, Your Honor.

1          **THE COURT:**  Dr. Lehman, I'm sorry.  Your

2     examination has been a little bit disjointed, not your fault,

3     but there's been an objection.  Now we come to the question

4     of customer confusion.  So now we're going to be talking

05:19   5     about this case that you cited to me earlier.

6          We started to discuss, it was a Judge Altonaga

7     case, citing an unpublished Eleventh Circuit case called Omar

8     versus Babcock, Locke, you have printed out the Drew Estate

9     Holding case?

05:19  10          **THE LAW CLERK:**  It's printing now.

11          **THE COURT:**  Printing as we speak?  How many pages?

12          **THE COURTROOM DEPUTY:**  Ten.

13          **THE COURT:**  I see.  I see.  That's logical.  So

14     Mr. Nelson, while this is printing out, I'm going to cutoff

05:20  15     your time, so we don't unfairly take time from you.  It's now

16     5:19.

17          **MR. NELSON:**  Administrative point, Your Honor?

18          **THE COURT:**  Yes.

19          **MR. NELSON:**  There's been a lot of discussion from

05:20  20     Mr. Foodman as well during this discussion.  May we at least

21     maybe have some leeway on the time on some of the objections.

22          **THE COURT:**  What do you mean leeway?  Well, right

23     now, you're off the clock.

24          **MR. FOODMAN:**  Your Honor, I would object to that

05:20  25     request based on the fact that we have offered -- -

1          **THE COURT:**  I'm not doing that.  There have been

2     periodic objections and colloquy back and forth all day long.

3     I'm not going to be here micromanaging literally every minute

4     every time someone has an objection that's not technically

05:20     5     question or an answer.  Do all the lawyers have copies of

6     this case?  Or can they read it?  Do you have it on your

7     laptop there?

8          **MR. FOODMAN:**  Yes, Your Honor.

9          **THE COURT:**  Amazon, you have this available?

05:21    10     Somebody said something.

11          **MR. NÚÑEZ-VIVAS:**  Yes, Your Honor, can we have five

12     minutes?

13          **THE COURT:**  Yeah, you want to take a five-minute

14     break?  I don't need to know the reason.  That would be in

05:21    15     the category of too much information.  But I'm just going to

16     remain here reading this case.  You all can either remain

17     here or go outside for five minutes, but literally five

18     minutes is the amount of the break.

19          (Thereupon, a brief recess was taken from 5:21 p.m.

05:25    20     to 5:25 p.m.)

21          **THE COURT:**  Just to give you folks a head up, I

22     just asked my law clerk to print out for me the Eleventh

23     Circuit case Babcock case, which Judge Altonaga cites in her

24     opinion because as I read that opinion, it appears that there

25     were multiple problems with the proposed expert testimony,

1    and not least of all that Judge Altonaga didn't know what the

2    expert's credentials were, nobody bothered to explain the

3    credentials, nobody bothered to explain how the opinion was

4    formed.

05:25    5        And then she cites to the Omar versus Babcock case,

6    but it's a simple parenthetical expression, the Court is

7    relying on a legal conclusion by an expert for a party to

8    meet a standard to produce relevant evidence.  So I need take

9    a look at that case myself, so bear with me for a minute,

05:25    10   please.

11        THE LAW CLERK:  Is there a pin site?

12        THE COURT:  Yes, there is a pin cite.  We're back

13   on the record.  So folks, in the Eleventh Circuit case of

14   Omar v, Babcock, the discussion about the admissibility of

05:27    15   the expert witnesses found at footnote 5, it had to do with

16   the proposed affidavit from an expert on the issue of whether

17   the appellants acted with deliberate indifference.

18        This was a federal civil rights statute brought

19   against a state agency alleging that it was deliberately

05:27    20   indifferent to abuse that an adopted child suffered at the

21   hands of an adopted mother.

22        And the Eleventh Circuit Court pointed out that a

23   Plaintiff could not rely on legal conclusions articulated by

24   an expert to meet his burden of coming forward with relevant

05:27    25   evidence.

1  **MR. FOODMAN:**  Your Honor, in the portion right

2  above that, in Rule of Evidence 702, I think is particularly

3  appropriate in this particular case.

4  The jury is not -- and you're sitting as the jury,

05:28  5  does not need the assistance of an expert to understand the

6  case, or if the witness simply recounts the facts, and then

7  offers an opinion as to the conclusion which a jury should

8  reach, such expert testimony is not permitted.

9  **THE COURT:**  So in a case like the one we have here,

05:28  10  with alleged infringement, where you as the Plaintiff want to

11  show customer confusion, and the Defendant wants to show the

12  opposite, is it typical in those kinds of cases to have

13  expert opinion testimony on likelihood of confusion?

14  **MR. FOODMAN:**  Yes, Your Honor.  Survey evidence on

05:28  15  confusion, which is what Dr. Sarel is going to attempt to

16  present to the Court, and not the type of evidence that

17  Professor Lehman is giving, number 1.

18  Number 2, I reiterate my previous objection, aside

19  from this one which I think is clear, on the issue of he is

05:29  20  not an expert on psychology or marketing, so he's not even in

21  a position to opine on confusion.

22  **MR. NELSON:**  Response, Your Honor?

23  **THE COURT:**  Yes.

24  **MR. NELSON:**  First of all, on the merits, he is --

05:29  25  it is completely commonplace to for an expert to give

1    opinions on actual confusion or likelihood of confusion,

2    number 1.

3         THE COURT:  So in a trademark case, you're telling

4    me, as an officer of the Court, that it is typical for the

05:29  5    issue of customer confusion to be brought out through expert

6    witness opinion testimony, not survey testimony, but expert

7    opinion testimony, having to do with whether or not there's

8    customer confusion?

9         MR. NELSON:  Your Honor.  No, I was referring to

05:29  10   the survey part of it.

11        THE COURT:  Well, this man is not here to talk

12   about a survey.

13        MR. NELSON:  I understand --

14        THE COURT:  Excuse me.  Doctor, are you going to

05:30  15   talk about a survey that you took?

16   A.  No.

17        THE COURT:  So my question is, in this kind of

18   case, a trademark case, is it typical for one side to show

19   likelihood of confusion or the other side to show absence of

05:30  20   confusion through an expert opinion of an expert?  Is that

21   typically how it's done?

22        MR. NELSON:  Your Honor, the answer is I don't know

23   about -- I can't cite you a case right now.  We would

24   appreciate the opportunity to brief that issue.  This is

05:30  25   obviously -- we submitted the declaration of Dr. Lehman in

1   our responsive believe.  They did not raise this issue at all

2   in their reply.

3          Obviously, it's coming up for the first time right

4   now in the middle of his testimony.  We would add this to the

05:30   5   administrative matters of what to brief, and would suggest

6   that we at least get the testimony in here for the Court to

7   decide after briefing on it.

8          I do know it's common, and Wreal itself relied on

9   evidence regarding, for example, fact testimony on customer

05:31   10   confusion.

11          **THE COURT:**  Well, that is different.

12          **MR. NELSON:**  It is.  And I think I'm trying to make

13   clear that as I sit here right now, because this issue is

14   sprung upon us, I can't cite you a case for that proposition.

05:31   15   And it is --

16          **THE COURT:**  I don't know if it's fair to say that

17   the issue was sprung upon you.

18          You're the person who is proffering Dr. Lehman's

19   expert opinion testimony, and therefore, it's your job to get

05:31   20   all your ducks in a row to meet your burden to demonstrate to

21   me that the doctor's proposed expert opinion testimony meets

22   all the prerequisites, qualifications, expertise,

23   helpfulness, methodology, relevance, propriety, whether or

24   not it would be helpful to the finder of fact, which would be

05:31   25   me in this case.

1          So you can't lay it off on the Plaintiff.  It's

2     your job, because it's your expert.  So at this time, I'm not

3     going to allow Dr. Lehman to provide expert opinion testimony

4     on what he believes to be customer confusion.

05:32    5          However, I will let you put that evidence on the

6     record to proffer it, and then if you a would like the

7     opportunity to brief it after this hearing, in an effort to

8     change my mind, I will let you do that.

9          But right now, the proposed expert testimony --

05:32   10     opinion testimony from Dr. Lehman on whether he things there

11     is a likelihood of confusion, my understanding is this is

12     expert testimony not based on a survey that he took, but just

13     on his opinion.  But you may proffer it now.

14          And in fairness, I will give the Plaintiff the

05:32   15     opportunity to cross-examine the Doctor on his proffered

16     testimony, because if later on Mr. Nelson persuades me to

17     change my mind, you want to have the opportunity, I would

18     think, to have those cross-examination points brought out,

19     right?

05:33   20          **MR. FOODMAN:**  Yes, Your Honor.  However, we do have

21     limited time, and we are making an evidentiary objection

22     based on Rule 702.  There is no springing of anything.

23          **THE COURT:**  I'm with you.

24          **MR. FOODMAN:**  Every evidentiary objection shouldn't

05:33   25     be allowed to be briefed, Your Honor.  I do have an objection

```
 1   to that.  I mean, this is clear under Rule 702, that this
 2   should not be admitted.
 3         And the proper testimony is going to count against
 4   our time when I have to cross-examine him, when I have
 5   limited time, Your Honor, on an issue he shouldn't be able to
 6   testify about.
 7         THE COURT:  Give me just a minute, please.  I think
 8   you raise a good point.  So here's what we're going to do.
 9   I'm not going to allow Dr. Lehman to offer his expert opinion
10   testimony this afternoon on his opinion on whether or not
11   there is a customer confusion.
12         However, at the end of the hearing, when we're
13   done, Mr. Nelson, you may remain here in court with
14   Dr. Lehman and proffer on the record the proposed expert
15   testimony.
16         So that later on, if any side files an objection to
17   any report recommendation that I make to the extent that
18   there's an issue about excluding this testimony, you'll be
19   able to show what the testimony would have been through the
20   proffer.
21         And to the extent --
22         MR. NELSON:  Thank you, Your Honor.
23         THE COURT:  Okay?  So that way they will be able to
24   proffer it and the time will not count against either side
25   because the testimony won't be coming in right now.
```

1    **MR. NELSON:**  Your Honor, I have one question that

2    is -- I don't think calls for the likelihood of confusion and

3    I can state the question on the record.

4         **THE COURT:**  Sure.

05:35   5         **MR. NELSON:**  And if there's an objection, obviously

6    there is.

7    **BY MR. NELSON:**

8    Q.   Dr. Lehman, what is your conclusion about whether a user

9    would think of anything else other than hardcore pornography

05:35   10   when it visits Wreal.com?

11   A.   **I do not --**

12        **MR. FOODMAN:**  I'm sorry, I don't understand the

13   question, Your Honor.

14        **THE COURT:**  It's basically a repeat of everything

05:35   15   that he's brought out through this witness in the past 25

16   minutes, but he may answer the question.

17   A.   **I do not think that anyone looking at this web site would**

18   **think -- and when I say this web site, FyreTV.**

19        **MR. FOODMAN:**  Objection, Your Honor, he's now

05:35   20   testifying as to confusion.

21        **THE COURT:**  Give me just a minute, please.

22        **MR. FOODMAN:**  I move to strike his testimony.

23        **THE COURT:**  Well, so far, the only thing that I've

24   seen here on this record is I do think that anyone looking at

05:36   25   this web site would think, and when I say this web site,

1    Wreal TV.

2         The question was not having to do with confusion.

3    The question is whether a user would think of anything other

4    than hardcore pornography when it visits this web site.

05:36    5         MR. FOODMAN:  Yes, Your Honor, it goes to the state

6    of mind of the user and what they think, and he's not in a

7    position to know what a user would think, based on multiple

8    grounds, including the fact that he's not an expert on

9    psychology and marketing.  He was only brought in to testify

05:36   10    as an expert on pornography.

11         THE COURT:  Stop.  Sustained.  Any other questions?

12         MR. NELSON:  No, Your Honor.  Thank you.

13         THE COURT:  So right now, let's see, it is now

14    5:35.  Dr. Lehman, don't go anywhere yet, please.

05:37   15    Mr. Foodman, would you like to cross-examine him?

16         MR. FOODMAN:  Yes, Your Honor, thank you.

17         THE COURT:  Okay.  It is 5:36.

18

19                    ***CROSS EXAMINATION***

05:37   20    BY MR. FOODMAN:

21    Q.  Dr. Lehman, can you distinguish between beer and wine?

22    A.  **Yes.**

23    Q.  You would agree that in many social and professional

24    circles, people use porn, but do not admit it?

05:37   25    A.  **Yes.**

1    Q.   Isn't it true that you can rent hardcore porn in hotels?

2    A.   **Yes.**

3    Q.   And, in fact, I believe you state in your book that most

4    large hotel chains offer pay per view adult movies, and many

05:38    5    video stores have adult movie rental sections; is that true?

6    A.   **I would have to see the exact quotation, but it's true**

7    **within a context of an argument that I was making, yes.  I**

8    **don't know if it was worded exactly like you read it, but --**

9    Q.   Would you like to see your book?

05:38    10    A.   **No, I've said that within the context of an argument that**

11    **I was making, which is part of the context.**

12    Q.   And you would agree that those same hotels offer kids and

13    mainstream movies as well?

14    A.   **Yes.**

05:38    15            **MR. FOODMAN:**  No other questions, Your Honor.

16            **THE COURT:**  Thank you.  Dr. Lehman, you may step

17    down.  Thank you, sir, at 5:37.

18            Next witness.

19            **MR. BAGEANT:**  Your Honor, our next witness is Mr.

05:38    20    Nate Fuller.  He's currently sequestered, so we're obtaining

21    him.

22            **THE COURT:**  Thank you.

23            **MR. BAGEANT:**  Your Honor, while the witness is

24    being obtained, might I approach with the exhibits?

05:39    25            **THE COURT:**  I think the witness is coming in right

1    behind you now.

2        Thereupon,

3                        **NATHANIEL FULLER,**

4    having been duly sworn by the Clerk, testified as follows:

05:39    5                **THE WITNESS:**  Yes.

6                **THE COURTROOM DEPUTY:**  Sir, please state and spell

7    your name for the record.

8                **THE WITNESS:**  Nate Fuller, N-A-T-E, F-U-L-L-E-R.

9                **THE COURT:**  So it's now 5:39.  You may begin.

05:40   10                **MR. BAGEANT:**  May I approach with the binder of

11   exhibits?

12                **THE COURT:**  Yes.

13                **MR. BAGEANT:**  (Complies.)

14                **THE COURT:**  Counsel, you know why I like this

05:40   15   exhibit already.

16                **MR. BAGEANT:**  It's very easy to read.

17

18                        ***DIRECT EXAMINATION***

19   **BY MR. BAGEANT:**

05:40   20   Q.  I just want to say for the record, Exhibit 1 is admitted

21   intentionally, and the gentleman's name, contrary to the

22   cover of the binder is Nathaniel Fuller, and not Daniel.

23   Mr. Fuller, would you state your name for the record?

24   A.  **It's Nathaniel Fuller, or Nate Fuller.**

05:40   25   Q.  Who is your employer?

```
  1   A.   Amazon.com.

  2   Q.   What do you do at Amazon.com?

  3   A.   I'm a program manager for digital devices customer

  4   service.

05:40  5   Q.   Does the scope of your work include work with Amazon Fire

  6   TV?

  7   A.   Yes, it does.

  8   Q.   Have you ever heard the phrase customer contacts?

  9   A.   Yes.

05:41 10   Q.   What are customer contacts?

 11   A.   So there are --

 12        THE COURT:   And also speak somewhat more slowly,

 13   please.

 14   A.   So customer contacts are mediums for contacting our

05:41 15   customer service.   So that would be phone, e-mail, chat or

 16   may day or video service.   And a customer contact is, say for

 17   phone, for example, customer calls us.   The associate takes

 18   notes about the call and enters that into our tools to be

 19   logged.

 20   BY MR. BAGEANT:

 21   Q.   Thank you.   As part of your job, do you monitor customer

 22   contacts?

 23   A.   Yes, we do.

 24   Q.   Do you know how many customer contacts related to Fire TV

05:41 25   have occurred this year?
```

1    A.   Yeah.   Approximately REDACTED between April and October of

2    2014.

3    Q.   And actually, to clarify, I mean Fire TV, with an I,

4    Amazon Fire TV?

05:41   5    A.   That's correct.

6    Q.   Of those REDACTED contacts, how many of them, if any, do

7    you know related to Wreal LLC, the Plaintiff in this case?

8    A.   Four contacts.

9    Q.   Mr. Fuller, could you please turn to Exhibit 3 in your

05:42   10   binder.

11   A.   (Complies.)

12          MR. FOODMAN:   Your Honor, can I just make sure that

13   the record is clear.   I don't see an Exhibit 1.   There's

14   nothing in --

05:42   15          MR. BAGEANT:   As in --

16          THE COURT:   Right.   I have nothing behind tab 1.

17   Is that intentional or --

18          MR. FOODMAN:   No, no, I wanted to make sure -- I

19   know what you told me, Mr. Bageant, but I wanted to make sure

05:42   20   the record was clear, so there is no confusion later.

21          THE COURT:   Yes, I think there was a comment

22   earlier about tab 1, so correct, there is no exhibit behind

23   tab 1, but that was -- that's just how it is now, and you

24   already flagged that to my attention, right, sir?

05:42   25          MR. BAGEANT:   Yes, Your Honor.

         1              THE COURT:  All right.  So --

         2     BY MR. BAGEANT:

         3     Q.  Do you recognize the document that's tab 3, Mr. Fuller?

         4     A.  **Yes, I do.**

05:43    5     Q.  What is it?

         6     A.  **It's a transcript from a phone contact.**

         7     Q.  There's some black bars at the top, are those redactions?

         8     A.  **Yes, they are.**

         9     Q.  Do they contain customer information?

05:43   10     A.  **It does.**

        11     Q.  Have you heard the telephone call that this is a

        12     transcript of?

        13     A.  **Yes, I have.**

        14              MR. BAGEANT:  Your Honor, we'd like to offer tab 3,

05:43   15     which is also docket 763 in this case.

        16              THE COURT:  Any objection?  We're trying to make

        17     clear.  The cross reference number, I think you mentioned

        18     something about an exhibit number.  Let me see here.  I think

        19     you said docket 763.

05:43   20              MR. NELSON:  It's entry 76-3.

        21              THE COURT:  So it's docket 76, exhibit 3, on the

        22     CMECF system.  All right.  So any objection, Plaintiff, to

        23     tab 3 to the Fuller binder for today's hearing being admitted

        24     into evidence?

05:44   25              MR. FOODMAN:  Your Honor, I do, for -- on several

 1    grounds.  Number 1, foundation.  Number 2, it appears that

 2    it's not complete, because the first page that I see in the

 3    binder, which is page 7 of 10, appears to start in the middle

 4    of a discussion.

05:44  5           THE COURT:  Well, mine starts off on page 6 of 10.

 6           MR. FOODMAN:  That's not in my binder.  So that may

 7    be why we have a problem.  I apologize.

 8           THE COURT:  So you now have pages 6, 7, 8, 9, and

 9    10 of 10.  Looks like it starts off with the beginning of the

05:44 10   phone call.  Any objections?

11           MR. FOODMAN:  Yes, I do.  I still believe there is

12    a lack of foundation.  He hasn't identified whether

13    everything contained in there is exactly what went on in the

14    phone call.

05:45 15           THE COURT:  Is this the phone call that you all

16    played to me earlier?

17           MR. FOODMAN:  Yes, Your Honor.  We don't know if

18    it's an accurate transcription, or if it covers everything in

19    that phone call.  That is something he has not testified to,

05:45 20   and that is my lack of foundation objection.

21           THE COURT:  See if you can't generate the requisite

22    foundation, please.

23    BY MR. BAGEANT:

24    Q.  Mr. Fuller, have you heard the underlying telephone call?

05:45 25   A.  **I have.**

|    |    |
|----|----|
| 1  | Q.  And you're familiar with this document? |
| 2  | A.  **I am.** |
| 3  | Q.  Is this an accurate transcription of this telephone call? |
| 4  | A.  **Yes.** |

05:45  5      MR. BAGEANT:  Your Honor, we would offer the

6  exhibit.

7           THE COURT:  Any objections?

8           MR. FOODMAN:  Based on that testimony, no, Your

9  Honor.

05:45  10          THE COURT:  So without objection, tab 3 of the

11  Fuller binder is now admitted.

12          (Thereupon, the aforementioned exhibit was admitted

13  into evidence.)

14  BY MR. BAGEANT:

05:45  15  Q.  Mr. Fuller, in the interest of time, could you summarize

16  your assessment of what is taking place in this telephone

17  call?

18  A.  **Yes, the customer has contacted in about our Fire TV with**

19  **an I, Amazon's Fire TV, about what products or services we**

05:46  20  **offer on the box itself.  So say, for example, Netflix and**

21  **games that they can play on the device.**

22  Q.  Does this customer ask about accessing adult content?

23  A.  **They did.**

24  Q.  What does he ask?

05:46  25  A.  **He asks if they can access adult content by spelling the**

1    word fire with a Y.

2    Q.   Does this customer also ask about Netflix content?

3    A.   **They do.**

4    Q.   What does the customer ask?

05:46    5    A.   **They asked about -- refresh my memory here -- they ask**

6    **about accessing Netflix, and did they have to have a separate**

7    **subscription for Netflix content on the device.**

8    Q.   In your view, after reviewing this telephone call and

9    reading the transcript, does this customer seem confused --

05:46    10           **MR. FOODMAN:**  Objection, Your Honor, he's not an

11    expert.  He hasn't been qualified as an expert to give an

12    opinion on whether a customer is confused or not.

13           **THE COURT:**  Your response?

14           **MR. BAGEANT:**  I'd like to finish my question, Your

05:47    15    Honor.

16           **THE COURT:**  All right.  Please don't answer because

17    there is an objection, so finish your question.

18           **MR. BAGEANT:**

19    Q.   Based on your review of the underlying telephone call,

05:47    20    the transcript, and your experience in Amazon, does this

21    customer seem to you to be confused about an affiliation

22    between Netflix and Amazon?

23           **THE COURT:**  Is there an objection to that question?

24           **MR. FOODMAN:**  One second.  Yes, Your Honor, the

05:47    25    same objection.

1    **THE COURT:**  Counsel?  What's your position?

2    **MR. BAGEANT:**  He's a customer service

3    representative at Amazon, and I think he's entitled to

4    explain whether he views the customer as confused about a

05:47  5    customer contact.

6    **THE COURT:**  I'm going to sustain the objection.

7    Number 1, he's a fact witness, not an expert witness.  Number

8    2, I'm capable of reviewing this transcript myself, and to

9    the extent that there are any conclusions about whether the

05:47  10    customer is confused or not, or possibly confused, I think

11    I'm able to evaluate it for that purpose.  So move on to

12    another question, please.

13    **MR. BAGEANT:**  With that in mind, Your Honor, I

14    would like to move on to the final exhibit, which is attorney

05:48  15    eyes only confidential, so with the Court's permission, we'll

16    invoke the sealing procedure and close out his questioning.

17    **THE COURT:**  This is tab 2.

18    **MR. BAGEANT:**  It is, Your Honor.

19    **THE COURT:**  So I think there may be some folks here

05:48  20    who will need to step out, it sounds like briefly.  I think

21    we just have one person, nothing personal, sir.  All right.

22    That witness has now left the courtroom.  You may proceed

23    with your question.

24    **BY MR. BAGEANT:**

05:48  25    Q.  Mr. Fuller, could you turn to tab 2 in your binder,

1   please?

2   A.  **Yes.**

3   Q.  Do you recognize the document that is tab 2?

4   A.  **I do.**

05:48  5   Q.  Is this the four customer contacts we discussed earlier

6   related to F-Y-R-E TV?

7   A.  **Yes, it is.**

8   Q.  Did you assist in the preparation of this document?

9   A.  **I did.**

05:48  10   Q.  There are some columns and rows and cells, can you tell

11   me what they're associated with?

12   A.  **They're content or flagging of our database for the**

13   **particular contacts.**

14   Q.  Do you have personal knowledge of that database?

05:49  15   A.  **I do.**

16   Q.  And do you recognize this to be the outputs of that

17   database?

18   A.  **Yes.**

19       **MR. BAGEANT:**  Your Honor, we would offer tab 2 of

20   Mr. Fuller's binder into evidence.

21       **THE COURT:**  Any objection from the Plaintiff?

22       **MR. FOODMAN:**  Yes, Your Honor, I don't think he

23   laid the proper predicate for a business record.

24       **THE COURT:**  You want to ask a few more questions,

05:49  25   counsel?

BY MR. BAGEANT:

Q.   Mr. Fuller, we talked about -- you mentioned a moment ago

tools and databases; do you recall that?

A.   **Yeah.**

Q.   And you mentioned that this was an output of those tools

and databases?

A.   **That's correct.**

Q.   Are these outputs maintained in the ordinary course of

Amazon's business?

A.   **Yes, they are.**

Q.   They're kept in its files for that purpose?

A.   **Correct.**

        MR. BAGEANT:  We would offer tab 2, Your Honor.

        THE COURT:  Any objection from the Plaintiff?

        MR. FOODMAN:  No, Your Honor.

        THE COURT:  Without objection, tab 2 is admitted.

        (Thereupon, the aforementioned exhibit was admitted

into evidence.)

BY MR. BAGEANT:

Q.   Mr. Fuller, could you refer to cell H@ on the first page

of tab 2, please?

A.   **H2?**

Q.   Yes, sir.

A.   **Yes.  I know Amazon's Fire TV is --**

        THE COURT:  Slowly, slowly, please.

```
 1   A.   I know what Amazon's Fire TV is, but another company has

 2   a service and a small box for streaming adult videos called

 3   FyreTV.  I just wanted to know if Amazon was aware of this,

 4   and the possible confusion it could cause among customers --

 5   or consumers, I'm sorry.

 6   BY MR. BAGEANT:

 7   Q.   Is this a customer contact, sir?

 8   A.   Yes, it is.

 9   Q.   Do you know how it was sent to Amazon?

10   A.   Through an e-mail.

11   Q.   Is there anything in this contact that indicates to you

12   that this customer is confused?

13        MR. FOODMAN:  Objection, Your Honor, same objection

14   I made before.

15        THE COURT:  Sustained.  The document says what it

16   says.  And this man is not an expert in psychology, customer

17   confusion, English syntax, et cetera.

18        And to the extent that there are any conclusions to

19   be drawn from this, I'm capable of doing that myself.  So the

20   objection is sustained.  Anything else?

21   BY MR. BAGEANT:

22   Q.   Mr. Fuller, could you turn to cell H3, please?

23   A.   Yes.

24   Q.   Is this another of four customer contacts related to the

25   Plaintiff Wreal?
```

```
 1    A.  Yes, it is.

 2    Q.  Could you turn to cell L4, please.

 3    A.  Yes.

 4    Q.  Is this another contact, sir?

 5    A.  Yes, it is.

 6    Q.  My last question, sir, is do you consider Amazon's

 7    customer contact searching tools that you mention earlier to

 8    be reliable?

 9    A.  Yes, I do.

10          MR. BAGEANT:  Thank you.

11          THE COURT:  The examination is complete.  Counsel?

12          MR. BAGEANT:  Yes, sir, it is complete.  I'm sorry,

13    Your Honor.

14          THE COURT:  So it is now 5:49.  You've taken up ten

15    minutes.  Is there any cross-examination, Mr. Foodman?

16

17                    CROSS EXAMINATION

18    BY MR. FOODMAN:

19    Q.  What software --

20          THE COURT:  Hang on, it's now 5:50.  Go ahead.

21    BY MR. FOODMAN:

22    Q.  You just indicated that you thought your software was

23    reliable, correct?

24    A.  Yes.

25    Q.  Isn't it true that software used for voice analytics did
```

```
 1   not pick up the phone call that was played for the Court
 2   earlier today?
 3   A.  That is correct.
 4   Q.  It did not?
 5   A.  It did not pick up that particular phone call, no.
 6   Q.  ████████████████ REDACTED ████████████████
 7   A.  That is correct.
 8         MR. FOODMAN:  No other questions, Your Honor, thank
 9   you.
10         THE COURT:  All right.  5:51.  Any redirect?
11
12              REDIRECT EXAMINATION
13   BY MR. BAGEANT:
14   Q.  One question.  Do you rely on that software in the course
15   of Amazon's business?
16   A.  Yes, we do.
17         MR. BAGEANT:  Thank you.
18         THE COURT:  Okay.  You may step down, sir, thank
19   you.  Are there any additional witnesses?  Hang on just a
20   minute.  Before we get there, let's see how we're doing on
21   time.  Let's see because this is an Amazon witness, let's
22   just tally up the Amazon time.  Bear with me just a minute.
23   Let me see.
24         So Locke, I'm going to indicate some numbers.
25   You're going to write them down, okay?
```

05:51 (line 5)
05:52 (line 10)
05:52 (line 15)
05:52 (line 20)
05:52 (line 25)

 1          THE LAW CLERK:  You got it.

 2          THE COURT:  First, we have 41 minutes.  Then we

 3  have 21 minutes.  Then we have 30 seconds.  We'll take that

 4  up to one minute.  Then we have 29 minutes.  We have 15

05:54    5  minutes.  Then we have 5 minutes.  Then we have 42 minutes.

 6  And we have 10 minutes.  10 minutes.  What does that come to?

 7          THE LAW CLERK:  Bear with me one second.

 8          164.  Let me add it again, just to be sure.

 9          MR. NELSON:  Clarification, Your Honor, did you say

05:55   10  two 10 minutes at the end?

11          THE COURT:  Yes.

12          MR. NELSON:  What was the first 10 minutes?

13          THE COURT:  One set of 10 minutes.  So just

14  subtract the last 10.  164 minutes.  So you have a total of

05:55   15  180 minutes.  So you have 16 minutes.

16          MR. HANSEN:  Your Honor, Amazon calls Dr. Dan

17  Sarel.

18          MR. NÚÑEZ-VIVAS:  Excuse me, Your Honor, may I ask

19  how much time do we have?

05:56   20          THE COURT:  I'm not prepared to give you an answer

21  right now, but we'll figure it out when we get to the cross.

22          MR. HANSEN:  May I approach, Your Honor, to hand

23  him some binders?

24          THE COURT:  You can.  So it's now -- let's swear in

05:56   25  the witness.

1        Thereupon,

2                        **DAN SAREL, PH.D.,**

3   having been duly sworn by the Clerk, testified as follows:

4              **THE WITNESS:**  I do.

05:56   5      **THE COURTROOM DEPUTY:**  Sir, please state your name

6   for the record.

7              **THE WITNESS:**  Dan Sarel, D-A-N, S-A-R-E-L.

8              **THE COURTROOM DEPUTY:**  Thank you.

9              **THE COURT:**  So it is now 5:55.  So you have until

05:57   10  6:11, and I'll give you a heads up it's 6:09.

11             **MR. HANSEN:**  Thank you, Your Honor, may I proceed?

12             **THE COURT:**  Yes, sir.

13

14                       _**DIRECT EXAMINATION**_

15  BY MR. HANSEN:

16  Q.  What do you do for a living, Dr. Sarel?

17  A.  **I'm a professor in marketing at the University of Miami.**

18  Q.  Do you have tenure at the University of Miami?

19  A.  **Yes, for over 30 years.**

05:57   20  Q.  Can you give us the brief overview of your educational

21  background, college forward?

22  A.  **Yes, I have a BA and MBA, highest distinction from the**

23  **University of Jerusalem, I did graduate studies at UCLA.  I**

24  **have a doctorate from the Harvard Business School**

05:57   25  **specializing in marketing.**

| | | |
|---|---|---|
| | 1 | Q.   What courses do you teach at the University of Miami? |
| | 2 | A.   **I've taught all of the marketing courses, all levels,** |
| | 3 | **including MBA, EMBA, executives, including marketing** |
| | 4 | **management, marketing research, consumer research, marketing** |
| 05:58 | 5 | **and advertising, and so on.** |
| | 6 | Q.   Do you consult in litigation from time to time? |
| | 7 | A.   **Yes, I do.** |
| | 8 | Q.   In what areas? |
| | 9 | A.   **Primarily likelihood of confusion and other marketing and** |
| 05:58 | 10 | **advertising issues.** |
| | 11 | Q.   How many likelihood of confusion surveys have you |
| | 12 | conducted? |
| | 13 | A.   **About 20.** |
| | 14 | MR. HANSEN:   Your Honor, I tender Professor Dan |
| 05:58 | 15 | Sarel as an expert in consumer surveys with particular |
| | 16 | expertise in likelihood of confusion. |
| | 17 | MR. FOODMAN:   No objection to his qualifications. |
| | 18 | THE COURT:   All right.  Please continue. |
| | 19 | BY MR. HANSEN: |
| 05:58 | 20 | Q.   Dr. Sarel, did you conduct a likelihood of confusion |
| | 21 | survey in this case? |
| | 22 | A.   **Yes, I did.** |
| | 23 | Q.   Was there a particular survey type or form that you used? |
| | 24 | A.   **Yes, the Eveready form.** |
| 05:58 | 25 | Q.   Can you describe the Eveready in general terms for the |

          1    Court?

          2    A.  **Yes, a market stimulus is presented to consumers and**

          3    **there are regular questions asked about whether -- what's the**

          4    **source of the mark, is it associated or affiliated with other**

05:58     5    **marks.  These are open ended questions.**

          6    Q.  In your experience, is the Eveready survey method

          7    generally accepted in the field?

          8    A.  **Absolutely.  It's the most commonly used survey.**

          9    Q.  In front of you, we have several exhibits.  Is the first

05:59    10    tab in your binder, Sarel 1, the redacted form of your

         11    declaration filed on November 25, docket 76-6?

         12    A.  **Yes, it is.**

         13    Q.  Is the second stab tab, the under seal form parts of your

         14    declaration which contain pornography, which was also filed

05:59    15    on November 5 [sic]?

         16    A.  **Yes, it is.**

         17    Q.  Is the next tab, Sarel 3, a notice of correction related

         18    to two of your appendices, appendix A, Sarel 4, and appendix

         19    F, Sarel 5, which was filed on December 17th as docket 102 in

05:59    20    this case?

         21    A.  **Yes, they are.**

         22         **MR. HANSEN:**  I would move admission of Sarel 1

         23    through 5.

         24         **THE COURT:**  You're going to have to give me a hand

05:59    25    here, because my tabs don't say Sarel 1 through 5.

1      **MR. HANSEN:**  I'm sorry, they are the first five

2    tabs in the binder, Your Honor.

3          **THE COURT:**  You didn't read off the names.

4          **THE COURTROOM DEPUTY:**  The names.

06:00   5          **THE COURT:**  So you're talking about --

6          **MR. HANSEN:**  The court reporter has them labeled,

7    Your Honor.

8          **THE COURT:**  Any objection to the first five tabs

9    from the Sarel binder?

06:00   10          **MR. MARFOE:**  Object to this on the grounds that

11    it's hearsay.  All his reports are hearsay.  Declarations are

12    hearsay.  He can testify about them himself.

13          **THE COURT:**  Sustained.

14    **BY MR. HANSEN:**

06:00   15    Q.  Dr. Sarel, are you familiar with the concept of a survey

16    universe?

17    A.  **Yes, I am.**

18    Q.  What is a survey universe?

19    A.  **It's a universe that consists of a specific market place**

06:00   20    **that we're talking, the customers that are relevant to a**

21    **specific case.**

22    Q.  Who did you select as your survey universe in this case?

23    A.  **I selected the Wreal's customer, and it's a reverse**

24    **confusion study, and you're supposed to study the senior or**

06:01   25    **older mark customers and these are the ones we surveyed.**

|     |                                                                           |
| --- | ------------------------------------------------------------------------- |
| 1   | Q.   Could you describe in general terms the question -- could            |
| 2   | you describe in general terms how you selected the survey                 |
| 3   | universe in this case?                                                     |
| 4   | A.   **Yes, the survey universe was based on adults over 18 that**        |

06:01
| 5   | **were interested and willing to pay to get to view porn --** |
| 6   | **streaming porn videos.** |
| 7   | Q.   Could you look at tab 1 in your binder and go to appendix |
| 8   | E, which I believe is the survey you actually conducted. |
| 9   | A.   **Yes.** |

06:01 10   Q.   Is this the survey you conducted in this case?

11   A.   **Yes, it is.**

12          **MR. HANSEN:**  I move the admission of Exhibit E to

13   tab A.

14          **THE COURTROOM DEPUTY:**  I'm sorry?

06:01 15          **THE COURT:**  Tab 5.

16          **MR. HANSEN:**  I'm sorry, Exhibit E to tab 1.

17          **THE COURT:**  Exhibit E to tab 1.

18          **MR. HANSEN:**  Appendix E to tab 1.

19          **THE COURT:**  I'm sorry?

06:01 20          **MR. HANSEN:**  Appendix E to tab 1.

21          **THE COURT:**  Appendix E to tab 1, is that somehow

22   flagged in here for me?  I mean, there are a lot of pages

23   here in tab 1.

24          **MR. HANSEN:**  It probably is not.  Well, let me

06:02 25   just -- sorry, Your Honor, do you have appendix E in front of

1   you?

2   **BY MR. HANSEN:**

3   Q.   Dr. Sarel, can you identify for the Court which page that

4   begins on?

06:02   5   A.   **I'm sorry?**

6   Q.   Can you identify for the Court which page --

7          **THE COURT:**  Out of 172 pages, where does it start?

8   If you notice in the upper right hand corner, Doctor, of each

9   page, it says page something of 172?

06:02   10   A.   **Yes, I do.**

11          **THE COURT:**  So what page are we starting at here?

12   A.   **Page 37.**

13          **THE COURT:**  Page 37 of 172.  This is the survey?

14   A.   **Yes, it is.**

06:02   15   **BY MR. HANSEN:**

16   Q.   Is this the survey you conducted in this case?

17   A.   **Yes, it is.**

18          **MR. HANSEN:**  We will relabel this as Sarel 1,

19   beginning at page 37.  So Sarel 1 will be 37 -- and

06:02   20   Dr. Sarel --

21          **THE COURT:**  Hang on just a minute.  Isn't it a

22   multiple page survey?

23          **MR. HANSEN:**  Yes, and that's what I was going to

24   say.

06:03   25   **BY MR. HANSEN:**

1   Q.  Dr. Sarel, from 37 to 172, can you describe for the Court

2   what there is here?

3   A.  **These are all the documents related to the survey, the**

4   **questions, the specific web pages that were shown to**

06:03   5   **consumers and so on.**

6           MR. HANSEN:  I move the admission of this as Sarel

7   1, which will be pages 37 through 172.

8           THE COURT:  37 through 172, the questions and the

9   survey results?

06:03   10          MR. HANSEN:  Correct, Your Honor.

11          THE COURT:  Any objection?

12          MR. MARFOE:  Objection again.  This is hearsay.

13          THE COURT:  Overruled.  Admitted.

14          (Thereupon, the aforementioned exhibit was admitted

15   into evidence.)

16  BY MR. HANSEN:

17  Q.  Dr. Sarel, could you turn to Sarel -- sorry, the second

18  tab in your binder.  Is this the unredacted version of the

19  web pages that you presented as part of your stimulus?

06:03   20  A.  **Yes.**

21  Q.  I move admission of Sarel 2, the second tab in the

22  binder.

23          THE COURTROOM DEPUTY:  Judge, I'm sorry, it's --

24          THE COURT:  Tab 2, counsel, to me, says declaration

06:04   25  of Dr. Sarel.  So is that what you're intending me to look at

|    |    |
|----|----|
| 1  | now, declaration? |
| 2  | **MR. HANSEN:**  Your Honor, it should be -- if you |
| 3  | turn the page, the very next thing, it's meant to be the |
| 4  | under seal portions, so it should just be pictures. |
| 5  | **THE COURT:**  No. |
| 6  | **MR. HANSEN:**  It is not. |
| 7  | **THE COURT:**  No.  Here is what I'm looking at, sir. |
| 8  | I'm looking thing at a black looseleaf binder with two tabs. |
| 9  | Tab 2 says declaration of Dr. Sarel to response for PI |
| 10 | seal -- |
| 11 | **MR. HANSEN:**  Your Honor, I apologize, we're going |
| 12 | to move to -- from tab -- under tab 2, these are the under |
| 13 | seal versions, appendix C to tab 2.  I apologize. |
| 14 | **BY MR. HANSEN:** |
| 15 | Q.  Dr. Sarel, do you see under appendix C to tab 2, it says |
| 16 | FyreTV study web page filed under seal? |
| 17 | A.  **I do.** |
| 18 | Q.  And are those the actual pictures you showed consumers or |
| 19 | respondents? |
| 20 | A.  **Yes, they are.** |
| 21 | **MR. HANSEN:**  Move for admission, Your Honor. |
| 22 | **THE COURT:**  Wait, because I'm not there yet. |
| 23 | **THE COURTROOM DEPUTY:**  I'm not there either. |
| 24 | **THE COURT:**  So we have tab 2.  We have the first |
| 25 | page called likelihood of confusion study.  Where in here are |

06:04 (line 5)
06:04 (line 10)
06:04 (line 15)
06:05 (line 20)
06:05 (line 25)

|   |   |
|---|---|
|   | 1 | you starting off?  Is there a page number, a reference? |

1   you starting off?  Is there a page number, a reference?

2           MR. HANSEN:  May I approach, and I can --

3           THE COURT:  Is it appendix C?

4           MR. HANSEN:  Correct, Your Honor.

06:05   5           THE COURT:  Appendix C, FyreTV study web pages.

6   And where does that go to?  Is it the rest of the entire

7   exhibit?

8           MR. HANSEN:  That's correct.

9           THE COURT:  Any objections to appendix C, to tab 2

06:05   10   of the Sarel binder?

11           MR. MARFOE:  Objection, lack of foundation.  He

12   hasn't said what it is.

13           THE COURT:  You want to ask a few more questions?

14   BY MR. HANSEN:

06:05   15   Q.  Are these the actual photographs that were presented as

16   part of your survey?

17   A.  **Yes.**

18           MR. HANSEN:  Move its admission.

19           THE COURT:  Any objection?

06:06   20           MR. MARFOE:  Objection, foundation, that's one of

21   the photographs.

22           THE COURT:  Objection overruled.  Appendix C to tab

23   2 to Dr. Sarel's binder will be admitted over objection.

24   Next?

06:06   25   BY MR. HANSEN:

1    Q.   Next is, Dr. Sarel, if you turn to corrected appendix F

2    to notice, do you see that, sir?

3    A.   **Yes.**

4    Q.   Is this a corrected version of the data you submitted as

06:06   5    part of your survey?

6    A.   **Yes.**

7              **MR. HANSEN:**  I would move the tab under corrected

8    appendix F to notice as Sarel 3.

9              **THE COURT:**  The entire exhibit?

06:06   10             **MR. HANSEN:**  The entire exhibit.

11             **THE COURTROOM DEPUTY:**  Sarel 3?

12             **MR. HANSEN:**  Yes.

13             **THE COURTROOM DEPUTY:**  Not 5.

14             **THE COURT:**  Wait, I'm sorry, would you say that one

06:06   15   more time?

16             **MR. HANSEN:**  Yes, corrected appendix F to notice is

17   Sarel 3.

18             **THE COURT:**  What are we looking at here?

19             **MR. HANSEN:**  I asked Dr. Sarel if this is the

06:07   20   corrected data output that you submitted in this case.

21   A.   **It is.**

22             **THE COURT:**  Any objections?

23             **MR. MARFOE:**  No objection.

24             **THE COURT:**  Without objection, this will be

06:07   25   admitted.

1          (Thereupon, the aforementioned exhibit was admitted

2     into evidence.)

3     **BY MR. HANSEN:**

4     Q.   Dr. Sarel, we're not going to look at the questions

06:07   5     because the Court can view them, but were these Eveready type

6     questions you asked in this case, or was it some other form?

7     A.   **Eveready questions.**

8     Q.   And what are the Eveready questions designed to probe?

9     A.   **They're designed to prove to -- or to measure whether**

06:07  10     **there's any association between the two marks involved.  So**

11     **usually the first question focuses on whether a respondent**

12     **believes what he sees comes from a specific source.**

13          **The second one deals with association, does he**

14     **believes that the two marks involved are affiliated.  The**

06:07  15     **third question deals with are the two marks -- is one closer**

16     **than the other one.  These are all standard questions.**

17     Q.   How many respondents to your survey mentioned Amazon in

18     response to any of the questions?

19     A.   **Two.**

06:08  20     Q.   What is that is as a likelihood of confusion rate?

21     A.   **In this situation, the two are one percent, and one**

22     **percent is statistically insignificant.  It's nonexistent**

23     **whatsoever.  If you look at the data, it's clear that they**

24     **are not thinking any way, shape or form about Amazon and its**

06:08  25     **contents.**

1        MR. NELSON:  Thank you, Your Honor.

2        THE COURT:  So it is now 6:07.  Bear with me just a

3   minute.  So you had asked me how much time the Plaintiff has

4   remaining.  So let's go ahead and tally that up.  Locke, are

06:08  5   you getting ready to perform your mathematics?

6        THE LAW CLERK:  You bet.

7        THE COURT:  So first we have 66 minutes.

8        MR. HANSEN:  Your Honor -- I beg your pardon.

9        THE COURT:  14 minutes.  We have 21 minutes.  Then

06:10  10   17 minutes.  I'm sorry, I missed a 5.  Then that's there's an

11   additional 6.  One more minute.  And there's another 1

12   minute.  Then there's another one minute.  That's it.  So

13   what's that total?

14        THE LAW CLERK:  Give me one second.

06:11  15        MR. FOODMAN:  Your Honor, may I be excused from the

16   courtroom?

17        THE COURT:  Sure.  Forever?  Or are you coming

18   back?

19        MR. FOODMAN:  Just my blood sugar.

06:11  20        THE COURTROOM DEPUTY:  132.

21        THE COURT:  So you have plenty of time.  48 minutes

22   remaining.

23        MR. HANSEN:  Your Honor, I'm sorry, may I raise

24   something before the examination?

06:12  25        THE COURT:  All right.

1          **MR. HANSEN:**  I think I may have misspoke on Sarel

2     1.  I just looked, I think I may have said from appendix E to

3     the end, instead of B to the end.  But I can't tell.  So I

4     apologize.  Sarel 1 is supposed to be appendix B to the end

06:12  5     of the first tab, page 36 to 172, to the end.

6          **THE COURT:**  Any objection to that, Plaintiff, or do

7     you need to take another look, because you're like me,

8     thoroughly confused.

9          **MR. NÚÑEZ-VIVAS:**  Yes.  I am confused, too, Your

06:12 10     Honor.

11          **THE COURT:**  I have to tell you, this is -- this is

12     a little dicey, this is the problem.  At 6:10 in the evening.

13     Let's take it one step at a time.

14          **MR. NÚÑEZ-VIVAS:**  The other thing is, I don't know

06:12 15     if this is what the witness actually was talking about.

16     Let's take a look at it.

17          **THE COURT:**  So, what are we looking at here?

18          **MR. HANSEN:**  We are looking at tab -- the first

19     tab.

06:13 20          **THE COURT:**  Tab 1.

21          **MR. HANSEN:**  The first tab in the Sarel binder.

22     While I was intending to mark as Sarel 1 begins at appendix

23     B.

24          **THE COURT:**  Page 1 of --

06:13 25          **MR. HANSEN:**  Page 36 of 172 and continues through

1    the end.  And forgive me, Your Honor, it may have had that as

2    what it was, but I can't tell from what I'm left with.  I

3    wanted to clarify.

4         **THE COURT:**  You want to introduce the questionnaire

06:13  5    and that was appendix B.

6         **MR. HANSEN:**  Appendix B.

7         **THE COURT:**  B as in boy.

8         **MR. HANSEN:**  Correct, Your Honor.

9         **THE COURT:**  So what's the problem?

06:13  10        **MR. HANSEN:**  Well, Your Honor, I don't know if I

11   said appendix E to the end, and that's what it says, or

12   appendix B to the end.  And I meant to introduce appendix B

13   to the end, and Dr. Sarel testified that was his screening

14   questionnaire results.  So I apologize if I messed this all

06:13  15   up.

16        **MR. NÚÑEZ-VIVAS:**  We have no objection.  Actually,

17   that is the one that he intended to because that's the one we

18   saw, too.

19        **THE COURT:**  So fine, we're all on the same page

06:14  20   literally and figuratively.  So appendix B, as in boy, has

21   been admitted again under the correct designation if it

22   wasn't already correctly designated.

23        So it's now 6:13 and you have 48 minutes remaining

24   with this witness and any other witnesses that may be called

06:14  25   today.

1          *CROSS EXAMINATION*

2     **BY MR. MARFOE:**

3     Q.   Good evening, Dr. Sarel.  You testified that in a reverse

4     confusion case, it's the senior customer's perceptions that

06:14 5    are relevant when they're in a survey, correct?

6     A.   **Correct.**

7     Q.   And then on paragraph 17 of your report, which is page 5

8     of the ECF stamp, you say that the target markets for the

9     FyreTV service seem to be audiences wishing to view

06:14 10   pornographic movies/videos, and willing to pay for such

11    access; is that correct?

12    A.   **Correct.**

13    Q.   And did you learn about that target market from Amazon's

14    counsel?

06:14 15   A.   **No.**

16              **MR. HANSEN:**  Objection.

17              **THE COURT:**  What's the basis of the objection?

18              **MR. HANSEN:**  Asked on its face for privileged

19    information, communications between counsel and the witness.

06:15 20            **THE COURT:**  Well, I hear the objection.  And if it

21    was something that the witness used to base his expert

22    opinion on, what would be your position then?

23              **MR. HANSEN:**  Then that would not be objectionable.

24              **THE COURT:**  So are you withdrawing to objection?

06:15 25            **MR. HANSEN:**  Depends on what his answer is, but

```
        1    yes.
        2              THE COURT:  Let's think about that.  It depends on
        3    what his answer is, but yes.  What do I make of that?
        4              MR. HANSEN:  I beg your pardon.  I will withdraw.
06:15   5              THE COURT:  All right.  Fair enough.
        6    A.   Could you repeat the question?
        7    BY MR. MARFOE:
        8    Q.   And you learned that -- you learned that from Amazon's
        9    counsel, your target market?
06:15   10   A.   That -- what is that specifically?
        11   Q.   Well, previously, we had mentioned paragraph 17 of your
        12   report where you said the target market?
        13             THE COURT:  Sir.
        14             MR. MARFOE:  Reading too fast?
06:16   15             THE COURT:  Reading too fast, talking to fast,
        16   probably thinking too fast.  I don't --
        17   BY MR. MARFOE:
        18   Q.   The target market for the FyreTV service seemed to be
        19   audiences wishing to view pornographic movie/videos, and
06:16   20   willing to pay for such access, and then the question was,
        21   did you learn that from Amazon's counsel?
        22   A.   I learned it from a variety of sources.
        23   Q.   And was one of those sources Amazon's counsel?
        24   A.   He might have mentioned it, but this was not the primary
06:16   25   source.
```

| | |
|---|---|
| 1 | Q.   And you did your own independent research to determine |
| 2 | what the target market was for FyreTV services? |
| 3 | A.   **The question is what you mean by research.  I visited the** |
| 4 | **web sites and I read the -- Mr. Franco's declaration.** |
| 06:16    5 | Q.   And but you did not review any demographic information |
| 6 | for Wreal's customers, did you? |
| 7 | A.   **That's correct.** |
| 8 | Q.   Are you aware that Wreal produced -- or provided to |
| 9 | Amazon a survey of its customers with detailed demographic |
| 06:16   10 | information in this case? |
| 11 | A.   **I am aware.** |
| 12 | Q.   And you don't think that would have been relevant to your |
| 13 | survey? |
| 14 | A.   **No, I do not.** |
| 06:17   15 | Q.   In fact, your survey did not collect any demographic |
| 16 | information at all other than age and sex; is that correct? |
| 17 | A.   **That's incorrect.** |
| 18 | Q.   That's incorrect?  What other demographic information did |
| 19 | your survey collect? |
| 06:17   20 | A.   **The survey itself collected specifically, as you** |
| 21 | **indicate, age and sex.  The panel company that prescreened** |
| 22 | **consumers have specific information on the ages of consumers.** |
| 23 | Q.   But that was not provided to us, was it? |
| 24 | A.   **It was not.** |
| 06:17   25 | Q.   But you have access to that information? |

1    A.   **I have access to it.**

2    Q.   Now, as to the -- as to the things in your report as to

3    age, your screening question only asked if the respondent was

4    over the age of 18; is that right?

06:17    5    A.   **Correct.**

6    Q.   Did you know that only about three percent of Wreal's

7    customers are in the age group of 18 to 24?

8    A.   **I learned it later from the survey.  So the survey is**

9    **reliable.**

06:17   10    Q.   Now, from your report, we have no way of knowing whether

11    the respondents' demographics by age group match Wreal's

12    actual customer base as -- from the survey that Wreal

13    produced to Amazon, do you?

14    A.   **I do.**

06:18   15    Q.   And is that through the demographic information that you

16    didn't provide to us?

17    A.   **This is from the verification study that was done, and I**

18    **report on that verification process in my report.**

19    Q.   And that reports the breakdown of the respondents that

06:18   20    you surveyed by age?

21    A.   **It does not provide breakdown.**

22    Q.   So you cannot determine whether the respondents who

23    answered your survey match Wreal's actual customer base

24    demographics by age group, can you?

06:18   25    A.   **As I mentioned earlier, I do have the ages, so I can**

1    determine.

2    Q.   But only with the information you didn't provide to us?

3    A.   **That's correct.**

4    Q.   Thank you.  Let's turn to the screening questions that

06:18   5    you asked to form the universe.  Now, the screening questions

6    should not be leading, should they?

7    A.   **Correct.**

8    Q.   And they shouldn't suggest to respondents how to qualify

9    for the survey?

06:19   10   A.   **I don't know what you mean by suggest to qualify.  The**

11   **questions are specifically asked to determine specific issues**

12   **and they should be asked in a nonleading way.**

13   Q.   But screening questions are asked to determine whether

14   someone will qualify for the survey; isn't that correct?

06:19   15   A.   **That is correct.**

16   Q.   And should screening questions suggest to respondents,

17   potential survey respondents, how they would qualify for the

18   survey?

19   A.   **I don't know how you suggest.  If I ask you, are you**

06:19   20   **interested in ice scream, does this suggest that I'm going**

21   **have a survey on ice scream?  So I have to ask questions**

22   **about the specific issues at hand.**

23   Q.   So your answer is that yes, it's acceptable for screening

24   questions to suggest to potential respondents how to qualify

06:20   25   for the survey?

1    A.   **I disagree with the way you phrased the question.   I'm**

2    **asking typical screening questions, I'm not suggesting**

3    **anything.**

4    Q.   So my question was whether screening questions should

06:20   5    suggest to potential respondents how they're going to qualify

6    for the -- how to qualify for the survey?

7    A.   **Again, questions -- what do you mean by suggest?  Does**

8    **the person answering the question, qualifying questions**

9    **has -- does he have a suspicion?  They might have a**

06:20   10   **suspicion.   This is no other way to screen people.**

11   Q.   Turn to question S 06 on your survey, and that's on page

12   40 of the ECF stamp?

13            THE COURT:   40 of 172.

14            MR. MARFOE:   40 of 172, yeah.   I'm going to use

06:20   15   those page numbers.

16   A.   **Okay.**

17   BY MR. MARFOE:

18   Q.   Now, at beginning of this question, it says, for this

19   survey, we are looking for people who have browsed adult

06:20   20   entertainment online; is that correct?

21   A.   **Correct.**

22   Q.   So this question tells respondents, we're looking for

23   people who browse adult entertainment online, isn't that

24   correct?

06:21   25   A.   **That's correct.**

```
         1   Q.   So by the time the respondents gets to questions S 08 and

         2   S 09, which are on pages 42 and 43 respectively, they know

         3   that you're looking for people who are -- who had watched

         4   adult entertainment online?

06:21    5   A.   Most likely.

         6   Q.   This was an online survey, correct?

         7   A.   Correct.

         8   Q.   And survey respondents receive an incentive to

         9   participate in online surveys, don't they?

06:21   10   A.   Correct.

        11   Q.   And the incentive is greater for respondents that

        12   qualify, isn't it?

        13   A.   They get many surveys.  They do it on an ongoing basis.

        14   Q.   My question was, there's two different types of people

06:21   15   who will take the survey.  Some will qualify, some won't.

        16   Those who qualify and take the survey, they receive a greater

        17   incentive than those who do not qualify?

        18   A.   On that specific day, yes.  Tomorrow, no.

        19   Q.   So for this survey, did respondents who completed the

06:22   20   survey receive a greater incentive than those who didn't

        21   qualify?

        22   A.   You have to qualify to receive a compensation, yes.

        23   Q.   So potential respondents who did not qualify received no

        24   compensation?

06:22   25   A.   That's correct.
```

|     |    |                                                                              |
| --- | -- | ---------------------------------------------------------------------------- |

1   Q.   So there's an incentive to lie and to participate in the

2   survey to get the incentive, isn't there?

3   A.   **No.**

4   Q.   There's not?

06:22   5   A.   **Not specifically.  Every survey will screen people, and**

6   **if they don't qualify, they don't participate.  So this is**

7   **common in the industry.  There's no other way to operate.**

8   Q.   My question wasn't whether it was common in the industry.

9   My question is whether there's an incentive to lie to

06:22   10   participate in the survey so you can get the incentive?

11   A.   **No, because on this survey, these people get repeated**

12   **surveys, and there's no reason for them to participate in a**

13   **survey that they don't know anything about.**

14   Q.   So you assume that nobody lies to qualify fir the survey?

06:22   15   A.   **People always lie.**

16   Q.   Did you do anything to screen out people who may have

17   been lying to qualify for your survey?

18   A.   **Yes.**

19   Q.   What was that?

06:23   20   A.   **There's a whole process.  I mean, the panel company**

21   **prescreens people before I get the list of people.  The way**

22   **the system works is panel companies collect interviews with**

23   **customers -- I'm sorry, with respondents on an ongoing basis.**

24   **They ask them a whole host of questions about a whole host of**

06:23   25   **issues.**

1          And people indicate if they are interested in

2     travel, Chinese food, pornography, coming to court, whatever

3     the issue is, and it doesn't specify any area.

4          The people that indicate in the past they have

06:23   5     interest in that category, they were the ones that were

6     invited to participate.

7          Many people that went through this questionnaires,

8     screening questionnaire, did not qualify and did not want to

9     participate and did not answer.

06:23  10          So in every survey, there is some selection.  This

11     is it typical to everything we have done in the past and

12     every market researcher has done.

13     Q.  Let's turn to paragraph 32 of your report, and that's on

14     page 8 of 172.

06:24  15     A.  **Page 8?**

16     Q.  8 of 172, paragraph 32.

17          **THE COURT:**  Counsel, excuse me.  The report is not

18     in evidence.  In fact, you objected to it.  I sustained the

19     objection.  You said that the report is hearsay.  You're now

06:24  20     want to question this expert witness about the very report

21     that you excluded?  If you do, that's fine.  I'm just trying

22     to figure out what your position is on this.  Because it

23     seems to me to be inconsistent.

24          **MR. MARFOE:**  Yes, I do want to question him about

06:24  25     the report that was not admitted into evidence, because there

1    are conclusions that he reached in that report that he

2    testified about, and I want to test some of those

3    conclusions.

4         THE COURT:  All right.  What do you think is going

06:24    5    to happen after you do that?  Well, we'll see what happens.

6    Okay.  Go ahead.

7    BY MR. MARFOE:

8    Q.   On paragraph 32 of your report?

9    A.   **Let me get to -- yes.**

06:25   10         THE COURT:  What page was that?

11         MR. MARFOE:  8 of 172.

12         THE COURT:  Okay.

13    BY MR. MARFOE:

14    Q.   Are you on the paragraph?

06:25   15    A.   **Yeah.**

16    Q.   So on paragraph 32 of your report, you say the relevant

17    universe is consumers over 18 years of age who paid for or

18    are willing to pay for adult porn video on demand streaming

19    services; is that right?

06:25   20    A.   **Correct.**

21    Q.   And then turn to the next page, it's page 9, paragraph

22    33, and it says there that you recruited a national sample of

23    respondents over the age of 18 who indicated paying in the

24    last six months for streaming adult porn video on demand

06:26   25    services?

1      **THE COURT:**  Sir.

2   **BY MR. MARFOE:**

3   Q.  Who indicated paying in the last six months for streaming

4   adult porn video on demand services, or who indicated that in

06:26   5   the next six months, they intended to pay for streaming adult

6   video on demand services, is that right?

7   A.  **Correct.**

8      **MR. HANSEN:**  Objection.

9      **THE COURT:**  What's the nature of the objection?

06:26   10      **MR. HANSEN:**  At this point, the exhibit should be

11   moved into evidence, if that's going to be questioned about

12   this extensively.  Otherwise, it's improper, because it's not

13   impeachment.  So I would move it into evidence.

14      **MR. MARFOE:**  My position again is that he testified

06:26   15   as to the results of the survey, and these questions go to

16   the survey design, so I want to test --

17      **THE COURT:**  Let me try to sharpen my question.  Do

18   you object to the request that this report now be introduced?

19   Yes, I object.  No, I don't object.  Those are the two

06:26   20   possibilities.

21      **MR. MARFOE:**  I mean, at this point, I do object to

22   this being admitted into evidence.

23      **THE COURT:**  I'm going to allow the report to be

24   admitted.  You have now opened up the door yourself.  You're

06:27   25   questioning the witness about the very report that you wanted

```
 1    to exclude.  So now it's in evidence.  You can still question

 2    him about it, but -- anyways.  Please continue.

 3              (Thereupon, the aforementioned exhibit was admitted

 4    into evidence.)

 5    BY MR. MARFOE:

 6    Q.  So again, on question 33, I'm going to repeat the

 7    question.  You said you recruited a national sample of

 8    respondents over the age of 18 who indicated paying in the

 9    last six months for streaming adult porn video on demand

 10   services --

 11             THE COURT:  Sir.

 12   BY MR. MARFOE:

 13   Q.  Or who indicated that in the next six months, they

 14   intended to pay for streaming adult video on demand services;

 15   is that right?

 16   A.  It is right.

 17   Q.  And that would be -- you think that's a proper sample?

 18   A.  Yes.

 19   Q.  Is it possible to visit the FyreTV.com web site without

 20   paying for anything?

 21   A.  It's possible to visit, but it's not possible to stream

 22   videos on a regular basis.

 23   Q.  But is it possible to visit the web site?

 24   A.  Yes.

 25   Q.  In fact, you visited the web site to design your survey,
```

1   didn't you?

2   A.   **I did.**

3   Q.   And you didn't have to pay to access any of the images

4   that you chose for the sample, did you?

06:28   5   A.   **That is correct.   The customer the FyreTV.com is trying**

6   **to attract is a paying customer.**

7   Q.   Okay.   Can you please turn to question S 08, which is on

8   page 42.

9   A.   **Yes.**

06:28   10   Q.   Can you read that question into the record, please?

11   A.   **In the last six months, have you visited adult content**

12   **web site which required visitors to pay to have full access**

13   **to the adult content?   Question mark.   An adult content web**

14   **site is a one displaying full nudity sexual acts and**

06:28   15   **pornographic movies.**

16   Q.   Isn't it true that a respondent could answer yes to that

17   question truthfully without having ever paid for streaming

18   adult content?

19   A.   **Could you repeat the question?**

06:29   20   Q.   Isn't it true that a respondent to could truthfully

21   answer yes to question S 08 without having ever paid to

22   access adult video on demand content.

23   A.   **Yes, it is possible.**

24   Q.   If you can please turn to question S 09, please.   Let me

06:29   25   just go back a second.   This means that there could be those

1   who truthfully answered yes to S 08, who have never paid for

2   adult video on demand services at all, not just in the six

3   months, right?

4   A.  **It's possible that it indicates that they visited an**

06:29   5   **adult porn site that requires paying.**

6   Q.  Yeah, but it's possible to visit an adult porn site that

7   requires paying without actually paying; is that correct?

8   A.  **That's correct.**

9   Q.  And you heard Mr. Rodrigo Franco this morning testify

06:30   10   that about one in a thousand people who visit the FyreTV.com

11   web site pay; do you remember that?

12   A.  **That's correct.**

13   Q.  So on question S 09, it says in the next six months, do

14   you intend to visit an adult content web site that require

06:30   15   visitors to pay to have full access to adult content, an

16   adult content web site is one displaying full nudity sexual

17   acts and pornographic movies.

18        Now, in question S 09 as well, isn't it true that a

19   respondent could truthfully answer yes to that question, even

06:30   20   if they had no intention of paying to access -- for full

21   access to the adult content or paying for access to the adult

22   video on demand services in the next six months?

23   A.  **It indicates that issue is visiting a web site that**

24   **provides all this information, and is asking them to pay.**

06:30   25   **Whether they decide to pay or not to pay, most people**

1   obviously would not pay.

2          But these people went there with the intention to

3   check whether this is something of interest to them, and

4   that's the target that your client is trying to attract.

06:31   5   Q.  But that's -- didn't quite answer my question there.  My

6   question was, could somebody truthfully answer yes to this

7   question even if they had no intention of paying for an adult

8   video on demand content web site?

9   A.  It is possible.

06:31   10  Q.  So you have no way of knowing from your streaming

11  questions whether any respondent actually paid during the

12  last six months or intends to pay in the next six months for

13  adult video on demand services, do you?

14  A.  I know they have intentions in a category.  Whether they

06:31   15  actually pay or didn't pay, we don't know.

16  Q.  So if you turn back to paragraph 32 of your report on

17  page 8.  The universe of respondents that you surveyed does

18  not match this universe that you defined here in paragraph

19  32, does it?

06:32   20  A.  No, I disagree.

21  Q.  Well, again, is there anything in the screening questions

22  that says that they have paid -- that anybody who responded

23  to this question has paid for adult video on demand services?

24  A.  It indicates that they have visited a site that was

06:32   25  asking them to pay, and indicates that they're willing to

1    **visit the site that has porn video that is asking them to**

2    **pay.  So that's basically the clientele, the prospective**

3    **clients of your customer?**

4    Q.   But it's possible that there's nobody in the survey who

06:32   5    actually has ever paid for or is even willing to pay for

6    adult video on demand?

7    A.   **Anything is possible.**

8    Q.   Now, it's important for a survey to replicate market

9    conditions, correct?

06:33   10   A.   **Correct.**

11   Q.   And the closer a survey is reflecting market conditions,

12   the better it is, right?

13   A.   **In general, yes.**

14   Q.   Now, in paragraph 30 of your report, which is back on

06:33   15   page 8, and you may still be there?

16   A.   **Yes.**

17   Q.   You say that in order to accurately assess the likelihood

18   of confusion, it is important it approximate market

19   conditions; is that right?

06:33   20   A.   **Yes.**

21   Q.   So you chose to use the FyreTV web site to simulate

22   market conditions, right?

23   A.   **Correct.**

24   Q.   Well, is that true, did you use the FyreTV web site or

06:33   25   did you use screenshots from the web site?

1    A.   **Screenshots.**

2    Q.   And that's because -- so on paragraph 40 -- paragraph 40

3    of your report was on page 11, you say that to ensure that

4    all respondents were exposed to the same material,

06:34  5    screenshots of eight representative pages were taken and

6    presented to respondents.   That's what you said, right?

7    A.   **Correct.**

8    Q.   And the eight screenshots that you selected were the

9    introductory screen and home page from the old version of the

06:34  10   web site, the home page from the new version of the web site,

11   and then the next four tabs at the top of the new version of

12   the web site and ordered from left to right; is that correct?

13   A.   **Correct.**

14   Q.   And you testified earlier that you visited the FyreTV.com

06:34  15   web site?

16   A.   **Yes.**

17   Q.   And so you know, then, that from the home page, there are

18   hyperlinks that a customer can click to go to other pages?

19   A.   **Yes.**

06:34  20   Q.   And one of those is frequently asked questions?

21   A.   **Yes.**

22   Q.   And that page is not one of your eight screenshots, is

23   it?

24   A.   **Correct.**

06:34  25   Q.   So your survey only tests consumers that saw those full

1    eight screenshots, is that right?

2    A.   **Correct.**

3    Q.   And it did not test for confusion with respect to any

4    other way to access the FyreTV service, right?

06:35  5    A.   **Correct.**

6    Q.   Now, is going through eight screenshots -- fully going

7    through eight screenshots something that consumers do in the

8    real world?

9    A.   **Consumers that have interest in a category go to a web**

06:35 10   **site and click on pages of interest to them.  So we are**

11   **trying to represent reality in a reasonable way.  There is no**

12   **way to replicate every consumer's experience.  This is a**

13   **typical experience of someone that has interest in a**

14   **category.  And similar approaches will be used in service in**

06:35 15   **courts many times.**

16   Q.   So your testimony is that it's typical for consumers to

17   go through those eight screenshots on the FyreTV web page in

18   order to get a feel for the page?

19   A.   **It can be eight, it can be six, can be seven.  The idea**

06:35 20   **here is to get an impression of the actual web site.  I**

21   **understand from your expert that he wanted to show one page.**

22          **So obviously I created a much more realistic**

23   **scenario that gives a person that's interested in the**

24   **category, so that's why they would go there, give them an**

06:36 25   **opportunity to get a sense of what the site is all about.  In**

1  any situation, you can't present every opportunity, every

2  possibility.

3  Q.  And is there some data that you base that on, that

4  consumers would go through those eight pages?

06:36  5  A.  There is a lot of data how consumers visit the web site,

6  and consumers that have an interest in a web site usually

7  look at several pages on the web site that is of interest to

8  them.

9  Q.  So staying on paragraph 40, all qualified respondents

06:36  10  were told to imagine that they're browsing adult online web

11  site, and they arrive at the following sites, correct?

12  A.  Let me get to where you are.  Which one?

13  Q.  Still on paragraph 40, this is page 11?

14  A.  Yes, sir.

06:37  15  Q.  And is that -- that's what is said there?

16  A.  Repeat the question?

17  Q.  Qualified respondents --

18      THE COURT:  Slowly.

19  Q.  Qualified respondents were told to imagine that they're

06:37  20  browsing online adult sites and that they arrived at the

21  following sites?

22  A.  Correct.

23  Q.  And you are aware that there are more than one way to

24  arrive at a web site, correct?

06:37  25  A.  Correct.

06:37

06:37

06:37

06:37

06:37

06:38

```
 1   Q.   They can type the web address directly in the browser?
 2   A.   Yes.
 3   Q.   They can find it from a search engine?
 4   A.   Yes.
 5   Q.   Linked from another site?
 6   A.   Yes.
 7   Q.   So if a respondent typed a web address into the browser,
 8   is it fair to say they knew the web site they wanted to
 9   visit?
10   A.   Say it again, please?
11   Q.   If a respondent typed a web site address into a browser,
12   is it fair to say they knew where they wanted to go?
13   A.   Most likely.
14   Q.   So they could have heard about it from a friend?
15   A.   Absolutely.
16   Q.   And they could have remembered it from an advertisement
17   that they saw?
18   A.   Possibly.
19   Q.   They could have seen it on a banner ad sometime in the
20   past?
21   A.   Possibly.
22   Q.   And your survey doesn't test whether respondents who were
23   first exposed to the FyreTV mark heard of FyreTV through word
24   of mouth, or from seeing it from on advertisement or any
25   other source, whether they were confused, does it?
```

|        |    |                                                                |
|--------|----|----------------------------------------------------------------|
|        | 1  | A.  **The study only surveys the people that were in the**     |
|        | 2  | **survey, not other people.  The survey is trying to replicate** |
|        | 3  | **a group of customers that are relevant to that situation.  So** |
|        | 4  | **the data here is about the customers that we studied.**      |
| 06:38  | 5  | Q.  But those customers weren't -- were only exposed to the    |
|        | 6  | stimulus of just the web page, right?                          |
|        | 7  | A.  **Yes, every customer of FyreTV, if they had interest in** |
|        | 8  | **the category, go to the web site.**                          |
|        | 9  | Q.  So if a consumer, for example, were to see a banner ad     |
| 06:38  | 10 | for FyreTV, and then base their decision on that, they decide  |
|        | 11 | to click on it, not click on it, because it may be associated  |
|        | 12 | with Amazon, your survey doesn't test for that, does that?     |
|        | 13 | A.  **If a consumer saw that from a banner ad, obviously they** |
|        | 14 | **arrive at the web site, and they were exposed to the web**   |
| 06:39  | 15 | **site.**                                                      |
|        | 16 | Q.  But if they chose not to click on it, your survey doesn't  |
|        | 17 | test for that?                                                 |
|        | 18 | A.  **That's correct.**                                        |
|        | 19 | Q.  So really, all your survey tests for is whether those who  |
| 06:39  | 20 | happen upon the FyreTV web site and were browsing online       |
|        | 21 | adult sites were confused, right?                              |
|        | 22 | A.  **I would rephrase it.**                                   |
|        | 23 | Q.  How would you phrase?                                      |
|        | 24 | A.  **I selected a representative sample of Wreal FyreTV**     |
| 06:39  | 25 | **customers.  Those who were interested in porn and streaming** |

1   porn, and are willing to pay for porn.  They actually -- this

2   is not a by accident arrival at the site.

3         These are people in the category in the market for

4   the specific product, ending up at the FyreTV.com web site,

06:40   5   and showing an interest in the category, looking at the

6   material.

7         And the question is, if they do all that, are they

8   likely to associate this web site with Amazon.  The answer is

9   absolutely not.

06:40   10   Q.  But it only tests people who had already found their way

11   to the web site?

12   A.  If a person is not on the web site, and they're only

13   thinking about something, obviously they're not on there.

14   Q.  Or if they saw a banner ad?

06:40   15   A.  Most people in the category that are seeing a banner ad

16   will tend to click on it.

17   Q.  Now, survey questions aren't supposed to bias

18   respondents, are they?

19   A.  Absolutely not.

06:40   20   Q.  And that applies to the screening questions as well?

21   A.  Say that again?

22   Q.  That also applies to the screening questions?

23   A.  They're not supposed to be any bias.

24   Q.  So now, going through the screening questions of your

06:40   25   survey which are on -- I have to go back to page 40.

1   Question S 06 says that they are looking for people who

2   browse adult entertainment online, is that correct?

3   A.   **Correct.**

4   Q.   And then question 07 asks whether comfortable viewing

06:41   5   adult content and completing the survey?

6   A.   **Is that a question?**

7   Q.   Is that correct?

8   A.   **Yeah, that's the question, yes.**

9   Q.   And then questions S 08 and S 09 both mention adult

06:41   10   content as well, don't they?

11   A.   **They mention adult consent as well, yes, absolutely.**

12   Q.   And the actual survey questions Q 01, Q 02, Q 03, Q 04

13   and those start on page 67, each one of those questions, Q 01

14   through Q 04, mentioned adult video on demand service?

06:42   15   A.   **I believe so.**

16         **MR. MARFOE:**  Thank you.  I have no further

17   questions.

18         **THE COURT:**  All right.  It is now 6:42.  Bear with

19   me just a minute, please.

06:42   20         So you have used up 29 minutes.  And I believe --

21   well, first, does Amazon have any additional questions of

22   this witness?

23         **MR. NELSON:**  Your Honor, an administrative matter,

24   because it affects whether and how much redirect we may do.

06:42   25   May I turn it over to Ms. Isani?  We think there might have

1    been an error in the calculation of time by about 10 minutes

2    or so, and perhaps Ms. Isani can supply some clarification of

3    that.

4              **MS. ISANI**:  I think the question goes to -- Your

06:43   5    Honor, may I stay here as opposed to the podium?

6              **THE COURT**:  All right.

7              **MS. ISANI**:  I think the question goes to the timing

8    of the time for Dr. Lehman, because I believe you counted 5

9    minutes for us at the beginning of Mr. Nelson's examination

06:43  10    of Dr. Lehman, and then 42 minutes.  And that's -- the 42

11    minutes is where the issue arises, because my understanding

12    is we did the five minutes from 4:42 to 4:47, and two minutes

13    where the Plaintiff conducted voir dire of Dr. Lehman.  We

14    went back on the record from 4:49 to 5:19.

06:44  15              It's at 5:19 that we went off the clock to print

16    the case.  And my notes reflect we went back on the clock at

17    5:35 for a minute or so, where Mr. Nelson asked a final

18    question or two, which would be a total of 31 minutes rather

19    than 42 minutes.  It's an 11 minute difference.

06:44  20              **THE COURT**:  I didn't have you going back on the

21    record again until 5:25.

22              **MS. ISANI**:  I had 5:35, Your Honor.  I don't think

23    there was ten minutes of questioning at that point.

24              **THE LAW CLERK**:  I think she's right, and I think

06:45  25    there's probably about 10 minutes that they should have in

1    addition, because we went off at 5:20 to review case law, and

2    it was about 10 minutes right then.

3        THE COURT:  All right.  So I'll give you a total of

4    12 minutes.

06:45    5        THE COURTROOM DEPUTY:  Judge, I'm sorry.  What was

6    the exhibit number?

7        MS. ISANI:  Would it be 10 additional minutes to

8    the 4 that we had remaining --

9        THE COURT:  14 minutes.  But I can't listen to you

06:45   10    and listen to my courtroom deputy at the time.  So she was

11    talking to me, so if you don't mind, let me deal with this

12    and then I'll listen to you.

13        THE COURTROOM DEPUTY:  I'm sorry, Judge, the report

14    of Mr. Sarel, what exhibit number was that?

06:45   15        THE COURT:  The report of Dr. Sarel itself is part

16    of tab 1, I believe -- no, it's tab -- let me see.  Oh, my

17    gosh.  Okay.  No.  The report -- is that the declaration of

18    Dr. Sarel, is that what we're talking about?  They have been

19    using the term report, but it's really the declaration of

06:46   20    Dr. Sarel, which is basically at tab 1 of the Sarel binder.

21        MR. HANSEN:  (Nodding.)

22        THE COURT:  It says likelihood of confusion study.

23    Study is another word for report.  And it's that document.

24        Yes, ma'am.  You have something you had something

25    you wanted to bring to my attention?

1          **MS. ISANI:**  I was just trying to understand, you

2     were adding 10 minutes, which leaves a total of 14.

3          **THE COURT:**  Yes, correct.  So it's now 6:45.  So

4     you will have until 6:59, and I'll give you a heads up at

06:46   5     6:57.

6          **MR. HANSEN:**  Thank you, Your Honor.  May I proceed?

7          **THE COURT:**  Go ahead.

8

9                    ***REDIRECT EXAMINATION***

06:46   10    **BY MR. HANSEN:**

11    Q.   Dr. Sarel, you were asked on cross-examination whether

12    you designed your survey universe to match some demographic

13    data that Wreal had at one point during the testimony, do you

14    remember those questions?

06:46   15    A.   **Yes.**

16    Q.   First off, when was that demographic data collected, was

17    it after April of this year or prior to?

18    A.   **2010.**

19    Q.   Okay.  So you then said you didn't need to match your

06:47   20    survey universe, or you didn't think it was appropriate to

21    match the survey universe to that 2010 demographic data; do

22    you remember that?

23    A.   **Correct.**

24    Q.   Why did you think that was not appropriate?

06:47   25    A.   **First, the data may be completely different today than in**

|        | 1  | 2010.  But more importantly, we use demographics as a proxy. |
|--------|----|---|
|        | 2  | If we don't have any other way to identify the target. |
|        | 3  | According to Franco's deposition specifically, the target are |
|        | 4  | people, adults that are interested in internet porn and |
| 06:47  | 5  | streaming videos, so whether a person is 30 or 42 or 55, |
|        | 6  | doesn't matter whatsoever. |

And my data indicates that demographics don't make any different whatsoever.  Every person -- 99 percent of the people in my survey, across all ages, all genders, said the same thing, no confusion.  These are people who are in the market for the product.  Including demographics don't make any difference whatsoever.

MR. MARFOE:  Mischaracterizes prior testimony.

THE COURT:  If that's an objection, I didn't hear the word objection, but whatever it was, it's overruled. Please continue.

BY MR. HANSEN:

Q.  You mentioned Mr. Franco's deposition, didn't you, sir?

A.  Yes.

Q.  Did Mr. Franco describe the Wreal target audience in his deposition?

A.  Yes.

Q.  Let's see it -- hold the thought.  Let me see the slide on that.  Could you describe what that is, who is testifying and what significance, if any, you take from it as you're

 1   testifying here today?

 2   A.  **This is exactly the target that I used because these are**

 3   **people over 20, males and females, interested in this type of**

 4   **material.**

06:48  5   Q.  Okay.  So Mr. Franco -- is this Mr. Franco testifying?

 6   A.  **Yes.**

 7   Q.  He is asked, quote, we'll get to that in a moment, sir,

 8   but for now, I just need to confirm your target audience is a

 9   male or female, 20 years or older, who had presumably paid

06:49 10   for pornography on the internet.  Answer, correct.  And has

11   access to the internet, closed quote.  Is that what that

12   says?

13   A.  **Yes, that's exactly who I surveyed.**

14   Q.  Next question.  You were asked whether your survey

06:49 15   questions were biased or leading, that they led respondents

16   to payment for pornography?  Do you remember those questions?

17   A.  **Yes.**

18   Q.  Can we see the Fyre web site that we have been looking at

19   all day?  Is it possible in your professional judgment to

06:49 20   conduct a likelihood of confusion survey about F-Y-R-E TV

21   without having respondents pay for pornography?

22   A.  **Absolutely not.  As the judge indicated earlier today,**

23   **everyone can see this is a porn site.**

24            **MR. HANSEN:**  Thank you.  No further questions.

06:49 25            **THE COURT:**  Thank you.  It's now 6:48.  Any

```
 1   additional witnesses?

 2          MR. HANSEN:  No, Your Honor, and we rest.

 3          THE COURT:  Any additional witnesses for the

 4   Plaintiff?

 5          MR. MARFOE:  I'm actually going to recross.

 6          THE COURT:  There's no recross.  I think you

 7   mentioned earlier a rebuttal witness.  Is there such a

 8   person?

 9          MR. MARFOE:  Yes, we'd like to call Dr. Thomas

10   Maromick to the stand, please?

11          Thereupon,

12                      THOMAS J. MAROMICK,

13   having been duly sworn by the Clerk, testified as follows:

14          THE WITNESS:  I do.

15          THE COURTROOM DEPUTY:  Sir, please state and spell

16   your name for the record.

17          THE WITNESS:  Thomas Joseph Maromick,

18   M-A-R-O-M-I-C-K.

19          THE COURT:  So it's now 6 -- well, I'm not going to

20   say the time yet, because they have whatever time they have.

21          THE LAW CLERK:  They have 19 minutes remaining.

22          THE COURT:  19 minutes remaining.  So for direct

23   and redirect of Dr. Maromick.  It's now 6:49.

24

25                    _DIRECT EXAMINATION_
```

1    BY MR. MARFOE:

2    Q.   Dr. Maromick, can you please tell us a bit about your

3    educational background?

4    A.   Yes, I have an undergraduate in philosophy from St.

06:51   5    Thomas Seminary, which is right outside of Seattle, an MBA

6    from the University of Denver, a doctor in business

7    administration from the University of Kentucky, and a law

8    degree from the University of Baltimore School of Law, and

9    I'm an inactive of the Maryland bar.

06:51   10   Q.   How about your professional background?

11   A.   I'm a professor of marketing at Towson University in

12   Baltimore.  In addition to that, I, for a total of 16 years,

13   was the director of the office of impact evaluation in the

14   Bureau of Consumer Protection at the Federal Trade

15   Commission.

16           And after leaving the Commission, I served as a

17   marketing expert for both Plaintiff and Defendant clients in

18   trademark and deceptive advertising matters.

19   Q.   And what did you do at the FTC?

06:52   20   A.   I was the in house expert for the Federal Trade

21   Commission.  I was there as a marketing expert, not as an

22   attorney.

23           And I was responsible for all the research, the

24   design and implementation of all the surveys done within the

06:52   25   Bureau of Consumer Protection during the 16 years I was

 1    there.

 2    Q.   And how many surveys did you do?

 3    A.   **I estimate while at the Commission, something in the**

 4    **order of 300 to 350 surveys.**

06:52  5    Q.   And have you analyzed consumer surveys conducted by

 6    others before?

 7    A.   **Yes, in three different ways.  Number 1, while I was at**

 8    **the Federal Trade Commission on surveys that were presented**

 9    **to the Commission as part of litigation and supported by**

06:52 10    **people being sued by the Commission.**

11          **Secondly, as peer reviewer for academic journals**

12    **when they included surveys in them.  And then thirdly, as a**

13    **marketing expert, probably another 300 surveys on behalf of**

14    **my litigation clients.**

06:52 15          **MR. MARFOE:**  I'd like to qualify Dr. Maromick as an

16    expert on the subject of consumer research.

17          **MR. HANSEN:**  No objection, Your Honor.

18          **THE COURT:**  Please continue.

19    BY MR. MARFOE:

06:53 20    Q.   Dr. Maromick, did you prepare a declaration for this

21    case?

22    A.   **I did.**

23    Q.   And what was the purpose of that declaration?

24    A.   **I was asked to review the survey and report that**

06:53 25    **Dr. Sarel had done, and to draw some conclusions as to the**

1    validity and reliability of the survey that he had done.

2    Q.   And what did you review in order to prepare your

3    declaration?

4    A.   **I reviewed the complaint and then I reviewed Dr. Sarel's**

06:53   5    **reports and also the underlying questionnaire and the data**

6    **that he provided in the form that he provided it.**

7    Q.   And what is your understanding of the purpose of

8    Dr. Sarel's survey?

9    A.   **Dr. Sarel's survey, as I understood it, was to assess the**

06:53   10   **extent to which, if at all, there was consumer confusion**

11   **between the Wreal FyreTV trademark and the Amazon Fire TV**

12   **trademark.**

13   Q.   And what did Dr. Sarel conclude?

14   A.   **Dr. Sarel concluded in his report, and here today,**

06:54   15   **tonight, that there was no consumer confusion.**

16   Q.   And what did he base that conclusion on?

17   A.   **On the consumer survey that he did and reported on and**

18   **described here this afternoon.**

19   Q.   And did he base that conclusion on anything else?

06:54   20   A.   **To the best of my knowledge, no, it was strictly on the**

21   **basis of that survey and the survey results.**

22   Q.   And what is your opinion on the survey relied upon by Dr.

23   Sarel to form his conclusion?

24   A.   **I think it's totally invalid and unreliable, that it**

06:54   25   **can't be relied on at all for the conclusion that he drew.**

```
        1    Q.   And why not?

        2    A.   Well, there's a number of flaws in it, and I think the

        3    flaws are fatal flaws as to the survey.  And therefore, I

        4    don't believe you can -- any one of those flaws is

06:54   5    significant.  As McCarthy has said in trademarks, McCarthy on

        6    trademarks, the cumulative of those flaws make the survey

        7    unreliable and in doubt.

        8    Q.   Okay.  And what were some of those flaws?

        9    A.   Well, there's four areas, if you want, of flaws.  The

06:55  10    first area was the universe that he said he was surveying

       11    versus the universe that he actually surveyed.  And I think

       12    that's a fundamental flaw.  He wasn't getting at the target

       13    market.

       14         Secondly, the screening questions were enormously

06:55  15    biased in terms of pushing people from neutral, away from an

       16    association with -- between the Wreal FyreTV's web site and

       17    any association with Amazon.  Then the stimuli that he used,

       18    the fact that he used eight web pages before he asked the

       19    fundamental Eveready question, whose web site is this, or

06:55  20    lines to that effect.  So that pushed it out even farther.

       21         And the question itself, so the stimuli were

       22    biased.  And then finally, if you -- even assuming you accept

       23    all of those, then the way he calculated the consumer

       24    confusion didn't even match his own methodology.  So if you

06:56  25    go back and look at his report, here is what he said he did,
```

1    but if you actually do that, you don't get the number that

2    Dr. Sarel came up with.

3    Q.   So let's start with the first conclusion on the survey's

4    universe.  Now, what is the proper universe for a likelihood

06:56   5    of confusion survey in this case, which is reverse confusion?

6    A.   And I think Dr. Sarel identified it in his description of

7    the universe.  That's people who have paid for adult content

8    internet streaming video, or were willing to pay for adult

9    content streaming video on the internet.

06:56   10           I think that -- so that the target market is people

11    who bought pornography on the internet, adult content, or

12    were willing to pay for that.  That's, I think, the proper

13    universe for a study like this, and I think that's what

14    Dr. Sarel said he had done.

06:57   15    Q.   But what universe did Dr. Sarel actually survey in this

16    case?

17    A.   Actually, as you pointed out, and as he responded, he

18    actually only identified people who had visited the site.  It

19    wasn't people who were willing to pay or who had paid.  It

06:57   20    was simply people who had visited the site.

21           And as I heard, I think it's Mr. Franco, I may have

22    the name -- the conversion rate he said was one out of a

23    thousand.  A thousand people look at it.  One of them

24    actually would be the ones that were in the target market for

06:57   25    the -- i.e. the universe, namely that they bought or were

1    willing to buy.

2            So significantly, 999 of the thousand visit, but

3    didn't buy.  That's not the universe, the universe of people

4    by Dr. Sarel's own words who bought or were willing to pay

06:58  5    for online streaming video with adult content.

6    Q.   And so what is the significance of using the universe

7    that Dr. Sarel actually used when it comes to his survey?

8    A.   Well, the results were, as I said, it's not grossly

9    overrepresentative of the population.  There is a fundamental

06:58  10    flaw as opposed to the people who had bought or were willing

11    to pay for online streaming video, he's got people who happen

12    to visit the site.

13            That's a long -- 999 of them, based on Wreal

14    FyreTV's executive weren't converted.  The fundamental issue

06:58  15    is what percent are converted, so again, one out of a

16    thousand, so it grossly overstates the population.

17    Q.   Now let's turn to the questions.  And starting with the

18    screening questions, did you notice -- I mean, other than the

19    issue with the universe, any other problems with Dr. Sarel's

06:59  20    choice of screening questions?

21    A.   Yes.  All of the questions pushed -- as I said a moment

22    ago, all of the questions, screening questions push the

23    people away from an association with Amazon and what Amazon

24    does.

06:59  25            By my count, there are 20 separate statements or

1   words, phrases that relate to adult content.  Nudity,

2   explicit sex, sexual acts, all of those words are again

3   saying, hey, this relates to an organization, a company that

4   does exclusively adult content, pornography, not Amazon.

06:59   5          So I think that's an enormous bias.  And even in

6   that first question -- eight, I think it is, he says, not

7   only visiting a web site -- by the way, let me make sure we

8   understand what we're talking about.  We're talking about web

9   sites that have nudity and explicit sex.  They made it real

07:00   10  clear that that's who -- so in my judgment, he alerted them

11  that this is about sexual content, the survey's about that.

12  And I think it was grossly biassing the survey.

13  Q.  Were there any other problems with the screening

14  questions?

07:00   15  A.  Yes, there's another fundamental -- this applies across

16  the whole survey.  There is a fundamental problem with the

17  demand effect in that a respondent can go back and change

18  your answer.  You just don't do that.

19          When you have a survey, when the surveyor answers

07:00   20  the questions, they can't go back and look at a subsequent,

21  oh, gee, I should have answered this other one this way.

22          That's a fundamental flaw in survey research.  You

23  never allow a respondent to go back and change an answer.

24  And yet every one of his questions, if you look at the

07:01   25  question, it says, previous, which is a link where you can

1    click and go back.

2          That's a fundamental flaw in any survey research

3    and a fundamental flaw in this one.

4    Q.   Now, let's move on to the stimuli.  Dr. Sarel says --

07:01   5    were there any problems with the stimuli Dr. Sarel used?

6    A.   **Absolutely.  Dr. Sarel used -- first of all, he says, you**

7    **browse to get there, and people don't browse to get to these**

8    **kinds of web sites.  You either know some way to get there.**

9    **He could frame that slightly differently, and it would have**

07:01   10   **been okay.  If you just assume you're browsing out there.  He**

11   **could you have said, browse or see it from a banner ad, or**

12   **from an ad.  That's not a big deal.**

13        **The big deal from my perspective in terms of**

14   **biassing his results is the fact that he used eight pages.**

07:01   15   **Amazon's marketing person, the lady that was -- that did**

16   **their media stuff, she said you have about three seconds to**

17   **get someone's content perceptions as to what we offer.  Three**

18   **seconds.  So that's the landing base.**

19        **Most of the time when you do these kind of surveys,**

07:02   20   **particularly with web pages, you show them the landing page.**

21   **The first page.  And they're going to make a decision, who is**

22   **this by, is this something I'm interested or not, on the**

23   **basis of that one page.**

24        **But he didn't do that.  He said, well, not only do**

07:02   25   **I get them there, but I'm going to show you 7 more pages and**

| | |
|---|---|
| 1 | again, as I said, it pushed them away from a perception of a |
| 2 | link back to Amazon.  Now you pushed them even farther and |
| 3 | farther away. |
| 4 | And, oh, by the way, it's -- there's no question |
| 07:02  5 | that there's pornography.  I'm not saying this is beautiful |
| 6 | stuff.  It's not.  But the point is it pushes them farther |
| 7 | and farther and farther away from an association with Amazon. |
| 8 | And I think that's incredible bias. |
| 9 | Q.  So is it your opinion that Dr. Sarel's survey did not |
| 07:03  10 | properly replicate real market conditions? |
| 11 | A.  **Absolutely, in terms of the way people approach web** |
| 12 | **pages, absolutely.** |
| 13 | Q.  So let's move on to the survey questions.  Were there any |
| 14 | problems with the actual survey questions? |
| 07:03  15 | A.  **Dr. Sarel said, and he's correct, that the correct format** |
| 16 | **is what's called the Eveready format, which is show them --** |
| 17 | **show the respondents in this case the web page.  And then** |
| 18 | **from that, we'll ask open ended question who puts it out.** |
| 19 | **But he doesn't do that.  He asked that, who offers** |
| 07:03  20 | **or puts it out, but he doesn't stop there.  He says who** |
| 21 | **offers or puts out this adult content web site.** |
| 22 | **In other words, oh, by the way, don't forget that** |
| 23 | **this is not an Amazon kind of a product, it's an adult** |
| 24 | **content, and you already know, you're so far away from** |
| 25 | **Amazon.** |

1          So by adding that phrase, he adds an additional

2     bias to the standard that's -- because Eveready says who

3     offers or puts out this product, this web site.  He didn't do

4     that.  He went beyond that.  And I think that adds an

07:04   5     additional bias to the data that he found.

6     Q.  And then you also said that there was an issue where

7     Dr. Sarel didn't follow his own methodology.  Can you

8     elaborate on that, please?

9     A.  Yes.  He asked that question, and that was the basis of

07:04  10     his answer when he said who puts this out.  And he said --

11     and he found, I think, two people, one percent, who said

12     Amazon.  That's fine.

13          But he asked a second question that's part of that

14     same -- which was, among the people who did not say Amazon,

07:04  15     which is virtually everybody, he acknowledged that.  He said,

16     do they put out any products that are sold basically on

17     Amazon, I forget the exact language of the question.

18          But he said, do they put out any products -- I have

19     to look at the question.  Do they put out any products that

07:05  20     could also be found on Amazon.  That's not quite the -- I

21     don't have the questionnaire in front of me.

22     Q.  Would it help you if we give you Dr. Sarel's report?

23     A.  Yes, it would.  Thank you.

24          MR. MARFOE:  May I approach?

07:05  25          THE COURT:  Yes.

```
 1              MR. MARFOE:  (Complies.)

 2              THE COURT:  Just giving you a heads-up, you have

 3      two and a half minutes remaining.

 4      BY MR. MARFOE:

 5      Q.   Dr. Maromick, when you get there, can you give some

 6      examples of various not properly --

 7      A.   I'm just trying to find the question.  Do you believe --

 8              THE COURT:  What are you reading from?

 9      A.   I'm sorry.  This is page 68 of 172.

10              THE COURT:  Thank you.

11      A.   Do you believe that whoever puts out or offers the adult

12      video on demand product you just saw, on these pages, puts

13      out any other products or services?  That was the form of the

14      question.

15      BY MR. MARFOE:

16      Q.   Had he properly concluded, what would have been the

17      confusion rate?

18      A.   If he had properly concluded, he would have gone back and

19      looked at all the products, because it asked what other

20      products and services.  And you look at that list from his

21      data, and you see that some of the responses were toys,

22      videos, games, books, so add all that up together, I think it

23      was 62 of the 200 gave -- answered that question as something

24      that was offered, and products were also offered on Amazon.

25              So if you add those together, as opposed to being
```

1    one percent, that goes to 31 percent.  Now, the control

2    condition was something else.  So the net of it is, if you

3    subcontract out the control, the response to the control

4    condition, under those conditions, then that number is 8.5

07:07  5    percent are confused, either because they mentioned Amazon,

6    or they said this provider of this web site offers products

7    that can be found on Amazon, such as toys, such as games,

8    such as books.

9    Q.   Is that confusion rate reliable?

07:07  10   A.   I believe it is.  I think it understates it because the

11   survey was done in, I think, October, right?  Not along after

12   Amazon had been out and before they had done this REDACTED

13   worth of advertising they have done.  So I think that number

14   is a valid and reliable number.

07:08  15          Again, assuming everything else was okay, and it

16   isn't.  So it's unreliable based on the other things, but

17   assuming that number, that understates what the actual

18   confusion rate is given that whoever it was said they have

19   dropped another REDACTED in the last quarter on

07:08  20   advertising.

21          THE COURT:  One minute remaining.

22          MR. NELSON:  I'm sorry, Your Honor, he's just

23   reviewing some highly confidential information in a courtroom

24   setting that is -- this might have to redact that part of the

07:08  25   transcript.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | **THE COURT:**  We'll talk about that later.  You have       |
|       | 2  | one more minute, sir.                                         |
|       | 3  | **BY MR. MARFOE:**                                            |
|       | 4  | Q.   Is there a perfect way to conduct a survey?             |
| 07:08 | 5  | A.   **Every survey is open to questions.  There are certainly** |
|       | 6  | **ways that are generally accepted to avoid biases in terms of** |
|       | 7  | **screening, in terms of analyzing the data, but there are** |
|       | 8  | **certain rules to follow, but every survey is open to**     |
|       | 9  | **challenges.**                                              |
| 07:09 | 10 | Q.   And can flawed surveys have some value?                 |
|       | 11 | A.   **Again, that's up to the court to judge that.  I don't go** |
|       | 12 | **there.  But yes, it can -- if the Court says yes, I**      |
|       | 13 | **understand the flaws, and accept it anyway.**              |
|       | 14 | Q.   In your opinion, is Dr. Sarel's survey flawed?         |
| 07:09 | 15 | A.   **Grossly flawed.**                                     |
|       | 16 | Q.   Does it have any value?                                |
|       | 17 | A.   **In my judgment, no, because the flaws, not one or two,** |
|       | 18 | **there are flaws so pervasive that I don't believe it can be** |
|       | 19 | **relied on in any way.**                                    |
| 07:09 | 20 | **MR. MARFOE:**  No further questions.                       |
|       | 21 | **THE COURT:**  Cross-examination, please.  So it's now     |
|       | 22 | 7:08, and let's make sure that we have no confusion as to the |
|       | 23 | total amount of time remaining.  You have 14 minutes.        |
|       | 24 | **THE LAW CLERK:**  11 minutes.                              |
| 07:10 | 25 | **THE COURT:**  11 minutes.  So you have until 7:19.         |

```
 1  I'll give you a heads-up at 7:17.
 2           MR. HANSEN:  Thank you, Your Honor, may I proceed?
 3           THE COURT:  Yes.
 4
 5                      CROSS EXAMINATION
 6  BY MR. HANSEN:
 7  Q.  Good evening, Dr. Maromick, how are you?
 8  A.  I'm fine, thank you.
 9  Q.  You didn't conduct a survey on your own in this case, did
10  you?
11           MR. MARFOE:  Objection.
12           THE COURT:  What's the basis of the objection?
13           MR. MARFOE:  Objection, it would be work product.
14           THE COURT:  Overruled.
15  A.  Yes.  Actually, I did conduct a survey in April, just
16  after the product was introduced.
17  BY MR. HANSEN:
18  Q.  What did you find?
19  A.  There was very low consumer confusion because the
20  product -- the level of awareness of the Fire TV, Amazon Fire
21  TV was almost nonexistent, so the level of consumer confusion
22  was very low.  I don't remember the numbers.
23  Q.  How many times in the last five years have the courts
24  either excluded or limited your expert testimony?
25  A.  I can't recall.  There certainly have been some.
```

|         |    |                                                                          |
|---------|----|--------------------------------------------------------------------------|
|         | 1  | Q.   You offered expert testimony in the American National               |
|         | 2  | case in federal court in Illinois; do you remember that?                 |
|         | 3  | A.   **Yes.**                                                            |
|         | 4  | Q.   And the Court in that case gave your survey little                   |
| 07:11   | 5  | weight, didn't it?                                                        |
|         | 6  | A.   **I don't recall.**                                                 |
|         | 7  | Q.   Let's see a slide on that, and let's see if I can refresh            |
|         | 8  | your recollection.  Do you recall the Court in the American              |
|         | 9  | National case saying that it accords Maromick's conclusions              |
| 07:11   | 10 | little weight, closed quote.  Do you recall that, sir?                    |
|         | 11 | A.   **I have not seen that, so I don't know that.**                     |
|         | 12 | Q.   You offered expert testimony in the In Re Front Loading             |
|         | 13 | Washing Machine litigation in 2013, where you conducted an               |
|         | 14 | internet based consumer survey.  Do you remember that?                    |
| 07:12   | 15 | A.   **Yes.**                                                            |
|         | 16 | Q.   Do you remember the Court excluding your survey in that             |
|         | 17 | case because it didn't satisfy Rule 702?                                  |
|         | 18 | A.   **I know that they excluded it.  For the life of me, to**           |
|         | 19 | **this day, I can't understand why, because if you look at**             |
| 07:12   | 20 | **their language, it was really quite consistent with it.**              |
|         | 21 | Q.   Let's see if we can refresh your recollection.  The Court           |
|         | 22 | said in that case, the Court finds that Dr. Maromick's 's                 |
|         | 23 | opinion does not satisfy Federal Rule of Evidence 702, closed            |
|         | 24 | quote.  Do you remember them saying that?                                 |
| 07:12   | 25 | A.   **I know they excluded it.  I don't remember seeing the**           |

1    Court's opinion on it.

2    Q.  You also offered expert testimony in the Teleflora case,

3    T-E-L-E-F-L-O-R-A, in federal court in California in 2013,

4    where you prepared an online survey for purposes of showing

07:12  5    damages.  Do you remember that?

6    A.  **Actually, I did the survey to show the extent to which**

7    **consumers are -- the difference between what a consumer**

8    **pays -- expects to get what they order from an online florist**

9    **such as Teleflora, and what they actually receive.  That was**

07:13  10   **what I was to determine.**

11   **And I asked -- I also asked the extent to which the**

12   **difference between what they ordered and what they paid**

13   **for -- what they ordered and paid for, and what they got.  So**

14   **I did that survey.**

07:13  15   **My purpose of it was to determine the extent to**

16   **which if there was a difference, and then to calculate some**

17   **sort of an order of magnitude of the size of that difference.**

18   Q.  Well, the Court in that case said the problems with your

19   model were, quote, manifold, closed quote.  Do you remember

07:13  20   that?

21   A.  **Yes.  And the reason for that --**

22   Q.  I'm sorry, now I'm going to object.  I object as

23   nonresponsive, there was a yes.  Because I'm on a limited

24   clock.

07:13  25   A.  **Again, as I said --**

1          **THE COURT:**  Stop, stop.  The witness may have an

2     opportunity to explain the answer.  So you've confirmed that

3     the Court said there were problems that were manifold.  Do

4     you have anything to add to that to clarify or put it in

07:14  5     context?  If so, you may tell us.

6     A.  **Again, the damages part was only a small part of what**

7     **that survey -- the major part of that survey was not the**

8     **damages component, but rather the extent to which there is a**

9     **difference between the flower arrangements ordered through**

07:14  10    **Teleflora and what was actually received.**

11          **So then the second part of it dealt with this issue**

12    **of damages.  But again, the focus there, as even your**

13    **citation says, the problems with this damages model --**

14    **damages model I was really presenting this, so that their**

07:14  15    **damages expert -- Teleflora's or the Plaintiff's damages**

16    **expert could, in fact, use that.  And so that's -- my part**

17    **was really more the other side, not the damages side.**

18    **BY MR. HANSEN:**

19    Q.  Right.  Thank you.  You also offered expert testimony in

07:15  20    Johnson versus Bayer, B-A-Y-E-R, a case in federal court in

21    California, where you provided expert analysis of messaging

22    and market research, isn't that right?

23    A.  **I don't recall that.**

24    Q.  Let's see if we can refresh your recollection.  Do you

07:15  25    remember the Court granted the motion to exclude your

1    testimony and opinions there?

2    A.  **I don't recall this Johnson versus Bayer case at all.**

3    Q.  Well, finally, you also offered expert testimony in FTC

4    versus Washington Data Resources, a case in federal court

07:15  5    here in Florida, where you did a survey on consumer

6    perceptions; do you remember that?

7    A.  **No, I don't.**

8    Q.  Let's see if we can refresh your recollection.  Do you

9    remember the Court excluding your opinion in that case

07:15  10   because it, quote, derives from an incomplete review of

11   pertinent evidence, and depends upon an unverified,

12   unsupported and speculative claim.  And concluding that --

13   sorry, closed quote, concluding that, quote, exclusion of

14   Maromick's testimony is warranted under both Daubert and Rule

07:16  15   403; do you remember that?

16   A.  **That was not a survey.  I don't believe that I did a**

17   **survey in Washington Data Resources.  So that was, again,**

18   **unverified, unsupported speculative claims, because I had not**

19   **done a survey.  I don't believe there was a survey in that**

07:16  20   **case.**

21   Q.  You said Dr. Sarel's survey universe is flawed, because

22   it doesn't represent FyreTV's target market, true?

23   A.  **That's correct.**

24   Q.  You listed what you reviewed before you prepared your

07:16  25   declaration in this case, right, sir?

1    A.    **That's correct.**

2    Q.    Had you reviewed FyreTV's web site before?

3    A.    **As of when I was preparing my the survey, yes, I looked**

4    **at the web site.**

07:16    5    Q.    Did you -- and had you reviewed Mr. Franco's deposition

6    in this case as of the time you provided your declaration in

7    this case?

8    A.    **No.  I had not.**

9    Q.    So you didn't review Mr. Franco's testimony about Wreal's

07:17    10    target market confirming that their target customers are male

11    or female 20 years or old who presumably paid for pornography

12    on the internet.  That's not something you reviewed before

13    you filed your declaration, right?

14    A.    **That's correct, but the purpose of my declaration was to**

07:17    15    **review what Dr. Sarel had done.  As a matter of fact, even**

16    **looking at this shows another mistake, or if you want a**

17    **problem with Dr. Sarel's --**

18            **MR. HANSEN:**  Now I'm going to object.

19            **THE COURT:**  You have two more minutes left.  Let's

07:17    20    move on to the next question, please.

21    **BY MR. HANSEN:**

22    Q.    You did not conduct a survey of your own that corrects

23    everything that you claim is wrong in Dr. Sarel's survey and

24    showed the Court what you think is the right result, did you?

07:17    25    A.    **No, I did not.**

1   Q.   I mean, was there anything preventing you from doing

2   that?

3   A.   **My purpose, what I was hired to do, retained to do was**

4   **simply to rebut -- review and rebut the methodology and**

07:17   5   **conclusions of Dr. Sarel's study.  It was not to then do a**

6   **study.  Can I do one?  Yes.  If the client asks me to do**

7   **that, I can do that.  Yes.**

8   Q.   You criticized Dr. Sarel because you say he should have

9   coded it as confused.  Anyone who mentioned some product

07:18   10   Amazon sells, even if they don't mention Amazon, that's what

11   you testified to on direct, right, sir?

12   A.   **Correct.**

13   Q.   So if someone in an answer to a question, who puts out --

14   what other products or services are sold on this web site

07:18   15   says sex toys, you with me so far?

16   A.   **Yes.**

17   Q.   And then they're asked, what other web site sells sex

18   toys.  And they say, like sextoys.com, they don't say Amazon,

19   you think that person should be coded as confused?

07:18   20   A.   **With all due respect, I did not -- in my counting, I**

21   **didn't include people who said sex toys.  I only included,**

22   **even though I've now learned that Amazon does sell sex toys.**

23   **I include in my analysis, in my tabulation, people**

24   **who said words that have no association, affiliation with**

07:19   25   **adult content or with sex at all.  They included toys, games,**

1    books, so I did not include the -- those that would imply sex

2    related products.

3    Q.   Great.  Let's use your example.

4         THE COURT:  Four minutes.

07:19  5  BY MR. HANSEN:

6    Q.   Someone says toys in response to what other products are

7    sold by whoever puts out Fire TV.  Are you with me so far?

8    A.   Yes.

9    Q.   And then they're asked, what other web sites sell toys.

07:19  10  You with me so far?

11   A.   Yes.

12   Q.   And then they respond something like, who knows, like

13   Porn Hub or sextoys.com, or something, but they don't say

14   Amazon.  Are you with me?  That person does not identify

07:19  15  Amazon in the answer to the question.  Are you with me so

16   far?

17   A.   Yes.

18   Q.   You think that person should have been coded as confused?

19   A.   I used Dr. Sarel's definition of confused, namely his

07:19  20  specific language was that they said Amazon or said a product

21   that is also sold on Amazon.  Those were his words.

22        All I did was simply say, I'll take your language

23   and look at the results of that question, what other products

24   or services.  And if they said a product and service that is

07:20  25  sold on Amazon, that that would also -- could possibly be

       1    someone who is confused.

       2    Q.  Are you aware of any academic literature that suggests in

       3    the example you just five, that if someone says something

       4    that happens to be sold on another web site that doesn't

07:20  5    identify the Defendant, they should be coded of confused, are

       6    you aware of any literature for that proposition that you

       7    just testified to?

       8    A.  **Quite the contrary, the literature would say that I have**

       9    **no basis for making an assumption either way.  So the**

07:20  10   **literature would say, you don't make -- the researcher does**

      11    **not make an assumption, well, if they said toys, they meant**

      12    **sex toys, or if they said videos, they meant sex videos.  You**

      13    **simply have to take the words as written.**

      14    Q.  Right.  Exactly.  And when Dr. Sarel --

07:21  15          THE COURT:  You're done.

      16          MR. HANSEN:  Am I done?

      17          THE COURT:  You're done, sir.  Thank you, Dr.

      18    Maromick.  All right.  Have a seat.  So the evidentiary

      19    portion of this hearing is now over.  Yes, sir, do you have a

07:21  20   comment?

      21          MR. NELSON:  Yes, Your Honor, an administrative

      22    matter, but I didn't want to interrupt.  At the Court's

      23    convenience, there is the proffer of Dr. Lehman.  Would the

      24    court like to hear that now or afterwards?

07:21  25          THE COURT:  No, no, maybe I didn't make myself

1    clear.  I am not listening to it.  Okay?  In a minute, we're

2    going to talk about some other administrative matters.  We're

3    going to talk about some other issues.  I'm going to give you

4    all some homework assignments.  And then I will be exiting

07:21  5    the courtroom.

6         You will remain here with the court reporter, but

7    we will give her a break first, and then you may proffer the

8    testimony.

9         **MR. NELSON:**  Thank you, Your Honor.

07:21  10        **THE COURT:**  So one of the things that you all may

11   have noticed is that it's 7:21, and we have been here for

12   most of the day, since early this morning.  And I had

13   initially scheduled 30 minutes for closing arguments, and I

14   am now to use a sports analogy going call an audible.  We're

07:22  15   not going to be having closing arguments at 7:20 at night for

16   another hour.

17        But I want to give you folks the opportunity to

18   frame your arguments to me.  And so instead, what we're going

19   to do is I'm going to give you folks a fairly significant

07:22  20   homework assignment, and it will be as follows.  And then

21   we'll talk about the timing.  It will be not exactly a

22   closing argument, but it will largely accomplish the same

23   purpose.

24        Each side will submit to me a proposed report and

07:23  25   recommendation.  So obviously, the Plaintiff would submit a

1    proposed report or recommendation, in which I am recommending

2    to Judge Leonard that she grant your motion for a preliminary

3    injunction.  And obviously, Amazon would submit a proposed

4    report and recommendation urging me to recommend that the

07:23   5    motion for preliminary injunction be denied.

6            Each report and recommendation should be drafted as

7    though I'm the person writing it.  So you're not going to say

8    something like the judge heard testimony -- it's not going to

9    be that way.

07:23   10           It's going to be as if I wrote the report and

11   recommendation.  In other words, to state the obvious, it

12   will be drafted in such a way that if I were so inclined to

13   simply attach my signature on the final page, I could do it.

14   I suspect I'm not going to do that.

07:24   15           But my point is that's the format it's going to

16   take.  And you're going to be referencing the testimony that

17   we heard here in court and the exhibits.  It probably and the

18   evidence probably unfolded largely the way you anticipated,

19   but not necessarily.

07:24   20           Maybe some points were excluded, maybe some

21   exhibits were excluded, maybe you didn't have time to develop

22   certain facts.  Maybe you didn't pursue certain themes to the

23   extent that you wanted to.

24           But in any event, the report and recommendation

07:24   25   will be based on the evidence here today.  So it will not

1   include things that were not discussed at the hearing today,

2   because I wouldn't be writing a report and recommendation

3   based on evidence that wasn't presented to me.

4        Now, you can make references to things which are

07:25   5   already part of the Court file.  But that is it.  You can't

6   just come up with a reference to another exhibit, some other

7   proposed testimony, discovery which has not yet been filed

8   with the Court, et cetera.

9        Now, people always think, not all people, but some

07:25   10   people think that Mark Twain is the person who is responsible

11   for the saying, gee, I apologize for writing such a long

12   letter.  I didn't have time to write a shorter one.  I've

13   done some research on it.

14        I don't think it was Mark Twain who actually said

07:25   15   it.  I think it was somebody many, many hundreds of years

16   before that, and he either borrowed the expression or somehow

17   it got attributed to him.

18        But either way, the point is, less is more.  So the

19   report and recommendation, the proposed report and

07:25   20   recommendation will be double-spaced.

21        I know that the rule is -- the local rules permit

22   you all to file in one and a half spacings, but my eyes as of

23   last week are 59 years old, and I just can't handle one and a

24   half spacing.

07:26   25        So it will be double-spaced.  It will be no more

         1   than 25 pages excluding certificate of service and signature

         2   block.  You should not treat the 25 pages as aspirational.

         3   If you want to submit something less than that, I encourage

         4   it.

07:26    5              Now, let's talk about the timing.  I don't want to

         6   just simply arbitrarily pull a deadline out of the air.  We

         7   do have the New Year's coming up.  It's the holiday week.  I

         8   suspect that you folks may have some other obligations, both

         9   professionally and family and otherwise.

07:26   10              So give me a feel, I'm not going to necessarily go

        11   with your recommendation, but first, Plaintiff, what do you

        12   think would be a reasonable deadline for you to submit your

        13   proposed report and recommendation.

        14              By the way, this will be simultaneous filings.  It

07:27   15   will not be Plaintiff submits its proposed reports, and then

        16   Amazon submits its proposed report.  Both of you will be

        17   submitting these proposed reports on the same day.

        18              So Mr. Núñez, I don't know if you're going to be

        19   the primary drafter or if some of your colleagues will be

07:27   20   joining you, or if it will be a team effort, but before you

        21   blurt out a date, I'm perfectly comfortable with you

        22   consulting with your partners, so that they don't jump out

        23   the window if you give a date that's unrealistic for them.

        24              **MR. NÚÑEZ-VIVAS**:  Fair enough.

07:27   25              **THE COURT**:  Defendants, Amazon, you can consult

 1    with your colleagues and see what they -- might make sense

 2    for you.

 3          MR. NÚÑEZ-VIVAS:  Your Honor, may I ask a question

 4    of the court reporter?

 5          THE COURT:  Sure.

 6          MR. NÚÑEZ-VIVAS:  How quick can we get a

 7    transcript?

 8          THE COURT:  Well, let's see, it's 7:27 right now.

 9          I assume you all took pretty good notes.  You know

10    generally what the testimony was.  You may not have a

11    pinpoint page cite, but I think you can start drafting the

12    proposed report before you actually get the transcript.

13          Maybe you can leave a couple of blanks here and

14    there, but you don't have to wait until you get the

15    transcript before you start drafting.  Right?

16          MR. NÚÑEZ-VIVAS:  Fair enough.  One question.

17          THE COURT:  Sure.

18          MR. NÚÑEZ-VIVAS:  We are limited to the evidence

19    submitted today, correct?

20          THE COURT:  And evidence that is already in the

21    record, correct.

22          MR. NÚÑEZ-VIVAS:  No declarations that were filed,

23    and they're in the court file, but were not -- that's not

24    evidence today, so that wouldn't be included.

25          THE COURT:  Correct, because otherwise that would

1    be -- the answer is yes.  Correct.  So, for example, for

2    example, as it turned out, Dr. Sarel's report was ultimately

3    admitted, but initially, I had excluded it.  If that ruling

4    had remained, I wouldn't allow you or the other side to make

07:29    5    reference to Dr. Sarel's report, because that would be

6    hearsay.

7          You would be able to rely on his testimony here in

8    court.  However, since his report was now admitted into

9    evidence, to the extent that you want to reference that in

07:29    10    addition to his actual testimony for whatever purpose, you

11    can.  Everybody understand that?  Plaintiff?

12          **MR. NÚÑEZ-VIVAS:**  Yes.

13          **THE COURT:**  Amazon, understood.

14          **MR. NELSON:**  Yes, Your Honor.

07:30    15          **MR. NÚÑEZ-VIVAS:**  Your Honor, 20 days.

16          **THE COURT:**  20 days from today.

17          **MR. NÚÑEZ-VIVAS:**  Yes.  And one of the reasons is

18    my schedule unfortunately is -- I mean, obviously, I'm going

19    to be the main drafter, but my schedule is really tight in

07:30    20    January.

21          **THE COURT:**  Listen, you don't need to explain or

22    justify.  I'm taking your estimate at face value.  You would

23    like 20 days.  Let's hear what Amazon has to say.

24          **MR. NELSON:**  Your Honor, we would say at least 30

07:30    25    days until Friday, January 30th, and just to give some

1    reasons for that --

2           **THE COURT:**  Can you speak into the microphone?

3           **MR. NELSON:**  Just to give some reasons for that, I

4    think we have all been working through the Christmas/Hanukkah

07:31   5    break here.  Some of us want to take a short break hopefully,

6    but more importantly, our schedules on other cases are coming

7    up.

8           And, Mr. Hansen, although we are not relying on

9    this, is an esteemed member of the Washington State

07:31  10    Legislature, who goes into service on January -- so that will

11    also push us a little bit, so we would appreciate until at

12    least January 30th if at all possible.

13           **MR. NÚÑEZ-VIVAS:**  I would agree.

14           **THE COURT:**  All right.  So it would be January

07:31  15    30th, simultaneous filing of these proposed reports and

16    recommendations.

17           Now, one of the things that I would like each of

18    the proposed reports to include, because I have to tell you,

19    I'm going to be very candid with you, one of the issues for

07:32  20    me -- I don't want to surprise you all, so in fairness, I

21    think you ought to discuss it.  One of the issues for me is

22    the delay between the filing of the lawsuit and the filing of

23    the motion for preliminary injunction.

24           I know there's been some reference to that in the

07:32  25    memoranda already filed.  So to the extent that you're filing

1   a proposed report and recommendation, just make sure that you

2   comprehensively address that issue.

3          Obviously, from the Plaintiff's perspective, you

4   would find applicable case law to support your position that

07:32   5   no worries, no problem, courts have granted injunctive relief

6   when there's been a greater delay.

7          And Amazon would find cases presumably which would

8   say to the contrary.  And that's a point that should be

9   fairly well developed in the proposed reports.

07:33   10          Other than that, you're free to draft these reports

11   in whatever way you see fit.  You all know what the issues

12   are, what the elements are of the issues that need to be

13   addressed.

14          **MR. NÚÑEZ-VIVAS:**  May I ask a question?  The reason

07:33   15   I agree with the 30 days is I'm assuming that that time frame

16   is not going to count against my client in any way, shape, or

17   form.  Otherwise, I will not sleep for the next three days

18   and draft this.

19          **THE COURT:**  No.  In other words, if you're saying

07:33   20   to, gee, Judge, if you're worried that the delay in seeking

21   injunctive relief is going to be held against us, and I'm

22   agreeing to an additional 10 days of briefing, you're going

23   to hold that against me.  That's not the case.

24          I'm simply talking about when the motion was filed,

07:33   25   because I do have a very strong recollection of my efforts to

1    schedule this evidentiary hearing sooner.  And I recall

2    Amazon saying, oh, my gosh, Judge, you can't do that, we're

3    Amazon.com.

4         The Christmas holidays is our most important

07:34  5    season.  All of our prospective witnesses are going to be so

6    tied up in the Christmas holiday, we can't possibly have a

7    hearing before Christmas day.  I think that was pretty much

8    the argument.

9         So the actual hearing itself was put off for a very

07:34  10   significant amount of time, and that's on Amazon.  So

11   whatever delay we're talking about here, it's not a delay

12   from the time you filed the lawsuit until there's been a

13   ruling.

14         I'm talking about the delay simply from the time

07:34  15   you filed the lawsuit until the time that you filed your

16   motion for preliminary injunction.  End of story.  Okay?  So

17   that extra ten days will not be a black mark on your

18   timeliness issue.  Any additional questions?

19         **MR. NÚÑEZ-VIVAS:**  No, thank you.

07:34  20         **MR. NELSON:**  No, Your Honor.  That's our

21   understanding as well, from the time of filing to the time of

22   the PI motion filing.

23         **THE COURT:**  So I had also earlier given you -- I

24   think this was on a previous note pad, another homework

07:35  25   assignment.  Let's see what that was all about?

     1          MR. NELSON:  Was that the Martinelli 30(b)(6)

     2     issue, Your Honor?

     3          THE COURT:  Yes, it was.  And bear with me just a

     4     minute.  Let me just get my notes here.

07:35  5          Correct.  That was the issue about whether or not I

     6     should consider his deposition as a 30(b)(6) witness because

     7     you were objecting to the questions, you didn't file a motion

     8     for a protective order.

     9          He answered the questions anyway.  So I don't view

07:36 10    this as something which is going to require a significant

    11     amount of briefing.  I don't anticipate that the memorandum

    12     will be lengthy.  What do you have in mind?

    13          MR. NELSON:  Your Honor, we would -- understanding

    14     all that, we would suggest sometime during the week of

07:36 15    January 12th.

    16          THE COURT:  No, no, first, let's talk about just

    17     the length of this memorandum.

    18          MR. NELSON:  I would think -- five or 10?  Eight

    19     pages would are more than sufficient.

07:36 20         THE COURT:  I would think so.  Plaintiff, what do

    21     you think?

    22          MR. NÚÑEZ-VIVAS:  Sorry, Your Honor.

    23          THE COURT:  Take your time.  You can consult with

    24     your team members.

07:37 25         MR. NÚÑEZ-VIVAS:  10 pages, I guess, is fine.

1    **THE COURT:**  That's not happening.  Okay.  Really.

2    Think about it.  It's a 25 page memo on the entire

3    preliminary injunction.  Then you want 10 pages on this

4    discrete issue concerning Mr. Martinelli as a 30(b)(6)

07:37   5    witness?  Thank you for your suggestion.  Thank you for your

6    suggestion.

7        I'm not accepting either of those suggestions.

8    It's going to be a five-page memorandum.  Same rules.

9    Double-spaced, excluding signature black and certificate of

07:37  10   service.  Now let's talk about the filing deadline.  What do

11   you have in mind?  This is an issue for you, so what are you

12   suggesting?

13       **MR. NELSON:**  Yes, Your Honor, because of holiday

14   schedules and the like, we would suggest at some point -- at

07:37  15   minimum, the week of January 12, and later in the week if

16   possible.  It's two weeks from today would be the 13th, if it

17   were -- so perhaps we can say the 13th or 14th, Your Honor.

18       **THE COURT:**  January 14th.  Just so there's no

19   confusion at all, for the major homework assignment, the

07:38  20   proposed report and recommendation, you said 30 days, but

21   rather than do that, let's just pinpoint a date certain.

22   That date would be -- today is December 29th.  So 30 days

23   would be December 59th.

24       **MR. NELSON:**  I think the proposal was January 30th.

07:38  25       **THE COURT:**  Thank you.  You're absolutely right.

 1   In fact, I'm looking at my notes, and it says January 30th.

 2   Correct.

 3        **MR. NELSON:**  Or December 59th.

 4        **THE COURT:**  Absolutely.  All right.  So in a

07:38   5   minute, I'm going myself take a leave and head back to my

 6   chambers to see, gosh, maybe I got an e-mail today while I've

 7   been in here, you never know.  We'll be able to proffer your

 8   testimony through the record.

 9        But before I leave, let me ask you this, and I

07:39  10   don't mean to say this in a negative way, but when do you

11   anticipate removing all of your electronic wizardry, gadgets

12   and trial graphic support and so forth.

13        **MR. NELSON:**  At the Court's pleasure, probably as

14   soon as the proffer is over at the latest.  And we'll try to

07:39  15   get everything down tonight if the Court will allow us.

16        **THE COURT:**  Here is the only thing.  I just can't

17   leave you in the courtroom.  So I have to have staff people

18   here, and I really don't want to keep anybody connected to

19   the Court here any longer than they have to be.

07:39  20        And I don't even know how long it's going to take

21   for your technical people to dismantle everything.  What do

22   you think it's going to take.

23        **MR. NELSON:**  Let me defer to my technical expert.

24   30 minutes.

07:40  25        **MR. NÚÑEZ-VIVAS:**  Your Honor, may I suggest --

07:40

1          **THE COURT:**  Wait, wait, wait.  This is why it's

2     always good to have a full-time law clerk.  And the question

3     was, how can Amazon be entitled to proffer the expert

4     testimony of Dr. Lehman if you've already exhausted your

5     three hours of time.

6          **MR. NELSON:**  I believe, Your Honor, when you

7     stated -- when we went through this at the time, you

8     specifically stated that it would not count against anybody's

9     time, the proffer.

07:40 10          **THE COURT:**  You're right, I did say that.  So thank

11     you, Locke, you refreshed my recollection.  So here is my

12     suggestion.  Have your technical folks come back early

13     tomorrow morning to remove all the equipment, because I just

14     don't want my folks here until 9:00 or 9:30 at night.  It's

07:41 15     just not right.

16          **MR. NELSON:**  Is the court open tomorrow?

17          **THE COURT:**  Yeah, we're going to be here.  In fact,

18     I have a hearing tomorrow at --

19          **THE COURTROOM DEPUTY:**  At 10:00, Judge.

07:41 20          **THE COURT:**  At 10:00.  Sounds like Maedon might be

21     here.  But there will be somebody here for sure, Locke, by

22     9:00?

23          **THE LAW CLERK:**  9:00.

24          **THE COURT:**  Yeah, there will be somebody here by

25     9:00, and if it's only going to take you half an hour, you'll

1    be done in time for our hearing.  And by the way, while I'm

2    watching you talk, and it's amazing to me, we have four

3    lawyers standing up, you're all wearing gray blue suits, red

4    ties light, light shirts.

07:41    5    You've all got the uniform on.  So if we had been

6    in trial, this would be a uniform on day 1.  And after two

7    weeks, you'd be a lot more flashy.  Anything else you need to

8    talk to me about before I leave, gentlemen.

9    **MR. NÚÑEZ-VIVAS:**  I was trying to see if with

07:42   10    Mr. Nelson, we could agree that maybe we could do this as at

11    a deposition setting, and we don't have to do it here.

12    Instead we can just have a court reporter, and have it like a

13    deposition.  Instead it would be a proffer, and then we

14    submit the proffer as that, and that way nobody has to stay

07:42   15    late.

16    **THE COURT:**  It doesn't matter to me how you would

17    like to do it, however you want to work it out.  But if

18    you're going to do it by deposition, you have to make sure

19    that Dr. Lehman is going to be available where and when, and

07:42   20    that's up to you.  But that suggestion is fine by me.  I'm

21    not going to micromanage that process.

22    **MR. NELSON:**  That's what we were discussing, and I

23    think we'll probably get a couple of minutes.  My inclination

24    is probably to get it done, everything tonight, but it's an

07:42   25    interesting suggestion.  We'll talk to see whether it works

1    logistically.

2         **THE COURT:**  All right.  So I'm going to be wishing

3    you folks a good night.  Let me just -- when you're done

4    taking the proffer, I think this is your laptop computer,

07:43   5    correct?  And then you'll swap that out and put it back

6    together.  And try to hook it up as best you can.  Very well.

7         I'm going to keep the sound system on, because

8    you're going to need it for your proffer.  So it was nice

9    spending the day and the evening with all of you.  Thank you

07:43   10   so much for your help.  Happy holidays to all of you.  Happy

11   New Year.  Safe travels to all the folks heading back to

12   Seattle.  Have a good legislative session for those of you

13   who are in the legislature.  And good night.  Take care.

14   We're in recess.

07:43   15        Why don't you give the court reporter, if she needs

16   it, five minutes rest before you proffer.  But ask her, maybe

17   she doesn't need it.  But if she does, then as a courtesy, I

18   think that would be the nice thing to do.

19

20                    *PROFFER*

21               *DIRECT EXAMINATION*

22   BY MR. NELSON:

23   Q.  We are on the record.  Dr. Lehman, we are here as a

24   proffer of your testimony for the Court to later rule on its

07:58   25   admissibility.  You testified earlier this afternoon.  Do you

|      |    |                                                                          |
|------|----|--------------------------------------------------------------------------|
|      | 1  | recall some of that testimony?                                           |
|      | 2  | A.  **Yes, I do.**                                                       |
|      | 3  | Q.  Do you recall -- and I'll just do a brief refresher on               |
|      | 4  | where we were to get you back up to speed?                               |
| 07:58 | 5 | A.  **Thank you.**                                                       |
|      | 6  | Q.  You recall that you testified regarding the Wreal                    |
|      | 7  | FyreTV.com web site, and the look and feel of that web site              |
|      | 8  | with the rows of graphic images, do you recall that                      |
|      | 9  | testimony?                                                               |
| 07:59 | 10 | A.  **Yes, I do.**                                                      |
|      | 11 | Q.  Do you stand by that testimony?                                      |
|      | 12 | A.  **Yes.**                                                            |
|      | 13 | Q.  And you recall that we began to testify about other                  |
|      | 14 | hardcore web sites such as You Porn that shared the same look            |
| 07:59 | 15 | and feel of --                                                          |
|      | 16 | A.  **We didn't get -- actually, we did not get to You Porn, is**        |
|      | 17 | **my recollection.  That was one of my slides that we were**             |
|      | 18 | **going to talk about.**                                                |
|      | 19 | Q.  Well, we don't have the slide here, but maybe you can                |
| 07:59 | 20 | generally describe what you saw on You Porn?                            |
|      | 21 | A.  **Yes, I can without the slide.  You Porn is another site**          |
|      | 22 | **which is generally considered the most popular one.  One of**          |
|      | 23 | **the most popular free hardcore porn sites.**                           |
|      | 24 | **It also offers rows and rows of screen grabs of**                      |
| 07:59 | 25 | **clips in this case that they offer, and it has a similar**            |

1    look.  There's a couple of things that -- points that I was

2    going to make about You Porn.

3            One of them is that at the top of the page, they

4    have the word categories.  And if you put your cursor on the

08:00   5    word categories, you then see a list of categories such as --

6    as I recall some of them, and I was going to mention, it

7    included Amateur Anal, Blow Jobs, Cream Pie, et cetera, and

8    it had some of the very similar categories that we saw on

9    Wreal's FyreTV.com, and in some cases, identical categories.

08:00   10           Another point that I was going to make about You

11    Porn is that if you put your cursor over any of the screen

12    grabs, it then creates a series of what seems to be random

13    frame grabs of what you will see if you look at that clip,

14    which is also exactly like what we saw on the FyreTV.com

08:01   15    site.

16    Q.   So is it your testimony that You Porn shares a similar

17    look and feel with FyreTV.com and other hardcore pornography

18    sites?

19    A.   Yes.  Almost all the hardcore porn sites have the

08:01   20    categories and also the rows of images, and the feature of

21    the random selection of images if you place the cursor over

22    the screen grab.

23    Q.   Do mainstream sites have anything like this?

24    A.   No, they don't.

08:01   25    Q.   Is this a distinct characteristic of the look and feel of

1    hardcore pornography sites?

2    A.  **Yes, it is, in that the kinds of graphic images that you**

3    **see there, which are characteristic of hardcore porn, as I**

4    **spoke about it earlier in my previous testimony, you do not**

08:01   5    **see things like that on mainstream sites.**

6    Q.  Did you look at the films available for streaming at

7    Amazon Instant Video?

8    A.  **I looked at some, obviously not all of them, but I looked**

9    **at some and researched other titles, and I also tried to view**

08:02   10   **those that were allegedly pornographic that were named in the**

11   **Wreal deposition.  So those were the ones that I looked at.**

12   Q.  You mean in Wreal's pleadings and papers?

13   A.  **Pardon?**

14   Q.  The ones that -- I think you meant the -- you said

08:02   15   Wreal's depositions, but were you discussing what Wreal said

16   in its pleadings?

17   A.  **Yes, they alleged that there was some pornographic titles**

18   **that they listed.  When I went to look for those titles, many**

19   **of them were unavailable.  The ones that I was able to find**

08:02   20   **that were available, I looked at.**

21   Q.  And were any of them, any video that you saw in this case

22   or just in your general use as an Amazon video customer, were

23   any of them on Amazon Video hardcore pornography?

24   A.  **No, they were not.**

08:03   25   Q.  Does the fact that Amazon sells sex toys mean that it is

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 08:03 | 5 |

1   a hardcore pornography site?

2   A.   **No, it does not.   Hardcore pornography defines a film and**

3   **video genre and it bears no relationship to any goods that**

4   **are for sale.**

08:03   5   Q.   Do mainstream web sites also sell these types of

6   products?

7   A.   **Yes, they do.   And one of the slides that I had prepared**

8   **included -- we saw something similar during someone else's**

9   **testimony, but I had slides from CVS, Walgreens, and**

08:03   10   **drugstore.com that showed that all of them had extensive**

11   **different terms that have been used here today, but basically**

12   **different sex toys, including vibrators and dildoes and**

13   **things like that, under what they call things like sexual --**

14   **I think sexual wellness, and things -- terms like that.**

08:04   15   Q.   And I'm going approach you.   Is this the slide that you

16   prepared?

17   A.   **Yes, I didn't take it myself, but I asked someone to take**

18   **it.**

19         MR. FOODMAN:   Mr. Nelson, can I look at the slide

08:04   20   if you don't mind.

21         MR. NELSON:   Yeah, you have copies.

22   A.   **If I take a guess, that's the one.**

23   BY MR. NELSON:

24   Q.   And to be clear to establish the record here, what's on

08:04   25   the slide reflects what you saw when you went to --

1    A.   **I saw that, yes.**

2    Q.   And you went to the web site and looked at this?

3    A.   **Yes, I did go to the web site.**

4    Q.   And you had the video technician capture this and put it

08:04   5    on the slide?

6    A.   **Correct.**

7    Q.   We're going to proffer this as Lehman --

8            **MR. FOODMAN:**  I'm going to object as it being

9    hearsay.

08:05  10            **MR. NELSON:**  We will do this as Lehman Proffer 1.

11            (Thereupon, the aforementioned exhibit was

12    introduced into evidence.)

13    **BY MR. NELSON:**

14    Q.   And do you think that a customer would confuse Wreal for

08:05  15    Amazon because Amazon sells sex toys or hardcore DVDs?

16            **MR. FOODMAN:**  Objection, lack of foundation and

17    speculation.

18    A.   **No, I do not because I think selling sex toys or**

19    **occasionally having some DVDs that slip through a policy of**

08:06  20    **not selling hardcore porn DVDs would not in any way have an**

21    **impact on how users viewed the respective web sites when they**

22    **went to Wreal's FyreTV.com, they would recognize a hardcore**

23    **porn web site.  And when they went to Amazon, they would**

24    **recognize a mainstream web site.**

08:06  25    **BY MR. NELSON:**

1    Q.   And Dr. Lehman, you were in court for Mr. Martinelli's

2    testimony?

3    A.   **Yes, I was.**

4    Q.   I believe you read Mr. Martinelli's deposition, you heard

08:06    5    Mr. Martinelli's deposition being read in court today, and

6    about what Amazon sells, its content policies, how on

7    occasion a third party -- or there will be DVDs available on

8    sale.  Does anything that you heard or read or seen about

9    Amazon change your opinion about whether users of Wreal's

08:06   10    FyreTV.com would confuse it with Amazon?

11              MR. FOODMAN:   I object to the lack of foundation as

12    an expert to be qualified to opine on this, and I believe it

13    would be speculation on his part, because he's not an expert

14    on these issues.

08:07   15    A.   **Would you reread the question again?**

16              (Thereupon, the court reporter read back the

17    requested portion.)

18    A.   **No.  Because the examples of admitting things like third**

19    **party users, that can succeed in selling some things for a**

08:07   20    **period of time, they do not fit the policy before they're**

21    **removed, and so forth seemed to me to be comparatively minor**

22    **and would not lead to any confusion.**

23    BY MR. NELSON:

24    Q.   And actually, before we go on, let me have you identify

08:08   25    this as Lehman Proffer 2?

1          (Thereupon, the aforementioned exhibit was

2     introduced into evidence.)

3     BY MR. NELSON:

4     Q.   It is this the You Porn slide that you had prepared?

08:08   5     A.   Yes, this is the You Porn slide that I referred to

6     previously.

7     Q.   Please go on, Doctor.

8     A.   Pardon?  Okay.  Do you want me to mention again what --

9     Q.   No, you already walked about that.

08:08  10     A.   Yes, this is the one to which I referred earlier.  This

11     is the top of the home page that shows --

12          MR. FOODMAN:  Objection, hearsay.

13     BY MR. NELSON:

14     Q.   Go on.

08:09  15     A.   It's the top of the home page, where you can see the word

16     categories, the second word in at the top under the word You

17     Porn, it shows the rows of graphic images I referred to.  And

18     there is another slide that you probably have there, or you

19     should have there which then -- yes.

08:09  20     Q.   (Complies.)

21     A.   Does everyone have --

22          MR. FOODMAN:  And just so I can lay on objection.

23     I'm going to object and move to strike because he's talking

24     about a document not in evidence, not offered in evidence.

08:09  25     BY MR. NELSON:

```
         1   Q.   Dr. Lehman, does this, what was -- we're going to mark as

         2   Lehman Proffer 2, which is the first You Porn screen capture,

         3   and Lehman Proffer 3, which is the second You Porn screen

         4   capture with categories on top, is that what you saw when you

08:10    5   went to You Porn?

         6   A.   Yes, it is.  And these are the categories that I was

         7   trying to recollect earlier, where you see titles like

         8   Amateur, Anal, Big Butt, Bit Tits, Blow Job, and Cream Pie

         9   and so forth, which are very reminiscent of, and in some

08:10   10   cases identical to the categories that we saw on Wreal's

        11   FyreTV.com.

        12   Q.   Okay.  Thank you.  And I'm just going to mark them right

        13   now as Lehman Proffer 2, which would be the first You Porn

        14   slide.  And to be clear, Dr. Lehman, what we're seeing in

08:10   15   Lehman Proffer 2 and you just looked at, you went to the web

        16   site and observed what is --

        17   A.   Yes, I did.

        18   Q.   And let me finish my question.

        19   A.   I'm sorry.

08:11   20   Q.   You observed what is on the slide as Lehman Proffer 2,

        21   correct?

        22   A.   Correct.

        23   Q.   And you had the video technician capture it and put it on

        24   the slide?

08:11   25   A.   Correct.
```

1   Q.  And it accurately represents what you saw at You Porn; is

2   that correct?

3   A.  **Correct.**

4   Q.  And for Lehman Proffer 3, which is the You Porn page with

08:11   5   the categories also represents that you went -- what you saw

6   when you went to You Porn?

7   A.  **Correct.**

8            (Thereupon, the aforementioned exhibit was

9   introduced into evidence.)

08:11   10  **BY MR. NELSON:**

11  Q.  And you have the video technician capture this, but it

12  represents what you actually saw when you went and visited --

13  A.  **Correct.**

14  Q.  Thank you.  Now -- I'm sorry.  Let me just make sure that

08:12   15  I've asked this.  You might have already answered it.  I

16  apologize.

17           Does anything that you have heard from the

18  Martinelli testimony, his deposition or his testimony here

19  today about Amazon sex toys policies, the fact that they sell

08:12   20  occasional DVDs of hardcore pornography against Amazon's

21  policies, change your opinion about whether users of Wreal's

22  FyreTV.com would confuse it with Amazon?

23           **MR. FOODMAN:**  Objection on multiple grounds.  To

24  form, to the fact that he's not qualified to give an opinion,

08:12   25  such as that being asked by counsel, and a lack of

```
  1   foundation.  Speculation as well.
  2   A.   No.  And I think I probably did already answer the
  3   reasons why, but if you want, I can repeat them again.
  4   BY MR. NELSON:
```
08:13
```
  5   Q.   Please do.
  6   A.   I think selling sex toys and other such goods bears no
  7   relationship to hardcore porn.
  8          Hardcore porn defines a film and video genre and
  9   the fact that Amazon occasionally sells against their policy,
```
08:13
```
 10   or participates in selling against their policy, some
 11   hardcore DVDs,                    REDACTED
 12                                               would change
 13   nothing about my opinion concerning how viewers and customers
 14   would feel about Wreal's FyreTV.com, which is clearly
```
08:13
```
 15   primarily a hardcore porn web site.
 16   Q.   Thank you, Dr. Lehman.  I'm going to approach you with
 17   Lehman Proffer 4.
 18          (Thereupon, the aforementioned exhibit was
 19   introduced into evidence.)
```
08:14
```
 20   BY MR. NELSON:
 21   Q.   Can you please explain what Lehman Proffer 4 is?
 22   A.   Yes.  If we had scrolled down to the bottom of the home
 23   page, if we started this testimony with -- this is --
 24   Q.   Referring to Wreal's FyreTV.com?
```
08:14
```
 25   A.   Yes, thank you.  Wreal's FyreTV.com, this is what we
```

         1  would have found at the bottom of the home page, and there

         2  are several things that I think we should point to here,

         3  which --

         4  Q.  Let me interrupt you and ask a question.  Do any

08:14    5  statements on Wreal's web site confirm your conclusion that a

         6  user would recognize that it specializes in hardcore

         7  pornography and distinguishes itself from mainstream web

         8  sites?

         9  A.  Yes.

08:15   10        MR. FOODMAN:  Objection to form.

        11  BY MR. NELSON:

        12  Q.  What are those?

        13  A.  The main one in that regard would be the line directly

        14  under the first image under the row on the left that says

08:15   15  FyreTV is the Netflix of porn.  What that line does is

        16  simultaneously suggest that they are successful --

        17  Q.  And sorry, let me interrupt.

        18  A.  Yes.

        19  Q.  Because there was an objection to form.

08:15   20  A.  I'm sorry.

        21  Q.  I want to rephrase my question so to -- what is your

        22  conclusion about Wreal's FyreTV.com on the basis of the

        23  statements that you see on Lehman Proffer 4?

        24        MR. FOODMAN:  Objection.  Calls for a legal

08:16   25  opinion.  This witness is not qualified to make any kind of

```
 1   opinions at this point, other than what he was admitted which

 2   is an expert on pornography and only pornography.  So any

 3   other testimony would be speculative at this point.

 4   A.   Okay.  The two statements that I would bring attention to

 5   are FyreTV's the Netflix of porn, which on the one hand tries

 6   to bring attention to a very successful company that it

 7   compares themselves to, but exactly by distinguishing their

 8   product as the -- being different from the mainstream kind of

 9   entertainment that you can find on Netflix.

10        That's reinforced in the paragraph below, where

11   again they used a XXX rating, which as I mentioned earlier is

12   the rating that the porn industry uses to identify its hard

13   porn products which has nothing to do with the Motion Picture

14   Association of America.

15        I would also bring your attention to the second

16   image at the top of the page from the left that has the image

17   of the very large penis pointing at the face of the young

18   woman in that close-up kind of composition.

19   BY MR. NELSON:

20   Q.   What is the title of that movie?

21   A.   The title of that is Babysitters Taking on Big Dicks 2.

22   And I think that that language is typical, too, but I just

23   want to point to the graphic, which like I mentioned earlier,

24   I think when you're talking about hardcore porn, it's

25   important to notice the composition.
```

08:16  5
08:16  10
08:17  15
08:17  20
08:17  25

|   |   |
|---|---|
| | 1 |    **And that composition really emphasizes the** |
| | 2 | **importance of these elements as the title does here, as the** |
| | 3 | **notion of the big dick and the word babysitter has these** |
| | 4 | **connotations of a very young woman.** |
| 08:18 | 5 | Q.   And have you taken a look at Netflix to see if it has |
| | 6 | similar content to the erotic or soft core videos on Amazon |
| | 7 | Instant Video? |
| | 8 | A.   **I have.** |
| | 9 |      MR. FOODMAN:  Objection, relevance. |
| 08:18 | 10 | **BY MR. NELSON:** |
| | 11 | Q.   And let me approach you with Lehman Proffer 5. |
| | 12 |      (Thereupon, the aforementioned exhibit was |
| | 13 | introduced into evidence.) |
| | 14 | **BY MR. NELSON:** |
| 08:18 | 15 | Q.   First, Dr. Lehman, let me just establish the foundation. |
| | 16 | Does this slide that we're looking at, Lehman Proffer 5, is |
| | 17 | it a slide that represents what you saw when you went to |
| | 18 | Netflix over the past few days? |
| | 19 |      MR. FOODMAN:  Objection, relevance. |
| 08:19 | 20 | A.   **Yes, it does.** |
| | 21 | **BY MR. NELSON:** |
| | 22 | Q.   And did you see this very image when you went to Netflix? |
| | 23 | A.   **Yes, I did.** |
| | 24 | Q.   And is it on the slide, because you had the video |
| 08:19 | 25 | technician capture the image and put it on the slide for you? |

```
 1   A.  Correct, yes.

 2   Q.  And what are we looking at here at Lehman Proffer 5?

 3   A.  We're looking at several things here that I think are

 4   typical of things you'll find on Netflix and Amazon Instant

 5   Video.  I want to notice the strong emphasis on the word

 6   unrated on the image, the first image in the film called

 7   Casting Couch.

 8          And when you look at -- excuse me, because it's a

 9   little dark up here, and I'm holding these images are small,

10   hard to look at.  The one called Sacred Flesh at the bottom.

11   These are soft core, these films suggest a soft core kind of

12   erotica but they are not marketed or presented in a manner of

13   the XXX hardcore porn in any way.

14          They typify a kind of -- what's frequently called

15   soft care or erotica.

16   Q.  Thank you.  And does this make Netflix or Amazon a

17   purveyor of hardcore pornography?

18          MR. FOODMAN:  Objection.  On several grounds.

19   Relevance, on the fact that he's only been proffered as a

20   witness to be an expert on pornography, so this would be

21   outside of the scope of his expertise, and he's not been

22   admitted for that, so any other testimony with regard to this

23   question will be speculative.

24   A.  No, it does not.

25   BY MR. NELSON:
```

```
 1   Q.   Do you think any users have been confused between Wreal
 2   and Netflix or Amazon because either of them offer erotica or
 3   soft core or unrated videos?
 4        MR. FOODMAN:   Objection.   I think part of this
 5   question was already sustained by the judge, but in any
 6   event, the same objection I just made, which is that he's
 7   given a legal opinion, number 1.
 8        Number 2, he's not qualified to give the opinion,
 9   that he's only an expert on pornography, not in consumer
10   confusion, does not have a degree in psychology or marketing,
11   so it would be speculative at best.
12   A.   I think it's highly unlikely that there would be
13   confusion.
14   BY MR. NELSON:
15   Q.   Okay.   And what is your opinion, then, about any actual
16   confusion of users who go to those sites, when any actual
17   confusion is taking place?
18        MR. FOODMAN:   I'm raising the same objection that I
19   just made a moment ago, which is that this witness is not
20   qualified to opine any on actual confusion.
21        He has no law degree, no psychology degree, he's
22   not presented a survey.   He has only been qualified as an
23   expert on pornography and not on confusion.   So it would be
24   speculative.
25   A.   Would you repeat the question for me, please.
```

08:21 (line 5)
08:21 (line 10)
08:21 (line 15)
08:22 (line 20)
08:22 (line 25)

1           (Thereupon, the court reporter read back the

2   requested portion.)

3   BY MR. NELSON:

4   Q.   Let me rephrase.  What is your opinion about not

08:23   5   likelihood of confusion, but any actual confusion of users

6   who actually go to Netflix or Amazon, whether they would have

7   been -- excuse me, not would, have been confused about the

8   differences between Wreal and Netflix or Amazon?

9           MR. FOODMAN:  I'm going to raise the same

08:23  10   objection, and I assume that Mr. Nelson agrees that it's the

11   same objection as before?

12           MR. NELSON:  Yes.

13   A.   **I believe that any user that goes to Wreal's FyreTV.com**

14   **will immediately recognize it as a hardcore porn web site and**

08:23  15   **any user that goes to Amazon.com will recognize it as a**

16   **general mainstream web site and --**

17   BY MR. NELSON:

18   Q.   Thank you.  So do you have a conclusion about whether a

19   user would think of anything other than hardcore pornography,

08:24  20   any -- excuse me, do you have a conclusion about whether a

21   user would think of any other type of web site other than

22   hardcore pornography, including any other mainstream site

23   when it visits Wreal's FyreTV.com?

24           MR. FOODMAN:  Same objection and also as to form

08:24  25   with regard to that question.

|   |   |
|---|---|
|  | 1 |

1   A.   **I believe that immediately upon going to Wreal's**

2   **FyreTV.com, any viewer would immediately recognize it as**

3   **being a hardcore porn web site, and they would not think of**

4   **it in relationship to any other kinds of web sites.**

08:24   5   BY MR. NELSON:

6   Q.   Thank you.  And on the underlying factual issue of actual

7   confusion, do you believe in your expert opinion, any viewers

8   or visitors to Wreal's web site would confuse -- or excuse

9   me, have confused Wreal's web site with any other site,

08:25   10   including Amazon?

11        MR. FOODMAN:  Same objection as well as the form.

12   A.   **I believe it's highly unlikely that any such confusion**

13   **has occurred in a statistically significant manner.  Highly**

14   **unlikely.  In fact, I think it's patently absurd.**

08:25   15   BY MR. NELSON:

16   Q.   And what then is your conclusion about a consumer who

17   visits FyreTV.com?

18        MR. FOODMAN:  Same objection.

19   A.   **I believe that a consumer who visits FyreTV.com**

08:25   20   **immediately recognizes it as a hardcore porn primarily or**

21   **even exclusively as a hardcore porn web site.**

22   BY MR. NELSON:

23   Q.   And what is your opinion then about whether they would be

24   likely to confuse FyreTV.com with Amazon?

08:26   25        MR. FOODMAN:  Same objection.

```
         1   A.  It is highly unlikely that they would confuse it with

         2   Amazon and patently absurd.

         3           MR. NELSON:  Thank you.  And let me then just give

         4   the proffer, I'll pass the witness, but I'll just give you

08:26    5   the proffer.

         6           Mr. Foodman, to speed things along, would you agree

         7   that all objections that I might raise except as to form, I'm

         8   not waiving if I don't say it?

         9           MR. FOODMAN:  No.  You need to make the objection.

08:27   10

        11                   CROSS EXAMINATION

        12   BY MR. FOODMAN:

        13   Q.  Good evening, Mr. Lehman.  Let me ask you what qualifies

        14   you to give a legal opinion on consumer confusion in this

08:27   15   case?

        16   A.  The field of what you're calling pornography, when you

        17   say I'm only qualified to talk about pornography, in my field

        18   of film and media studies, we cover many areas including, by

        19   the way, psychology, psychoanalytic theory, marketing,

08:27   20   exhibition, distribution, all those things.

        21           So the field of film and media studies, all areas,

        22   not just gender, sexually and pornography, but all areas of

        23   my field of expertise extend into this.  And, in fact, I've

        24   used and drawn heavily upon psychology and psychoanalytic

08:28   25   theory.
```

```
 1   Q.  You were not qualified by the Court, other than to give

 2   an opinion on pornography, were you?

 3   A.  But the word "pornography" --

 4   Q.  Sir, please answer my question, and I'll be happy to give

08:28  5   you the time to expand, but I asked a specific question.

 6   A.  Can you ask the question again, please?

 7   Q.  Please reread the question.

 8            (Thereupon, the court reporter read back the

 9   requested portion.)

08:28 10   A.  Yes.

11   BY MR. FOODMAN:

12   Q.  You were?

13            MR. NELSON:  I object.  And I guess I'll object to

14   form on multiple grounds.  And including misstates the

08:28 15   testimony.  And calls -- anyway, I'll leave it at that.  And

16   is vague and ambiguous.

17   BY MR. FOODMAN:

18   Q.  Isn't it true that you were only proffered by Amazon's

19   counsel on pornography today in court?

08:28 20   A.  Yes.

21   Q.  How many trademark cases have you provided an expert

22   opinion on before?

23   A.  None.

24   Q.  List for me, please, the cases that you've given an

08:29 25   expert opinion on consumer confusion before?
```

```
      1    A.   None.

      2    Q.   Did you know that the judge decides whether there's a

      3    likelihood of consumer confusion?

      4              MR. NELSON:  Objection to the form.

08:29 5    BY MR. FOODMAN:

      6    Q.   You can answer.

      7    A.   No, I do not know.

      8    Q.   Do you think --

      9    A.   In this hearing, I know that the judge decides, yes.  Is

08:29 10   that the question?  In this hearing, yes, I know that the

      11   judge decides.

      12   Q.   Do you think the judge needs your opinion to decide

      13   whether there's a likelihood of consumer confusion?

      14   A.   Yes, I understand that the judge takes under advisement

08:29 15   everything that's part of the record in making his decision.

      16   Q.   Can you tell me the difference between reverse and

      17   forward confusion?

      18              MR. NELSON:  Objection to the form.

      19   BY MR. FOODMAN:

08:30 20   Q.   You can answer.

      21   A.   Yes, it's my understanding that in reverse confusion, in

      22   this case, Amazon is the senior established company that has

      23   the mark which FyreTV.com, the Plaintiff, is claiming that

      24   it's reversed in the sense that they could suffer damages

08:30 25   from the senior, that the company that already has the mark
```

 1   that they're claiming infringes on theirs.  That they could

 2   become associated with Amazon.

 3   Q.  Did Amazon tell you before you signed your declaration

 4   that one of its customers called Amazon and asked to access

08:31  5   Wreal's FyreTV content on Amazon's Fire TV?

 6         MR. NELSON:  Objection to the form, and objection

 7   on privilege grounds.  I'm going to ask you not to answer

 8   because that calls for privileged communications that you did

 9   not rely on.

08:31 10   BY MR. FOODMAN:

11   Q.  How many searches from pornography did Amazon tell you it

12   receives from consumers on it web sites?

13         MR. NELSON:  I'm going to -- the same instruction

14   not to answer.  It calls for communications that you did not

08:31 15   rely on regarding the attorney/client -- expert relationship

16   in the case.

17   BY MR. FOODMAN:

18   Q.  What did you rely on to make your determination?

19   A.  I'm sorry, to make what determination?

08:31 20   Q.  To make your determinations in your opinion in this case?

21   A.  I already mentioned that at the beginning.  I relied on

22   reading the -- I went to the various web sites.  I read the

23   depositions.  For the -- that were made by both the parties.

24   And I did the research on the FyreTV.com web site.  And on

08:32 25   Amazon web site.

|    |    |
|----|----|
| 1  | Q.  Were you aware that there were approximately 80,000 |
| 2  | searches for XXX on Amazon's web site during this period? |
| 3  | A.  **No, I was not.** |
| 4  | Q.  I thought it was your testimony, though, that no one |
| 08:32  5 | would confuse a porn web site from a mainstream web site? |
| 6  |       MR. NELSON:  Objection form. |
| 7  | A.  **My testimony was that no one would confuse Wreal's** |
| 8  | **FyreTV.com with Amazon.** |
| 9  | BY MR. FOODMAN: |
| 08:32  10 | Q.  Not that consumers would go on Amazon looking for |
| 11 | pornography? |
| 12 | A.  **I don't know what consumers go on Amazon looking for.  I** |
| 13 | **can't answer a question like that.** |
| 14 | Q.  Well, would it change your opinion if there were 80,000 |
| 08:33  15 | searches for XXX on Amazon.com's web site? |
| 16 | A.  **I don't know.  I have no way of evaluating that data.  I** |
| 17 | **don't know what that means in relationship to Amazon's search** |
| 18 | **engine.** |
| 19 | Q.  I'm asking you to assume that as an expert. |
| 08:33  20 | A.  **I have --** |
| 21 |       MR. NELSON:  Objection to the form. |
| 22 | BY MR. FOODMAN: |
| 23 | Q.  You can answer. |
| 24 | A.  **I have no way of evaluating what that number would** |
| 08:33  25 | **indicate in relationship to Amazon's --** |

1   Q.   What if 302,000 people searched for the word porn on

2   Amazon.com's web site?

3   A.   **I have no knowledge about how their search engine works**

4   **and what the users are like and --**

08:33   5   Q.   I'm asking you to assume --

6   A.   **Over what period of time and how many people search, I**

7   **have no data points to compare it to or anything.**

8   Q.   I'm asking you to assume as an expert that in a recent

9   quarter, three months, that there were 302,000 searches for

08:34   10   the word porn on Amazon.com.  As an expert, you've learned

11   that fact.  What is your view about that fact?

12           MR. NELSON:  Objection to the form.

13   A.   **Well, that would suggest to me that, you know, 8,000**

14   **people wanted to know whether Amazon sold XXX rated videos.**

08:34   15   **BY MR. FOODMAN:**

16   Q.   And I asked you specifically a moment ago about 302,000

17   searches for porn.  What would that indicate to you?

18   A.   **I don't know where that figure came from.**

19   Q.   You're an expert, you're assuming that that's a fact,

08:34   20   provided by Amazon?

21           MR. NELSON:  Objection to the form.

22   **BY MR. FOODMAN:**

23   Q.   I'm asking you to assume that fact, that in one quarter,

24   there were 302,000 searches for porn?

08:35   25   A.   **That would tell me that 302,000 people wanted to know**

 1  whether Amazon sold XXX DVDs.

 2  Q.  Wasn't it your testimony that no one would confuse Amazon

 3  with FyreTV?

 4  A.  **That still wouldn't change my opinion about that, that**

08:35  5  **people would confuse Amazon with FyreTV, even if that many**

 6  **people wanted to know if Amazon sold X rated DVDs in that**

 7  **quantity, that number of people wanted to know.**

 8  Q.  If you assume the example that I just gave you, wouldn't

 9  you agree that people are searching for porn on Amazon?

08:35  10       MR. NELSON:  Objection to the form.

 11  A.  **You would have to assume that people were searching, yes.**

 12  **BY MR. FOODMAN:**

 13  Q.  In paragraph 3 of your declaration, you make reference to

 14  Merriam Webster's definition of pornography.  I assume you

08:36  15  read that definition?

 16  A.  **I read the definition, but I'm not certain what you're**

 17  **referring to right now.**

 18       **THE COURT REPORTER:**  Mr. Foodman, we have 10

 19  minutes.  Okay?

 20       **MR. FOODMAN:**  I wasn't limited by the Court.  You

 21  got a half an hour --

 22       **THE COURT REPORTER:**  You can find somebody else to

 23  do it because we're going home.

 24       **MR. FOODMAN:**  Is that on the record?  I would like

08:36  25  that to be on the record.

         1          **MR. NÚÑEZ-VIVAS:**  We need to have that on the

         2   record.

         3          **THE COURT REPORTER:**  You have 10 minutes to finish

         4   up because we're going home.

         5          **MR. FOODMAN:**  Okay.  Is that on the record?

         6          **THE COURT REPORTER:**  Yeah, I just put it on.

         7          **MR. FOODMAN:**  Okay.  Thank you.

         8          **MR. NÚÑEZ-VIVAS:**  So we have 10 minutes, according

         9   to the court reporter, to finish the cross-examination

08:36  10   because she's leaving to go home.

        11          **MR. FOODMAN:**  And we offered to take the deposition

        12   at a separate time, and they object -- they object to that --

        13          **MR. NÚÑEZ-VIVAS:**  We object to that, and we would

        14   like the opportunity to have additional time to finish the

08:36  15   cross-examination if it's not finished in 10 minutes.  Thank

        16   you.

        17   A.  **I did not quote this entire definition in anything I said**

        18   **in my declaration.**

        19   BY MR. FOODMAN:

08:37  20   Q.  Would a copy of your declaration refresh your

        21   recollection?

        22   A.  **Yes, what I wanted to say was that the portion that you**

        23   **were saying that I quoted in my testimony is what I testified**

        24   **earlier.**

08:38  25   BY MR. FOODMAN:

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | Q.   I've just handed you for the record a copy of your            |
|       | 2  | declaration; is that correct, Mr. Lehman?                          |
|       | 3  | A.   **It's Dr. Lehman.**                                          |
|       | 4  | Q.   What's that?                                                   |
| 08:38 | 5  | A.   **It's Dr. Lehman, not Mr. Lehman.**                         |
|       | 6  | Q.   I apologize, Doctor.                                           |
|       | 7  | A.   **Yes, you did hand it to me.  (Reading)  You didn't show**  |
|       | 8  | **me the section to which you were referring.**                    |
|       | 9  | Q.   I handed you the declaration so you could see your copy       |
| 08:38 | 10 | of the Merriam Webster definition.                                 |
|       | 11 | A.   **You made reference to my reference to a dictionary**       |
|       | 12 | **definition.**                                                    |
|       | 13 | Q.   If you look at paragraph 3, please?                           |
|       | 14 | A.   **Paragraph 3?**                                             |
| 08:39 | 15 | Q.   Yes, sir.                                                      |
|       | 16 | A.   **(Complies.)  Okay.  Yes, that one phrase came up**         |
|       | 17 | **someplace in reference to some other deposition or**            |
|       | 18 | **declaration someplace else.**                                    |
|       | 19 | Q.   Had you read the definition that you posted in your          |
| 08:39 | 20 | declaration?                                                        |
|       | 21 | A.   **The intended to cause sexual excitement, yes.**           |
|       | 22 | Q.   Do you disagree with that definition?                         |
|       | 23 | A.   **Pardon?**                                                  |
|       | 24 | Q.   Do you disagree with that definition of pornography?         |
| 08:39 | 25 | A.   **Yes, I do.**                                               |

1    Q.   You disagree with Merriam Webster's definition?

2    A.   **I just looked at the one that you gave me.  I haven't**

3    **read it carefully.**

4    Q.   The definition that you cited to in your declaration?

08:40    5    A.   **That you can define pornography as intending to cause**

6    **sexual excitement?**

7    Q.   Yes, sir.

8    A.   **Do I disagree with that?  Yes.**

9    Q.   What makes your definition any more persuasive than the

08:40   10   highly recommended Merriam Webster dictionary?

11   A.   **Because intention is -- has long been -- it's too vague**

12   **to describe.  You can describe -- you can describe**

13   **characteristics, such as what I did by defining hardcore in**

14   **terms of --**

08:41   15            MR. NELSON:   Finish your answer.

16   A.   **Yeah, I'm getting distracted by all the activity going on**

17   **here.  You can define hardcore pornography as a genre like**

18   **any other genre, like you can define Westerns in relationship**

19   **to a time setting.  And certain kinds of actions are likely**

08:41   20   **to take place between certain groups of people and so forth.**

21            **You can define pornography the same way through the**

22   **meat shot through the money shot, through defining**

23   **characteristics that give it a precise definition, and a way**

24   **of understanding it in relationship to other forms of things**

08:41   25   **that people might call pornography, like soft core**

1    pornography.

2         And these things have nothing to do with something

3    as vague and general as intending to cause sexual excitement.

4    You can't measure intentions.  And intentions to cause sexual

08:42  5    excitement may take place in a magazine advertisement.  They

6    may take place in a television commercial.  They may take

7    place in a PG-13 rated Hollywood movie.

8         It doesn't help us understand what hardcore

9    pornography is.  Even the word pornography is too broad to be

08:42  10   useful without being broken down in ways where we can define

11   specific genres such as the hardcore porn film in

12   relationship to soft core porn, for example.

13        MR. FOODMAN:  I'm going to take a break while I

14   speak to your counsel who asked to speak to me.

08:43  15        (Thereupon, there was a brief pause.)

16        MR. FOODMAN:  We're going to continue this

17   proceeding to a videotaped deposition by agreement of the

18   parties.

19        MR. NELSON:  And let me just say for the record

08:44  20   very briefly, I have offered this.  I expect that Mr. Foodman

21   has represented that he's about halfway done.

22        And I expect that the remainder of the

23   cross-examination will take about the time it's taken us so

24   far, and we'll do it by videotaped deposition.

08:44  25        MR. FOODMAN:  Not agreed to limit the time frame.

1          **MR. NELSON:**  We'll confront that if we have to.

2    Hopefully we won't.  I mean, you're not going to do a 7-hour

3    deposition.

4          **MR. NÚÑEZ-VIVAS:**  We're done.

5

6

7          (Thereupon, the above hearing was concluded.)

8

9                         *           *           *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            **C E R T I F I C A T E**

2

3            I hereby certify that the foregoing is an accurate

4    transcription of the proceedings in the above-entitled

5    matter.

6

7        1-11-2015

8    _____        _____

9    DATE COMPLETED              GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25