## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 14-21385-CIV-LENARD/GOODMAN

WREAL LLC,

      Plaintiff,

v.

AMAZON.COM, INC., et al.,

      Defendant.

_____/

## REPORT AND RECOMMENDATIONS
## <u>ON PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>

In his 1989 hit song, singer/songwriter Billy Joel famously noted, "We didn't start the fire."[1] Twenty-five years later, those lyrics apply to Plaintiff's preliminary injunction motion. To be more specific, Defendant Amazon.com, Inc. ("Amazon") did not start the idea of using a name incorporating the word "fire" for its set-top box for streaming video and audio content to a television. In fact, Amazon knew that another company already had trademark protection for its "Fyre TV" set-top box before it decided to launch its "Fire TV" product.

Nevertheless, Amazon decided that the two "fire" television movie-related products were dissimilar (because Fyre TV offers exclusively pornographic content and Amazon portrays itself as offering general interest content with an emphasis on family-

---

[1]      From the song of the same name, on the "Storm Front" album (Columbia 1989).

1

friendly features on its Fire TV product), and it thought it could therefore safely proceed. But Plaintiff Wreal LLC ("Wreal"), which owns the registered marks FyreTV® and FyreTv.com® disagrees, and it filed this lawsuit approximately two weeks after Amazon launched its Fire TV product. It did not, however, file its preliminary injunction motion [ECF No. 28] for more than five additional months.

United States District Judge Joan A. Lenard referred [ECF No. 35] the preliminary injunction motion to me.

The Court has reviewed Wreal's motion (the "Motion"), Amazon's response [ECF No. 76], and Wreal's reply [ECF No. 83], as well as the submissions that accompanied those documents. The Court also held a full-day evidentiary hearing (the "Hearing") on December 30, 2014, and heard live testimony from Rodrigo Franco and Raul Plaza from Wreal, and Elizabeth Baicy, Anthony Martinelli, and Nathaniel Fuller from Amazon. Amazon also presented expert testimony from Dr. Peter Lehman[2] and Dr. Dan Sarel, and Wreal put on rebuttal expert testimony from Dr. Thomas Maronick.

---

[2]      At the Hearing, Amazon tendered Dr. Lehman as an expert in the field of pornography, not as an expert in customer confusion or in marketing. (Hearing Transcript, ECF No. 127-1 ("Tr.") 271:21-274:13). Indeed, Dr. Lehman admitted to not having a degree in psychology or marketing. (Tr. 273:2-7). Thus, the Court allowed Dr. Lehman to testify that the FyreTV website is a "hardcore porno site." (Tr. 295:25-296:11). However, the Court excluded Dr. Lehman's testimony on likelihood of confusion. (Tr. 302:16-303:13, 306:5-12). Dr. Lehman neither conducted a survey (Tr. 300:1-301:16), nor was he qualified to opine on consumer psychology.

For the reasons outlined below, the Undersigned respectfully **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion. Amazon may not have started the "fire," but it will not now be required to stop that "fire." To quote a different Billy Joel song, the Court is convinced by Amazon's efforts to portray Wreal's preliminary injunction motion as, in effect, a "River of Dreams"[3] which should not be granted.

## I.     GENERAL OVERVIEW

Wreal sells a pornography pay-per-view service called "FyreTV" and a pornography set-top box -- a device that streams video content directly to a television -- called the "Fyre BoXXX"[4] through its website, www.fyretv.com. Wreal owns registered trademarks "FyreTV" and "FyreTV.com." In April 2014, Amazon introduced the Amazon Fire TV, a set-top box dedicated to mainstream content. Wreal then brought this lawsuit, claiming Amazon's Fire TV infringes its trademarks. Wreal alleges reverse confusion as opposed to traditional forward confusion: it alleges that consumers will mistakenly believe the junior user (here, Amazon) is actually the source of the senior user's products (here, FyreTV or the Fyre BoXXX).

---

[3]      From the album of the same name, (Columbia 1993).

[4]      The evidence at the Hearing reflected several different names for this product. WREAL's print ads called it the "BoXXX," as in "The Hottest BoXXX You'll Ever Experience." (Plaintiff's Exhibit ("Pl.'s Ex.") 3). WREAL's Chief Operating Officer, Rodrigo Franco, testified that the company at times called it the "FyreTV box." (Tr. 62:12-13). The Court uses the name "Fyre BoXXX" in this Report, as this is the name WREAL currently uses on its website's "Frequently Asked Questions" and "My Account" pages. (D.'s Ex. R.F.X. 210; D.'s Ex. R.F.X. 214; Tr. 133:5-7).

Wreal moved for a preliminary injunction. It does not seek to preclude Amazon from selling its product -- it merely seeks to stop Amazon from selling and marketing it under the "FireTV" name. The Court recommends denial of Wreal's request for the following reasons, which will be outlined in greater detail later in this Report:

*First*, there is no likelihood that an appreciable number of consumers will mistakenly believe Amazon is responsible for Wreal's FyreTV or Fyre BoXXX. Notably, not one but two consumer surveys (one by Amazon's expert and one by WREAL's own expert) showed what the experts characterized as "very low" or "nonexistent" confusion. No case has found likelihood of confusion in these circumstances.

*Second*, there is no irreparable harm. At the Hearing, Wreal's Chief Operating Officer, Rodrigo Franco, could not identify any legally cognizable harm his company might suffer because of Amazon's Fire TV. The only injuries Mr. Franco identified are unrecognized by trademark law (such as being falsely thought a pirate) or speculative (such as the hypothetical scenario that Amazon might one day suffer a scandal that might tarnish Wreal's reputation). The Fyre BoXXX -- featured prominently in WREAL's Complaint [ECF No. 1, ¶ 9] -- was not even on sale to new customers when Wreal filed its Complaint in April 2014.

Even if Wreal could identify any compensable harm, its more-than-five-month delay in moving for a preliminary injunction "tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial." *Seiko Kabushiki Kaisha v.*

*Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355-56 (S.D. Fla. 2002) (Lenard, J.) (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)). Moreover, Amazon has offered streaming video under the "Fire" brand through its tablets since 2011, without any complaint from Wreal. Again, Wreal waited more than five months after filing this lawsuit before seeking a preliminary injunction. This delay is problematic and unexplained and could by itself be reason enough to deny the preliminary injunction motion.

*Third*, the balance of hardships is one-sided. A preliminary injunction would cost Amazon a substantial amount of money. Amazon pegs the anticipated loss in the tens of millions of dollars. Wreal challenges this estimate and argues that it would be substantially less. But regardless of whether the loss would be more than ten million dollars or five million dollars or even three million dollars, Amazon would have to retrieve and destroy packaging with the Fire TV name, change in-store displays, recode its operating system, and then re-launch Fire TV under a new brand. In contrast, Wreal identifies no compensable injury -- much less an irreparable one -- it will suffer if an injunction does not issue.

*Fourth*, Wreal has not demonstrated that a preliminary injunction would serve the public interest. For all practical purposes, Wreal's Fyre BoXXX is all but defunct. Its FyreTV streaming hardcore pornography service is not faring much better. The company's revenues were steadily declining even before Amazon launched its Fire TV.

A preliminary injunction would force Amazon to halt and rebrand an actively marketed product, at great expense and at the risk of confusing its own customers or potential customers, because of the speculative chance that some likely small number of consumers might eventually confuse it with Wreal's FyreTV or Fyre BoXXX. Under these circumstances, the Undersigned is not persuaded that a preliminary injunction would serve the public interest.

II.      **BACKGROUND**

A.      **The Parties**

1.      **Wreal and the FyreBoXXX**

Wreal is a Miami-based technology company that was formed in 2006 to develop a platform for "IPTV," or Internet Protocol Television. (Tr. 52:13-19). IPTV allows users to stream video content over the internet and watch it on a television screen or other device. (Tr. 52:19-22). Wreal claims that it has spent over $20 million in developing its technology and markets its service under the service marks FyreTV® and FyreTV.com®. (Tr. 52:23-25; 56:22-57:1). FyreTV® and FyreTV.com® were registered with the United States Patent and Trademark Office on October 14, 2008, and Wreal has continuously used the marks in commerce since 2007. (Pl.'s Ex. 2; Tr. 60:4-1:25).

Among the uses allowed for the registered marks are telecommunications access to video and audio content provided via a video on demand service via the internet, as well as transmitting stream sound and audio visual recordings via the internet. (Tr.

60:14-61:17). In sum, the marks FyreTV and FyreTV.com are registered for streaming video over the internet.

Wreal contends that FyreTV® provides its customers with *access* to pornographic content. (Tr. 58:23-59:2). Amazon, however, simply describes Wreal as "a pornography company." [ECF No. 125-1, p. 9]. Wreal describes its FyreTV video streaming platforms as "content agnostic," meaning they can be used to stream any video content, including Hollywood movies. (Tr. 58:12-25, 82:2-18).

But the reality is that Wreal offers exclusively pornographic content, not mainstream movies. (Tr. 58:23-59:2, 112:16-17). Most of its offerings are hardcore pornography. (Tr. 112:10–12). Wreal markets a streaming hardcore pornography service called "FyreTV," which Wreal describes as "The Ultimate Adult Video On Demand Experience," a "porn pay per view service," and "the Netflix of Porn." (Pl.'s Ex. 5). Wreal does not believe its use of the "Netflix" mark infringes any trademarks because it believes Netflix operates in a different market. (Tr. 120:20-121:7).

Wreal sells its FyreTV service exclusively through its FyreTV.com website (Tr. 130:20-22), which requires visitors to affirm they are over 18 and willing to view adult content before they can enter (Tr. 275:4-14; D.'s Ex. R.F.X. 204). Upon entry, the viewer immediately sees several rows of highly explicit pornographic images (Pl.'s Ex. 5); the "Categories" page offers a further selection of many different lurid pornography genres. (D.'s Ex. R.F.X. 205; D.'s Ex. R.F.X. 206).

FyreTV® was first available only through Wreal's own proprietary set-top box, and later available through other devices as well, such as the Roku set-top box, and on the web at www.fyretv.com and www.firetv.com. (Tr. 54:9-56:21, 78:2-4, 97:13-22). Wreal's set-top box is marketed and sold under the name FyreTV®, though Wreal occasionally refers to its set-top box as either the FyreBoXXX or the FyreTV Box. (Tr. 62:1- 63:13).

The "Fyre BoXXX" is a set-top box dedicated to hardcore pornography. (Pl.'s Ex. 5; D.'s Ex. R.F.X. 210; D.'s Ex. R.F.X. 214). The Fyre BoXXX is only available to customers who first sign up for a FyreTV account at Wreal's website. (Tr. 130:13-22). Wreal has never sold this product at any store or through any website other than FyreTV.com. (Tr. 133:14-19). In October 2012, Wreal stopped selling the Fyre BoXXX to new subscribers, only restarting these sales after Amazon launched its Fire TV in April 2014. (Tr. 57:2-25; Tr. 123:11-20). For a period of time in late 2013 and early 2014, Wreal shut down Fyre BoXXX sales to all customers (existing and new) because of battery leaks. (Tr. 127:25-128:22, 166:12-18, 167:25-168:7). As an April 8, 2014, Wreal email noted: "[W]e don't sell STBs [set-top boxes] anymore." (D.'s Ex. R.F.X. 4). Wreal sold only four Fyre BoXXX units from May through September 2014. (Tr. 135:4-139:9; D.'s Ex. R.F.X. 215).

But, even after the Hearing, there is some dispute about specifically when, and under what circumstances, the FyreBoXXX set-top box was sold, offered, or provided to Wreal's customers.

Wreal says it **never** stopped selling its FyreTV set-top box. It concedes that it stopped selling it to *new* customers for a period of time to channel them to use the new FyreTV video streaming platforms, but emphasizes that it always made its FyreTV set-top box available to current customers. Its position is that it only **briefly** stopped selling its set-top box to anyone for a period of about three weeks in 2014 due to battery leaks. After fixing the battery leak problem, it re-started selling it to all customers.  (Tr. 57:2-58:4, 124:11-15, 167:19-170:3).  In addition, Wreal underscores the fact that it never stopped streaming video to its proprietary FyreTV set-top box.  (Tr. 57:16-9).

But Amazon points to other evidence to support its view that Wreal's description is incomplete or at least partially incorrect. For example, at the Hearing, Raul Plaza, a former Wreal employee, testified that Wreal had fixed the battery leaks by April 2014, when Amazon released its Fire TV. (Tr. 168:8-17.) However, when Amazon took his deposition as a Rule 30(b)(6) corporate representative, Plaza testified that Wreal was **not** selling set-top boxes to anyone as of April 2014. [ECF No. 74-15, pp. 5-6, 47:10–48:20] ("Q. Is it true that, as of April 8, 2014, WREAL didn't sell set-top boxes anymore? A. Yeah, there was an issue with the boxes we had.").

Amazon also notes that Wreal stated in an interrogatory response that "[f]rom October of 2012 through April 2014, Wreal stopped selling a set-top box, but continued to support the set-top box, and maintained a stock of refurbished set-top boxes for its current customers." [ECF No. 76-1, p. 16]. Regardless of when sales to *existing*

customers stopped (or if those sales ever stopped for more than three weeks), it is undisputed that Wreal was not selling set-top boxes to *new* customers in April 2014, when Wreal filed its lawsuit.

Wreal has advertised FyreTV® through various channels, including magazine ads, television commercials, trade shows, and online. (Tr. 63:21-64:19). Wreal says it currently advertises FyreTV® online through the use of banner advertisements (Pl.'s Ex. 4) and "word-of-mouth" advertising. (*Id.* 77:14-78:6). Wreal's current advertising, other than "word-of-mouth" advertising, is only on adult websites. (Tr. 142:13-15, 143:1-10; Pl.'s Ex. 4.). Wreal stopped all television advertising in 2012, and the latest print advertisement introduced at the Hearing was from 2009. (Tr. 64:6-10, 67:25-68:6; Pl.'s Ex. 3).

### 2. Amazon and the Amazon Fire TV

Amazon is a Seattle-based company that sells a broad variety of products, primarily through its home page, www.amazon.com. (Pl.'s Ex. 6). Amazon started using the "Fire" brand with streaming video in 2011, when it introduced its Kindle Fire tablets. (Tr. 207:20-208:23). Amazon selected "Fire" to show the evolutionary progression from the "Kindle" e-reader to the "Fire" tablets with streaming video capability. (Tr. 207:25-208:9). Amazon had released three generations of the "Fire" tablets by April 2013. (Tr. 208:24-209:1).

In late 2012 and early 2013, Amazon was planning for the introduction of several new products, including a phone, a new generation of tablets, and a set-top box. (Tr. 209:5-16). Amazon decided to use "Fire" for all these products, extending its previous use of "Fire" as its multimedia brand. (Tr. 210:1-9). The company also decided to use its house brand, "Amazon," with the new products. (Tr. 210:10-17).

At some point during those branding discussions, Amazon became aware of Wreal's FyreTV® service. (Tr. 211:6-9). Though Amazon was aware of Wreal's marks, it decided upon the Fire TV name anyway. Amazon did not contact Wreal about its plans to use the Fire TV name, and Wreal contends that it was shocked upon learning of Amazon's Fire TV. (Tr. 90:20- 91:1).

Amazon's set-top box, the Amazon Fire TV, launched April 2, 2014. (Pl.'s Ex. 6; 7). Amazon later released a similar device called the "Fire TV Stick." (Tr. 217:1-3).

Amazon emphasizes that its Fire TV is not a streaming video service. Instead, it points out that its streaming video service is named "Amazon Instant Video," and its subscription streaming video service is marketed as "Prime Instant Video." (Pl.'s Ex. 7; Pl.'s Ex. 10).

Amazon markets its Fire TV as a set-top box for general interest content -- "instant access to Netflix, Prime Instant Video, WatchESPN," and more -- including selections like "House of Cards" and "Dora the Explorer" for video and Pandora for music. (Pl.'s Ex. 7). Amazon says that it particularly touts its Fire TV's family-friendly

11

features, advertising that the "FreeTime" service "revolutionizes parental controls—parents can choose what your kids see and set time limits for types of content and times of day." (Pl.'s Ex. 7; Tr. 213:9-18). In October 2014, Amazon launched a smaller version, the "Fire TV Stick," that plugs directly into a television. (Tr. 216:18-217:3).

Amazon does not market its Fire TV or any of the "Fire" family of devices (such as the phone or the tablets) for viewing pornography. (Tr. 213:5-8). Amazon bought paid internet keyword ads for its Fire TV, but it did not purchase ads for keywords around Wreal's FyreTV name or anything related to pornography. (Tr. 212:19–213:1). Amazon prohibits pornographic apps for its Fire TV. (Tr. 256:1-6). More generally, Amazon's content policies for both Amazon Instant Video and DVDs available on Amazon's website (whether sold by Amazon or third parties) prohibit pornography. (D.'s Ex. Martinelli 1; D.'s Ex. Martinelli 2.)

Amazon argues that consumers do not associate Amazon with pornography: Elizabeth Baicy, an Amazon principal marketing manager, testified pornography has "never once" come up in many different focus groups on consumer perceptions of the Amazon brand. (Tr. 245:18-246:4).

Amazon claims that it spent tens of millions of dollars advertising the Fire TV products in 2014. (Tr. 223:9-12; D.'s Ex. Baicy 1). This included a national television campaign, print media, and ads on Hulu and CBS.com. (D.'s Ex. Baicy 1). Amazon contends that it would lose some unspecified portion of the benefit of this investment if

12

it were to stop using the Fire TV name. Ms. Baicy testified that consumers remember a brand more than individual product features identified in advertising; in her view, if Amazon had to rename the product, it would lose the customer connection with the "Fire TV" brand. (Tr. 223:13-224:13).

Amazon contends that it would also incur additional costs in the tens of millions of dollars if it stopped using the Fire TV name. (Tr. 231:10-13). Amazon predicts that it would have to spend at least as much as it spent in its initial launch, over and above its planned 2015 Fire TV advertising budget, to create a totally new brand and build consumer awareness for that brand without a new product as a natural "hook" for consumer interest. (Tr. 225:24-227:13). In addition, Amazon would have to change packaging and manuals to replace references to Fire TV with the products' new names (Tr. 227:11-229:11), change point-of-purchase merchandising displays at stores like Best Buy and Staples (Tr. 230:7-12), and recode the operating systems to refer to the products' new names (Tr. 230:13-18). Amazon envisions also likely incurring other costs as well: for example, it predicts that it would likely lose sales of its Fire TV products from consumers confused about the name change. (Tr. 231:14-25).

## III.    ANALYSIS

Before discussing the preliminary injunction standards, the Undersigned will first address an evidentiary issue concerning the Rule 30(b)(6) testimony of Anthony Martinelli. Wreal sought to introduce portions of his deposition testimony at the

Hearing. Amazon objected, arguing that the specific testimony Wreal sought to introduce was not actually 30(b)(6) testimony because Amazon objected to the noticed 30(b)(6) topics. Therefore, Amazon argued, the deposition testimony at issue is of a mere fact witness and is therefore hearsay (and inadmissible), as opposed to being the testimony of a party (i.e., Amazon), which would have rendered it admissible.

The Court tentatively admitted the testimony, "subject to a later ruling of whether Mr. Martinelli's answers here are 30(b)(6) witness answers as opposed to [ ] an individual employee." (Tr. 200:14-17). The Court directed each party to submit a post-hearing memorandum on this issue, and both Wreal and Amazon have done so. [ECF Nos. 121; 122].

The Court concludes that the deposition testimony is not admissible. This conclusion is based on the **substance** of the testimony, not on whether specific portions of Martinelli's testimony should be deemed 30(b)(6) testimony (like his other deposition testimony) or the testimony of an individual fact witness.

The disputed testimony concerns sex toys and paraphernalia. But these two topics are not relevant to the issues confronting the Court on the preliminary injunction motion. Sex toys and paraphernalia are not available on either Fire TV or Fyre TV. Moreover, they are not referenced in the Complaint. Wreal has never sought to amend its Complaint to assert a sex toy theory, nor has it offered opinion testimony that

14

FyreTV.com consumers would be confused by sex toys.  In fact, as Amazon noted in its memorandum, Wreal dropped its request for sex toy documents. [ECF No. 122, p. 6].

The Court is therefore not considering the challenged portions of Martinelli's deposition testimony in connection with the preliminary injunction motion. As a result, the Court has no need to determine when and how Amazon should have interposed its objections to these 30(b)(6) topics, whether (and when) it should have moved for a protective order, whether Amazon should be sanctioned for failing to produce an appropriate 30(b)(6) witness on the sex toys topic listed in the 30(b)(6) notice, or whether the deposition testimony about sex toys is of a mere fact witness or a corporate party designee.

**B.      Preliminary Injunction Standard**

Injunctions are specifically authorized by the Lanham Act in trademark infringement cases. 15 U.S.C. § 1116(a). In order to obtain a preliminary injunction, Wreal must demonstrate (1) a substantial likelihood of success on the merits; (2) irreparable harm should the injunction not be granted; (3) that the threatened injury to the plaintiff outweighs any potential harm to the defendant; and (4) that granting the injunction would not be adverse to the public interest.  *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

However, "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the

four requisites." *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.*, 887 F.2d 1535, 1537 (quoting *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983)) (internal quotation marks omitted). "The burden of persuasion on all of the four requirements for a preliminary injunction is at all times upon the plaintiff." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).

### 1.    Substantial Likelihood of Success on the Merits

A plaintiff in a trademark infringement case must demonstrate: (1) that its mark has priority, and (2) that the defendant's mark is likely to cause consumer confusion. *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999) (internal citation omitted). Likelihood of confusion is assessed according to the following factors: "(1) distinctiveness of the mark alleged to have been infringed, (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public." *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007).

This is not a "passing off" case. Rather, Wreal alleges that Amazon's use of the Fire TV moniker results in reverse confusion, which occurs when a large junior user like Amazon "saturates the market with a brand name that is similar or identical to the

mark of a smaller, senior user," like Wreal. *TV Land L.P. v. Viacom Int'l, Inc.*, 908 F. Supp. 543, 550 (N.D. Ill. 1995) (internal citation omitted). In reverse confusion cases, the resulting harm is "that the senior user loses the value of the trademark – its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Id.* (internal quotation omitted).

The relevant test is *likelihood* of confusion, not mere *possibility* of confusion. "[R]ecovery under the Lanham Act requires, at a minimum, that confusion, mistake, or deception be 'likely,' not merely 'possible.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 651 (11th Cir. 2007) (internal quotation omitted). A plaintiff must show "a likelihood that *an appreciable number* of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Id.* at 651 (quoting *New Sensor Corp. v. CE Distrib. LLC*, 303 F. Supp. 2d 304, 310-11 (E.D.N.Y. 2004) (emphasis added)).

The Undersigned will now assess these seven factors.

i.      Distinctiveness of Mark

Amazon's "Fire TV," Wreal's "FyreTV," and Amazon's own "Amazon" house mark are strong and distinctive. The Eleventh Circuit has noted in a forward confusion context that a junior user's house mark can reduce the possibility of confusion by identifying the junior user as the product's source. *See Custom Mfg.*, 508 F.3d at 652, n.10. Other courts have recognized that this reasoning holds true for reverse confusion

17

as well, either where (as here) only the junior user uses its distinctive house mark in connection with the challenged mark[5] or where both parties use their house marks.[6]

Amazon's consistent use of its distinctive house mark with the brand name for Amazon products (such as the Amazon Fire Phone, the Amazon Fire TV, and the Amazon Echo) (Tr. 210:10–17) makes it more likely a reasonable consumer would expect to see "Amazon" next to an Amazon product. The *absence* of Amazon's distinctive house mark on Wreal's website is a signal that Wreal's FyreTV and Fyre BoXXX are not Amazon products.

Users must sign up for Wreal's FyreTV streaming service through the fyretv.com website -- which, of course, does not mention Amazon -- whereas customers can purchase Amazon's Fire TV set-top box on the Amazon-branded home page or through retail outlets that display Amazon's name prominently next to the product's name. In these circumstances, it is very unlikely that consumers would believe Amazon is the source of Wreal's FyreTV, or vice versa. *See Cohn v. Petsmart, Inc.,* 281 F.3d 837, 842 (9th Cir. 2002) ("critical factor" in reverse confusion case that both

---

[5]      *See, e.g., Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.,* 22 F.3d 1527, 1530-31 (10th Cir. 1994) (considering both forward and reverse confusion theories, concluding junior user's use of "distinctive . . . house mark" reduced possibility of confusion).

[6]      *See, e.g., Cohn v. Petsmart, Inc.,* 281 F.3d 837, 842 (9th Cir. 2002); *Stuart J. Kaufman, M.D. & Assocs. v. Bausch & Lomb Inc.,* No. 8:13-CV-461-T-33, 2013 WL 6154166, at *7 (M.D. Fla. Jul. 25, 2013) *recommendation adopted by* No. 8:13-CV-461-T-33, Doc. No. 55 (M.D. Fla. Sept. 4, 2013); *Tanel Corp. v. Reebok Int'l, Ltd.,* 774 F. Supp. 49, 54 (D. Mass. 1990).

parties used their house marks; "[t]he emphasis on these housemarks has the potential to reduce or eliminate likelihood of confusion.") (internal quotation omitted); *Universal Money Centers, Inc. v. Am. Tel. & Telegraph Co.,* 22 F.3d 1527, 1531 (10th Cir. 1994) ("distinctive . . . house mark" reduces possibility of confusion).

This factor thus weighs in Amazon's favor.

ii.    Similarity of Marks

Wreal argues the marks are similar by comparing the spelling and sounds of the two words standing alone ("Fire" versus "Fyre"), disconnected from their actual use in the marketplace. But marks are not compared in the abstract. Instead, the test is "the commercial impression created by the mark as a whole." *Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 261 (5th Cir. 1980) (internal citation omitted). In *Amstar,* the Fifth Circuit reversed as clearly erroneous a trial court's finding of likelihood of confusion between two nearly identical word marks for food -- "Domino" and "Domino's" -- finding "little similarity" between the two marks. *Id.* at 261.

Similar-sounding or similarly-spelled words do not suffice for marks to be similar; the Eleventh Circuit has repeatedly found marks with identical or nearly identical words to be dissimilar based on their **use** in the marketplace.[7] Judge Lenard,

---

[7]    *See Welding Servs., Inc.,* 509 F.3d at 1361 (affirming summary judgment for defendant; "WSI" and "WTI" marks for welding services were dissimilar based on their use in commerce even though there was "undisputed" similarity of services, sales methods, and advertising methods); *Sun Banks of Fla., Inc. v. Sun Fed. Savs. & Loan Assoc.,* 651 F.2d 311, 317-18 (5th Cir. 1981) (reversing as clearly erroneous trial court's

who referred this case to the Undersigned, found no similarity between two uses of the word "Tiger" for computer-related products (one by Apple and one by the discount retailer Tiger Direct) based on the marks' actual presentation in commerce. *Tiger Direct, Inc. v. Apple Computer, Inc.*, No. 05-21136-CIV, 2005 WL 1458046, at *16 (S.D. Fla. May 11, 2005).

Here, the marks themselves are different. Wreal's "FyreTV" is one word (not two, as with Amazon's Fire TV), in a unique and stylized font (different from the font Amazon uses for its house mark or its Fire TV), in red and white (not orange, which Amazon uses for the "Fire" in Fire TV). (Pl.'s Ex. 5, 6). Wreal's set-top box further distinguishes itself by its unique "Fyre BoXXX" name. (Def.'s Ex. R.F.X. 210; Def.'s Ex. R.F.X. 214; Tr. 133:5-7).

Moreover, the companies present the marks in commerce in very different ways. Amazon's Fire TV appears on Amazon's website, an Amazon-branded marketplace with other Amazon-branded products, such as the Kindle Fire, in a general consumer environment free from pornography. (Pl.'s Ex. 6). By contrast, Wreal's FyreTV is available **only** to consumers who affirmatively represent they are over 18 and willing to view adult content. (Tr. 275:4-14; Def.'s Ex. R.F.X. 204). Upon entry, these consumers confront the FyreTV mark in a site crowded with an array of adult-oriented brands

---

finding of likelihood of confusion; two "Sun" bank names with orange colors were presented differently in commerce).

("Elegant Angel," "Digital Sin," "Evil Angel" and others) and titles. (Pl.'s Ex. 5). The marks' presentations in commerce are significantly different.[8]

But Wreal argues that the marks also share the same meaning or connotation, in that they both combine a variant of the arbitrary word "Fire" with the descriptive "TV." In other words, "[n]either literally means anything . . . ," apart from the shared use of "TV." *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131 (9th Cir. 1998).

To be sure, the marks share *some* visual similarities. They both use the same word with a slightly different spelling, and use colors associated with fire -- red for Wreal, orange for Amazon, though Amazon occasionally uses red as well. (Pl.'s Ex. 10). And while the parties currently use different fonts and graphics to depict the marks visually, neither party has offered evidence that consumers have strong associations with their marks as they appear visually. *See Masters Software, Inc. v. Discovery Comm's, Inc.*, 725 F. Supp. 2d 1294, 1302 (W.D. Wash. 2010) ("Neither Masters nor Discovery has offered evidence that consumers have strong associations with their marks as they appear visually").

Amazon urges the Court to focus on the way the mark is presented on the parties' respective web pages, claiming that its Fire TV is presented in a streamlined, Amazon-branded environment, whereas the FyreTV® mark appears on a page with

---

[8]      *See Tiger Direct*, 2005 WL 1458046, at *16 ("[A] consumer would not confuse the source or the use of the Tiger mark in the Apple-branded, streamlined environment, with the TigerDirect mark utilized by the Plaintiff in a crowded retail marketplace, featuring competing brands at discount prices.").

explicit imagery. [ECF No. 76, p. 17]. Thus, Amazon argues, the marks are presented differently in commerce. [*Id.*]. Wreal points out that Amazon customizes its landing page, and that a customer visiting amazon.com that had recently searched for pornography will be exposed to the Fire TV mark alongside a selection of pornography and other products. [ECF No. 83, p. 9].

Wreal presented evidence in the form of a screenshot taken of the amazon.com homepage. (Tr. 102:6-103:25; Pl.'s Ex. 10). The page featured a red banner advertisement for Fire TV, along with other items for sale, including pornographic magazines by other brands. (Tr. 103:12-104:25). Thus, Wreal contends that the evidence contradicts Amazon's explanation of how its Fire TV name appears in commerce. Wreal's theory is that because Amazon customizes its landing page, its Fire TV mark will be presented differently to different customers. One that is interested in pornography, and thus is likely a part of Wreal's target market, may be exposed to Amazon's Fire TV mark alongside pornographic magazines or other adult oriented items.

In addition, Wreal specifically notes that Amazon advertises Fire TV with other brand names that stream video through the device, including Netflix, Hulu, WatchESPN, Crackle, and Showtime Anytime (which can be used to stream pornography). (Tr. 87:12-22, 88:4-10, 180:14-17; Pl.'s Ex. 6).

Nevertheless, based on how the marks are presented as a whole and how they are used in the marketplace, the Undersigned concludes that Amazon has the better

argument; the marks are not similar enough to cause this factor to be classified as a factor favoring Wreal.

        iii.        Similarity of Products

The parties' products are significantly dissimilar. Phrased differently, Wreal has not convinced me that the products are substantially similar.

Amazon's Fire TV is a set-top box for mainstream content; Wreal's FyreTV is a "porn pay per view service" specializing in hard-core pornography. (Pl.'s Ex. 5). Amazon's own non-pornographic streaming video services are Amazon Instant Video and Prime Instant Video; Wreal's own pornographic set-top box is not "FyreTV" but rather the "Fyre BoXXX." Wreal even calls itself "the Netflix of Porn," distinguishing itself from mainstream streaming sites like Netflix. (Tr. 120:12-20).

Wreal acknowledges that the content typically streamed over Amazon's Fire TV differs from the content streamed over its FyreTV®. [ECF No. 28, p. 23].  But it argues that this distinction is irrelevant as the proper inquiry is whether the products or services at issue are of the kind that the public attributes to the same **source**, not whether they are identical. [*Id.*]. Wreal puts forth evidence that mainstream movies and adult content are complementary in that well-known content providers such as Comcast offer a full spectrum of pay-per-view movies, including mainstream and adult

content. (Tr. 82:10- 83:25).[9] *See Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1131 (relatedness of goods extends to goods that are complementary).

Wreal argued at the Hearing that the products were similar because Amazon offers sexually-related content or products, pointing to what it claimed were sexually suggestive Amazon Instant Video titles (Pl.'s Ex. 10), an allegedly pornographic DVD offered on Amazon by a third-party seller (Pl.'s Ex. 11), and a selection of sex toys available on Amazon (Pl.'s Ex. 10). However, none of these alleged similarities show the products at issue here are "so similar as to be likely to cause confusion." *Ross Bicycles, Inc. v. Cycles USA*, 765 F.2d 1502, 1507 (11th Cir. 1985) (quoting district court's opinion).

Amazon's policies for both Amazon Instant Video and its DVD store prohibit pornography. (Tr. 249:17-254:10; Def.'s Martinelli Ex. 1; Def.'s Martinelli Ex. 2.) The presence on Amazon's website of one or a handful of titles that may violate that policy does not mean an appreciable number of consumers will believe Amazon's Fire TV is a device for viewing pornography, akin to Wreal's FyreTV and Fyre BoXXX. All the evidence was to the contrary.

Amazon does not market the Fire TV or any "Fire" product for viewing pornography. (Tr. 213:5-8). Amazon did not buy any Fire TV paid internet ads for keywords related to pornography. (Tr. 212:19-213:1). Amazon prohibits pornographic

---

[9]      Amazon did not dispute this point. In fact, its expert on pornography, Dr. Peter Lehman, testified that hardcore pornography can be rented from large hotel chains that also offer mainstream and kids movies. (Tr. 307:1-14).

apps for its Fire TV. (Tr. 256:1-6). And Amazon argues (and Wreal did not effectively rebut this notion) that consumers do not in fact associate Amazon with pornography; Ms. Baicy testified that Amazon has conducted many different consumer focus groups on the Amazon brand, and pornography has "never once" come up. (Tr. 245:18-246:4).

To be sure, Wreal submitted competent evidence demonstrating that some allegedly pornographic content is available on Amazon and that adult sex toys are available from Amazon vendors on Amazon's website.

But these illustrations are irrelevant to Amazon and its Fire TV. No witness testified the referenced titles on Amazon Instant Video were hardcore pornography, akin to what Wreal offers.

At the Hearing, Amazon called Professor Peter Lehman as an expert witness. Professor Lehman is a tenured professor at Arizona State University and the director of its Center for Film Media and Popular Culture; he has written and taught extensively about pornography. (Tr. 270:16-271:20). Professor Lehman testified that hardcore pornography is its own distinct genre, distinguished by particularly graphic imagery, a unique rating ("XXX"), lurid "categories," and unique stylistic devices meant to signal to the viewer that they are viewing actual and not simulated sexual acts. (Tr. 275:4-277:22, 282:19-284:3).

No evidence introduced at the Hearing demonstrated that the Amazon Instant Video titles had any of these features. The DVD admitted into evidence at trial is not

particularly relevant and likely has no probative value. It is not available on Amazon's Fire TV, which does not have a DVD tray, cannot play DVDs, and has no functionality permitting DVD purchases from Amazon. (Tr. 252:6-11). It is not even an Amazon product: it was sold not by Amazon but by "Italian Objects," a **third-party seller**; although it was available on Amazon's website it was not packaged by Amazon nor shipped from Amazon's fulfillment centers. (Tr. 262:2-9, 262:24-263:19). Wreal did not introduce any evidence suggesting that consumers would  confuse third party sellers with Amazon's Fire TV product -- or even that consumers somehow construed the seller as being Amazon.

Finally, sex toys are irrelevant to this case. Wreal has not sued Amazon for selling sex toys; Wreal does not sell sex toys. (Tr. 143:20-21). Wreal's theory appears to be that the sex toys on Amazon's website will lead consumers to believe Amazon also sells hardcore pornography, thus leading consumers to believe (mistakenly) that Amazon offers Wreal's products. But this theory is far-fetched and speculative at best: general interest merchandisers such as Walgreens sell sex toys (Tr. 258:15-260:14; Def.'s Martinelli Ex. 5); Wreal did not introduce evidence that consumers therefore believe that Walgreen's sells hardcore pornography -- and logic suggests otherwise. Hardcore pornography is a film and video genre; it is not related to other goods (such as sex toys). (Tr. 296:15-20).

The products here are at least as dissimilar as products that other courts, including the Eleventh Circuit, have found different in other trademark cases.[10] Consumers can easily distinguish "Ross" bicycles and "Boss Cruiser" bicycles even though both are bikes (*Ross*), pizza and sugar even though they are both foods (*Amstar*), and rap and jazz even though they are both music (*Sunenblick*). Similarly, consumers can easily distinguish a streaming service for hardcore pornography (FyreTV) and set-top box hardware for viewing general interest content (Amazon's Fire TV) -- just as they can distinguish a movie theater showing "Frozen" from a theater showing triple X hard-core pornography (even though they are both theaters) and a striptease from the ballet (even though they are both dances). This factor is in Amazon's favor.

---

[10]    *See Ross Bicycles,* 765 F.2d at 1507 (no confusion between "Ross" bicycles and "Boss Cruiser" bicycles -- though the products had "an inherent degree of similarity" because they were both bicycles, they were "not so similar as to be likely to cause confusion" because of "obvious differences" such as size of tubing, style of wheels, pedals, seats, kickstands, and difference in frame angles) (quoting district court's opinion); *Amstar*, 615 F.2d at 261 (Fifth Circuit "fail[s] to see any great similarity" between two types of food, pizza (on the one hand) and sugar, salt, mustard, and ketchup (on the other hand)); *see also Sunenblick v. Harrell*, 895 F. Supp. 616, 628-29 (S.D.N.Y. 1995) ("UPTOWN RECORDS" for re-releases of "lost or forgotten" jazz music not a similar product to "UPTOWN RECORDS" for rap; the former product was directed at a "somewhat esoteric market" and even though the two products were sold in the same stores, they were "not sold side-by-side; rather, they are featured in different sections of the stores in which they are sold").

iv.        Similarity of Sales Outlets and Customer Base

Wreal argues that there is significant overlap between the parties' respective target markets because Amazon's Fire TV is a mass-market product. Franco contends that the parties target the same customers because Wreal targets adults over the age of 20 with disposable income and access to the internet -- "the same type of customers that will buy erotica, toys, hardcore pornography magazines from Amazon or hardcore pornography DVDs from Amazon's web site." (Tr. 78:10-15, 79:2-13).

Amazon argues that Wreal's FyreTV® is not available for sale on Amazon or any retail outlets that sell Fire TV, and thus the parties do not share retail outlets.

Wreal's arguments are not persuasive. The Court concludes that there is no overlap in sales outlets: Amazon sells Fire TV on the Amazon home page (Pl.'s Ex. 6); Wreal sells the FyreTV and Fyre BoXXX exclusively on its own home page (Tr. 130:20-22, 133:14-19). The companies do not offer one another's products on their respective websites. Nor is there any similarity in customer base. Wreal targets adults interested in paying to view hardcore pornography. (Tr. 361:24-363:13). As stated above, Amazon does not market the Fire TV for viewing pornography. The fact that Amazon markets its Fire TV to a national audience does not make its target market similar to Wreal's **specialized** target market of hardcore pornography purchasers. *See Amstar*, 615 F.2d at 261-62 (no similarity in target markets where Amstar (the holder of the "Domino"

28

mark) sought a "national audience" while Domino's pizza targeted only a subset: "young, male college students," who are "rather a specialized class of consumers.").

Amazon argues that a contrary rule would mean that any company marketing to a national audience would have its customer base considered "similar," for likelihood of confusion purposes, to that of every other company in the country, no matter how narrow, specialized, or distinct the latter companies' target audiences. Wreal has not specifically advanced this theory, to be sure, but it appears to be the logical consequence of a theory that the parties share a customer base in common even though Amazon's market is a general, national audience and Wreal's is a more-narrow market. Wreal has not submitted any authority to support that type of extreme theory, and the Court is unaware of any such authority either. This factor is in Amazon's favor.

v.      Similarity of Advertising

Wreal argues that the parties advertise over the same media, noting that it has advertised in mainstream magazines and on television.

But Wreal no longer advertises on television, and other factors also demonstrate that there is no overlap in advertising channels.

Amazon advertises its Fire TV through a variety of channels Wreal does not use, including Amazon's home page, national television, and print. (Pl.'s Ex. 1; Def.'s Ex. Baicy 1; Tr. 64:6-10). Wreal advertises on adult websites only (Tr. 142:13-15, 143:1-10; Pl.'s Ex. 4); no evidence introduced at the Hearing suggested Amazon advertises on the

same websites. Wreal introduced a single internet banner ad at the Hearing, featuring a woman with an exposed breast on the "Adult DVD Talk" website. (Pl.'s Ex. 4). No evidence suggested consumers would mistake this for an Amazon ad. In the Fifth Circuit's words, "considering the significant differences between the advertisements in message content and presentation," "hardly anyone would confuse" the ads. *Amstar*, 615 F.2d at 262 (no similarity between "Domino" sugar and "Domino's Pizza" ads). This factor is in Amazon's favor.

        vi.        Defendant's Intent

Typically, courts look to an infringer's intent to determine if it used the plaintiff's mark "with the intention of deriving a benefit from the plaintiff's business reputation[.]" *Frehling*, 192 F.3d at 1340. In a traditional infringement case, intentional blindness is sufficient to establish a finding in favor of the claimant on the intent factor as it substitutes for a lack of conscious intent. *Id.*

But the Eleventh Circuit has not yet established whether the intent inquiry should differ in a *reverse confusion* case from the typical intent inquiry.[11] Wreal argues

---

[11]     Other courts have dealt with this question in varying ways. The Seventh Circuit held intent is "essentially irrelevant" to reverse confusion. *See Sands, Taylor, & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir. 1992) (noting that intent in traditional forward confusion cases is relevant to the issue of likelihood of confusion "only if he intended to palm off his products as those of another") (internal quotation omitted). The Third Circuit held the test "changes from the deliberate intent to palm off or exploit the goodwill of the senior user's mark (deliberate confusion) . . . to the deliberate intent to push the senior user out of the market (reverse confusion)." *Freedom Card Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 479 (3d Cir. 2005).

that this standard is inapplicable in reverse confusion cases and Amazon has not argued to the contrary.

In the absence of on-point authority, Wreal posits that the appropriate test is "whether the defendant acted carelessly or otherwise culpably in selecting the infringing name." [ECF No. 28, pp. 25-26]. Wreal contends that Amazon did not merely act carelessly, it intentionally ignored Wreal's rights because it knew of Wreal's use of the registered FyreTV® marks but "chose to ignore Wreal's senior rights to the marks." [ECF No. 126, p. 18]. In support of this approach, Wreal cites *Imperial Toy Corp., Inc. v. Ty, Inc.*, No. 97-C-8895 1998 WL 601875, at *6 (N.D. Ill. Sept. 9, 1998) (noting that the intent factor is somewhat reversed in a reverse confusion case, pointing out that some courts "focus instead on whether the more well-known junior user ignored the senior user's rights" and finding that the intent factor weighed in favor of a likelihood of confusion where the junior user deliberately ignored the senior user's rights).

Because Amazon acted, at minimum, in "knowing disregard of Wreal's senior rights to the marks," Wreal argues, the intent factor weighs in favor of a finding of a likelihood of confusion. [ECF No. 126, p. 18].

Amazon has not urged a specific standard to evaluate the intent factor in a reverse confusion case in the Eleventh Circuit and simply notes that the issue is undecided.

Whatever the standard, Wreal has not demonstrated that Amazon had a nefarious intent in selecting the "Fire" brand for its Fire TV. Amazon had used the "Fire" brand for multimedia tablets since 2011; Amazon wanted to continue using that brand for its next generation of multimedia products, including its Fire TV. (Tr. 207:20-208:23, 210:1-9). Amazon knew about the "FyreTV" pornography site when it was deciding on the name of the Amazon Fire TV, but concluded any association was unlikely because hardcore pornography was so different from what Amazon does as a company. (Tr. 211:6-212:3).

To be sure, Amazon knew about Wreal's "FyreTV" mark, but Wreal has not established that Amazon acted in bad faith by using "Fire TV" for a totally different product, marketed to a different audience, where there is no realistic likelihood that an appreciable number of consumers will confuse it with Wreal's hardcore pornographic products.

Assuming for the sake of discussion only that the applicable standard is the plaintiff-friendly "careless" standard or even the "ignored the senior user's rights" approach, the Undersigned finds that this factor is, at best (for Wreal), neutral, with the intent factor weighing in neither party's favor.

> vii.    Actual Confusion

Actual confusion is "the best evidence of likelihood of confusion." *Amstar*, 615 F.2d at 263 (internal citation omitted).

At the Hearing, Wreal relied on two types of purported actual confusion evidence.

First, Wreal introduced two tweets dated shortly after Amazon released its Fire TV. However, two tweets are hardly sufficient to show actual confusion. "[I]n considering actual confusion we look not only to the existence but also to the extent of such confusion." *Tana v. Dantanna's*, 611 F.3d 767, 779-80 (11th Cir. 2010) (affirming summary judgment for defendants in trademark infringement case despite two incidents where customers inquired as to possible affiliation between "Dan Tana's" restaurant and "Dantanna's" restaurant).

The Eleventh Circuit has repeatedly dismissed occasional instances of actual confusion as *de minimis*, insufficient to raise a triable fact issue even on summary judgment -- much less to satisfy the high threshold for a preliminary injunction.[12]

---

[12]     *See Sun Banks*, 651 F.2d at 319 (reversing as clearly erroneous trial court's finding of likelihood of confusion; employee reports of incidents of confusion and testimony from four fact witnesses inquiring about relationship dismissed as "isolated instances of uncertainty"); *Ross*, 765 F.2d at 1508 (inquiries from "an undetermined number of potential customers" held to be "no clear evidence" of actual confusion) (quoting district court's opinion); *Amstar*, 615 F.2d at 263 n.10 (two verbal inquiries asking whether Domino's Pizza was related to Domino sugar and a letter to a Domino's Pizza employee misaddressed as to "Domino Sugar" dismissed as "isolated instances of actual confusion" that were "insufficient to sustain a finding of likelihood of confusion."); *First S. Fed. Sav. & Loan Ass'n of Mobile, Ala. v. First S. Sav. & Loan Ass'n of Jackson Cnty., Miss.*, 614 F.2d 71, 72 (5th Cir. 1980) (affirming trial court finding of no likelihood of confusion under common law even though "[a]ctual confusion of the names of the two institutions has occurred on several occasions").

Neither tweet shows any actual confusion. One asked, "Did you guys just merge with Amazon?" (Pl.'s Ex. 8); the other wrote: "Apple delivers AppleTV. Amazon starts FyreTV. Google reinventing GoogleTV into AndroidTV. Roku still chugging. This is no longer a hobby." (Pl.'s Ex. 9). The authors of these tweets did not testify at the Hearing, so the Court cannot determine whether they were actually confused. The Fifth Circuit held evidence very similar to the "Did you guys just merge with Amazon?" tweet to be insufficient to show actual confusion in *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979) (dismissing "commentary in a trade magazine that purportedly suggests that [plaintiff] might have acquired [defendant]" as "practically useless": "It is . . . impossible to determine whether the author of the comments was actually confused, merely speculating, or attempting to be humorous about whatever it was he or she was writing about.").

The second tweet does not provide much help to Wreal, either. True, the author apparently misspelled Amazon's Fire TV as "FyreTV," but there is no indication the author is even aware of (much less believes Amazon to be the source of) Wreal's hardcore streaming pornography service. Misspellings are not evidence of actual confusion unless the author is in fact confused as to source, affiliation, or sponsorship. *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996). As the Fifth Circuit has explained: "[F]undamentally, deception, actual or probable, is the essence of an action for infringement or unfair competition. The test is whether there is a

probability that the average person will be so confused by the use of the device complained of as to believe that the products offered by the infringer were produced by the trademark owner,—that there is likelihood that prospective purchasers will be misled to [plaintiff's] damage." *Squirrel Brand Co. v. Barnard Nut Co.*, 224 F.2d 840, 844 (5th Cir. 1955).

Thus, a Twitter user who misspells names is not necessarily deceived; in the absence of other evidence, he has simply made a typographical error.

Second, Wreal relied on a customer service inquiry to Amazon, where a customer asked whether he could access adult content on the Amazon Fire TV by spelling "Fire" with a "y." (Tr. 313:22-314:7; Def.'s Ex. Fuller 3). However, this customer does not suggest he believes Amazon is the *source* of the adult content he seeks: the same customer also asks about accessing Netflix on his Amazon Fire TV (*id.*); this does not mean the customer thinks Amazon is the *source* of Netflix.

In any event, this inquiry is only **one** of tens of thousands of customer service inquiries related to Amazon's Fire TV. (Tr. 309:24-310:8). Even if this call were considered evidence of actual confusion, it would amount to a confusion percentage of less than one hundredth of a percent. Notably, *none* of Wreal's 51,000 customers have contacted Wreal about Amazon's Fire TV. (Tr. 142:10-12). Adding these 51,000 Wreal customers to the tens of thousands of customer service inquiries on the Amazon side shrinks the confusion percentage even further.

Thus, this one inquiry would be at best a *de minimis* level of confusion -- which would be insufficient to raise a fact issue.[13]

The absence of actual confusion is particularly noteworthy in light of the scale of Amazon's Fire TV advertising. As noted previously, Amazon spent a significant sum of money launching the Fire TV products, including a national television campaign. And yet only four people mentioned Wreal's product to Amazon -- the three who were clearly not confused because they explicitly stated they realized Amazon's Fire TV was different from Wreal's FyreTV (Def.'s Ex. Fuller 2), and the one, noted above, who wanted to know how to access various types of content but gave no indication he believed Amazon was the source of the content he sought. Any substantial evidence of actual confusion should already be evident; its absence is strong evidence consumers are *not* likely to confuse the marks.[14]

---

[13]     *See George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 398-400 (4th Cir. 2009) (affirming summary judgment for defendants in trademark infringement case; four instances of consumer confusion where defendant sold 500,000 products per year was "at best *de minimis*"); *D & J Master Clean, Inc. v. Servicemaster Co.*, 181 F. Supp. 2d 821, 828-29 (S.D. Ohio 2002) (denying motion for preliminary injunction; purported actual confusion evidence consisted of over 20 phone calls over 4 months from customers confused between "MASTER CLEAN" and "ServiceMASTER Clean"; court found insignificant in light of total call volume because less than one percent of all calls were from customers supposedly confused).

[14]     *See Tiger Direct*, 2005 WL 1458046, at *21 ("Given the substantial press garnered by Apple's Tiger, the Court does not credit TigerDirect's argument that it is too early to assess whether there is actual confusion in the marketplace . . . ."). The Hearing took place approximately eight months after Amazon's Fire TV was launched. If consumers

Consumer survey evidence further demonstrates no likelihood of confusion. The ABA Section of Intellectual Property Law treatise on surveys describes survey evidence as "a standard form of evidence -- perhaps *the* standard form of evidence -- on consumer perception in cases involving trademarks and deceptive advertising." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 3 (S. Diamond & J. Swann eds., 2012) (Editors' Introduction) (hereinafter "Diamond & Swann").

At the Hearing, Amazon offered testimony from Dr. Dan Sarel, a tenured professor of marketing at the University of Miami. (Tr. 322:16-19). Dr. Sarel earned B.A. and M.B.A. degrees from the University of Jerusalem and a doctorate specializing in marketing from the Harvard Business School. (Tr. 322:20-25). Dr. Sarel has conducted approximately 20 likelihood of confusion surveys. (Tr. 323:11-13).

Dr. Sarel conducted an *Ever-Ready* survey in this case, the "most commonly used" type of likelihood of confusion survey. (Tr. 323:23-324:8). Wreal's expert, Dr. Thomas Maronick, also testified that the *Ever-Ready* format was proper here. (Tr. 373:13-18).

As is appropriate when testing reverse confusion, Dr. Sarel surveyed potential users of Wreal's product -- here, according to Franco's deposition testimony, adults interested in paying to view internet pornography. (Tr. 361:24-363:13). Dr. Sarel then showed respondents several web pages from the FyreTV.com website (Def.'s Ex. Sarel

_____

were confused, then surely Wreal would have been able to produce more evidence than it did over the intervening eight months.

2), representing how consumers in the marketplace would likely encounter the site (Tr. 353:6-15, 354:3-8). The survey then asked a series of questions to test whether respondents associated the FyreTV mark with Amazon. (Tr. 332:4-16; Def.'s Ex. Sarel 1; Def.'s Ex. Sarel 4).

Only 2 respondents out of 200 mentioned Amazon at all, for a confusion rate of one percent -- a rate Dr. Sarel deemed "statistically insignificant" and "nonexistent." (Tr. 332:17-25; Def.'s Ex. Sarel 4, ¶¶ 46-55). This survey percentage is far below the threshold required to find a likelihood of confusion. A leading treatise states that *no reported case has found likelihood of confusion with consumer survey results below 8.5%.*[15] In fact, this 1% *de minimis* confusion level in a survey demonstrates confusion is *not* likely.[16]

Wreal's expert, Dr. Thomas Maronick, criticized Dr. Sarel's survey for what he claimed were methodological errors.

But as the ABA's treatise on survey evidence notes, courts do and should ignore or give little weight to survey criticisms absent a showing that using the approach the

---

[15]    6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:188 (2014) (hereinafter "McCarthy on Trademarks"); *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013) (citing McCarthy on Trademarks, holding survey showing 7% confusion insufficient to sustain finding of likelihood of confusion).

[16]    *See* McCarthy on Trademarks § 32:189 (survey results below 10% can be affirmative evidence that confusion unlikely); *Henri's Food Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358-59 (7th Cir. 1983) (district court correctly concluded that 7.6% confusion finding weighed against infringement).

critiquing expert believes to be correct would lead to a different result. G. Kip Edwards, "The *Daubert* Revolution and Lanham Act Surveys," *in* Diamond & Swann at pp. 359-61.[17] The Court thus gives no weight to Dr. Maronick's various criticisms.[18]

Significantly, Dr. Maronick testified that he conducted his own survey, which generated results which actually tend to support Dr. Sarel's finding. (Tr. 378:9-22). Dr. Maronick conducted his survey in April 2014 (*id.*) -- the same timeframe Wreal argues actual confusion existed; all of Wreal's purported actual confusion evidence (the tweets and customer service call to Amazon) date from early April. Dr. Maronick's own survey showed a "very low" consumer confusion level. *Id.* Dr. Maronick did not conduct his survey again at a later date. With not one but two separate surveys showing low levels

---

[17]    *See, e.g., Whirlpool Props., Inc. v. LG Elecs. USA, Inc.*, No. 1:03-cv-414, 2006 WL 62846, at *3 (W.D. Mich. Jan. 10, 2006) ("[P]laintiffs' criticisms of the methodology used by the defense experts would have been substantially aided by proof that the 'correct' methodology would had led to a different result.").

[18]    The Court notes that several courts in the last few years have either excluded or given little weight to Dr. Maronick's expert testimony on consumer perceptions or consumer surveys. *See, e.g., In re Front Loading Washing Machine Class Action Litig.*, No. 08-51(FSH), 2013 WL 3466821, at *7 (D. N.J. July 10, 2013) (excluding Dr. Maronick's internet-based consumer survey because it "does not satisfy Fed. R. Evid. 702"); *Bruce v. Teleflora*, No. 2:13-cv-03279, 2013 WL 6709939, at *7 (C.D. Cal. Dec. 18, 2013) (noting "manifold" problems with damages model based on Dr. Maronick's consumer survey, including that Dr. Maronick did not survey proper audience because the "survey respondents were not necessarily actual putative class members"); *FTC v. Washington Data Resources*, No. 8:09-cv-2309-T-23, 2011 WL 2669661, at *2 (M.D. Fla. July 7, 2011) (describing Dr. Maronick's expert testimony about consumer perceptions as "deriv[ing] from an incomplete review of pertinent evidence," "purely speculative," and "incomplete, unreliable, and unhelpful").

of confusion, this Court concludes confusion is not likely, which means this factor is in Amazon's favor.

### 2.      Irreparable Harm

"[P]reventing irreparable harm in the future is the sine qua non of injunctive relief." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1133 (11th Cir. 2005) (internal quotation omitted). Wreal's delay in moving for a preliminary injunction significantly undermines any finding that it might suffer irreparable injury if an injunction does not issue. Amazon used the "Fire" name since 2011 on tablets with streaming video functionality. (Tr. 207:20–208:23). There is no evidence that Wreal ever objected to that use or indicated it believed consumers would be confused. Then, after filing this lawsuit in April 2014, Wreal waited more than five months (nearly six months since Amazon's Fire TV launch) before moving for a preliminary injunction.

In addition, Wreal did not pursue any discovery during this period. When Wreal finally moved for a preliminary injunction, its brief relied on purported actual confusion evidence available back in April, when Wreal filed its Complaint. [ECF No. 28, Exs. 10-12 (media articles from April 2-3 and Twitter posts from April 2-8)]. Notably, the two Twitter posts introduced at the Hearing were dated April 2 and April 7, 2014. (Pl.'s Exs. 8; 9).

Wreal was on notice it needed to explain its delay. Amazon raised Wreal's delay in its response [ECF No. 76, pp. 32-34] and again in its opening statement at the

Hearing. (Tr. 45:17-24). Yet Wreal never explained or introduced any evidence as to why it waited more than five months to file this motion.

"[A] plaintiff's delay in seeking an injunction in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Seiko*, 188 F. Supp. 2d at 1355-56 (internal quotation and citation omitted).

In *Seiko*, the plaintiff knew about the product for approximately a year, but during that period was sending cease-and-desist letters and thus the Court gave plaintiff "credit for attempting to reach a settlement without litigation." *Id.* at 1356. But even after that period, "there remain[ed] a three-month delay between Plaintiff's last communication with Defendants and commencement of this suit." *Id.* at 1356. The Court noted: "Plaintiff's dilatory prosecution of its rights somewhat vitiates the notion of irreparable harm," citing to a case with a "three-month delay since parties' last communication," before concluding: "The Court finds that this **unexplained delay** undercuts any sense of urgency and, therefore, Plaintiff has failed to demonstrate sufficient need for a preliminary injunction." *Id.* (emphasis added).

Other courts (both in and outside the Eleventh Circuit) have held that unexplained delays of a few months negate any claim of irreparable harm on a

preliminary injunction motion.[19] As one court stated: "[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998).[20]

As logically explained in *Seiko*, "preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights." 188 F. Supp. 2d at 1355 (quoting *Citibank*, 756 F.2d at 276). Therefore, a plaintiff (like Wreal) concerned about a harm truly believed to be irreparable would and should act swiftly to protect itself. Here, however, Wreal sat on its rights for more than five months. Wreal's delay is by itself sufficient grounds to deny its request for an injunction.

---

[19]   *See, e.g., CORD:USE Blood Bank, Inc. v. CBR Sys., Inc.*, No. 6:11-cv-893-Orl-36, 2012 WL 8745155, at *10 (M.D. Fla. Sept. 26, 2012) (report and recommendations) (plaintiff offered "no explanation for the more than two month delay in filing the [preliminary injunction] motion after attempts at mediation broke down"), *adopted* 2012 WL 8745157; *Anago Franchising, Inc. v. CHMI, Inc.*, No. 09-60713-CIV, 2009 WL 5176548, at *13 (S.D. Fla. Dec. 21, 2009) (plaintiff filed preliminary injunction motion "some two months after the lawsuit was filed" and then "waited two months after its first motion for a preliminary injunction was denied to file the present [preliminary injunction] [m]otion," these "combined" delays "indicate the absence of actual and imminent harm"); *Hi-Tech Pharms., Inc. v. Herbal Health Prods., Inc.*, 311 F. Supp. 2d 1353, 1357-58 (N.D. Ga. 2004) ("delay in seeking a preliminary injunction weighs against a filing of irreparable harm," court's docket indicates that Complaint filed Aug. 20, 2003 (ECF No. 1) and preliminary injunction motion filed four months later on Dec. 23, 2003 (ECF No. 26)).

[20]   *See, e.g., Magnet Commc'ns, LLC v. Magnet Commc'ns, Inc.*, 2001 WL 1097865, *1 (S.D.N.Y. Sept. 19, 2001) (denying preliminary injunction in face of three-month delay); *Greenpoint Fin. Corp. v. Sperry & Hutchinson Co.*, 116 F. Supp. 2d 405, 408-09 (S.D.N.Y. 2000) (denying preliminary injunction in face of four-month delay).

In any event, Wreal has shown no risk it will suffer any compensable harm (much less the required irreparable harm) if a preliminary injunction does not issue. Franco could not identify a single lost set-top box sale because of Amazon's Fire TV. (Tr. 133:20-23). More generally, Franco could not identify *any* actual damage -- loss of business, lost sales, or subscriber cancellations -- due to Amazon's Fire TV.[21] Wreal's revenues were steadily declining from April 2013 through March 2014, before Amazon launched the Amazon Fire TV. (Tr. 140:9-14). Wreal offered no evidence that Amazon's Fire TV affected this downward trend. The Fyre BoXXX was not even on sale to new customers when the Complaint was filed in April 2014. (Tr. 57:2-25, 123:11-20). Even since, Wreal's Fyre BoXXX sales are hardly substantial: the company sold only four between May and September 2014. (Tr. 135:4-139:9; Def.'s Ex. R.F.X. 215).

At the Hearing, when Wreal's counsel asked Franco to identify how Wreal would be damaged if a consumer associated FyreTV with Amazon, he responded: "We are damaged because reputation is something very important to us, our company's reputation. If consumers would come to believe that Wreal's FyreTV is [sic] imitator or a **pirate service** from Amazon's Fire TV movie streaming service, they would be very

---

[21]     "Q. Is there anything in your sales numbers that suggests any loss of business due to the Amazon Fire TV? A. I wouldn't know. Q. Can't point to any lost sales, right? A. I wouldn't know. Q. Okay. You can't point to a single customer who stopped their subscription because of Amazon Fire TV, right? A. Yes, I have not received that call." (Tr. 141:24-142:6).

unlikely to sign up to my service and, therefore, making it very difficult for me it [sic] acquire subscribers and generate revenue." (emphasis added). (Tr. 91:19-92:3).

But "falsely being thought a pirate" is not an injury compensable by trademark law. *See DeCosta v. Viacom Int'l, Inc.*, 981 F.2d 602, 609 (1st Cir. 1992) ("If 'falsely being thought a pirate' were an actionable harm, no one could safely use a mark ever previously used by another, no matter how different the product, place of sale, or class of buyer.").

Even if Wreal were to lose customers in the manner it suggests, then its remedy would be money damages, as the injury is compensable -- it is not "irreparable." *See Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990), *rev'd on other grounds* 508 U.S. 656 (1993) ("An injury is 'irreparable' only if it cannot be undone through monetary remedies"); *see also United States v. Jefferson Cnty.*, 720 F.2d 1511, 1520 (11th Cir. 1983) (affirming denial of preliminary injunction and noting that plaintiff firefighters, even if they were to prevail, would not have suffered an injury that could not be adequately compensated through an award of back pay and seniority points along with compelled future promotion). *Cf. Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be

available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

Franco also testified he might "lose control of my brand and my destiny," speculating that if Amazon were to have a "scandal" then "that would completely destroy my company." (Tr. 92:4–18). Such a speculative scenario does not adequately establish the requisite irreparable harm. Irreparable injury must be "*likely* in the absence of an injunction" -- not merely a "possibility." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285 ("The injury must be neither remote nor speculative, but actual and imminent.") (internal quotation omitted). Franco's concern is highly speculative and attenuated, and it is inadequate to evidence the type of actual and imminent injury which Wreal needs to demonstrate on the irreparable harm factor.

Finally, Wreal would not be entitled to a presumption that would eliminate its burden to show irreparable harm, even if such a presumption remains available after *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). In *eBay*, the Supreme Court reversed a Federal Circuit doctrine presuming irreparable harm on a finding of patent infringement. Although the Eleventh Circuit has expressly held that *eBay* applies in trademark cases, it specifically reserved the question of whether the presumption would still be available. *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227-28 (11th Cir. 2008).

45

Pre-*eBay* authority suggests such a presumption requires either a "particularly high likelihood of confusion or potential danger to customers' health and safety." *Seiko*, 188 F. Supp. 2d at 1355. Wreal has shown neither. Thus, it would not be entitled to a presumption, even if the Eleventh Circuit would still allow such a presumption. Wreal has not established irreparable harm.

### 3.      Balance of Hardships

The balance of hardships favors Amazon. As discussed above, Amazon would incur substantial costs if required to discontinued use of the Fire TV brand. Wreal, on the other hand, has identified no compensable or irreparable injury it would suffer if an injunction were not to issue. Wreal has not prevailed on this factor.[22]

### 4.      Public Interest

The public interest is not served by an injunction where there is no likelihood of success on the merits, no threat of irreparable injury, and a balance of hardships favoring the defendant. Here, an injunction would not promote the public interest: it

---

[22]      *See, e.g., Tiger Direct*, 2005 WL 1458046, at *23; *CORD:USE*, 2012 WL 8745157, at *7 (denying preliminary injunction in part because balance of hardships favored defendant, noting: "While the Plaintiff claims Defendant's continued use of [mark] will damages its reputation or sales, the issuance of an injunction would force Defendant to actually **remove signage, advertising materials, and other company property already in existence.**") (emphasis added).

*Tiger Direct* is also helpful to Amazon on another related point: the Court noted that "Plaintiff's requested injunctive relief would substantially disrupt and burden Apple's marketing efforts at a critical moment in the product launch . . . ." *Id.*

would force Amazon to take down and re-brand, at great expense, a product it has actively marketed for many months, when there is no significant likelihood that any appreciable number of consumers will confuse it with Wreal's FyreTV or Fyre BoXXX.

Moreover, an injunction would not preserve Wreal's business. The public interest does not favor issuing an injunction to reward an illusory or attenuated injury: Wreal had already stopped selling its set-top box to new customers when it filed its Complaint, restarting sales only after filing this lawsuit.

## IV.    RECOMMENDATION

For the reasons described above, the Undersigned respectfully recommends the District Court **DENY** Wreal's preliminary injunction motion.

## V.    OBJECTIONS

Under 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(b), the parties have **10** days after being served with a copy of this Report and Recommendations to serve and file written objections, if any, with the District Court. Each party may file a response to the other party's objection within **5** days of the objection.[23] Failure to timely file objections shall bar the parties from a de novo determination by the District Court of an issue covered in this Report and Recommendations and bar the parties from attacking

---

[23]    Because the Parties have extensively briefed the issues discussed in this Report and Recommendations, the Undersigned is shortening the deadlines for filing Objections and Responses.

on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, February 3, 2015.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Judge Joan A. Lenard
All Counsel of Record

48