UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 14-CV-21385-LENARD/GOODMAN

WREAL, LLC, a Florida Limited
Liability Company,

      Plaintiff,

vs.

AMAZON.COM, INC., a Delaware
Corporation,

      Defendant.

_____/

**<u>WREAL, LLC's OBJECTIONS TO REPORT AND RECOMMENDATION</u>**

I.      **INTRODUCTION**

This is a trademark infringement case involving reverse confusion. Wreal owns the federally registered marks FyreTV® and FyreTV.com® (collectively "FyreTV®"). FyreTV® is a service for streaming video over the internet. The content available on FyreTV® consists of adult content, including hardcore pornography, erotica, and instructional videos related to sex. FyreTV® is available through Wreal's fyretv.com (and firetv.com) website, its own proprietary set-top box, third-party set-top boxes like Roku, and through mobile devices.[1]

On April 2, 2014, Amazon launched its own device and service for streaming video over the internet. Amazon called its set-top box "Fire TV." (Hearing Transcript, ECF No. 127-1 ("Tr.") 90:4-15).

II.     **ARGUMENT**

A.      **Standard of Review**

"Upon receipt of the Report and the objections of the parties, the Court must now 'make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.'" *Westchester Gen. Hosp., Inc. v. Dep't of Health & Human Servs., Ctr. for Medicare & Medicaid Servs.*, 770 F. Supp. 2d 1286, 1289 (S.D. Fla. 2011) (Lenard, J.) (quoting 28 U.S.C. § 636(b)(1)(C)). A de novo determination requires the district judge to consider factual issues on the record independent of the magistrate judge's Report and Recommendation. *Ernest S. ex rel. Jeffrey S. v. State Bd. of Educ.*, 896 F.2d 507, 513 (11th Cir.1990). The Court "may accept, reject, or modify, in whole or in part, the findings or

---

[1] Wreal initially offered its service exclusively through its proprietary set-top box. As FyreTV® became available on other devices, including devices that also stream mainstream content like Roku and Boxee, demand for the FyreTV® set-top box waned, and Wreal stopped marketing the device to new customers. However, in 2014, Wreal began selling it to customers as well. Importantly, the FyreTV® set-top box is still, and always was, supported by Wreal, and Wreal has no plans to stop the customers that use its set-top box.

recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court may also "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

### B.      Preliminary Injunction Standard

Injunctions are specifically authorized by the Lanham Act in trademark infringement cases. 16 U.S.C. §1116(a). In order to obtain a preliminary injunction, Wreal must demonstrate (1) a substantial likelihood of success on the merits; (2) irreparable harm should the injunction not be granted; (3) that the threatened injury to the plaintiff outweighs any potential harm to the defendant; and (4) that granting the injunction would not be adverse to the public interest. *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

### C.      Contrary to the Report and Recommendation, Wreal Established that it has a Substantial Likelihood of Success on the Merits.

To prevail on its trademark infringement claim, Wreal must demonstrate (1) that its mark has priority and (2) that Amazon's mark is likely to cause consumers confusion. *See Frehling Enters., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir.1999); *see also* 15 U.S.C. § 1114(1). The priority of marks is not in dispute, and thus the Magistrate looked solely at whether Amazon's use of Wreal's mark is likely to cause confusion.

Courts in this Circuit consider seven factors in determining whether there is a likelihood of confusion: (1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets (trade channels) and customers, (5) similarity of advertising media, (6) defendant's intent, and (7) actual confusion. *Frehling Enterprises, Inc. v. International Select Group, Inc.,* 192 F.3d 1330, 1335 (11th Cir. 1999). "Of these, the type of mark and the evidence of actual confusion are the most important." *Id.*

As will be explained below, because Wreal put forth competent evidence establishing each of the *Frehling* factors, the Court should reject the Magistrate's recommendation.

2

1.    **Type of Mark**

Courts analyze this factor to determine whether the mark at issue is "strong or weak." *Frehling*, 192 F.3d at 1335. As to the type of mark, one of the most important factors under *Frehling*, the Magistrate correctly found that "Wreal's 'FyreTV'," is "strong and distinctive." (R&R at 17 (ECF No. 130)).  It also found the same for Amazon's "Fire TV" and Amazon's housemark "Amazon."  *Id.*   The Magistrate also found that Amazon consistently uses its own distinctive housemark alongside Fire TV. (*Id.* at 18). The Magistrate erred, however, in determining that Amazon's use of its housemark alongside Fire TV somehow makes confusion less likely.

The Magistrate's reasoning is flawed because in this reverse confusion case the harm is that consumers will come to associate the FyreTV® name **with Amazon** rather than Wreal. *Sands, Taylor & Wood Co. v. Quaker Oats Co*., 978 F.2d 947, 960 (7th Cir. 1992) (in a reverse confusion case, the junior user's practice of linking the mark with the junior user's house mark "is an aggravation, not a justification"). Thus it follows that Amazon's decision to use its housemark alongside Fire TV serves to "aggravate, rather than mitigate" the likelihood of confusion. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 230 (3d Cir. 2000).[2] Even Amazon recognized in its briefing that it is "surely correct" that "clearly associating a mark with its **true source** tends to reduce confusion as to its source." (ECF No. 76

---

[2] This is well established law. *See, e.g., Attrezzi v. Maytag Corp*., 436 F.3d 32, 39 (1st Cir. 2006) (in a reverse confusion case, use of the strong mark Jenn-Air in conjunction with the mark at issue aggravated the likelihood of confusion); *Commerce Bank & Trust Co. v. TD Banknorth, Inc.*, 554 F. Supp. 2d 77, 85-86 (D. Mass. 2008) (finding that linking the more recognized label TD with the mark in question aggravated the threat to the plaintiff); *Glow Indus., Inc. v. Lopez,* 252 F. Supp. 2d 962, 995 (C.D. Cal. 2002) (finding that the addition of a "celebrity 'housemark'" may heighten the risk of confusion in a reverse confusion case.).  Further, in the Eleventh Circuit, the addition of a housemark does not necessarily lessen the likelihood of confusion even in forward confusion cases. *Frehling*, 192 F.3d at 1337–38 (adding brand name did not lessen likelihood of confusion for marks of otherwise "striking similarity").

at 12). But Amazon is not the ***true source*** of the FyreTV® mark, and by consistently using its housemark alongside Fire TV it clearly associates the mark with the wrong source, and the result is reverse confusion.

The law does not support the Magistrate's recommendation. Indeed, the handful of reverse confusion cases upon which the Magistrate relies is inapposite because in each case ***both*** parties used their respective housemarks alongside the mark in question.[3] That is not the case here, as Wreal does not use its housemark alongside FyreTV® (and has no obligation to do so). *Sands,* 978 F.2d at 960 (internal citation omitted).

Nevertheless, the Magistrate erroneously recommends that the Court set aside the law and the evidence and determine that Amazon's use of its housemark mitigates against the likelihood of confusion because Amazon's consistent use of its housemark across its other products, such as its Fire Phone, "makes it more likely a reasonable consumer would expect to see 'Amazon' next to a product." (R&R at 18). The evidence does not support the Magistrate's conclusion, however. That is because Amazon only put forth evidence that it uses its housemark alongside some products, not across its whole line of products. Indeed, Amazon does not use its housemark with the "Kindle Fire" device. (*See, e.g.* Tr. 208:19-21). Thus, Amazon's use of its housemark across its devices is anything but consistent. Moreover, there is no evidence whatsoever in the record that consumers expect to see the name "Amazon" on something that

---

[3] *See* R&R at 18 n. 6 (citing *Cohn v. Petsmart, Inc.,* 281 F.3d 837, 842 (9th Cir. 2002); *Stuart J. Kaufman, M.D. & Associates, P.A. v. Bausch & Lomb Inc.*, 2013 WL 6154166 (M.D. Fla. Sept. 4, 2013); *Tanel Corp. v. Reebok Int'l, Ltd.,* 774 F. Supp. 49, 54 (D. Mass. 1990)). Further, in *Universal Money Ctrs., Inc. v. Am. Tel & Tel. Co.*, 22 F.3d 1527, 1530-31 (10th Cir, 1994), both forward and reverse confusion were at issue, distinguishing that case from this one (and in that case, the court noted that the plaintiff Universal Money Centers, Inc., used the word at issue "Universal" with the words "Money Center," "Money Card" and "Money", while AT&T also used its housemark with the word "Universal"). Accordingly, as to the case of *Universal Money Centers*, contrary to the Magistrate's conclusion, it did not involve a case where "only the junior user uses its distinctive house mark in connection with the challenged mark …" (R&R at 18).

Amazon puts out. The Magistrate's conclusion is nothing but pure speculation, contrary to the law and the evidence.

Accordingly, because the marks as used by both parties are strong and distinct, and because Amazon aggravates the likelihood of confusion by using its housemark alongside "Fire TV," the Court should find that this factor weighs in favor of Wreal.

### 2. <u>Similarity of Marks</u>

Courts considering this factor compare the marks and consider "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc*., 756 F.2d 1525, 1531 (11th Cir. 1985).

It is undisputed that the marks sound the same, and the Magistrate correctly found that the marks share some visual similarities. (R&R at 21). And the Magistrate did not disagree with Wreal that the marks have the same meaning, in that "'[n]either literally means anything…,' apart from the shared use of 'TV.'" (R&R at 21). The Magistrate also correctly pointed out that whatever visual differences there are, "neither party has offered evidence that consumers have strong associations with their marks as they appear visually." (*Id.* (citing *Masters Software, Inc. v. Discovery Comm's, Inc.*, 725 F. Supp. 2d 1294, 1302 (W.D. Wash. 2010)).

And while Amazon argued that the marks are presented differently in commerce, the Magistrate recognized that this is not always the case, relying on evidence that Amazon advertises its Fire TV alongside other pornographic items on its website, specifically to consumers that are interested in pornography, or, in other words, Wreal's target market and the relevant consumers in this case. (R&R at 22). Nevertheless, the Magistrate found this factor favors Amazon.

The Magistrate's recommendation is unsupported by the evidence and contrary to the law. The Magistrate found similarities in both sound and meaning, and failed to address the impact of the "perfect similarity of sound" *Dreamwerks Prod. Group Inc. v. SKG Studio,* 142 F.3d 1127, 1131 (9th Cir. 1988). This is contrary to the law in the Eleventh Circuit, which held that aural similarities are "particularly important" where a consumer simply speaks the name of the mark. *E. Remy Martin,* 756 F.2d at 1531. The Magistrate ignored uncontroverted evidence that consumers do speak the name of the mark, as Wreal relies on "word of mouth" to attract new customers, and customers are likely to make a recommendation in person. (Tr. 77:14-78:4).

Having established that the marks are similar in sight, sound, and meaning, the Magistrate's recommendation rests on a comparison of the way the marks are presented on the parties' respective websites, relying on this Court's decision in *Tiger Direct, Inc. v. Apple Computer, Inc.*, 2005 WL 1458046 *16 (S.D. Fla. May 11, 2005) (Lenard, J.). There, this Court reasoned that consumers would not confuse the way Apple and Tiger Direct present their respective marks because Apple does so in an "Apple-branded, streamlined environment…," whereas Tiger Direct presented its mark in a crowded retail marketplace. *Id.* But as the Court recognized, Amazon's website is not like Apple's. Indeed, the evidence shows that, at least to the relevant consumers, its Fire TV mark is presented in a crowded market of choices across multiple brand names, including pornographic items like Buttman and Hustler. (Tr. 102:5-103:21).

Thus, the Court should decline to accept the magistrate's recommendation, as the evidence shows that the marks are similar in sight, sound, and meaning, and that they are presented similarly in commerce, particularly to the relevant consumers in this case.

### 3.    Similarity of Products

The law in this Circuit and elsewhere is that the trademark owner's rights "are not limited to protection with respect to the specific goods stated on the certificate—for **Remy Martin**, cognac and brandy—but extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods." *E. Remy Martin & Co.*, 756 F.2d at 1530 (holding that, contrary to the lower court's finding, wine is sufficiently similar to cognac or brandy, as even a sophisticated consumer could conclude that Remy Martin had undertaken the production and sale of wine, even though it did not do so). Amazon's Fire TV delivers a service that is identical to Wreal's certificate of registration for FyreTV®. Both services are delivered through a set-top box. Wreal's FyreTV® service streams video from a wide variety of content providers, as does Amazon's Fire TV. The similarities between FyreTV® and Amazon's Fire TV are obvious.

The Magistrate ignored these obvious similarities, and instead chose to focus solely on the differences in the content offered by each party, concluding that consumers can distinguish the content.[4] But the Magistrate should have analyzed "whether the products are the kind that the

---

[4] The Magistrate relied on a handful of factually inapposite cases where courts looked at whether consumers could distinguish the products. To that end, the Magistrate relies heavily on *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1506 (11th Cir. 1985), a forward confusion case involving athletic equipment (bicycles), where the Eleventh Circuit approved without further analysis the opinion of the district court, which in turn found no likelihood of confusion because the two bicycles in question looked different and had different riding characteristics. Thus, the court held that the competitor did not *copy* the plaintiff's mark. Thus, the analysis in that case was whether the defendant *copied* the plaintiff's bicycle, and the district court noted that consumers "do not ask for a particular brand" when buying the types of bicycles at issue. *Id.* at 1506 ("The comparison of the Boss Cruiser and the Ross Diamond Cruiser frames shows conclusively that defendant did not copy the Ross bicycle when developing the Boss Cruiser."). Nowhere in that case, which also dealt with trade dress infringement, was there any mention of the proper standard in reverse confusion: whether the products are the kind that the public attributes to a single source, *not* whether or not the purchasing public can readily distinguish

public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products and services of the respective parties." *Tiger Direct,* 2005 WL 1458046 at *17 (citing the following Eleventh Circuit cases: *Frehling,* 192 F.3d at 1338 and *E. Remy Martin & Co.*, 756 F.2d at 1530); *see also TV Land, L.P. v. Viacom, Int'l, Inc.* 908 F. Supp. 543, 551 (N.D. Ill. 1995) ("[T]he rights of an owner of a registered trademark … extend to any goods related in the minds of consumers in the sense that a single producer is likely to put out both goods.")

Had the Magistrate done the proper analysis, he necessarily would have concluded that the products are similar enough that they can be attributed to the same source. Indeed, the Magistrate acknowledged that Wreal put "forth evidence that mainstream movies and adult content are ***complementary*** in that well-known content providers such as Comcast offer a full spectrum of pay-per-view movies, including mainstream and adult content." (R&R at 23-24) (emphasis added). The Magistrate also noted that Amazon <u>did not dispute that point</u>, and that Amazon's own expert, Dr. Peter Lehman, testified that hardcore pornography can be rented from

---

between the products and services of the respective parties. Thus this case is factually and legally inapposite.

Likewise, the Magistrate's reliance on *Sunenblick v. Harrell,* 895 F. Supp. 616, 628-29 (S.D.N.Y. 1995) is misplaced. In that case, the plaintiff's product was directed to a "somewhat esoteric market." However, this was analyzed in the context of whether the same consumers are exposed to the parties' respective products. Thus, the *Sunenblick* court held that "absent any evidence that consumers of one will be potential consumers of the other…" it was unlikely that consumers of the plaintiff's product would even see the defendant's products, let alone the mark in question. *Id.* at 629. Here, there is no evidence that Wreal's FyreTV® is directed at an esoteric market. The opposite is true, as Wreal targets adults over the age of 20 with disposable income that buy adult content. There was no evidence presented that consumers interested in adult content are not also interested in mainstream content, which was the case in *Sunenblick*. The evidence and common sense show that consumers that chose to view adult content also view mainstream content. Indeed, many of Wreal's customers use Roku, a direct competitor to Amazon that primarily provides access to the same mainstream content as Amazon's Fire TV, to access FyreTV®.

large hotel chains that also offer mainstream and kids movies. (R&R at 24).

Thus, there is no dispute that FyreTV® and Fire TV both provide consumers with access to streaming online content. And there is no dispute that mainstream and adult content are complementary and often are put out by the same source, just like Comcast and major hotel chains offer access to both. These facts alone are more than sufficient to show that FyreTV® and Amazon's Fire TV are "related in the minds of consumers in the sense that a single producer is likely to put out both goods." *E. Remy Martin & Co.*, 756 F.2d at 1530; *see also E. & J. Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1291 (9th Cir.1992) ("Where goods are related or complementary, the danger of consumer confusion is heightened."); *Dreamwerks Prod. Group, Inc.*, 142 F.3d at 1131 (relatedness of goods extends to goods that are complementary).

Amazon argued that, unlike Comcast and major hotel chains, consumers would not associate pornographic material with *Amazon*. But the only evidence that the Magistrate relied on in support of Amazon's position is testimony from Ms. Elizabeth Baicy, who said that in focus groups, "never once has pornography ever come up in a free association with the brand." (R&R at 25; Tr. at 245:23-246:1). Ms. Baicy did not provide any additional information about these focus groups, such as who was present at them and when they took place.

To counter Amazon's argument that consumers would not associate *Amazon* with pornography, "Wreal submitted competent evidence demonstrating that some allegedly pornographic content is available on Amazon and that adult sex toys are available from Amazon vendors on Amazon's website." (R&R at 25). This undisputed evidence means that in the minds of consumers, Amazon could be the source of Wreal's FyreTV® service. Otherwise, why would Amazon sell pornographic content and adult sex toys on its website? In addition, the Magistrate's conclusion is contrary to the fact that pornography is streamed through Amazon's

9

Fire TV.  (R&R at 22 ("Wreal specifically notes that Amazon advertises Fire TV with other brand names that stream video ***through the device***, including … Showtime Anytime (which can be used to stream pornography)." (emphasis added); Tr. 180:1-181:1; Tr. 87:12-88:10).

Yet the Magistrate erroneously found the evidence showing that Amazon puts out pornographic content is somehow irrelevant as to whether consumers would think that Amazon puts out FyreTV®, when the only thing ostensibly distinguishing it from Amazon's Fire TV is the content. (R&R at 25-26). Like Comcast and major hotel chains, consumers would believe that Amazon would put out a streaming video service that provides access to adult content.

Accordingly, the Court should decline to adopt the Magistrate's recommendation with respect to this factor, and instead conclude that this factor favors Wreal.

### 4.   Similarity of Sales Outlets and Customer Base

The Magistrate erroneously concluded that the parties do not share sales outlets or a customer base. That is because the Magistrate failed to account for the significant consumer overlap between the parties' target markets. Mr. Franco testified that Wreal targets adults over the age of 20 with disposable income and access to the internet. (Tr. 78:10-15). Indeed, FyreTV® currently has 51,000 subscribers, with 97% over the age of 24.  (*Id.* 78:7-18).  He explained that FyreTV®'s target market overlaps with Amazon because Wreal targets the type of customers that purchase explicit material from Amazon's website, such as sex toys and pornographic DVDs. (*Id.* 78:10-79:13). Indeed, a customer shopping on Amazon's website for pornographic material may be exposed to a Fire TV advertisement alongside advertisements for pornographic magazines. (Tr. 99:9-12; 102:6-105:14; P.X. 10). Amazon did not controvert this evidence.

Instead, Amazon identified Roku as a top competitor of its Fire TV, and Ms. Elizabeth Baicy testified that Amazon targets Roku's customers. (Tr. 212:10-18). Wreal's FyreTV® is

available on Roku, thus to the extent that Amazon targets Roku users, it also targets Wreal's users. And while the products are not sold at the same retail outlets, this is hardly fatal. Indeed, as the Ninth Circuit recently explained, "[m]arketing channels can converge even when different submarkets are involved so long as 'the general class of ... purchasers exposed to the products overlap.'" *Pom Wonderful LLC v. Hubbard*, No. 14-55253, 2014 WL 7384391, at *8 (9th Cir. Dec. 30, 2014).

The Magistrate failed to consider this evidence, and instead concluded, without support, that a large company like Amazon that markets to a mass audience cannot have its customers considered to be "similar" with another's for likelihood of confusion purposes, because the result would be that every company shares a target market with Amazon. (R&R at 29). The Magistrate acknowledged that Wreal did not advance such a theory, nor would it. The reality is that the parties' share the same customers. Indeed, Comcast customers buy mainstream movies and pornographic movies. There is an overlap because the content is complementary. Amazon put forth no evidence to the contrary. Thus, the Court should decline to adopt the Magistrate's recommendation, and find that this factor weighs in favor of a finding of likelihood of confusion.

### 5.   <u>Similarity of Advertising</u>

The Magistrate erroneously concluded that this factor weighs in favor of Amazon because the parties do not *currently* advertise over the same media. Overlap is not necessary in a reverse confusion case, however. That is particularly true here where the junior user has significant market power and can permeate virtually every marketing channel, even channels that Amazon has not specifically targeted. *Masters Software,* 725 F. Supp. 2d at 1305. For example, someone who comes across one of Wreal's banner advertisements might assume that it is connected to Amazon even if Amazon never advertised on that particular website. *See id.* And there is uncontroverted evidence that Wreal advertised on the same media as Amazon in the past.

Should Wreal decide to do so in the future, then the similarity of advertising media will only increase.

The Magistrate also ignored evidence that both parties rely on word-of-mouth advertising. (Tr. 77:14-78:6; 231:17-25). This type of marketing is particularly susceptible to confusion given that the names are aurally identical. Accordingly, the Court should find that this factor weighs in favor of Wreal.

6.   <u>**Actual Confusion**</u>

Wreal put forth evidence of actual confusion in the marketplace, something rare in a reverse confusion case as "marshalling evidence of actual confusion is often difficult…." *A&H Sportswear,* 237 F.3d at 233. This is especially true in this case, where a confused consumer would be contacting Amazon to ask about adult content. Moreover, as Amazon's expert on pornography admitted, many people use pornography, but do not admit it. (Tr. 306:23-25). And it is well settled that even in traditional trademark infringement cases, evidence of actual confusion is not required. *TracFone Wireless, Inc. v. Cabrera,* 883 F. Supp. 2d 1220, 1226 (S.D. Fla. 2012) (Lenard, J.) (Evidence of actual confusion "is not necessary to a finding of likelihood of confusion.")

For the following reasons, the Court should not follow the Magistrate's recommendation with respect to this factor.

i.   ***The Magistrate Improperly Dismissed the Evidence of Actual Confusion as De Minimis.***

The evidence included an audio recording of an individual that called Amazon's customer support shortly after Amazon launched its Fire TV. That individual called Amazon to inquire about its Fire TV, and asked specifically how to access adult content on the device. (Tr. 178:11-183:5). The caller was under the impression that he could access adult content through

Amazon's device by spelling F-Y-R-E. (*Id.*) Wreal also put forth tweets of consumer confusion. The Magistrate questioned whether this customer was confused, but Amazon already provided the answer, as its 30(b)(6) representative testified that a confused caller would do exactly what this customer did: contact Amazon to ask how to access the "Fyre, with a Y, streaming service." (Tr. at 188:15-21).[5]

The Magistrate erroneously dismissed the evidence of actual confusion as *de minimis,* relying on *Tana v. Dantanna's,* 611 F.3d 767, 779-80 (11th Cir. 2010). In *Tana,* the Eleventh Circuit disregarded two incidents of actual confusion that were spaced out over *five years* of continuous use. *Id.* The reality is that "the quantum of evidence needed to show actual confusion is relatively small." *Caliber Automotive Liquidators, Inc. v. Premier Chrysler Jeep, Dodge, LLC,* 605 F3d 931, 937 (11th Cir. 2010). Thus, it was not proper for the Magistrate to dismiss the evidence of actual confusion in this case as *de minimis. See World Carpets, Inc. v. Dick Littrell's New World Carpets,* 438 F.2d 482, 489 (5th Cir.1971) ("[R]eason tells us that while very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of proof would be necessary to refute such proof."))

ii.     ***The Magistrate Should Have Given No Weight to the Sarel Survey***

In the R&R, the Magistrate relied heavily on a remarkably flawed consumer survey purporting to show an absence of confusion put forth by Amazon's expert, Dr. Sarel. The Sarel Survey suffered from a multitude of flaws, all of which were identified by Dr. Thomas Maronick, who Wreal retained to rebut Dr. Sarel's survey. (Tr. 365:2-377:19).

---

[5] The Magistrate also erroneously relied on the fact that Amazon did not produce any other evidence of consumer confusion in its records. However, Amazon conceded that its search had some limitations in that its search of its telephone records failed to pick up the call discussed in this section. (Tr. 319:25-320:5.)

One flaw in particular renders Dr. Sarel's survey irrelevant to this case, which is Dr. Sarel's failure to survey the correct universe. This alone is fatal to Dr. Sarel's survey, as "[s]election of the proper universe is one of the most important factors in assessing the validity of a survey and the weight that it should receive because 'the persons interviewed must adequately represent the opinions which are relevant to the litigation.'" *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008) (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980)). "Selection of a proper universe is so critical that 'even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'" *Id.* (citing *Wells Fargo & Co. v. WhenU.com, Inc.,* 293 F.Supp.2d 734, 767 (E.D. Mich. 2003)).

As defined by Dr. Sarel, the proper universe in this case is "consumers over 18 years of age who paid for, or are willing to pay for, adult porn video-on-demand (VOD) streaming services." (Tr. 346:23-347:4 (Decl. of Dr. Sarel ¶ 32)). The Magistrate recognized that it is appropriate to survey potential users of Wreal's service, but completely ignored the fact that Dr. Sarel, by his own admission during cross-examination, did not survey this universe. That is because the screening questions that Dr. Sarel used only screened for those who had visited or intend to visit adult websites that require users to pay to access, ***and not for those that actually paid for access or were willing to pay for access***. (Tr. 348:10-350:9; 369:15-370:16). In sum, even Dr. Sarel admitted that he surveyed the wrong universe, something the Magistrate erroneously and inexplicably failed to consider.

In addition, the Magistrate ignored the evidence that the way Dr. Sarel calculated the consumer confusion did not even match the methodology that he claimed he followed. Had Dr. Sarel actually followed his own methodology, he would have realized that his survey showed an

actual confusion of 8.5%, which as the Magistrate pointed out is a threshold that meets a finding of actual confusion.  (R&R at 38; Tr. 374:6-376:14).  Without basis, the Magistrate also failed to consider this significant point.

### iii.   The Magistrate Improperly Penalized Wreal for Not Putting Forth its Own Survey Evidence

The Magistrate erroneously ignored that Dr. Sarel's surveyed the wrong universe along with the numerous other flaws identified by Dr. Maronick because Dr. Maronick did not conduct his own survey using the approach that he believed to be correct. (R&R at 38-39).[6] Other than a single treatise, the Magistrate offered no support for his recommendation that the Court ignore Dr. Maronick's criticisms of Dr. Sarel's fatally flawed survey because Dr. Maronick did not conduct one of his own just after.[7]

The reason there is no support is because the Eleventh Circuit "has moved away from relying on survey evidence." *Frehling,* 192 F.3d at 1341 n. 5 ("This Circuit, however, has moved away from relying on survey evidence. [citation omitted]. Thus, the failure to adduce such evidence is not damaging to the Plaintiff's case. The district court correctly held that the lack of survey evidence was not dispositive."). Thus the fact that Wreal did not put forth survey

---

[6] The Magistrate also mentioned that Dr. Maronick's expert testimony has been excluded in the past by some courts.  (R&R at 39 n. 18).  He went on to note three cases.  What the Magistrate failed to point out is that Dr. Maronick has conducted over 300 surveys on behalf of his litigation clients; Dr. Sarel has only done 20. (Tr. 366:11-14; R&R at 37). Given the Magistrate's pointing out that some courts have excluded Dr. Maronick's testimony, it is inexplicable why the Magistrate failed to point out that Dr. Sarel's surveys have also been excluded.  In *Innovation Ventures, LLC v. N2G Distributing, Inc.*, 2011 WL 6010206 at *5 (E.D.Mich. Nov. 30, 2011), the court excluded Dr. Sarel's survey because, as it is in this case, it was "so questionable that it is not appropriate material to assist the jury ..."

[7] Something that, by the way, would have been practically difficult if not impossible. Wreal received Dr. Sarel's survey just over a month before the December 30, 2014 evidentiary hearing. It would have been impractical for Dr. Maronick to identify each of the flaws in Dr. Sarel's survey, design a survey fixing those flaws, obtain a sample, analyze the results, and prepare a report in that given time. Regardless, as explained herein, that is not required in the Eleventh Circuit.

evidence "is not damaging to [its] case." *Id.* Yet the Magistrate erroneously ignored Eleventh Circuit law and effectively penalized Wreal for not putting forth survey evidence of its own. This is clear error, and it would be erroneous for the Court to accept the Magistrate's recommendation to the extent that it gives any weight to Dr. Sarel's survey.

> ### iv.     *The Magistrate Improperly Relied on a Pilot Study Conducted by Dr. Maronick*

The Magistrate also improperly relied on testimony given by Dr. Maronick, over Wreal's objection that it constitutes work product, that he conducted a survey in April, just after the product was launched. (R&R at 39).[8] Dr. Maronick explained that there was a low level of consumer confusion because the level of awareness of Amazon's Fire TV was very low at the time. "[A] survey cannot be run in a reverse confusion case prior to the junior user's saturation of the market with its mark because, until that time, consumers have not been exposed to the relatively large advertising and promotion of the junior user that is the hallmark of a reverse confusion case." 4 McCarthy on Trademark and Unfair Competition § 23:10 (4th ed. 2011). Thus, Dr. Maronick's survey has no relevance.

Moreover, Dr. Maronick's survey was not put into evidence, and indeed was never presented to the Court. Thus, the Magistrate failed to analyze the survey at all. In fact, the only evidence that the Magistrate had to rely on was Dr. Maronick's uncontested testimony where he clearly explained that the level of awareness of Amazon's Fire TV was extremely low just after it launched. (Tr. at 378:15-22).

Accordingly, for the foregoing reasons, the Court should not adopt the Magistrate's

---

[8] The Magistrate improperly overruled Wreal's work product objection. The survey in question was a pilot study and Dr. Maronick was not offered to testify on that study. Rather, Dr. Maronick worked with Wreal in the capacity as a consultant at the time that he conducted the pilot study. *See Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir.1989) (holding that survey prepared by consulting expert was protected by work-product privilege);

recommendation with respect to this actual-confusion factor, and instead find that this factor weighs in favor of a finding of likelihood of confusion.

7.     **Balancing all Factors**

Had the Magistrate properly analyzed each of the *Frehling* factors, he would have found that each weighs in favor of a finding of a likelihood of confusion.[9] Thus, the Court should not adopt the Magistrate's finding that there is no likelihood of confusion, and instead find based on the clear and largely undisputed evidence that there is a substantial likelihood of confusion.

D.     **Wreal Will Suffer Irreparable Harm Absent an Injunction.**

Given that there is a substantial likelihood of confusion, it follows that Wreal will be irreparably harmed. That is because trademark infringement "by its nature causes irreparable harm." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 986 (11th Cir. 1995). Because the Magistrate erroneously found that there is no likelihood of confusion, it improperly denied Wreal the benefit of the presumption of irreparable harm. *See Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1286 (S.D. Fla. 2010) ("The Eleventh Circuit explained that it has repeatedly held that 'a sufficiently strong showing of likelihood of confusion [caused by trademark infringement] may itself constitute a showing of … [a] substantial threat of irreparable harm.'").

Regardless, Wreal established that it will be irreparably harmed even absent the benefit of a presumption. Mr. Franco testified that if consumers come to associate the FyreTV® name with Amazon, Wreal would lose control of its brand and its destiny. (Tr. 92:4-18). Mr. Franco also

---

[9] As to the intent factor, it is undisputed that Amazon knew of Wreal's use of the FyreTV® marks, but ignored Wreal's senior rights to the mark. *Imperial Toy Corp., Inc. v. Ty, Inc.,* 1998 WL 601875 at *6 (N.D. Ill. 1998). Thus, while the Magistrate recommended that this factor favor neither party, the Court should find that it clearly favors a finding of a likelihood of confusion.

testified that Wreal's reputation is in jeopardy due to Amazon's infringement. (*Id.* at 91:19-92:3). He explained that "[t]he confusion caused by Amazon taking [Wreal's] name will make it difficult for Wreal to acquire new customers…" and that if Amazon is allowed to continue its infringement, "Wreal will likely be forced to abandon using its own brand name." (Franco. Decl. ¶¶ 36-37 (ECF No. 28-1)). The result will be the "destruction of years of hard work and capital that [Wreal] put into building up [its] brand name and reputation…." (*Id.* ¶ 37).

This is precisely the type of harm that the law expects in reverse confusion cases. "The doctrine of reverse confusion protects against a specific type of harm, namely that "[t]he public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter... [T]he senior user loses the value of the trademark— *its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.*" *A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.*, No. CIV.A. 94-CV-7408, 2002 WL 27735, at *2 (E.D. Pa. Jan. 9, 2002). (emphasis in original).

The Magistrate erroneously ignored the evidence that Wreal will suffer irreparable harm absent an injunction. Yet this evidence was uncontroverted. Indeed, Amazon did not seek to rebut any of this evidence, and instead argued that Wreal has not suffered any *compensable* harm in the form of lost revenue. (R&R at 43). And though the Magistrate correctly identified the resulting harm from reverse confusion, which is "that the senior user loses the value of the trademark – its product identity, corporate, identity, control over its goodwill and reputation, and ability to move into new markets," he nevertheless relied on the fact that Mr. Franco "could not identify *any* actual damage – loss of business, lost sales, or subscriber cancellations – due to Amazon's Fire TV." (R&R 17, 43). This is improper, as "[t]he likelihood of damage to reputation and good will, even where there is no proof of lost sales or side-by-side competition,

entitles a plaintiff to preliminary relief." *Paco Rabanne Parfums, S.A. v. Norco Enterprises, Inc.,* 680 F.2d 891, 894, (2d Cir. 1982) (reversing denial of preliminary injunction); *see also Auburn University v. Moody*, 2008 WL 4877542 (M.D. Ala. 2008) (Granting preliminary injunction, relying on the presumption and also on trademark owner's loss of control of its reputation.)

The Magistrate also erroneously held that the fact that Wreal did not race to the courthouse to file its motion for preliminary injunction "is by itself sufficient grounds to deny its request for an injunction." (R&R at 42). The Magistrate erroneously relies primarily on two trademark infringement cases from within this Circuit, this Court's decision in *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.,* 188 F. Supp. 2d 1350, 1354 (S.D. Fla. 2002) and *CORD:USE Blood Bank, Inc. v. CBR Sys., Inc.,* 2012 WL 8745155 at *10 (M.D. Fla. Sept. 26, 2012). Both cases are factually inapposite, however, as (1) the plaintiffs in those cases waited far longer than Wreal – nearly a year in *Seiko*[10] and over 14 months in *CORD:USE*, and (2) both are traditional forward confusion cases, not reverse confusion cases. Here it is undisputed Wreal learned of Amazon's Fire TV on April 2, 2014, the same day that Amazon announced it to the world. Wreal filed suit within two weeks; it didn't wait a year like the plaintiff in *Seiko*.

Indeed, the Magistrate did not cite any authority supporting the proposition that a mere five-month delay in moving for a preliminary injunction is presumptively unreasonable such that it demands an explanation. *See Bellsouth Adver. & Publ'g Corp. v. Real Color Pages, Inc.*, 792 F. Supp. 775, 784-5 (M.D. Fla. 1991) ("The evidence before this Court establishes that Plaintiff first learned of Defendants' insertion directory in January 1991. The Court finds that Plaintiff's delay of ***seven to eight months*** is ***not*** an unreasonable amount of delay, and does not necessitate

---

[10]   In the *Seiko* case, as the Magistrate pointed out, the Court gave the plaintiff credit for the time it spent attempting to settle the case.  However, under the facts of that case, the credited period was only four months.  Accordingly, the "unexplained" delay in that case was approximately eight months, with three of those months taking place after settlement negotiations ceased.

the preclusion of a finding of irreparable injury.") (emphasis added). And courts in reverse confusion cases, where the plaintiff, like Wreal here, faces a foe with far more resources, routinely grant motions for preliminary injunctions filed longer than five months after the plaintiff noticed the infringement. *Boldface Licensing + Branding v. Tillett*, 940 F. Supp. 2d 1178 (C.D. Cal. 2013) (granting motion for preliminary injunction filed eight months after infringement noticed); *American Beverage Corp. v. Diageo N.A.*, 936 F. Supp. 2d 555 (W.D. Pa. 2013) (six months). The Court should decline to follow the Magistrate's recommendation, especially given the substantial likelihood of success on the merits.

### E.      Balance of Hardships and Public Interest

Because the Magistrate erroneously found that there is no likelihood of confusion, it improperly analyzed these factors. That is because due to Wreal's substantial likelihood of success on the merits, Amazon will suffer no harm because it has no right to use Wreal's marks. *Chanel, Inc. v. chanel255.org*, 2012 WL 1941598 at *6 (S.D. Fla. May 29, 2012) (finding that there is no legitimate hardship to a defendant that is enjoined from using marks that it had no legal right to use.). And the public interest will be served if the Court grants an injunction, as the public will avoid the "unnecessary confusion" caused by Amazon's infringement. *Angel Flight of Ga. V. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008).

### III.      <u>CONCLUSION</u>

For the foregoing reasons, the Court should decline to adopt the Magistrate's Report and Recommendation, and instead should enter an order granting Wreal's motion for preliminary injunction.

Respectfully submitted,

WNF LAW, P.L.
*Attorneys for WREAL, LLC*
1111 Brickell Avenue, Suite 2200
Miami, Florida 33131
Phone: (305) 760-8500
Fax: (305) 760-8510


By:____/s/ John G. Marfoe_____
          Carlos Nunez-Vivas
          Florida Bar No. 128181
          can@wnflaw.com
          Daniel Foodman
          Florida Bar No. 337160
          df@wnflaw.com
          Dennis J. Wouters
          Florida Bar No. 28692
          djw@wnflaw.com
          John G. Marfoe
          Florida Bar No. 101535
          jgm@wnflaw.com

## CERTIFICATE OF SERVICE

I certify that on February 13, 2015, this document was served by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel of record on the Service List below.


By:____/s/  John G. Marfoe_____

## SERVICE LIST

Justin A. Nelson, Esq.
Drew D. Hansen, Esq.
Patrick C. Bageant, Esq.
*Co-counsel for Defendant*
Susman Godfrey L.L.P.
1201 Third Avenue
Suite 3800
Seattle, WA 98101
Tel. 206-516-3880
Fax 206-516-3883
jnelson@susmangodfrey.com
dhansen@susmangodfrey.com
pbageant@susmangodfrey.com

Jamie Z. Isani, Esq.
Shannon Shaw, Esq.
*Co-counsel for Defendant*
Hunton & Williams LLP
1111 Brickell Avenue
Suite 2500
Miami, FL 33131
Tel. 305-810-2500
Fax 305-810-2460
jisani@hunton.com
sshaw@hunton.com