**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 1:14-cv-21385-JAL

| | |
|---|---|
| WREAL, LLC, a Florida Limited Liability Company, | |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| AMAZON.COM, INC., a Delaware corporation, | |
| Defendant. | |

**AMAZON.COM, INC.'s OPPOSITION**
**TO WREAL, LLC'S, OBJECTIONS TO REPORT AND RECOMMENDATION**

# CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STANDARD OF REVIEW ................................................................................. 1

III.  FACTUAL BACKGROUND .............................................................................. 2

IV.   WREAL DID NOT CLEARLY ESTABLISH THE BURDEN OF PERSUASION
      ON THE FOUR REQUISITES TO A PRELIMINARY INJUNCTION ............................ 3

      A.   WREAL Did Not Establish a Substantial Likelihood of Success .................................. 3

           1.   Distinctiveness of Mark ........................................................................ 4

           2.   Similarity of Marks ............................................................................. 6

           3.   Similarity of Products ......................................................................... 7

           4.   Similarity of Sales Outlets and Customer Base ................................. 9

           5.   Similarity of Advertising ................................................................... 11

           6.   The Defendant's Intent ...................................................................... 11

           7.   Actual Confusion .............................................................................. 12

                a)   Twitter Posts and Tweets Show No Confusion ............................ 13

                b)   Amazon's Customer Contacts Show No Confusion .................... 13

                c)   Dr. Sarel's Survey Shows No Actual Confusion ......................... 14

                d)   Dr. Maronick's Survey Shows No Actual Confusion ................... 15

                     (1)   Dr. Maronick's Survey Was Not Work Product .................. 15

                     (2)   WREAL's Criticism of Dr. Sarel Deserved Little Weight ......... 16

      B.   WREAL Advanced No Evidence of Irreparable Harm ................................................. 18

      C.   Balance of Hardships and Public Interest ................................................................ 20

# AUTHORITIES

## Cases

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
    722 F.3d 1229 (10th Cir. 2013) ..................................................................... 15

*All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.*,
    887 F.2d 1535 (11th Cir. 1989) ...................................................................... 3

*Amlong & Amlong, P.A. v. Denny's, Inc.*,
    500 F.3d 1230 (11th Cir. 2007) .................................................................... 10

*Amstar Corp. v. Domino's Pizza, Inc.*,
    615 F.2d 252 (5th Cir. 1980) ............................................................. 6, 7, 9, 12

*Apple Inc. v. Amazon.com, Inc.*,
    No. 11-1327 PJH, 2013 WL 1320760 (N.D. Cal. Apr. 1, 2013) ..................... 15

*Armstrong Cork Co. v. World Carpets, Inc.*,
    597 F.2d 496 (5th Cir. 1979) ........................................................................ 12

*Caliber Automotive Liquidators, Inc. v. Premier Chrysler Jeep, Dodge, LLC*,
    605 F3d 931 (11th Cir. 2010) ....................................................................... 14

*Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*,
    508 F.3d 641 (11th Cir. 2007) ........................................................................ 5

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ..................................................................................... 19

*Essex Ins. v. Rodgers Bros. Servs.*,
    No. 8:05-cv-00648, 2007 WL 2298356 (M.D. Fla. Aug. 7, 2007) ................... 2

*Eze v. Am. Equip. Leasing, LLC*,
    No. 6:11-CV-1213, 2011 WL 4481436 (M.D. Fla. Sept. 27, 2011) ................. 4

*Frehling Enters., Inc. v. Int'l Select Group, Inc.*,
    192 F.3d 1330 (11th Cir. 1999) ................................................................. 4, 17

*Hormel Foods Corp. v. Jim Henson Prods., Inc.*,
    73 F.3d 497 (2d Cir. 1996) ........................................................................... 13

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*,
    896 F.2d 1283 (11th Cir. 1990) .................................................................... 20

*North Am. Med. Corp. v. Axiom Worldwide, Inc.*,
    522 F.3d 1211 (11th Cir. 2008) .................................................................... 19

*Ross Bicycles, Inc. v. Cycles USA,*
    765 F.2d 1502 (11th Cir. 1985) ................................................................... 8

*S.E.C. v. Reyes,*
    2007 WL 963422 (N.D. Cal. Mar. 30, 2007) ................................................. 16

*Schwab v. Philip Morris USA, Inc.,*
    No. 04-CV-1945, 2006 WL 721368 (E.D.N.Y. Mar. 20, 2006) ...................... 16

*Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.,*
    188 F. Supp. 2d 1350 (S.D. Fla. 2002) ......................................................... 19

*Shields v. Sturm, Ruger & Co.,*
    864 F.2d 379 (5th Cir.1989) ......................................................................... 15

*Sun Banks of Fla., Inc. v. Sun Fed. Savs. & Loan Assoc.,*
    651 F.2d 311 (5th Cir. 1981) ......................................................................... 6

*Sunenblick v. Harrell,*
    895 F. Supp. 616 (S.D.N.Y. 1995) ............................................................... 9

*Tana v. Dantanna's,*
    611 F.3d 767 (11th Cir. 2010) ....................................................................... 14

*Tiger Direct, Inc. v. Apple Computer, Inc.,*
    No. 05-21136-CIV, 2005 WL 1458046 (S.D. Fla. May 11, 2005) ............... 6, 7

*Universal Money Ctrs., Inc. v. Am. Tel & Tel. Co.,*
    22 F.3d 1527 (10th Cir. 1994) ....................................................................... 5

*Williams v. McNeil,*
    557 F.3d 1287 (11th Cir. 2009) ..................................................................... 4

## Statutes

28 U.S.C. § 636(b)(1)(B) ..................................................................................... 1

## Rules

Fed. R. Civ. P. 26(a)(2)(B)(ii)............................................................................. 16

Fed. R. Civ. P. 72(b) .......................................................................................... 1

Defendant Amazon.com, Inc. ("Amazon") files this Opposition to the Objections to Report and Recommendation filed by WREAL, LLC ("WREAL"). As explained herein, WREAL fails to identify a single reversible error in the Report and Recommendations ("R&R"), much less enough to tip the multi-factor preliminary injunction test in its favor. The Court should overrule WREAL's objections and adopt the R&R in its entirety.

## I.     INTRODUCTION

The core of a trademark case is whether consumers are likely to be confused, and the core of a preliminary injunction motion is whether a plaintiff makes that showing so clearly as to entitle it to pretrial relief. Magistrate Judge Goodman's R&R correctly concluded the answer to both questions is "no." It recognized that actual confusion is "the best evidence of likelihood of confusion," that WREAL had none, and that its efforts on the remaining elements of the trademark and injunction tests fared no better. WREAL's objections only emphasize the fatal flaws in its case: (1) not one but *two* consumer surveys have found no confusion; (2) no customer has *ever* expressed confusion to WREAL; (3) of tens of thousands of inquires to Amazon about Fire TV, WREAL argues only *one* is evidence of confusion – yet the R&R properly concluded that even this person was not confused as to the source of FyreTV; and (4) WREAL's remaining arguments are based on stale evidence from a few weeks of its Complaint. WREAL's objections similarly highlight the legal flaws in its case: its delay alone is ground to deny a preliminary injunction and, at any rate, no reported case has ever found a likelihood of confusion where fewer than 8.5% of survey respondents are confused, much less the 1% *de minimis* rate present here. The R&R determined correctly that this case – which involves no customer confusion – should not strike new ground, particularly on the heightened preliminary injunction standard.

## II.    STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b), any portion of a Magistrate

Judge's report and recommendation is reviewed *de novo* upon a timely objection. "[I]ssues of fact not objected-to," however, "are reviewed under a clearly erroneous standard." *Essex Ins. v. Rodgers Bros. Servs.*, No. 8:05-cv-00648, 2007 WL 2298356, at *1 (M.D. Fla. Aug. 7, 2007).

## III.   FACTUAL BACKGROUND

WREAL objects to some of the R&R's factual findings, which Amazon addresses below. However, WREAL does ***not*** object to many of the R&R's most critical findings, including:

1. WREAL "offers exclusively pornographic content, not mainstream movies" and "most of [WREAL's] offerings are hardcore pornography" (R&R at 7);

2. WREAL agrees Netflix, a mainstream video-streaming site, operates in a different market than WREAL (*id.*);

3. WREAL currently refers to its pornographic set-top box on its website as the "Fyre BoXXX," a name very different from Amazon's Fire TV (*id.* at 3, 20);

4. WREAL uses the "FyreTV" mark as "one word (not two, as with Amazon's Fire TV), in a unique and stylized font (different from the font Amazon uses for its house mark or its Fire TV), in red and white (not orange, which Amazon uses . . .)" (*id.* at 20);

5. WREAL's FyreTV streaming pornography service is sold exclusively through the fyretv.com website, which requires visitors to affirm they are over 18 and willing to view adult content before they can enter (*id.* at 7);

6. Upon entry, WREAL's website immediately presents the viewer with several rows of highly explicit pornographic images (*id.* at 7) which the Court can view for itself in the exhibits on file (*see, e.g.*, Pl.'s Ex. 5, D.'s Ex. R.F.X. 205, 206);

7. WREAL's own set-top box, the "Fyre BoXXX," is available only on WREAL's website to customers who first sign up for a FyreTV account (R&R at 8);

8. WREAL stopped selling the Fyre BoXXX to new customers in October 2012, only restarting sales after Amazon launched its Fire TV (*id.* at 8-10);

9. WREAL does not advertise on television or print media and its internet advertising is limited to adult websites (*id.* at 10);

10. WREAL and Amazon do not sell the products at issue at the same venues; WREAL's website does not sell Amazon products and Amazon's website does not sell WREAL's products (*id.* at 28) (WREAL explicitly concedes this point, *see* Obj. 11 ("the products are not sold at the same retail outlets"));

11. No evidence suggested consumers would mistake the single WREAL internet ad introduced at the hearing (featuring a woman with an exposed breast on the "Adult

2

DVD Talk" website) for an Amazon ad (R&R at 30);

12. Amazon first used "Fire" for streaming video in 2011 when it introduced the Kindle Fire tablets (*id*. at 10);

13. Amazon selected "Fire" for its set-top box to continue and extend its previous use of "Fire" as its multimedia brand (*id*. at 11);

14. Amazon does not market the Fire TV for viewing pornography, as Amazon (a) did not purchase paid internet ads for the Fire TV for pornographic keywords, (b) prohibits pornographic apps for Fire TV, and (c) prohibits, through its content policies, pornographic videos for Amazon Instant Video (Amazon's streaming video service) and its DVD store on Amazon (*id*. at 12);

15. Amazon would incur costs in the tens of millions of dollars if it had to stop using the "Fire TV" name, including costs associated with changing packaging and manuals, point-of-purchase displays, and the operating system (*id*. at 14);

16. WREAL could not identify ***any*** actual damage—lost set-top box sales, lost business or other sales, subscriber cancellations—because of Amazon's Fire TV (*id*. at 43);

17. WREAL's revenues were steadily declining before Amazon Fire TV's launch and WREAL offered no evidence Fire TV affected this downward trend (*id*.); and

18. WREAL has "never explained or introduced any evidence as to why it waited more than five months" after filing suit to move for a preliminary injunction" (*id*. at 41).

As explained below, these undisputed findings demonstrate why Magistrate Judge Goodman properly recommended that this Court deny WREAL's motion.

## IV.  WREAL DID NOT CLEARLY ESTABLISH THE BURDEN OF PERSUASION ON THE FOUR REQUISITES TO A PRELIMINARY INJUNCTION

WREAL acknowledges the R&R applied the correct preliminary injunction test and does not challenge that a preliminary injunction is "an extraordinary and drastic remedy not to be granted unless the movant ***clearly establishes*** the burden of persuasion."[1] The R&R correctly ruled WREAL failed to make this showing; nothing in WREAL's objections shows that it erred.

### A.   WREAL Did Not Establish a Substantial Likelihood of Success

To succeed on a trademark claim, a plaintiff must demonstrate: (1) its mark has priority,

---

[1] R&R at 15-16 (quoting *All Care Nursing Serv., Inc. v. Bethesda Memorial Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (emphasis added)).

and (2) the defendant's mark is likely to cause consumer confusion. *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999). WREAL does not contest the R&R's observation that "the relevant test is **_likelihood_** of confusion, not mere **_possibility_** of confusion" (R&R at 17) – specifically, that WREAL must establish "a likelihood that **_an appreciable number_** of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Id.* (emphasis added). The evidence on which WREAL relies would fall short of creating even a fact issue at summary judgment and, as such, is far from sufficient for the "extraordinary remedy" of a preliminary injunction. *Id.*

### 1.    Distinctiveness of Mark

WREAL does not contest the R&R's finding that Amazon's "Fire TV," WREAL's "FyreTV," and Amazon's own "Amazon" house mark all are strong and distinctive. R&R at 17. WREAL's objection is based on inconsistent arguments about the significance of the house mark "Amazon" next to "Fire TV." *See* Obj. at 3-4. WREAL's argument, relying on out-of-circuit authority, is that Amazon's use of its house mark aggravates confusion (Obj. 3-5), or in the alternative that Amazon does not always use its house mark on all its products so the R&R erred in concluding that Amazon's use of its house mark is a factor in Amazon's favor (Obj. at 3-4).

The R&R's factual and legal conclusions are correct. First, WREAL's assertion that Amazon does not use its house mark for **_every_** product (Obj. 4) was never presented to the Court and should not be considered now.[2] The lone transcript citation from WREAL on this point relates only to the identification of Amazon's Kindle Fire; WREAL cites no evidence as to whether Amazon uses "Amazon" as part of the branding strategy for its "Fire" tablets.

---

[2] *See Eze v. Am. Equip. Leasing, LLC*, No. 6:11-CV-1213, 2011 WL 4481436, at *3 (M.D. Fla. Sept. 27, 2011) (citing *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) ("[A] district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge.")).

Regardless, as the R&R found (and WREAL does not dispute), Amazon *does* use the "Amazon" mark with a variety of products, including the Amazon Fire Phone, the Amazon Fire TV, and the Amazon Echo (R&R at 18); this was part of Amazon's deliberate branding strategy for its introduction of new consumer electronics products, including the Fire TV (*id*. at 11).

WREAL's legal argument is that Amazon's use of its house mark increases rather than decreases the possibility of confusion. Obj. 3-4. But the R&R correctly noted Eleventh Circuit law (in a forward confusion context) that a junior user's house mark *can* reduce confusion by identifying the junior user as the product's source. R&R at 17 (citing *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652 n.10 (11th Cir. 2007)). WREAL argues for a different rule in reverse confusion cases, but there is no Eleventh Circuit support for that, other courts reject that conclusion,[3] and WREAL's proposed rule is contrary to common sense: as the R&R stated, "Amazon's consistent use of its distinctive house mark with the brand name for Amazon products (such as the Amazon Fire Phone, the Amazon Fire TV, and the Amazon Echo) (Tr. 210:10-17) makes it more likely a reasonable consumer would expect to see 'Amazon' next to an Amazon product. The *absence* of Amazon's distinctive house mark on WREAL's website is a signal that WREAL's FyreTV and Fyre BoXXX are not Amazon products." R&R at 18.

---

[3] The R&R cites considerable authority for the proposition that a junior user's house mark can reduce likelihood of reverse confusion. R&R at 17-18. WREAL criticizes the R&R for considering cases where both parties used house marks because only Amazon uses one here, but WREAL ignores that in *Universal Money Ctrs., Inc. v. Am. Tel & Tel. Co.*, 22 F.3d 1527 (10th Cir. 1994), there was no indication that the plaintiff senior user (UMC) had a distinctive house mark of its own to use; it sometimes used its corporate name – "Universal Money Center" – as a trademark and sometimes used other marks like "Universal Money." *Id.* at Appx. However, the defendant junior user AT&T did use its house mark with the challenged mark, and thus the Court noted "the mark as a whole is not confusingly similar to [plaintiff's] mark, *especially in light of the distinctive AT&T house mark prominently displayed on the front of AT&T's card.*" *Id.* at 1531 (emphasis added). This is the situation here: WREAL has no distinctive house mark to use, and Amazon uses its distinctive "Amazon" mark alongside "Fire TV," just as it uses its "Amazon" mark next to the Amazon Fire Phone, the Amazon Echo, and so on; the absence of that mark with any FyreTV product signals that Amazon is *not* the source of WREAL's FyreTV.

### 2.      Similarity of Marks

The R&R ruled correctly that WREAL's "FyreTV" and Amazon's "Fire TV" marks are not so similar as to weigh in WREAL's favor for a preliminary injunction. WREAL's objections argue – as it did at the hearing – about the marks' spelling and sound when pronounced or discussed by "word of mouth." Obj. at 13. The R&R recognized that even if the marks have a similar spelling and sound, they are also different in that WREAL's mark is one word (not two), in a unique, stylized font (different from Amazon's), in red and white (not orange). R&R at 20.

Further, the R&R recognized that mere comparison of the marks in the abstract would not be adequate under governing law – the test also depends on "the commercial impression created by the mark as a whole." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 261 (5th Cir. 1980). Indeed, the approach WREAL urges here (looking only to spelling and sound) is the approach *Amstar* rejected as clearly erroneous: the Fifth Circuit reversed a finding of likelihood of confusion based simply on the spelling and pronunciation of "Domino" and "Domino's". *Id.*; *see also Sun Banks of Fla., Inc. v. Sun Fed. Savs. & Loan Assoc.*, 651 F.2d 311, 317-18 (5th Cir. 1981) (reversing trial court's clearly erroneous finding of likelihood of confusion; two "Sun" bank names with orange colors were presented differently in commerce); *Tiger Direct, Inc. v. Apple Computer, Inc.*, No. 05-21136-CIV, 2005 WL 1458046, at *16 (S.D. Fla. May 11, 2005) (no similarity in "Tiger" for computer-related goods because marks were presented differently).

Applying the correct legal test, the R&R recognized that the companies present the marks in very different ways: Amazon's Fire TV appears on Amazon's website, in an Amazon-branded marketplace, with other Amazon-branded products, in an environment free from pornography.[4]

---

[4] WREAL asserts that the marks are presented similarly in commerce because Amazon's website includes pornography or sex toys. *See, e.g.*, Obj. at 5-6. The assertion is wrong with respect to pornography and – more importantly – no facts WREAL cites show that the R&R's finding in this connection erred. The R&R found that (a) hardcore pornography is a distinct genre, citing

R&R at 20. WREAL's FyreTV is available only to consumers who affirmatively represent they are over 18 and willing to view adult content. *Id*. (citing Tr. 275:4-14; Def.'s Ex. R.F.X. 204). These consumers confront the FyreTV mark among an array of adult-oriented brands and graphic pornography. *Id*. It is apparent that FyreTV's commercial environment is different from Fire TV's, and the R&R did not err in recognizing that fact. In light of those apparent differences, and under the governing case law in *Amstar*, *Sun Banks*, and *Tiger Direct*, there was no error in its determination that WREAL had not clearly established similarity of the marks.[5]

### 3. Similarity of Products

The R&R committed no error in finding that WREAL's hardcore "porn pay per view" FyreTV service is not substantially similar to Amazon's Fire TV device. R&R at 23. Specifically, the R&R correctly recognized that Amazon "Fire TV" is a ***hardware device*** dedicated to mainstream content (Amazon's streaming mainstream video service is branded "Amazon Prime") whereas "FyreTV" is a ***streaming hardcore pornography service*** (WREAL's hardware pornography device is called the "Fyre BoXXX"). R&R at 21.

WREAL argues that even with these obvious differences, its product should be considered "similar" to Amazon's Fire TV because both "provide consumers with access to streaming online content." R&R at 9. But this does not make the products similar for trademark law purposes. Pizza and sugar both are foods (*Amstar*), but they are not "so similar as to be likely to cause confusion." R&R at 24 (quoting *Ross Bicycles, Inc. v. Cycles USA*, 765 F.2d 1502, 1507

---

the testimony of Amazon's expert Dr. Peter Lehman (R&R at 25) and (b) hardcore pornography is not available to stream on the Amazon Fire TV (*id.* at 25 ("No evidence introduced at the Hearing demonstrated that the Amazon Instant Video titles had any [hardcore pornographic] features"). It further found that sex toys are immaterial and irrelevant to this case because WREAL doesn't sell them and Amazon doesn't brand them "Fire TV". R&R at 26. WREAL does not explain why these clearly correct factual conclusions were in error.

[5] *See Tiger Direct*, 2005 WL 1458046, at *16 (no confusion a to "the source or the use of the Tiger mark in the Apple-branded, streamlined environment, with the TigerDirect mark utilized by the Plaintiff in a crowded retail marketplace, featuring competing brands at discount prices.").

(11th Cir. 1985)). WREAL argues that the products here are confusingly similar because, it claims, mainstream and adult content are "complementary." Obj. 10. However, even if some providers offer both (Obj. 9), WREAL offered no evidence that an appreciable number of consumers believe hardcore pornography is "complementary" to mainstream shows like "House of Cards" or "Dora the Explorer" available on Amazon's Fire TV (R&R at 11). Critically, WREAL *itself* acknowledged that mainstream sites like Netflix operate in a ***different*** market than WREAL. R&R at 7. The companies at issue here show the truth of WREAL's concession; they keep hardcore pornography and mainstream video content far apart. WREAL's website offers hardcore pornography and not mainstream movies (R&R at 7); Amazon's website, content policies, and marketing strategy go to great length to keep pornography ***away*** from Amazon and its products: Amazon (a) did not purchase paid internet ads for the Fire TV for pornographic keywords, (b) prohibits pornographic apps for Fire TV, and (c) prohibits, through its content policies, pornographic videos for Amazon Instant Video (Amazon's streaming video service) and its DVD store on Amazon (R&R at 12). Amazon's Elizabeth Baicy, who "deal[s] with customers a lot" (Tr. 245:23), testified ***without contradiction*** that pornography has "never once" come up in consumer focus groups on the Amazon brand (R&R 25).[6]

---

[6] WREAL also argues the products are similar because (1) Amazon's Fire TV delivers a service that is "identical" to the description in WREAL's certificate of registration for FyreTV, (2) both services are delivered through a set-top box, and (3) WREAL's FyreTV service streams video from a wide variety of content providers, as does Amazon's Fire TV. Obj. at 7. However, none of these points matter. First, WREAL submitted no evidence that it actually uses the FyreTV mark in commerce for mainstream streaming content (rather than hardcore pornography). Second, whether the services are or are not delivered through a set top box does not make erroneous the R&R's (correct) finding that FyreTV is a pornography streaming service whereas Amazon's Fire TV is a hardware device – i.e., they are dissimilar. Third, WREAL's argument that FyreTV, like Amazon.com, streams content from a variety of providers does not make erroneous the R&R's finding that the content itself is wildly different – WREAL's "variety of providers" provide graphic, hardcore pornography; no provider of content available on Amazon's Fire TV delivers anything of the kind. R&R at 7, 24.

Finally, WREAL's objections argue that the R&R makes a legal error in analyzing whether the public can distinguish WREAL's pornography from Amazon's mainstream content, rather than merely "whether the products are the kind that the public attributes to a single source." Obj. at 7-8. But the R&R *did* examine this issue, and it expressly found that "all the evidence was to the contrary." R&R at 24. The R&R explained that Amazon's policies prohibit pornography, and that in light of the record evidence WREAL had not shown that "an appreciable number of consumers will believe Amazon's Fire TV is a device for viewing pornography." *Id*. Just as an appreciable number of consumers are unlikely to believe pizza and sugar come from a single source even though both are foods (*Amstar*, 615 F.2d at 261), or rap and jazz come from a single source even though both are music (*Sunenblick v. Harrell*, 895 F. Supp. 616, 628-29 (S.D.N.Y. 1995) ("UPTOWN RECORDS" for rereleases of "lost or forgotten" jazz music not a similar product to "UPTOWN RECORDS" for rap), there is nothing erroneous in the R&R's analogous conclusion that appreciable numbers of consumers do not believe mainstream video and hardcore pornography come from a single source – indeed, given WREAL's own concession that it operates in a *different* market from mainstream streaming sites such as Netflix (R&R at 7), it is difficult to see how WREAL can argue to the contrary.

### 4.      Similarity of Sales Outlets and Customer Base

The R&R correctly found WREAL had not demonstrated similarity of sales outlets or customer base. R&R at 28-29. WREAL does not contest the R&R's indisputably correct factual finding that there is *no* overlap in sales outlets. R&R at 28. As to customer base, the R&R correctly found that WREAL targets adults interested in paying to view hardcore pornography and Amazon does not market the Fire TV for that purpose. R&R at 28 (citing Tr. 361:24-363:13). These facts are also indisputably true. Given these facts, the R&R correctly found that "the fact that Amazon markets its Fire TV to a national audience does not make its target market

similar to WREAL's specialized target market of hardcore pornography purchasers." R&R at 28. This conclusion is not erroneous – it is grounded in precedent. *See Amstar*, 615 F.2d at 261-62 (no similarity in markets where the holder of the "Domino" sugar mark sought a "national audience" while Domino's pizza targeted only a subset: "young, male college students.").

In response, WREAL offers conflicting testimony, and then quibbles with the version the R&R ultimately credited. WREAL argues that its Chief Operating Officer, Rodrigo Franco, testified its customers overlap with Amazon's because WREAL broadly targets adults over the age of 20 with disposable income and access to the internet, and it was therefore error to conclude that the markets differ. Obj. at 10 (citing Tr. 78:10-15)). However, this hearing testimony conflicted with prior sworn deposition testimony, where Mr. Franco testified WREAL targets a much narrower set of customers (namely, those interested in pornography). R&R at 37 (citing Tr. 361:24-363:13). There is no error in crediting one sworn statement over a conflicting and self-serving sworn statement by the same witness. *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1245-50 (11th Cir. 2007) (a Magistrate Judge's credibility determinations are entitled to great deference, and typically require a new hearing before being set aside).[7]

Finally, WREAL argues that the customer bases are similar because, WREAL claims, some customers may search for sex toys or "explicit material" on Amazon's website, and some further subset of these customers "may be exposed to a Fire TV advertisement alongside advertisements for pornographic magazines." Obj. at 10. WREAL offered no evidence at the hearing that any appreciable number of consumers might actually see Fire TV advertisements

---

[7] WREAL's factual argument is also contrary to its argument later in its objections regarding Dr. Dan Sarel's survey where it asserts that, to capture WREAL's target market, Amazon's expert should have surveyed consumers over age 18 who paid for, or are willing to pay for, adult porn video-on-demand streaming services. Obj. at 14. That is, when it comes to market and customer bases WREAL says that it targets everyone (*id*. at 10), but when it comes to identifying WREAL's target customers to survey, it says the proper universe is much narrower (*id*. at 14).

side-by-side with advertisements for pornographic magazines; and even if true, it would not affect the R&R's correct factual finding that Amazon does not market Fire TV – the product actually at issue in this case – to customers for the purpose of viewing pornography. R&R at 28.

### 5. Similarity of Advertising

There was no error in the R&R's finding that WREAL's and Amazon's advertising are dissimilar. R&R at 29. WREAL first argues that the R&R "erroneously concluded that this factor weighs in favor of Amazon because the parties do not ***currently*** advertise over the same media," asserting that WREAL advertised in print and radio from 2008 to 2012. Obj. at 11. This argument misses the point – the test is whether actual advertising is similar, not whether one party's existing advertising is similar to advertising that has not existed for years. As a fallback, WREAL makes a nonsensical argument: "overlap is not necessary in a reverse confusion case, however" and "that is particularly true here where the junior user has significant market power and can permeate virtually every marketing channel, even channels that Amazon has not specifically targeted," with the added speculation that "someone who comes across one of WREAL's banner advertisements might assume that it is connected to Amazon even if Amazon never advertised on that particular website." *Id*. at 12. But as the R&R correctly found, there was ***no*** evidence presented at the hearing that ***any*** consumers would believe that WREAL's internet banner ad – the one introduced at the hearing featuring a woman with an exposed breast on the "Adult DVD Talk" website – emanated from Amazon. R&R at 29-30. Regardless, WREAL cites no authority that that an overlap in advertising channels ceases to be a factor in reverse confusion cases, and the Court should decline WREAL's invitation to create new law here.

### 6. The Defendant's Intent

In certain trademark cases a defendant's intent to infringe may be considered, but here the R&R determined that intent did not affect the analysis one way or the other. R&R at 30-31.

Regardless of the intent standard that should apply in a reverse confusion case – the R&R noted an absence of authority in the Eleventh Circuit and differing tests outside (R&R at 30 & n.11) – Amazon's use of the "Fire TV" name was appropriate under *any* test: it is undisputed that Amazon chose the "Fire" brand for its "Fire TV" as an extension of its use of "Fire" for multimedia streaming video on its tablets since 2011. R&R at 30. Amazon was far from nefarious in applying its historical branding practices to "a totally different product [from WREAL's], marketed to a different audience, where there is no realistic likelihood that an appreciable number of consumers will confuse it with WREAL's hardcore pornographic products." R&R at 32. WREAL's objection – limited to a single footnote – is "it is undisputed that Amazon knew of WREAL's use of the FyreTV marks, but ignored WREAL's senior rights to the mark." Obj. at 17 n. 9. To be sure, this is far from "undisputed" but it does not matter here: WREAL presented no evidence that Amazon intended to *infringe* WREAL's mark, and the facts that came to light at the hearing – that "Fire" is a logical extension of the Amazon brand (R&R at 10), Amazon's content does not include hardcore pornography (*id*. at 25), and customers do not associate Amazon with pornography (*id*. at 12) – tend to show the opposite.

### 7.    Actual Confusion

The R&R recognized actual confusion is "the best evidence of likelihood of confusion," and that not *one* of WREAL's 51,0000 customers had contacted it about Amazon. R&R at 32, 35 (citing *Amstar*, 615 F.2d at 263). Instead, for actual confusion WREAL relies on two Twitter posts and a single customer call from among tens of thousands to Amazon. None of this evidence actually shows confusion, however – as Dr. Dan Sarel's and Dr. Thomas Maronick's surveys confirm. *Id*. On these facts the R&R did not err in finding WREAL had not established confusion so clearly as to warrant an injunction.

### a)   *Twitter Posts and Tweets Show No Confusion*

At the hearing, WREAL introduced two tweets it found on the internet and argued their authors were confused. The first asked, "Did you guys just merge with Amazon?" (R&R at 34 (citing Pl.'s Ex. 8)) and the R&R correctly concluded, under the case law, that this did not actually show that its author was confused. *See Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 505 (5th Cir. 1979) (dismissing "commentary in a trade magazine that purportedly suggests that [plaintiff] might have acquired [defendant]" as "practically useless"). The second read: "Apple delivers AppleTV. Amazon starts FyreTV. Google reinventing GoogleTV into AndroidTV. Roku still chugging. This is no longer a hobby." *Id*. (citing Pl.'s Ex. 9). The author did misspell Amazon's Fire TV as "FyreTV," but there was no indication the author was aware of (much less believed Amazon to be the source of) WREAL's hardcore streaming pornography service. *Id*. at 34. These conclusions by the R&R were correct under the law: misspellings are not evidence of actual confusion unless the author is in fact confused as to source, affiliation, or sponsorship. *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 504 (2d Cir. 1996).

### b)   *Amazon's Customer Contacts Show No Confusion*

WREAL also relied on a telephone call, in which an Amazon customer asked whether he could access adult content on the Amazon Fire TV by spelling "Fire" with a "Y." R&R at 35 (citing Tr. 313:22–314:7; Def.'s Ex. Fuller 3)). The Court parsed the call's transcript and concluded the customer was not confused: "this customer does not suggest he believes Amazon is the ***source*** of the adult content he seeks: the same customer also asks about accessing Netflix on his Amazon Fire TV; this does not mean the customer thinks Amazon is the ***source*** of Netflix." *Id*. (emphasis in original). This finding was not error – it was consistent with the call transcript – and it was not contrary to law to refuse a preliminary injunction regardless.

WREAL's only arguments in response are that *de minimis* evidence of confusion

sometimes suffices in a trademark case, and that perhaps there are more calls yet to be uncovered in Amazon's files.[8] As to "*de minimis*," WREAL cites to *Tana v. Dantanna's*, 611 F.3d 767 (11th Cir. 2010), stating, "In *Tana*, the Eleventh Circuit disregarded two incidents of actual confusion that were spaced out over five years of continuous use." Obj. at 13. But *Tana* affirmed summary judgment for the defendant and stated that two concrete incidents of confusion were *insufficient* to create a triable fact issue. 611 F.3d at 779-80.[9] The same standard applies with even more force here, where WREAL (which has the burden of proof) has identified no concrete examples of confusion. WREAL also cites to *Caliber Automotive Liquidators, Inc. v. Premier Chrysler Jeep, Dodge, LLC*, 605 F3d 931 (11th Cir. 2010), asserting that "the quantum of evidence needed to show actual confusion is relatively small." But although *Caliber* found sufficient actual confusion evidence to raise a fact issue, the Eleventh Circuit *refused* to create a bright-line rule that a single instance of confusion creates an issue of fact, reiterating Eleventh Circuit law that "merely one instance of actual confusion did not militate in favor of finding likelihood of confusion." 605 F.3d at 937. Thus, even if WREAL were correct that the telephone call showed confusion (it did not), WREAL's own cases say that a single instance of confusion is not enough to survive summary judgment – much less to warrant a preliminary injunction.

### c)   *Dr. Sarel's Survey Shows No Actual Confusion*

Amazon offered testimony from Dr. Sarel, a tenured professor of marketing at the

---

[8] WREAL's argument that Amazon's files *may* contain more evidence fails. Speculation about purported evidence that was not before the Court does not make erroneous the R&R's findings based on the evidence that *was* before it. And Amazon's employees testified that the search tools they used were reliable. (Tr. at 319:6-9). It bears emphasis that Amazon has produced tens of thousands of customer contacts in this litigation and WREAL has never indicated what additional documents it believes Amazon should identify and produce, nor has it brought any discovery motion challenging the sufficiency of what Amazon's (voluminous) production. The notion that "there may be something else out there" is speculation, not evidence.

[9] *Tana* does not stand alone; the R&R cited additional authority holding that one or a few incidents of confusion among tens of thousands of customer contacts would be insufficient to raise a fact issue even on summary judgment. R&R at 35-36 & n.13.

University of Miami, who conducted an *Ever-Ready* survey, the "most commonly used" type of likelihood of confusion survey. R&R at 37 (citing Tr. 322:16-19). (WREAL's expert, Dr. Thomas Maronick, agreed this was the proper format here (*id.*)). It found a "statistically insignificant" and "nonexistent" level of confusion. *Id.* at 38. As the R&R noted, no reported case has found likelihood of confusion with consumer survey results below 8.5% and, "[i]n fact, this 1% *de minimis* confusion level in a survey demonstrates confusion is ***not*** likely." *Id.* at 37-38; *see also 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1249 (10th Cir. 2013) (7% confusion rate insufficient to support likelihood of confusion).

### d)  Dr. Maronick's Survey Shows No Actual Confusion

In an attempt to rebut the unequivocal findings in Dr. Sarel's survey, WREAL offered its own expert who (1) conducted his own survey, and (2) criticized Dr. Sarel. WREAL chose not to offer its own survey into evidence, however, because that survey actually found no confusion, (R&R at 39) – rather, WREAL attempted to assert that its survey was work product. The Court correctly overruled that objection, and correctly discounted Dr. Maronick's testimony.

### (1)  Dr. Maronick's Survey Was Not Work Product

WREAL's expert Dr. Maronick was asked on cross-examination whether he conducted his own survey in this case. WREAL objected that his survey was work product (Tr. at 378:11-14), the Court overruled that objection (*id.*), and he testified that he had (*id.* at 378:15-16). Dr. Maronick then testified that his survey – conducted in April 2014, the same time WREAL argues actual confusion existed – showed "very low" consumer confusion. R&R at 39. A footnote in WREAL's objections again attempts to shield that unfavorable evidence by asserting that the Court erred in overruling its objection. Obj. at 16 n. 8. It did not.

15

Dr. Maronick was WREAL's ***testifying expert***.[10] Rule 26(a)(2)(B)(ii) ***requires*** production of "the facts or data considered" by a testifying expert in forming his or her opinions. The word "considered" is broadly construed – courts read it "to include information that an expert reviews or generates, 'regardless of whether the experts actually rely on those materials as a basis for their opinions.'" *Apple Inc. v. Amazon.com, Inc.*, No. 11-1327 PJH, 2013 WL 1320760, at *1 (N.D. Cal. Apr. 1, 2013) (citing *S.E.C. v. Reyes*, 2007 WL 963422, at *1 (N.D. Cal. Mar. 30, 2007)). This includes surveys conducted but not disclosed by a testifying expert when they relate to the expert's testimony. *See, e.g.*, *Schwab v. Philip Morris USA, Inc.*, No. 04-CV-1945, 2006 WL 721368, at *3-4 (E.D.N.Y. Mar. 20, 2006). Here, Dr. Maronick's survey was about the ***very issue*** on which he testified: WREAL presented him at the hearing to explain how a trademark survey should have been conducted, and in furtherance of his engagement he actually conducted a survey that ***was*** in what he contends was the correct manner. R&R at 39 (citing Tr. 378:9-22). It is obvious that his own survey was "information" that he "review[ed] or generate[d]" and was subject to disclosure under Rule 26(a)(2)(B)(ii).

        (2)      WREAL's Criticism of Dr. Sarel Deserved Little Weight

At the hearing, Dr. Maronick offered various criticisms of Dr. Sarel's survey, which the Magistrate Judge considered and rejected. R&R at 38-39. WREAL now reargues these points.

First, Dr. Maronick asserted, as WREAL now argues in its objections, that Dr. Sarel failed to survey the correct universe of individuals. Obj. at 14. The R&R explained that Dr. Sarel correctly surveyed potential users of WREAL's product – "adults interested in paying to view internet pornography." R&R at 37 (citing Tr. 361:24–363:13). In fact, WREAL admits that, as defined by Dr. Sarel, the proper universe in this case is "consumers over 18 years of age who

---

[10] The only case WREAL cites, *Shields v. Sturm, Ruger & Co.*, 864 F.2d 379 (5th Cir.1989), held that a survey prepared by a ***consulting*** (i.e., ***non-testifying***) expert was protected work product.

paid for, or are willing to pay for, adult porn video-on-demand (VOD) streaming services." (Tr. 346:23-347:4 (Decl. of Dr. Sarel ¶ 32)).[11] WREAL's quibble is with the screening questions Dr. Sarel used to capture that audience, arguing that he screened for people who *had visited* or *intended to visit* adult websites that require users to pay to access, rather that for those that *actually paid* for access or were *willing to pay* for access. Obj. at 14 (citing Tr. 348:10-350:9; 369:15-370:16). In other words, WREAL asserts that not only is there a *difference* between customers who are willing to pay (or have paid) for pornography on websites, versus customers who intend to pay for pornography on websites (or have paid), but the difference is *so significant* as to render Dr. Sarel's survey flawed. *Id.* That is nonsense. There is no meaningful difference in those survey universes. If there were, then WREAL could easily have shown that these wording quibbles make a difference by offering own survey using what it believed to be the "correct" screening questions – which it conspicuously failed to do.

Second, WREAL argues that the R&R "ignored the evidence that the way Dr. Sarel calculated the consumer confusion did not even match the methodology that he claimed he followed" and the "right methodology would yield actual confusion of 8.5%, which as the Magistrate [Judge] pointed out is a threshold that meets a finding of actual confusion." Obj. at 14-15. WREAL's argument rests on an assumption that Dr. Sarel should have coded as "confused" anyone who mentioned any product that also appears on Amazon's website, even if the respondent gave no indication she was thinking about Amazon. Tr. 384:8-386:13. This bizarre approach is supported by no academic literature Dr. Maronick could identify (Tr. 386:2-13). Notably, Dr. Maronick's own survey also showed no confusion, which suggests Dr. Sarel's survey used the proper methodology as both surveys reached consistent results.

---

[11] This is exactly who WREAL's COO admitted it targets. R&R at 37 (citing Tr. 361:24–363:13).

Finally, WREAL criticizes the R&R for (in its view) punishing it for not advancing a survey of its own. But WREAL cannot have it both ways: the reason WREAL did not offer a survey was that it tried to hide the one it had. The Alice-in-Wonderland assertion that the Court then "penalized" WREAL for its tactical decision to hide evidence deserves no weight at all.

At any rate, the R&R's ruling in this connection was not "contrary to law." WREAL appears to believe the R&R imposed an adverse inference on WREAL for not producing its own survey, asserting that the Eleventh Circuit "has moved away from relying on survey evidence." Obj. at 15 (citing *Frehling*, 192 F.3d at 1341 n. 5 ("The district court correctly held that the lack of survey evidence was not dispositive.")). But the R&R did not find that WREAL's lack of survey evidence was "dispositive." Rather, it stated that "courts do and should ignore or give little weight to survey criticisms absent a showing that using the approach the critiquing expert believes to be correct ***would lead to a different result***." R&R at 38-39 (emphasis added). The ABA Section of Intellectual Property Law treatise on survey evidence recommends exactly this approach. *Id.* The evidence at the hearing was (1) that WREAL's expert conducted a survey according to the methodology that he deemed appropriate, and (2) ***it produced the same result as Dr. Sarel's***. The R&R's observation – that these facts tended to undercut the weight of WREAL's criticisms of Amazon's survey – is both commonsense and legally grounded.[12]

### B.    WREAL Advanced No Evidence of Irreparable Harm

There is no serious argument that without an injunction WREAL will suffer irreparable harm. The R&R correctly found that WREAL had (1) slept on its rights, and (2) not articulated any credible injury cognizable under trademark law.

First, WREAL waited five months to move for an injunction, without any justification.

---

[12] *See, e.g.*, *Whirlpool Props., Inc. v. LG Elecs. USA, Inc.*, No. 1:03-cv-414, 2006 WL 62846 (W.D. Mich. Jan. 10, 2006) (a critiquing survey expert offered no survey with different results).

R&R at 40. Amazon has used the "Fire" name since 2011 on tablets with streaming video functionality and there is no evidence WREAL ever objected or indicated it believed consumers would be confused. R&R at 30 (citing Tr. 207:20-208:23). Then, after filing this lawsuit in April 2014, WREAL waited more than five months (nearly six months since Amazon's Fire TV launch) to move for an injunction. *Id*. WREAL did not pursue discovery during this period, and when it finally filed its motion its relied entirely on evidence available at the time of its Complaint. *Id*. (citing ECF No. 28, Exs. 10-12 (evidence dating to April 2014)).

WREAL has never explained its delay. It did not do so at the hearing despite being directed to (ECF No. 76 at 32-34), and it did not do so in post-hearing briefing or in its objections. Rather, WREAL's objections merely cite cases holding that in certain circumstances a delay may be permissible. Obj. at 19. Whatever the facts of those cases, the R&R was not erroneous in ruling that the delay was not justified on the facts of ***this*** case – where the plaintiff waited months, conducted no discovery, and then moved for an injunction based on evidence it knew when it filed its Complaint. R&R at 40-41; *see also Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355-56 (S.D. Fla. 2002).

Second, WREAL articulated no actual injury. At the hearing WREAL could not attribute a single lost sale or any actual damage to Amazon Fire TV. R&R at 42 (citing Tr. 133:20-23). WREAL's Fyre BoXXX was not even on sale to new customers when the Complaint was filed in April 2014, *id*. (citing Tr. 57:2-25, 123:11-20), and sales since have been insubstantial: from May to September WREAL sold just ***four***. *Id*. (citing Tr. 135:4-139:9; Def.'s Ex. R.F.X. 215). It was not error on these facts to rule that WREAL had not clearly established irreparable injury.[13]

---

[13] WREAL's objections argue it is entitled to a presumption of irreparable harm because there is a substantial likelihood of confusion. Obj. at 17. But that bootstrapping argument cannot help here: the R&R, and all of the evidence it relies upon, shows there is no actual confusion in the

Finally, WREAL's objections speculate about injuries it says it may suffer in the future, but the R&R considered and rejected each. WREAL asserts that if consumers come to associate the FyreTV name with Amazon, WREAL would lose control of its brand and "destiny" because people would think WREAL was trying to profit from Amazon's brand. Obj. at 45. As the R&R recognized, however, "falsely being thought a pirate" is not an injury trademark law recognizes. *Id*. at 44. WREAL also argues that "[t]he confusion caused by Amazon taking [WREAL's] name will make it difficult for WREAL to acquire new customers . . ." and that "WREAL will likely be forced to abandon using its own brand name." Obj. at 18. The R&R considered these speculative arguments as well, and correctly categorized them as "compensable" injuries that (if even real) would be suitable for monetary damages at trial – not as "irreparable" injuries that mandate a preliminary injunction. R&R at 44 (citing cases).

### C.    Balance of Hardships and Public Interest

There is no serious argument that the balance of hardships favors WREAL. The record amply demonstrates the massive costs Amazon would incur if required to discontinue the Fire TV brand. *See* R&R at 5, 13. WREAL, on the other hand, has identified ***no*** compensable or irreparable injury it would suffer absent an injunction. R&R at 4-5. The R&R's succinct conclusion says it all: "The public interest is not served by an injunction where there is no likelihood of success on the merits, no threat of irreparable injury, and a balance of hardships favoring the defendant." R&R at 46. There is no error in that reasoning.

---

first place. Further, such a presumption may be unavailable after *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), which reversed Federal Circuit doctrine presuming irreparable harm in patent infringement. The Eleventh Circuit has applied *eBay* in trademark cases but reserved the question whether the presumption is still available. *North Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1227-28 (11th Cir. 2008). Pre-*eBay* cases suggest the presumption requires either a "particularly high likelihood of confusion or potential danger to customers' health and safety." *Seiko*, 188 F. Supp. 2d at 1355. WREAL has shown neither.

Dated: February 18, 2015                Respectfully submitted,

                                        By: /s/Jamie Z. Isani_____
                                            Jamie Zysk Isani (Florida Bar No. 728861)
                                            HUNTON & WILLIAMS LLP
                                            1111 Brickell Avenue, Suite 2500
                                            Miami, Florida 33131
                                            Telephone: (305) 810-2500
                                            Facsimile: (305) 810-1675
                                            jisani@hunton.com

                                            Justin A. Nelson *(pro hac vice)*
                                            Drew D. Hansen *(pro hac vice)*
                                            Patrick C. Bageant *(pro hac vice)*
                                            SUSMAN GODFREY L.L.P.
                                            1201 Third Ave, Suite 3800
                                            Seattle, Washington 98101
                                            Telephone: (206) 516-3880
                                            Facsimile: (206) 516-3883
                                            jnelson@susmangodfrey.com
                                            dhansen@susmangodfrey.com
                                            pbageant@susmangodfrey.com

                                            *Counsel for Defendant Amazon.com*

## CERTIFICATE OF SERVICE

**I CERTIFY** that on February 18, 2015, a true and correct copy of the foregoing was served by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.



/s/Jamie Z. Isani
Jamie Zysk Isani

## SERVICE LIST

Carlos Nunez-Vivas
can@wnflaw.com
Daniel Foodman
df@wnflaw.com
Dennis J. Wouters
djw@wnflaw.com
John G. Marfoe
jgm@wnflaw.com
WNF Law, P.L. – Waserstein Nunez & Foodman
1111 Brickell Avenue, Suite 2200
Miami, Florida 33131
Tel.: (305) 760-8500
Fax: (305) 760-8510

*Attorneys for Plaintiff WREAL, LLC*

22