```
 1                IN THE UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                              MIAMI
                      CASE NO. 14-CV-21385-JAL
 3        _____

 4        WREAL, LLC, A FLORIDA LIMITED

 5        LIABILITY COMPANY,

 6                          Plaintiff

 7             vs.                          May 22, 2015

 8        AMAZON.COM, INC., A DELAWARE

 9        CORPORATION,

10                          Defendant.

11        _____

12                          DISCOVERY HEARING

13              BEFORE THE HONORABLE JONATHAN GOODMAN,

14         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
          _____
15
                             A P P E A R A N C E S
16
          FOR THE PLAINTIFF:    JOHN G. MARFOE, ESQ.
17                              Waserstein, Núñez, and Foodman, PL
                                1111 Brickell Avenue, Suite 2200
18                              Miami, Florida 33131
                                (305) 760-8500
19                              Jgm@wnflaw.com

20        FOR THE DEFENDANT:    PATRICK C. BAGEANT, ESQ
                                Susman Godfrey, LLP
21                              1201 Third Avenue, Suite 3800
                                Seattle, WA  98101
22                              (206) 516-3880
                                Pbageant@susmangodfrey.com
23                                        and
                                JAMIE ISANI, ESQ,  ESQ
24                              Hunton & Williams, LLP
                                1111 Brickell Avenue, Suite 2500
25                              Miami, FL  33131
                                (305) 810-2500
```

1          Jisani@hunton.com

2   TRANSCRIBEDD BY:   **GIZELLA BAAN-PROULX**, RPR, FCRR
                       United States Court Reporter
3                      400 North Miami Avenue, Suite 8S32
                       Miami  FL  33128
4                      (305) 523-5294
                       gizella_baan-proulx@flsd.uscourts.gov
5

6          (FROM THE DIGITALLY-AIDED RECORDING SYSTEM)

7

8             P R O C E E D I N G S

9        *(The following proceedings were held in open court.)*

10:18  10        **THE COURTROOM DEPUTY:**  All rise.  The Honorable

11   Jonathan Goodman presiding.

12        **THE COURT:**  Hi, folks.  Good afternoon.

13        **MR. MARFOE:**  Good afternoon.

14        **THE COURT:**  Please be seated.  We'll start off with

10:18  15   appearances, please, starting first with the plaintiff.

16        **MR. MARFOE:**  Good afternoon, Your Honor.  John

17   Marfoe with WNF Law representing the plaintiff Wreal LLC, and

18   my colleague Paul Bagley here with me.

19        **THE COURT:**  All right.  Bear with me just one

10:18  20   minute.  And for the defense?

21        **MR. BAGEANT:**  Your Honor, this is Patrick Bageant

22   from Susman Godfrey for the defendant Amazon.com, and with me

23   is Jamie Isani with Hunton Williams.

24        **THE COURT:**  Well, good afternoon.  Before we begin

10:19  25   the hearing, I'll ask if you folks have resolved any of the

discovery disputes that were listed in the joint notice. You

know, hope springs eternal, and maybe something has been

resolved. Any progress?

    **MR. MARFOE:** I'm afraid not, Your Honor.

    **MR. BAGEANT:** Unfortunately.

    **THE COURT:** I thought I'd ask. Every once in a

while somebody says, Yes, we were just chatting out in the

hall for the past 15 minutes and we've worked things out.

    All right. So I have here the agenda, so to speak,

and we have two broad categories that Wreal wants to address

and then one that Amazon wants to address. So let's start

first with the Wreal, number one. I'm looking at the joint

notice of discovery hearing, topic Number 1, which has to do

with a request to continue the 30(b)(6) deposition concerning

seven topics in the notice of taking continued videotaped

deposition.

    **MR. MARFOE:** Thank you, Your Honor. This is John

Marfoe representing the plaintiff Wreal. This 30(b)(6)

notice, the original -- this deposition was originally

noticed during the preliminary injunction phase of discovery,

and it was noticed for November 17 and 18 because we had a

lot of topics and there were going to be more than one

witness. These particular seven topics Amazon designated a

single witness, Ms. Elizabeth Baicy, to testify as to those

topics.

1          THE COURT:  Was Ms. Baicy the one that was at the

2     hearing?

3          MR. MARFOE:  She indeed was.  She was amazon's

4     corporate representative at the hearing as well.

10:20   5          THE COURT:  And also testified at the hearing?

6          MR. MARFOE:  Yes, she did testify.

7          THE COURT:  All right.  She is the marketing

8     person.

9          MR. MARFOE:  She is.  She is.  So as I said, it was

10:21  10     initially noticed during the expedited discovery period out

11     of the preliminary injunction motion.  The deposition took

12     place actually on November 18.  There were seven topics.  The

13     deposition lasted about four hours.  We had about a little

14     over a half hour per topics.  The Court may wonder why we

10:21  15     didn't use the full seven hours at that time.  And the very

16     simple reason is that document production was expedited in

17     the case as well, and we received documents actually in this

18     order.  From Amazon we received a production on November --

19     I'm sorry -- October 20, 2014, of about 98,000 pages.  We

10:21  20     didn't really get through a lot of those.

21          On November 11, 2014, which is just a week before

22     the deposition, we received a production of another 60,000

23     pages of documents.  We were not able to fully review those

24     documents ahead of the deposition.  So at this time we seek

10:25  25     leave to 1) continue the deposition and also to extend it

|      |    |
|------|----|
|      | 1  | beyond the presumptive seven-hour limits.  Upon reviewing the |
|      | 2  | documents that were produced, we feel that there are |
|      | 3  | additional things that we'd like to ask Ms. Baicy about or |
|      | 4  | whoever Amazon may designate since it is a 30(b)(6).  We do |
| 10:26 | 5  | not -- it will not be cumulative.  We will be asking about |
|      | 6  | different -- we'll be bringing up different documents and |
|      | 7  | different questions related to the same topics.  These topics |
|      | 8  | are very important topics to this case.  These topics revolve |
|      | 9  | around -- excuse me.  If you can't tell, I'm a little under |
| 10:26 | 10 | the weather. |
|      | 11 | These topics involved Amazon's current and past |
|      | 12 | framing strategy with respect to its hardware -- |
|      | 13 | THE COURT:  Mr. Marfoe, give me a favor? |
|      | 14 | MR. MARFOE:  Yes. |
| 10:26 | 15 | THE COURT:  This may sound similar to a request |
|      | 16 | that I made at the last hearing.  Do you have any idea what |
|      | 17 | I'm about to say? |
|      | 18 | MR. MARFOE:  If there are any exhibits or whatnot. |
|      | 19 | MR. BAGLEY:  Slow down. |
| 10:26 | 20 | MR. MARFOE:  Oh, to slow down.  Yes, I can do both |
|      | 21 | of those. |
|      | 22 | THE COURT:  Exactly, Mr. Bagley. |
|      | 23 | Right now you're going at about 80, and we're maybe |
|      | 24 | in a 60-mile-per-hour zone. |
| 10:27 | 25 | MR. MARFOE:  Thank you.  No problem.  The topics |

1    that I said, they cover marketing topics.  They center really

2    around consumer awareness, Amazon's understanding of the

3    consumer awareness of its Fire TV products, its efforts to

4    create consumer awareness, its goals with respect to consumer

10:27  5    awareness for its Fire TV products, its knowledge of Wreal's

6    Fyre TV, when it actually knew about Wreal's Fyre TV and, you

7    know, what specifically we were getting into the naming when

8    Amazon chose to name its product Fire TV, whether Wreal knew

9    about -- I'm sorry -- Amazon knew about Wreal's Fyre TV at

10:27 10    the time.  And again, these topics all -- they all generally

11    involve consumer awareness or consumer perception.

12            Now, in the trademark infringement case, the

13    ultimate issue --

14            **THE COURT:**  You're looking up in the rear view

10:28 15    mirror, you're going to see the red lights flashing.

16            **MR. MARFOE:**  I apologize.  In the -- in a trademark

17    infringement case like this one, particularly in this case,

18    the key issue is consumer confusion.  I don't think there's

19    any dispute that priority on Wreal's right to the mark, the

10:28 20    crux of this case will be on whether there's consumer

21    confusion.  So there's really two -- we'd like to continue

22    the deposition, use up the remaining three hours that we

23    would have had to go through some of the documents.  We also

24    expect to receive continued -- Amazon to produce documents

10:28 25    pursuant to their continuing obligation to Judge Lenard's

1    order of some newer documents.  And we would like to ask

2    Ms. Baicy about that as well.

3         THE COURT:  So how much more time are you seeking?

4    You have three hours left from the original 30(b)(6)

10:29    5    deposition which ended after four hours.  So how much more

6    time do you want other than the three hours?

7         MR. MARFOE:  Well, what we're asking for is another

8    four hours to give us a seven-hour day.  Of course, we'll

9    endeavor to obviously not waste too much of Ms. Baicy's, or

10:29   10    whoever Amazon designates, time.  We won't ask any

11    unnecessary questions.  If we can complete it in less than

12    that, we will.  But we would be asking for an additional four

13    hours.

14         THE COURT:  So these seven topics that you've

10:29   15    listed here, were any of those discussed at the earlier

16    30(b)(6) deposition or you never even got to those topics?

17         MR. MARFOE:  We did address actually with the

18    exception of topic 9, which we actually never received a

19    30(b)(6) witness on.  We did touch on each of those topics.

10:29   20    The issue is that we did so with incomplete information,

21    which tends to happen during a expedite discovery ahead of a

22    preliminary injunction.  So we'd like to continue the

23    deposition and take a little bit more time in order to fully

24    explore these topics with Amazon ahead of trial.

10:30   25         THE COURT:  And if I were to provide that relief,

1   would you be proceeding under the same discovery notice or

2   deposition notice, the same 30(b)(6) notice with the same

3   seven topics, or are you seeking to add to the list of seven

4   topics?

10:30   5        MR. MARFOE:  No, we would not be adding to the list

6   of topics.  It would be the same topics.  We have a separate

7   30(b)(6) notice that we issued to Amazon with different

8   topics, but --

9        THE COURT:  Right.

10:30   10       MR. MARFOE:  --  we're looking --

11       THE COURT:  That's in the re-notice.

12       MR. MARFOE:  Yes.

13       THE COURT:  All right.  That will be the next issue

14   that comes up.  But for this one, you'll be using, if I

10:30   15  permit it, the same list of seven topics.  And when I hear

16   you say, as I think I heard you say earlier this afternoon,

17   you want to question Ms. Baicy or whoever Amazon designates

18   about some documents.  Would those documents be related to

19   one or more of these seven categories?

10:31   20       MR. MARFOE:  All of them would be.

21       THE COURT:  All of them would be.

22       MR. MARFOE:  All of them would be, yeah.  Like I

23   said, we would stick with those seven topics.  It would be a

24   combination of two sets of documents; documents that we were

10:31   25  able to review after the preliminary injunction hearing and

then documents that we expect to receive from Amazon pursuant
to their duty to supplement their discovery responses per
Judge Lenard's order.

    **THE COURT:**  So when you took the 30(b)(6)
deposition last year, how many witnesses did Amazon
designate?  Was it just Ms. Baicy.

    **MR. MARFOE:**  For those topics, it was just
Ms. Baicy.

    **THE COURT:**  All right.  So at the end of the four
hours, how did things end?  Did you say, for example, We
don't have anymore questions, thank you very much?  Did you
say, We're not adjourning the deposition.  We've been on the
receiving end of a huge document dump and we haven't had a
chance to adequately review the materials, and we plan on
continuing this 30(b)(6) at a later date?  How did things end
at that deposition?

    **MR. MARFOE:**  Your Honor, it was the former.  My
colleague, Mr. Foodman took the deposition and he ended it by
saying that he does not have any other questions.  There's a
bit of background to that.  And during one of our earlier
telephonic meet and confers, you know, early on in this case,
we discussed a potential stipulation.  It did not actually
become a -- nothing was ever put into writing.  I want to be
very clear about that.  But we discussed that any depositions
taken during the preliminary injunction phase, the parties

|  |  |
|---|---|
|  | 1 |
|  | 2 |

1   would retain the right to continue them during the merits

2   phase.  That was my personal understanding at the time.

3           The parties disagree on that.  And absolutely

4   nothing was put in writing.  I'm not saying that there is a

10:32  5   stipulation.  But that would be the reason why we didn't

6   specifically reserve anything on the record.  So to the

7   extent that we're seeking leave for a second deposition, I

8   think the same reasoning would apply.

9           THE COURT:  So before I hear from Mr. Bageant, let

10:33 10  me just ask you to also go to the next one because it sounds

11  to me like it would be very similar, right?  You want to seek

12  the deposition of a 30(b)(6) witness concerning topics 1 and

13  2 in the re-Notice of Deposition.  So as long as you're

14  chatting about 30(b)(6) notices, let's talk about that.

10:33 15  These topics here --

16          MR. MARFOE:  Uh-huh.  (Nodding.)

17          THE COURT:  -- were they covered in a prior

18  deposition or not?

19          MR. MARFOE:  No.  This is only a re-notice because

10:33 20  of -- the parties have been going back and forth on

21  scheduling.  Actually, this is going to have to be re-noticed

22  again because it was most recently re-noticed for May 19.

23  But, you know -- no, these topics, these specific topics

24  and -- well, none of them have actually -- none of these

10:34 25  depositions have gone forward yet.  Amazon has told us

1    they're going to produce a witness for 3 and 4.  They have

2    objected on 1 and 2 on the basis that the topics themselves

3    call for attorney/client privilege or work product material.

4         Now, a little bit of background on these.  Amazon

10:34    5    submitted to the USPTO oppositions to the potential

6    registration of two different trademarks; one is Firegram and

7    one is FireChat.  And in its opposition, it alleges

8    essentially that consumers familiar with Amazon's Fire mark

9    or purported Fire marks including Fire TV and Fire TV stick

10:34   10   are likely to incorrectly assume that Amazon's the origin of

11   the products marketed under the Firegram mark or the FireChat

12   mark or that they're somehow licensed by Amazon.

13        And what we're seeking here -- and we clarified

14   this with opposing counsel -- is the -- when I say reasons,

10:35   15   the factual basis.  We don't want any legal opinion.  We

16   don't want any -- you know, any conversations with lawyers

17   about the legal merit or anything like that.  We're not going

18   to be seeking anything privileged.  Yet Amazon has asserted

19   what is essentially a blanket claim of privilege in response

10:35   20   to this 30(b)(6) notice.  There's quite a bit of case law in

21   this circuit, Your Honor, that says that that is improper.

22   I'll start with SEC versus Cramer.

23        **THE COURT:**  Counsel, I appreciate the fact that

24   you've done research and are about to cite me, I guess, a

10:35   25   string of cases.  I'm familiar with the law on that.  So

1   unless I find a compelling need to have all those cases

2   repeated, I think I'm good to go on that point.

3          MR. MARFOE:  Okay.

4          THE COURT:  All right.  So let me hear,

10:50  5   Mr. Bageant, from you first.  Let's talk about the request to

6   take a continued 30(b)(6) deposition on these seven topics.

7          MR. BAGEANT:  Yes, Your Honor.  Thank you, Your

8   Honor.  May I approach the bench with one exhibit, one

9   document?

10:50  10         THE COURT:  Sure.  Have you given it to opposing

11   counsel?

12         MR. BAGEANT:  Yes.

13         MR. MARFOE:  He has, Your Honor.

14         THE COURT:  Perfect.  Wonderful.  And you even have

10:51  15   an extra copy for my law clerk.  Excellent.

16         MR. BAGEANT:  Your Honor, this is the transcript of

17   the culmination of the Elizabeth Baicy deposition.  So I'd

18   like to go back and fill in some of the -- just sort of the

19   procedural timeline here.  Wreal served a Notice of 30(b)(6)

10:51  20   Deposition on a host of topics in advance of the preliminary

21   injunction hearing.  We designated various witnesses.  We

22   provided those witnesses, and we let Wreal depose them for as

23   long as Wreal wanted.  Wreal took Elizabeth Baicy's

24   deposition for four hours, as Mr. Marfoe acknowledges.  It

10:51  25   had all the documents in advance of the deposition except

perhaps documents we may have produced pursuant to some duty
to supplement.

So his complaint is that he didn't have a fair
opportunity to review documents, and that he sort of -- he
had this document dump placed upon him that didn't allow him
to take a full and fair deposition.  It doesn't appear in the
transcript of the deposition.  What you have before you shows
that they ended it.  The deposition concluded.  Thank you
very much.  Daniel Foodman, Mr. Marfoe's colleague, then
explains to the witness how to sign the final transcript, and
everybody goes home for the day.  So the reason that they
didn't use their full seven hours is because they finished.
And the reason that they finished was they were done.  That
was in November.

Now it's the middle of May and discovery is
closing, and they want to go back and revisit some of these
topics.  In between, they examined Ms. Elizabeth Baicy here
before Your Honor at the preliminary injunction hearing on
these same issues.  So they've cross-examined her twice.  Now
they want to cross-examine her a third time.  There ought to
be some sort of a showing for this, and a showing has to be
more than, We didn't have the chance to review the documents
that we already had.  Amazon's view of this is that this is
burdensome.  This is an attempt to take three bites at the
apple.  This is a deposition that they concluded, that they

```
 1   ended.  They acknowledge on the record that they concluded.

 2   And now they're kind of trying to backtrack and sort of get a

 3   mulligan on this one.  That's the height of our position.

 4            As to an agreement among counsel, there was --

 5   there was certainly -- there was not an agreement that

 6   depositions during the preliminary injunction phase could be

 7   taken over again.

 8            THE COURT:  I think Mr. Marfoe was clear that

 9   although there was some discussions, there was no agreement.

10   And I understand that point.

11            MR. BAGEANT:  Yeah.  Thank you.  So that's kind

12   of --

13            THE COURT:  So you have nothing -- listen.  There's

14   nothing wrong with making a succinct argument.  I understand.

15   Let's move on to the second 30(b)(6) deposition notice.

16            MR. BAGEANT:  The second 30(b)(6) deposition notice

17   relates to this Firegram and FireChat issue.

18            THE COURT:  Right.

19            MR. BAGEANT:  So Firegram is a trademark.  It's a

20   proposed trademark filed by a company, just like FireChat,

21   each one.  Trademarks on these names.  Amazon intervened in

22   those proceedings.

23            THE COURT:  By the way, these two proposed marks,

24   Firegram and FireChat, are they being submitted or were they

25   submitted by the same entity or different entities?
```

1          **MR. BAGEANT:**  They're different entities, Your

2   Honor.  They are all one word and they're spelled with an I.

3   Firegram defaulted, so that proceeding is over.  Amazon won.

4          **THE COURT:**  They just threw up their hands and gave

10:54   5   up ran away.

6          **MR. BAGEANT:**  Sometimes that happens.  That's what

7   happened with Firegram.  FireChat is in settlement

8   negotiations.  They're attempting to close that one out or

9   resolve it --

10:54   10          **THE COURT:**  In settlement negotiations with Amazon?

11          **MR. BAGEANT:**  That's right.  The owners -- or the

12   applicants in the FireChat case and Amazon are negotiating a

13   settlement.  Amazon's objection in both of those cases is --

14   the objection to the trademark application in both of those

10:55   15   cases is stated in the public record.  These filings are --

16   you could download them from the USPTO's website.  And it

17   lays out the reasons that Amazon says these marks should not

18   be allowed.

19          Among those reasons, according to Amazon, are that

10:55   20   these marks are potentially confusingly similar to Amazon's

21   own Fire line of trademarks.  What Wreal would like to do now

22   is take a deposition on why Amazon thinks these marks and

23   these Firegram/FireChat cases are confusingly similar.  Those

24   are legal contentions, right?  So they want to know why

10:55   25   Amazon thinks consumers are likely to be confused or why

1    Amazon thinks that marks are likely to appear in commerce in

2    the same kind of way.  The only people that Amazon who engage

3    in the trademark litigation in Firegram and FireChat are

4    Amazon's lawyers.  There is a trademark team that works on

10:56    5    this issue.  There has been no discussion outside of the

6    trademark team of Amazon's arguments or potential arguments

7    in the Firegram and FireChat case except for one conversation

8    with an in-house counsel in the litigation department and

9    except for some questioning that the trademark lawyers had to

10:56   10    ask one of the business people about the potential terms of

11    the settlement.

12           So there hasn't been any discussion at Amazon.

13    There is no knowledge at Amazon outside of its counsel about

14    what its legal arguments are or its basis for them.  If we

10:56   15    were going to put up a witness, it would be Amazon's in-house

16    counsel.  And if the witness were to answer questions, they

17    would be questions about the types of arguments that Amazon

18    may make in this other litigation.  That's not your typical

19    sort of fact versus legal argument type of deposition.

10:56   20    That's a deposition of counsel.  And that's disfavored.

21           THE COURT:  What about the general principle of

22    law, that it's inappropriate to simply raise a blanket

23    objection to all questions that might come up in a deposition

24    as being questions which could implicate either the

10:57   25    attorney/client privilege or the work product privilege?

1   Isn't the law to the contrary, that you need to assert that

2   on a question-by-question basis?

3          MR. BAGEANT:  Well, that's true, Your Honor.  But I

4   think it's going to be a lot more productive for both me and

10:57   5   Mr. Marfoe to get some guidance from the Court here.  Because

6   if we sit down in front of Amazon -- in front of Wreal's

7   counsel or the witness, and they ask us, What is the basis

8   for your contention in the trademark and patent proceedings

9   at ABC; the witness is going to say, We have stated the

10:57   10   factual basis for our arguments in our pleadings.  Anything

11   beyond that is impressions of counsel.

12          THE COURT:  By pleadings, you mean submitted to the

13   USPTO?

14          MR. BAGEANT:  Yes, Your Honor.  The public

10:58   15   documents.  Anything beyond that, you're intruding upon

16   counsel's thoughts and impressions.  You're asking for

17   communications among counsel.  You're asking for litigation

18   strategy in another case.  You're asking for something that

19   you're not entitled to.

10:58   20          Put it another way.  The opposer in the

21   Firegram/FireChat case wouldn't be entitled to ask these

22   questions.  Why is it that Wreal can ask these questions

23   here?  If they want to know the factual basis for those

24   filing, they're contained in the filings.  They're structured

10:58   25   a lot like a federal court pleadings.  You know, We assert

1   that A) because of the -- we assert that C because of D.  If

2   they want to know why Amazon's counsel chose to string them

3   together in that way, or why Amazon selected those facts to

4   rely on -- upon instead of other facts, I don't think that's

10:58   5   something they're entitled to.  And do I think that there's a

6   well-taken privilege objection to that type of questioning.

7   Beyond that type of questioning, I don't know what they could

8   ask.

9        THE COURT:  Well, if you say, We're going to be

10:58   10   producing an attorney and therefore the only answers that the

11   attorney can give will be those which you can't give because

12   they're privileged or they'll impinge on work product or the

13   attorney's thought process, isn't that in part caused by

14   Amazon's decision to designate a lawyer to appear at a

10:59   15   30(b)(6) deposition?  That's your choice who you're going to

16   designate.  You don't have to designate a lawyer.  Maybe you

17   designate a nonlawyer.  What about that?

18        MR. BAGEANT:  Well, right now the only people with

19   the knowledge are the lawyers.  So if you designate a

10:59   20   nonlawyer, they will have to sit down with a lawyer and the

21   lawyer will have to say, Here is our litigation strategy in

22   this other case.  And they impart that knowledge to the

23   witness, and then the witness testifies to that.  That ought

24   not to be a fair way to pierce the privilege.

10:59   25        THE COURT:  Well, I don't know if they would

necessarily say what's the litigation strategy.  They may

say, In this submission with the USPTO, you have taken the

position that such and such.  What are the facts that support

that contention?  How is that really any different, let's

11:00   say, than a standard interrogatory saying what facts support

the allegation in paragraph 15 of the complaint, or a

contention interrogatory?  Do you contend that such and such

happened and, if so, what facts support that contention?  How

is that different?

11:00        **MR. BAGEANT:**  Well, the facts are spelled out in

the pleadings.  So I think the question really that they

would have to ask is, you know, what facts in addition to

what you've put in the record in the patent and trademark

cases do you contend supports your claims there?  Those

11:00   aren't facts that Amazon is required to put forward in that

litigation.  They're facts and sort of thoughts and analysis

that are in the possession of Amazon's counsel as part of

Amazon's legal strategy.  It's not something that Amazon

outside of its counsels' office has any corporate knowledge

11:00   of.  This is, in our view, very, very intrusive and very

invasive of the attorney/client privilege and of the sort

of -- of Amazon's counsels' office.

        I mean, ultimately what they want to do is then

take these contentions from Amazon's counsel in this other

11:01   litigation, privately held contentions, contentions that are

not a matter of public record, contentions that have not been

made, and then use them here to sort of to try to impeach

Amazon or to say you're taking different positions, et

cetera.  Impeachment --

11:01          THE COURT:  So let's say that their strategy.  It

seems pretty obvious to me that's what their strategy is.  So

what?  Why does that mean they're not entitled to take a

30(b)(6) deposition?  Sounds like a -- sounds like a

perfectly permissible strategy.  If you're taking a certain

11:01   position that there's no confusion in this case but you're

taking a position in a similar case involving a similar name

with the word fire, maybe that's going to generate some in

consistency.  And so, wouldn't they have the right to explore

that?

11:01          MR. BAGEANT:  Well, if we had made an inconsistent

statement, yes.  But all of the statements that Amazon has

made on that are in the public record.  They've already been

presented in the filings to the PTO.  So to the extent they

want to ask about something that's not in the PTO filings.

11:02   They're asking about things, thoughts, ideas, impressions,

conclusions that are in Amazon's counsels' heads that have

never seen the light of day.  To then take that and try to

impeach Amazon with that in this case seems -- it's just --

it's invasive and intrusive of the attorney/client privilege.

11:02          They're not gathering facts and information from

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       |  1 | the world.  They're gathering ideas and thoughts and         |
|       |  2 | impressions from Amazon's counsel and then using that to     |
|       |  3 | impeach Amazon.  I think it's a different situation.  One     |
|       |  4 | case I want to point you to Your Honor, if I can, is a case   |
| 11:02 |  5 | called Stern Kessler Goldstein and Fox v. Eastman Kodak.     |
|       |  6 | It's a District Court of Columbia case from 2011.  And it's  |
|       |  7 | 276 FRD 376.                                                 |
|       |  8 | THE COURT:  276 FRD.                                          |
|       |  9 | MR. BAGEANT:  376.                                            |
| 11:03 | 10 | THE COURT:  376.  Stern Kessler versus.                      |
|       | 11 | MR. BAGEANT:  Eastman Kodak, Your Honor.                     |
|       | 12 | THE COURT:  Eastman Kodak.  Okay.  And that's from           |
|       | 13 | where?                                                        |
|       | 14 | MR. BAGEANT:  The District Court for the District            |
| 11:03 | 15 | of Columbia.                                                 |
|       | 16 | THE COURT:  D.C. District.  What year?                        |
|       | 17 | MR. BAGEANT:  2011.                                           |
|       | 18 | THE COURT:  All right.  And what does that case              |
|       | 19 | say?                                                         |
| 11:03 | 20 | MR. BAGEANT:  The case says that in a patent                 |
|       | 21 | context, you can't depose a prosecuting attorney for a patent |
|       | 22 | application for these same reasons.  This is a trademark     |
|       | 23 | context.  They want to depose Amazon's trademark lawyers.    |
|       | 24 | It's the same type of situation.  You can't go into the      |
| 11:03 | 25 | thoughts and impressions and sort of records and files and   |

```
 1    ideas of counsel in prosecuting a patent, to try to use that

 2    in litigation.  It's the same issue here just in trademark

 3    context.

 4         The other case, if I can, Your Honor, cite to you

 5    is Douglas Asphalt Company, 436 Bankruptcy 246.  This one's

 6    from the 11th Circuit.  And it sort of makes the observation

 7    that I've been trying to make here, which is --

 8         THE COURT:  Just give me the name of that case one

 9    more time.

10         MR. BAGEANT:  Yes, Your Honor.  In re, Douglas

11    Asphalt Company.

12         THE COURT:  Douglas Asphalt.  All right.  Please

13    continue.

14         MR. BAGEANT:  It explains -- citing authority from

15    the 8th Circuit that depositions of opposing counsel disrupt

16    the adversarial system, lower the standards of the

17    profession, add to time and cost of litigation, and detracts

18    from the quality of client representation.  And the reasons

19    for that is that, you know, they're going into our camp to

20    try to depose our lawyers about our legal contentions in

21    another lawsuit, legal contentions that have never been made.

22    It's harassing.  It's intrusive.  There are other ways to go

23    about this.  If they want to know the facts we're relying,

24    they can look at the public record.

25         Again, one of these cases is gone.  The other one
```

1   is about to settle.  So it's not like these facts are going

2   to come to light.  It's not like these mental impressions are

3   going anywhere.  It's truly the thoughts of Amazon's counsel

4   in resolving two disputes that have now in one case been

11:05   5   resolved and the other is about to be resolved.

6           THE COURT:  Isn't there a distinction that in those

7   other cases, presumably, the party seeking a deposition named

8   the particular lawyer as a deponent?  Here, this is merely a

9   30(b)(6) notice.  It's entirely up to you who to select.  If

11:05   10   you decide to pick a lawyer, that's on you.  You could pick a

11   nonlawyer.

12           MR. BAGEANT:  Yes, that's certainly true, Your

13   Honor.  But the only people with this knowledge are lawyers.

14   So if we want to pick a nonlawyer, we would have to give them

11:05   15   all the knowledge of a lawyer.  There's no way to not depose

16   a lawyer.  It's just that's we would have to train somebody

17   in the lawyer information or give them the person with the

18   most knowledge, which is the lawyer.  So it's functionally --

19           THE COURT:  By the way, there's no rule that says

11:06   20   you can take a deposition of the person with most knowledge.

21   That doesn't exist.

22           MR. BAGEANT:  Yes.  It's -- I agree, Your Honor.

23   We can --

24           THE COURT:  So doesn't that happen all the time in

11:06   25   a 30(b)(6) deposition context?  A party wants to take a

|  | 1 | 30(b)(6) deposition, they list five topics.  It's up to the |
|---|---|---|
|  | 2 | lawyers for the corporation with the input of the corporation |
|  | 3 | to find the appropriate designees.  And then many times, the |
|  | 4 | lawyers either on their own -- frequently on their own will, |
| 11:06 | 5 | in effect, open up the brain of the 30(b)(6) designee and |
|  | 6 | just throw in all the information that their corporation has, |
|  | 7 | whether it be deposition transcripts, internal documents, |
|  | 8 | memoranda, research or whatever.  And basically, you as the |
|  | 9 | lawyer create your 30(b)(6) witness through intense |
| 11:07 | 10 | preparation.  Isn't that how it works in a typical 30(b)(6) |
|  | 11 | deposition? |
|  | 12 | MR. BAGEANT:  Yes, Your Honor. |
|  | 13 | THE COURT:  All right.  And sometimes the |
|  | 14 | information that you're filling the head of the 30(b)(6) |
| 11:07 | 15 | witness is information that you the lawyer have acquired. |
|  | 16 | Doesn't that happen? |
|  | 17 | MR. BAGEANT:  Absolutely.  Absolutely. |
|  | 18 | THE COURT:  So how would that be any difference |
|  | 19 | here? |
| 11:07 | 20 | MR. BAGEANT:  Because what these topics are after |
|  | 21 | aren't -- are not facts.  These topics are after legal |
|  | 22 | arguments; the reasons why you contend that consumers would |
|  | 23 | not be -- or that consumers of -- I don't have the wording in |
|  | 24 | front of me.  But the reasons why you contend consumers would |
| 11:14 | 25 | be confused between these two sets of marks, Your Honor, is |

|  | 1 | very familiar with the trademark analysis at this point. |

1  very familiar with the trademark analysis at this point.

2  It's a seven-factor test, each of which is a legal

3  conclusion.  The likelihood that consumers are to be

4  confused, whether things are operating in the same markets,

11:14  5  these are all legal arguments based on factual assertions.

6  We've put the factual assertions in the pleadings.  They want

7  to ask us what those legal arguments are.  They're asking for

8  the thoughts and impressions of counsel, not some fact that

9  counsel has learned.

11:14  10       THE COURT:  Right, right.  So your position is,

11  listen, this is not a 30(b)(6) deposition about facts in this

12  case; it's a 30(b)(6) deposition on a completely different

13  case, and a challenge to an application submitted to the

14  USPTO, and it's simply a legal challenge made by Amazon in

11:15  15  another case.  So it's not even really a fact-based inquiry.

16  It's more a strategic-based inquiry in another case.

17       MR. BAGEANT:  That's right.  And then -- that goes

18  to the second point that sort of follows under this, is that

19  to the extent that this is actually relevant, it's weakly

11:15  20  relevant.  It doesn't go to the merits of what consumers

21  think about Fyre TV with a Y.  It doesn't go to the merits of

22  what consumers think about Fire TV with an I.

23       THE COURT:  Right, right.  But I don't think

24  necessarily that Mr. Marfoe is arguing that this discovery

11:15  25  would, in fact, for sure be admissible at trial.  I think

1   what he's saying is I'm entitled to discover it now.  The

2   standards are broader for discovery.  So have a seat for just

3   a minute.

4           Mr. Marfoe, what are your responses to these

11:16   5   comments, that it really is an effort to seek legal strategy,

6   to seek impressions from the lawyers, plus it's not even in

7   this case?  It's a completely different case where there's a

8   legal challenge.  So whatever the relevancy is, it is highly

9   attenuated and weak.  What are your responses to those

11:16   10  points?

11          **MR. MARFOE:**  Sure, Your Honor.  And I have just a

12  few brief responses.  First of all, with respect to the

13  question of whether there's a likelihood of confusion and the

14  predicate factors that go into that, in this circuit those

11:16   15  are questions of fact.  Those are not legal determinations.

16          **THE COURT:**  Well, that's likelihood of confusion in

17  this case between the two names at issue.  It's not

18  likelihood of confusion of some other name in some other

19  case.

11:17   20          **MR. MARFOE:**  Well, that is true, Your Honor, but

21  they would be questions of fact in those cases as well.

22          Now, Amazon's made a fairly bare bones allegation

23  that consumers familiar with Amazon's Fire marks will

24  incorrectly assume that Amazon is the origin of the

11:17   25  applicants products or that the applicant's use of Fire is

somehow licensed or otherwise endorsed by Amazon or its

affiliates.  And in front of the USPTO -- the standards in

front of the USPTO, particularly with respect to -- I believe

it is the one that is -- I wasn't aware that one had been

11:17   dropped and it's not reflected in the USPTO's files as of

today, anyway.

          But with respect to the -- one moment here.

Anyway, with respect to one of the two, there's an actual

product on the market.  And the standard there is the same.

11:18   You know, you do a comparison of the products.  You do a

comparison of the marks.  You look at the customer bases.

You look at the similarity in advertising.  You look at the

intent of the parties.  You look at actual confusion.  These

are all facts, and these are the things we want to inquire

11:18   about.

          We want to find out why Amazon felt that its --

that these two products which we contend are unrelated to

Amazon's Fire TV or its Fire marks, why Amazon believes that

consumers would be likely to be confused between those two;

11:18   whereas, they do not believe that consumers would be likely

to be confused between two nearly identical marks in very

similar services, Wreal's Fyre TV and Amazon's Fire TV.

          **THE COURT:**  Right, right.  So your theory is

they're talking out of both sides of their mouth depending on

11:19   the situation; in this case, they say one thing and in

1   another case, they say something completely different.

2            MR. MARFOE:  Yes.

3            THE COURT:  I hear you.  I get it.

4            MR. MARFOE:  And presumably, these allegations have

11:19   5   some factual basis behind them.  I mean, I think Your Honor

6   pointed out that the allegations in the complaint are not

7   the -- that's not the full set of facts, that's not the full

8   factual record.  You get discovery and you're entitled to

9   determine the facts that support those allegations.  And

11:19   10  that's what we want to find out.

11           And Amazon does not have to designate an attorney.

12  Amazon can designate anyone they want within the corporation.

13  They can inform those people only of the factual basis for

14  these oppositions.  They don't have to tell them the legal

11:19   15  reasons why they think that they're right, why they think

16  that they would succeed in front of the USPTO.  They don't

17  have to tell them the legal arguments.  We're not going to

18  ask them any questions about that.  It's solely on the

19  factual basis.

11:20   20           And I know that you mentioned earlier that

21  you've -- you're quite familiar with the case law on this.

22  There's one other --

23           THE COURT:  Well, what I meant this, I don't mean

24  this nuance on the USPTO and taking the deposition based on a

11:20   25  statement submitted to the USPTO.  What I meant when I said

1    I'm familiar with the law, I meant I'm familiar with the law

2    that generally it's inappropriate to raise a privilege in a

3    blanket way and normally it has to be done on a

4    question-by-question basis.  That's the law I was referring

11:20   5    to that I was familiar with.

6              MR. MARFOE:  Absolutely.  And, you know, I do not

7    think that there's any controlling law or even any persuasive

8    law addressing this very specific issue, which I don't think

9    comes up very often, to be quite frank.  But I think it's

11:21   10   very analogous to where -- to a defendant's ability to

11   inquire into the facts upon which a plaintiff relies in the

12   support of the complaint.  And the Southern District recently

13   in AR Xrail Route (ph.) versus Dudek.  It's 304 FRD 668.

14             THE COURT:  304 FRD 668.

11:21   15             MR. MARFOE:  Southern District of Florida 2015.  It

16   addressed the -- the principles of law that you just

17   explained that you're familiar with.  And it added that, you

18   know, it seems fundamental that a defendant should be able to

19   inquire into the facts upon which a plaintiff relies in

11:21   20   support of its complaint.  And I don't think there's any

21   reason that the same logic should not apply to the facts that

22   Amazon relies on in filing oppositions with the TTAB.  The

23   only distinction I think between this case and that one is

24   that this involves the -- these are not allegations that they

11:21   25   made against us.

1        The allegations are not directly involved in this

2   case, but they're relevant because it's -- because they're

3   really taking what we think to be very contradictory

4   positions.  That, you know, in one hand they think that their

11:22   5   Fire marks are going to cause confusion with anybody who uses

6   anything with fire in the name, such as Firegram or FireChat.

7   Yet that likelihood of confusion for some reason will be

8   absent with two identically named products Fire TV and Fyre

9   TV.  So I think we're entitled to explore that, Your Honor.

11:22  10   And once again, it would only be the factual basis for these

11   allegations.  And if there are no factual basis, then every

12   question may end up being privileged, but...

13        **THE COURT**:  Anything further, Mr. Bageant?

14        **MR. BAGEANT**:  Just that the factual bases are in

11:23  15   the pleading.  It says they'll be confused because it's

16   spelled the same, F-I-R-E.  The root word is the same,

17   F-I-R-E.  They'll be confused because they're in the same

18   class of services; internet commerce, internet chat.  The

19   facts are there in the document.  One party has defaulted,

11:23  20   the other's about to settle.  These cases aren't going

21   anywhere.  There's not some fact that they're going to ask

22   that they're -- you know, that they can be, you know,

23   entitled to know.  They only want to get inside of Amazon's

24   counsels' head.

11:23  25        The reason that there's not a lot of cases on this

because it's not the kind of thing that people do.  We don't

want to put up a lawyer to testify about Amazon's internal

legal musings.  We don't want to train somebody else in what

Amazon's internal legal musings are.  We don't want to be in

a situation where we have to sit down and hash through these

things, you know, for the first time without the guidance of

the Court in a deposition.  That's part of why we're here.

Whatever your ruling is on this will guide how the deposition

goes and what privilege grounds we object on.

THE COURT:  So Mr. Marfoe, what about the fact that

Amazon's counsel just said, Listen, your client doesn't need

to know or take a 30(b)(6) deposition to find out the facts

upon which Amazon relied to support its statement in the

USPTO submission?  The facts are listed in the very USPTO

challenge.  So I heard you say two or three times, Judge,

we're not going to ask about their theory, we're not asking

about their strategy.  We're asking only about the facts.

Well, I'm taking you at your word.  So if you're seeking only

the facts upon which Amazon relied to challenge the Firegram

and FireChat proposed marks, if those facts are listed in the

challenge, don't you have what you need in the very public

document?

MR. MARFOE:  No, Your Honor, because I don't

believe that all of the facts are listed in the challenge.

These -- the allegations are done very similar to the notice

of pleading standard in federal court.  For example, one of
the allegations on similarity in appearance is applicant's
Firegram market is highly similar to Amazon's Fire marks in
appearance, pronunciation, connotation and overall commercial
impression.  Well, some natural follow-up questions to that
are, Why do you think that?  What makes you think that
they're similar in appearance?  What makes you think that
they're similar in pronunciation, Firegram and Fire?  What do
you consider to be the overall commercial impression of the
two marks?  And then, I don't want to give all the deposition
questions right now, but these are just some examples of
factual questions that will follow from some of these
allegations.

          **THE COURT:**  As bright as you and your colleagues
are, this can't be -- this case can't be the first time that
some lawyers have come up with the notion of, Listen, let's
probe the veracity of somebody's arguments in this trademark
infringement case by comparing and contrasting their position
in this lawsuit with positions that they've taken, let's say,
in a challenge before the USPTO.  This can't be the first
time that somebody has thought of this strategy.  I don't
mean to minimize the creativity of you and your colleagues,
but -- and I tip my hat off to you for coming up with that
approach.  But it seems to me that it's happened before.

          So if so, is there any case law out there from

11:27

either side?  I know there are cases that Mr. Bageant cited

which stands for the more specific proposition that it's --

that you can't take the deposition of the trademark and

patent lawyer.  That's a little bit of a different issue.  Do

we have any case law that's remotely similar to the scenario

here?

MR. MARFOE:  Your Honor, I personally did not find

any.  There are cases on patent examiners who kind of play a

dual attorney, slash, factual role, and sometimes those

11:27

depositions are allowed.  I don't think that that law would

apply here.  As far as specific -- you know, this specific

type of dispute, there is nothing -- nothing on point that I

found throughout the -- throughout the country.  I don't

know.  It could be that perhaps someone like Amazon hasn't

11:27

taken in positions like this before or, you know, not in such

a blatant way.  It could be that the general rule, the

30(b)(6) depositions go forward was followed and the 30(b)(6)

deposition went forward and so this was never challenged.

But if Your Honor would like us to -- to brief the matter, I

11:30

will be happy to try to --

THE COURT:  Well, I'm not necessarily looking for a

brief, to tell you the truth.  I don't think that's required.

At the most, I might just ask for a list of supplemental

authority, just a listing of cases.  But I'm a little bit

11:30

reluctant to do that because my guess is that before coming

1    here today, you folks did a good job of researching and

2    trying to track down the most analogous case that you could

3    and you didn't find anything directly on point.

4         MR. MARFOE:  That is the case on our end.

5         MR. BAGEANT:  Yeah, that's correct, Your Honor.  I

6    don't think that anybody disputes that when a party takes

7    inconsistent positions, that's fair game for a

8    cross-examination.  I don't think that Amazon's positions are

9    inconsistent.  And at any rate, they have the basis of that

10   contention already from these public documents.  What we

11   object to is this notion of then going in for a deposition on

12   it.  His questions -- the questions that he said before he

13   stopped giving away his questions all began with, What makes

14   you think?  That's very telling, right?  We've listed the

15   facts in the pleading.  Now he wants to explore why we

16   selected some facts and not some other facts, or what makes

17   us think these facts point to certain legal conclusions.

18   This is offensive to a different notion than the scope of

19   discovery.  They're trying to get into the legal camp at

20   Amazon.  This is why this is invasive of the attorney/client

21   privilege and of these doctrines of protected attorney work

22   product.

23        So I guess, you know, at some point we're going to

24   start going in circles here.  But our point is they have the

25   facts in the public record.  The only people with additional

knowledge are the lawyers, and that knowledge is legal

analysis, not factual analysis.  If we prepare someone on it,

we're just giving them the legal file, the legal thoughts and

impressions, and then telling them to go testify from that.

11:32    So it's not really a way to get around it.  And we don't

think that at the end of the day it's particularly relevant

anyway.

        THE COURT:  I don't know.  It sounds to me like it

might be potentially helpful.  It sounds to me like there's

11:32    some fodder for some decent cross-examination.  Seems to me

that they might be able to score some points at trial if the

trial judge were to permit it.

        MR. BAGEANT:  Well, it could go both ways.  We

could explain our answers brilliantly and we could totally

11:34    sort of deflate any opportunity to use this as

cross-examination at any rate.  And they may make a strategy

call that, Gosh, we've got what we want from the pleadings

here at deposition and this would be a stupid move as a

tactical matter.  But at any rate --

11:34    THE COURT:  Listen, there's an old saying.  I think

it's sometimes attributable to either Napoleon or the famous

Chinese warlord Sun Tzu.  But the phrase is this:  Never

interrupt your enemy in the midst of making a mistake.  So

maybe this would be a strategic blunder to try to take a

11:35    30(b)(6) deposition.  In which case, better for you.  Who

knows?

        MR. BAGEANT:  Except that --

        THE COURT:  Except for the inconvenience and the
fact that you may think that it's an attempt to invade the
legal camp, so to speak.  All right.  So anything further on
this particular issue?

        MR. MARFOE:  I have nothing further, Your Honor.

        THE COURT:  All right.  So, so far I'm prepared to
rule on these first two issues.

        Concerning the first issue on the request for a
second 30(b)(6) deposition on the seven topics, that will be
denied because you already took a 30(b)(6) deposition on
these points.  Basically, your colleague Mr. Foodman ran out
of questions at the end.  He did not say at the deposition,
We're not adjourning it, we're only temporarily suspending
it.  He didn't say, as I understand it, on the record, We've
been unduly prejudiced by this late disclosure of documents.
None of those things were on the record, and he simply said
it's the end of the deposition.  Beyond that, this deposition
was taken back in -- was it November?

        MR. BAGEANT:  Yes, Your Honor.

        THE COURT:  So we're now in, you know, late May and
now you're trying to revisit this issue shortly before the
end of discovery.  So to me, I'm not going to permit a second
deposition on topics on which you have already taken a

1    30(b)(6) deposition.  It may well be that now you or

2    Mr. Foodman or your other colleagues think that in retrospect

3    you could take a better deposition.  But I got to tell you,

4    every deposition I've ever taken in my life, later on I've

11:37   5    always said, Gosh, I probably could have done a better job if

6    only I had done asked these other questions.  So you haven't

7    really persuaded me and -- although I am somewhat sympathetic

8    to the fact that you had late documents, that never came up.

9    It was never on the record.  And if that were to be

11:37  10    permitted, then anytime anyone took a deposition, they could

11    simply months later say, I want another deposition because I

12    wasn't adequately prepared and the exception would swallow

13    the rule.  So I'm simply not going to permit it.

14          However, you're going to have better luck on the

11:37  15    second notice of taking deposition which concerns the

16    re-notice of taking videotaped depositions.  I'm going to

17    permit those -- that 30(b)(6) deposition to go forward.

18    However, the two topics are going to be more tightly framed

19    because the way that you have it currently listed is too

11:38  20    broad and would arguably encompass the very concerns that

21    Mr. Bageant had raised and could arguably get into privileged

22    areas.  So both of these two topics, one and two, will be as

23    follows:  And I'm just going to read the introduction.

24          The facts -- and by the way, we're going to enter a

11:38  25    written order after this.  So I see you taking notes, and I'm

11:39    sure you'll do a good job, but it will also be memorialized

later in an order.  But the two topics will be reworded as

follows:  The facts which relate to Amazon's stated position,

comma, in its USPTO challenge, comma, that -- and then the

rest of the language.  And the same will be for Number 2.

But I have to tell you in fairness, Mr. Marfoe,

that it's entirely up to you whether you want to go forward

with the 30(b)(6) deposition.  And I say this for the

following reason.  I'm allowing you to get into the facts.

11:39    You say you don't want to go into the legal theories or the

strategies, you're just a fact guy and you want the facts.

Mr. Bageant says, Well, we already put the facts in the

document.  And your theory is, well, maybe there are

additional facts, or maybe we can flesh out some additional

11:39    detail on the facts.  Maybe, but maybe not.

So you may get ready for this deposition.  They'll

have their designated person.  Maybe it will be a lawyer.

Maybe it will be a nonlawyer who is prepared by lawyers, or

maybe it will be a nonlawyer who is prepared by a bunch of

11:40    different people.  Who knows?  But it seems to me entirely

possible that at the deposition, all you're going to get is

the witness saying the facts which support the position we

took in this USPTO challenge are the very facts that are

listed in that document.  I think you called it a pleading.

11:40    I'm not sufficiently familiar with USPTO (coughing), if

1    submissions are called pleadings.

2           Are they called pleadings?

3           MR. MARFOE:  I don't believe they're called

4    pleadings, but they're very much like pleadings.

5           THE COURT:  So let's just call them submissions, a

6    fair enough generic term.  So it may will be that the

7    witness, the designee or designees, will say, The facts are

8    simply what we listed in our USPTO submission.  Are there any

9    additional facts?  Nope.  That's them.  Those are them.  And

10   you'll say, Really, these are the only facts?  Correct.  No

11   other details?  Nope, that's it.

12          Then at that point the deposition will be over

13   because you've told me you're not going to go into legal

14   strategies or theories.  And questions such as, Well, why did

15   you think that this fact would necessarily lead to this legal

16   conclusion, that's the exact kind of thing that you told me

17   you don't want to go into or won't go into.  You're just

18   looking for facts.  And I realize you can get into a lot more

19   detail.  Somebody can give a broad, sweeping conclusory fact,

20   and it may take 20 minutes to flesh out all the details.  And

21   you're certainly entitled to try to go into that.

22          So you and your colleagues will have to decide

23   whether or not it's worth the effort and the time and energy

24   to go forward.  But if you want to do that, I'm giving you

25   that opportunity pursuant to the ruling that I just made.

```
 1   All right?

 2           MR. MARFOE:  Okay.

 3           THE COURT:  And by the way, will the deposition be

 4   here or will it be in Seattle?

 5           MR. MARFOE:  We will have to discuss that.  We have

 6   actually done a couple by video conference --

 7           THE COURT:  All right.  The reason I say that is

 8   that may play a role in your decision.  If you have to -- I

 9   want to make sure that I use the right legal phrase here.  If

10   you have to schlep to Seattle to take this deposition, maybe

11   you won't want to do it.  I don't know.  Or maybe you want to

12   do it by videotape or satellite hookup.  That may save on

13   money but might not be quite as effective.  But that will be

14   up to you.  A strategic call.  Maybe a conversation you can

15   have with your colleagues and your client.

16           All right.  So now we get to the next discovery

17   issue, which is something that is on Amazon's plate, which

18   has to do with Amazon's efforts to take the deposition of

19   your client's CEO and sole investor, Estefano -- is it

20   pronounced Isaias?

21           MR. BAGEANT:  Isaias, Your Honor.

22           THE COURT:  Isaias?  Why don't we just call him the

23   CEO?  All right.  So as I understand it, Wreal -- and by the

24   way is it Wreal or Wreal?

25           MR. MARFOE:  Wreal with a silent W.
```

1    **THE COURT:** All right.  Whenever I hear of a silent

2    W, I think of Barbara Wah-wah, which actually wouldn't be

3    silent.  It's like an extra W.

4        All right.  So your position is that the CEO,

11:43  5    Estefano, is an apex-type deposition and therefore it would

6    be off limits.  That's a summary of your view?

7        **MR. MARFOE:** Yeah.  That's a -- given where we are

8    in this litigation.  Given the fact that we don't believe

9    that Amazon has shown that Mr. Isaias has any unique

11:44 10   knowledge or anything that he couldn't impart to anybody else

11   at the company, any lower-ranked officials.  Amazon's made

12   very little attempt to -- to establish that.  We think that

13   they have not gone through the necessary steps in order to

14   take an apex deposition.

11:44 15       **THE COURT:** Your comment?

16       **MR. BAGEANT:** My comment is that this is a company

17   where there are two people on the payroll.  The CEO is the

18   founder of the company.  He is the person who, according to

19   the deposition testimony we had earlier today, defines the

11:44 20   scope and the vision of the company.  He's a person who,

21   according to deposition testimony we had under oath earlier

22   today, decided on the trademark that's at issue here.  Chose

23   the name.  Calls the shots.  Invested the $20 million that

24   they allege was spent in the pleadings.

11:44 25       **THE COURT:** I'm sorry.  Whose deposition was taken

earlier today?

MR. BAGEANT:  A gentleman named Fabio Vasco, an independent contractor to Wreal.  Someone who provides technical services to the company.

11:44  THE COURT:  Was that the gentleman who testified at the injunction hearing?

MR. BAGEANT:  No, Your Honor.  That was Rodrigo Franco.

THE COURT:  There was someone else who testified at 11:45 the hearing as well.  Some kind of a technical person who helped them with their IT.

MR. BAGEANT:  That was Mr. Vasco's partner.  His name is Raúl Plaza.

THE COURT:  All right.  So in any event, you 11:45 learned today at a deposition that the CEO is the man with the vision in addition to having the money.  And he was the one who came up with the name.  And in any event, it's only a two-person entity.  Now, when you say that two people are on the payroll, is the CEO one of those two people on the 11:45 payroll?

MR. BAGEANT:  He's the owner of the company.  It's an LLC.  So I don't yet know how he's compensated because no one has been able to answer that question yet.  But I would assume that's it's a pass-through profit situation, like an 11:45 LLC.  So I would assume that he takes a profit from the

1    company after its expenses are made.

2         THE COURT:  Well, based on what I've heard so far,

3    I don't know if there are any profits.  So perhaps there are

4    no distributions yet.  Anything further you'd like to tell

5    me?

6         MR. BAGEANT:  Let me scroll through my notes here.

7    I kind of -- (tape cut out) when our shooting when I stood

8    up.  One issue I want to tack on is the burden, whose job it

9    is to show that -- that they're entitled to withhold their

10   CEO because he's an apex individual.  One case, General Star

11   Indemnity 210 FRD 80 at page 82 says it's their burden to

12   come forward with affidavits that show that an apex

13   individual in a company doesn't have any unique knowledge.

14        At any rate, the test for an apex deposition is

15   fairly similar to what Mr. Marfoe outlined.  Does he have

16   limited knowledge?  Is the party seeking to harass the CEO of

17   a company?  That type of thing.  This is not an apex

18   situation.  This is a tiny company with one owner.  His title

19   is a CEO, but we had deposition testimony today about how the

20   titles don't really matter at the company because everybody

21   kind of pitches in.  This is not, for example, someone trying

22   to depose the CEO of Ford Motor Company in order to navigate

23   towards a product liability settlement, or somebody trying to

24   depose the CEO at Amazon to navigate towards a trademark

25   settlement.

11:46
11:47
11:47
11:48
11:48

1          This is somebody who founded the company, chose the

2     marks at issue, defines the company's scope and vision.  He

3     will stand to benefit from the lawsuit as the owner or stand

4     to lose from the lawsuit as the owner.  He is the person in

11:48   5     charge and most centrally involved.  We definitely want to

6     take his deposition.

7          THE COURT:  Sir, did you learn today from the

8     deposition whether or not the CEO shows up on a regular basis

9     to work or even on a part-time basis to work?  Because what

11:48  10     you've told me so far is he put in some money initially.  He

11     put up $20 million as seed money to get the company up and

12     running.  He selected the name.  All this other stuff about

13     he -- you know, he comes -- he defines the spirit of the

14     company and he generates the scope, that can be sort of like

11:49  15     all mush language.  I want to know what the man does, if

16     anything.  You've told me that he came up with the money

17     sometime ago and he picked the name.  What else?

18          MR. BAGEANT:  I've seen documents where people

19     e-mail him proposed designs for the remote for the Fyre TV

11:49  20     set-top box.  Which design to you like best?  He writes back

21     and says, We should use this one because of this, or, We

22     should reject that one because of that.  That's ground-level

23     decision making.  There are -- there is a document shortly

24     after this lawsuit is filed where there's some discussion

11:49  25     about what to do.  And his direction is, Go to the lawyers.

1    That's kind of the end of what we have, obviously, because of

2    privilege issues.  He's involved there.

3         Rodrigo Franco, I understand is the individual

4    running the company on a day-to-day basis right now.  But

11:50    5    during the time -- during the time when the events that Wreal

6    relies upon in its complaint were taking place, this man was

7    the person in charge, the person at the office, the person

8    making decisions.  Yes, we heard that he had an office at

9    Wreal.  I don't know if he still has an office at Wreal.  But

11:50    10    he had an office at Wreal at the time that Wreal was

11    launching its product, naming its brand, making the

12    advertisements that it relies upon in its complaint.  Again,

13    this is not a huge company.

14         THE COURT:  So as far as you know, did the CEO play

11:50    15    any role in deciding the advertising which was going to be

16    selected?  Did he participate in strategic decisions about

17    what type of advertising as opposed to another, that sort of

18    thing?

19         MR. BAGEANT:  I don't know the answer to that

11:50    20    question one way or the other.  I can't imagine that he

21    didn't.  It's a small company and he's the boss.  But again,

22    you know, I think we're entitled to discover it in a

23    deposition.  The notion that this is an apex deposition is a

24    very difficult one, I think, to square with the law.

11:51    25         THE COURT:  Anything further, Mr. Marfoe?

|  |  |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:51 | 5 |

1        **MR. MARFOE:**  Yeah, a few things.  First of all --

2    and we heard a lot of things that they don't know about about

3    Mr. Isaias and whether he has any unique knowledge on these

4    topics.  There's absolutely no reason why Amazon can't

5    explore these topics through a 30(b)(6) deposition.  And

6    Wreal can appoint whomever they want and then they will be

7    fully informed, possibly by Mr. Isaias himself, possibly by

8    other people in the company who were with Mr. Isaias when the

9    company was founded.  Mr. Raúl Plaza and Mr. Fabio Vasco are

10    two of those people.  There were others.  The notion that the

11    company has two full-time employees is a little misleading

12    because there are -- it's a large base of operations in

13    Ecuador, and most of these people are actually independent

14    contractors with a different company but they act as

15    full-time employees.  So, you know, it's not a -- it's not a

16    two-man operation, so to speak.

17        **THE COURT:**  What is it?  A five-man operation?

18        **MR. MARFOE:**  To give you the detailed numbers right

19    now, I believe it's closer to ten based on --

20        **THE COURT:**  So let's say it's ten.  So it's a

21    ten-employee company which is not the typical situation where

22    there's an apex argument made.  This is not as though Amazon

23    is seeking to take the deposition of Tim Allen, the CEO of

24    Apple computer, where it's pretty clear he's so high at the

25    top of the pyramid that it's unlikely he has any unique

 1   knowledge about the issues here.

 2          Here it's either a two-employee company or a

 3   five-employee company or two-employee company with eight

 4   independent contractors.  Either way, it's a very small

 5   operation, and they're seeking to take the deposition of the

 6   man who funded the company, who came up the name, and who

 7   apparently gets consulted from time to time on major

 8   decisions, such as advertising and marketing.  So how is that

 9   an apex deposition in a two-employee or five-employee firm?

10          **MR. MARFOE:**  For two reasons.  First, Mr. Isaias is

11   currently -- this came out in the deposition today -- and for

12   quite some time, has not been active in the company.  He's

13   not on the payroll.  He delegates authority mainly to

14   Mr. Franco and to some of the other employees and independent

15   contractors at Wreal.  He is only involved in absolutely

16   high-level decision making and on a very limited basis.  He

17   was much more involved when the company was founded, and

18   we're looking back to '07, '08 here.  All the information

19   that -- all the knowledge that he has is shared with other

20   people in the company who were also there when the company

21   was founded.

22          To the extent that anything is not, I believe the

23   Spect versus -- I forget the actual case name here.  The

24   Stellar Products versus Google case, which is a -- Case

25   Number 05-80387, 2008 Westlaw 4218107.  It's a Southern

District of Florida 2008 case.  It was a trademark

infringement case.  The plaintiff there wanted to depose

Google's top executives and founders relating to things that

happened when Google was founded.  I do understand that Wreal

11:54    is a much smaller company than Google.  Regardless, the Court

there, its decision wasn't based on the size of Google.  It

was based on the fact that Google could appoint a 30(b)(6)

representative to give the exact same information that

they're seeking from their top executives.

11:55    And it's really an analogous situation to what we

have here.  And I'm not aware of any law that suggests that

the apex doctrine only applies to corporations of a different

size.  I think that when we have a situation like we have

here, where there is a CEO who is a founder of the company,

11:55    who is really removed from the day-to-day decisions,

especially now extremely removed from the day-to-day

decisions, and -- and Amazon only really wants to ask him

about things that happened several years ago.  The naming of

Fyre TV, that occurred in 2007.  The vision for the company

11:55    was developed in 2007.  These are the things that came out

today.  They have not elicited any testimony from any other

witness about anything that he's done since then.  I believe

they presumed that he's involved in selecting advertising.  I

don't believe there's any evidence of that.  He may have been

11:55    at the very start of the company.  But like I said, he's

largely delegated authority to the folks that he trusts and

who are in charge and who I think would be the better people

to be deposed on this topic.

If Amazon can't -- is not satisfied at the end of a

30(b)(6) deposition of -- related to the topics that I think

Mr. Isaias has unique knowledge of, then they can -- they can

come back and try to seek Mr. Isaias' deposition.  But I

doubt that will be the case.

THE COURT:  Have you taken a 30(b)(6) deposition

yet in the case?

MR. BAGEANT:  No, Your Honor, we haven't.  And the

reason is that we have not been able to schedule one before

the close of discovery.  This is something we're going to

have to bring up with Judge Lenard.  Maybe we can table that.

THE COURT:  What does discovery end?

MR. BAGEANT:  June 1st.  Here is the situation

we're in.  Both sides asked for depositions.  Both sides

asked for 30(b)(6) depositions.  Both sides started

scheduling depositions.  The designee that Wreal would like

to put up on some of its topics is not available currently.

He will be available after June 1st.  We don't have a problem

accommodating his schedule.  My understanding is that that's

a scheduling issue that belongs to Judge Leonard and not to

Your Honor.  We need to get that resolved.  If you know

(coughing) -- otherwise we'll be trying to take 30(b)(6)

1  depositions on a Sunday and nobody wants to do that.  But

2  that is the answer to your question, has Amazon taken a

3  30(b)(6) deposition here.

4          We put up -- we have depositions scheduled every

11:57  5  single day until the close of discovery, I guess with the

6  exception of this coming Friday.  We had a cancellation --

7          **THE COURT:**  So have you sent the plaintiff a list

8  of 30(b)(6) topics even though you haven't scheduled the

9  actual deposition?

11:57  10         **MR. BAGEANT:**  Yes, Your Honor.  Your Honor, if I

11  may.

12         **THE COURT:**  One minute.  So on this list of

13  30(b)(6) topics, are there things such as the circumstances

14  under which the company selected the name Fyre, F-Y-R-E, the

11:58  15  vision for the company?  In other words, the very topics that

16  you say you want to question the CEO about.  Were they listed

17  in former fashion in the 30(b)(6) list of issues?

18         **MR. BAGEANT:**  I need to correct something I said a

19  moment ago, actually.  There was a separate 30(b)(6)

11:58  20  deposition that Amazon took in the preliminary injunction

21  stage of this case, where one of the topics was the selection

22  of the Fyre TV name.  Amazon appointed Mr. Raúl Plaza.  We

23  met at the preliminary injunction hearing and he testified

24  broadly to why the Fyre TV mark was selected.  So we did get

11:58  25  some testimony on that.  I don't want to imply that the only

1  thing we want to ask this gentleman about is why he chose the

2  Fyre TV name.  There's -- you know, and I don't -- I don't

3  feel like it's my job, unless Your Honor tells me it's my

4  job, to explain to opposing counsel all the things that we

11:59  5  need to explore at his deposition.

6          We certainly made a primary prima facia case of

7  relevance here.  This is again, at best, a ten-person

8  company.  Amazon has already given or offered more than ten

9  depositions of its own people.  The notion that we need to

11:59  10  work our way down the list and then if we're not satisfied,

11  get -- you know, we've been selective about the number of

12  depositions we're taking depositions of.  We want this one.

13  It will be, you know, our second or third fact deposition.  I

14  guess our third fact deposition.  This is not -- you know,

11:59  15  it's not some gung-ho, crazy, scorched earth litigation

16  strategy that's going after the apex of a company so that we

17  can get him.  It's not the type of situation we're in.  That

18  the objection that we're -- that's being advanced here that

19  this is an apex, CEO-type individual and we're trying to

12:00  20  harass him just doesn't fit.

21          **THE COURT:**  Where is the CEO located?

22          **MR. MARFOE:**  He is -- it's a good question.  He

23  travels quite a bit and has lots of different businesses.

24  Wreal is not his only venture.  Usually he's in Miami.  I

12:00  25  don't know if he's in Miami now.

<table>
<tr><td></td><td>1</td><td>And if I may add a couple of things addressing some</td></tr>
</table>

1    And if I may add a couple of things addressing some

2    things that Mr. Bageant said.  He did ask a question of

3    Mr. Raúl Plaza in his 30(b)(6) deposition about the name.

4    And it was one question.  Who at Wreal made the decision to

12:00  5    go with that name?  Who was the ultimate decision maker at

6    that time?  Answer:  Estefano Isaias.  That's it.

7         Didn't explore that any further.  Didn't probe

8    anymore to try to get anymore information on that.  We

9    actually asked a similar question at depositions of Amazon's

12:01  10   personnel.  Who was the ultimate decision maker?  Who made

11   the final decision as to the name?  And the answer that we

12   got was Mr. Jeff Bezos.  Now, we did not seek a deposition of

13   Mr. Jeff Bezos based on that answer alone.  We've asked

14   questions about other folks who were at the naming meetings

12:01  15   with Mr. Bezos.  We've asked questions of -- you know, again

16   things that are related to that that we want to know.  And at

17   this time, we have -- we don't see a need to take Mr. Bezos'

18   deposition because we've been following the law, I believe,

19   in trying to get the information from lower-ranked employees.

12:01  20        THE COURT:  So discovery ends June 1st.  And what's

21   the trial date?

22        MR. MARFOE:  The trial date, Your Honor, is in

23   April of 2016.  Now, just a bit on the timeline.  We do have

24   a lot of deposition coming --

12:01  25        THE COURT:  That's unusual.  The discovery ends in

1    June of 2015 and trial is in April of 2016?

2            MR. MARFOE:  Yes.  And that's why I think both

3    sides need to -- due to scheduling errors -- scheduling

4    issues that need to take an additional deposition or two.

12:02   5    And I think both parties were -- we've been discussing this,

6    you know, moving for Judge Lenard for a modest extension of

7    the discovery deadlines since we don't think it would impact

8    any of the pretrial deadlines given the large amount of time

9    between now and the actual trial.

12:02  10            THE COURT:  Was there anything unusual about the

11   way the case unfolded which would explain why your discovery

12   period is June 1st and your trial is April the following

13   year?  That's somewhat atypical.

14            MR. BAGEANT:  There's a window of time built in

12:02  15   there, Your Honor, based on our assessment of how long we

16   thought it would take to get through dispositive motions.

17   And there's a fairly long expert discovery period and expert

18   report period in this case because I think it will be expert

19   intensive.

12:02  20            THE COURT:  So this was sort of your -- the parties

21   collective suggestion on when the case should be tried, and

22   then Judge Lenard in effect adopted your proposed timetable?

23            MR. BAGEANT:  I don't remember all the details, but

24   it's along those lines.  I know that there were a couple of

12:06  25   submissions to the Court, and the final one was a joint

1    submission.

2         THE COURT:  When is that mediation deadline?

3         MR. BAGEANT:  Is it in October.

4         MR. MARFOE:  It is -- I don't know off the top of

12:06  5    my head.  October sounds right.  Your Honor set one mediation

6    deadline for December of last year, which we took to be ahead

7    of the preliminary injunction hearing.  And then Judge Lenard

8    set one shortly thereafter.  And October sounds right, but

9    I --

12:06  10        THE COURT:  The case has not yet been mediated?

11        MR. MARFOE:  Well, it has.  We did mediate at the

12    preliminary injunction.

13        THE COURT:  Before the injunction.

14        MR. MARFOE:  Yes.

12:07  15        THE COURT:  And just remind me.  Who was the

16    mediator?

17        MS. ISANI:  David Lichter.

18        THE COURT:  Saw David Lichter last night, as a

19    matter of fact.  All right.  And who is going to be your

12:07  20    mediator the next time?

21        MR. BAGEANT:  I don't think the parties have

22    decided on one yet, although we'd be happy to go with

23    Mr. Lichter again.

24        THE COURT:  I'm going to permit the deposition of

12:07  25    the CEO.  I don't think this is what typically is called an

1    apex deposition given the nature of the company.  The fact

2    that it was a closed company, the fact that it has two

3    employees and perhaps a handful of other independent

4    contractors doesn't mean that this man is off limits.  I

12:07    5    think that it's appropriate for them to take his deposition.

6             It may well be, Mr. Marfoe, that this is a very

7    short deposition.  It may be that they'll ask the CEO, What

8    have you done, and he'll say, I put up some money.  I helped

9    decide the name of the company, and I've done nothing else

12:08    10    for the past three years.  In which case, the deposition will

11    be over in 20 minutes and everybody goes home.  Or maybe he

12    did some other things.  And given the fact that he frequently

13    is based here in Miami, I don't think it will be unduly

14    burdensome for him to appear for deposition in Miami.  So

12:08    15    you'll be able to take that.

16             By the way, let me just mention to you folks,

17    you've won some rulings, you've lost some rulings.  If

18    anybody wants to take me up, that's fine.  I'll be getting

19    out a brief summary-type administrative order just outlining

12:08    20    the highlights of the rulings.  But if you want to take me

21    up, you need to actually order up the transcript because that

22    will give Judge Lenard a better feel for what happened and

23    the nature of the dispute and the basis of my rulings and the

24    arguments because, otherwise, in every single discovery

12:09    25    dispute, I'd have to enter a 25-page order and it's just not

feasible.

So the ruling are what they are.  They'll be memorialized in an order uploaded in the next business day or two.  And to the extent anyone is unhappy enough to make an objection, you'll need to get the transcript.  Anything further that I can help you folks out with this afternoon?

MR. MARFOE:  Your Honor, one question about your first ruling regarding the 30(b)(6) deposition.  With respect to the documents, I understand that we did not -- that it was not preserved that we would continue and we didn't bring up the document issue there.  But there is one other document issue that I brought up, which is that we are still expecting a supplemental production from Amazon if there is any of new -- new documents that are responsive to our earlier requests which did largely address these topics.  And presumably there's new data.  There's new information on consumer perception of Amazon's Fire TV that's been generated between November and now, May -- November 2014 and May of 2015.  So I'd like to ask that your ruling be without prejudice if we see that within those new documents there are things that we need to ask about specific to those documents.

THE COURT:  Sure.  What's your argument?

Mr. Bageant, I'm simply saying it's without prejudice.  If -- who know?  Maybe they'll be an additional production, maybe there won't be.  If there is an additional

production, who knows whether it will include documents

related to the seven topics.  And if you want to revisit the

issue, I'm simply saying procedurally you're not going to be

shut down.  You'll have the opportunity to make your

12:10    presentation.  I will listen fully to your presentation and

listen to the likely opposition and make a ruling.  So if you

have grounds to bring it, I'm happy to consider it based on

the new documents.

          **MR. BAGEANT:**  Thank you, Your Honor.

12:11    **THE COURT:**  All right.  Anything further I can help

you folks out with?  No?  All right.  We will be going off

the record here.

1                    <u>C E R T I F I C A T E</u>

2

3          I hereby certify that the foregoing is an accurate

4     transcription of the recorded proceedings in the

5     above-entitled matter.

6

7       6-5-2015

8     _____         _____

9     DATE COMPLETED              GIZELLA BAAN-PROULX, RPR, FCRR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25