UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-21385-CIV-LENARD/GOODMAN

**WREAL, LLC, a Florida Limited**,
**Liability Company,**

    Plaintiff,

v.

**AMAZON.COM, INC. a Delaware**
**Corporation,**

    Defendant.
_____/

**ORDER ADOPTING REPORT OF MAGISTRATE JUDGE (D.E. 130),**
**AND DENYING PLAINTIFF'S MOTION FOR PRELIMINARY**
**INJUNCTION (D.E. 28)**

**THIS CAUSE** is before the Court on the Report and Recommendation of United States Magistrate Judge Jonathan Goodman (the "Report," D.E. 130), issued on February 3, 2015, recommending that the Court deny Plaintiff's Motion for Preliminary Injunction (the "Motion," D.E. 28), filed September 22, 2014.  Specifically, Judge Goodman recommends that the Court deny the Petition because (1) there is no likelihood that an appreciable number of consumers will mistakenly believe Defendant Amazon is responsible for Plaintiff Wreal's FyreTV or Fyre BoXXX; (2) there is no irreparable harm; (3) the balance of hardships is one-sided—Amazon's outweighing Wreal's; and (4) Wreal has not demonstrated that a preliminary injunction would serve the public interest. (D.E. 130 at 3–6.)  Wreal has filed its Objections to the Report (D.E. 132), to which Amazon has responded in support of the Report (D.E. 133).  Based on a review of the

Motion, the Report, the Objections, the Response, and the record, the Court finds as follows.

**I.      Background**

Wreal was formed in 2006 to develop and implement a technology known as Internet Protocol Television ("IPTV").  (Franco Decl., D.E. 28-1 ¶ 4.) IPTV now allows consumers to stream high-quality video over the internet directly to their desktop computer, laptop computer, tablet, smartphone, or directly to their internet-connected television or traditional television through the use of a dedicated set-top box ("STB").  (Id.)  Wreal sells a pornography pay-per-view service called FyreTV and a pornography STB called the Fyre BoXXX through its website www.fyretv.com.[1]  Wreal owns registered trademarks "FyreTV" and "FyreTV.com."  (Id. ¶ 13)[2]  A representative image of Wreal's trademark with the product is below:



---

[1] Wreal also registered the domain name "firetv.com" to ensure that consumers who were confused over the proper spelling of the brand name—FyreTV—were directed to the right site. (D.E. 28-1.)

[2] United States Patent and Trademark Office, Registration Nos. 3517534 and 3517535, respectively.  See (D.E. 28-1 ¶13.)

2

In April 2014, Amazon introduced the Amazon Fire TV, an STB dedicated to mainstream content. The following is a screenshot of an Amazon Fire TV advertisement shown on Amazon's website:



On April 17, 2014, Wreal filed this lawsuit, under the Lanham Act, Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), and Florida common law, claiming that Amazon's Fire TV mark infringes Wreal's registered trademarks. (D.E. 1.) Specifically, Wreal alleges "reverse confusion" as opposed to the traditional, "forward confusion"—i.e., Wreal alleges that consumers will mistakenly believe that the junior user (Amazon) is actually the source of the senior user's (Wreal) products (FyreTV or Fyre BoXXX). In support, Wreal cites to the availability of adult content on Amazon's website and its streaming service.

On September 22, 2014, five months after filing its Complaint, Plaintiff filed the instant Motion, attaching eighteen exhibits in support. (D.E. 28.) The Court referred Plaintiff's Motion to the Magistrate Judge for a report and recommendation. (D.E. 35.)

On December 30, 2014, the Magistrate Judge held an evidentiary hearing on the Motion.  See (D.E. 118); see also (D.E. 127-1 (Tr. Prelim. Inj. Hr'g).)[3]  On February 3, 2015, the Magistrate Judge entered the Report, including his factual findings and conclusions of law.  (D.E. 130.)  Wreal filed its objections to the Report on February 13, 2015, arguing that (1) Wreal established a substantial likelihood of success on the merits; (2) Wreal will suffer irreparable injury without an injunction; (3) the balance of harms weighs in favor of an injunction; and (4) the public interest will be served by the granting of an injunction.  (D.E. 132.)  The majority of Wreal's objections relate to the Magistrate Judge's findings and conclusions in furtherance of his substantial-likelihood-of-success analysis.  Specifically, Wreal maintains that the Magistrate Judge erred in his analysis and conclusions on the (1) type of marks; (2) similarity of marks; (3) similarity of products; (4) similarity of sales outlets and customer base; (5) similarity of advertising; and (6) actual confusion.  (D.E. 132 at 3–12.)

On February 18, 2015, Defendant responded to Plaintiff's objections.  (D.E. 133.)  Defendant's response provides support for the Report and specifically addresses each of Plaintiff's arguments.  (Id.)

**II.    Standard**

Under 28 U.S.C. § 636(b)(1)(B), upon the issuing of a magistrate judge's report and recommendation, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is

---

[3] Citations to the Transcript of the Preliminary Injunction Hearing, located at D.E. 127-1, will be as follows: "(Tr. [#].)"

made."  See also Fed. R. Civ. P. 72(b)(3).  De novo review requires that the "district court's consideration of the factual issue must be independent and based upon the record before the court."  LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988).  If the "magistrate has made findings of fact based upon the testimony of the witnesses heard before the magistrate, the district court is obligated to review the transcript or listen to the tape-recording of those proceedings."  Id.  However, facts not objected to are only subject to the clearly-erroneous standard.  Essex Ins. v. Rodgers Bros. Servs., Nos. 8:05-cv-00648-T-17-TBM, 8:05-cv-980-T-17-TBM, 2007 WL 2298356, at *1 (M.D. Fla. Aug. 7, 2007) (citing LoConte, 847 F.2d 745).

### III.   Discussion

The Lanham Act, 15 U.S.C. §§ 1051–1141n, was created

> to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

Id. § 1127.  "The Lanham Act's trademark provisions are the primary means of achieving these ends."  POM Wonderful LLC v. Coca-Cola Co., 134 S. Ct. 2228, 2234 (2014).  Section 1116(a) vests the federal district courts with the power to grant injunctions in trademark-infringement cases.  15 U.S.C. § 1116(a).

To obtain a preliminary injunction, plaintiffs must demonstrate "'(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the

injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendant; and (4) that granting the injunction would not disserve the public interest.'" Levi Strauss & Co. v. Sunrise Intern. Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995) (quoting Church v. City of Huntsville, 30 F.3d 1332, 1341–42 (11th Cir. 1994)); see also 15 U.S.C. § 1116(a) (stating that court may issue injunction "according to the principles of equity and upon such terms as the court may deem reasonable"). To be sure, the issuance of a preliminary injunction is an extraordinary remedy, requiring the proponent of the injunction to clearly establish the burden of persuasion as to the four elements. All Care Nursing Serv. v. Bethesda Mem'l Hosp., 887 F.2d 1535, 1537 (11th Cir. 1983) (citing United States v. Jefferson, 720 F.2d 1511, 1519 (11th Cir. 1983)). "At the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" Levi Strauss, 51 F.3d at 985 (quoting Asseo v. Pan Am. Grain Co., 805 F.2d 23, 26 (1st Cir. 1986)).

      1.    <u>Substantial Likelihood of Success on the Merits</u>

Wreal's Complaint seeks preliminary and permanent injunctive relief and damages pursuant to the Lanham Act, 15 U.S.C. §§ 1114(1) & 1125(a); Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), §§ 501.201–501.213, Florida Statutes; Florida common-law trademark infringement; and Florida common-law unfair competition. All counts are premised on Wreal's accusations that Amazon's mark infringes on Wreal's trademark rights. See Custom Mfg. & Eng'g v. Midway Servs., 508 F.3d 641, 652 (11th

Cir. 2007) ("Plaintiff's failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its claim under Florida law.").

To prevail in this case, Wreal must show "(1) that it had prior rights to its mark or name, and (2) that [Amazon] had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers are likely to confuse the two." It's a 10, Inc. v. Beauty Elite Grp., 932 F. Supp. 2d 1325, 1330 (S.D. Fla. 2013) (quoting Lone Star Steakhouse & Saloon v. Longhorn Steaks, 106 F.3d 355, 358 (11th Cir.), modified, 122 F.3d 1379 (11th Cir. 1997)) (internal quotation marks and alterations omitted). Here, there is no dispute that Wreal had prior rights to its mark; thus, the Court's analysis is focused on whether Amazon's mark is confusingly similar to Wreal's mark.

Whether there is a likelihood of confusion among marks depends on (1) the type of mark; (2) the similarity between the marks; (3) the similarity of the products that the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of the parties' advertising media; (6) the defendant's intent; and (7) whether there is actual confusion. Frehiling Enters. v. Int'l Select Grp., 192 F.3d 1330, 1335 (11th Cir. 1999) (citing Lone Star Steakhouse & Saloon, 122 F.3d at 1382). "Of these, the type of mark and the evidence of actual confusion are the most important." Id. (citing Dieter v. B & H Indus. of Sw. Fla., 880 F.2d 322, 326 (11th Cir. 1989)). "Although evidence of actual confusion is an important factor, the law is well settled that evidence of actual confusion is not necessary to a finding of likelihood of confusion." Tiger Direct, Inc. v. Apple Comput., Inc., No. 05-21136-CIV-Lenard, 2005 WL 1458046, at *5 (S.D. Fla. May 11, 2005) (citing E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imps.,

7

756 F.2d 1525, 1529 (11th Cir. 1985)). Moreover, "there is no pre-determined calculus as to the weight given to each of the seven factors or as to how many factors warrant a finding of trademark infringement; instead, a district court's finding is a highly fact-specific and contextualized undertaking, examining the total impression created across the seven factors." Id. (citing Dippin' Dots, Inc. v. Frosty Bites Distrib., 369 F.3d 1197, 1207 (11th Cir. 2004)).

Here, Wreal alleges a "reverse confusion" case. "Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark." Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 957 (7th Cir. 1992). The injury results to the senior user because

> [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

Ameritech, Inc. v. Am. Info. Techs. Corp., 811 F.2d 960, 964 (6th Cir. 1987). Based on precedent from the former Fifth Circuit Court of Appeals,[4] "the reverse confusion doctrine is presumed to apply in the Eleventh Circuit, but a state's substantive law may operate to prevent its application." Inmuno Vital, Inc. v. Golden Sun, Inc., 49 F. Supp. 2d 1344, 1352 (S.D. Fla. 1997) (citing Cap. Films Corp. v. Charles Fries Prods., 628 F.2d 387, 393 (5th Cir. 1980)).

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before October 1, 1981.

The Court will address the Magistrate Judge's analysis of the factors affecting likelihood of confusion, and their respective objections.

### a. *Type of Mark*

Specific to this sub-element, Wreal argues that the Magistrate Judge erred by "determining that Amazon's use of its housemark alongside Fire TV somehow makes confusion less likely." (D.E. 132 at 4.) Wreal cites Quaker Oats, inter alia, for the premise that in reverse confusion cases "the linking of the plaintiffs' mark with the defendant's brand name is an aggravation, not a justification." 978 F.2d at 960; accord Attrezzi v. Maytag Corp., 436 F.3d 32, 39 (1st Cir. 2006) (stating that use of more recognized label by junior user could actually aggravate threat to senior user).

Though there may be situations where Wreal's position could be true, it is not necessarily true in every scenario, and specifically, not under circumstances presented here. First, the cases relied on by Wreal are not binding, Eleventh Circuit precedent. Second, two cases cited by Wreal—Quaker Oats and Attrezzi—are materially distinguishable from the instant case.

In Attrezzi, both parties used the exact word "Attrezzi" with their product, and the use of a housemark by junior-user Maytag could only aggravate the harm caused in the reverse confusion context because it led consumers to believe that the Attrezzi mark was Maytag's property. 436 F.3d at 35. Likewise, in Quaker Oats, both parties used the phrase "Thirst Aid," but the junior user put its housemark before the trademarked term. 978 F.2d at 950–51. Again, this would lead consumers to generally believe that the junior user was the true owner of the trademark.

9

Here, the allegation is that the marks are confusingly similar. Wreal does not allege that the marks are identical. Thus, the use of Amazon's housemark next to its Fire TV mark, spelled and styled differently than FyreTV, could help distinguish the products. Accordingly, the Court agrees with the Magistrate Judge's conclusions on this factor. Thus, the Court finds that this factor weighs in Amazon's favor.

      b.    *Similarity of Marks*

"Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 260–61 (5th Cir. 1980) (quoting Restatement of Torts § 729, cmt. B (1938)) (internal quotation marks omitted). A court "must also consider the commercial impression created by the mark as a whole." Id. at 261 (collecting cases). Stated differently, "[i]n evaluating the similarity of marks, [the court] must consider the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." E. Remy Martin, 756 F.2d at 1531.

Wreal argues that the Report is unsupported by the evidence and contrary to the law. (D.E. 132.) Specifically, Wreal states that the Magistrate Judge failed to address the impact of the "perfect similarity of sound," as addressed in Dreamwerks Production Group Inc. v. SKG Studio, 142 F.3d 1127, 1131 (9th Cir. 1988), and E. Remy Martin & Co., S.A. v. Shaw–Ross International Imports, Inc., 756 F.2d 1525, 1531 (11th Cir. 1985). In short, Wreal is wrong.

10

The Magistrate Judge found that the marks themselves are different because Wreal's FyreTV is one word, not two like Amazon's Fire TV, and FyreTV uses a unique and stylized font and different colors than Amazon's Fire TV mark. Wreal blows past these findings by focusing on the Magistrate Judge's statement that there are some similarities. The fact that there are some similarities does not raise the issue to one of substantial confusion. See Domino's Pizza, 615 F.2d at 260–61 (comparing similarity of design as to "Domino Granulated Pure Cane Sugar" and "Domino's Pizza," and finding them distinguishable). Furthermore, the Magistrate Judge addressed the marks as used in commerce by finding that "Amazon's Fire TV appears on Amazon's website, an Amazon-branded marketplace with other Amazon-branded products, such as the Kindle Fire, in a general consumer environment free from pornography." (D.E. 130 at 20 (citing Pl.'s Ex. 6).) Whereas, Wreal's FyreTV is available only to consumers who verify that they are over eighteen years old and are willing to view adult content. Furthermore, once customers verify their age, they are directed to a website that exclusively contains pornographic brands.

The Court agrees with the Magistrate Judges legal conclusion and finds no factual errors. Thus, this factor weighs in favor of Amazon.

      c.    *Similarity of Products*

The Magistrate Judge determined that the parties' products are significantly dissimilar. (D.E. 130 at 23.) Wreal's FyreTV is in the market of streaming pornographic

11

content. Amazon Fire TV is expressly <u>not</u> in the market of streaming pornographic content. Wreal expends energy highlighting the availability of certain sex toys or DVDs for sale on Amazon.com—purportedly as evidence that Amazon is in the same business as Wreal. However, Wreal fails to address the truly pertinent issue of whether Amazon's Fire TV product offers any semblance of pornographic streaming, like FyreTV. Accordingly, the Court agrees with the Magistrate Judge's determination as to this factor. Thus, this factor weighs in favor of Amazon.

        d.     *Similarity of Sales Outlets and Customer Base*

Wreal argues that the Magistrate Judge failed to account for the significant consumer overlap between the Parties' target markets. Wreal maintains that its customer base overlaps with Amazon's customer base because Wreal "targets the type of customers that purchase explicit material from Amazon's website, such as sex toys and pornographic DVDs." (D.E. 132 at 11.) Under Wreal's expansive interpretation of this factor, the parties share the same customer base of internet shoppers and humans over eighteen years of age. Wreal misses the mark and fails to grasp the notion that Amazon does not target individuals in the market to stream pornography. Accordingly, the Court agrees with the Magistrate Judge's determination as to this factor. Thus, this factor weighs in favor of Amazon.

        e.     *Similarity of Advertising*

Wreal's objections to the Magistrate Judge's weighing of this factor focus on a failure to consider word-of-mouth advertising and the fact that "Wreal advertised on the

same media as Amazon in the past." (D.E. 132 at 12.) Notwithstanding the fact that Wreal does not cite to specific advertisements that it claims the Magistrate Judge ignore, Wreal cannot reasonably argue that the channels of advertisement between it and Amazon's Fire TV are similar. The Magistrate Judge properly concluded that Amazon uses its homepage, national television, and print; whereas, Wreal advertises on adult-websites only. (D.E. 130 at 29.) Accordingly, the Court weighs this factor in favor of Amazon.

    f. *Defendant's Intent*

If a defendant purposefully used the same or confusingly similar mark as the plaintiff "with the intent of deriving benefit from the reputation" of the plaintiff, "'that fact alone may be sufficient to justify the inference that there is confusing similarity.'" Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263 (11th Cir. 1980) (quoting Restatement of Torts § 729, cmt. f (1938)). However, whether this inference is applicable in reverse confusion cases has not been decided by the Eleventh Circuit. But see Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 957 (7th Cir. 1992) (determining that intent is not entirely relevant to reverse confusion cases); Freedom Card Inc. v. JPMorgan Chase & Co., 432 F.3d 463, 479 (3d Cir. 2005) (focusing on intent of junior user to push senior user out of market). Based on the uncertainty of this factor, the Magistrate Judge gave Wreal the benefit of the doubt and determined that even applying Wreal's suggested standard of "carelessness," "this factor is, at best (for Wreal), neutral, with the intent factor weighing in neither party's favor." (D.E. 130 at 32.)

13

Wreal tucks an objection to the intent factor in a footnote on page seventeen of its Objections. (D.E. 132 at 17.) In short, Wreal maintains that the Magistrate Judge erred in determining that the intent factor was neutral. The Court agrees with the Magistrate Judge's conclusion. Though Amazon knew of Wreal's FyreTV mark, it understood the differences between their products and markets, and used different spelling and styles to create their own mark to stream non-pornographic materials. There is no evidence of intent to confuse Wreal's potential customers, or a careless disregard for potential confusion.

      g.    *Actual Confusion*

"Although evidence of actual confusion is not necessary to a finding of likelihood of confusion, it is nevertheless the best evidence of likelihood of confusion." Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263 (11th Cir. 1980) (citing Roto-Rooter Corp. v. O'Neal, 513 F.2d 44, 46 (5th Cir. 1975)). "[I]n considering actual confusion we look not only to the existence but also to the extent of such confusion." Tana v. Dantanna's, 611 F.3d 767, 779–80 (11th Cir. 2010). Here, as accurately found by the Magistrate Judge, the existence of actual confusion proffered by Wreal in this case is de minimis at best. Accordingly, this factor does not weigh in favor of an injunction.

Wreal argues that (1) the evidence presented was not de minimis; (2) the Magistrate Judge should not have given any weight to Amazon's expert's survey report; (3) the Magistrate Judge improperly penalized Wreal for not providing survey evidence; and (4) the Magistrate Judge erred in relying on a pilot study conducted by Wreal's own

14

expert. As clear from the aforementioned objections, Wreal spends considerable time objecting to evidence that would support the finding of no actual confusion, rather than focusing on any evidence Wreal put forth to show actual confusion—a tactic that fails to grasp their own burden of proof when seeking a preliminary injunction. Because proof of actual confusion is all that would benefit Wreal, the Court need only review the few pieces of evidence proffered by Wreal as proof of confusion.

At the hearing, Wreal relied on two Twitter posts—"tweets"—dated shortly after Amazon released its Fire TV. One asked "Did you guys just merge with Amazon?" (Pl. Ex. 8); the other stated: "Apple delivers AppleTV. Amazon starts FyreTV. Google reinventing GoogleTV into AndroidTV. Roku still chugging. This is no longer a hobby." (Pl. Ex. 9). The Magistrate Judge specifically addressed the tweets and determined that neither tweet showed any actual confusion because the authors did not testify at the hearing that they were actually confused. (D.E. 130 at 34 (citing Armstrong Cork Co. v. World of Carpets, Inc., 597 F.2d 496, 505 (5th Cir. 1979)).) The Magistrate Judge also stated that without any further foundation, the second tweet could be nothing more than a misspelling. (Id. (citing Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 504 (2d Cir. 1996)).) The Court agrees with the Magistrate Judge's analysis.

Wreal also proffered a customer-service inquiry made to Amazon, wherein a customer asked whether he could access adult content on Amazon Fire TV by spelling "Fire" with a "y." (Tr. 313:22–314:7; Def. Ex. Fuller 3). The Magistrate Judge determined that this inquiry did not represent that the caller thought Amazon was the

source of the adult content anymore then the caller could think Amazon was the source of Netflix when the caller also asked about accessing Netflix on his Amazon Fire TV.  (D.E. 130 at 35.)   A review of the transcript supports the Magistrate Judge's conclusion.

Notwithstanding that the above inquiry does not show confusion, even if it did, the one inquiry out of "tens of thousands of customer service inquiries related to Amazon's Fire TV" is de minimis.  See (D.E. 130 at 35 (citing Tr. 309:24–310:8).)  The Magistrate Judge also cited to Wreal's admission that none of its customers have contacted Wreal about confusion with Amazon's Fire TV.  (Id. (citing Tr. 142:10–12).)

In Wreal's objection to the above findings, it cites Caliber Automotive Liquidators, Inc. v. Premier Chrysler Jeep, Dodge, LLC, 605 F.3d 931, 937 (11th Cir. 2010), for the proposition that "the quantum of evidence needed to show actual confusion is relatively small."  Though this may be true, the key word is "relatively."  That is, the Caliber court made clear that "there is no absolute scale as to how many instances of actual confusion establish the existence of that factor."  Id. (internal quotation marks omitted).  Instead, "[t]he court must evaluate the evidence of actual confusion in the light of the totality of the circumstances involved.  [And] one instance of actual confusion [has been held to] not militate in favor of finding likelihood of confusion."  Id. (internal quotation marks and footnote omitted).  Here, Amazon is a very large corporation with a very large customer base.  The one customer inquiry that allegedly shows confusion is just one of tens of thousands of customer service inquiries.  Thus, the Court cannot conclude that such constitutes a showing of a likelihood of confusion.

In summary of all of the factors discussed supra, the minor similarities that Wreal maintains were inappropriately analyzed do not amount to proof of a likelihood of success on the merits. This is not to say that Wreal cannot succeed ultimately. It is merely a determination that at this time, Wreal has failed to adequately prove the marks are so similar as to confuse a consumer.

2. Substantial Threat of Irreparable Harm

Even if Wreal had established a substantial likelihood of success on the merits, it must still prove that there is a substantial threat of irreparable harm if an injunction is not issued. See Levi Strauss & Co. v. Sunrise Intern. Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995). "[P]reventing irreparable harm in the future is 'the sine qua non of injunctive relief.'" Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1133 (11th Cir. 2005) (quoting Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990)) (emphasis added).

The Magistrate Judge determined that Wreal's delay in seeking preliminary injunctive relief after the filing of their Complaint significantly undermines their position that they might suffer irreparable injury without an injunction. In support, the Magistrate Judge pointed to Wreal's reliance on evidence that was available in April 2014, the month it filed the Complaint. (D.E. 130 at 40.) Despite being aware that it would have to potentially justify such a delay, Wreal offered no reason for the delay for the Magistrate Judge's consideration. Accordingly, the Magistrate Judge did not err in considering Wreal's delay when determining whether there is a substantial threat of irreparable harm. (D.E. 130 at 41 (citing Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc., 188 F. Supp.

2d 1350, 1355–56 (S.D. Fla. 2002) ("The Court finds that this unexplained delay undercuts any sense of urgency and, therefore, Plaintiff has failed to demonstrate sufficient need for a preliminary injunction.").

Furthermore, the Magistrate Judge accurately found that Wreal had not shown any risk of any compensable harm—i.e., there was no evidence presented that any sales were lost because of Amazon's use of the Fire TV mark. (D.E. 130 at 43 (citing transcript of Franco's testimony at the preliminary-injunction hearing).)

Wreal objects to the Magistrate Judge's Report stating that Wreal was entitled to the presumption of harm because this is a trademark-infringement case. (D.E. 132 at 18.) (citing Levi Strauss, 51 F.3d at 986). Wreal does not address the Magistrate Judge's analysis of whether such a presumption remains applicable in this Circuit. Nevertheless, the Magistrate Judge found that even the prior case law "suggests such a presumption require either a 'particularly high likelihood of confusion or potential danger to customers' health and safety.'" (D.E. 130 at 46 (quoting Seiko, 188 F. Supp. 2d at 1355). Consistent with the Court's analysis on whether Wreal has established a substantial likelihood of success on the merits, the Court likewise concludes that there is not a particularly high likelihood of confusion or potential danger to customers' health and safety. Thus, a presumption of harm is not appropriate.

    3.    <u>Whether Threatened Injury to Wreal Outweighs the Harm an Injunction May Cause Amazon.</u>

Amazon has been using the "Fire" mark as a brand for approximately four years and has already invested substantial funds in branding and launching its Fire TV.

Specifically, Amazon spent tens of millions of dollars advertising the Fire TV products in 2014, including a national television campaign, print media, and ads on Hulu and CBS.com. (Tr. 223:9-12; Def. Ex. Baicy 1.) Amazon proffered evidence that it would have to then spend tens of millions more dollars to rebrand their product if a preliminary injunction was entered. (Tr. 230–31.) Conversely, as set forth supra Part III, Section 2, Wreal fails to proffer any articulable damage besides their speculative claim that it will lose control of its brand. In addition to the compounding issue that they have not supplied enough evidence to show a substantial likelihood of confusion, Wreal wholly fails to present any semblance of future injury that can compete with damage that would be caused to Amazon. Accordingly, the Court concludes that the Magistrate Judge properly determined that any threatened harm to Wreal does not outweigh the harm an injunction may cause Amazon. See, e.g., Tiger Direct v. Apple Comput., No. 05-21136-CIV-Lenard, 2005 WL 1458046, at *23 (S.D. Fla. May 11, 2005).

4. The Public Interest

Wreal's objection to the public-interest factor is that all of the other portions of the Magistrate Judge's analysis were wrongly decided and thus, so too was the public-interest prong that relied on the prior determinations. Indeed, the Magistrate Judge determined that the "[t]he public interest is not served by an injunction where there is no likelihood of success on the merits, no threat of irreparable injury, and a balance of hardships favoring the defendant." (D.E. 130 at 46.) Because the Court agrees with the prior determinations of the Magistrate Judge, so too does the Court agree with the

determination that the public's interest would not be served by a preliminary injunction in this matter.

## IV. Conclusion

"The standard for injunctive relief is stringent because the nature of the relief is extraordinary." <u>Seiko</u>, 188 F. Supp. 2d at 1356. The Court concludes that the Magistrate Judge properly determined that Wreal has not carried its burden to obtain the extraordinary relief requested.

Therefore, after an independent review of the Report and record, it is hereby **ORDERED AND ADJUDGED** that:

1. The Report and Recommendation of the Magistrate Judge (D.E. 130), issued on February 3, 2015, is **ADOPTED**;

2. Plaintiff's Objections to Report and Recommendation (D.E. 132), filed February 13, 2015, is **OVERRULED**; and

3. Plaintiff's Motion for Preliminary Injunction (D.E. 28), filed September 22, 2014, is **DENIED**;

**DONE AND ORDERED** in Chambers at Miami, Florida this 31st day of August, 2015.

                                                           **JOAN A. LENARD**
                                                           **UNITED STATES DISTRICT JUDGE**