<pre>
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                           MIAMI DIVISION
                     CASE NO. 14-21385-CIVIL-LENARD
 3

 4   WREAL, LLC,                       Miami, Florida

 5              Plaintiff,             September 16, 2015

 6         vs.                         3:01 p.m.

 7   AMAZON.COM, INC.,

 8              Defendant.             Pages 1 to 108

 9

10                       DISCOVERY HEARING
           BEFORE THE HONORABLE JONATHAN GOODMAN,
11              UNITED STATES MAGISTRATE JUDGE
          (TRANSCRIBED FROM THE DIGITAL AUDIO RECORDING)
12

     APPEARANCES:
13

14   FOR THE PLAINTIFF:      JOHN MARFOE, ESQ.
                             PAUL BAGLEY, ESQ.
15                           WASERSTEIN, NUNEZ & FOODMAN, P.L.
                             1111 Brickell Avenue
16                           Suite 2200
                             Miami, Florida 33131
17

18   FOR THE DEFENDANT:      PATRICK C. BAGEANT, ESQ.
                             SUSMAN GODFREY, LLP
19                           1201 Third Avenue
                             Suite 3900
20                           Seattle, Washington 98101

21                           JAMIE ZYSK ISANI, ESQ.
                             HUNTON & WILLIAMS, LLP
22                           1111 Brickell Avenue
                             Suite 2500
23                           Miami, Florida 33131

24

25
</pre>

FILED by _____ D.C.

SEP 2 5 2015

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

```
 1    TRANSCRIBED BY:          LISA EDWARDS, RDR, CRR
                               Official Court Reporter
 2                             United States District Court
                               400 North Miami Avenue
 3                             Twelfth Floor
                               Miami, Florida 33128
 4                             (305) 523-5499

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   We don't eat these days.

2          THE COURT:  I don't think she's fulfilling her local

3   counsel responsibilities completely.

4          MR. BAGEANT:  She does a great job, your Honor.

5          MS. ISANI:  I know, your Honor.

6          THE COURT:  In terms of restaurants, is what I'm

7   talking about.

8          (Laughter.)

9          MR. BAGEANT:  Your Honor, I'm going to give the Court

10  and the clerk two additional documents.  I shared them with

11  Plaintiff's counsel.  One is a prior order of your Honor's and

12  the other is the case schedule in this matter, which will be --

13  I think both of us will be talking about today.

14         THE COURT:  Gosh.  I always get nervous whenever people

15  hand me up my own orders or cite to me my own cases.  I'm

16  always tempted to say, "Don't you have any better authority?"

17  But it is what it is.  Okay.

18         MR. BAGEANT:  We'll do the best with what we have.

19         THE COURT:  Pass up what you'd like to pass up, please.

20         MR. BAGEANT:  So as your Honor said, Amazon is moving

21  to strike two rebuttal expert reports that Wreal served on the

22  final day of expert discovery.  And the basis of our motion

23  is -- it comes in two parts.  The first part is

24  Rule 26(a)(2)(D), which requires parties to disclose expert

25  testimony at the time and in the sequence that the Court

1    orders.  And we're going to make arguments in the scheduling

2    order that that hasn't been done here.

3         And the second part of our motion, your Honor, is under

4    Rule 37(c)(1), which has a self-executing provision that

5    undisclosed evidence is barred or may not be used at trial,

6    absent special justification or harmlessness.

7         Before we get into that, I'd like to walk through the

8    procedural history, because there have been some developments

9    that aren't reflected in our filing to Judge Lenard.  So I'll

10   walk through as quickly as I can chronologically from the

11   beginning.

12        THE COURT:  Take whatever time you need.  Don't feel

13   like you're being rushed.  We have no other hearings this

14   afternoon.  So I'm here for as long as you'd like.

15        MR. BAGEANT:  Thank you, your Honor.

16        So you'll recall that there was a preliminary

17   injunction hearing last year in this case.  And at that

18   hearing, Amazon offered an expert, Dr. Dan Sorel, who testified

19   that he had done a study in this case and that his study found

20   no likelihood of consumer confusion regarding the two

21   trademarks.

22        In opposition to Dr. Dan Sorel, Wreal offered

23   Dr. Thomas Maronick, who testified that the study that

24   Dr. Sorel had done was in his opinion flawed in certain ways.

25        He didn't come to court with a study of his own; but on

1  cross-examination, he admitted that he had conducted a study

2  and that his findings were similar to the findings of Amazon's

3  expert.

4          After the preliminary injunction hearing, Amazon served

5  Dr. Maronick with a subpoena seeking to get his study.  We

6  argue that he was a testifying expert because he testified and

7  we're entitled to see that.

8          THE COURT:  I remember.

9          MR. BAGEANT:  Your Honor disagreed with us.  You ruled

10 that he had not been designated as a testifying expert at trial

11 and that therefore you were going to quash the subpoena.

12         THE COURT:  Right.  I think I indicated that, later, if

13 Wreal were to designate him as a trial expert, then it would be

14 a different scenario.  I think I said something like that.

15         MR. BAGEANT:  You did, your Honor.

16         What you said was -- I'm referring to the order I just

17 gave you on Page 9:  "At this time, Wreal has not designated

18 Dr. Maronick as an expert for use at trial."  This is at the

19 top of the page.  "It has until June 15th, 2015, to do so."

20         You made the same reference on Page 4 in the second

21 full paragraph.  You explained that he's not designated

22 Dr. Maronick.  Wreal has until June 15th to do so.

23         There's a footnote in my presentation here.  You chose

24 the date June 15th based on the schedule that was later

25 modified slightly by Judge Lenard.  The deadline became June

1   26th.

2        But at any rate, you noted here, as the schedule notes,

3   Wreal's deadline to disclose its testifying experts was in

4   June.

5        In June, Wreal noticed expert disclosures.  It

6   disclosed one expert witness.  It did not disclose any expert

7   testimony on surveys.  It did not disclose any expert testimony

8   on damages.

9        With surveys, that's not surprising.  If it had

10  disclosed Dr. Maronick as an expert, it would have immediately

11  faced another subpoena from us citing your order and requesting

12  the study that he had done.

13       Wreal made a tactical decision to not do that.  It made

14  a tactical decision to not disclose the damages expert as well.

15  Ordinarily, it's the Plaintiff's case.  It's an element of the

16  Plaintiff's case.  There are reasons that it took a gamble and

17  wanted to wait until -- until Amazon's expert is disclosed.

18       So Wreal made its disclosures on June 26th, according

19  to the Court's order.  Then on August 11th, Amazon made its

20  disclosures.  The original date in the scheduling order was

21  July 31.  That one was moved slightly as well.

22       So our deadline came up on August 11th.  We disclosed

23  three experts.  The first was Dan Sorel.  He offered the same

24  study and the same opinion that he submitted to your Honor at

25  the preliminary injunction hearing.  I want to emphasize that:

1   the same study, same exact study.

2          We also offered Pat Gannon, who testified -- he offered

3   opinions on damages, both on the Wreal side.  He opined that

4   Wreal hadn't been harmed in this case.  And on the Amazon side,

5   he opined --

6          THE COURT:  From Kaufman Rossin?

7          MR. BAGEANT:  Yes, sir.

8   ████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████████████████████

12         THE COURT:  Right.

13         MR. BAGEANT:  We also offered Peter Lehman, who your

14  Honor met at the hearing, who opined about the nature of the

15  goods and services at issue in this case.

16         THE COURT:  Right.

17         MR. BAGEANT:  Wreal took depositions of those three

18  experts.  Wreal moved to extend the expert discovery deadline

19  to September 10th, which was referenced in the briefing that

20  your Honor mentioned earlier.

21         And then at the close of business on September 10th,

22  Wreal served two new expert reports from two new experts.  The

23  first was Dr. Maronick.  He had reappeared in the case.  He

24  offered opinions about Dr. Sorel's study.

25         The second was a man named Jesse David, who offered

1    opinions about enrichment that Amazon has obtained through Fire

2    TV.

3            Neither Mr. David nor Mr. Maronick were disclosed by

4    Wreal on June 26th.  That's the deadline to disclose expert

5    testimony.

6            I'll refer the Court to the scheduling order, which I

7    just gave your Honor.  On the second page, you'll see this is

8    the -- this is the version of the schedule order that was made

9    before the minute order changing Wreal's deadline.  So this one

10   says by June 15th, 2015, Plaintiffs must furnish an expert

11   witness list to the Defendants.  That's actually June 26th.  I

12   don't think the date change is material.  And it provides very

13   clearly that "Only those expert witnesses shall be permitted to

14   testify."

15           The first argument we're going to make to the Court,

16   your Honor, is that this is unambiguous and this is clear and

17   that there's no real dispute that neither Dr. Maronick nor

18   Jesse David were contained on this list.  Our position is that

19   they're not permitted to testify.

20           THE COURT:  I have a question.

21           So this particular order, the scheduling order, it's

22   adopting the joint scheduling report.  So I'm curious:  When

23   you all submitted your joint scheduling report -- I haven't

24   gone back to look at it -- but when you folks agreed and you

25   submitted whatever you submitted, did it provide for the same

```
 1   format or methodology?  In other words, Plaintiff furnishes its
 2   expert witness list, then Defendants furnish theirs and
 3   whatever you agree to did not incorporate another modification
 4   involving rebuttal experts?  Is that what happened?
 5           MR. BAGEANT:  That is exactly what happened, your
 6   Honor.
 7           THE COURT:  All right.
 8           MR. BAGEANT:  To that, I would add only that we
 9   submitted this joint scheduling report twice.  At one point, we
10   agreed that -- we hadn't agreed on all the dates.  And the
11   Court sent it back to us and said, "Keep working on it."  So we
12   were able to reach an agreement on the specific dates.
13           But the template and the format that the parties
14   negotiated and that we discussed has always contemplated two
15   sets of expert disclosures:  one from the Plaintiff, where it
16   makes out its *prima facie* case, one from the defense, where it
17   responds.
18           What has happened here, your Honor, with these two
19   expert reports coming in on the last day of expert discovery is
20   the exact opposite:  Now the Plaintiff is making out elements
21   of its *prima facie* case after the Defendant has served its
22   disclosures responding to the Defendant's disclosures and in a
23   way that won't allow us to test them or conduct any discovery.
24           There's two pieces to that.  The first is that the
25   discovery deadline has passed.  The second is that the
```

1    dispositive motions and *Daubert* deadline is October 2nd.

2           So this is going to put us in a position where we have

3    two new experts in the case opining on major issues of damages

4    and major issues of consumer confusion and surveys with

5    which -- I don't know how we conduct the document discovery we

6    need, take depositions, turn around, write the *Daubert* briefs,

7    incorporate them into the summary judgment motion and complete

8    all that by October 2nd.

9           I don't know, you know, whether this is by inadvertence

10   that these experts didn't come up earlier, whether this is by,

11   you know, a tactic or a strategy designed to load on a lot of

12   work in a short period of time.  That's the situation it's

13   putting us in.

14          We don't think that's how it works.  We don't think

15   that's what the parties intended when we negotiated this

16   schedule.  We don't think that's what the parties intended when

17   they stipulated twice to the "Only those experts should --

18   shall be allowed to testify" language.  And we think that's the

19   end of the matter.

20          This -- what Wreal is going to say in response --

21   they're going to come up here with a case called *Feliciano v.*

22   *City of Miami Beach*, where a magistrate judge interpreted Judge

23   Lenard's scheduling order that contained --

24          THE COURT:  Was it me?

25          MR. BAGEANT:  No, your Honor.

1          THE COURT:  Whew.

2          MR. BAGEANT:  It interpreted a scheduling order that

3    contained similar provisions that provided "Only those

4    witnesses shall testify" and set forth certain deadlines for

5    disclosures and ultimately allowed the Plaintiff to serve a

6    late expert report in rebuttal.

7          There are a couple of reasons why we don't think that

8    case is persuasive and we don't think your Honor should find it

9    persuasive, either.

10         THE COURT:  By the way, that was an order entered by a

11   magistrate judge or by District Judge Lenard or by a magistrate

12   judge and then it was adopted by the district judge?

13         MR. BAGEANT:  This is the first reason I don't find it

14   persuasive.  It was entered by the magistrate judge; and an

15   immediate objection was taken to Judge Lenard.  The objection

16   said:  This order interprets your scheduling order differently

17   than what your scheduling order said.  It's either

18   contradicting the plain language or it's exceeding the

19   magistrate judge's authority because it's rewriting the

20   scheduling order.

21         THE COURT:  Right.

22         MR. BAGEANT:  While that was happening, a flurry of

23   summary judgment motions were filed.  Judge Lenard granted many

24   of them.  The parties took immediate interlocutory appeal.  The

25   case was stayed, remanded from appeal with some instructions

1    and settled.

2          So Judge Lenard never ruled on the objection.

3          That's the procedural problem with the *Feliciano* case.

4    The substantive problem is that what Wreal is seizing on is two

5    sentences of analysis from the entire opinion, where the

6    *Feliciano* case says basically, Looking at Judge Lenard's

7    schedule, I don't see that it contains any provision one way or

8    the other for rebuttal reports.  So I'm going to find that it

9    doesn't speak otherwise to the default rules under the federal

10   rules.

11          THE COURT:  In other words, the assessment was, Since

12   it wasn't prohibited in the order, I'm going to permit it?

13          MR. BAGEANT:  Yes, your Honor.  And then there's a

14   lengthy analysis of whether it would be prejudicial to the

15   Defendant and, you know, how to permit it in a way that is fair

16   and equitable.  That's really -- you know, the *Feliciano*

17   opinion is one page long.  There's two sentences on what the

18   schedule permits and then there's an analysis of how that court

19   went about permitting on the facts of that case.

20          They weren't in a situation where you had *prima facie*

21   elements of the Plaintiff's case brought in for the first time

22   at the last minute on the *Daubert* summary judgment deadline.

23          So that's our first argument:  The schedule doesn't

24   permit these experts because they were not disclosed.  The

25   reason the schedule doesn't permit them is because -- the

1    reason the schedule provides that is because it's what the

2    parties stipulated to.   It's the ordinary sequence of timing of

3    expert disclosures.   Plaintiff makes its case; Defendant

4    responds.

5         It's clear as day that these two experts weren't

6    listed.   And only listed experts can testify.

7         THE COURT:   So at the time that you were negotiating

8    with the Plaintiff the joint scheduling report, was there any

9    discussion back and forth about, Should we submit a proposed

10   order which provides for rebuttal experts or not?   Was there

11   any push-back on that issue, any discussion, any negotiation?

12   Or was it simply not even mentioned?

13        MR. BAGEANT:   I don't believe it was mentioned.   And I

14   couldn't find it in my e-mail when I went back and looked

15   through.

16        And I believe that the reason it wasn't mentioned is

17   because nobody intended for that to take place.   It's not

18   contained in any of the documents that were submitted to the

19   Court.   We had joint stipulations over the course of this

20   summer to amend and modify the expert discovery schedule

21   slightly so that we could accommodate the schedule of

22   witnesses.   It was never brought up then.

23        And in fact, in the course of amending those schedules,

24   we shortened the expert discovery window in which Wreal would

25   have been able to serve rebuttal reports.   In other words, it

1    moved from 30 days to approximately 20 days.  Wreal never

2    complained.  It never said, Hey, I need this time to prepare my

3    rebuttal expert reports.

4        I think that's because Wreal didn't intend to serve

5    expert rebuttal reports either.

6        The second point I want to make to your Honor --

7        THE COURT:  Give me just one second.

8        So I get a fairly decent number of cases on consent.  I

9    think right now I have maybe 32 or 33 cases on consent.  And

10   when that happens, I issue my own trial scheduling order.  And

11   so I generally issue two types of discovery trial orders

12   vis-à-vis expert disclosures.

13       One type is the one here.  One side goes; the other

14   side goes; that's it.  No third step involving a rebuttal-type

15   expert.

16       And the other type of trial scheduling order that I

17   enter is:  One side discloses; the other side discloses; and

18   then there's rebuttal.

19       And so in some of those cases, there is some fairly

20   significant discussion between the parties about which of those

21   two methodologies they'd like to use.  And sometimes in the

22   joint scheduling report I get differing perspectives.  They

23   don't agree.  One side says, We just think that a two-step

24   procedure is appropriate; and the other side says, No.  We

25   think it ought to be the third -- the second type, where

1  there's the third step of rebuttal.  And then if they can't

2  agree, I'll decide which one of the two.

3       But I do find it interesting that sometimes the parties

4  discuss it.  Sometimes they agree; sometimes they disagree.

5  But you're telling me apparently nobody even raised the issue.

6  It never came up.

7       MR. BAGEANT:  The first time rebuttal reports ever came

8  up, your Honor, was after the depositions of our experts.

9  Wreal disclosed these experts to us for purposes of the

10  protective order way back in early June.  So it had these

11  experts in its pocket.  It was presumably consulting and

12  working with them.

13       Actually, let me back up.  What I just said was not

14  correct.  They disclosed one expert, Dr. Osberg, who is yet

15  another survey expert that they've hired and chosen not to

16  offer testimony from in early June.

17       They disclosed Mr. Davids [sic], the financial expert,

18  in August prior to Pat Gannon's deposition.

19       So --

20       THE COURT:  So Mr. David was disclosed before

21  Mr. Gannon's deposition but after Mr. Gannon's report was

22  turned over to the Plaintiff?

23       MR. BAGEANT:  Yes, your Honor.

24       THE COURT:  All right.

25       MR. BAGEANT:  I don't believe that either party

1    intended or considered or expected to see rebuttal expert

2    reports in this case in any event until those things happened.

3    As your Honor pointed out, there are two kinds of scheduling

4    orders.  One kind provides for them; the other kind doesn't.

5    And regardless of, you know, what the parties intended or

6    expected or had discussions about, it's certainly true that

7    this is the kind of scheduling report that doesn't provide for

8    them.

9             That's the first point we want to make.  These experts

10   were disclosed.  Now they're here.

11            The second point we want to make is that even if there

12   were some sort of avenue for rebuttal reports in this case,

13   these reports aren't rebuttal.  The first report is from

14   Dr. Maronick, who is criticizing a survey that he was handed in

15   2014.  Wreal disavowed any attempt to call him a testifying

16   expert so that it could prevent us from discovering work that

17   Dr. Maronick had done in connection with forming opinions in

18   this case.

19            Your Honor agreed with that in an order that said,

20   Wreal has up until June to disclose its testifying experts.

21   They laid behind the log.  They didn't disclose him.  They

22   didn't mention --

23            THE COURT:  I'm sorry.  What was that phrase?  "Laid

24   behind the log"?

25            MR. BAGEANT:  Laid behind the log.

1       THE COURT:  Is that, like, a Seattle expression?  I'm

2   not familiar with that.

3       MR. BAGEANT:  Maybe it is.  It's a -- a blunter word is

4   sandbagging.

5       THE COURT:  All right.  I'm familiar with that term.

6       MR. BAGEANT:  Yes, your Honor.

7       THE COURT:  Like a lying-low-in-the-weeds kind of

8   thing?

9       MR. BAGEANT:  Yes, your Honor.

10      THE COURT:  Go ahead.

11      MR. BAGEANT:  Jumping out at the last minute.

12      THE COURT:  All right.  So this is a good day for me.

13  I learned something.  I learned a folksy expression, laying --

14  what was it?  Laying in the logs?

15      MR. BAGEANT:  Laying behind the log.

16      THE COURT:  Laying behind the logs.

17      MR. BAGEANT:  You can picture someone leaping from

18  behind the log.  That's the analogy.

19      THE COURT:  All right.  Please continue.

20      MR. BAGEANT:  Then we had litigation, brief filings to

21  Judge Lenard about whether rebuttal reports would be allowed.

22  They didn't mention Dr. Maronick.  He didn't show up until

23  after close of business on the final day of expert discovery.

24      It's difficult for us to not interpret that as a

25  transparent attempt to game the schedule in a way that denies

1  us discovery under the basis of his opinions.  And we know why

2  Wreal would want to do that; and the reason is that his

3  opinions are bad for Wreal.  He did a survey that tends to

4  confirm the survey that our expert conducted.  We don't think

5  that it's rebuttal because he had all the material that his

6  opinion is based on way back in December.

7       You'll recall that Peter Lehman also testified way back

8  in December.  Wreal offered expert testimony rebutting Peter

9  Lehman in June, according to its expert schedule.  It hired an

10  expert to talk about pornography.  It did what it could have

11  done with Dr. Sorel's survey with respect to Mr. Lehman.  It

12  chose to wait because it wanted to avoid discovery.

13       Equitably, that's certainly not fair.  That's certainly

14  not what the schedule contemplates.  It doesn't follow or fit

15  with your order, what you said, that they have up until June to

16  disclose Dr. Maronick as a testifying expert.

17       And it puts us in a situation where we've got to deal

18  with this opinion that we can't test without access to the

19  documents that we've argued to your Honor before related to it

20  all coming up on the October 2nd *Daubert* deadline.

21       Mr. David's testimony is not rebuttal either.  Damages

22  and financial injury, you know, what the Plaintiff is owed are

23  elements of the Plaintiff's *prima facie* case.

24       We offer -- when Wreal's expert deadline came in June,

25  it offered no testimony on damages.  The reason as a practical

1  matter is that Wreal can't show that it's been harmed.  Wreal

2  also offered no testimony on profits that Amazon has acquired

3  from Fire TV. ███████████████████████████████████████████

4  █████████████████████████

5  When Wreal's deadline came and went without expert

6  testimony on those issues, we waited until our expert

7  disclosure deadline and then we disclosed an expert on damages,

8  on financial issues.  He testified that, Yep, I've looked at

9  the documents.  Wreal hasn't been harmed.  Yep, I've looked at

10  the documents. ███████████████████████

11  Now comes on the last day of expert discovery Jesse

12  Davids.  What Jesse Davids says is not, I've looked at

13  Mr. Gannon's analysis and I disagree with it for reasons.  He's

14  not rebutting specific elements of Mr. Gannon's analysis.

15  Mr. Gannon's analysis was: ███████████████████████████

16  What Jesse David did is come in and say, There's an

17  unjust enrichment theory that ought to be in this case. ████████

18  ███████████████████████████████████████████████████

19  ███████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████

21  ████████████

22  In a trademark case, it's the Plaintiff's burden to

23  come forward and show the money that the Defendant has made

24  from a product.

25  Then it's the Defendant's burden to respond with

1   evidence of what it cost to make that money.  So Plaintiff

2   shows revenues; Defendant shows profits.

3        What Mr. David is doing is saying, ███████████████

4   ████████████████████████████████████████████████████████

5   ████  That's initial burden material.  It should have been

6   showing whatever theory it has for benefit or money to Amazon

7   from Fire TV back in June with its initial expert disclosures.

8        It's not academic or procedural.  That's important,

9   because the reason the burdens in a plaintiff's case are set

10  out that way is we, who have been accused of wrongdoing, are

11  entitled to know how much money they think we've made from a

12  product.  We're entitled to know what revenues they're going to

13  go after, what their theory of the case is.

14       Then, once we have that, we can say, Well, according to

15  your theory of the case, you know, there's this much revenue

16  involved.  Here's our cost.  It's actually only, you know, some

17  smaller set of profit.

18       Instead, they didn't say anything about revenues.  They

19  didn't say anything about money that Amazon's made.  ████████

20  ████████████████████████████████████████████████████████████

21  ██████████████████████

22       ██████████████████████████████████████████████████████

23  ██████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████

1    That turns the burdens around.  That's the opposite of

2    the disclosures that the scheduling order set forth.  It's the

3    opposite of how civil litigation usually procedures.  It's

4    ordinarily not our job to come forward and justify our conduct

5    and then their job to criticize our justification.  They come

6    forward with their case; we respond to it.  That's -- that's

7    how litigation normally proceeds and that's certainly how the

8    scheduling order proceeds.  So that's our second point, your

9    Honor.

10    Neither of these experts are rebuttal.  Maronick's

11    dealing with something he saw last year.  David is bringing new

12    theories into the case.  It was their burden to respond to both

13    of those things on June 26th.

14    So those two first points go to whether these reports

15    were disclosed timely.  That's Rule 26(a)(2)(D).  They're not.

16    The second part of the analysis -- and the burden here

17    shifts to Wreal -- is to find out whether there's a substantial

18    justification or a failure to make timely disclosures or

19    whether their untimely disclosures were harmful.  They can't

20    make either of those showings here.  And again, if it's a draw,

21    it goes to us, because it's their burden.  The rule is

22    self-executing.

23    First, on Maronick, there's no substantial

24    justification, because all the material that he's dealing with

25    was given to them last year.  He criticized the same survey at

1  the preliminary injunction hearing that now he's criticizing on

2  the last day of expert discovery.  They've gamed the system to

3  deny us access and the discovery into his work product, as now

4  a testifying expert.  They didn't make the disclosure on time,

5  I think, in an effort to avoid that.  And those facts don't add

6  up to substantial justification for waiting until the last

7  minute.

8          On prejudice or harm to Amazon, your Honor, this is --

9  this is certainly prejudicial or harmful to us.  We're not

10  going to deal with an opinion of an expert without any

11  discovery into him.  We're going to deal with an opinion from

12  an expert in a big area of the case in the weeks before *Daubert*

13  and summary judgment deadlines.  We're presumably going to have

14  one opportunity to criticize or challenge his -- the basis of

15  his methodology in a *Daubert* motion without an opportunity to

16  take his deposition.  And that's no way to do those things

17  without amending the scheduling order.

18          And all of this in the context of a report that's not

19  true rebuttal anyway and in the context of litigation tactics

20  that are designed to surprise.

21          So I don't think there is substantial justification

22  there and I don't think there's harmlessness either.

23          The point to emphasize is that they could have

24  disclosed his opinion on June 26th.  They chose not to.  They

25  took that gamble to try to deny us discovery.  And we're asking

1   you to hold them to the schedule, your Honor, because it was a

2   gamble that we don't think they should win.

3        THE COURT:  Bear with me just a minute.

4        Well, when you say that the Plaintiff could have

5   disclosed Mr. Maronick and his opinion by June 26th, I'm

6   looking in his declaration.  And in numbered Paragraph 5, he

7   says, "I was retained by counsel for Wreal, LLC, to analyze the

8   declaration of Dr. Dan Sorel submitted on August 11th, 2015."

9        So how can you say that they could have disclosed

10  Mr. Maronick by the June 26th deadline when he wasn't even

11  retained until August 11th, 2015?

12       MR. BAGEANT:  Well, he was retained to testify at the

13  preliminary injunction hearing.

14       THE COURT:  Right.

15       MR. BAGEANT:  He presumably worked with Wreal

16  throughout the spring as a consulting expert.  He's been

17  working with Wreal on this case.  He's been retained by Wreal

18  on this case at least since December of last year.

19       The notion that he was retained by Wreal on August

20  11th, our deadline to serve expert disclosures doesn't square

21  with those facts.

22       It sounds -- that reads more to me like they got our

23  expert disclosures on August 11th and said -- picked up the

24  phone and called Dr. Maronick and said, Hey, we've got some

25  more work for you.

1        But what they received on August 11th is what they were

2    given at the preliminary injunction hearing.  So the material,

3    the study that he is criticizing, according to his

4    quote-unquote "retainment" on August 11th is the same study

5    that he was retained to criticize at the preliminary injunction

6    hearing.

7        Wreal did the same thing with Peter Lehman.  There, it

8    received expert testimony from Peter Lehman at the preliminary

9    injunction hearing and it retained an expert to criticize that

10   testimony before we made our expert disclosures.  It then

11   served a report from that expert, a woman named Dr. Linda

12   Williams, on its expert disclosure deadline.

13       So it could have done so.  It chose not to because it

14   wanted to avoid your Honor's order, which strongly indicated

15   that you would authorize discovery into his testimony if he was

16   disclosed as a testifying expert.

17       THE COURT:  So concerning Jesse David, his expert

18   report says that he was asked by Wreal's counsel to review

19   Mr. Gannon's report and to provide other opinions about that.

20   But just -- so he wasn't retained until after Mr. Gannon's

21   report, your expert's report, was disclosed.  And that was

22   after June 26th.  Right?

23       MR. BAGEANT:  Yes, your Honor.

24       THE COURT:  Okay.  So what do you say about -- I'm

25   anticipating their argument's going to be, We couldn't have

1  disclosed these experts on June 26th because they weren't

2  retained until after June 26th.

3      MR. BAGEANT:  I couldn't have -- the argument would be,

4  I couldn't have disclosed this expert because I didn't hire

5  them in time for the deadline.

6      THE COURT:  Right.

7      MR. BAGEANT:  That's not persuasive to me because Wreal

8  knows as a plaintiff that damages and profits in a trademark

9  case are part of its burden.

10     So a plaintiff shouldn't be able to say -- a plaintiff

11 in a medical malpractice case shouldn't be able to say, Well,

12 I'm not going to offer any expert testimony on injury because I

13 hadn't retained my injury expert until after they offered an

14 expert that said I wasn't injured.  It's the same issue.

15     The other piece of that, your Honor, is that setting

16 aside the elements of its case and what it needs to prove, it

17 knew that damages were an issue.  It took a deposition of a

18 financial person at Amazon who we designated as knowledgeable

19 on financial matters.  It examined him on the primary financial

20 document that David relies upon.

21     Shortly after that, we disclosed Pat Gannon under the

22 protective order, so it knew we'd hired him.  It knew that we

23 were putting damages in play based on our pleadings.  Our

24 preliminary injunction briefing is full of references to how

25 Wreal has not been harmed ███████████████████████████

1      There's no reasonable way to look at that record and

2 conclude that damages somehow aren't going to be an issue in

3 the case.

4      I would read that record and I would say, Gosh, I'm

5 going to need expert testimony on damages.

6      Waiting until after we've served our disclosures

7 doesn't fit with the scheduling order because the scheduling

8 order provides a specific sequence in timing.  And it's

9 prejudicial and harmful to us because it's -- you know, it's

10 allowing Wreal to put in the damages theory that it should have

11 put in long ago after the fact at the eleventh hour.

12      So --

13      THE COURT:  Okay.  So let's assume for the sake of

14 discussion the Plaintiff messed up, dropped the ball.  It

15 should have retained these experts earlier but it didn't.

16 Let's give them the benefit of the doubt and not assume that it

17 was some sort of intentional, devious strategy, that they had

18 these experts in their pocket the entire time and that they

19 purposely waited to ambush you and spring it on you later.

20 Let's assume they sort of dropped the ball and only later

21 realized, My gosh, we really do need experts.

22      I understand that perhaps technically there's a

23 violation of the rule.  If I wanted to adopt the Plaintiff's

24 perspective, I might say it's just a technical violation.

25      And in response to your position that you'd be unduly

1    prejudiced, what about the notion that, Well, okay.  But we can

2    ameliorate the prejudice.  We can simply allow you to take the

3    depositions of these two experts in the next week or so, and

4    then you'll have the information that you need to file your

5    *Daubert* motion.

6            What is your response to that possible remedy?

7            MR. BAGEANT:  A couple of responses.  One is to respond

8    to the premise and the other is to respond to the remedy.

9            In response to the remedy, these two experts are

10   opining on huge swaths of the case.  This isn't, Oh, we

11   overlooked a small technical detail.  These are major issues

12   that Wreal effectively took out of the case when it didn't

13   serve expert testimony on them.  So it's not the case that we

14   take a deposition on them and then we write up a quickie

15   *Daubert* motion and the prejudice has been cured.

16           Second, the timeline in which to do that is very

17   compressed and very small.  You know, dispositive motion

18   briefing in this case is not going to be a small task.  Neither

19   is *Daubert* briefing.  All those deadlines fall on the same day,

20   and they're right around the corner.

21           To go to the premise, though, the notion that

22   Plaintiffs made a mistake, I disagree with that.  But if we

23   assume that that's -- that that's what happened here, it's not

24   fair or reasonable or in compliance with the scheduling order

25   to punish Amazon for any mistake that Wreal made.

1    You know, whether what they did was by inadvertence or

2    whether it was by something else, it plainly is not allowed.

3    We followed the rules.  We made disclosures.  We disclosed

4    expert testimony on areas of the case, even though Wreal

5    hasn't.  We complied with the deadlines.  We followed the

6    discovery schedule and we followed the scheduling order.

7    And now to allow a do-over on expert testimony, which

8    is what this would be, because under these sort of questionable

9    circumstances Wreal has made a mistake would be to punish

10   Amazon for Wreal's inadvertence.

11   We have schedules and we have deadlines for reasons.

12   Among them is that finality is a value in the Rules of Civil

13   Procedure.  Another is to keep cases moving towards

14   disposition.

15   I mean, stepping back, Amazon's perspective is that it

16   has been wrongfully sued and has been accused of something that

17   it hasn't done.  Allowing a do-over we don't think complies

18   with the rules and we don't -- you know, we don't think it

19   would -- it's just their job to follow the rules and their job

20   to follow the schedule.

21   The final point I guess I would make, your Honor, is

22   that Rule 37(c)(1) is self-executing.  So if you agree with us

23   that they haven't followed the scheduling order here -- and I

24   think, given the plain language of the order, given the fact

25   that it's stipulated between the parties, given the fact that

1    it's utterly unambiguous, I think you should -- then in the

2    absence of anything else, Rule 37(c)(1) operates to preclude

3    this testimony.

4         It's their burden to show substantial justification,

5    which they can't on these facts; or, number two, harmlessness,

6    which they can't on these facts.

7         So I think as a final point, Rule 37(c)(1) would

8    conflict with the proposed remedy your Honor made of, you know,

9    creating a do-over on expert discovery.

10        THE COURT:  So is your argument that the Plaintiff has

11   the burden to show "substantial justification and harmlessness"

12   or "or harmlessness"?  Because you phrased it actually both

13   ways.

14        MR. BAGEANT:  Both ways.  Let me get back to you in the

15   rebuttal on that.  I'd like to read -- the rule of the cases

16   I'm thinking of that analyze it provides a list of factors and

17   they do it in narrative fashion.  But let's see what the Rule

18   of Civil Procedure actually says.

19        THE COURT:  Do you have your rule book here?

20        MR. BAGEANT:  I have an iPhone, your Honor.

21        THE COURT:  I guess that's the modern-day equivalent of

22   the rule.  Take the time and just track down that rule on your

23   phone.  I'm curious.

24        MR. BAGEANT:  Okay.

25        (Pause in the proceedings.)

1    THE COURT:  I have the rule right here, 37(c)(1),

2  Failure to Disclose Or Supplement:  "If a party fails to

3  provide information or identify a witness as required by

4  Rule 26(a) or (e), the party is not allowed to use that

5  information or witness to supply evidence on a motion at a

6  hearing or at a trial unless the failure was substantially

7  justified or is harmless."

8    So I guess if they demonstrate one or the other, they

9  would fall into the permissible exception.

10    MR. BAGEANT:  Yes, your Honor.

11    You know, the cases on substantial justification tend

12  to be newly discovered information.  Sometimes there's a change

13  in the law.  Sometimes a party has withheld information.  And

14  then -- you know, those are the types of factors.

15    THE COURT:  Sure.  And I understand your position is

16  that the Plaintiff hasn't met either of those two alternatives.

17  But they are alternatives as opposed to being two separate

18  requirements.  It's one or the other --

19    MR. BAGEANT:  Yes, your Honor.

20    THE COURT:  -- under the rule as opposed to the

21  scheduling order argument.

22    MR. BAGEANT:  Yes, your Honor.  So the scheduling order

23  argument goes to whether there's been a violation and then the

24  rule goes to what to do with it.

25    THE COURT:  Right.

1        All right.  Anything further right now?

2        MR. BAGEANT:  No, your Honor.  We'll hear from

3    Mr. Marfoe.  And if I may, I'll respond to him.

4        THE COURT:  All righty.  Mr. Marfoe, you can either

5    come to the podium or stay at the counsel table.  Your choice.

6        MR. MARFOE:  I'll choose the podium --

7        THE COURT:  All right.

8        MR. MARFOE:  -- which as I recall does not balance a

9    bottle of water very well.

10        THE COURT:  Well, it's probably because it's a low

11    bidder on a government podium contract.

12        MR. MARFOE:  The cup holder was not in there.

13        THE COURT:  It reminds me:  Many, many years ago I had

14    the privilege and pleasure of trying the very first case in the

15    new courtroom down in Key West, the new federal courtroom in

16    Key West.  And they were trumpeting the fact that the courtroom

17    was being opened and there was a lot of hoopla about it, and

18    they had done a masterful job of bringing in fittings and

19    furniture and all that.  And they had this very fancy-schmancy

20    podium.  I think it was imported Italian wood and so forth and

21    so on.

22        And I remember getting up to the podium to make my very

23    first argument in front of Judge King.  And I took my legal

24    pad, which back in those days was an actual legal sized, not

25    letter size, and I tried to plop it down right on the podium.

1    And guess what?  It wouldn't fit.  It was too big.  They only

2    had the podium to accommodate a letter-sized pad, which was

3    stunning to me.

4          And I think this was actually back in the day when the

5    pleadings -- when you submitted pleadings, they were actually

6    on the legal-sized format, not the letter-sized.  So some

7    designer, some architect, some furniture planner, wasn't aware

8    of how people -- how lawyers work in actual practice.

9          So anyway, thank you for sending me on a brief trip

10   down memory lane with your comment about the podium.

11         MR. MARFOE:  Happy to do so.  And any trip down memory

12   lane to Key West is usually a good one.

13         THE COURT:  Well, back in those days, it was.  That's

14   because it was before they started bringing in all the cruise

15   ships.  Once that happened, it changed the entire personality

16   of the city.

17         But in any event --

18         MR. MARFOE:  I've heard.

19         THE COURT:  -- we digress.  So let's get back to the

20   lawsuit here.

21         MR. MARFOE:  Yes.  Right.

22         And so Amazon moves to strike Wreal's rebuttal reports.

23   And, you know, the primary argument they're making is that

24   they're untimely.

25         I mean, we don't even get to the balance of

1    justification or prejudice or harmlessness if these are timely.

2    And they are timely.

3          Now, Amazon raised two bases to say that the scheduling

4    order in this case does not permit Wreal to disclose rebuttal

5    experts.

6          The first argument is essentially that the scheduling

7    order in this case provides otherwise to Rule 26, which would

8    hold that the rebuttal reports are due 30 days after the

9    disclosure of the other expert's report.  However, of course, a

10   scheduling order can provide otherwise.  Amazon says that they

11   do provide otherwise because of the language in the order

12   saying that only these experts can testify at trial.

13         And their second argument is that they are improper

14   rebuttal, which is also a timeliness issue, really, because if

15   they -- even assuming rebuttal reports, which we think are

16   permitted -- if they're not proper rebuttal, then they should

17   have been submitted with the initial expert reports on June 15.

18         So there are two timeliness issues.

19         Our deadline to submit our expert rebuttal reports was

20   June 26th.  We disclosed Dr. Linda Williams at this time.

21   Mr. Bageant said that that was purely in rebuttal to

22   Dr. Lehman.  Some parts of her report addressed Dr. Lehman's

23   opinions.  She also offered brand-new opinions that were not on

24   the same subject matter as Dr. Lehman's.  So it was a -- it was

25   I guess a burden-of-proof report, so to say.

1          On August 11, their deadline, Amazon disclosed

2    Dr. Gannon and Dr. Sorel.  Dr. Sorel submitted a report

3    containing the same consumer survey that he ran in October and

4    November and some additional opinions kind of bolstering that

5    survey.  He didn't conduct a new survey, which quite frankly we

6    expected him to do.

7          But I mean, I guess the real point there is up until he

8    disclosed his report on June -- on August 11, we didn't know

9    whether Amazon was going to disclose Dr. Sorel as a survey

10   expert, whether they were going to disclose a survey expert at

11   all, whether they were going to disclose another survey expert,

12   whether they were going to disclose Dr. Sorel with some other

13   survey and some other opinion.  We had no idea what Dr. Sorel

14   was going to disclose.

15         Dr. Gannon as well disclosed his opinions on August 11.

16   We (inaudible) he was ID'd to the expert ID provision, which

17   applies to both testifying and consulting experts.  Again,

18   until we saw Dr. Gannon's opinions on August 11, we didn't know

19   what he was going to testify to.

20         Now, the first issue is on -- goes to the scheduling

21   order.  The scheduling order I don't think there's any dispute

22   is silent as to rebuttal reports.  It does not mention them.

23         The case law is quite clear that when a scheduling

24   order is silent as to rebuttal reports, the rule controls.  And

25   Amazon predicted that I would rely on the *Feliciano versus City*

1    *of Miami Beach* case.  It's Case No. 10-23139-CIV, Southern

2    District of Florida, of course, and the cite is 2012 WL 12540.

3    It's a Judge Lenard case.

4            THE COURT:  2012 WL.  Give me the next part.

5            MR. MARFOE:  I'm sorry.  12540.

6            THE COURT:  Okay.

7            MR. MARFOE:  Actually, your Honor, I actually have --

8    I'm going to refer to a couple of issues.  I've given a copy to

9    the Plaintiff.

10            May I approach?  I have a copy for the Court.

11            THE COURT:  Sure.  Sure.

12            Thank you.  Got it.

13            MR. MARFOE:  Now, Amazon argues that, as I said, the

14   language in the scheduling order that "Only those experts named

15   on this list and for whom the required reports or summaries had

16   been provided shall be permitted to testify" somehow provides

17   otherwise and precludes rebuttal expert reports.

18            They also argue in their motion for clarification that

19   the close of expert discovery provided otherwise.  I would

20   agree with that.  But that argument's moot, as Judge Lenard

21   extended the close of expert discovery to September 10th.

22            So had the expert discovery deadline been August 31st,

23   that would have been our deadline to submit rebuttal reports.

24   It was extended at our request to September 10.  The reason for

25   that request was in part to have additional time to serve

1    rebuttal reports, such as leaves us with the language in the

2    scheduling order.

3           Now, the very same issue -- and I mean, it's one of

4    those things that I wish -- I remember when I was a junior

5    associate, to get an assignment from a partner, "Find this very

6    specific -- find a very specific case directly on point with

7    this very specific discovery dispute" -- and, of course, you

8    can never find them -- well, *Feliciano versus Miami Beach, City*

9    *of Miami Beach*, is directly on point.  I've included in the

10   binder at Tab 3 the scheduling order from the *Feliciano* case.

11          Judge Lenard provides a form scheduling order.  And the

12   language in this scheduling order and the *Feliciano* case is

13   identical.  At least the relevant language is identical to the

14   language in our scheduling report.

15          The dates in both of ours change; but in the *Feliciano*

16   report, if you look at Page 2, it says there that by July 15,

17   2011, Plaintiffs must furnish an expert witness list along with

18   summaries or reports required by Local Rule 16.1(k), which no

19   longer exists.  And it says only those experts shall be

20   permitted to testify.

21          The same language for the Defendant's report in the

22   *Feliciano* scheduling order, just like ours, is silent as to

23   rebuttal expert reports.

24          So in the *Feliciano* case, the Plaintiff in that case

25   was a 15 -- it was a very complex case with 15 counts against

the City of Miami Beach related to police brutality.
Apparently, a woman was arrested by the officers and she was --
claimed to have been assaulted and that that assault led to a
miscarriage.

The Defendants disclosed on their expert report
deadline a medical expert who was actually opining the
miscarriage was not caused by -- or could not have been caused
by any alleged brutality.  And on the close of expert
discovery, just like in this case, the Plaintiff submitted
rebuttal expert reports of their own medical expert, who
addressed the exact same subject matter as the Defendant's
expert that was disclosed and said that actually it could have
caused the injury.

Now, the City of Miami Beach moved to strike, just as
Amazon did here.  Judge Lenard referred it to Magistrate Judge
O'Sullivan.  And the City of Miami Beach made the same
arguments that Amazon just made.  They argued that the language
"Only those expert witnesses who are named may testify" is
language that provides otherwise in that you do not default
back to the rule.

And if you look at Tab 2, I actually attached the
Defendant's motion to strike there.  On Page 2, Paragraph 3,
you'll see that the Defendant said in the order the Court
warned that "Only those expert witnesses disclosed in
accordance with the timetable set forth above shall be

1    permitted to testify."

2            Again, on Page 6 of their brief, the entire, I guess,

3    first full paragraph makes the exact same argument.

4            So the issue was presented to Judge -- to Magistrate

5    Judge O'Sullivan.  Magistrate Judge O'Sullivan did not accept

6    that argument.  He ruled that because the scheduling order is

7    silent as to rebuttal reports, the rule controls; and the

8    rebuttal reports submitted by the Plaintiff in that case were

9    timely, even though they were on the last day of discovery.

10   Even though the scheduling order did not provide for rebuttal

11   reports, the rule controls.  And the Plaintiff in the *Feliciano*

12   case was entitled to submit their rebuttal expert report and it

13   was considered timely.

14           Now, Mr. Bageant mentioned that there was further

15   analysis in that very short decision, which I attached at Tab

16   1.  I think the key analysis really comes in the first two

17   paragraphs, where the Court found that, contrary to the

18   Defendant's assertions, which is the same assertions that

19   Mr. Bageant made here today, the scheduling order does not

20   preclude rebuttal experts.  It's silent on the issue.  And the

21   Plaintiff discloses rebuttal experts within the time allotted

22   by Rule 26(a)(2)(D)(ii).

23           I don't think there's any dispute here that Wreal

24   disclosed its rebuttal experts in accordance with

25   Rule 26(a)(2)(D)(ii).

```
 1            And then the Court there went on to say, even assuming

 2   arguendo that they do not comport with the scheduling order,

 3   the Court then went into the analysis as to whether the -- it

 4   was substantially justified or harmless.

 5            THE COURT:  Right.

 6            MR. MARFOE:  Now, there's no reason for this Court to

 7   depart from Judge O'Sullivan's interpretation of the order.

 8   It's a fair and reasonable interpretation of the scheduling

 9   order.

10            In that case, just like this one, the same scheduling

11   order was used.  It was a form scheduling order.  It doesn't

12   have a provision for rebuttal reports.

13            If the Court wanted the parties to specifically address

14   rebuttal reports, it very well could have done.  It could have

15   put something in there explicitly saying, "There are no

16   rebuttal expert reports" or "Rebuttal expert reports are due on

17   XY date."

18            But when the order is silent, just like this one, you

19   default to the rule.

20            THE COURT:  All right.  So if we were to follow the

21   deadline of Rule 26 as opposed to sort of the implicit silent

22   deadline of the Court's discovery order, would the disclosure

23   of your rebuttal witnesses from strictly a timing perspective

24   comply with Rule 26(a)(2)(D)?

25            MR. MARFOE:  Absolutely.
```

1    THE COURT:  All right.

2    MR. MARFOE:  Amazon disclosed theirs on August the

3    11th.  And 30 days later, we disclosed ours, on September 10.

4    THE COURT:  So what about the point that 26(a)(2)(D)

5    says that the disclosures "must be made if the evidence is

6    intended solely" -- I'm underscoring and emphasizing the word

7    "solely" -- "solely to contradict or rebut evidence on the same

8    subject matter identified by another party within 30 days"?

9    So let's assume you're okay on the timing issue.

10   Amazon discloses its experts and then you disclose yours 30

11   days later.  So you're okay on the timing, if I buy your

12   argument.

13   By what about sort of the substantive aspect, which is:

14   You're only allowed to do that if the expert testimony is

15   intended solely to contradict or rebut?  Mr. Bageant's argument

16   is that you don't meet that test either.

17   MR. MARFOE:  Well, I would disagree with Mr. Bageant.

18   Rule 26 -- absolutely right -- they're permitted to present

19   evidence that contradicts or rebuts evidence on the same

20   subject matter identified by the individual expert witness.

21   That goes kind of to the second timeliness argument, which is

22   whether these are proper rebuttal in the first place.

23   And the Eleventh Circuit hasn't explicitly defined or

24   explained the same subject matter.  The Courts have interpreted

25   this broadly.  A very recent case from the Middle District of

1    Florida said just that.  It's *Northup* [sic] *v. Warner*

2    *Enterprises*.  The case number is 8:14-CV-1627-T-27JSS.  The

3    Westlaw cite is 2015 WL 4756947.

4            THE COURT:  And what's the name of the case again?

5            MR. MARFOE:  Sorry.  It's *Northup versus Warner*

6    *Enterprises*.

7            THE COURT:  "Northrop"?

8            MR. MARFOE:  "Northrop."  Sorry.

9            THE COURT:  *Northrop versus Warner Enterprises*.  Okay.

10   And it's 2015 Westlaw 4756947.  And what court is that from?

11           MR. MARFOE:  That is in the Middle District of Florida,

12   and that was a case that was decided on August 11, 2015.  So

13   it's --

14           THE COURT:  That's pretty recent.

15           MR. MARFOE:  It's fairly new.

16           THE COURT:  And what does that case stand for?

17           MR. MARFOE:  The Court in that case just merely

18   explained that the Eleventh Circuit has not defined or

19   explained the same subject matter in the context of the rule,

20   but that courts in this district have interpreted it broadly

21   and it was interpreted broadly in that case.

22           Now, I don't think that we need to necessarily

23   interpret it broadly.  In fact, whether it's construed broadly

24   or narrowly, both these experts are opining on the exact same

25   subject matter as the expert that they're rebutting.

1      I'll start with Dr. Maronick.  His opinion solely

2   addresses Dr. Sorel's survey.  Wreal does not intend to

3   introduce a survey in its case in chief.  It's not -- the only

4   way a consumer survey will be admitted in this case is if

5   Dr. Sorel is permitted to testify.  And his opinion goes

6   directly to Dr. Sorel's survey and his report surrounding the

7   survey.

8      If Amazon does not open the door by having Dr. Sorel

9   testify as to his survey, Wreal will not call Dr. Maronick

10   because -- and the jury would be pretty confused as to why

11   we're calling somebody to talk about survey evidence when none

12   has been presented by Amazon.

13      And likewise, Dr. Davids specifically addresses

14   Dr. Gannon's methodology and how it computes Amazon's profits

15   and expenses and how it allocates certain profits and expenses

16   attributable to Fire TV and its conclusions.

17      Now, Mr. Bageant's absolutely right:  In a trademark

18   infringement case, if we were going to -- it's not an element

19   of the case; but to obtain damages, it is the Plaintiff's

20   burden to show Amazon's sales.  And we intend to do that.  Not

21   through an expert, but we intend to do that.

22      Dr. Gannon --

23      THE COURT:  In your case in chief, let's move forward

24   in time.  We're in the middle of trial.

25      MR. MARFOE:  Right.

1        THE COURT:  The Plaintiff is putting on its case.  Are

2   you going to be trying to put on this expert in your case in

3   chief?

4        MR. MARFOE:  At this time, we have no intention to do

5   so.

6        THE COURT:  I'm talking about Dr. David.

7        MR. MARFOE:  Dr. David.  Yeah.  Certainly not

8   Dr. Maronick.

9        THE COURT:  All right.  So you have no intent to put on

10  Dr. David in your case in chief.  And therefore, you

11  acknowledge that you have a burden to prove damages and you're

12  going to do that through some other way, whether it's exhibits,

13  testimony, a combination thereof.  You're going to do it

14  without an expert witness.

15       MR. MARFOE:  That's the intention.

16       THE COURT:  And therefore, you say to me in effect,

17  "And therefore, that expert witness, Jesse David, is truly a

18  rebuttal expert, because the only way we're going to put him on

19  is if Amazon puts on Dr. Gannon."  And therefore, I assume that

20  you would say to me, "If Amazon does not put on Dr. Gannon as a

21  trial expert, we're not going to put on Dr. David."  Is that

22  right?

23       MR. MARFOE:  Exactly right.  Just like if Amazon

24  doesn't present Dr. Sorel and his flawed survey, we'd have no

25  need for Dr. Maronick to discuss his survey.  So these are pure

1    rebuttal, your Honor.

2         So I believe that addresses both of the timeliness

3    issues.  We have a decision directly on point from this

4    district, from this Court, really, a different magistrate in

5    this Court, but Judge -- it was Judge Lenard's scheduling order

6    interpreting the exact same scheduling order in the way that we

7    think is reasonable and the right way to do it and consistent

8    with the Federal Rules of Civil Procedure, the local rules and

9    case law throughout the country.

10        THE COURT:  So let me ask you this question, because I

11   see the *Feliciano* case.  From one perspective, it has the

12   advantage of being one page, so it's really digestible and

13   manageable.

14        But I have to ask myself -- and in fact, I am asking

15   myself:  Gee, could this be the only opinion out there on this

16   issue?  And I have a feeling I know what the answer is, because

17   I've been doing this for 35 years, meaning being a lawyer, and

18   I know that sometimes I'll say to myself, Surely this issue

19   must have come up dozens and dozens of times.  My gosh, it

20   comes right from the trial scheduling order and from the Rules

21   of Civil Procedure.  There's got to be dozens and dozens of

22   cases out there.  Surely this can't be the first time that

23   somebody has written about it.

24        And over the years, I've learned that when I think

25   that, oftentimes I'm completely wrong and there's a dearth of

1    authority on it.

2           Now, have you found any other cases on this particular

3    point other than the *Feliciano* case?  And what I mean by "this

4    point," I mean, what happens when the judge's trial scheduling

5    order is silent and then you revert back to the rule?  And if

6    the trial scheduling order doesn't say anything either way

7    about rebuttal experts, it doesn't authorize it, it doesn't

8    prohibit it, it just sort of ignores the issue completely, what

9    happens?

10          So as far as you know, *Feliciano* is the only case to

11   talk about that?

12          MR. MARFOE:  Absolutely not.

13          THE COURT:  Oh.

14          MR. MARFOE:  I'm highlighting *Feliciano* only because

15   it's so on point and because it's actually addressing a

16   scheduling order with the exact same language as ours.

17          THE COURT:  All right.

18          MR. MARFOE:  It's actually the prevailing rule

19   throughout the country, throughout the circuit and the country.

20          If you go to Tab 5 in our binder, I included our motion

21   for extension of time to complete expert discovery.  And on

22   Page 2 of that motion, at the end of Paragraph 6, I added a

23   footnote there where I cited the *Teledyne Instruments* case.

24   It's in the packet, so I can't give you the full cite.  But

25   it's right there.

```
 1              THE COURT:  Hang on just a minute, please.  Bear with
 2    me for a minute, because I can't listen to you and read at the
 3    same time.  And right now, I'm reading.  So thank you for your
 4    patience.
 5              MR. MARFOE:  Sure.  No problem.
 6              THE COURT:  I see.
 7              So you do cite several other cases, probably four or
 8    five other cases.
 9              So is Amazon aware of any cases to the contrary?  In
10    other words, this footnote points out that -- let's call it the
11    Feliciano rule, for lack of a better phrasing.  This footnote
12    points out that the Feliciano rule is the prevailing rule both
13    in the circuit and throughout the country, the rule being if
14    the discovery order -- I'm sorry -- if the trial scheduling
15    order is silent, it doesn't mean that rebuttal expert testimony
16    is not permitted; it simply means that you use the deadlines in
17    the Federal Rules of Civil Procedure, in particular
18    Rule 26(a)(2)(D).
19              So do you agree that that is the prevailing rule or do
20    you have some different authority?
21              MR. BAGEANT:  Well, your Honor, the rule under the
22    Rules of Civil Procedure is unless a court order provides
23    otherwise, you follow the Rule of Civil Procedure.
24              So Feliciano said, I find that the scheduling order is
25    silent on the issue of rebuttal reports.  Therefore, Feliciano
```

1    concluded the scheduling order did not affirmatively provide

2    otherwise.

3            To the extent that that's the prevailing rule in the

4    country, I see that as just the inverse statement of the Rule

5    of Civil Procedure.  Right?  The Rule of Civil Procedure says,

6    If a court order provides otherwise, follow the court order.

7            *Feliciano* says, This thing doesn't say anything one way

8    or the other, so there's no court order to follow.  We'll apply

9    the Rule of Civil Procedure.

10           That doesn't answer the question here.  The question

11   here is whether this scheduling order provides otherwise.

12           THE COURT:  Just like that was the issue in the

13   *Feliciano* case, whether it provides otherwise.  And the

14   argument is:  It doesn't, because it's silent.  It doesn't

15   provide otherwise; it just doesn't provide at all.

16           MR. BAGEANT:  Well, I disagree with that reading of

17   *Feliciano*.  It's true that the scheduling order in that case

18   contained the -- that "Only those witnesses shall be able to

19   testify."

20           THE COURT:  Just like it did here, because,

21   fortuitously, it was the same district court judge and, you

22   know, judges are creatures of habit.  And I'm sure Judge Lenard

23   has been using the same or substantially the same trial

24   scheduling order for many years.  And so it's no surprise to me

25   that the trial scheduling order in *Feliciano* at least in

1    connection with experts is the same, contains the same language

2    as the trial scheduling order here.

3           MR. BAGEANT:  But this language that we're relying upon

4    was not argued to the Court in *Feliciano*.  It's quoted in the

5    brief.

6           And this is Mr. Marfoe's point:  You can look at the

7    brief and you can see they quote from the scheduling order here

8    in two places in their -- in their briefing on this argument.

9    The point -- the argument that we're making, the argument being

10   the language "Only those witnesses shall be permitted to

11   testify" precludes these experts because they were not

12   disclosed is not the argument that was made in *Feliciano*.

13          The argument in *Feliciano* was, Judge, read this report.

14   It doesn't say anything about rebuttal reports -- I'm sorry.

15   Judge, read this case schedule.  It doesn't say anything about

16   rebuttal reports.

17          THE COURT:  Correct.

18          MR. BAGEANT:  Therefore, it does not provide otherwise.

19          THE COURT:  Correct.

20          MR. BAGEANT:  To be candid, I think they did a poor job

21   of arguing the issue.  And I think that the magistrate judge's

22   ruling in that case is not sound based on the scheduling order.

23          THE COURT:  I hear what you're saying.  Let me try to

24   sharpen my question.

25          Mr. Marfoe, excuse me for shifting and questioning the

1    defense.  But I'm picking up on an argument that you made that

2    sounds at least facially compelling, and therefore I need to

3    immediately ask Amazon about it before I forget.

4         So let me phrase the way a little bit differently:  We

5    have the *Feliciano* case.  You disagree with it.  You think the

6    magistrate judge was incorrect who, by the way, he's still a

7    magistrate judge today in this Court.  He's about six-foot-six,

8    so you may not want to be looking him in the eye and saying, I

9    disagree with you.

10        But Judge O'Sullivan's been a magistrate judge for more

11   years than me.  But let's assume you don't agree with him.

12   Okay.  I'm not bound by his opinion.  It's just another

13   opinion in the district.  Maybe it's persuasive; maybe it's

14   not.  I don't have to follow it.

15        So then we have these other cases that Mr. Marfoe cites

16   in this footnote, the *A&J Manufacturing* case, the *SEC versus*

17   *Bodian* case, the *Mayo versus Ferguson* case, the *Smith versus*

18   *Jacobs and* (inaudible) *Group* case, the *IBM versus Fasco*

19   *Industries* case.

20        Now, Mr. Marfoe, do all of those cases there in the

21   footnote basically stand for the proposition that if the trial

22   scheduling order is silent on rebuttal that you simply defer to

23   the Rule of Civil Procedure and it does not mean -- the silence

24   doesn't mean that rebuttal exhibits are prohibited?  Do those

25   cases stand for that?

1        MR. MARFOE:  That is what those cases stand for.

2        THE COURT:  All right.  So my question to Amazon is:

3   Do you disagree that that's what those other cases stand for?

4        MR. BAGEANT:  I find that those case are various

5   statements of what I called a moment ago the inverse of the

6   Rule of Civil Procedure, which is that if a scheduling order

7   does not provide otherwise to Rule 26, Rule 26's disclosure

8   schedule controls.

9        THE COURT:  Right.

10       MR. BAGEANT:  I don't find that they answer the

11   question of whether this scheduling order provides otherwise.

12   And the reason is, number one, the language "Only those

13   witnesses shall be permitted to testify" precludes the use of

14   these experts in this case.

15       THE COURT:  But isn't that the language that was in

16   Judge Lenard's order in the *Feliciano* case?

17       MR. BAGEANT:  But the argument wasn't made.  That

18   language appeared in the briefing.  But this argument that I'm

19   making to you, your Honor --

20       THE COURT:  Wait.  Wait.

21       When you say the argument was found in the briefing,

22   you mean in the *Feliciano* case?

23       MR. BAGEANT:  I'm sorry.  The quoted language, "Only

24   those experts shall be permitted to testify" --

25       THE COURT:  Yes.

1    MR. BAGEANT: -- appeared in the *Feliciano* briefing

2 because they quoted the scheduling order.

3    THE COURT: All right. But what do you mean, "It

4 wasn't argued"?

5    MR. BAGEANT: They didn't -- there's a paragraph in the

6 brief that says, "Only those witnesses shall be permitted to

7 testify. They didn't disclose him. It violates this

8 language," et cetera, et cetera, et cetera.

9    Our argument today and what we're urging the Court to

10 do is not issue a broad proclamation, you know, on what all of

11 Judge Lenard's scheduling orders mean. Our argument is that

12 these experts were not disclosed and are not permissible under

13 this scheduling order because they were not included in the

14 list of experts disclosed to testify.

15    I don't think that that -- you know, we're arguing as

16 well that this scheduling order doesn't permit rebuttal

17 reports, period. But really, to resolve this dispute among us,

18 you just have to read the order and ask whether these two

19 experts, who they're offering testimony from, are permitted

20 under the plain language of this scheduling order.

21    THE COURT: So these other cases in the footnote, the

22 four or five other cases that I just mentioned: Did those

23 involve scheduling orders which also said in words or substance

24 "and only those experts shall be permitted to testify"?

25    MR. BAGEANT: I have not pulled the scheduling orders

55

1   from each of those cases.  They didn't involve that specific

2   argument.  But I have not gone to the dockets of each of those

3   cases and looked at their scheduling orders.

4        THE COURT:  So I understand that you disagree with

5   *Feliciano*, and you're more than welcome to disagree.  It's not

6   binding precedent.  And I understand your argument.

7        So now my question to you is:  Do you have an actual

8   case to support your position?  It's one thing to take pot

9   shots at the other side's argument.  It's one thing to take pot

10  shots and challenge another opinion.  And it's one thing to

11  say, I disagree.  And it's one thing to try to distinguish the

12  other case.  But it's even better if you have an actual case

13  affirmatively supporting your position.  Do you have such a

14  case?

15       MR. BAGEANT:  I have a case and I have an observation.

16  So probably like Mr. Marfoe, I went through Westlaw for this

17  scheduling order language and looked for cases citing various

18  iterations of it.  There's not much.  You do find a lot of

19  scheduling orders, but not a whole lot of cases analyzing it.

20       THE COURT:  Right.

21       MR. BAGEANT:  The case I'd like to give you is

22  called -- I'm probably pronouncing it wrong, but *Halaoui versus*

23  *Renaissance Hotel.*

24       THE COURT:  Spell the first name.

25       MR. BAGEANT:  H-A-L-A-O-U-I.

1       THE COURT:  *Halaoui versus Renaissance Hotel*?

2       MR. BAGEANT:  Right.  It's 2014 Westlaw 6801807.

3       THE COURT:  I'm sorry.  2014 Westlaw.  6801807?

4       MR. BAGEANT:  Yes, your Honor.  It's from the Middle

5  District of Florida.

6       THE COURT:  All right.  And what is the significant

7  holding?

8       MR. BAGEANT:  So what *Halaoui* did was look at the

9  timing of expert disclosures under a scheduling order.  So the

10  Court held that an expert discovery cutoff, even though it

11  never mentioned rebuttal reports, affirmatively provided

12  otherwise to Rule 26 because the date that it provided for

13  expert discovery was shorter than the date allowed under the

14  federal rules.

15       In other words, the federal rules' default rule, absent

16  a court order providing otherwise, is that you get 30 days to

17  serve rebuttal reports from the service of the report that

18  you're trying to rebut.

19       The scheduling order in *Halaoui* provided less than 30

20  days.  That Court read that as implicitly providing otherwise

21  to Rule 26 and didn't allow any rebuttal reports.

22       THE COURT:  All right.  Well, let me just make sure I

23  understand the order there.

24       The order there was different because the federal rule

25  mentions 30 days and the trial court's scheduling order

1  mentioned less than 30 days.  So it is, in fact, providing

2  otherwise.

3          But it's not a situation like here, where the trial

4  scheduling order is simply silent.  Am I right?

5          MR. BAGEANT:  That's correct.

6          THE COURT:  All right.  So that really doesn't answer

7  the question.  That simply states the truism that "If a trial

8  scheduling order says otherwise, then it says otherwise."

9  Whether it's 30 days or 50 days or 20 days, it says otherwise.

10 It doesn't address the issue confronting us here, which is:

11 Does silence equate to providing otherwise?  That's the issue,

12 isn't it?

13         MR. BAGEANT:  It's very close to the issue.  It's --

14         THE COURT:  How would you phrase the issue?  It's now

15 Judge Bageant.  You're going to phrase the issue.  Tell me how

16 you would phrase it.

17         MR. BAGEANT:  Your Honor, I would phrase the issue as:

18 Does this scheduling order permit the service of these reports

19 by these experts?

20         Now, there are various arguments why it doesn't.  One

21 argument which we've been discussing is that it can be read to

22 not permit any rebuttal reports at all.

23         THE COURT:  Right.

24         MR. BAGEANT:  Another argument is that even if it

25 doesn't permit rebuttal reports, it doesn't permit rebuttal

1   reports from these experts because they were never disclosed.

2         And another argument is --

3         THE COURT:  It prohibits these rebuttal expert reports

4   because they're not actually substantively rebuttal reports.  I

5   understand the third issue.

6         MR. BAGEANT:  Yes, your Honor.

7         THE COURT:  So right now we're on Issue No. 1.  And I

8   don't mean to be confrontational.  I don't like the phrasing of

9   the issue by you.

10        I like my phrasing better, which is:  If an order, if a

11  trial scheduling order, is silent, does the silence mean that

12  the trial scheduling order, quote, "provides otherwise," as

13  contemplated by or as mentioned in Federal Rule of Civil

14  Procedure 26?  That's how I'm phrasing the issue.

15        So we have the *Feliciano* case, which deals with an

16  order which is silent.  I know you say that it wasn't really

17  argued to the magistrate judge.  But at least it contained the

18  same language or phrased more artfully the absence of language.

19        Then we have these cases that Mr. Marfoe cited to me.

20        Then we have this *Halaoui versus Renaissance Hotel*

21  case, which quite frankly to me doesn't really address the

22  issue, because it involves an order which specifically and

23  unequivocally does provide to the contrary by coming up with a

24  shorter deadline.

25        So other than the *Halaoui* case, did you find any other

1    cases which would help me address this first issue?

2              MR. BAGEANT:  I think the body of case law that will

3    help you address this first issue is the case that we've been

4    discussing.  So the answer is --

5              THE COURT:  I'll take that as a no.  It sounds like no.

6              MR. BAGEANT:  That's a no, your Honor.

7              THE COURT:  All right.  Got you.

8              MR. BAGEANT:  But --

9              THE COURT:  I'm not saying you lose.  I'm just saying

10   right now on this first argument about whether or not silence

11   means providing otherwise and therefore the Plaintiff is out of

12   the box, I hear what you're saying and I hear what the

13   Plaintiff is saying.  And it sounds like they have cited more

14   authority, which, by the way, none of it is controlling; none

15   of it is binding.  They're all district court cases.  You can

16   have 500 district court cases and none of it is binding, even

17   if it's other district court cases from this district, even,

18   quite frankly, if it's my own opinion.  It's not binding

19   either.

20             So it's still legally an open issue unless the Eleventh

21   Circuit or the Supreme Court tells me otherwise.  And neither

22   of those two courts have.

23             MR. BAGEANT:  I'm sorry.  I want to try to agree with

24   Mr. Marfoe here on one thing.

25             If the proposition -- you know, if the question is:

1   Does something that doesn't provide anything provide otherwise?

2   The answer is no.

3          THE COURT:  All right.

4          MR. BAGEANT:  I mean, that's why there's a lot of cases

5   on that.  It doesn't help us here, because for reasons that

6   perhaps I should save for my time, this scheduling order does

7   provide certain restrictions on the type of expert testimony

8   that can be offered today.

9          THE COURT:  I know.  I heard your argument.  And you're

10  focusing me to the language which says "and no other witness

11  may testify at the trial."  And therefore you say that is, you

12  know, the overarching language and that's the prohibition.  I

13  understand your argument.

14         Mr. Marfoe, I cut you off a little while ago.  So if

15  you can -- if you have the ability to get back to where you

16  were, maybe you have an outline that you were looking at or

17  maybe you're just very adept and quick on your feet.  But

18  either way, please continue.

19         MR. MARFOE:  I'll do my best.  I think I can address

20  some of those points.  I'm just going to circle back briefly.

21  I think this has been said many times.

22         But the *Feliciano* case really did address this issue

23  directly on point.  And there's -- I think Amazon's given a

24  reason for the Court to depart from, you know, what may not be

25  controlling authority, but certainly is -- given that it came

1    from this Court and the Southern District of Florida, certainly

2    is persuasive.  And there's no reason to disturb the *stare*

3    *decisis* effect of that decision.

4          THE COURT:  You know, I've always wanted.  Is it "*stare*

5    *decisis*" or "*stare decisis*"?  I always called it "*stare*

6    *decisis*."

7          MR. MARFOE:  I learned it --

8          THE COURT:  What do you folks call it?

9          MR. MARFOE:  I learned it "*stare decisis*" in law

10   school.  It may have just been the professor that said it

11   first.

12         THE COURT:  What do you say?

13         MR. BAGEANT:  My law school study partner was a Latin

14   professor.  He took this kind of issue very seriously.

15         THE COURT:  Yes.

16         MR. BAGEANT:  And so there are a number of things that

17   have been engrained in me.  "*Decisis*" is one of them.

18         THE COURT:  And what do you say?

19         MS. ISANI:  I was with you, Judge.  I say "*decisis*."

20         THE COURT:  I, too, had a study partner who used Latin

21   phrases all the time.  It drove me crazy --

22         MR. BAGEANT:  It's awful.

23         THE COURT:  -- because he always wanted to include the

24   Latin phrase in a brief that we were submitting to the Court,

25   which would basically be a law professor.  And I remember

1   once -- I'm going back to 1980 -- he insisted that we include

2   in the brief the phrase *stricto senso*.

3          I said, "'*Stricto senso*'?  What does that mean?"

4          Any idea?

5          MR. MARFOE:  Strict sense?

6          THE COURT:  Strictly speaking.

7          I said, Well, why don't you say strictly speaking?  Why

8   do you say *stricto senso*?  What if the professor doesn't know

9   *stricto senso*?  Then we're, like, insulting the professor.

10  What are we trying to use this fancy-schmancy language for?  I

11  prevailed on that argument, at least that one time.

12         Mr. Marfoe, please continue.

13         MR. MARFOE:  Okay.  So I think we've established that

14  Wreal's disclosures were timely, both under the scheduling

15  order, under the rule and under the case law that we've

16  presented.

17         Now, there should end the matter.  However, should this

18  Court disagree with Judge O'Sullivan, we then go to the

19  sanctions issue.

20         The question is whether the -- Wreal should be

21  sanctioned by excluding these experts or by striking the

22  witnesses.  It's not an automatic sanction.  As we discussed

23  earlier, it's -- you know, the Court must look as to whether

24  Wreal was substantively justified in making what -- if it were

25  a tardy production, a tardy production or a tardy disclosure.

1    And the Court also takes into account Wreal's need for the

2    expert testimony and any prejudice that may flow to Amazon that

3    cannot be cured.

4         Now, these factors all weigh in Wreal's favor.  There

5    is a bit of discussion by Mr. Bageant on our motivations -- and

6    it's purely speculation, in my opinion -- on our motivations

7    here.  Our motivation was to disclose rebuttal reports after we

8    learned what we were rebutting.  It would have been very

9    difficult for us to rebut something that we hadn't seen yet.

10        And there are a couple other reasons that -- there's

11   one other, I think, certain reason that Wreal is justified.

12   And that is going back to the scheduling order itself and the

13   case law.  Wreal's disclosure was substantially justified

14   because it was based on a good-faith, reasonable interpretation

15   of the scheduling order, one that another magistrate judge in

16   this district agreed with.  And there's no contrary authority

17   in this district.

18        Now, as I explained earlier, the Court would have to

19   disagree with Judge O'Sullivan in order to find that the

20   reports are not timely.  So that's one piece of justification.

21   We're relying on the law.

22        Now, moreover, like in *Feliciano*, the timing is

23   explained by the fact that they were rebuttal reports.  As I

24   mentioned earlier, Judge O'Sullivan in *Feliciano* did the --

25   assuming arguendo that they're not timely, I would still find

1   them justified.

2        One of the reasons is that, Well, it was a rebuttal

3   report and it's not something that could have been produced

4   ahead of the report that it was rebutting.

5        And I don't believe there's anything in the rules or

6   any case law or anything that would require us to guess at what

7   Amazon is going to put forth in their expert disclosures and

8   try to precognitively figure out who to retain -- experts are

9   not free -- who to consult with and who to talk to on rebutting

10  something that we haven't seen yet.

11       THE COURT:  So excuse me for just a minute.

12       You made your disclosures of these two experts, these

13  two rebuttal experts, on what specific date?

14       MR. MARFOE:  These -- the actual disclosures were done

15  on September 10, which was 30 days after Amazon's.

16       THE COURT:  And when did the discovery period close?

17       MR. MARFOE:  Expert discovery closed on that day, just

18  as in the *Feliciano* case, although actually I believe the

19  expert --

20       THE COURT:  So let's think about that for a minute.

21       So let's assume that your expert -- that your rebuttal

22  expert disclosure was timely and that it was substantively

23  appropriate in the sense of they truly were rebuttal experts.

24       So you turn over the information timely on September

25  10th.

1          Amazon receives these reports and disclosures on

2     September 10th.

3          And naturally, Amazon will say to itself -- assuming

4     that they agree that the reports were timely produced, Amazon

5     would likely say, Well, we need to take the depositions of

6     these two experts.  Depositions of the experts have already

7     taken place.  Everybody agrees that depositions of experts in

8     this case is appropriate discovery.

9          But they wouldn't be able to do it because the

10    discovery deadline ended on the very day that you submitted

11    your rebuttal experts.  So that to me sounds mighty odd.

12          MR. MARFOE:  Well, one thing I can say during the

13    meet-and-confer process that we had ahead of -- before this

14    hearing was scheduled, we told Amazon that we would not object

15    to any motion to take these experts' depositions, that we agree

16    that they should be deposed.  I think fairness would require

17    it.

18          And we, I believe, both in e-mail and over the phone

19    offered them for a deposition.  We said we'd make them

20    available and we would not oppose any motion to the Court if it

21    were necessary to extend the time to take those depositions.

22          I mean, we take the scheduling order as it is.  In the

23    *Feliciano* case as well, the rebuttal expert report was served,

24    I believe, late in the evening the day before close of

25    discovery, which put the Defendant there in the exact same

1    predicament Amazon's in.  Judge O'Sullivan allowed the

2    deposition.  I agree with his decision there.

3         And we would have no objection to Amazon deposing those

4    witnesses and receiving documents, documents they claim that

5    though -- well, they were not able to receive before.

6    Obviously, you know, disclosing witnesses -- well, Dr. Maronick

7    is a testifying expert.  It means that we have to disclose the

8    documents that he reviewed or relied upon.  And we fully intend

9    to do that and we fully intend to make him available for

10   deposition, if the Court would allow it.

11        THE COURT:  So does Judge Lenard's trial scheduling

12   order include language -- I'm going to call it "safety valve"

13   language?  This is language that I typically keep in my trial

14   scheduling orders when I have a case by consent.  And the

15   language goes something like this:  If the parties want to take

16   discovery on their own after the deadline expires without

17   seeking leave of Court, they're certainly free to do so.  You

18   don't need my permission to do that.  I'm not going to extend

19   any deadlines specifically unless you ask me for it.

20        And if you enter into an agreement to take discovery

21   after the fact and then somebody backs out, don't look to me to

22   enforce it.  But if on your own you want to work it out, fine

23   by me.  That's what I call the "Let's clean up discovery

24   safety-valve mechanism" without dragging me into that sort of

25   dispute.

1          Now, does Judge Lenard's order contain that kind of
2    language?
3          MR. MARFOE:  I don't believe that it says anything --
4    that it mentions it either way.
5          THE COURT:  Oh, it's silent?
6          MR. MARFOE:  I believe that it is silent to that.
7          THE COURT:  I wonder what that means.
8          MR. MARFOE:  It's silent to that as well.  That's why I
9    said that we would not oppose a motion for relief seeking an
10   enlargement of time to take those depositions.
11         You know, another point to bring up -- and your Honor
12   has mentioned this before -- the scheduling order is a bit
13   quirky in another way.  Trial is not set until the middle of
14   April next year.  We have dispositive motions coming up, but
15   then we have a seven-month gap between now and trial.
16         So I don't think that this is an issue where there are
17   going to be -- and the discovery rules are really set up to
18   prevent some sort of unfair ambush before trial.  There's
19   plenty of time ahead of trial.  I mean, again, this gets into
20   the prejudice issue, which I don't think we need to address
21   unless the Court were to find that the reports were not timely.
22         But yet we are certainly a long way away from trial.
23   There's wiggle room with the schedule.  We offered, like I
24   said, last week -- we said we would make those experts
25   available.  Amazon has not taken us up on that offer.  They

 1    haven't contacted us just in case to try and schedule them.

 2    So, I mean....

 3            THE COURT:  I just had a thought.

 4            You mentioned something about the *Daubert* motion

 5    deadline.  When did you say that was?

 6            MR. BAGEANT:  October 2nd, your Honor.

 7            THE COURT:  October 2nd.

 8            Where does it say that?  I don't see a separate

 9    deadline for *Daubert* motions.  I just see "all dispositive

10    motions as well as any motions to exclude or limit proposed

11    expert testimony."  It says October 28th.  So where are you

12    getting the October 2nd deadline from?

13            MR. MARFOE:  Your Honor, you may be looking at the

14    *Feliciano* scheduling order at Tab 3.

15            THE COURT:  Oh, you're right, because it says 2011.

16            MR. MARFOE:  Although the same language is --

17            THE COURT:  That is four years too late.

18            (Laughter.)

19            THE COURT:  Hang on.  Excuse me.

20            MR. MARFOE:  It says October 2nd.

21            THE COURT:  Hang on just a minute.

22            MR. BAGEANT:  Page 3 of the operative scheduling order.

23            THE COURT:  I see.  I see.

24            Anything further, Mr. Marfoe?

25            MR. MARFOE:  I mean, just a couple of other points on

1    the prejudice issue and to, I guess, respond to a couple of

2    things that Mr. Bageant had said.

3          Let me just double-check and see if there's anything I

4    haven't addressed already.

5          THE COURT:  Well, I'll ask you a question.

6          MR. MARFOE:  Sure.

7          THE COURT:  So you knew and your legal team and your

8    client knew for months and months and months and months that

9    the issue of damages and your ability to prove the proximate

10   cause of the damages or the Defendant's argument that you have

11   no damages and can't attribute damages to whatever they did or

12   didn't do would be an issue in the case.  My report and

13   recommendation discussed that issue.  I think Judge Lenard's

14   order adopting that report and recommendation also mentioned

15   that.

16         So how is it that you didn't on your own realize the

17   need to have an expert witness to provide expert opinion

18   testimony on damages?  I know now you say that it's in the form

19   of rebuttal testimony because we needed it to rebut Mr. Gannon.

20   And I can understand why you can't rebut Mr. Gannon's testimony

21   until you see what Mr. Gannon's testimony is.

22         But that's sort of in a way beside the point, because

23   as a Plaintiff, it's your burden to prove damages.  And that

24   issue was already flagged and underscored.  So why didn't you

25   retain your own expert as part of your case in chief and

1    disclose it initially?

2            It sounds like a major point, I have to tell you, that

3    I don't want to go out on a limb and say never, because I've

4    been practicing law since 1983.  But I have to tell you that I

5    can't recall any case of whatever kind, medical malpractice,

6    breach of contract, anti-trust, what have you, where a

7    plaintiff who is seeking substantial damages didn't on its own

8    retain an expert witness.  And I think this may be the first

9    case that I've ever confronted where the Plaintiff didn't list

10   an expert damages witness until the rebuttal stage.  I've never

11   seen that before.

12           And what are your thoughts about that?

13           MR. MARFOE:  Well, your Honor, a couple, I guess,

14   points about this case and our burden in this case.

15           As a trademark infringement case, specifically a

16   reverse confusion case, and also to clarify a bit on

17   Mr. David's report and what it's addressing, as -- first of

18   all, there's really two parts to the damages.  There's lost

19   profits, which your Honor in your report and recommendation,

20   Judge Lenard in her opinion, noted that there was no evidence

21   of actual damages that can be attributable to Amazon.

22           THE COURT:  Right.

23           MR. MARFOE:  Fortunately, that's not an element of a

24   trademark infringement case.  The primary remedy that we're

25   seeking is an injunction in this case.

1          The reason that we don't have at this point an expert

2     or anybody discussing our lost-profits damages is that at this

3     stage there may not be a way to calculate our damages.  The

4     harm is, as we allege, irreparable.  And there may not be, as

5     the case in many, many trademark infringement cases -- there

6     may not be a way to tell -- to quantify the harm that's been

7     caused by Amazon's decision to infringe on my client's mark.

8          So that's kind of like -- kind of setting the framework

9     here.  And that's the lost-profits issue.

10         Now, on -- the Lanham Act provides other remedies.

11    Amongst them are disgorgements of the Defendant's profits.  And

12    the burden on the Plaintiff there is actually quite simple.  We

13    have to show Amazon's sales of its -- of the infringing

14    product, period.

15         Amazon would then have the burden to show the cost of

16    those sales and to explain why -- obviously, you know, in most

17    cases, there are costs of sales.  You're not entitled to all

18    the sales.  They have to explain the cost of the sales and how

19    they are allocated and how they're accounted for within Amazon.

20         And that's what Dr. Gannon did.  And Dr. David is

21    retained to solely rebut the methodology used by Dr. Gannon in

22    forming his analysis as to what the proper disgorgement remedy

23    should be.

24         THE COURT:  So you're basically saying to me, For our

25    case in chief, we're not really seeking lost profits.  We're

1   seeking an injunction, but also disgorgement of the Defendant's

2   profits.  And we can do that easily enough.  We don't need an

3   expert witness.  All we need to do is introduce evidence of

4   Amazon's sales, its revenues, and then the burden shifts to

5   Amazon to demonstrate the costs it incurred associated with

6   those revenues.

7          And then they did that.  Amazon did that through

8   Gannon.

9          And then once they did that, then we have the

10  opportunity to come back in and rebut it with our expert.

11  That's sort of how it unfolded?

12         MR. MARFOE:  That was well put.

13         The only thing I would say is that at this stage,

14  evidence of lost profits on our side is not present.  Nothing

15  has been disclosed to Amazon, of course.  We are still seven

16  months from trial.  I don't know what's going to happen with

17  sales -- I mean, new information may come out.  So we're not

18  dropping that argument at this point.  But yes.  What you said

19  is accurate.

20         So yeah.  I believe that that's where we are.  I

21  believe that under the precedent in this district and

22  throughout the country, what the *Teledyne* Court described as

23  the prevailing rule when a scheduling order is silent as to a

24  rebuttal expert's report, they are permitted.  You default back

25  to the rule.  The rule gives you 30 days.  They were timely

1   disclosed within 30 days.

2        Any doubt about any specific language in Judge Lenard's

3   order was addressed by Magistrate Judge O'Sullivan.  And I

4   think that was a reasonable decision.  And it's one that we

5   relied upon.

6        THE COURT:  So I'm just interested:  Going forward, not

7   in this case, but in other cases, when you're in federal court

8   and you have to submit a joint scheduling report, are you going

9   to include language in there that says something like, Although

10  we don't have a specific deadline for rebuttal reports, the

11  parties are specifically contemplating the feasibility of

12  rebuttal reports?  And maybe you want the joint submission to

13  actually provide otherwise and say, The parties anticipate the

14  need for rebuttal experts, and the deadline for that disclosure

15  will be so-and-so.

16       In other words, going forward, are you going to avoid

17  the potential issues arising from silence and specify your view

18  on rebuttal expert witnesses?

19       MR. MARFOE:  I certainly think that it's always wise to

20  be as clear and unambiguous as possible when drafting

21  scheduling orders or any type of procedural order to make sure

22  that disputes like this don't come -- don't come to this --

23  don't come to a head.  That's certainly the case.

24       As it so happens here, this order was silent; and the

25  law is quite clear that when an order is silent, the rule

1    controls.

2           So yes.  I mean, I agree with you and in the abstract

3    theory that being clear is always better than leaving something

4    possibly ambiguous, although I think the rule here kind of

5    jumps in and takes away that ambiguity.

6           THE COURT:  Anything further?

7           MR. MARFOE:  Nothing from us, your Honor.

8           THE COURT:  Okay.  Defense?  Anything further?

9           MR. BAGEANT:  A couple of brief things, your Honor.

10          THE COURT:  Go ahead.

11          MR. BAGEANT:  First, we never would have stipulated to

12   an expert discovery schedule that would have allowed rebuttal

13   reports to be served on the last day of discovery.  We don't

14   read this order as permitting them, because it would be kind of

15   absurd to do that, especially expert reports coming from

16   experts that have never been disclosed.

17          So, you know, what are we going to do in the future?

18   We may clarify it.  But the point is already present by

19   inference from the schedule.

20          We certainly never intended to be in a position where

21   Wreal could serve new reports from new experts on the last day

22   of discovery.

23          We've talked about how to cure that harm, what

24   Mr. Marfoe called the predicament he had put Amazon in.  Well,

25   you can't do that without amending the schedule.

1          So the remedy that's being asked for is:  Amend the

2     schedule to allow it to provide for rebuttal reports in a fair

3     and equitable way.  That strongly implies that the report --

4     excuse me -- that the current schedule does not provide for

5     rebuttal reports.  Right?  If the way we're going to fix it is

6     by changing the expert discovery deadline to allow expert

7     discovery in contemplation of expert reports, that would be

8     fair and equitable.  That means that the current schedule we

9     have does not fairly provide for rebuttal reports.

10          That's reinforced by the notion that one thing it does

11     provide clearly and unambiguously is that only witnesses

12     disclosed by the parties in their opening expert disclosures

13     shall be permitted to testify.

14          What this schedule sets forth is an opportunity for one

15     party to come forward and then the other party to come forward.

16     That's the first point I would make.

17          The second point I want to talk about is the

18     Plaintiff's burden, which came up in the end of Mr. Marfoe's

19     discussion.  Our expert, Pat Gannon, served a two-part expert

20     report.  Part one said that nothing that Amazon has done has

21     caused Wreal any harm.

22     ████████████████████████████████████████████

23          THE COURT:  ████████████████████████████████████

24          MR. BAGEANT:  They have.

25          Wreal now brings Jesse David to supposedly rebut

1    Amazon.  He doesn't respond to anything on part one.  He

2    doesn't dispute that Wreal hasn't suffered any harm here.

3    Instead, he focuses on benefits that he alleges Amazon has

4    received from Fire TV.

5            Earlier in my initial argument, I made reference to

6    what I called a tactical decision that Wreal had made in not

7    disclosing an expert on Amazon's profits or on money that it

8    might be entitled to.  And the tactical decision is based on

9    the burden-shifting framework for remedies in trademark law.

10           So in a trademark case, a plaintiff has access to a lot

11   of different kinds of remedies.  If it's been actually damaged,

12   if someone has stolen its customers, it can get those profits.

13   If it has -- if it's been irreparably harmed in a way that

14   money can't fix, it can get an injunction ordering the

15   Defendant to stop using the trademark.

16           And in certain cases, it can get a disgorgement of the

17   Defendant's profits.  So if it proves that the Defendant

18   infringed the mark and made a lot of money, the Defendant has

19   to turn that money over to the Plaintiff.

20           What Mr. Marfoe is talking about today and what

21   Mr. David's opinion opines on has to do with that final remedy,

22   what they call the accounting for profits.  There's a

23   burden-shifting framework in trademark law for that.

24           And the burden-shifting works like this:  Plaintiff

25   comes forward with Defendant's sales, usually in the form of

1    revenues, revenues or sales, and says, Here's the number.  You

2    know, we'll make up a number.  We'll say it's $100 million.

3           If that is the end of the presentation of evidence,

4    there are cases that say the Plaintiff gets the $100 million.

5    The burden shifts to the Defendant to prove its cost of sales,

6    expenses, et cetera, to narrow that window down to what is a

7    profit.

8           Mr. Gannon did that.  He took Amazon's sales.  He said,

9    Here's the sales.  Here's what it cost to sell the product.

10   ████████████████████████████████████████████████████

11   ████████████

12          And he did that in I guess what you'd call an abundance

13   of caution.  We wanted to have -- we wanted to disclose

14   testimony so we'd have the ability to offer in case Wreal

15   changed its mind ████████████████████████████████

16          Now comes Mr. David, though, who opines about something

17   differently.  What he is opining on, regardless of whether he

18   or anyone else calls it rebuttal to Gannon, ██████████████

19   ██████████████████████████████████████████████████████

20   ██████████████████████████████████████████████████████

21   ██████████████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24          That point is a point that should be made in the

25   Plaintiff's initial *prima facie* case.  That is a point about

1   how much Amazon has received gross from this product.  That is

2   the kind of point that goes in the *prima facie* case.  Just like

3   you show the Defendant's sales, you should be showing all the

4   benefits the Defendant received from use of the product.  Then

5   it's the Defendant's job to back that out.

6        What's happened here is he is injecting these new

7   opinions about benefits that he alleges Amazon has received

8   without an opportunity for us to back that out.

9        Unless your Honor offers a rebuttal to these new

10  opinions, which the scheduling order doesn't allow either, we

11  don't have an opportunity to come back and say, Mr. David is

12  wrong for this reason or Mr. David is wrong for that reason.

13  It's truly a lay-behind-the-log scenario.  It's just -- it's

14  just not the way the burden-shifting framework works.  That's

15  why this report is not rebuttal.

16       So the points that I wanted to impress upon you before

17  I leave today are, number one, yes, the scheduling order does

18  not say anything about rebuttal reports expressly, but it

19  clearly provides a timing and a sequence of expert disclosures

20  that, number one, doesn't fairly allow an opportunity for

21  expert discovery on rebuttal reports, as is conceded by the

22  proposed remedy, which is to change the scheduling around so

23  that rebuttal reports would fit.

24       Point number two:  Even if it did allow rebuttal

25  reports, it doesn't allow rebuttal testimony from these

 1    witnesses because they've never been disclosed.  You know, if

 2    it allowed rebuttal reports, it would contemplate a situation

 3    where Mr. David opines on all the ways that Amazon has made

 4    money.

 5              Pat Gannon says, No.  ███████████████████  And

 6    Mr. David says, No.  I'm sticking by my original opinion or, in

 7    light of what Mr. Gannon has said, I'm modifying it in this

 8    way, et cetera.  That's the kind of rebuttal that would be

 9    rebuttal.

10              What we've got here is something different.

11              Point number three is the prejudice issue.  I don't

12    agree that we haven't been prejudiced and I don't agree that

13    taking a deposition is going to fix it.  We've got a limited

14    amount of time under the operative schedule with which to do

15    some important dispositive tasks in the case, cases that are

16    critical to -- matters that are critical to our defense.  We

17    don't want to move the schedule around to accommodate this.

18    And frankly, we don't want to take depositions on these issues

19    because we don't see them as rebuttal and we don't see them as

20    properly timed in the case.

21              Of course Wreal wants to offer us depositions, because

22    what it wants is a mulligan on this issue.  The deadline to

23    disclose this testimony and to make these kinds of opinions an

24    element of the Plaintiff's case has passed.

25              So curing the prejudice to us in terms of taking some

 1    depositions or, you know, moving the *Daubert* deadlines around

 2    or moving back the dispositive motions deadline doesn't really

 3    solve that issue.

 4          THE COURT:  So, Mr. Marfoe, I have a question for

 5    you --

 6          MR. MARFOE:  Yes.

 7          THE COURT:  -- which is, I'm not the judge presiding

 8    over the case.  I'm not the district court judge.  I'm the

 9    magistrate judge who's been assigned to handle discovery

10    issues.  And Judge Lenard referred this dispute to me.

11          Now, if I were to agree with you and allow you to move

12    forward with these two so-called rebuttal experts, then I think

13    you'd agree in fairness the only thing that I could do is to

14    give Amazon the opportunity to take the depositions of these

15    two experts.  Right?

16          MR. MARFOE:  Well, I -- I wouldn't put it the exact way

17    Mr. Bageant put it.

18          THE COURT:  Well, how about the way I just put it?

19          MR. MARFOE:  Well, yeah.  I think that that would be

20    something appropriate.  But I think that is something that

21    Amazon would actually have the burden to go to Judge Lenard to

22    ask for.  We --

23          THE COURT:  That was going to be my next question.

24          MR. MARFOE:  We've said we would not oppose it.

25          THE COURT:  All right.  But here's my specific

1   question:  Do I even have the authority and jurisdiction to in

2   effect amend Judge Lenard's trial scheduling order by saying,

3   Listen, this is a really odd scenario.  It's an unusual set of

4   circumstances.  It's unfolded in a quirky way.

5          Maybe I agree with you that the trial scheduling order

6   is silent and that it is not an order providing otherwise.  And

7   then maybe I also agree that your disclosure of these two

8   so-called rebuttal experts are timely.  Maybe I agree with all

9   of that.

10          But then the way from a scheduling perspective this

11   happened, you disclose these reports on September 10th.  And

12   then that's when the discovery period ended, on September 10th.

13   So that seems fundamentally unfair, to deprive Amazon of the

14   opportunity to take depositions of these two experts,

15   fundamentally unfair.  I can't imagine how I or any other judge

16   would simply permit that.

17          So the next step is:  Okay.  If I'm inclined to agree

18   with you on all those points, and the only fair thing to do

19   under the circumstances, if we agree with you, is to provide

20   Amazon with the opportunity to take the depositions, in order

21   for that to happen, wouldn't I need to in effect amend Judge

22   Lenard's trial scheduling order, which in its written form

23   originally said August 31st but was then amended to September

24   10th?  Right?

25          Well, we're already past September 10th.  So who the

1    heck am I as a federal magistrate judge, an Article I judge, to

2    say, You know what?  I'm amending the trial scheduling order of

3    Judge Lenard, an Article III judge.

4              How do I do that?

5              MR. MARFOE:  Well, Judge, I think there's -- well, one

6    point to that:  Judge -- Magistrate Judge O'Sullivan in the

7    *Feliciano* case did order that the Plaintiff would make the

8    expert available for deposition.

9              THE COURT:  I know.  But how do you know that that was

10   before expiration of the deadline as opposed to after the

11   deadline?  Does that case say either way?

12             MR. MARFOE:  It was after the deadline.

13             THE COURT:  It was.

14             MR. MARFOE:  The facts are completely on all fours

15   here.  It was the -- the expert disclosure in that case -- the

16   rebuttal disclosure was made the evening before the close of

17   expert discovery.  It would be -- that was October -- I'm

18   sorry -- November 4, 2011.  I believe the close was November 5.

19   And the last line in the order is, "The Plaintiff shall make

20   Dr. Harrington available for deposition no later than Monday,

21   January 30, 2012."

22             So it was permitted in that case to allow a late

23   deposition.  As I said earlier, nothing in Judge Lenard's

24   scheduling order prohibits a later deposition.  Nothing

25   explicitly --

1    THE COURT:  Show me where in this order it says that

2    the discovery deadline expired --

3    MR. MARFOE:  Let me see here.

4    THE COURT:  -- in the *Feliciano* case.

5    MR. MARFOE:  Yeah.  Sure.

6    It may not say it in the case itself, but we can look

7    at the motion filed by the Defendant.  It's Paragraph 4 on Page

8    2 of Tab 2.  And it's citing the scheduling order in that case

9    saying that the deadline for expert discovery was October 28th,

10   2011.  So that deadline had passed.

11   I'm sorry.  The motion was filed on November 4.  I'm

12   guessing that the expert report was filed on October 27, 2011.

13   THE COURT:  So Page 4.  Where?

14   MR. MARFOE:  I'm sorry.  Page 2, Paragraph 4 --

15   THE COURT:  Page 2.

16   MR. MARFOE:  -- of the Defendant's motion to strike the

17   Plaintiff's untimely disclosed expert report lists October

18   28th, 2011, as the deadline for expert discovery.  And I don't

19   think there's any dispute in that case that expert discovery

20   had closed.

21   THE COURT:  One minute, please.

22   So that says that the deadline for expert witness

23   discovery was set for September 14th.  Does that mean that

24   that's the deadline for the experts to be disclosed and their

25   reports to be disclosed or does it also mean the depositions of

1    the experts?

2             MR. MARFOE:  Well, I believe in Paragraph 4, just below

3    that, it says that --

4             THE COURT:  And the deadline for expert discovery was

5    set for October 28th, 2011.

6             MR. MARFOE:  And it expired.

7             THE COURT:  Okay.

8             MR. MARFOE:  At the time that the expert report was --

9    the rebuttal reports were disclosed, I believe, the day before

10   in that case.

11            Now, again, here, because it was timely, the deposition

12   is not really a remedy to cure prejudice because it -- these

13   are timely disclosed.  We don't get to the "substantially

14   justified" or "harmless" analysis if they're timely disclosed.

15   This remedy is something that Wreal quite frankly believes --

16   it's not necessarily a remedy; it's something that Wreal just

17   quite frankly believes Amazon should be entitled to take the

18   depositions of our experts.  That's just not the way we

19   litigate.

20            THE COURT:  Are you saying it's not a remedy for a

21   violation because you haven't committed a violation?

22            MR. MARFOE:  Exactly.  It's a -- it's an offer that

23   we've given to the other side to make sure that this case is

24   decided on the merits and not by procedural quirks with the

25   scheduling order.

85

1      THE COURT:  Anything further from Amazon?

2      MR. BAGEANT:  Just the rest of the procedural history

3  of *Feliciano* where an objection was taken because a magistrate

4  judge doesn't have the authority to amend a scheduling order.

5      THE COURT:  Well, let's focus on that comment.

6      Was that the basis of the objection?  Or was it simply

7  an objection like people object to my rulings, not because I

8  don't have jurisdiction or not because it's an amendment to the

9  discovery orders; they just disagree with me and they take an

10  objection?  It's basically an internal appeal to the district

11  court.

12      So maybe you want to step back that comment a bit

13  because you probably don't know what the objection was, do you?

14      MR. BAGEANT:  I read the objection and I read the

15  pretrial transcript --

16      THE COURT:  Okay.

17      MR. BAGEANT:  -- where these things were discussed.

18      THE COURT:  So the basis for the objection was that the

19  magistrate judge doesn't have authority to amend the trial

20  scheduling order?

21      MR. BAGEANT:  The objection worked like this:  The

22  objection said, "Judge Lenard, as your Honor just indicated,

23  this order is mistaken."

24      THE COURT:  Okay.

25      MR. BAGEANT:  "This order contradicts the plain

1  language of the scheduling order."

2          THE COURT:  Yes.

3          MR. BAGEANT:  So --

4          THE COURT:  Meaning, We think the magistrate judge is

5  wrong on the merits as opposed to not necessarily having

6  jurisdiction.

7          Yes.  Go ahead.

8          MR. BAGEANT:  Or it works an amendment to the

9  scheduling order, which exceeds the jurisdiction, as I was

10 telling --

11         THE COURT:  All right.  Hang on just a minute.  Hang

12 on, please.

13         Fortunately, I have the ability to look this up.  I'm

14 going to do that right now.  So bear with me just a minute.  So

15 this is Case 10-23139.  Run query.  Docket report.  Run report.

16 Magistrate Judge O'Sullivan's order was January 30th, 2012.  So

17 the objections were probably fairly soon after that, January

18 30th, 2012.

19         MR. BAGEANT:  It's --

20         THE COURT:  Yes.  Go ahead.

21         MR. BAGEANT:  It's somewhere -- try around 202 or 196.

22         THE COURT:  Plaintiff's objection to magistrate judge's

23 order.  Order denying motion for sanctions.  Let's see that.

24 No.  That's a different order.  That's a motion to exclude.

25 The *Feliciano* case that we have here is a motion to strike, not

1   a motion to exclude, so that's not it.

2          The order that I have here, the *Feliciano* case, says

3   that it was January -- oh, January 3rd.  That's January 3rd,

4   but then the order says January 30th.  Maybe it's a typo.  So

5   let's see January 3rd.  Here it is.  Okay.

6          Order granting motion to strike.  That looks like it's

7   at 145.  Let's see here.  Motion to strike.  No.  That's

8   Mr. Ganzanga.  That's a different motion to strike.

9          Let's see.  Another January 3rd order granting -- hmm.

10  Motion to strike.  Denying motion to strike.

11         Here it is.  Dr. Harrington.  All right.

12         So the order here is Docket Entry 146 in the *Feliciano*

13  case.  So now let's see 151 of the objections.  151.  Appeal.

14  Okay.  They call it an appeal, which is the same as an

15  objection.  Let's see.

16         Okay.  Interesting.

17         Folks, here's what we're going to do.  Here's what I'm

18  going to do.  Here's my ruling:  My ruling is, I'm going to be

19  reserving ruling because I find this to be actually a very

20  interesting issue.  There doesn't seem to be a whole lot of law

21  on it.  I'm personally interested in it and intrigued.  I find

22  it to be rather fascinating.  I'm a little goofy that way.

23         So rather than just rule from the bench, I want to take

24  a look at some of these cases that were cited in the footnote.

25  I want to take another look at the *Feliciano* case.  I want to

1    noodle a little bit on the availability of extending the

2    deposition deadline.

3              I'm not sure that I even have authority to do that,

4    because it's not my trial scheduling order.  So there are a lot

5    of issues, quite frankly, many of which are interrelated, that

6    I need to take further look at.

7              I know that you have deadlines coming up, and I'm going

8    to do my best to try to issue an order as soon as I possibly

9    can.  So we'll put our noses to the grindstone.  That's really

10   just two noses, Ms. Davila and me, so it's a two-nosed effort.

11   Probably my nose is bigger.  But we'll do what we can.  And I

12   appreciate your efforts and your argument and your advocacy.

13             So safe travels back to Seattle.

14             MR. MARFOE:  Judge, if I --

15             THE COURT:  Yes.

16             MR. MARFOE:  I -- there's one more point I wanted to

17   add to something Mr. Bageant said towards the end there.

18             I don't mean to add more to the analysis here, but he

19   was discussing a bit on the scope of Dr. Gannon's report and

20   Dr. David's rebuttal report.  And there's just one piece of

21   information I wanted to add to that.

22   ████████████████████████████████

23   ██████████████████████████████████

24   ████████████████████████████████████████

25   █████████████████████████████████

```
 1   ████████████████████████████████████████████
 2   ███████████████████████████████████████████████
 3   ████████████████████████████████████████████
 4   ███████████████████████████████████████████████
 5   ███████████████████████████████████████████████
 6   ████████
```

7   And in that regard, just before Dr. Gannon served his

8   report, we received documents that we had requested months ago

9   related to this very issue that Dr. Gannon relied upon.  So

10  there are a number of documents specifically going to other

11  ways that Amazon gains revenue other than just simply selling

12  the devices that we did not receive until just a week before

13  Dr. Gannon's report was disclosed.

14          So obviously, that could never have been part of a

15  burden-of-proof expert report that we would have submitted in

16  June.  And, of course, Dr. David relied on a number of those

17  documents as well.

18          So it's not -- while it's true that documents with just

19  the raw sales were produced to us on a timely basis, we did not

20  get -- I believe it's the majority of the documents that were

21  relied upon by Dr. Gannon until just before he filed his

22  report.  So that's why some of those opinions appear in

23  Dr. David's report.  I mean, they're still simply addressing

24  what Dr. Gannon put in there.

25          So that's the only point I had -- only extra point I

1   had to make.

2           MR. BAGEANT:  Okay.  I -- I didn't think -- I thought

3   that they had dropped this argument.  I have to respond to it,

4   because it's factually incorrect.

5           The primary document upon which Mr. Davids relies was

6   produced in May before the discovery cutoff closed.  His list

7   of materials considered includes documents that we produced in

8   August at Wreal's request and documents that Mr. Gannon indeed

9   considered as well because Wreal had requested them.

10          But it's not an accurate characterization of the

11  discovery sequence here to say that Mr. Davids is relying on

12  newly produced information.

13          THE COURT:  Well, did Mr. Gannon rely on documents

14  which weren't turned over to the Plaintiff until a week before

15  his report?

16          MR. BAGEANT:  Mr. Gannon cites those documents because

17  Wreal had asked for them.  It put them in the case.

18          But to characterize this as Mr. Gannon springing

19  evidence after discovery had closed and they're relying on it

20  and giving them no opportunity to rebut is not accurate.  And

21  in particular, your Honor can read the report.  We've belabored

22  a lot of points today and I -- I want, you know, to let

23  everybody go.  But the primary document upon which Mr. David

24  relies is a document produced in May.

25          THE COURT:  And what document is that?  I mean, just

```
 1   give me a general -- I don't need the document number, but just
 2   describe to me what it is.
 3              MR. BAGEANT:  ████████████████████████████████
 4   ██████████████████████████████████████████████████████████
 5   ███████████████████████
 6              THE COURT:  Potential future ways of what?
 7              MR. BAGEANT:  ████████████████████████████████
 8   ███████████████████████████████████████████████████████████
 9   ███████████████████████████
10              THE COURT:  And that's an Amazon document?
11              MR. BAGEANT:  Yes, sir.
12              THE COURT:  That's a pretty long title for a document.
13              MR. BAGEANT:  The file name is what I'm looking for
14   here.  █████████████████████████████████████████████
15              THE COURT:  So that description is your own sort of
16   layman's explanation of the document as opposed to being the
17   title of the document?
18              MR. BAGEANT:  Yes, your Honor.
19              At any rate, it's the document that the second half of
20   the report is based upon.
21              THE COURT:  All righty.  I understand.
22              MR. MARFOE:  Your Honor, if you'd like, we can provide
23   you -- the documents are listed by Bates numbers in both
24   reports.  We can submit which documents were produced on which
25   day, if you'd like.
```

1          THE COURT:  I don't think my decision is going to

2    necessarily turn on that.

3          So, folks, we're going to be in recess.  Thank you very

4    much.

5          MR. BAGEANT:  Thank you, your Honor.

6          (Proceedings concluded.)

7

8                     C E R T I F I C A T E

9          I hereby certify that the foregoing is an

10   accurate transcription of the proceedings in the

11   above-entitled matter.

12

13

14   _____      /s/Lisa Edwards
           DATE           LISA EDWARDS, RDR, CRR
                          Official Court Reporter
15                        United States District Court
                          400 North Miami Avenue, Twelfth Floor
16                        Miami, Florida 33128
                          (305) 523-5499
17

18

19

20

21

22

23

24

25