REDACTED

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
Case No. 1:14-cv-21385-JAL

WREAL, LLC, a Florida Limited Liability
Company,

      Plaintiff,

v.

AMAZON.COM, INC., a Delaware
corporation,

      Defendant.

**AMAZON'S MOTION FOR SUMMARY JUDGMENT**
**AND SUPPORTING MEMORANDUM OF LAW**

**CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     FACTS ................................................................................................................2

III.    ARGUMENT .....................................................................................................5

        A.      No Reasonable Fact-Finder Could Find Likely Confusion. ........................7

                1.      Actual confusion. ...................................................................7

                        a.      Survey evidence shows no likelihood of
                                confusion. .................................................................7

                        b.      WREAL's purported actual confusion evidence
                                does not create a fact issue. .................................10

                2.      Distinctiveness of mark. ..........................................................11

                3.      Similarity of mark. ..................................................................12

                4.      Similarity of the goods or services. ..........................................14

                5.      Similarity of sales outlets and customer base. ..............................17

                6.      Similarity of advertising. .........................................................18

                7.      Intent. ....................................................................................18

        B.      No Reasonable Fact-Finder Could Find WREAL Has
                Sustained Damages or Amazon Has Recoverable Profits. .........................19

IV.     CONCLUSION .................................................................................................20

V.      REQUEST FOR HEARING ..............................................................................20

# AUTHORITIES

## Cases

*Amstar Corp. v. Domino's Pizza, Inc.*,
  615 F.2d 252 (5th Cir. 1980) .............................................................................. 7, 13, 14

*Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*,
  508 F.3d 641 (11th Cir. 2007) .................................................................................. 5, 6, 7

*Denimafia, Inc. v. New Balance Athletic Shoe, Inc.*,
  2014 WL 814532 (S.D.N.Y. Mar. 3, 2014) ...................................................................... 8

*E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*,
  756 F.2d 1525 (11th Cir. 1985) ................................................................................... 12

*Fishman Transducers, Inc. v. Paul*,
  684 F.3d 187 (1st Cir. 2012) ...................................................................................... 20

*Freedom Card Inc. v. JPMorgan Chase & Co.*,
  432 F.3d 463 (3d Cir. 2005) ....................................................................................... 18

*Frehling Enters., Inc. v. Int'l Select Grp., Inc.*,
  192 F.3d 1330 (11th Cir. 1999) ..................................................................................... 7

*George & Co. LLC v. Imagination Entm't Ltd.*,
  575 F.3d 383 (4th Cir. 2009) ....................................................................................... 10

*IDV N. Am., Inc. v. S & M Brands, Inc.*,
  26 F. Supp. 2d 815 (E.D. Va. 1998) .............................................................................. 9

*Murray v. Cable Nat'l Broad. Co.*,
  86 F.3d 858 (9th Cir. 1996) .......................................................................................... 9

*New Sensor Corp. v. CE Distribution LLC*,
  303 F. Supp. 2d 304 (E.D.N.Y. 2004) ............................................................................ 6

*Ross Bicycles, Inc. v. Cycles USA, Inc.*,
  765 F.2d 1502 (11th Cir. 1985) ................................................................................. 5, 14

*Royal Palm Props., LLC v. Premier Estate Props., Inc.*,
  2010 WL 1524720 (S.D. Fla. Apr. 15, 2010) ................................................................. 11

*Sands, Taylor, & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992) ...................................................................................... 18

3930603v1/014332

*Sun Banks of Fla., Inc. v. Sun Federal Savings & Loan Assoc.*,
    651 F.2d 311 (5th Cir. 1981) ................................................................................ 13

*Sunenblick v. Harrell*,
    895 F. Supp. 616 (S.D.N.Y. 1995) .......................................................... 14, 15

*Tana v. Dantanna's*,
    611 F.3d 767 (11th Cir. 2010) .............................................................. 6, 7, 19

*Tiger Direct, Inc. v. Apple Computer*,
    2005 WL 1458046  (S.D. Fla. May 11, 2005) ......................................... 13, 14

*Welding Servs., Inc. v. Forman*,
    509 F.3d 1351 (11th Cir. 2007) ............................................................... 6, 18

**Other Authorities**

*Trademark and Deceptive Advertising Surveys: Law, Science, and Design*
    (S. Diamond & J. Swann eds., 2012) ......................................................... 7

**Treatises**

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    § 32:188 (2014) ......................................................................................... 9

6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*
    § 32:189 (2014) ......................................................................................... 9

## I.  INTRODUCTION

Plaintiff WREAL, LLC ("WREAL") sells the "FyreTV" pornography pay-per-view service and the "Fyre BoXXX," a device for viewing the FyreTV service. WREAL has registered trademarks for "FyreTV" and "FyreTV.com." In April, 2014, defendant Amazon.com, Inc. ("Amazon") launched the Amazon Fire TV, a set-top box that plugs into a TV and streams a variety of general interest content such as ESPN and "Dora the Explorer." WREAL then filed this lawsuit, pursuing a reverse confusion trademark theory: WREAL claims an appreciable number of ordinarily prudent consumers will believe Amazon is responsible for WREAL's FyreTV or Fyre BoXXX.

WREAL moved for a preliminary injunction last September, which gave it the opportunity to test this theory in a daylong evidentiary hearing before Magistrate Judge Jonathan Goodman. After hearing sworn testimony from fact and expert witnesses and reviewing a voluminous documentary record, Magistrate Judge Goodman issued a Report and Recommendation recommending denial of WREAL's motion, concluding unequivocally: "[T]here is no likelihood that an appreciable number of consumers will mistakenly believe Amazon is responsible for Wreal's FyreTV or Fyre BoXXX." ECF No. 130, at 4. The Court then adopted this Report and Recommendation and denied WREAL's motion. ECF No. 177.

The evidentiary record has changed very little since the preliminary injunction proceedings. WREAL's FyreTV is still a hardcore "porn pay per view" service; the Amazon Fire TV is still a general consumer media product that prohibits pornographic apps and content. Amazon's Statement of Undisputed Facts ("SOF") ¶¶ 1, 26, 32. WREAL still advertises FyreTV exclusively on adult websites; Amazon still advertises the Amazon Fire TV through a variety of mainstream channels WREAL does not use, such as TV and print media. SOF ¶¶ 14, 15, 37. The products are still not available in the same retail outlets. SOF ¶¶ 9, 37, 41. The parties still

display the marks in commerce using different words, spellings, colors, and fonts. SOF ¶ 39. There is still no survey evidence demonstrating actual confusion: WREAL did not produce a survey in its favor between the December 2014 preliminary injunction hearing and the close of expert discovery over eight months later, and thus the Court is left with uncontradicted survey evidence from both Amazon's expert and WREAL's expert affirmatively demonstrating confusion is <u>not</u> likely. SOF ¶¶ 47-48. Remarkably, WREAL has gone backward since the preliminary injunction proceedings: when WREAL's expert Dr. Thomas Maronick attempted to explain why his surveys showed no confusion, he retreated to the explanation ████████████ ████████████████████ – which, if true, means confusion is impossible and the case must be dismissed. SOF ¶ 49 (Dr. Maronick testifying that ██████ ████████████████████). WREAL still can show no damage attributable to Amazon's Fire TV – instead, it is undisputed that ████████████████████████ ████████████████████████████████████████████████ ████████████████████ SOF ¶¶ 16-18. ████████████████████ SOF ¶ 51.[1] Put simply, no reasonable fact-finder could find in WREAL's favor: there is <u>no</u> likelihood an appreciable number of ordinarily prudent consumers will think Amazon is responsible for WREAL's pornographic FyreTV service or Fyre BoXXX product. Amazon is entitled to summary judgment, and the case should be dismissed.

## II. FACTS

WREAL sells a streaming pornography service called "FyreTV," which WREAL describes as "The Ultimate Adult Video On Demand Experience," a "porn pay per view service," and "the Netflix of Porn." SOF ¶ 1. WREAL does not believe its use of the "Netflix" mark

---

[1] Amazon's profit on the Amazon Fire TV is highly confidential and commercially sensitive; Amazon respectfully asks that the Court redact that information in any publicly filed opinion.

infringes any trademarks because it believes Netflix operates in a different market. SOF ¶ 13. FyreTV offers exclusively pornographic content, not mainstream movies, and most of its offerings are hardcore pornography. SOF ¶ 2. Customers can sign up for a FyreTV account exclusively through WREAL's FyreTV.com website (SOF ¶ 3), which requires visitors to affirm they are over 18 and willing to view adult content before they can enter. SOF ¶ 4. Upon entry, the viewer immediately sees several rows of highly explicit pornographic images (SOF ¶ 5); the "Categories" page offers a further selection of many different lurid pornography genres. SOF ¶ 6.

WREAL also offers the "Fyre BoXXX," a set-top box dedicated to streaming pornography with the "FyreTV" service. SOF ¶ 7. WREAL has never sold this product at any store or through any website other than FyreTV.com. SOF ¶ 9. In October 2012, WREAL stopped selling the Fyre BoXXX to new subscribers, only restarting these sales after Amazon launched the Amazon Fire TV in April 2014. SOF ¶ 10.

█████████████████████████████████████████████ SOF ¶ 16. ███████
████████████████████████████████████████████████████████████████
███████████████████████████████ SOF ¶ 17. WREAL cannot identify any actual damage – lost set-top box sales, lost business, subscriber cancellations, or anything else – caused by Amazon's Fire TV. SOF ¶ 18. WREAL currently advertises only on adult websites (SOF ¶ 15) to its target market of pornography consumers (SOF ¶ 12): WREAL ended television and print advertising and stopped attending trade shows no later than 2012 (SOF ¶ 14).

Amazon is a Seattle-based company that sells a broad variety of products, including through its home page, www.amazon.com. SOF ¶ 19. Amazon started using the "Fire" brand with streaming video in 2011, when it introduced the Kindle Fire tablets. SOF ¶ 19. Amazon

-3-

decided to extend its use of the "Fire" brand with subsequent multimedia products, including the Amazon Fire phone, a new generation of tablets, and the Amazon Fire TV. SOF ¶ 22.

The Amazon Fire TV launched April 2, 2014. SOF ¶ 25. Amazon markets the device as a set-top box for general interest media content – "instant access to Netflix, Prime Instant Video, WatchESPN," and more – including selections like "House of Cards" and "Dora the Explorer" for video and Pandora for music. SOF ¶ 26. Amazon advertises the Amazon Fire TV's family-friendly features such as the "FreeTime" service, which "revolutionizes parental controls – parents can choose what your kids see and set time limits for types of content and times of day." SOF ¶ 27. In October 2014, Amazon launched a smaller version, the "Fire TV Stick," that plugs directly into a television. SOF ¶ 28.[2] Amazon advertises its Fire TV products through the Amazon.com homepage and through other channels, including television, print media, and in-store displays at stores such as Best Buy and Staples. SOF ¶ 37.

Amazon does not market the Amazon Fire TV or any of the "Fire" devices (such as the phone or the tablets) for viewing pornography. SOF ¶ 30. Amazon bought paid internet keyword ads for the Amazon Fire TV, but it did not purchase ads for keywords around WREAL's FyreTV name or anything related to pornography. SOF ¶ 31. Amazon prohibits pornographic apps for the Amazon Fire TV. SOF ¶ 32. Amazon's content policies prohibit pornography on Amazon Instant Video (which streams to the Amazon Fire TV) and DVDs available on Amazon's website. SOF ¶ 33. Elizabeth Baicy, an Amazon principal marketing manager, testified at the preliminary

---

[2] In September 2015, Amazon announced updated versions of the Amazon Fire TV (adding 4K Ultra HD video capability and voice search for information such as weather and sports news) and the Amazon Fire TV Stick (adding a voice remote) as well as a new Amazon Fire TV Gaming Edition, which comes with a game controller, two included games, and additional storage capacity. SOF ¶ 29. For simplicity, this brief refers to all the Amazon Fire TV products collectively as "Amazon Fire TV."

injunction hearing that pornography has "never once" come up in many different focus groups on consumer perceptions of the Amazon brand. SOF ¶ 36.

Amazon has received tens of thousands of customer service inquiries about the Amazon Fire TV. SOF ¶ 43. Of these thousands of contacts, one customer asked whether he could access adult content on Amazon's Fire TV by spelling "Fire" with a "y," but this customer did not suggest he believed Amazon to be the source of WREAL's FyreTV. SOF ¶ 44. None of WREAL's 51,000 customers have contacted it about Amazon (other than to ask if WREAL's FyreTV app will be available on Amazon's Fire TV). SOF ¶ 40.

Experts for both WREAL and Amazon have conducted consumer surveys for this litigation. WREAL's surveys, conducted by Dr. Thomas Maronick in April 2014, showed "very low" levels of consumer confusion. SOF ¶ 48. Amazon's survey, conducted by Dr. Dan Sarel in October and November 2014, showed a confusion rate of one percent, which Dr. Sarel testified was "statistically insignificant" and "nonexistent." SOF ¶ 47.

## III. ARGUMENT

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(a). Amazon is entitled to summary judgment on WREAL's Lanham Act claims (Counts I and II) because no reasonable fact-finder could find in WREAL's favor on the required element of likelihood of confusion. *See Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503-04 (11th Cir. 1985). WREAL's state-law claims (Counts III-V) are premised on its federal trademark claims and also rely on allegations of consumer confusion (ECF No. 177 at 6, ECF No. 1 ¶¶ 75-96; Bageant Decl. Ex. 40). Summary judgment is therefore proper on those claims as well. *See Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652 (11th Cir. 2007).

As Magistrate Judge Goodman correctly observed (ECF No. 130 at 17), a plaintiff must show <u>likelihood</u> of confusion, not a mere <u>possibility</u> of confusion: "[R]ecovery under the Lanham Act requires, at a minimum, 'that confusion, mistake, or deception be 'likely,' not merely 'possible.''" *Custom Mfg.*, 508 F.3d at 651 (citation omitted). This means not just the speculative possibility that somewhere, at some point, a small number of consumers might be confused; rather, a plaintiff must show "a likelihood that <u>an appreciable number of ordinarily prudent purchasers</u> are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Id.* (emphasis added) (quoting *New Sensor Corp. v. CE Distribution LLC*, 303 F. Supp. 2d 304, 310-11 (E.D.N.Y. 2004)).

"Although likelihood of confusion is a question of fact, it may be decided as a matter of law." *Tana v. Dantanna's*, 611 F.3d 767, 775 n.7 (11th Cir. 2010). The Eleventh Circuit assesses likelihood of confusion using the following factors: "(1) distinctiveness of the mark alleged to have been infringed, (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public." *Welding Servs.*, *Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007). Summary judgment is proper even where some factors weigh in plaintiffs' favor.[3] The Eleventh Circuit has repeatedly affirmed summary judgment for defendants in trademark cases where no reasonable fact-finder could conclude an

---

[3] *See*, *e.g.*, *Tana*, 711 F.3d at 775-82 (affirming summary judgment for defendant despite "conceded similarity between the two marks (factor two)" and "undisputed similarity of the parties' sales methods (factor four)"); *Welding Servs.*, 509 F.3d at 1361 (affirming summary judgment for defendant despite "undisputed similarity of services offered, sales methods, and advertising methods").

appreciable number of ordinarily prudent consumers were likely to be confused. *See*, *e.g.*, *Tana*, 611 F.3d at 774-82; *Custom Mfg.*, 508 F.3d at 648-52; *Welding Servs.*, 509 F.3d at 1360-61. Here, as discussed in more detail below, <u>none</u> of the factors in the likelihood of confusion test weigh in WREAL's favor; rather, <u>all</u> favor Amazon.

**A.      No Reasonable Fact-Finder Could Find Likely Confusion.**

**1.      Actual confusion.**

Actual confusion is "the best evidence" and "the most persuasive evidence" of likelihood of confusion. *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980); *Tana*, 611 F.3d at 779. Here, all actual confusion evidence favors Amazon.

a.      <u>Survey evidence shows no likelihood of confusion.</u>

The ABA Section of Intellectual Property Law survey treatise describes survey evidence as "a standard form of evidence – perhaps <u>the</u> standard form of evidence – on consumer perception in cases involving trademarks and deceptive advertising." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design* 3 (S. Diamond & J. Swann eds., 2012) (Editors' Introduction).[4] The Court has not one but two sets of surveys – one from Amazon's expert Dr. Dan Sarel, a tenured professor of marketing at the University of Miami School of Business, and one by WREAL's own expert Dr. Thomas Maronick, a former FTC expert in charge of surveys in the Bureau of Consumer Protection – concluding the risk of confusion is "very low" (Maronick) or "statistically insignificant" at one percent (Sarel). SOF ¶ 47-48.

WREAL has attempted to rebut this survey evidence in two ways. First, it has pointed to what it claims are errors in Dr. Sarel's survey. However, WREAL's criticism is entitled to no

---

[4] The Eleventh Circuit has rejected the argument that a court may impose a presumption against a plaintiff based solely on a failure to produce any survey evidence. *See Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1341 n.5 (11th Cir. 1999)). Amazon does not argue for such a presumption; rather, Amazon argues that <u>uncontradicted</u> survey evidence <u>from both sides</u> weighs against a finding of likely confusion.

weight as WREAL never ran its own survey to show the results would differ after correcting the supposed "errors."[5] The confusion level in Dr. Sarel's survey is so low that it is incredible to suggest that WREAL's proposed changes would lead to a different result.[6] In fact, given that WREAL's own expert, Dr. Maronick, conducted different surveys with different questions (presumably more to WREAL's liking) and still found no confusion, the only plausible inference is that changing Dr. Sarel's survey would not affect the results.[7] Dr. Maronick admitted as much, conceding no survey design would show confusion at present. SOF ¶ 50.

Second, WREAL now argues Dr. Sarel's survey and WREAL's own surveys from Dr. Maronick should be disregarded because (WREAL claims) ███████████████████████ ███████████████████████ Bageant Decl. Ex. 26 at ¶¶ 10-26. This new theory contradicts WREAL's own allegations that Amazon "saturate[d] the marketplace" through an "immersive advertising campaign" for the Amazon Fire TV[8] and the uncontradicted evidence about the scale of Amazon's advertising starting with the launch in April 2014. SOF ¶ 38. WREAL's attempt to reverse course and disavow these allegations would be fatal to its case:

---

[5] *See* ECF No. 130 at 38-39 ("As the ABA's treatise on survey evidence notes, courts do and should ignore or give little weight to survey criticisms absent a showing that using the approach the critiquing expert believes to be correct would lead to a different result.").

[6] *See Denimafia, Inc. v. New Balance Athletic Shoe, Inc.*, 2014 WL 814532, at *21 (S.D.N.Y. Mar. 3, 2014) ("Moreover, any argument that a narrower subset of the surveyed universe would have returned a markedly different result is weakened significantly by the fact that [the expert's] survey returned zero incidents of confusion.").

[7] Dr. Sarel has also responded in detail to the criticisms raised in connection with the preliminary injunction proceedings, explaining why none of them have merit. Bageant Decl. Ex. 35 at ¶¶ 21-35. Dr Maronick's newer criticisms appeared only on the last day of expert discovery with no opportunity for Dr. Sarel to respond, which is one reason Amazon has sought to exclude Dr. Maronick's September 2015 report as untimely. *See* ECF No. 201.

[8] ECF No. 1 at ¶ 33-34. *See id.* at ¶ 59 (referring to Amazon's "massive, national advertising campaign, encompassing print, television, and internet advertising."), ¶¶ 30-33 (detailing advertising campaign and media coverage); ECF No. 28 at 5-6 (WREAL asserting in preliminary injunction brief that Amazon "Saturates the Market with Advertising," including that Amazon Fire TV launch was "extensively covered by the press," and backed by a "massive" and "highly memorable" television advertising campaign).

as this Court recognized, "[r]everse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user." ECF No. 177 at 8. If WREAL truly wishes to argue ████████████████████████████████ ████████████████████████████████████████████████████ then there can be no reverse confusion and the case should be dismissed.[9] Dr. Maronick candidly admitted as much ████████████████████████████████ SOF ¶ 49.

This is an extraordinary evidentiary record: surveys by experts from both sides, conducted at different times, using independent methodologies, have found no confusion. WREAL has been unable to find an expert to validate its speculative confusion theory,[10] which leaves this survey evidence unrebutted. A leading treatise states no reported case has found likelihood of confusion with survey results below 8.5%, far above Dr. Sarel's one percent "statistically insignificant" level.[11] The survey evidence from both sides thus weighs strongly in favor of an affirmative finding that confusion is not likely.[12] Regardless whether there is no confusion because ██████████████████████████ (WREAL's new theory) or because consumers do not believe Amazon is responsible for a pornographic pay-per-view service, the result is the same: there is no likelihood of confusion and the case must be dismissed.

---

[9] *See id.*; *see also Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 861 (9th Cir. 1996) (dismissing reverse confusion claim because plaintiff "failed to allege sufficient facts to state a claim for reverse confusion under the Lanham Act," including that plaintiff "does not contend that [defendant] saturated the market with advertising . . . .").

[10] This apparently was not for lack of trying. In early June, WREAL disclosed Dr. Henry Ostberg, a survey expert, to Amazon under the protective order – but then, at the expert disclosure deadline, WREAL failed to submit any survey from Dr. Ostberg.

[11] *See* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:188 (2014) (hereinafter "McCarthy on Trademarks")

[12] *See* McCarthy on Trademarks § 32:189  (survey results below 10% can be affirmative evidence that confusion unlikely); *see, e.g.*, *IDV N. Am., Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815, 829 (E.D. Va. 1998) ("Survey results indicating a low percentage of 'confused' recipients is evidence of the absence of likelihood of confusion.") (citing McCarthy and collecting cases).

b.  <u>WREAL's purported actual confusion evidence does not create a fact issue.</u>

WREAL has pointed to several types of purported actual confusion evidence, much of which this Court and Magistrate Judge Goodman already found did not demonstrate actual confusion. ECF No. 177 at 15-17; ECF No. 130 at 32-36. First, WREAL points to an April, 2014 customer service inquiry where an Amazon customer asks if he can access adult content on Amazon's Fire TV by spelling "Fire" with a "y." SOF ¶ 44. As this Court found, not only does this customer never suggest he thinks Amazon is the <u>source</u> of FyreTV (ECF No. 177 at 15-16), even if this inquiry were credited as evidence of actual confusion, it would be *de minimis* and insufficient to avoid summary judgment as Amazon is "a very large corporation with a very large customer base. The <u>one</u> customer inquiry that allegedly shows confusion is just one of tens of thousands of customer service inquiries." ECF No. 177 at 16.[13]

Second, WREAL has relied on two April 2014 tweets. Bageant Decl. Exs. 38 & 39. The Court already found neither tweet showed any actual confusion, specifically noting that the Court could not determine whether the authors were actually confused because they did not testify at the preliminary injunction hearing. ECF No. 177 at 15. WREAL failed to subpoena the authors of these tweets or do anything else in discovery to obtain their testimony, and thus there is still no indication these persons were confused.

Third, WREAL has pointed to communications where its customers ask about accessing the FyreTV service on an Amazon Fire TV. Bageant Decl. Ex. 40 at Nos. 6-7. Yet none of these communications suggests these customers believe Amazon is responsible for WREAL's service

---

[13] *See* ECF No. 130 at 33 ("The Eleventh Circuit has repeatedly dismissed occasional instances of actual confusion as *de minimis*, insufficient to raise a triable fact issue . . . on summary judgment.") (citing cases); *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 399 (4th Cir. 2009) (affirming summary judgment for defendants in trademark infringement case; four instances of consumer confusion where defendant sold 500,000 products per year was "at best de minimis").

-10-

any more than their mentioning Google TV suggests they believe Google is responsible for FyreTV. To the contrary, they know perfectly well that FyreTV's pornography pay-per-view service is an app <u>separate from</u> various devices (Google TV, Android-enabled devices, etc.) that could run it. SOF ¶¶ 40, 44.[14]

Fourth, WREAL has suggested it plans to rely on the idea that customers may mistakenly go to WREAL's FyreTV.com website "when looking for Amazon's Fire TV" as evidence of confusion. Bageant Decl. Ex. 40 at No. 6. However, if customers reach WREAL's website by going to firetv.com – a domain WREAL owns, which points to its FyreTV.com site, but a name in which WREAL owns no trademark rights – this cannot be evidence of confusion: WREAL's own decision to register the non-trademarked "firetv.com" domain has led customers to its site. (And it is not clear how any misdirected traffic would harm rather than benefit WREAL.) In any event, WREAL has no evidence such customers are actually confused and believe Amazon is responsible for FyreTV.com. To the contrary, such customers will know immediately – from the over-18 and willing to view adult content opt-in screen (SOF ¶ 4), from the rows of highly explicit porn (SOF ¶ 5), from any number of other cues – that they are not on a general consumer website like Amazon's.[15]

## 2. Distinctiveness of mark.

The evidence related to this factor is unchanged since the preliminary injunction proceedings. Amazon still often uses its housemark "Amazon" and markets the product as the "Amazon Fire TV." SOF ¶ 24. As the Court previously found, because the parties' marks are not

---

[14] One customer even speculates that WREAL might <u>benefit</u> from any potential confusion through a "domain name sale" and says explicitly: "I know it [the Amazon Fire TV] is NOT related to you guys." SOF ¶ 40.

[15] *See Royal Palm Props., LLC v. Premier Estate Props., Inc.*, 2010 WL 1524720, at *7 (S.D. Fla. Apr. 15, 2010) (evidence of customers "misdirected" to another's website "is not evidence of actual confusion as the consumers knew they were on a competitor's website").

identical, "the use of Amazon's housemark next to its Fire TV mark, spelled and styled differently than FyreTV, could help distinguish the products." ECF No. 177 at 10.

### 3.    Similarity of mark.

The facts related to this factor also have not changed since the preliminary injunction proceedings. The Court already affirmed Magistrate Judge Goodman's conclusion that "the marks themselves are different because Wreal's FyreTV is one word, not two like Amazon's Fire TV, and FyreTV uses a unique and stylized font and different colors than Amazon's Fire TV mark." ECF No. 177 at 11; SOF ¶ 39. In addition, the "Fire" portion of the marks is spelled differently and Amazon often uses "Amazon" next to "Fire TV," where WREAL does not. SOF ¶ 39. The Court also affirmed Magistrate Judge Goodman's conclusion that the marks' overall impression based on their use in commerce is different because:

> "Amazon's Fire TV appears on Amazon's website, an Amazon-branded marketplace with other Amazon-branded products, such as the Kindle Fire, in a general consumer environment free from pornography." (D.E. 130 at 20 (citing [Bageant Decl. Ex. 19] Pl.'s Ex. 6).) Whereas, Wreal's FyreTV is available only to consumers who verify that they are over eighteen years old and are willing to view adult content. Furthermore, once customers verify their age, they are directed to a website that exclusively contains pornographic brands.

ECF No. 177 at 11.

WREAL has previously raised two arguments in response. First, WREAL stresses similarity of sound, which WREAL argues is particularly important because, it claims, it relies heavily on "word of mouth" advertising. ECF No. 132 at 6. Yet this Court already rejected that argument: "The fact that there are <u>some</u> similarities does not raise the issue to one of substantial confusion." ECF No. 177 at 11.[16] Courts in the Eleventh Circuit have repeatedly refused to find

---

[16] This case differs from *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1531 (11th Cir. 1985), where WREAL argues aural similarity was particularly important because customers typically purchased Remy Martin cognac by asking for a glass of "Remy." *Id.*

similarity even between phonetically identical or nearly identical marks where their overall impression in commerce is distinctly different.[17]

Second, WREAL has argued that – for some users at some times – the Amazon Fire TV may appear on the same page as adult-oriented images in the "Related to Items You've Viewed" section of Amazon's homepage if the user had previously searched for adult products. ECF No. 83 at 9; Bageant Decl. Ex. 41. As an example, WREAL points to a page that Rodrigo Franco, WREAL's Chief Operating Officer, generated for the preliminary injunction hearing (the page says "Hello Rodrigo" at the top right) by searching for adult magazines sold by third-party sellers on Amazon's website. Bageant Decl. Ex. 41; *id.* Ex. 2 at 98:15-25. To begin with, WREAL has provided no evidence that any appreciable number of Amazon consumers have search histories similar to Mr. Franco's, such that they would see something similar to Mr. Franco's page. Even Mr. Franco's created-for-litigation example shows the significant difference in the parties' use of the marks in commerce. Mr. Franco's Amazon page still has mainstream consumer content: advertisements for headphones, shoes, a toy fire truck, barbells, and Direct TV. *Id.* Ex. 41. WREAL's FyreTV.com homepage, by contrast, has no mainstream content at all – just row after row of highly graphic pornographic imagery. SOF ¶ 5.

---

No evidence suggests prospective customers can purchase WREAL's FyreTV by simply saying the name out loud. Rather, the uncontradicted evidence is that FyreTV is only available to customers who first sign up for an account on WREAL's website (SOF ¶ 3), where they will confront the "FyreTV" mark as it is actually used in commerce, alongside a barrage of images from hardcore pornography. SOF ¶ 5.

[17] *See Amstar*, 615 F.2d at 261 (reversing as clearly erroneous trial court's finding of likelihood of confusion between "Domino" and "Domino's" based on the "total effect" of their use in commerce); *Sun Banks of Fla., Inc. v. Sun Fed. Savings & Loan Assoc.*, 651 F.2d 311, 317-18 (5th Cir. 1981) (reversing as clearly erroneous trial court's finding of likelihood of confusion; two "Sun" bank names with orange colors were presented differently in commerce); *Tiger Direct, Inc. v. Apple Computer*, 2005 WL 1458046, at *16 (S.D. Fla. May 11, 2005) (two uses of the word "Tiger" for computer-related products found to be dissimilar based on the marks' overall impression).

-13-

### 4.     Similarity of the goods or services.

The Court previously found the products to be different: "Wreal's FyreTV is in the market of streaming pornographic content. Amazon Fire TV is expressly <u>not</u> in the market of streaming pornographic content." ECF No. 177 at 12. WREAL has raised several arguments on this factor. First, WREAL has argued the products are similar at general levels, such as that "[b]oth services are delivered through a set-top box," and both "stream[] video from a wide variety of content providers." ECF No. 132 at 7. But the Eleventh Circuit has repeatedly held general similarities are not sufficient for the products to be "so similar as to be likely to cause confusion." *Ross Bicycles, Inc.*, 765 F.2d at 1507.[18]

Second, WREAL has claimed "mainstream and adult content are complementary and often are put out by the same source," arguing Comcast and major hotel chains offer both types of content. ECF No. 132 at 8-9. But the relevant inquiry is not whether some entities offer the two different products, as that argument could be constructed in plenty of cases.[19] Rather, the inquiry is "whether the goods are so related <u>in the minds of consumers</u>" that they are likely to be confused. *Tiger Direct*, 2005 WL 1458046, at *17 (emphasis added). In *Sunenblick v. Harrell*, 895 F. Supp. 616 (S.D.N.Y. 1995), for example, jazz and hip-hop records with competing "Uptown Records" marks were sold in the very same stores. *Id.* at 629. Yet the court held this did not suffice to show similarity in products because <u>consumers</u> did not think the goods were related: the two sets of records were "not sold side-by-side; rather, they are featured in different

---

[18] The Eleventh Circuit has recognized this principle many times: Two different bicycles share an "inherent degree of similarity," but also have "obvious differences" such that consumers were not likely to confuse the two (*Ross Bicycles, Inc.*, 765 F.2d at 1507); pizza and sugar are "both edible" but still don't share "any great similarity" (*Amstar*, 615 F.2d at 261); two "fine-dining establishments serving meat and fish" are not similar products because they are "strikingly dissimilar" in ambiance, style of food, and décor (*Tana*, 611 F.3d at 777-78).

[19] For example, the plaintiffs in *Amstar* could have argued that large food conglomerates offer both pizza and sugar; the plaintiffs in *Ross* could have argued that many bike manufacturers make more than one style of bike.

-14-

sections of the stores in which they were sold, according to genre and not by label name." *Id.* Here, WREAL has offered <u>no</u> evidence that substantial numbers of consumers in fact believe that "Dora the Explorer" and ESPN so are related to the graphic, hardcore content offered on FyreTV.com that they are likely to be confused: no expert in consumer psychology or marketing, no focus group results, no survey of consumer attitudes.

WREAL has attempted to shore up this argument with a report from its expert Dr. Linda Williams, a professor of film studies at the University of California, Berkeley, who has opined there is no "clear boundary" between hardcore pornography and other erotic content because the genre's "conventions" are in "constant flux." Bageant Decl. Ex. 42 at ¶¶ 1(c), 14-15. The *Sunenblick* plaintiffs tried a similar argument, claiming the existence of the genre of "fusion" jazz demonstrated hip-hop and jazz were "not entirely separate." *Sunenblick*, 895 F. Supp. at 629. The court rejected this argument, noting any crossover in the genres didn't go to the relevant inquiry: it didn't establish whether "consumers of one genre . . . have become consumers of the other," particularly as the products were "marketed differently and still sold in separate sections of record stores." *Id.* This is exactly the situation here: there may be a academic sense in which mainstream content like R-rated movies and hardcore pornography are "related," but that does not go to whether <u>consumers</u> perceive them as so similar that they are likely to be confused. In the marketplace, hardcore pornography and R-rated movies are obviously very different and marketed to consumers in very different ways. SOF ¶¶ 45-46.[20] Dr. Williams in fact agrees that consumers are not likely to confuse two sites with such different content:

---

[20] Amazon's expert Dr. Peter Lehman has provided an expert opinion supporting what is clearly true: "a hard-core pornography site looks and feels different to a viewer than does a mainstream retail website like www.walmart.com, www.bestbut.com [sic], or www.amazon.com." Bageant Decl. Ex. 33 at ¶ 21; SOF ¶ 46. Hardcore sites like FyreTV.com – or FyreTV's competitors, such as Pornhub, YouPorn, RedTube, Spankwire, and others – "share a dominant look featuring rows

> Q. Do you agree that the visitor of the portal of a hardcore website like FyreTV.com is unlikely to think they are visiting a mainstream website that does not sell hardcore pornography?
>
> A. I agree that they would not confuse the two.

Bageant Decl. Ex. 24 at 164:9-14; *see also* SOF ¶ 45 (citing *id.* at 41:3-10 (agreeing that printout of Amazon's home page looks "different than a typical page of Fyre, F-Y-R-E.")).

Third, WREAL has scoured Amazon's website to try to find the closest items to pornography WREAL can locate – for example, an allegedly pornographic DVD introduced at the preliminary injunction hearing sold by "Italian Objects," a third-party seller, through Amazon's website. ECF No. 130 at 25-26. However, the Court has already held that DVDs (or sex toys) sold on Amazon's website are not relevant: "[W]hether Amazon.com lists sex toys or DVDs for sale is not relevant to whether Amazon's Fire TV mark is confusingly similar to Wreal's FyreTV to the point that Wreal's porn-streaming consumers would think that Amazon.com is the actual provider of FyreTV." ECF No. 176 at 2. Instead, the "truly pertinent issue" is "whether Amazon's Fire TV product offers any semblance of pornographic streaming, like FyreTV." ECF No. 177 at 12. And here, WREAL's evidence falls far short: WREAL has <u>never</u> produced any evidence that a substantial volume of hardcore pornography is available for streaming on Amazon's Fire TV, and in fact Amazon goes to great lengths to keep pornography

---

of videos with graphic hard-core screen captures showing such things as erections and penetration," (Bageant Decl. Ex. 33 at ¶ 21), their "categories" and film titles are themselves obviously hardcore pornography. *Id.*; SOF ¶ 46. Mainstream sites such as Wal-Mart, Best Buy, or Amazon's homepage do not have these features that would lead a visitor to believe they are entering a pornography site. *Id.*; SOF ¶ 46.

-16-

off the Amazon Fire TV, with its content policy prohibiting pornography from streaming through Amazon Instant Video and its policy prohibiting pornographic apps. SOF ¶¶ 32-33.[21]

WREAL notes that Showtime and HBO (available on Amazon's Fire TV) offer some adult-oriented content. ECF No. 85 at 8.[22] However, experts from both sides as well as WREAL's Rodrigo Franco agree: hardcore pornography is its own category, very different from other adult content, even so-called "soft-core" pornography that might be available on premium cable channels such as Showtime or HBO. SOF ¶ 45.[23] WREAL has presented no evidence that appreciable numbers of consumers believe the existence of adult content on Showtime and HBO – a tiny fraction of the total content available on the Amazon Fire TV – makes the total Amazon Fire TV content so similar to WREAL's exclusively pornographic content that they are likely to be confused.

5.    Similarity of sales outlets and customer base.

This factor strongly favors Amazon: WREAL has conceded the products are not sold at the same sales outlets. SOF ¶ 9. The Court has already rejected WREAL's argument that the target audiences are similar because WREAL claims it "targets the type of customers that

---

[21] In fact, customer reviews often note that the Amazon Instant Video titles WREAL claims are pornographic are in fact not pornographic. *See, e.g.*, Bageant Decl. Ex. 43 ("DO NOT PURCHASE if you are looking for an adult movie"); *id.* at 28 ("Not really an XXX movie.").

[22] "Adult content" can mean nothing more than R-rated movies or other non-pornographic content not suitable for children, as when one Amazon employee wrote to another about how his "kids are particularly taken" with the Amazon Fire TV but the employee wanted to "explore the parental controls a bit" because of the "large amount of adult content apparently" available. Bageant Decl. Ex. 44 (AMZN 0105773). The recipient understood this email to refer not to pornography but rather to content that simply was not appropriate for the author's children. Bageant Decl. Ex. 18 at 215:13-216:8.

[23] As WREAL's Mr. Franco testified: "Q. What about a difference between hard core pornography and soft core pornography; is that a distinction that means something to you, and if so, what is it? A. There are different types of categories of adult content. There are different breakdowns. Usually, soft core is something that shows maybe just a naked woman or a male. Hard core would be something that shows more of sexual intercourse happening." Bageant Decl. Ex. 32 at 10:24-11:8.

purchase explicit material from Amazon's website, such as sex toys and pornographic DVDs." ECF No. 177 at 12. As the Court held, the relevant fact is that "Amazon does not target individuals in the market to stream pornography" (*id.*), which is still true (SOF ¶ 30).[24]

### 6.   Similarity of advertising.

As the Court found: "The Magistrate Judge properly concluded that Amazon uses its homepage, national television, and print; whereas, Wreal advertises on adult-oriented websites." ECF No. 177 at 13. This is still true. SOF ¶¶ 15 ,37.

### 7.   Intent.

The Eleventh Circuit has not yet decided whether the intent inquiry should differ in a reverse confusion case from the typical intent inquiry, which asks whether the alleged infringer intended "to misappropriate the proprietor's good will." *Welding Servs.*, 509 F.3d at 1360.[25] Yet under any standard – even WREAL's suggested "carelessness" standard – Amazon had no nefarious intent. As the Court previously concluded: "Though Amazon knew of Wreal's FyreTV mark, it understood the differences between their products and markets, and used different spelling and styles to create their own mark to stream non-pornographic materials. There is no evidence of intent to confuse Wreal's potential customers, or a careless disregard for potential confusion." ECF No. 177 at 14. To the contrary, Amazon chose the "Fire" brand as a logical

---

[24] WREAL has argued its customer base should be considered similar because FyreTV is available on Roku and Amazon considers Roku to be a competitor to Amazon's Fire TV, so "to the extent that Amazon targets Roku users, it also targets WREAL's users." ECF No. 132 at 10-11. However, to the extent that Roku users are attracted to the product because of its pornographic offerings such as FyreTV, they are most definitely not part of Amazon's marketing strategy for the Amazon Fire TV because (unlike Roku) Amazon prohibits pornographic apps for the Amazon Fire TV and prohibits streaming pornography for the Amazon Fire TV. SOF ¶ 32.

[25] Other courts of appeals have dealt with this question in varying ways: the Seventh Circuit held intent is "essentially irrelevant" to reverse confusion (*Sands, Taylor, & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 961 (7th Cir. 1992)); the Third Circuit held the test is whether the junior user acted with "deliberate intent to push the senior user out of the market" (*Freedom Card Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 479 (3d Cir. 2005)).

-18-

extension of its previous use of "Fire" for streaming video since 2011, when it introduced the Kindle Fire tablets with streaming video capability. SOF ¶¶ 20-23. The Eleventh Circuit's reasoning regarding intent in a forward confusion case is applicable here: "Where a story of the creation of a mark is undisputed and shows an innocent origin, we have concluded that there is no intent of misappropriation contributing to a likelihood of confusion." *Tana*, 611 F. 3d at 779.

**B.    No Reasonable Fact-Finder Could Find WREAL Has Sustained Damages or Amazon Has Recoverable Profits.**

This Court found WREAL had demonstrated no damages as of the preliminary injunction proceedings. ECF No. 177 at 18. WREAL has not improved its evidentiary record: WREAL did not designate any expert witness to calculate damages. Amazon's expert Patrick F. Gannon, CPA, has conducted an analysis of WREAL's financials demonstrating WREAL has no damages: to the contrary, ███████████████████████████████████ ███████████████████████████████████████████ SOF ¶ 17.

WREAL has claimed its damages are evident in various documents that deal with how WREAL's FyreTV appears in search results. Bageant Decl. Ex. 40 at No. 16. WREAL's argument is apparently that Amazon's launch of Amazon Fire TV moved WREAL's FyreTV down in the results that various search engines show for queries for "Fire TV." Yet this argument does not provide sufficient evidentiary basis for a reasonable fact-finder to calculate damages. First, WREAL does not have any trademark rights in the terms "Fire TV," or "FireTV" and thus search behavior based on those terms has no relevance to WREAL's damages. Second, WREAL has made no effort to quantify any damage from this alleged change in search engine result placement. Damages must be calculated with reasonable certainty; they cannot be based on

speculation and guesswork.[26] Here, WREAL has submitted <u>no</u> expert analysis that could form the basis for a jury's computation of damages.



*See* 15 U.S.C. § 1117(a)(1). Amazon's expert Mr. Gannon has explained ███████████████ (SOF ¶ 51). For the reasons explained in more detail in Amazon's motion to exclude WREAL's expert Dr. Jesse David and incorporated by reference here, WREAL's attempt to show the contrary is speculative and could not serve as the basis for a profits award: among other failings, ██████████████████████ ████████████████████████ (SOF ¶ 52) and thus any profits award would be based on pure speculation.

## IV. CONCLUSION

For the foregoing reasons, Amazon respectfully requests that the Court grant summary judgment in Amazon's favor and dismiss this action.

## V.  REQUEST FOR HEARING

Amazon respectfully requests a hearing, not to exceed one hour, on its motion for summary judgment. Oral argument may help demonstrate that the material facts in this case are not in dispute.

---

[26] *See, e.g.*, *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 194-96 (1st Cir. 2012) (plaintiffs' fact and expert testimony related to damages in trademark case properly excluded where they would create "merely a basis of jury speculation" because they did not provide "some means" for the jury to "make a reasonable estimate" of damages).

Dated: October 13, 2015              Respectfully submitted,

By:    */s/ Jamie Zysk Isani*          

        Jamie Zysk Isani (Florida Bar No. 728861)
        HUNTON & WILLIAMS LLP
        1111 Brickell Avenue, Suite 2500
        Miami, Florida 33131
        Telephone: (305) 810-2500
        Facsimile: (305) 810-1675
        jisani@hunton.com

        Justin A. Nelson *(pro hac vice)*
        SUSMAN GODFREY L.L.P.
        1000 Louisiana Street, Suite 5100
        Houston, Texas 77002-5096
        Telephone: (713) 651-9366
        Fax: (713) 654-6666
        jnelson@susmangodfrey.com

        Drew D. Hansen *(pro hac vice)*
        Edgar Sargent *(pro hac vice)*
        Patrick C. Bageant *(pro hac vice)*
        SUSMAN GODFREY L.L.P.
        1201 Third Ave, Suite 3800
        Seattle, Washington 98101
        Telephone: (206) 516-3880
        Facsimile: (206) 516-3883
        dhansen@susmangodfrey.com
        esargent@susmangodfrey.com
        pbageant@susmangodfrey.com

        *Counsel for Defendant Amazon.com*

-21-

## CERTIFICATE OF SERVICE

**I CERTIFY** that on October 13, 2015, a true and correct copy of the foregoing was served by transmission of Notice of Electronic Filing generated by CM/ECF on all counsel or parties of record on the Service List below.



/s/Jamie Z. Isani
Jamie Zysk Isani

## SERVICE LIST

Carlos Nunez-Vivas
can@wnflaw.com
Daniel Foodman
df@wnflaw.com
Dennis J. Wouters
djw@wnflaw.com
John G. Marfoe
jgm@wnflaw.com
WNF Law, P.L. – Waserstein Nunez & Foodman
1111 Brickell Avenue, Suite 2200
Miami, Florida 33131
Tel.: (305) 760-8500
Fax: (305) 760-8510

*Attorneys for Plaintiff WREAL, LLC*