UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 14-CV-21385-LENARD/GOODMAN

WREAL, LLC, a Florida Limited
Liability Company,

      Plaintiff,

vs.

AMAZON.COM, INC., a Delaware
Corporation,

      Defendant.

_____/

**WREAL'S NOTICE OF FILING PROPOSED REPORT &**
**RECOMMENDATION RELATED TO OMNIBUS DAUBERT MOTION HEARING**

## I.    BACKGROUND AND PROCEDURAL HISTORY

On October 13, 2015, the parties filed five Daubert motions to exclude the testimony and opinions (either in part, or in their entirety) for each party's respective expert witnesses.  Wreal filed its Motion to Exclude Certain Testimony of Dr. Peter Lehman ("Dr. Lehman") [ECF No. 209], Amazon's expert in the area of pornography. Amazon, in turn, filed its Motion to Exclude the Testimony of Dr. Linda Williams, ("Dr. Williams") [ECF No. 210], Wreal's expert in the area of pornography. Wreal also filed its Motion to Exclude Testimony of Dr. Dan Sarel ("Dr. Sarel") [ECF No. 214], a survey expert Amazon put forth to show that confusion is unlikely.  Amazon, in turn, filed its Motion to Exclude Certain Opinions of Dr. Thomas J. Maronick (Dr. Maronick") [ECF No. 212], Wreal's proposed rebuttal survey expert, on the basis that Dr. Maronick did not conduct his own survey. Amazon moved to exclude n to Exclude the Expert Testimony of Dr. Jesse David ("Dr. David") [ECF No. 207], Wreal's proposed financial rebuttal expert, on the basis that Dr. David's criticism of Amazon's financial expert is flawed.

## II.    DAUBERT STANDARD

The proponent of expert testimony bears the burden of establishing its admissibility, though the standard is a liberal one. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579. 588 (1993) (explaining that Rule 702 is part of the "liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony"). A party proferring expert testimony must prove admissibility by a preponderance of the evidence. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

An expert is permitted to testify at trial if his "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue." Fed. R. Evid. 702. A qualified expert may testify if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and

methods reliably to the facts of the case." *Id.*; *see Kumho Tire v. Carmichael,* 526 U.S. 137, 141,

148-49 (1999). Thus, courts in the Eleventh Circuit consider whether (1) the expert is qualified to

testify competently regarding the matters he intends to address; (2) the methodology by which the

expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact,

through the application of scientific, technical, or specialized expertise, to understand the evidence

or to determine a fact in issue. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

### III.   AMAZON'S MOTION TO EXCLUDE DR. JESSE DAVID SHOULD BE DENIED.

Amazon argues that the expert testimony of  Wreal's rebuttal financial expert, Dr. Jesse

David, should be excluded because he employs a flawed or no methodology and does not perform

the "required" calculations to be reliable. Amazon does not challenge Dr. David's expected

testimony based on his qualifications or competency.

Amazon moved to exclude Dr. David's testimony as unreliable and unhelpful because it

claims that ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████

Amazon's arguments are premised on a misunderstanding of its burden of proof with

respect to an accounting of its profits under the Lanham Act. Wreal's burden is only to prove

Amazon's gross sales, and it does not intend to call Dr. David in order to meet that burden. Once

a Wreal has proven gross sales, the burden shifts to Amazon, "which must prove its expenses and

other deductions from gross sales." *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*,

833 F.2d 1484, 1487-88 (11th Cir. 1987). Amazon put forth Mr. Gannon as its expert to prove its expenses and other deductions. Wreal puts forth Dr. David to critique Mr. Gannon's methodology in tabulating Amazon's deductions. In that regard, he reaches two conclusions: ████████



In sum, Dr. David's opinions mean that Amazon failed to meet its burden by ████████

████████ Fairness dictates that the expense be apportioned across the lifetime of the device. Thus, Gannon's methodology is flawed, and the jury will benefit from Dr. David's expert explanation as to why.

### A.   WREAL'S EXPERT, DR. DAVID, IS NOT REQUIRED TO APPORTION COSTS ATTRIBUTABLE TO AMAZON'S INFRINGEMENT TO DEDUCT FROM AMAZON'S GROSS SALES AS A MATTER OF LAW.

Amazon argues that Dr. David should be excluded because he failed to provide a specific calculation of ████████████████████████. [ECF No. 269 at 3]. This misstates the law. In *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, 09-61490-CIV, 2011 WL 2295269, at *4 (S.D. Fla. June 8, 2011), the defendants argued that the plaintiff's expert should have been excluded for failure to "sufficiently apportion for profits attributable to the alleged infringement." *Id.* at *4. Yet the *Pandora* court rejected such an argument because it is the defendant's burden to apportion profits attributable to the plaintiff. *Id.* Dr. David does not provide a specific apportionment of profits, but he does not have to in order to rebut Mr. Gannon's purported offsets in calculating Amazon's profits. *Pandora Jewelers 1995, Inc. v. Pandora*

*Jewelry, LLC*, No. 09-61490-CIV, 2011 WL 2295269, at *4 (S.D. Fla. June 8, 2011) *citing Nutrivida, Inc. v. Immuno Vital, Inc.,* 46 F.Supp.2d 1310, 1315 (S.D.Fla.1998).

Accordingly, because it is the infringer's burden to prove any proportion of its total sales which may not have been due to the infringement or may have been offset as costs and deductions, Amazon has to provide the jury with evidence of its offsets. Dr. David is then able to rebut the legitimacy of those offsets. S*ee 1st Source Bank v. First Resource Fed. Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996) ("[A]s a rebuttal witness, [an expert] may criticize . . . damage theories and calculations without offering alternatives.").

Amazon's efforts to distinguish the *Pandora* decision are unpersuasive. Amazon claims that in *Pandora*, the plaintiff served "an opening report arguing for disgorgement of profits." *See* [ECF No. 269 at 5]. Yet Amazon provides no authority that the Lanham Act places the burden first on  Wreal to submit an opening report arguing for disgorgement. *See*, *e.g.*, *Mystique, Inc. v. 138 Int'l, Inc.*, 07-22937-CIV, 2009 WL 2357029, at *5 (S.D. Fla. July 30, 2009) <u>aff'd,</u> 375 F. App'x 997 (11th Cir. 2010) (explaining, "[A] defendant's testimony, alone, provides a sufficient evidentiary basis for the court to assess its profits."). At any rate, Wreal's Complaint requests in its prayer for relief: "Ordering Amazon to pay  Wreal the profits that it earned by its illegal use of the Fire TV name." *See* [ECF No. 1 at 1]. Therefore, even if Amazon claims that Plaintiff was required to first submit an opening report, which it is not, Amazon has been on notice that  Wreal sought disgorgement of its profits since filing its Complaint in April 2014.

Furthermore, Amazon's reliance on *Slep-Tone Enter. Corp. v. Johnson*, 518 Fed. Appx. 815 (11th Cir. 2013) is also misplaced. The issue in *Step-Tone* was whether the District Court properly reduced the plaintiff's damage award pursuant to 15 U.S.C. § 1117(a), which gives the court discretion to adjust a recovery based on profits that is "excessive." *Id.* at 819. Thus, the issue

in *Step-Tone* was not the plaintiff's failure to apportion expenses, but rather whether the district court had discretion to reduce plaintiff's award. Thus, *Step-Tone* is inapposite.

Here, Dr. David is being offered to rebut Mr. Gannon's purported offsets and show that Amazon ███████████████████████████████████████████████████ ████████████████████████████████ jury may then weigh the credibility of Dr. David's testimony to determine whether Amazon's offsets are legitimate to deduct from its gross sales. *See Jerry's Famous Deli, Inc. v. Papanicolaou*, 383 F.3d 998, 1004–05 (9th Cir. 2004) ("Under established law, once gross profits related to the infringement are established, [infringer] has the burden of documenting any legitimate offsets"); *see also Am. Honda Motor Co. v. Two Wheel Corp.*, 918 F.2d 1060, 1063 (2d Cir. 1990) (plaintiff entitled to amount of gross sales unless defendant adequately proves amount of costs to be deducted from it); *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986) (court awarded receipts from sales pursuant to 15 U.S.C. § 1117(a)). This is consistent with the parties' burdens with respect to the disgorgement remedy, and Dr. David's opinion will be helpful to the jury.

## B. WREAL'S RELIANCE ON AMAZON'S INTERNAL BUSINESS VALUATIONS AND ANALYSES OF ITS FIRE TV PRODUCTS IS NOT A VALID BASIS TO EXCLUDE DR. DAVID'S TESTIMONY.

Amazon's argument that Dr. David's testimony impermissibly relies on its own internal records misses the mark on several levels. Wreal does not have the burden to calculate an exact number offsetting Amazon's gross sales under the Lanham Act. Therefore, as explained in *Pandora*, when plaintiff's expert "provided calculations based on defendants' evidence[,] defendant is free to cross-examine any weaknesses in [plaintiff's expert's] data or assumptions[.]" 2011 WL 2295269, at *5. Moreover, the *Pandora* court noted that defendants could "offer its own testimony regarding apportionment and deductions, as required under the Lanham Act." *Id.* Similarly, here, Amazon is free to provide its own testimony as to the proper apportioning of

damages for its infringement of Wreal's marks (as it is Amazon's burden to carry under the Lanham Act). The court in *Pandora* did not exclude plaintiff's expert because he provided calculations based on defendants' evidence. And this Court will not recommend doing so now where Dr. David relied upon ███████████████████████████████████████ financial expert, Mr. Gannon.

### C. DR. DAVID'S UNDERSCORES A GLARING INCONSISTENCY BETWEEN AMAZON'S EXPERT OPINION AND AMAZON'S PUBLIC COMPANY STATEMENTS THAT WILL HELP A JURY DETERMINE DAMAGES.

Dr. David's reliance on Amazon's internal documents to ████████████████████ ████████████████████████████████████████████████ but rather to underscore a significant, █████████████████████████████████████████████████████████ ████████████████████████████████ and (2) Amazon's public statements by the company, third party analysts, and Amazon's internal documents that reflect that "Fire TV sales have significantly exceeded our sales forecast and we are working hard to increase our manufacturing output." *See* Expert Report of Dr. David ¶ 12 (quoting Amazon Press Release on July 24, 2014).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ is proper rebuttal testimony applying his expertise. *See Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 835 (D. Minn. 2011) (holding that rebuttal experts "sufficiently applied their expertise to the facts and methodologies used by each of [plaintiff's] experts in forming their conclusions."). Such statements contradict Mr. Gannon's ██████████████████████████" to calculating Amazon's profits. Therefore, a jury may find that Amazon did not properly establish offsets and deductions from its gross sales – ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

"When 'the infringer fails to carry its statutory burden to offer evidence of deductions, the plaintiff's entitlement to profits under the Lanham Act is equal to the infringer's gross sales.'" *FSC Franchise Co., LLC v. Express Corporate Apparel, LLC*, 8:09–CV–454–T–23TGW, 2011 WL 1226002, at *7 (M .D. Fla. Feb. 28, 2011) (quoting *WMS Gaming, Inc. v. WPC Prods. Ltd .,* 542 F.3d 601, 609 (7th Cir. 2008)).

Indeed, Dr. David points out that CEO Jeff Bezos' has recently stated with respect to Fire TV devices, Amazon was "having trouble building enough." *Id.* (quoting *Fortune* article.) But if



*See United States v. Apple, Inc.*, 791 F.3d 290, 299 (2d Cir. 2015) ("The district court also referred to this as a 'loss leader[ ]' strategy . . . and explained that Amazon 'believed [the $9.99] pricing would have long-term benefits for its consumers [referring to Amazon's wholesale price of e-books].'"). Therefore, Dr. David opines that Mr. Gannon's

## D. DR. DAVID DOES NOT CONCEDE THAT UNDER HIS METHODOLOGY AMAZON HAS NO PROFITS TO DISGORGE.

During the December 2, 2015, hearing, the Court posited several questions about Wreal's purported unjust enrichment damages theory, particularly to determine whether Dr. David is outstepping his grounds as a rebuttal witness in opining on Amazon's unjust enrichment. Unjust enrichment is not an independent ground for relief, however, but rather is one theory by which a

plaintiff can obtain an accounting of the defendant's profits. *See Optimum Techs., Inc. v. Home Depot, U.S.A., Inc.,* 217 Fed. App'x 899 (11th Cir. 1007) (holding that willful and deliberate infringement, unjust enrichment and deterrence are appropriate circumstances for an accounting of profits). Under any theory, the standard remains the same – Wreal must prove Amazon's gross sales, and the burden then shifts to Amazon to prove any offsets. *Wesco*, 833 F.2d at 1487-88.

Against this backdrop, the district court has the statutory authority to "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C.A. § 1117. "[A]ll monetary awards under Section 1117 are 'subject to the principles of equity,' [and] contrary to the assertions of both parties, no hard and fast rules dictate the form or quantum of relief." *Burger King Corp. v. Mason*, 855 F.2d 779, 782-83 (11th Cir. 1988) (citing *Burger King Corp. v. Mason*, 710 F.2d 1480, 1485 n. 11 (11th Cir.1983)). The accounting for profits furthers the Congressional purpose by making infringement unprofitable, and because it deprives the defendant of unjust enrichment and provides a deterrent to similar activity in the future it is justified. *Monsanto Co. v. Campuzano*, 206 F. Supp. 2d 1239, 1249 (S.D. Fla. 2002).

Dr. David merely opines that Mr. Gannon did not account for Amazon's profits properly, which is Amazon's burden. That is proper rebuttal.

Here, however, Wreal will prove that there are s

Because Wreal contends that Dr. David opines Amazon (1) failed to calculate profit offsets correctly and carry its burden under the Lanham Act obviating any final analysis as to whether the company has profited from its infringement and (2) because Dr. David attempts to contradict and rebut Mr. Gannon's methods of calculating profits, the Undersigned recommends that Amazon's Motion to Exclude the Expert Testimony of Dr. Jesse David should be denied.

## IV.   WREAL'S MOTION TO EXCLUDE DR. PETER LEHMAN'S OPINION REGARDING CONSUMER CONFUSION SHOULD BE GRANTED.

Amazon seeks to offer the testimony and expert opinions of Dr. Peter Lehman ("Dr. Lehman") in the field of pornography. In particular, Dr. Lehman opines that (1) hard-core pornography is a distinctly definable genre; (2) that Wreal markets itself exclusively as a seller of hard core pornography; and (3) that consumers would not confuse Wreal's Fyretv for Amazon Fire TV or fyretv.com for amazon.com. [Expert Report of Dr. Lehman ¶ 11].  Wreal does not challenge Dr. Lehman's first two opinions. With respect to Dr. Lehman's third opinion, Wreal seeks to exclude it on the basis that Dr. Lehman is unqualified to offer it, that the methodology used is unreliable, and that ultimately, it is not helpful to the trier of fact. In addition, Wreal explained that Dr. Lehman is not even opining on the correct issue as it relates to confusion.

In determining whether an expert's proposed opinion meets the requirements of Rule 702, the Court must analyze whether the expert is qualified to offer the opinion, whether the reasoning and methodology used to arrive at the opinion is reliable, and whether the opinion would be helpful to the trier of fact. These requirements are distinct and must each be individually analyzed. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). Wreal correctly argued that Dr. Lehman's opinion on confusion meets none of threshold requirements. On December 30, 2014, at the evidentiary hearing on Wreal's Motion for a Preliminary Injunction, the Court declined to allow Dr. Lehman to testify regarding consumer confusion. The Court sees no reason why it should depart from its previous ruling.

Amazon seeks to admit Dr. Lehman's opinion on confusion based on his experience in what it deems "reception studies." This is not surprising given Dr. Lehman's self-admitted inadequacies in being qualified to opine as to confusion, namely that he has never dealt with trademark infringement before [Lehman Dep. 13:3 – 13:5], has never offered an expert opinion on any case dealing with confusion (or any case) [Tr. of Evidentiary Hr'g Dec. 30, 2014, 420:18 – 421:1], and that he has never conducted a survey [Lehman Dep. 101:3-8]. According to Dr. Lehman, and as Amazon states in its Response [ECF No. 249], "reception studies are concerned with explaining how and why an audience may respond to film with empathy, anger, arousal, etc. In the context of this matter, reception studies provide an analytical framework for documenting…how film customers are encouraged to respond to www.fyretv.com and www.amazon.com, or how Wreal and Amazon market themselves, or whether audiences are likely to confuse the two."

However, the Court is still left without an adequate explanation as to how reception studies are relevant to this litigation or to any opinion of Dr. Lehman as it relates to confusion. In fact,

10

other than Dr. Lehman's own self-professed expertise in reception studies, which is encompassed in one paragraph and one footnote of his Expert Report, and a 28-page Curriculum Vitae which mentions one chapter in one textbook about the subject, the Court has serious concern over whether Dr. Lehman, a pornography expert, is even qualified to opine on this issue. Needless to say, each requirement must be individually analyzed. Thus, assuming arguendo that Dr. Lehman is in fact qualified, (a point, which the Court has serious reservations about), the Court will next address the reliability of his opinions.

Amazon alleges that Dr. Lehman's methodology is sound because he employs principles that underpin his opinion, i.e., "that merchandisers of hard-core pornographic content use marketing techniques that are distinct from the merchandisers of mainstream content or even other erotic material: for example, hard-core sites display graphic depictions of sex acts whereas mainstream retailers do not, and hard-core sites features rows of videos showing erections and penetration and prominently advertise 'categories' of undeniably explicit content, whereas mainstream websites do not." [ECF No. 249 at 8]. The Court is not convinced with this argument. It would be unreasonable to believe that the trier of fact requires expert testimony to explain how the marketing techniques differ between hard-core merchandisers and mainstream merchandisers, when the Court recognized this fact, as would any reasonable juror. Moreover, Wreal has conceded as much.

Amazon next alleges that Dr. Lehman used comparative analysis, using the same principles stated above, and concludes that Wreal displays graphic depictions of sex acts and features rows of videos showing erections and penetration, prominently advertising "categories" of undeniably explicit content, whereas Amazon does not. Again, the Court is not convinced that this "methodology" is reliable, or that the trier of fact is not capable of coming to this conclusion

11

without the assistance of expert testimony. Moreover, Wreal is not disputing that fyretv.com adheres to the marketing techniques which Dr. Lehman claims his experience allows him to decipher.

But, assuming that Dr. Lehman's analysis and opinion on confusion were even methodologically sound, Wreal alleges that Dr. Lehman is confusing, for lack of a better word, because Dr. Lehman is not opining on the proper and relevant issue that is before the Court. In that regard, Wreal correctly points out that the relevant issue before the Court is not whether a consumer that goes to fyretv.com would believe he or she is on amazon.com, or vice-versa, a fact that Wreal readily concedes, but whether a consumer is likely to believe that Amazon could be the source of FyreTV. Thus, whether Dr. Lehman is right or wrong in opining that it is "patently absurd" for a consumer to confuse FyreTV for Amazon Fire TV or fyretv.com for amazon.com is irrelevant.

Accordingly, Dr. Lehman's opinion is not helpful to the jury. The Court has serious concern that Dr. Lehman's opinion on confusion has the potential to mislead and confuse the jury as to the real issue underlying this lawsuit, whether a consumer could believe that Amazon is the source of FyreTV. The prejudice of the trier of fact interpreting Dr. Lehman's opinion on confusion as a reliable basis to find an absence of confusion on the ultimate issue is far too dangerous. Certainly, the potential prejudice is far outweighed by any probative value. *See* Fed. R. Evid. 403. As the gatekeeper to the admission of scientific testimony, the Court is responsible for ensuring that "speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Daubert*, 509 U.S. at 589; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (quoting *McCorvery v. Baxter Healthcare Corp.*, 298 F. 3d 1253, 1256 (11th Cir. 2002)). Amazon simply has not, and cannot, carry the

burden of laying the proper foundation for the admission of Dr. Lehman's expert testimony on confusion by a preponderance of the evidence. *See Allison v. McGhan Med. Corp*., 184 F.3d 1300, 1306 (11th Cir. 1999). Dr. Lehman may be qualified to opine on certain issues relating to pornography, but his opinion on confusion simply cannot reach the jury.

## V.   AMAZON'S MOTION TO EXCLUDE DR. LINDA WILLIAMS SHOULD BE DENIED.

Wreal retained its own pornography expert, Dr. Linda Williams ("Dr. Williams"), who comes to several of her own conclusions regarding pornography, and rebuts certain opinions offered by Dr. Lehman. In that regard, Dr. Williams opines that, contrary to Dr. Lehman's opinion, hard-core pornography is not a distinctly definable genre. Rather, Dr. Williams opines that the complementary nature of hard-core pornography and mainstream create an overlapping target market between the two opposite ends of the spectrum, which prevents hard-core pornography from being so neatly wrapped up in its own little package.

Amazon does not appear to question Dr. Williams' qualifications as a pornography expert. However, Amazon questions Dr. Williams' qualifications in the sales volumes of large companies, or the creation or enforcement of content policies, and takes issue with Dr. Williams' opinion that

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ Amazon is correct that Dr. Williams lacks these qualifications. Like Dr. Lehman, she is a pornography expert. However, unlike Dr. Lehman, who offers an opinion without any reliable basis and ultimately opines on the wrong issue, the evidence supports Dr. Williams' opinions.

While Dr. Williams may not be an expert in the sales volumes of large companies, she has reviewed multiple page listings from Amazon that feature pornographic movies to buy or stream,

as well as other pornographic magazines and paraphernalia. This ultimately is relevant to the crux of this litigation; whether a consumer would likely believe that Amazon is the source of FyreTV.com. As Dr. Williams stated in her Expert Report, ██████████████████████ ████████████████████████████ Williams Dep. 102:10-13. The evidence clearly demonstrates that Amazon does sell hard-core pornography, despite its anti-pornography content policies. In that regard, Wreal referred to several titles sold and shipped by Amazon, and not a third party, that Amazon's own expert, Dr. Lehman, conceded was hard-core pornography.[3] Wreal asserts that the evidence, and testimony of both pornography experts, leads to the only reliable conclusion; that Amazon's repeated statements that it is a "Dora the Explorer" type of company is disingenuous.

As Wreal has correctly asserted, Amazon's "Dora-the-Explorer" defense has "opened the door" to rebutting this claim. The direct examples of hard-core pornography sold and shipped directly by Amazon, which have been reviewed by both pornography experts and unequivocally confirmed to be hard-core pornography, allows Dr. Williams to testify that Amazon sells a significant amount of pornography or material related to pornography, despite its content policy that claim the contrary.

Moreover, the Court finds Dr. William's opinions relevant to the issue regarding similarity of products/services, which asks the question "whether the products are the kind that the public attributes to a single source, ***not*** whether or not the purchasing public can readily distinguish between the products and services of the respective parties." *Tiger Direct, Inc. v. Apple Computer, Inc.*, 05-21136CIV-LENARD, 2005 WL 1458046 at *17 (S.D. Fla. May 11, 2005) (emphasis added); *see also TV Land, L.P. v. Viacom, Int'l, Inc.* 908 F. Supp. 543, 551 (N.D. Ill. 1995) ("[T]he

---

[3] *See* December 1, 2015 Tr. 122:15-125:24.

rights of an owner of a registered trademark … extend to any goods related in the minds of consumers *in the sense that* a single producer is likely to put out both goods.") (emphasis added). Thus, whether Amazon sells pornography on its website is relevant to the determination whether the public would attribute to Amazon a set-top box and service that sells pornography under the name "FyreTV," *as well as* a set-top box and service that sells mainstream movies as well as pornography under the identically sounding name "Fire TV." The Court is not convinced that Dr. Williams' lack of experience in sales volumes or content policies should prevent her from disclosing her findings to the trier of fact. Such inadequacies go to the weight, not admissibility of Dr. Williams' testimony, and can be sufficiently addressed by Amazon on cross-examination. *See Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (citations omitted) ("This inquiry is "'not stringent,' and 'so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.'")

Amazon also takes issue with the methodology employed by Dr. Williams to determine whether something is pornographic or related to pornography. But these criticisms are misplaced because Amazon misquotes what Dr. Williams actually said in her deposition, which was not included in her Expert Report. Although Amazon claims that Dr. Williams stated that G-rated movies are related to hardcore pornography, she did not state that. Dr. Williams testified that mainstream is complementary with hardcore pornography in varying levels of degrees, beginning with hardcore, softcore, NC-17, R-rated and then G-rated at "the very end of the spectrum." Williams Dep. 71:11-72:24; 91:13-19. Similarly, Amazon criticizes Dr. Williams' extreme examples of bicycles, statues and condoms being related to pornography. Yet, Dr. Williams stated that "using absolutely contemporary understandings, probably none of these would be considered

15

directly related to pornography. I am simply trying to point out the history of these items." *Id.*
118:13-17.

These opinions of Dr. Williams actually support her opinion that mainstream content is
complementary to hard-core pornography. Dr. Williams' Expert Report points out the evolution
of hard-core pornography, from something completely forbidden and unable to find in the
mainstream marketplace, to now being second nature, and being readily available on Amazon.com.
The Court believes that Dr. Williams' historical perspective actually sheds light and puts into
perspective how mainstream content and hard-core pornography can today be considered
complementary. Because this circles directly back to the threshold issue of whether a consumer is
likely to believe that Amazon is the source of FyreTV, the Court finds that this testimony would
be helpful to the trier of fact.

Wreal posed the question to the Court at the hearing: Is it so difficult to believe that if the
Hilton or Hyatt can offer both ends of the spectrum, G-rated and hardcore, that Amazon could not?
Is it so difficult to believe that Amazon, which already sells thousands of pornographic books,
movies and magazine would not also venture into the hardcore porn industry? And in doing so, is
it not plausible that Amazon would name one content delivery service for mainstream fire with an
i and then another content delivery service with a y instead, and offer exclusively pornography?
And how many people would miss the spelling and just assume that both come from the same
source? Amazon is a service provider. It provides everything to everyone, to cater to every possible
individual taste and preference. Why not porn? The Court agrees.

Even Dr. Lehman's opinion, i.e., that a *film consumer* would not confuse FyreTV for Fire
TV, or www.fyretv.com for a mainstream website like www.amazon.com, essentially concedes
the very point that Dr. Williams has been stating with respect to the complementary nature of

pornography and mainstream content, i.e., if "film consumers" are the relevant consumers of both pornography and mainstream content, then there is a clear overlap in target markets. The Court concludes that if the marketplace supports the idea that if the same companies routinely offer similar products in the marketplace, such as movies and sci-fi merchandise, and baseball and hot dogs; *see E. Remy Martin,* 756 F.2d at 1530; *Dreamwerks,* 142 F.3d at 1131, then it is plausible for consumers to conclude that mainstream content and hard-core pornography are complementary, and ultimately, that Amazon could be the source of both. The Court finds Dr. Williams' opinions to be relevant to the underlying issues of this litigation and will allow her testimony to be offered.

## VI.   WREAL'S MOTION TO EXCLUDE DR. DAN SAREL SHOULD BE GRANTED

Wreal moves to exclude Amazon's consumer survey expert, Dr. Dan Sarel, along with his dated and irrelevant October 2014 consumer survey purporting to show an absence of actual confusion in the marketplace. Wreal argues that Dr. Sarel's survey is irrelevant and unreliable because he (1) improperly used the *Eveready* methodology when ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (2) sampled from an improper universe that dramatically differed from the one he defined, (3) used an improper stimulus design that failed to replicate market conditions by artificially reducing respondents' exposure to the marks at issue, (4) used inappropriate screening questions that allowed respondents to self-select whether they wanted to participate in the survey based on its topic, (5) impermissibly used leading questions designed to further focus respondents away from the mark, (6) failed to follow his own methodology in coding responses, (7) failed to provide the response rate to his survey, and (8) failed to validate the results of his survey.

In applying the *Daubert* standard to survey evidence, courts consider a number of criteria including whether (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts." *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, 7:10–CV–124 (HL), 2012 WL 1833877 (M.D. Ga. May 18, 2012) (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F.Supp.2d 415, 433 (S.D.N.Y. 2004)) (citation and alterations omitted).

The Court has carefully evaluated the record evidence and recommends that Wreal's motion to exclude Dr. Sarel be granted because (1) Dr. Sarel's *Eveready* survey was premature, (2) Dr. Sarel surveyed the wrong universe, rendering his survey irrelevant, (3) Dr. Sarel improperly used a distorted stimulus, and (4) the combined effect of each of the flaws identified by Wreal render it so fundamentally flawed that it must be excluded under Rule 702 and 403. *See Native Am. Arts, Inc.*, 2012 WL 1833877 at \*6 (citing *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 118–21 (3d Cir. 2004); *THOIP v. Walt Disney Co.*, 788 F. Supp. 2d 168 (S.D.N.Y. 2011); *Hodgdon Powder Co. v. Alliant Techsys., Inc.*, 512 F.Supp.2d 1178, 1181 (D. Kan. 2007) ("[W]hen the deficiencies are so substantial as to render the survey's conclusions untrustworthy, a court should exclude the survey from evidence.")).

## A. DR. SAREL'S EVEREADY SURVEY WAS PREMATURE AND THUS CANNOT BE RELIABLY USED TO MEASURE WHETHER CONFUSION IS LIKELY IN THIS CASE.

Wreal argues that "Dr. Sarel's choice of an *Eveready* design is flawed given the nature of this case and the timing of his survey." [ECF No. 214 at 5]. The nature of this case is one of reverse confusion. Wreal alleges that Amazon is saturating the market with Fire TV, and that this will lead

consumers to associate the name Fire TV, which Wreal alleges is confusingly similar to FyreTV with Amazon. Thus, Wreal contends consumers will think Amazon is the source of Wreal's FyreTV®. *See Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir. 1988) ("Reverse confusion is the misimpression that the junior user it the source of the senior user's goods.").

Wreal contends that Dr. Sarel prematurely employed an *Eveready* survey before consumers has sufficient time to become aware of Amazon's Fire TV on an unaided basis. [ECF No. 214 at 5-7.] Specifically, Wreal argues that Dr. Sarel's *Eveready* survey cannot be used to reliably show likelihood of confusion in this case because ██████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████

Wreal does not contend that an *Eveready* survey could never reliably measure confusion given the facts of this case. Instead, it argues that Dr. Sarel's October 2014 *Eveready* survey could not reliably measure confusion. At its core, Wreal's argument is a temporal one – Dr. Sarel conducted his survey prematurely, Wreal argues. His *Eveready* suvey is only useful to measure confusion amongst those that were aware on of Amazon's Fire TV in October 2014. Thus, Wreal's argument is not only that ███████████████████████████████████████████ to reliably measure confusion, but also ███████████████████████████████████████

---

[4] The terms "unaided awareness," "top-of-the-mind," and "readily accessible," are essentially synonymous when applied to measure the strength of a brand or mark in consumers' minds. "Unaided" refers specifically to an open-ended question that does not "aid" the respondent by providing the answer as part of list of choices. Swann, Likelihood of Confusion at 53 (explaining that the Eveready format is "unaided" because "respondents are shown only the allegedly infringing mark/dress, and the 'source confusion' question is open-ended." A mark is "top of mind" when it is "highly accessible" or "internally available" in memory. *Id.* Put another way, "in memory, top-of-mind brands function as antidotes to clutter…." *Id.* at 60. Thus, there is no real distinction between "unaided awareness," "top-of-mind," and "readily accessible" in this context.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

In sum, then, Wreal argues that Dr. Sarel's survey cannot reliably measure the *likelihood* of confusion in this case, as it does not take into account the ████████████████████████ ████████████████████

Amazon argues that Wreal's criticism has "no methodological basis" and is contrary to relevant authority. Amazon can only reach these conclusions by mischaracterizing Wreal's argument, the relevant authority, and Amazon's burden establishing that Dr. Sarel's survey is admissible.

I find that Amazon has the burden of showing that Dr. Sarel's survey is reliable, and that Amazon failed to meet that burden because Dr. Sarel relies on data that cannot be used to support his conclusions.

1. Wreal's Argument That Dr. Sarel's Survey was Premature is Methodologically Sound.

According to Amazon, Wreal has "no methodological basis" for its argument that Dr. Sarel's survey was premature because Dr. Maronick explained that it would be speculative to give a "magic number" as to when it would be proper to conduct a survey. [ECF No. 250 at 5-6]. This misstates Wreal's position. Dr. Maronick never said that there is a magic threshold of awareness. His opinion is that, ██████████████████████████████████████████

████████████████████████████████████████████████

██████████ [ECF 214-3 ¶ 23). In a reverse confusion case, where the junior user is new to the market, growth in unaided awareness must be taken account. [ECF 214-3 ¶ 15] Thus while Dr. Maronick cannot guess where unaided awareness of Amazon's Fire TV is headed, he can and does

opine based on the ███████████ and his background in marketing that unaided awareness is likely to continue to increase.[5]

   2.  An *Eveready* Survey is an Unaided Test, and Amazon's Data on Aided Awareness is Irrelevant for an Eveready Survey.

   Amazon also argues that Wreal's position that Dr. Sarel's survey is premature is contrary to the "relevant authority in [the] field because, in Amazon's view, ████████████████ ████████████████████████████ – in assessing the appropriateness of the *Eveready* format." [ECF No. 250 at 6-7]. This is contrary to the relevant authority, which explains that *Eveready* is an unaided test.[7] There is no dispute that Dr. Sarel did not show respondents Amazon's Fire TV, nor did it include Amazon's Fire TV as a response to a closed-ended question. Dr. Sarel testified that he did not aid respondents ECF 214-4 at 212:15-21.

   This is consistent with the ABA's treatise, which explains that in an unaided format, respondents much search their memory to identify stimulus based on similarity to what they already know. Swann at 61, 67 (describing Eveready as "an unaided comparison (involving an internal search of memory)). The unaided Eveready format is thus hostile to weak marks that are not top-of-mind or internally accessible, as "[t]he internal search of memory…" required by the

---

[5] That Dr. Maronick can only speculate as to when unaided consumer awareness will plateau and at what level completely misses the point. Rather, it exposes the fact that Dr. Sarel's data is unreliable. Amazon's Fire TV has been the most popular streaming media player. Amazon continues to saturate the market with advertising.[5] Dr. Maronick, when asked to speculate at his deposition, thought that in this case unaided awareness should be at least 50 percent before reliably running an *Eveready* survey. [Maronick Dep. at 50:11-19]. That is not unreasonable considering the position of ████████████████████████ *excluding* those that currently own a Roku. ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████

[7] Jerre B. Swann, "Likelihood of Confusion," in Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Shari Seidman Diamond & Jerre B. Swann, eds., 2012) at 61. (hereinafter "Swann").

Eveready format "will consistently produce negligible estimates of likelihood of confusion" for commercially weak marks. *Id.* at 64.

Indeed, "unaided awareness" simply means awareness measured using unaided open-ended questions without showing respondents the junior mark in a reverse confusion case. In addition, unaided questions typically elicit only commercially strong "top-of-mind" marks, which are those easily accessible in memory. Thus, *Eveready*'s unaided format confronts only "conscious confusion or 'top-of-mind' awareness." *Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 291 (S.D.N.Y. 1997) (explaining that the fact that the Eveready design measures "top-of-mind" awareness and "may significantly underestimate the likelihood of confusion" where respondents are unfamiliar with the untested mark); *see also Akiro LLC v. House of Cheatham, Inc.*, 12-CIV-5755, 2013 WL 2181088, at *11 (S.D.N.Y. May 13, 2013) ("While the Eveready format is generally accepted as the 'gold standard' for cases involving strong marks, by design it will underestimate confusion for marks that are not highly accessible in a consumer's memory.").

The fact that an Eveready survey requires unaided consumer awareness is hardly controversial and is even recognized by Dr. Sarel. ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████

Thus, the Court does not accept Amazon's description of the *Eveready* format as an "aided" format, as this is against the weight of the authority. In fact, Amazon's only support for this

assertion is the fact that the co-editor of the ABA's Treatise disagrees with the nomenclature used by survey experts and suggests that, in his personal view, the format resembles a "partially aided awareness test." *Id.* at 62 n 62. This does not change Mr. Swann's view that *Eveready* assesses "accessible" brands. Moreover, it certainly does not mean that *Eveready* in any way resembles an aided awareness test, where surveyors put both brands directly into a respondents' "cognitive workspace" and afford a mark "100 percent top-of-mind awareness…." *Id.* at 67-68, 72.

In fact, if Amazon truly believed that aided awareness was the relevant measure, this supports Wreal's argument that an unaided *Eveready* survey was inappropriate. During the hearing, the Court asked Wreal's counsel whether any court had rejected an *aided* awareness test in a revere confusion case. Dec. 1, 2015, Tr. 213:13-15. In *Kargo Glob., Inc. v. Advance Magazine Publishers, Inc.*, 06 CIV 550 JFK, 2007 WL 2258688 (S.D.N.Y. 2007), the court rejected an aided awareness test for failing to replicate marketplace conditions because it made respondents "artificially aware of the other party's trademark." 2007 WL 2258688, at *8. The *Kargo* court found that the survey's use of a back-to-back display of the marks failed to approximate market conditions because the marks were unlikely to be seen in close physical or temporal proximity, a fact "rendered even more remote by the fact that *Cargo* ran for only twenty issues and is no longer published." 2007 WL 2258688 at *7.

But if the relevant measure of awareness is aided awareness, as Amazon urges, then any concern that an aided-awareness survey would make consumers "artificially aware" would be absent here because, as Amazon pointed out, ████████████████████ in October 2014. Thus, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████

Thus, the Undersigned finds that aided consumer awareness is irrelevant to whether an *Eveready* survey is reliable, except to the extent that it establishes that an aided survey would have better replicated market conditions than an unaided *Eveready* survey.

3. The Evidence Does Not Support Amazon's Use of an *Eveready* Survey in October 2014.

Wreal argues that Amazon's decision to employ an *Eveready* survey in October 2014 was premature because unaided awareness was low at that time, but has been and continues to grow.

█████████████████████████████████████

█████████████████████████████████████

███████████████████████

a. *Amazon Improperly Conflates Market Saturation With Unaided Consumer Awareness.*

Amazon disagrees with Wreal and suggests that the evidentiary record supports Dr. Sarel's decision to use an *Eveready* survey because it has saturated the market with advertising. Likewise, Amazon argues that Wreal's position that Dr. Sarel's survey was premature is fatal to its reverse confusion theory because market saturation is necessary to establish reverse confusion. Amazon's arguments both fail because Amazon improperly conflates saturation and unaided consumer awareness.

This is evident by the fact that Amazon argues its *Eveready* survey was appropriate because Amazon saturated the marketplace with advertising shorty after launch. But Amazon and its expert ignored its own data on unaided consumer awareness showing that saturation did not translate into immediate unaided awareness. And there is no evidence that advertising expenditures and saturation of the market translate into immediate unaided consumer awareness. To the contrary,

Dr. Maronick explained that "while a massive advertising campaign is likely to increase top-of-mind awareness of a product, this is not something that happens overnight." [ECF No. 214-3 ¶ 19].

In response to Wreal's argument that Amazon is improperly conflating market saturation with unaided consumer awareness, Amazon's counsel urged the Court to look to Section 23:10 of McCarthy's Treatise, where he states:

> In the author's opinion, a survey cannot be run in a reverse confusion case prior to the junior user's saturation of the market with its mark because, until that time, consumers have not been exposed to the relatively large advertising and promotion of the junior user that is the hallmark of a reverse confusion case.

4 McCarthy on Trademarks and Unfair Competition § 23:10 (4th ed.) Amazon's counsel interpreted this single sentence to mean that a survey can be run once Amazon saturates the market. [December 1, 2015 Tr. 225:25-226:15]. But at most the author is expressing his opinion that saturation is a *necessary* condition before a survey can be run, not that saturation alone is *sufficient* to run a survey in a reverse confusion case. And the treatise certainly does not say that saturation of the market necessarily means there is a high level of unaided awareness.

    b.    *The Fancaster, Inc. v. Comcast Corp. Decision Illustrates The Proper Way to Conduct Likelihood of Confusion Studies in Reverse Confusion Cases.*

The court's decision in *Fancaster, Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380 (D.N.J. 2011), which both parties urged this Court to consider, perfectly illustrates why Dr. Sarel got it wrong in this case and why Amazon's view is flawed.

In *Fancaster,* Comcast was sued for reverse confusion after launching fancast.com, a website devoted to streaming video online. 832 F. Supp. 2d at 380. Comcast launched fancast.com in January 2008. Like Amazon, Comcast saturated the market with advertising for its Fancast website, promoting it across a multitude of advertising channels, including nationwide television, print and internet advertising. *Id.* at 392. By the end of 2009, however, the Fancast website had

lost about $80 million, and Comcast began to phase it out, rebranding it "FANCAST Xfinity TV." *Id.* at 393. In March 2011, Comcast took down the FANCAST website. *Id.*

Just as Amazon did here, Comcast retained an expert to provide survey research in order to disprove the likelihood of confusion. The first survey was conducted in March 2009, some 14 months after Comcast launched FANCAST. *Id.* at 397. Comcast's expert did not use an *Eveready* design for the 2009 survey. *Id.* Instead, it used an aided "sequential lineup" format, which works by simulating a scenario in which a consumer first comes to learn about Comcast's mark, then encounter's Fancaster's mark. *Id.* Unaided consumer awareness was not a prerequisite for this survey.

The same expert conducted a second survey in March 2011, this time using an *Eveready* design. *Id.* at 398-99. Comcast's expert explained that he used an *Eveready* format in March 2011, but not March 2009, "because, at that time, 'the Fancast service had been in existence for an additional two plus years and consumer should therefore have had ample opportunity to become aware of the FANCAST mark." *Id.* at 399. Thus, Comcast's expert thought it was necessary to simulate consumer awareness (effectively making it an aided awareness test) some 14 months after Comcast launched its website and began saturating the market with advertising. 832 F. Supp. 2d at 397. The same expert did not use the unaided *Eveready* format until March 2011, 38 months after launch. *Id.* at 398-99. In contrast, Dr. Sarel conducted an unaided awareness test only 7 months after Amazon launched Fire TV and began saturating the market with advertising.

The plaintiff in *Fancaster* argued that the March 2011 survey was flawed because it failed to screen out respondents that had actually been exposed to the junior user's mark. *Id.* at 407. The *Fancaster* court disagreed with the plaintiff, and explained that the argument was against the theory of reverse confusion itself, which "depends on the overall commercial strength of the junior

26

user's mark." *Id.* (citations omitted). Thus, the court concluded, "it was proper … to use an Eveready survey <u>in March 2011</u>." *Id.* (emphasis added). Amazon argues that this undermines Wreal's theory of the case. Not so. Perhaps that would be true if the facts were more like in *Fancaster*, where unaided consumer awareness was not likely to increase more than three years after a failed product had launched and already been shut down.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

Even more, Wreal does not, as Amazon's counsel suggested, argue that Dr. Sarel's "Eveready survey was improper because there is no evidence that its respondents had been exposed to the junior user's mark." *Id.* at 175. Rather, Wreal's argument is that Dr. Sarel's survey was premature because ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

Thus, the Undersigned finds that *Fancaster* supports Wreal's position that an *Eveready* survey is inappropriate in this case. *Fancaster* stands for the proposition that market saturation does not automatically lead to unaided consumer awareness. Comcast's expert did not think that market saturation had led to sufficient unaided consumer awareness over a year after Comcast began saturating the market. And he only conducted an *Eveready* survey after ensuring enough

time – over three years – went by to allow sufficient time for Comcast's advertising to translate to

unaided consumer awareness. ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

it has only been after a much more significant period of time than a matter of months had passed

from the time infringement began to the time when the survey was conducted. *See Denimafia Inc.*

*v. New Balance Athletic Shoe, Inc.*, 12 CIV. 4112 AJP, 2014 WL 814532 (S.D.N.Y. Mar. 3, 2014)

(over two years from alleged infringement to survey); *Kargo Global*, 2007 WL 2258688 (over two

years); *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218 (S.D.N.Y. 2010) (one year, five months)[8].

    4.   Dr. Sarel's October 2014 Survey Was Premature and Thus is Unreliable and Should be Excluded.

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████  The reason is that it is impossible to discern whether Dr. Sarel's

---

[8] In *Thoip*, the court actually allowed an *Eveready* survey only on a forward confusion theory, not a reverse confusion theory. In a later decision, the same court *excluded* an *Eveready* survey put forth to prove reverse confusion because it was conducted after the product was taken off the market, and thus inadequately reflected market conditions when the product was on the market and consumers were more likely to be aware.

survey showed no confusion because, as Dr. Sarel concludes, confusion is unlikely, or, as  Wreal

suggests, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████

      This does not mean that an *Eveready* survey cannot or should not be used in a reverse

confusion case. Once there is evidence that consumers are aware of a junior user's mark without

being aided, or evidence that shows that the junior user's mark is unlikely to gain sufficient

commercial strength to generate unaided awareness, then an *Eveready* survey could and likely

would be appropriate in a reverse confusion case. ██████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Amazon itself proudly

announced the day before Undersigned heard this motion that Fire TV sales increased six-fold

from a year earlier. It announced that from July – October 2015, data neither Wreal nor Dr.

Maronick had access to, Fire TV was the top-selling streaming media player in the United States,

dethroning long-time market leader Roku. ████████████████████████████████

██████████████████████ The evidence suggests that the landscape will continue to rapidly change.

Thus, Dr. Sarel's survey is not probative of whether confusion is likely once Amazon has fully

saturated the market and unaided awareness has plateaued.

**B.  DR. SAREL'S SURVEY IS IRRELEVANT BECAUSE HE SURVEYED      THE WRONG UNIVERSE, RENDERING IT INADMISSIBLE.**

Wreal also argues that, aside from the fact that Dr. Sarel's survey was premature, it is also irrelevant because he surveyed the wrong people. The Federal Judiciary Center's Reference Guide on Survey Research explains that "[t]he definition of the relevant population is crucial because there may be systematic differences in the responses of members of the population and nonmembers. For example, consumers who are prospective purchasers may know more about the product category than consumers who are not considering making a purchase." Federal Judicial Center, *Reference Manual on Scientific Evidence,* 376 (2011).

Whether Dr. Sarel surveyed the proper universe goes directly to his survey's relevance because "the persons interviewed must adequately represent the opinions which are relevant to the litigation." *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980). Thus, the "[s]election of a proper universe is so critical that 'even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.'" *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008) (citing *Wells Fargo & Co. v. WhenU.com, Inc.*, 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003)).

Here, Dr. Sarel failed to survey the universe he defined, a fact that is beyond dispute. The relevant market in a reverse confusion case is the senior user's market, which makes  Wreal's market the relevant one to survey. Dr. Sarel identified  Wreal's target market as those "wishing to view pornographic movies/videos and willing to pay for such access." [ECF. No. 211-2 at ¶ 17]. Thus, he "defined the relevant universe as consumers over 18 years of age who paid for, or are willing to pay for, adult porn video-on-demand (VOD) services." [*Id.* ¶ 32]. *See Amstar Corp.*, 615 F.2d at 264 (a survey "should include a fair sampling of those persons most likely to partake" in the goods or service tested in the survey.)

30

Dr. Sarel failed to screen for the universe he defined, but instead screened only for those that visit adult websites regardless of whether they have ever paid or ever would pay to gain full access to those sites. That is because Dr. Sarel never asked respondents about their willingness to pay to access adult content. [ECF No. 211-3 at ¶¶ 32-34]. Dr. Sarel conceded that respondents could qualify for his survey despite having "no intention absolutely of ever paying…" to access adult content. [ECF No. 211-4 at 82:18-23; 84:2-11]. Dr. Maronick concluded that Dr. Sarel's failure to survey the correct universe renders his survey extremely overbroad to the point that is worthless given that very few people that visit adult websites actually go on to pay to access content. [ECF No. 211-2 at ¶ 37-38].

Dr. Sarel eventually responded by backing away from his initial definition of the proper universe, and testified that whether consumers are willing to pay is "a meaningless question." [ECF No. 211-4 at 88:16-89:6]. As Wreal pointed out, this is inconsistent with Dr. Sarel's past practice of screening for people willing to buy the product or service in question. [ECF No. 211 at 11, n. 41].

Moreover, Dr. Maronick compared the demographics of Dr. Sarel's universe with the demographics of Wreal's actual customers, and found that the differences to be dramatic. For example, Dr. Sarel's universe was 60% male, whereas 96% of Wreal's customers are men, and Dr. Sarel's respondents were much older than Wreal's actual customers. [ECF 211-3 at ¶ 41].

Because Dr. Sarel admittedly surveyed a different universe than the one he identified as correct, and because the data shows that the universe Dr. Sarel surveyed looks nothing like Wreal's actual customers, I conclude that Dr. Sarel's universe was improper, and thus his survey is irrelevant, unreliable and inadmissible under *Daubert*.

## C. DR. SAREL USED A DISTORTED STIMULUS AND THUS FAILED TO REPLICATE MARKET CONDITIONS, RENDERING IT INADMISSIBLE.

Wreal argues that Dr. Sarel's stimulus fails to replicate market conditions. "To be valid for purposes of demonstrating actual confusion in a trademark infringement suit, it is necessary for a survey's protocol to take into account marketplace conditions and typical consumer behavior so that the survey may as accurately as possible measure the relevant 'thought processes of consumers encountering the disputed mark … as they would in the marketplace." *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1327 (N.D. Ga. 2008) (citation omitted). "[T]he results of a survey that fails to simulate how a consumer would encounter a trademark are neither reliable nor probative. *Fancaster*, 832 F. Supp. 2d at 405 (excluding a survey for failing to replicate market conditions by showing screengrabs of a website instead of a live version).

Dr. Sarel used eight screengrabs of  Wreal's fyretv.com website as his stimulus. Wreal argues that those screengrabs were presented devoid of any context or foundation, including, critically, how respondents got to the website in the first place. In the real world, however, people do not happen upon a website – they get there either by clicking a link or by typing the URL into their browser. I find this to be a critical and unexplained omission, particularly given that the URL is the mark at issue – fyretv.com. There is no legitimate reason to leave out this critical information from the stimulus, and Dr. Sarel has included this information in other surveys. *See The Learning Network, Inc. v. Discovery Comm's, Inc.*, 153 F. Supp. 2d 785, 790-91 (D. Md. 2001) (excluding survey that used screengrabs of a website with the URL stripped and without any context as to how consumers got there); *see also Sears, Roebuck & Co. v. Menard, Inc.*, 01-C-9843, 2003 WL 168642, at *2 (N.D. Ill. Jan. 24, 2003) (striking trademark survey because the stimulus "distorted marketplace conditions" by removing "important cues regarding affiliation or lack of affiliation between the parties.").

I find that Dr. Sarel's unexplained and unconventional[9] use of a distorted stimulus renders his survey unreliable because it fails to replicate market conditions. *Wal-Mart Stores*, 537 F. Supp. 2d 1302, 1327. As a result, Dr. Sarel's survey should be excluded.

### D.  THE COMBINED EFFECT OF THE NUMEROUS FLAWS IDENTIFIED IN DR. SAREL'S SURVEY RENDER IT UNRELIABLE AND INADMISSIBLE.

Dr. Maronick explained that Dr. Sarel's survey suffers from a number of additional flaws that bias his survey toward a finding that confusion is likely. Specifically, Wreal argues that Dr. Sarel's survey is unreliable because he used improper screening questions that biased the results of his survey, used impermissibly leading questions, failed to follow his own coding methodology, failed to provide the response rate to his survey and failed to validate the results of his survey. Typically, these types of flaws would go to the weight the jury should give a survey, not its admissibility. *See Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 844-45 (11th Cir. 1983) (finding that technical defects in a survey went to its weight and not its admissibility).

However, I find that the combined effect of the flaws in Dr. Sarel's survey render it unreliable to answer the question of whether confusion is likely in this case. *See Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 118 (2d Cir. 1984) (finding survey "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion"); *Vista Food Exchange, Inc. v. Vistar Corp.*, 03–CV–5203, 2005 U.S. Dist. Lexis 42541, 2005 WL 2371958, at *21-22 (E.D.N.Y. Sept.27, 2005) (excluding survey on Rule 403 grounds because it was "flawed to the point that its probative value is substantially outweighed by the survey's potential for unfair prejudice and confusion"); *Revlon Consumer Prods Corp. v. Jennifer Leather Broadway, Inc.*, 858 F.Supp. 1268, 1276 (S.D.N.Y.1994) (finding survey

---

[9]  Wreal points out that Dr. Sarel did not make this critical omission in a different case where he also tested respondents using a website as a stimulus, but in fact simulated a Google search and left in the URL. [ECF No. 214 at 14].

"so unreliable that it is entitled to no weight"); *Exxon Corp. v. Xoil Energy Resources, Inc.*, 552 F.Supp. 1008, 1021 (S.D.N.Y.1981) (affording survey no weight because survey, among other things, was not "taken under market conditions").

## VII.   AMAZON'S MOTION TO EXCLUDE DR. THOMAS MARONICK SHOULD BE DENIED.

Because this Court recommends that Dr. Sarel's expert report and testimony be excluded, Amazon's motion to strike Dr. Maronick is moot, as  Wreal only intends to use him as a rebuttal expert to critique Dr. Sarel's methodology. However, if Dr. Sarel were permitted to testify, Dr. Maronick should be as well.

Amazon moves to exclude Dr. Maronick's expert rebuttal report critiquing Dr. Sarel's survey methodology. Its main argument is that Dr. Maronick's report and testimony should be excluded because he did not conduct his own survey.[10] This is a truly remarkable argument, as Amazon essentially argues that its expert should be immune from criticism by one of his peers simply because Dr. Maronick did not re-run Dr. Sarel's survey. I find that this argument is contrary to the law, and not a basis by which to exclude Dr. Maronick.

Amazon's other arguments fair no better. Its argument that Dr. Maronick's testimony is unhelpful to the jury because the same information can be elicited from Dr. Sarel on cross-examination is unsupported by the law. Otherwise, Amazon simply explains that it disagrees with Dr. Maronick, which is not a basis to exclude him. Finally, Amazon argues that Wreal should be

---

[10] Amazon has apparently backed away from this argument, and its counsel said unequivocally that Amazon is not taking the position that the expert has to run his or her own survey. [December 1, 2015 Tr. 236:13-15]. Amazon took this position throughout its briefing, however. *See* [ECF No. 212 at 1] ("Dr. Maronick's criticisms are untested: he has made no effort to re-run Dr. Sarel's survey after adjusting for the criticisms to see if the results differ."); *Id.* at 5 ("Dr. Maronick made no attempt to show that re-running Dr. Sarel's survey with the supposed 'errors' corrected would make any difference in the results."). [ECF No. 268 at 1] ("An expert critiquing a survey should be held to the *Daubert* standard: did the expert test the methodology by re-running the survey to see if fixing the criticisms would make any difference?").

judicially estopped from putting forth Dr. Maronick's testimony because Wreal represented to the Court that Dr. Maronick would not testify. However, Wreal made no such representation, and indeed has never taken an inconstant position with respect to Dr. Maronick. Thus, the doctrine of judicial estoppel is inapplicable. Accordingly, the Undersigned recommends that the Court deny Amazon's motion to strike Dr. Maronick's opinions.

## A. DR. MARONICK CAN RELIABLY CRITIQUE DR. SAREL'S SURVEY WITHOUT PRESENTING SURVEY EVIDENCE OF HIS OWN.

Dr. Maronick is an expert in consumer survey research. He served as a director at the FTC's Bureau of Consumer Protection for 17 years, where his duties included evaluation of consumer research studies that were designed and implemented by the Bureau during that period. Since leaving the FTC in 1997, Dr. Maronick has served as an expert witness in dozens of cases involving marketing issues and consumer survey research. Not surprisingly, Amazon does not challenge Dr. Maronick's expertise.

Dr. Maronick was retained by Wreal to evaluate Dr. Sarel's likelihood of confusion survey. Based on his knowledge and expertise, Dr. Maronick examined Dr. Sarel's consumer survey to determine whether it was reliable to support its conclusion that confusion is unlikely. As discussed above, he concluded that it does not. He relied on the methods of data collection used by Dr. Sarel, as well as data produced during this litigation that Dr. Maronick believes Dr. Sarel should have considered including internal data on unaided consumer awareness of Amazon's Fire TV.

Amazon argues that Dr. Maronick's criticism is inadmissible because "Dr. Maronick has made no attempt to show that re-running Dr. Sarel's survey with the supposed 'errors' corrected would make any difference in the results." [ECF 212 at 5.] The notion that Dr. Maronick's criticisms cannot go to the jury without an accompanying consumer survey is unsupported by the law. Courts routinely permit rebuttal survey experts to criticize their opponent's methodology

35

without running a survey that would correct the identified flaws. *See, e.g., A & J Mfg., LLC v. Kingsford Products Co., LLC*, CV 209-049, 2010 WL 1956042, at *1 (S.D. Ga. May 13, 2010) (permitting a rebuttal survey expert whose testimony was "limited exclusively to his description of perceived flaws in the trade distinctiveness presented by [the defendant's] expert…."); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1330 (N.D. Ga. 2008) (A critiquing expert's "extensive experience designing and evaluating surveys qualifies him to provide testimony about technical flaws in the design of [the opposing expert's] study and the impact of those flaws on the trustworthiness of [the opposing expert's] reported results.")

This is consistent with the general rule that a party may put forth a rebuttal expert to critique another expert's methodology. *Coquina Investments v. Rothstein*, 10-60786-CIV, 2011 WL 4949191, at *3 (S.D. Fla. Oct. 18, 2011) (citing *Pandora*, 2011 WL 2295269, at *5 (internal citation omitted)) ("A rebuttal expert can testify as to the flaws that she believe[s] are inherent in another expert's report that implicitly assumes or ignores certain facts."). And it is consistent with the Federal Judicial Center's Reference Manual on Scientific Evidence, which explains in the section on survey evidence that:

> Parties often call on an expert to testify about a survey conducted by someone else. The secondary expert's role is to offer support for a survey commissioned by the party who calls the expert, to critique a survey presented by the opposing party, or to introduce findings or conclusions from a survey not conducted in preparation for litigation or by any of the parties to the litigation.

Federal Judicial Center, *Reference Manual on Scientific Evidence,* 3d Ed. at 375 (2011).

Indeed, Amazon's argument is inconsistent with the leading treatise on trademark infringement law, which recognizes that parties often put forth opposing experts solely to critique another party's survey, also rejects Amazon's view. 6 McCarthy on Trademarks and Unfair Competition § 32:158 (4th ed.) ("The survey expert for the opponent may then attack the substance

and form of the other side's survey and/or counter it with a different survey producing different results." (emphasis added).

It is even rejected by Amazon's own caselaw. The court in *Whirlpool Properties, Inc. v. LG Electronics, USA, Inc.*, 1:03-CV-414, 2006 WL 62846 (W.D. Mich. Jan. 10, 2006), upon which Amazon heavily relies, said that the it is "not unusual" for experts to be retained solely to review and critique a survey conducted by the opponent's expert. *Id.* at *3 (citing 5 McCarthy § 32:158 at 32-258.1).

In fact, Amazon's reliance on *Whirlpool* is entirely misplaced, as that case does not stand for the proposition that a rebuttal survey expert must be excluded if he did not conduct his own consumer survey. Rather, the plaintiff in *Whirlpool* moved to exclude the defendant's survey based on the plaintiff's expert report criticizing the defendant's expert's methodology. The court noted that the plaintiff's expert "was not retained by plaintiffs to conduct a survey, but only 'to review and offer an opinion' regarding a survey conducted by the defendant's expert…." *Id.* at *3. And though the court denied the plaintiff's motion to exclude, it did not exclude the rebuttal expert.[11] Instead it considered the rebuttal report, but found it unpersuasive in convincing the court to exclude the defendant's expert report.[12] Thus, I do not find *Whirlpool* to be of any help to Amazon.

---

[11] The court noted that the plaintiff's expert criticism of the methodology used by the defendant's expert would have been substantially aided by proof that the correct methodology would have led to a different result. *Whirlpool Properties, Inc.*, 2006 WL 62846 at *3. However, in this case, Dr. Maronick, relying on Amazon's own internal data, concluded that a reliable survey could not be run until Amazon's ongoing saturation of the marketplace results in a higher level of consumer unaided awareness (as opposed to the high aided awareness that already existed) of its Fire TV.

[12] Amazon also cites a handful of cases from the Eleventh Circuit and this District where courts rejected testimony from experts that did not test their theories. None of those cases involved a survey expert's critique of the methodology used by another survey expert. Rather, in each of those cases, the expert was putting forth an affirmative theory that was untested and ultimately unreliable; much like Dr. Sarel has in this case.

Aside from *Whirlpool*, Amazon only relies on an unpublished, sealed order where one judge excluded a critiquing survey expert that did not conduct his own survey. [ECF No. 212 at 2]. That order does not even stand for the proposition that a competing survey *must* be put forth – indeed it gives little background as to the facts surrounding the expert opinion at issue. Amazon's argument is contrary to the overwhelming weight of the authority and common practice of permitting a survey expert to review and critique the methodology used by an opponent. If Dr. Sarel were permitted to testify, this Court would allow Dr. Maronick to provide his critique of Dr. Sarel's survey. The jury, then, can decide what weight, if any, to allot each expert's opinion.

## B.  THE JURY WILL BENEFIT FROM DR. MARONICK'S CRITICISM OF DR. SAREL'S METHODOLOGY.

Amazon also seeks to exclude Dr. Maronick's testimony because it fails to satisfy the "helpfulness" prong of the *Daubert* analysis because any methodological flaws in Dr. Sarel's survey can be brought out on cross-examination. Amazon also argues that Dr. Maronick's opinion is unhelpful because they are "irrelevant in light of Dr. Maronick's ultimate conclusion that no survey would show a likelihood of confusion in this case." [ECF No. 268 at 11]. Neither of these arguments are a basis to exclude Dr. Maronick. As explained above, it is perfectly acceptable for one survey expert to critique another's methodology.

And Dr. Maronick did not opine that no survey could ever be used to measure the likelihood of confusion in this case, or that confusion does not exist, as Amazon ███████████████. Thus, Dr. Maronick explained that in order to reliably test for confusion using an *Eveready* survey, ███████ ████████████████████████████████.

███████████████████████████████████████████████████

████████████████████

Thus, I find that Amazon's complaints with respect to the helpfulness prong miss the mark. If Dr. Sarel were permitted to testify, the jury would benefit from Dr. Maronick's expert opinion reviewing and critiquing Dr. Sarel's methodology. Dr. Maronick would be needed to explain why the flaws in Dr. Sarel's survey are important, and why they bias the results. The jury will benefit from Dr. Maronick's ███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████. This is appropriate rebuttal testimony, and it will be helpful to the jury.

### C. WREAL IS NOT JUDICIALLY ESTOPPED FROM PUTTING FORTH DR. MARONICK BECAUSE IT NEVER TOOK AN INCONSISTENT POSITION.

Finally, Amazon argues that Wreal should be judicially estopped from putting forth Dr. Maronick because, according to Amazon, Wreal represented that Dr. Maronick would not testify at trial in this case. [ECF No. 212 at 12]. Amazon claims that Wreal made this representation as part of its effort to quash a subpoena that Amazon issued to Dr. Maronick. [*Id*. at 13]. Thus, Amazon argues that Wreal took an inconsistent position, which the Court relied upon, and which resulted in an unfair advantage for Wreal. *See Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (explaining that in determining whether to apply the doctrine of judicial estoppel, courts in the Eleventh Circuit evaluate (1) whether the present position is clearly inconsistent with the earlier position, (2) whether the party succeeded in persuading a tribunal to accept the earlier position, and (3) whether the party advancing the inconsistent position would derive an unfair advantage).

Wreal made no such representation, however, and thus Amazon cannot establish the obvious prerequisite for judicial estoppel, namely that Wreal took any inconsistent position.

Rather, Wreal argued that the Undersigned should quash the subpoena because Dr. Maronick had not been designated as a witness to testify at trial at the time. *See* [ECF No. 139 at 3-4] ("Amazon's subpoena is at best premature, as Dr. Maronick has not been designated as an expert that may testify at trial…."). But Wreal left open the possibility that it may later designate Dr. Maronick as a witness to testify at trial. It did not, as Amazon claims, represent "that Dr. Maronick would not testify at trial." [ECF No. 212 at 12]. Ultimately, Wreal timely disclosed Dr. Maronick as a rebuttal witness on September 10, 2015. [ECF No. 183, 243].[13]

Because Wreal never took an inconsistent position, there can be no judicial estoppel. Accordingly, while Amazon's motion to strike Dr. Maronick is rendered moot by my recommendation that Dr. Sarel's testimony not be permitted, even if Dr. Sarel were permitted to testify, I would recommend that the Court deny Amazon's motion to strike Dr. Maronick.

**RESPECTFULLY RECOMMENDED,** in Chambers, at Miami, Florida this ___ day of _____, 2015.

_____
**JONATHAN GOODMAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[13] Nor could Amazon possibly claim any unfair prejudice even if Wreal had taken some inconsistent position. Wreal puts forth Dr. Maronick as a rebuttal expert to provide his criticism of Dr. Sarel's methodology, not to put forth his own survey. Thus, early pilot studies conducted by Dr. Maronick – which apparently have been provided to Amazon – are largely irrelevant to Dr. Maronick's opinion.

Respectfully submitted,

WNF LAW, P.L.
*Attorneys for  Wreal, LLC*
1111 Brickell Avenue, Suite 2200
Miami, Florida 33131
Phone: (305) 760-8500
Fax: (305) 760-8510


By: ___*/s/  John Marfoe*_____
   Carlos Nunez-Vivas
   Florida Bar No. 128181
   can@wnflaw.com
   Daniel Foodman
   Florida Bar No. 337160
   df@wnflaw.com
   Dennis J. Wouters
   Florida Bar No. 28692
   djw@wnflaw.com
   John G. Marfoe
   Florida Bar No. 101535
   jgm@wnflaw.com


## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 14, 2015, this document was served by the Court's ECF filing system on all counsel of record on the Service List below.


By:___ /s/ John Marfoe_____

41

## SERVICE LIST

Justin A. Nelson, Esq.
Drew D. Hansen, Esq.
Edgar G. Sargent, Esq.
Patrick C. Bageant, Esq.
Jordan L. Talge, Esq.
*Co-counsel for Defendant*
Susman Godfrey L.L.P.
1201 Third Avenue
Suite 3800
Seattle, WA 98101
Tel. 206-516-3880
Fax 206-516-3883
jnelson@susmangodfrey.com
dhansen@susmangodfrey.com
pbageant@susmangodfrey.com
esargent@susmangodfrey.com
jtalge@susmangodfrey.com

Jamie Z. Isani, Esq.
Shannon Shaw, Esq.
*Co-counsel for Defendant*
Hunton & Williams LLP
1111 Brickell Avenue
Suite 2500
Miami, FL 33131
Tel. 305-810-2500
Fax 305-810-2460
jisani@hunton.com
sshaw@hunton.com