# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

### CASE NO. 14-21385-CIV-LENARD/GOODMAN

WREAL, LLC,

      Plaintiff,

v.

AMAZON.COM, INC.,

      Defendant.

_____/

## *REDACTED, PUBLIC* VERSION[1] OF OMNIBUS REPORT AND RECOMMENDATIONS
## CONCERNING VARIOUS *DAUBERT* MOTIONS

Plaintiff Wreal, LLC and Defendant Amazon.com, Inc. each filed multiple motions to exclude expert testimony. Wreal filed a *Daubert* Motion to Exclude Certain Testimony and Opinions of Dr. Peter Lehman [ECF No. 208] and a Motion to Exclude Dr. Dan Sarel's Survey and Testimony [ECF No. 211]. Amazon filed a Motion to Exclude Expert Testimony of Dr. Jesse David [ECF No. 207], a Motion to Exclude the Testimony of Dr. Linda Williams [ECF No. 210], and a Motion to Exclude Certain

---

[1]    This is the redacted version of a Report which was initially filed under seal because Amazon contends the full, unredacted version discusses confidential information which it has not released to the public. The Undersigned directed Amazon to submit a proposed redacted version of the Report, which it did. Amazon's proposed redactions are limited, and the Court's version -- i.e., this version of the Report -- adopts the redactions suggested by Amazon. The Undersigned has used the star character (i.e., ****) to designate those few words and phrases which I redacted.

Opinions of Thomas J. Maronick [ECF No. 212]. United States District Judge Joan A. Lenard referred the motions to the Undersigned. [ECF No. 238].

The Undersigned has reviewed the motions, responses, and replies, as well as the submissions accompanying those documents. The Court also held a multi-hour hearing on the various motions on December 1, 2015. [ECF No. 299]. For the reasons outlined below, the Undersigned **respectfully recommends** that the District Court: (1) **grant in part and deny in part** Amazon's Motion to Exclude Expert Testimony of Dr. Jesse David; (2) **deny** Wreal's Motion to Exclude Certain Testimony and Opinions of Dr. Peter Lehman; (3) **grant in part and deny in part** Amazon's Motion to Exclude the Testimony of Dr. Linda Williams; (4) **deny** Wreal's Motion to Exclude Dr. Dan Sarel's Survey and Testimony; and (5) **deny** Amazon's Motion to Exclude Certain Opinions of Thomas J. Maronick.

## I.    Factual Background

Wreal sells a pornography pay-per-view service called "FyreTV" and a pornography set-top box -- a device that streams video content directly to a television -- called the "Fyre BoXXX" through its website, www.fyretv.com. [ECF No. 130, p. 3]. Wreal owns registered trademarks "FyreTV" and "FyreTV.com." [*Id.*]. In April 2014, Amazon introduced the Amazon Fire TV, a set-top box dedicated to mainstream content. [*Id.*] Wreal then brought this lawsuit, claiming reverse confusion: it claims a

substantial number of ordinarily prudent consumers will mistakenly believe Amazon is responsible for Wreal's FyreTV or Fyre BoXXX. [*Id.*, pp. 3, 17].

The parties have designated experts related to key issues in the case: pornography (Dr. Williams and Dr. Lehman), damages and profits (Mr. Patrick F. Gannon and Dr. David), and surveys (Dr. Maronick and Dr. Sarel). The parties have moved to exclude, in whole or in part, opinions of each of these experts except for Amazon's Mr. Gannon.

## II.    Legal Standard for Expert Testimony

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained and refined by the United States Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Under this framework, district courts are charged with a gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Rule 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

3

Fed. R. Evid. 702. The Supreme Court has stated that "[t]he inquiry envisioned by Rule 702 is . . . a flexible one." *Daubert*, 509 U.S. at 594. "Many factors will bear on the inquiry," and no "definitive checklist or test" exists. *Id.* at 593.

To fulfill its obligation under *Daubert*, a trial court engages in a three-part inquiry and considers "whether: '(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005) (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir.1998)).

The burden of establishing the reliability of an expert's opinion rests on the proponent of that expert's testimony. *United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004).

As part of its gatekeeper role, the district court has "broad discretion in determining whether to admit or exclude expert testimony, and its decision will be disturbed on appeal only if it is manifestly erroneous." *Evans v. Mathis Funeral Home*, 996 F.2d 266, 268 (11th Cir. 1993) (citing, inter alia, *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

"To warrant or permit the use of expert testimony, two conditions must be met: first, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman; second, the witness must have such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *Faircloth v. Lamb-Grays Harbor Co.*, 467 F.2d 685, 694 (5th Cir. 1972) (internal quotation omitted).

## III.   Amazon's Motion to Exclude Expert Testimony of Dr. Jesse David

Wreal designated Dr. Jesse David as a rebuttal expert to find the flaws in the opinions of Mr. Gannon (Amazon's damages and profits expert). Dr. David contends that Amazon benefited from infringement and was therefore unjustly enriched. He states that Mr. Gannon's conclusion that Amazon's Fire TV product line has not *********************** is flawed for two reasons: (1) Mr. Gannon failed to consider that the use of the Fire TV name allowed the company to save money in advertising costs; and (2) Mr. Gannon's profit measurement was too limited in scope, inconsistent with Amazon's method of analyzing its financial performance, and should have taken into consideration the product's "lifetime value" to Amazon overall, ***********************.

Amazon seeks to exclude Dr. David as an expert witness on the basis that he is not a proper *rebuttal* witness -- but instead presents a previously undisclosed unjust enrichment theory which rebuts nothing in Mr. Gannon's expert report. Alternatively,

Amazon also contends the Court should exclude Dr. David's opinion because he allegedly used an unreliable methodology and he did not provide a basis other than speculation for a monetary award.

Amazon is correct in arguing that the Court should exclude Dr. David's testimony addressing unjust enrichment because it is inappropriate for Wreal to raise it for the first time in rebuttal expert testimony.

Rule 26 permits rebuttal expert testimony only where it "is intended solely to contradict or rebut evidence on the same subject matter identified by another party." Fed. R. Civ. P. 26(a)(2)(D)(ii). Courts in this district have strictly held that "[r]ebuttal testimony is permitted only when it *directly addresses an assertion* raised by an opponent's experts." *In re Trasylol Prods. Liab. Litig.*, No. 09-01928, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010) (emphasis added) (citation omitted). In other words, rebuttal "cannot be used to advance *new arguments* or *new evidence*," *Blake v. Securitas Sec. Servs., Inc.*, 292 F.R.D. 15, 17 (D.D.C. 2013) (emphasis added) (quotation omitted), and a rebuttal expert cannot "offer[] separate and distinct analysis," *Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, No. 03-1860, 2005 WL 2465020, at *4 (M.D. Fla. Oct. 6, 2005). If a party attempts to advance new arguments through a "rebuttal" expert, then "the overwhelming weight of authority is that preclusion is *required* and *mandatory* absent some unusual or extenuating circumstances – that is, substantial justification." *Blake*, 292 F.R.D. at 19.

Here, Dr. David's theory that Amazon was unjustly enriched by using the Fire TV name does not "rebut" anything in Mr. Gannon's report. Unjust enrichment is a completely new theory based on Dr. David's opinions on advertising cost savings and future projection. Mr. Gannon did not discuss this unjust enrichment theory in his report -- nor could he, because Wreal had not disclosed it as a theory beforehand and Wreal did not submit an opening expert report. Dr. David's opinions thus comprise exactly the type of "new arguments and new evidence" that belong in an opening report.[2] *Blake*, 292 F.R.D. at 17.[3]

To the extent Wreal puts forth Dr. David as an expert to challenge Dr. Gannon for not considering advertising costs savings and the lifetime values of the Amazon Fire TV in his calculations, the Court should permit Dr. David to testify about the criticisms

---

[2]    The Court notes that at the hearing Wreal's counsel was unable to articulate whether it intends to offer Dr. David's "unjust enrichment" theories as rebuttal. [ECF No. 305, pp. 65-71]. Nevertheless, Wreal's counsel eventually conceded that Wreal will rely on an "unjust enrichment" theory in its case-in-chief. This admission that Wreal's "unjust enrichment" falls within its case-in-chief further demonstrates that Dr. David's proposed testimony is not proper rebuttal.

[3]    The Undersigned notes that he previously ruled that Dr. David was a rebuttal expert in conjunction with Amazon's scheduling-order related challenge of Wreal's disclosure of Dr. David. [ECF No. 183, p. 7]. That order specifically reserved whether his testimony would be admissible under *Daubert*. [*Id.*, p. 11 n.1], and the ruling focused on whether rebuttal experts could even be used at all by either side. The parties' briefs relating to Amazon's *Daubert* challenge of Dr. David and the hearing have now demonstrated that Dr. David's testimony concerning unjust enrichment does not rebut the testimony of Mr. Gannon and it is thus subject to exclusion.

he has of Dr. Gannon's calculations (but only if Amazon provides trial testimony from the underlying, to-be-rebutted reciprocal expert -- Mr. Gannon -- in its defense case).

Courts often repeat the *Daubert* maxim that "trial courts are the gatekeepers to the admission of *all expert testimony* and must ensure that *any and all expert testimony* or evidence admitted is not only relevant, but reliable." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09–61490–Civ., 2011 WL 2295269, at *4 (S.D. Fla. June 8, 2011) (citing *Daubert*, 509 U.S. at 589). Amazon also repeats this language and contends that Wreal was required, but failed, to have its rebuttal expert employ a methodology and ultimately offer alternative calculations. It argues that the mere fact that he is designated as a "rebuttal" expert does not exclude him from needing to employ a methodology and provide alternatives.

However, several district courts, including those in the Southern District of Florida, have concluded that rebuttal expert witnesses may criticize other experts' theories and calculations without offering alternatives. *See Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc.*, 829 F. Supp. 2d 802, 834-35 (D. Minn. 2011). Such criticism can be about an opposing expert's failure to consider certain facts and evidence in arriving at a damages estimate. *Id. (*quoting *Coquina Invs. v. Rothstein*, No. 10–60786–Civ., 2011 WL 4949191, at *5 (S.D. Fla. Oct. 18, 2011) for the proposition that "[a] rebuttal expert can testify as to the flaws that she believe[s] are inherent in another expert's report that implicitly assumes or ignores certain facts;" also quoting *Pandora Jewelers 1995, Inc. v.*

8

*Pandora Jewelry, LLC*, No. 09–61490–Civ., 2011 WL 2295269, at *4 (S.D. Fla. June 8, 2011) (authorizing testimony from a rebuttal expert who "merely provides other factors that [the plaintiff's expert] should have considered in his report, based on her economics expertise," and explaining that "[h]ighlighting such factors will be helpful for the jury to weigh the evidence presented at trial.").

There, if Amazon puts forth Dr. Gannon as an expert, Wreal should be permitted to elicit Dr. David's testimony specifically concerning the flaws in Dr. Gannon's methodology and calculations. In other words, Dr. David may give his expert opinion on how Amazon's expert failed to consider and/or include advertising cost savings and how the Fire TV impacted Amazon as a whole in his calculations.

Nevertheless, the Court should exclude Dr. David's proposed opinion testimony that Amazon saved on advertising costs by using "Fire TV" as the product name and that Amazon derives benefits overall from the Amazon Fire TV because the opinion is not sufficiently reliable.

Experts ordinarily cannot rely on hearsay testimony or other opinions unless the relied-upon evidence is of the "type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject." *Daubert*, 509 U.S. at 595.

Dr. David provides no reliable methodology for determining and concluding that Amazon indeed saved on advertising because it chose Fire TV as the product name instead of another name. Rather, he merely speculates that it saved money.

Dr. David admits that he did not have information on how much Amazon spent on marketing the particular product or what it would have cost Amazon if it had used another name. [ECF No. 227-1, pp. 52-57] Also, he states that he did not conduct any sort of analysis or calculation to confirm this theory. [*Id.*] Moreover, Dr. David states that his knowledge on this is largely based on Elizabeth Baicy's (the Principal Marketing Manager at Amazon) declaration in which she states it would be more difficult for Amazon to introduce a new product under a new brand than launch a new product under an established brand. [ECF No. 227-1, p. 58].

Additionally, Dr. David testifies that he has not seen anything in the record that actually indicates advertising costs would have been higher if Amazon had used another name. In sum, his testimony concerning Amazon's alleged savings on advertising is entirely speculative and unreliable. [ECF No. 227-1, pp. 55-57].

As for any benefits from the Amazon Fire TV to Amazon as a whole that ultimately demonstrate ***********************, Dr. David's conclusion is unreliable. The documents Dr. David relied on do not appear to be of the type normally relied on by experts in his field. Although the evidence here is a document prepared by Amazon, which could suggest reliability, Dr. David even noted this was not a standard accounting practice (i.e., not standard to project future benefits or value from a product through the concept of lifetime value), referred to it as the document preparer's "best

guess," and noted the numbers would change with changes in time.  [ECF No. 227-1, pp. 90, 123].

Stated differently, Dr. David seeks to offer an opinion (based on Amazon's non-standard document, which guesses the future value of a product for the company and is likely to change its projections based on changing circumstances), ***********************. And he reaches this conclusion without conducting any independent analysis. [ECF No. 227-1, pp. 75, 81-83].  Accordingly, the Court finds that Dr. David's conclusion is unreliable and is therefore inadmissible.

By way of summary, to the extent Wreal seeks to put forth Dr. David as an expert to testify that Amazon was unjustly enriched, the Undersigned **respectfully recommends** that the District Court prohibit that testimony. To the extent Wreal seeks to use Dr. David to challenge Dr. Gannon's calculations (assuming Amazon puts forth Mr. Gannon at trial), I **respectfully recommend** that the District Court permit this testimony -- limited to criticisms of the calculations. However, the Undersigned **respectfully recommends** that the District Court exclude Dr. David's conclusion that Amazon actually saved on advertising costs by using the Fire TV name and that Amazon benefited as a whole from it.

## IV.  Wreal's Motion to Exclude Certain Testimony and Opinions of Dr. Peter Lehman

Dr. Peter Lehman, who Amazon retained as an expert, gives three opinions: (1) hardcore pornography is a distinctly definable genre; (2) Wreal markets itself

exclusively as a seller of hardcore pornography; and (3) consumers would not confuse Wreal's FyreTV for Amazon Fire TV or fyretv.com for amazon.com. Of these opinions, Wreal seeks to exclude only the third opinion concerning consumer confusion. Wreal contends Dr. Lehman's testimony concerning confusion should be excluded because he is not qualified to give this opinion, his methodology is not sufficiently reliable, and it will not assist the jury.

As previously stated, in determining whether an expert's proposed opinion meets the requirements of Rule 702, the Court must analyze whether the expert is qualified to offer the opinion, whether the reasoning and methodology used to arrive at the opinion is reliable, and whether the opinion would be helpful to the trier of fact. These requirements are distinct and must each be individually analyzed. *U.S. v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

Concerning qualification, an expert needs to be minimally qualified and any objections to the level of his expertise typically go to the credibility and weight of his opinion, not the admissibility of it. *See Vision 1 Homeowners Ass'n Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009); *Clena Investments, Inc. v. XL Specialty Ins. Co*, 280 F.R.D. 653, 661 (S.D. Fla. 2012). The test is "whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise." *In re Mentor Corp. ObTape Transobturator Sling Prods. Liab. Litig.*, 711 F. Supp. 2d 1348, 1367 (M.D. Ga. 2010) (citing *Maiz* v. *Virani,* 253 F.3d 641, 665 (11th Cir. 2001)).

12

Although Dr. Lehman specializes in pornography and film studies, his area of expertise includes studies in "industry, marketing, and changing technologies." [ECF No. 220, Ex. 1, p. 1] He also states that he has expertise in reception studies, "which document how viewers or users respond to films," "examine how actual viewers interact with and react to films including film marketing material," and evaluate "all forms of digital viewing, marketing, advertising, and purchasing such as websites, on-line DVD, and streaming video services." [*Id.*, pp. 1-2]. He also co-authored an introduction to a film textbook containing a section dedicated to "Audiences and Reception." [*Id.*].

The Undersigned finds that Dr. Lehman is qualified to testify on this topic because of his expertise in reception studies. As a tenured professor, Dr. Lehman has taught and authored textbook chapters related to reception studies. [ECF No. 220, Ex. 4, pp. 115-16; Ex. 1, pp. 2 n. 1, B-3]. As Dr. Lehman stated, reception studies "provide an analytical framework" for documenting the differences between www.amazon.com and www.fyretv.com. [ECF No. 220 Ex. 1, p. 15 n. 30]. "[O]bjections to the level of [his] expertise go to credibility and weight, not admissibility." *Vison I*, 674 F. Supp. 2d at 1325.

Wreal also contends that Dr. Lehman is not qualified because he has not previously testified as an expert on this specific topic and has not previously worked on a trademark infringement case. However, I give little weight to this because it does not

mean he is unqualified here as every expert at one point had previously never been an expert. Moreover, he is not giving an expert opinion on trademarks; he is discussing consumer confusion between the parties' websites and products.

Wreal alleges he is also unqualified because he has never conducted a consumer survey. However, it has not demonstrated that Dr. Lehman is required to have conducted a consumer survey in order to qualify.

Accordingly, the Undersigned finds that Dr. Lehman is at least minimally qualified to testify on this subject.

Wreal next contends that Dr. Lehman's principles and methodology are not reliable because he is unable to articulate any reasonable methodology. Wreal explains that he reaches an allegedly expert opinion just through the observation of people who watch films and that he failed to use survey evidence.

However, Wreal does not demonstrate that survey evidence is required in this case. Additionally, Dr. Lehman uses his background and experience to formulate his expert opinion and he uses information attained from reception studies. Dr. Lehman also explains that there is a difference between qualitative and quantitative research. In qualitative work, researchers do critical and analytical work by "carefully analyz[ing] what [they] are looking at and draw[ing their] conclusions from that analysis. It is not data driven." [ECF No. 220, Ex. 4, pp. 102-04]. He explains that quantitative research, such as through surveys, collects data and that it could be useful and help confirm or

contradict the qualitative research. Although qualitative studies will not provide statistical significance, it can provide information as to "how people distinguish between . . . hard-core pornography [and] soft-core pornography, [and] what is a mainstream website like Amazon.com, what's a hard-core website like FyreTV.com."

In arriving at his opinion that consumers would not be confused between the two products and the two websites, Dr. Lehman analyzed and compared the look of the websites, the content, the way they market themselves, and their procedures and policies.

Wreal also argues that Lehman's testimony will not assist the jury because he is unqualified (for the reasons previously asserted) and because an expert is not necessary to determine whether a consumer would be confused between the two websites and the two products. Amazon responds that the test is not whether "the jury is capable of considering the evidence presented at trial" [ECF No. 249 at 9], but merely whether the expert's testimony "will help" it in doing so, Fed. R. Evid. 702(a).

The Undersigned agrees that Dr. Lehman's testimony is helpful. Even accepting as true Wreal's assertion that the average lay person is familiar with "the particulars of pornography" [ECF No. 213, p. 9], it remains true that Dr. Lehman's testimony could help because his opinions set forth principled, articulable criteria that will assist the jury with understanding the differences and in analyzing the goods and services at issue "to the best possible degree." Fed. R. Evid. 702, Advisory Comm. Notes (2000).

15

Even if it is "obvious" that the two websites and the two products are different to the trier of fact, the opinion of an expert, who has criticized and analyzed the information, can help the trier of fact understand the differences between them. *See Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 821 (C.D. Ill. 2009) ("Men of common understanding do not need assistance in comparing the similarities and differences of common English words such as "flag," "free" or "star". They need help in determining how the similarities of these words lead to confusion, or conversely, how the differences among the words may negate the likelihood of confusion.").

The Undersigned notes that Wreal argued at the motion hearing that this opinion is irrelevant to the case because the issue is whether Amazon could be the **source** of FyreTV and whether the products come from the same source. However, Wreal did not raise this argument in its motion and, therefore, the Undersigned is not considering it now. Moreover, Wreal is free to bring out on cross-examination the point that its theory is not that consumers would confuse the two streaming services, but, rather, that consumers would mistakenly think that Amazon is the source for its product.

In sum, Dr. Lehman is a qualified expert who uses reliable principles and methods to reach an opinion that could be helpful to the jury here. Accordingly, the Undersigned **respectfully recommends** that the District Court **allow** Dr. Lehman to testify about his third opinion if Amazon chooses to use him as an expert witness.

**V.    Amazon's Motion to Exclude the Testimony of Dr. Linda Williams**

Wreal retained its own pornography expert, Dr. Linda Williams, who comes to several of her own conclusions regarding pornography, and rebuts certain opinions offered by Dr. Lehman. She offers three sets of opinions: (1) a variety of material, including "soft-core" pornography, R-rated movies, and mainstream content, is related or complementary to hardcore pornography; (2) Amazon's website sells products, including DVDs and sex toys, that are pornographic or related to pornography; and (3) Amazon's internal policies on pornography are inconsistent and enforced poorly. Amazon moves to exclude all of her opinions.

1.    A variety of material, including "soft-core" pornography, R-rated movies, and mainstream content, is related or complementary to hardcore pornography.

Amazon does not challenge Dr. Williams' qualifications as a pornography expert, but does challenge her methodology and the relevance of her opinion. Dr. Williams challenges Dr. Lehman's opinion that hardcore pornography is a distinctly definable genre.

Dr. Williams's "methodology" for judging whether other content is "related to" or "complementary" to hardcore pornography is, in part, an "erotic stimulation" test: if something provides erotic stimulation, then Dr. Williams would classify it as related to hardcore pornography; if it does not, then she would not. [ECF No. 210-1 Ex. 3, pp. 70-76]. Amazon argues this approach fails to qualify as a "methodology" under Rule 702(c)

17

because it is irrational and leads to absurd results: under this methodology, a variety of products including G-rated movies would qualify as "related to" or "complementary to" hardcore pornography. [ECF No. 210, pp. 6-8].

But Wreal argues that Amazon takes statements out of context and that Dr. Williams testified that all content falls on a spectrum of relatedness such that G-rated movies may bear a weaker relationship to hardcore pornography than R-rated content. [ECF No. 253, pp. 7-8].

Expert testimony that is not "the product of reliable principles and methods" is not admissible under Federal Rule of Evidence 702(c). To be "reliable," the methodology that informs an expert opinion must have a basis that is, at a minimum, "rational." *United States v. 77,819.10 Acres of Land*, 647 F.2d 104, 108 (10th Cir. 1981). "[A] court may properly scrutinize anomalous conclusions and reject expert opinion if the expert fails to identify and defend the reasons why his scientific methodologies yielded novel results." *Allison*, 184 F.3d at 1306 (citation omitted).

Amazon contends that Dr. Williams reaches an "anomalous" and "novel" opinion and tries to sway the Court with the "absurd results" of Dr. Williams' theory. However, the Undersigned finds that the expert has, at least at a minimum, a rational basis for her opinion. Dr. Williams, using her background and expertise in pornography and film, discusses the evolution of hardcore pornography. The Court believes that Dr.

18

Williams' historical perspective provides an opinion on how mainstream content and hardcore pornography can today be considered complementary.

Additionally, Amazon contends that expert testimony concerning her opinion that mainstream content is complementary to hardcore pornography is irrelevant and therefore will not assist the jury. However, this testimony rebuts Dr. Lehman's opinion that hardcore pornography is a distinctly definable genre. Dr. Williams is contending that there is no definite line dividing the genre from others. Based on that blurred line (which is essentially a scale/spectrum of most complementary to least complementary), Amazon sells material that could be considered at least complementary to hardcore pornography.

Ultimately, it is not up to the Court to determine the credibility of the expert's opinion or to determine which one is the more persuasive one. *Pods Enterprises, Inc. v. U-Haul Intern., Inc.*, 8:12-CV-01479-T-27, 2014 WL 2625297, at *2 (M.D. Fla. 2014) (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). Rather, the Court must consider the admissibility of the opinion and allow the trier of fact to give weight, if any, to the expert opinion. As such, the Undersigned **respectfully recommends** that the District Court allow Dr. Williams to testify about how a variety of material is complementary to hardcore pornography.

19

2.    Amazon's sells products, including DVDs and sex toys, that are pornographic or related to pornography.

Amazon seeks to exclude any testimony concerning its sale of products that are pornographic or related to pornography on the basis that the Court has previously ruled that this information is irrelevant.

To the extent Wreal's expert provides an opinion that there are DVDs and sex toys that are pornographic or related to pornography, the Undersigned previously deemed Amazon's sale of DVDs and sex toys irrelevant [ECF No. 130] and the District Court adopted my report and recommendation discussing that topic [ECF No. 177]. I still find irrelevant the sale of both DVDs and sex toys on Amazon's website. Accordingly, the Undersigned **respectfully recommends** that the District Court exclude any expert testimony concerning the sale of DVDs and sex toys that are related to pornography.

However, to the extent Wreal's expert contends that there are items available for streaming on Amazon's Fire TV that are pornographic or related to pornography, the Undersigned finds that Dr. Williams' opinion is admissible and **respectfully recommends** that the District Court allow Dr. Williams' to testify concerning whether products (other than DVDs and sex toys) available for streaming are related to pornography.[4]

_____

[4]    Amazon also seeks to exclude Dr. Williams' opinion that Amazon sells a "significant" amount of material related to pornography. This aspect of her opinion will

3.    Amazon's internal policies on pornography are inconsistent and enforced poorly.

The third set of opinions Amazon moves to exclude are Dr. Williams' opinions that Amazon sells a "significant amount" of material related to pornography and that Amazon's internal policies against pornography are inconsistent and unenforced, which results in the sale of a significant amount of material that is pornographic or related to pornography. Amazon argues that Dr. Williams is not qualified to offer these opinions because they are outside the scope of her expertise and contends that her opinion is also inadmissible because it is not based upon sufficient facts or data.

The Undersigned agrees that Dr. Williams is not qualified to offer this set of opinions. Rule 702 recognizes five bases for qualification: "knowledge, skill, experience, training, or education." However, "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y, Fla. Dep't of Children & Families*, 772 F.3d 1352, 1369 (11th Cir. 2014). Amazon argues that Dr. Williams may be qualified in her particular field, which is the academic study of pornography, but her expertise does not extend to practical industry experience and specifically does not extend to the sales volumes and corporate policies of mainstream consumer companies such as Amazon.

Wreal does not appear to dispute this characterization: its opposition brief concedes that "Dr. Williams does not profess to be an expert on sales volumes of

_____

be addressed below. However, the Undersigned reiterates that Dr. Williams' testimony explaining that material available for streaming on the Amazon Fire TV is related to pornography is admissible.

companies or corporate content policies." [ECF No. 253, p. 9]. After making this concession, however, Wreal offers no explanation as to how Dr. Williams's training would qualify her to testify about Amazon's sales or policies. [*Id*.]

It is undisputed that Dr. Williams has no private-sector experience, has never published on sales, and professes no expertise on internet commerce. This leads the Undersigned to conclude that her testimony in these areas does not grow naturally from her academic expertise; rather, she appears to have developed her opinions "solely for purposes of testifying." *Lebron*, 772 F.3d at 10; Fed. R. Evid. 702, Advisory Comm. Notes (2000).

Additionally, as Amazon contends, Dr. Williams' opinion is based on insufficient facts and data. For example, she opines that Amazon sells a "significant" amount of material that is "either pornographic, or directly related to pornography," [ECF No. 231, Ex. 1, pp. 3, 8], despite admitting at the deposition that she does not know Amazon's actual sales figures. [ECF No. 231, Ex. 3, pp. 97, 100, 103-04]. Similarly, Amazon argues that her opinions about Amazon's anti-pornography policies lack a basis in fact because she reached her opinion without reviewing documents describing what Amazon does to check offerings under its policies and without reviewing testimony and affidavits from Amazon witnesses about the policies or their application. [ECF No. 210, p. 10 (citing ECF No. 231, Ex. 3, pp. 179-80).

22

Federal Rule of Evidence 703 of the Federal Rules of Evidence requires experts to base their opinions on facts or data in the case that the expert has been made aware of, or personally observed; a purported expert opinion based on material the expert has not reviewed is properly excluded. *See Cantrell v. BNSF Ry. Co.*, No. Civ-12-0129, 2013 WL 8632378, at *7 (D.N.M. June 28, 2013) (striking expert report when, "despite the representations in the final report, [the expert] did not review many of the documents referenced in the report or draft critical portions of the report."); *O'Hara v. Travelers*, No. 11-cv-208, 2012 WL 3062300, at *23-24 (D. Miss. July 26, 2012) (finding an expert's opinions unreliable because there was evidence that he did not write the report and did not review the documents listed therein).

Dr. Williams cannot testify about Amazon's sales volumes because an expert must "know the actual numbers" before her opinions about those numbers are admissible. *See, e.g.*, *In re Denture Cream Prods. Liability Litig.*, No. 09-2051, 2015 WL 392021, at *25 (S.D. Fla. Jan. 28, 2015) (striking expert opinion about the number of denture cream customers because it was based on conjecture rather than "particularized data" about actual customers). There appears to be no dispute that Dr. Williams did not review material directly relevant to the enforcement of Amazon's anti-pornography policies, a fact that makes her opinions inadmissible under Rules 702 and 703. *Cordoves*, 2015 WL 2258457, at *8 (striking expert's opinion because documents and witness statements contained "critical pieces of evidence" that expert did not review).

23

Further, Dr. Williams based her opinion classifying certain material available on Amazon's website as pornographic without reviewing the relevant documents. Specifically, she admitted that, despite her June 26 report containing affirmative opinions about the contents of a DVD, she did not watch the DVD before writing the report and finally watched it the day before her deposition. [ECF No. 231, Ex. 3, pp. 61-62]. The Undersigned has already deemed Dr. Williams' opinion on DVDs inadmissible. Either way, her opinion is unreliable and subject to exclusion because it is not based on facts or data known to Dr. Williams at the time she offered it. *See Cantrell*, 2013 WL 8632378, at *7; *O'Hara*, 2012 WL 3062300, at *23-24.

In sum, to the extent Wreal wants to put forth Dr. Williams to testify that a variety of material is related or complementary to hardcore pornography, the Undersigned **respectfully recommends** that the Court allow it. To the extent Wreal seeks to have Dr. Williams testify on Amazon's sale of products that are related to pornography, the Undersigned **respectfully recommends** that the District Court allow Dr. Williams to give her opinion on products that can be *streamed* on Amazon's Fire TV and exclude testimony about DVDs and sex toys sold on Amazon's website. Finally, to the extent Wreal seeks to admit Dr. William's opinion on the administration of internal policies and the quantity of pornography-related materials available on amazon.com, the Undersigned **respectfully recommends** that the District Court exclude it.

## VI.    Wreal's Motion to Exclude Dr. Sarel's Survey and Testimony

Wreal requests that the Court exclude Amazon's survey expert, Dr. Sarel, because his *Eveready* survey is irrelevant and unreliable for eight different reasons. Of those reasons, Wreal argues, three[5] of the alleged flaws independently render the survey irrelevant and inadmissible. As for the additional flaws raised, Wreal contends that they cumulatively render the survey inadmissible even though they would typically go only to the weight of the testimony and not the admissibility.

Before assessing the merits of these arguments, it is helpful to discuss both reverse confusion and *Eveready* surveys.

"Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark." *Sands, Taylor & Wood Co. v Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992). The injury results to the senior user because:

> [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987).

---

[5]   According to its *Daubert* motion, Wreal contends that there are two reasons that would independently render the survey inadmissible. However, at the hearing and in its proposed Report and Recommendations, Wreal contends that there are *three* fatally flawed aspects of the survey that independently should render it inadmissible.

A reverse confusion case requires a showing that the junior user has saturated the marketplace with advertising to an extent that consumers are likely to believe (incorrectly) that the junior user is responsible for the senior user's mark. S*ee Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 861 (9th Cir. 1996) (dismissing reverse confusion claim because plaintiff "failed to allege sufficient facts to state a claim for reverse confusion under the Lanham Act," including that plaintiff "does not contend that [defendant] saturated the market with advertising. . . .").

Thus, a reverse confusion case requires a showing that consumers are aware of the junior mark: if they are not aware, then they cannot be confused. McCarthy on Trademarks § 23:10 ("When few of the senior user's customers will be exposed to or familiar with the junior user's mark, there will be no 'overwhelming' or 'swamping' effect on the senior user's mark and good will. In that case, reverse confusion will be unlikely.") This is an area where Dr. Sarel, Dr. Maronick (Wreal's survey expert), and the relevant treatise authority are all in agreement. [ECF Nos. 229, Ex. 2 pp. 13 ("If there is no awareness, there can't be confusion."), 21; 221, Ex. 4, pp. 197-98 ("If no one knows about the Amazon Fire TV, then there is no confusion. . . .")].

In reverse confusion cases, *Eveready* surveys have become the "gold standard." An *Eveready* survey, named after the survey presented in *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 385 (7th Cir. 1976), tests for the likelihood of confusion between similar marks. In a reverse confusion case, the survey shows respondents an

example of the senior user's mark as used in commerce and then asks respondents a series of open-ended questions designed to test whether respondents believe the junior user is the source, affiliate, or sponsor of the senior user's mark. *See generally* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:174 (2014) (*Eveready* survey is a "standard and widely accepted format to prove the likelihood or non-likelihood of confusion.").

As previously stated, Wreal contends that there are some fatal flaws in Dr. Sarel's survey that individually merit the exclusion of the survey and there are some flaws that cumulatively merit its exclusion. "In the context of survey evidence, 'mere technical flaws' in methodology go to the 'weight accorded a survey, not its admissibility.'" *Fancaster Inc. v. Comcast Corp.*, 832 F. Supp. 2d 380, 402 (D.N.J. 2011) (citing *Citizens Financial Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F. 3d 110, 121 (3d Cir. 2004). "However, 'fatal flaws' in a survey's methodology merit its exclusion." *Id.* "The judge should only exclude evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *In Re Paoli R. R. Yard PCB Litigation*, 35 F.3d 717, 746 (3d Cir. 1994).

1.      The alleged independently fatal flaws of the survey

*A. Eveready survey could not reliably measure confusion*

Wreal contends that the *Eveready* survey is not the appropriate survey when the product (Amazon Fire TV) is a new market entry (as opposed to a product that has

saturated the market or when there is "unaided awareness" of the product). It argues that Amazon's expert, Dr. Sarel, conducted his survey prematurely.[6]

Market research often draws distinctions between "unaided," "aided," and "partially aided" awareness. "Unaided" awareness is measured by open-ended questions without a stimulus or other prompt that suggests the name of the brand tested. "Aided" awareness is measured by questions that give respondents a defined list of brands and ask if they have heard of any. "Partially aided" awareness is a middle ground between the two: a respondent is presented with a stimulus with *some* resemblance to the brand tested to see if the presence of the stimulus cues or "aids" the respondent in naming the brand tested.

The ABA Survey Evidence treatise notes that *Eveready* "more closely resembles a <u>partially aided</u> awareness test: it assesses whether the junior user's mark and product cues are similar enough to those of an accessible senior brand to trigger the latter's schema in response to a source (or sponsorship or affiliation) confusion question." (emphasis added). Jerre B. Swann, "Likelihood of Confusion," 62 n.62 in Diamond

---

[6]     Although Wreal's expert *now* contends that the *Eveready* survey format was inappropriate at the early stages of Amazon's use of the Fire TV mark, suggesting that this format yields unreliable findings of confusion when used on new market entrants, he initially used the *Eveready* format himself at the preliminary injunction stage.

& Swann.[7] As a partially aided awareness test, *Eveready* is thus appropriate for testing alleged infringement by a "top of mind" mark: one that is "highly accessible (*internally available*) in memory, enhancing the likelihood that it will be cognitively cued by a similar junior use." *Id.* at 53 (emphasis in original). A key here is the word "cued" -- a "top-of-mind" or "highly accessible" brand is one with high total awareness that can be "cued" (or, in aided awareness language, "aided") by stimulus.

Also, courts, the experts for both parties, and McCarthy on Trademarks all agree that reverse confusion cases require proof of market saturation or awareness of the junior mark. Indeed, Wreal emphasized in its complaint that Amazon saturated the market through an immersive advertising campaign, and it later argued in its motion for preliminary injunction that the product launch for Fire TV was "extensively covered by the press" and included a "massive" and "highly memorable" TV campaign.

Another court faced with similar inconsistent arguments -- calling for exclusion of survey evidence based on low awareness in a reverse confusion case involving allegations of extensive promotion and advertising of the allegedly infringing mark -- rejected the argument that the expert testimony should be excluded. *See E&J Gallo Winery v. Proximo Spirits, Inc.*, 2011 WL 5922090, at *6 (E.D. Cal. Nov. 28, 2011); *see also Fancaster Inc.*, 832 F. Supp. 2d at 407 (rejecting argument to exclude use of *Eveready*

---

[7]     Wreal's counsel suggested at the hearing that the Diamond and Swann treatise should not be followed, but the Undersigned notes that Wreal's expert, Dr. Maronick himself, acknowledged this treatise as authoritative. [ECF No. 229, Ex. 2 p. 77].

survey format based on senior mark's customer's unawareness of the junior mark in reverse confusion case in part because court recognized that "it is the commercial strength of the junior user's mark that gives rise to an inference of exposure to that mark").

Additionally, to the extent the use of the *Eveready* survey format underestimates the potential for confusion because Amazon's Fire TV product was relatively new at the time of the survey, such a concern affects the evidentiary significance to be given to the survey results, not their admissibility. *See Simon & Schuster, Inc. v. Dove Audio, Inc.*, 970 F. Supp. 279, 299 (S.D.N.Y. 1997) (assigning reduced significance to the survey evidence); *Akiro LLC v. House of Cheatam, Inc.*, 946 F. Supp. 2d 324, 339 (S.D.N.Y. 2013) (noting jury could accept the results of the survey or assign limited value to the evidence based on the strength of the mark).

Accordingly, the Undersigned finds that Dr. Sarel's survey was not inappropriate and it is therefore admissible. The jury, as the trier of fact, should be the entity to evaluate the significance of the survey results.

### B. Improper universe

Wreal contends that Dr. Sarel surveyed the incorrect universe. "A proper survey universe is 'that segment of the population whose perceptions and state of mind are relevant to the issues in the case.'" *Fancaster* 832 F. Supp. 2d at 403 (citing *Citizens Financial Grp.*, 383 F.3d at 118-19). "A survey of the wrong universe will be of little

probative value in litigation." *Id.* In a reverse confusion case, the universe "should be limited to the senior user's customer base." *Id.* This means that the universe should target the current customer base, and not some future potential customer base.

In this reverse confusion case, the survey universe needs to be limited to Wreal's current customer base. Dr. Sarel identified Wreal's customer base as those individuals who pay or would be willing to pay for pornography. Wreal agrees with that definition of the universe. Wreal, however, contends that Dr. Sarel's survey failed to actually survey that universe -- because he instead surveyed a broader universe of individuals that "merely *visit* adult websites" and he never asked about their willingness to actually pay to access adult websites.

The universe surveyed by Dr. Sarel is not so fundamentally flawed that the Court should exclude it. Dr. Sarel's survey asked whether the individual had visited in the last six months and if the individual would visit, in the next six months, a website that requires visitors to pay to have full access to the content on the website. This survey universe still evaluates Wreal's target audience.

Also, even if Dr. Sarel did not specifically ask about the individual's willingness to pay for full access and determine who has paid or would pay, the smaller universe that Wreal prefers is subsumed in the universe surveyed. "Where a party surveys a slightly broader universe than would be the perfect target group, it merely goes to the weight given the survey results, not to the very admissibility of the survey." *See*

*Whirlpool Properties, Inc. v. LG Elecs. U.S.A., Inc.*, 1:03 CV 414, 2006 WL 62846, at *4 (W.D. Mich. 2006) (citing *Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930-31 (7th Cir. 1984)). "Even if a survey does not target what the court considers to be the optimal universe, the results may be so compelling that it still supports the factual finding for which it is intended." *Id.* (quoting 5 McCarthy § 32:162 at 32-258)

Moreover, Dr. Sarel discusses his questions and explains that it is not possible to determine whether those individuals who are willing to pay for pornography actually pay for it in the future. Dr. Sarel explains that Wreal's position goes against Wreal's marketing approach -- Wreal targets people that are potentially interested in paying for its service.

Accordingly, the universe surveyed is not so fundamentally flawed that the Court should exclude it. The jury, as the trier of fact, can consider the actual universe used in the survey and then determine how much weight to give to Dr. Sarel's survey and opinion.

### C. Improper stimulus design

In its motion, Wreal did not argue that the stimulus design was so fundamentally flawed that it alone required exclusion of the survey. Rather, it was challenged as a flaw that contributed to a cumulative effect of unreliability when considered with the other alleged technical flaws of the survey. However, Wreal subsequently raised it as a fatal flaw. Regardless, the stimulus design implemented by Dr. Sarel in his survey is not so

fundamentally flawed that the Court should exclude his survey and his testimony from this trial.

"Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating the market." *Fancaster*, 832 F. Supp. 2d at 405. "[T]he results of a survey that does not adequately simulate how a consumer would encounter a trademark are neither reliable nor probative." *Id.*

Wreal contends that the individuals taking the survey were presented with screenshots of the FyreTV website without the FyreTV URL and without having followed a path to get to the website.

But these are potential omissions that the jury can consider when evaluating what weight to give to the survey. The mere fact that the URL was removed from it does not mean that it was unclear that the screenshots were of FyreTV's website. The FyreTV logo was present throughout and the instructions on the screenshots indicated they were entering an adult website and then perusing that website.

Accordingly, the Undersigned does not find that the stimulus design was so flawed as to render the survey inadmissible.

2.      The alleged flaws that cumulatively render the survey inadmissible

Technical difficulties of a survey influence the weight given to an expert's opinion and not the admissibility of that expert's opinion. *See Jellibeans, Inc. v. Skating*

*Clubs of Ga., Inc.,* 716 F.2d 833, 844–45 (11th Cir.1983) (technical deficiencies, including "(1) poor sampling; (2) inexperienced interviewers; (3) poorly designed questions; and (4) other errors in execution" go to the survey's weight, not admissibility); McCarthy, *Trademarks and Unfair Competition* ("The majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence.").

Wreal contends that Dr. Sarel (1) used inappropriate screening questions, (2) used impermissibly leading questions; (3) failed to follow his own coding methodology; (4) failed to provide a response rate to his survey; and (5) failed to validate the results of his survey.

Wreal admits that these technical issues are typically brought up to challenge the weight of the expert testimony and not the admissibility of it, but it still contends that the survey is unreliable when considering all of these flaws simultaneously. However, Wreal's argument fails to successfully demonstrate how these alleged flaws cumulatively render the opinion unreliable and why they should not be presented to the jury so that it can determine how much weight to give to the survey. *See, e.g., Jellibeans*, 716 F.2d at 844 (listing as "alleged technical deficiencies (1) poor sampling, (2) inexperienced interviewers, (3) poorly-designed questions, and (4) other errors in execution"); *Holiday Inns, Inc. v. Holiday Out in Am.*, 481 F.2d 445, 447 (5th Cir. 1973) ("format of the questions and the manner of conducting the survey" go to "weight of

[the] evidence"); *Pods Enters., Inc. v. U-Haul Int'l, Inc.*, 2014 WL 2625297, at *2-3 (M.D. Fla. June 12, 2014) ("improper universe" and "improper questioning" were "technical deficiencies" that "go to the weight of [the] opinions, not their admissibility"); *Nightlight Systems, Inc. v. Nitelites Franchise Sys., Inc.*, No. 1:04-CV-2112-CAP, 2007 WL 4563873, at **7-8 (N.D. Ga. July 17, 2007) (allegedly flawed survey universe and question formats were technical deficiencies of weight, not admissibility).

When evaluated with Dr. Sarel's explanations and reasoning, the smaller technical flaws that Wreal highlights have much less a potential impact on the reliability than the ones analyzed as individually fatal and they do not collectively amount to a fatal flaw.

Initially, Wreal does not even successfully demonstrate that there are in fact technical issues with all of the challenges it raises. For example, Wreal alleges that the screening questions were inappropriate because survey respondents knew that the survey was about pornography before answering qualifying questions and that this made it likely that they self-selected based on the topic. However, because this is a reverse confusion case, the relevant universe should be limited to the senior user's customer base. Wreal, as it admits, sells pornography. Therefore, the survey should consider Wreal's customer base -- which includes, at a minimum, individuals who want to view pornography. The website itself even asks visitors whether they are willing to view adult content.

Ultimately, even if there are arguably technical issues, the trier of fact should evaluate them when considering the weight to give the opinion. Wreal did not sufficiently demonstrate that the totality of the flaws indeed causes the survey to be unreliable.

In sum, the Undersigned **respectfully recommends** that the District Court deny Wreal's motion to exclude Dr. Sarel's survey and testimony.

VII.   **Amazon's Motion to Exclude Certain Opinions of Thomas J. Maronick**

Amazon does not seek to exclude the survey that Wreal's expert, Dr. Maronick, conducted for the preliminary injunction hearing, but it does seek to exclude those portions of his opinion that critique Dr. Sarel's opinion. Amazon contends that Dr. Maronick's opinion is unreliable because his criticisms are untested and because he cites to no authority to support his views. It also argues that Dr. Maronick's opinions are irrelevant and unhelpful to the jury because his criticisms go to weight -- and that Wreal could easily highlight them during its cross-examination of Dr. Sarel. Additionally, Amazon contends that Dr. Maronick's critiques have no relevance as he believes there is no survey design that would show actionable reverse confusion. Lastly, Amazon contends the Court should exclude the opinion on judicial estoppel grounds.

"Rule 26 permits rebuttal expert testimony intended to contradict or rebut evidence 'on the same subject matter identified by another party.' Fed. R. Civ. P. 26(a)(2)(D)(ii). Rebuttal testimony is proper as long as it addresses the same subject

36

matter that the initial experts address and does not introduce new arguments. *See Perez v. State Farm Mutual Auto. Ins. Co.*, No. C 06–01962, 2011 WL 8601203, at *6 (N.D. Cal. Dec. 7, 2011); *General Electric Company v. Wilkins*, 1:10–cv–00674 LJO JLT, 2012 WL 5398407, at * 2–3 (E.D. Cal. Nov.2, 2012)." *Meyer Mfg. Co. Ltd. v. Telebrands Corp.*, 2:11-CV-03153-TLN, 2013 WL 3242209 at *2 (E.D. Cal. June 20, 2013).

A defendant is not required to present survey evidence in its case in chief. *See Companhia De Bebidas Das Americas—Ambev v. The Coca–Cola Co.*, No. 91178953, 2012 WL 1881492, at *2 (TTAB May 2, 2012) (holding "the fact that evidence might have been offered in chief does not preclude its admission as rebuttal"). As explained in McCarthy:

> The usual procedure is for one of the parties to the litigation to hire a survey taker to run an appropriate survey. The survey expert for the opponent may then attack the substance and form of the other side's survey and/or counter it with a different survey producing different results. Then ensues the "battle of the experts," a process that takes place in many trials of all kinds. . . . If one side takes a survey, often the other side will do so too, hoping to present the court with offsetting data to nullify the impact of the first survey.

6 McCarthy on Trademarks and Unfair Competition § 32:158 (4th ed.). Also, the Federal Judicial Center's Reference Manual on Scientific Evidence, in the section on survey evidence, explains that:

> Parties often call on an expert to testify about a survey conducted by someone else. The secondary expert's role is to offer support for a survey commissioned by the party who calls the expert, to critique a survey presented by the opposing party, or to introduce findings or conclusions

37

> from a survey not conducted in preparation for litigation or by any of the
> parties to the litigation.

Federal Judicial Center, *Reference Manual on Scientific Evidence,* 3d Ed. at 375 (2011).

While Amazon in its motion argued that Dr. Maronick's opinion on Dr. Sarel's survey should be excluded because he failed to conduct his own survey, it later conceded at the hearing that Dr. Maronick's omission is not actually a reason for excluding Dr. Maronick. [ECF No. 305, pp. 235-236]. Additionally, the Court finds it illogical to require an expert to conduct a survey that remedies the alleged problems in the original survey when that expert's opinion is that it is premature for any survey to be conducted at all.

The Undersigned also finds that Dr. Maronick's testimony *would* be helpful to the jury, and I therefore reject Amazon's contrary argument. Although Amazon contends Dr. Maronick's testimony would not be helpful because Wreal could easily accomplish the same goals by challenging Dr. Sarel's survey on cross-examination, I find that the jury would benefit from a rebuttal expert. Dr. Maronick's interpretation of Amazon's data and his critiques of the technical aspects of the survey will assist the trier of fact in determining the weight, if any, to give to Dr. Sarel's survey.

In addition, the Undersigned finds unpersuasive Amazon's position that Dr. Maronick's opinion should be excluded because his critiques have no relevance as he believes there is no survey design that would show reverse confusion. Dr. Maronick did not opine that no survey could *ever* be used to measure the likelihood of confusion in

this case. Rather, he explained that an *Eveready* survey is and will be the appropriate survey format for this case -- but that it was not the right format or was not run at the right time when Dr. Sarel conducted his survey in October 2014. Thus, Dr. Maronick explained that in order to reliably test for confusion using an *Eveready* survey, "one would have to wait for top-of-the-mind awareness of Amazon's FIRE TV to stabilize, then conduct an *Eveready* survey without the flaws [Dr. Maronick] identified in Dr. Sarel's survey." [ECF No. 212-1, Ex. 4, p. 25 ¶ 74]. Despite believing it is too early to conduct a survey, Dr. Maronick can speak to how that survey should have been conducted, including, but not limited to, what universe would need to be surveyed and the types of questions that should be asked.

Amazon, of course, is free to cross-examine Dr. Maronick on the inconsistency generated by his current position that a survey would be premature and his use of a survey early in the case.

Regardless of how successful Amazon could be on cross-examination, the jury would benefit from Dr. Maronick's expert opinion reviewing and critiquing Dr. Sarel's methodology. He would explain why he believes the alleged flaws in Dr. Sarel's survey are important and why they bias the results. The jury would also benefit from his interpretation of Amazon's data. This is appropriate rebuttal testimony, and it would be helpful to the jury.

39

Additionally, Amazon contends that some of Dr. Maronick's opinions should be excluded on judicial estoppel grounds. Amazon alleges that Wreal represented, up until the very last day of expert disclosure, that Dr. Maronick was *not* a trial witness but then named him as a rebuttal witness on the last day of expert discovery.

Judicial estoppel is an equitable doctrine that "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal citations omitted). "Judicial estoppel is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *Am. Nat'l Bank of Jacksonville v. Fed. Deposit Ins. Corp.*, 710 F.2d 1528 (11th Cir. 1983) (internal citation omitted).

The Eleventh Circuit typically considers factors including "(1) whether the present position is 'clearly inconsistent' with the earlier position; (2) whether the party succeeded in persuading a tribunal to accept the earlier position . . . and (3) whether the party advancing the inconsistent position would derive an unfair advantage on the opposing party." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002) (citing *New Hampshire*, 532 U.S. at 750-51).

Previously, Amazon sought to subpoena documents from Dr. Maronick without Wreal having designated him as an expert and before expiration of the deadline for disclosing experts. The Undersigned quashed the subpoena because, as argued by

Wreal, Wreal had not designated Dr. Maronick as a testifying expert and the time for doing so had not expired. The deadline for designating primary expert witnesses finally expired and Wreal did not list Dr. Maronick as a testifying expert. However, Wreal disclosed Dr. Maronick as an expert for trial on the last day of expert witness disclosures as a purported "rebuttal" witness when the scheduling order was silent about rebuttal experts. At a discovery hearing, the Undersigned considered whether Dr. Maronick was a rebuttal expert and whether rebuttal experts were even permissible here (when the trial order was silent on the point). At the time, I found that Dr. Maronick was indeed a rebuttal expert and that, even though the scheduling order was silent as to rebuttal experts, rebuttal experts were permitted because there was no order providing otherwise. [ECF No. 183].

To be sure, it could be argued that Wreal implied that Dr. Maronick would be a primary testifying expert when it explained in the context of the subpoena litigation that his disclosure as a trial expert would be done (if at all) by a specific date -- which happened to be the deadline for designating experts. However, Wreal's position is not clearly inconsistent and Amazon has not been prejudiced. Certainly, Wreal *could* have expressed itself more clearly when stating (in a memorandum) that it had until June 15, 2015[8] to designate Dr. Maronick as a testifying expert for use at trial. [ECF Nos. 141, p.4;

---

[8]     Wreal stated in its "Memorandum of law in support of its motion to quash the subpoena issued to Dr. Maronick" that the deadline for its expert witness disclosures was July 31, 2015. [ECF No. 139, p.2]. That is incorrect. The deadline was June 15, 2015.

139, p. 1]. Ultimately, however, Wreal never unequivocally stated that it would *not* put forth Dr. Maronick as a rebuttal expert. Moreover, the trial scheduling order did not expressly provide for rebuttal experts and likewise did not have a deadline for disclosing rebuttal experts, so the date Wreal mentioned in its memorandum was the only date available at the time.

Wreal is not required to produce an expert with a survey to argue its case in chief. Moreover, Wreal's survey expert would have had nothing to put forth at trial because his opinion is that it was too early to conduct an *Eveready* study in this case. It would have been futile for Wreal to designate an expert who merely stated that there was no survey that could be conducted at this time. Thus, Wreal had no reason to disclose a survey expert until Amazon disclosed one. Once that happened, Wreal could then challenge Amazon's expert's opinion by putting forth its own rebuttal expert -- to primarily challenge and criticize Amazon's survey expert.

As such, the Undersigned **respectfully recommends** that the District Court allow Wreal to use Dr. Maronick as a rebuttal expert **if** (but only if) Amazon uses Dr. Sarel as a trial expert. Thus, this recommendation precludes Wreal from using Dr. Maronick in its case in chief and further precludes Wreal from using him at trial if Amazon were to not use Dr. Sarel as a trial expert.

**VIII.   Conclusion**

The Undersigned respectfully recommends that Judge Lenard grant and deny

the *Daubert* motions as outlined above.

**IX.   Objections**

Under 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(b), the parties have 14

days after being served with a copy of this Report and Recommendations to serve and

file written objections, if any, with the District Court. Each party may file a response to

the other party's objection within 7 days of the objection. Failure to timely file objections

shall bar the parties from a de novo determination by the District Court of an issue

covered in this Report and Recommendations and bar the parties from attacking on

appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 749-50

(11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988).[9]

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on

January 7, 2016.[10]

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

---

[9]     At the risk of stating the obvious, the deadlines for filing objections run from the time of filing of the original sealed Report and Recommendations. [ECF No. 316].

[10]     The original sealed Report and Recommendations was entered on December 29, 2015. [ECF No. 316].

**<u>Copies furnished to</u>:**
The Honorable Joan A. Lenard
All Counsel of Record