## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 14-21385-CIV-LENARD/GOODMAN

WREAL, LLC,

     Plaintiff,

v.

AMAZON.COM, INC.,

     Defendant.

_____/

### REPORT AND RECOMMENDATIONS ON DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

In this trademark-infringement case, Plaintiff Wreal, LLC sued Defendant Amazon.com, Inc., alleging that Amazon's Fire TV product launch infringed on Wreal's FyreTV and FyreTV.com trademarks. Wreal uses those marks to identify its hardcore pornography services and alleges a *reverse*-confusion theory: that consumers will mistakenly believe that the junior user (Amazon) is the source, affiliate, or sponsor of the senior user's (Wreal) FyreTV services. There is no dispute that Amazon knew of Wreal's FyreTV marks before it decided to offer products with the Fire TV name.

Wreal previously moved for a preliminary injunction [ECF No. 28], but, after a full-day evidentiary hearing, the Undersigned recommended that the motion be denied. [ECF No. 130]. United States District Judge Joan A. Lenard adopted the recommendation

and denied the motion. [ECF No. 177]. Wreal appealed that decision, but the Eleventh Circuit Court of Appeals affirmed the denial of the preliminary-injunction motion in a published order. *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016).[1]

After successfully defending Wreal's preliminary-injunction motion, and at the end of discovery, Amazon moved for summary judgment. [ECF Nos. 205; 224].[2] The summary-judgment motion is Amazon's effort to now achieve complete success. Judge Lenard referred this motion to the Undersigned. [ECF No. 341].

The Undersigned ordered Amazon to file declarations related to (1) its Fire TV profits since the close of the summary-judgment briefing and (2) the different platforms that Amazon's Fire TV has been in since the close of the summary-judgment briefing. [ECF No. 352]. The Undersigned also ordered supplemental briefing from each side on how, if at all, the *Daubert* order and Amazon's declarations affected the pending

---

[1]     The Eleventh Circuit opinion provides procedural and historical context, but it is not directly relevant to the summary-judgment issues because the appellate court did not rule as to the merits -- or lack of merits -- of the infringement claim, including on the issue of likelihood of confusion. Rather, the opinion was based on Wreal's unexplained delay in seeking injunctive relief; the delay undermined Wreal's claim of irreparable injury. Although the delay issue was critical in the preliminary-injunction context, it is not significant now.

[2]     The parties also moved at the end of discovery to exclude certain experts, in whole or in part, under *Daubert*. [ECF Nos. 207–214]. Judge Lenard referred those motions to the Undersigned [ECF No. 238], and the Undersigned recommended granting them in part and denying them in part [ECF No. 316]. Judge Lenard adopted the recommendations. [ECF No. 349].

summary-judgment motion. *Id*.

The Undersigned has reviewed the declarations and supplemental submissions [ECF Nos. 353–59], as well as Amazon's summary-judgment motion [ECF Nos. 205; 224], Wreal's response [ECF Nos. 261; 274], Amazon's reply [ECF Nos. 288; 292], and the documents accompanying these submissions [ECF Nos. 206; 225; 232; 263; 275–76; 291].[3]

In short, although likelihood of confusion is generally a question of fact, it may, in certain appropriate circumstances, be decided as a matter of law at the summary-judgment stage. And this case is one of those times. That is because Wreal has not presented sufficient evidence for a reasonable fact-finder to find that "an appreciable number of ordinarily prudent purchasers"[4] will somehow connect Wreal's hardcore pornographic FyreTV service with Amazon.

A party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.'' *Matsushita Elec. lndus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Yet "metaphysical doubt" is all that Wreal offers; Wreal offers (a) no evidence of actual confusion, (b) no survey evidence in its favor, and

---

[3]     Multiple citations may refer to the same documents because many documents were filed both under seal and publicly but with redactions. Whenever possible, the Undersigned cited to the publicly-filed document, unless a redaction necessitated a citation to the sealed document. Moreover, as explained below, Amazon later pinpointed to the Undersigned only a few passages from the parties' proposed reports and recommendations that it believed warranted sealing and redacting, and the Undersigned excised those parts from this report. Wreal, however, made no designations of its own.

[4]     *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 651 (11th Cir. 2007).

(c) no evidence that Amazon markets Fire TV to customers interested in streaming hardcore pornography.

Notably, the Court's findings at the preliminary-injunction stage rested on evidence that was not truly disputed even then, and that evidence has not materially changed. For example, Amazon has not suddenly decided to advertise on adult websites, permit pornographic apps, or repeal the content policy that prohibits pornography on Amazon Instant Video, which streams to the Amazon Fire TV. [*See* ECF No. 177, pp. 11–13].

In other words, the likelihood-of-confusion factors substantially favor Amazon, and the Undersigned therefore **respectfully recommends** that the Court **grant** Amazon's summary-judgment motion.

## I.     Preliminary Note About this Report's Public Filing

Many of the submissions, orders, and reports and recommendations are filed under seal in this case. This report is not being filed under seal, however, because the Undersigned has removed any information that the parties (based on recent filings) deem so confidential that, if mentioned, would need to be filed under seal.

Concerned that the parties were over-designating information as requiring under-seal status in their proposed reports and recommendations, the Undersigned directed each to file under seal a point-by-point memorandum explaining the rationale for each requested redaction. [ECF No. 375]. Wreal did not submit anything, thereby indicating

4

that it did not contend that any of its information needs to be filed under seal. Amazon filed an affidavit from it senior corporate counsel for litigation [ECF No. 376-1] and an under-seal memorandum [ECF No. 377] pinpointing one provision from its proposed report and three passages from Wreal's proposed report that it wanted redacted and filed under seal.

Because the Undersigned prefers a publicly-filed report to one version filed under seal and one version publicly-filed but redacted, the Undersigned did not include any of the four flagged passages (or the information discussed in the four passages) in this report. Given this procedure, the Undersigned is now able to comfortably file a public, non-redacted report and recommendations (notwithstanding that the report may cite and quote from documents already filed under seal).

## I.    Undisputed Facts

Wreal concedes the following facts from Amazon's statement of undisputed facts. Unless otherwise noted, the numbering below corresponds to the numbering in Amazon's statement of undisputed facts:

2.    Wreal's FyreTV exclusively offers pornographic content, not mainstream movies, and most of its offerings are hardcore pornography. [ECF Nos. 206, p. 2; 263, p. 1].

4.    Wreal's FyreTV.com website requires users to confirm that they are 18 years of age and willing to view adult content before they can enter. [ECF Nos. 206, p. 2; 263,

p. 1].

5.      Wreal's FyreTV.com homepage shows several rows of highly explicit pornographic images. [ECF Nos. 206, p. 2; 263, p. 1].

6.      The "Categories" page on Wreal's FyreTV.com website shows images from many different lurid pornography genres. [ECF Nos. 206, p. 3; 263, p. 1].

9.      Wreal has never sold the Fyre BoXXX at any store or through any website other than FyreTV.com. [ECF Nos. 206, p. 3; 263, p. 1].

16.     Wreal has lost money every year from its founding in 2007 to the present. [ECF Nos. 206, p. 4; 263, p. 3].

17.     Wreal's revenues started declining in 2012, before the launch of the Amazon Fire TV. [ECF Nos. 206, p. 4; 263, p. 3].

22.     In late 2012 and early 2013, Amazon was planning to introduce several new products, including a phone, a new generation of tablets, and a set-top box. [ECF Nos. 206, p. 5; 263, p. 4].[5]

---

[5]     Amazon also manufactures its own hardware, including e-readers under the "Kindle®" brand and tablets under the "Kindle Fire" name. [ECF No. 202-2, pp. 6–8]. By late 2012 or early 2013, Amazon began expanding its product line into new categories, including a streaming video device that would eventually become Fire TV. [ECF No. 202-2, p. 8]. Around the same time, Amazon started considering how it would brand its new streaming media player. *Id.* During those branding discussions, Amazon became aware of Wreal's FyreTV service. [ECF No. 202-2, p. 10]. Although Amazon knew of Wreal's marks, it decided on the Fire TV name anyway. [ECF No. 202-2, pp. 10–11]. Amazon did not contact Wreal about its plans to use the Fire TV name, which is why Wreal contends that it was shocked when it learned of Amazon's Fire TV. [ECF No. 202, p. 90].

25.     Amazon Fire TV launched on April 2, 2014.[6] [ECF Nos. 206, p. 5; 263, p. 4].

26.     Amazon markets the Amazon Fire TV as a set-top box for general interest content -- "instant access to Netflix, Prime Instant Video, WatchESPN," and more -- including selections like "House of Cards" and "Dora the Explorer" for video and "Pandora" for music. [ECF Nos. 206, p. 5; 263, p. 4].

27.     Amazon markets the Amazon Fire TV's family-friendly features, advertising that the "FreeTime" service "revolutionizes parental controls – parents can choose what your kids see and set time limits for types of content and times of day." [ECF

---

[6]     According to Jason Gall, Amazon's Senior Manager, Product Management, Fire TV Business & Marketing, Amazon has expanded its use of the Fire TV mark to multiple products, including software pre-loaded on television sets. [*See* ECF No. 354-1]. Gall explained that, since 2015, the Amazon Fire TV has been available in the following forms: (a) Fire TV Streaming Media Player (multiple editions, including a box shape, pendant shape, Gaming Edition with a controller accessory, the Fire TV Stick, and the Fire TV Cube (with expanded functionality for Alexa)); and (b) Fire TV Edition (software preloaded on smart TV hardware from third party manufacturers Toshiba, Element, Westinghouse, and Insignia). [ECF No. 354-1, ¶ 2]. In addition, Amazon is accepting pre-orders for the Fire TV Recast (a DVR that lets one watch and record over-the-air TV (with an HD antenna) at home or on-the-go with a Fire TV, Echo Show, or compatible mobile device). [ECF No. 354-1, ¶ 3].

Galls' declaration (filed on October 11, 2018) also explains that there is an Amazon Fire TV app available for mobile devices (like tablets and smartphones). [ECF No. 354-1, ¶ 4]. This app functions as a remote control; it does not give access to any streaming content. *Id.* With the launch of the Amazon Fire TV Recast, the Amazon Fire TV app will allow the user to watch live or prerecorded content from an Amazon Fire TV Recast from over-the-air channels available through an HD antenna, such as ABC, CBS, FOX, NBC, PBS, and the CW. *Id.*

Nos. 206, p. 6; 263, p. 4].

35.    The Amazon Fire TV does not have a DVD tray and cannot play DVDs. [ECF Nos. 206, p. 7; 263, p. 5].

37.    Amazon advertises its Amazon Fire TV products through the Amazon.com homepage and other channels, including television, print media, and in-store displays at stores such as Best Buy and Staples. [ECF Nos. 206, p. 7; 263, p. 5].

41.    Amazon and Wreal do not offer one another's products on their respective websites: consumers cannot buy Amazon's Fire TV on Wreal's website, nor can they buy Wreal's FyreTV or Fyre BoXXX on Amazon's website. [ECF Nos. 206, p. 9; 263, p. 6].

42.    Amazon offers Amazon's Fire TV through channels where consumers cannot purchase Wreal's FyreTV or Fyre BoXXX, including Amazon's own website, Best Buy, and Staples. Wreal has conceded that "the products are not sold at the same retail outlets." [ECF Nos. 206, p. 9; 263, p. 6].

43.    Amazon has received tens of thousands of customer-service inquiries related to the Amazon Fire TV. [ECF Nos. 206, p. 9; 263, p. 6].

52.    Dr. Jesse David, an expert retained by Wreal's counsel, has not performed an analysis quantifying Amazon's net profits on the Amazon Fire TV attributable to the alleged infringement, which he states is the proper method for analyzing recovery of profits. [ECF Nos. 206, p. 11; 263, p. 8].

Concerning the following facts, Wreal contends that they are "disputed." But the mere fact that Wreal says the facts are disputed does not mean that they are actually disputed or that the dispute concerns a material fact. For these so-called disputed facts, Wreal either (1) adds factual assertions that do not contradict (and in some cases support) Amazon's undisputed fact or (2) does not cite to any record evidence that creates a dispute. This strategy is problematic for Wreal and does not generate a factual dispute.

"The non-movant cannot defeat summary judgment by (a) resting upon mere allegations or denials, (b) simply *saying* the facts are in dispute, or (c) relying on evidence that is merely colorable or not significantly probative." *Katchmore Luhrs, LLC v. Allianz Global Corp. & Specialty*, No. 15-cv-23420, 2017 WL 432671, at *5 (S.D. Fla. Jan. 31, 2017) (internal quotation marks and citations omitted).

Thus, for the reasons explained below, the Undersigned also deems the facts that follow undisputed. The numbering corresponds to the format Amazon used in its statement of undisputed facts, with a brief explanation after each fact about how Wreal's responses fail to create a genuine dispute (such as by only slightly changing the undisputed fact in a non-material way).

1.      Wreal's FyreTV is a pay-per-view streaming pornography service. Wreal describes its FyreTV service as "The Ultimate Adult Video On Demand Experience," a "porn pay per view service," and "the Netflix of Porn." [ECF No. 206, p. 2].

**Assessment of Purported Dispute**: Wreal does not actually dispute this fact; rather, Wreal adds only that "[i]t also offers subscription-based services." [ECF No. 263, p. 1].

3.      A person can become a FyreTV customer only by signing up for an account at the FyreTV.com website. [ECF No. 206, p. 2].

**Assessment of Purported Dispute**: Wreal adds only that a FyreTV customer can later buy content through any other device offering FyreTV, including Apple TV and Roku. [ECF No. 263, p. 1]. But Wreal does not dispute that a customer must first sign up for an account at FyreTV.com. In fact, Wreal prefaces its additional fact with the admission that "a customer must sign up for an account on Wreal's fyretv.com website. . . ." [ECF No. 263, p. 1].

12.      Wreal's target market is pornography consumers. [ECF No. 206, p. 3].

**Assessment of Purported Dispute**: Although Wreal claims to dispute this fact, Wreal simply states, "Wreal targets people between the age of 20 and 50 with disposable income that are interested in purchasing pornography." [ECF No. 263, p. 2]. For our purposes, that amounts to the same thing that Amazon is saying.

13.      Wreal does not believe its use of the "Netflix" mark infringes any trademarks because it believes Netflix operates in a different market. [ECF No. 206, p. 4].

**Assessment of Purported Dispute**: Wreal claims this fact is disputed, but Wreal then cites the same record testimony (from the December 30, 2014 preliminary-injunction

hearing) that Amazon cites on this point and that plainly *supports* this factual assertion. [ECF No. 206, p. 129 ("Q. You call yourself the Netflix of porn because you are in a different market from Netflix, but both you and Netflix offer streaming video? A. Right."). Wreal even concedes that it and Netflix "are not direct competitors." [ECF No. 263, p. 2].

14.     Wreal stopped all print, radio, trade show, and TV advertising by no later than 2012. [ECF No. 206, p. 4].

**Assessment of Purported Dispute**: Wreal "disputes" this fact by asserting that its advertising is in "constant flux" and that it "has advertised through multiple mediums at different points in time, including television, radio, print, social media, search engines and trade shows." [ECF No. 263, p. 3]. Wreal, however, then candidly states that it "*currently* advertises on social media and through newsletters." *Id.* (emphasis added). Wreal does *not* say that it *currently* advertises in print, radio, at trade shows, or television, which is consistent with the record evidence that both it and Amazon rely on. [*See* ECF Nos. 232-17, p. 10 ("Q. . . You stopped investing in these other mediums in 2012, and then started focusing on tube sites; is that correct? [objection to form and scope] THE WITNESS: Yes. We -- We wanted to explore different ways to advertise."); 275-8, p. 6 ("Due to the nature of the content that is available now on our service, we limit our traditional print and television advertising. As a result, FyreTV markets its service primarily on the internet[.]")].

15.     Wreal currently advertises online only on adult websites. [ECF No. 206, p. 4].

**Assessment of Purported Dispute**: Wreal's dispute of this fact, similar to its challenge of the previous undisputed fact, is that it "currently advertises on social media and through newsletters." [ECF No. 263, p. 3]. The Undersigned thus takes it as undisputed that Wreal, at one time, advertised on adult websites online but does not do so now, currently advertising only on social media and in newsletters.

20.     Amazon selected the "Fire" brand in 2011 to show the evolutionary progression from the "Kindle" e-reader to the "Fire" tablets with streaming video capability. [ECF No. 206, p. 5].

**Assessment of Purported Dispute**: Wreal's claimed dispute relates solely to the functionality of the Kindle versus the Kindle Fire. [ECF No. 273, pp. 3–4]. Wreal does not dispute that Amazon chose the "Fire" name as a progression from the "Kindle" name.

23.     Amazon decided to use the name "Fire" for all the new products (the phone, new generation of tablets, and set-top box), extending its previous use of "Fire" as its multimedia brand. [ECF No. 206, p. 5].

**Assessment of Purported Dispute**: Wreal simply says, "Disputed to the extent that Amazon used 'Fire' as a brand, rather than 'Kindle Fire.'" [ECF No. 263, p. 4]. Wreal, however, cites no record evidence for this assertion, and the record evidence Amazon cites clearly reflects that Amazon used "Fire" as a brand. [ECF No. 206-1, p. 219 ("Q. So

what **brand** did Amazon decide to associate with this whole family of products? A. That would be the Fire. Q. And why did Amazon decide to do [so]? A. Essentially, we had already started building a **brand.** We had a **brand** that we were leveraging called the Fire that meant multimedia. And that had we had [sic] been developing for multiple years, so we wanted to leverage that **brand** as we went into new categories.") (emphasis added)].

24.    Amazon often markets its consumer electronics products with the "Amazon" name before its products' brand names: for example, the Amazon Echo, the Amazon Fire phone, and the Amazon Fire TV. [ECF No. 206, p. 5].

**Assessment of Purported Dispute**: Wreal simply adds that "Amazon does not consistently use its housemark when advertising its products." [ECF No. 263, p. 4]. But that added point does not contradict Amazon's assertion that it "often" -- and thus not necessarily always -- uses its housemark when advertising its products.

31.    Amazon bought paid internet keyword ads for the Amazon Fire TV, but it did not buy ads for keywords around Wreal's FyreTV name or anything related to pornography. [ECF No. 206, p. 6].

**Assessment of Purported Dispute**: Wreal's claimed "dispute" is simply a claim that Amazon "bought Fire TV search terms on Google and Bing to ensure that Amazon's Fire TV was positioned first in the search results." [ECF No. 273, p. 5]. Therefore, both parties agree that Amazon "bought paid internet keyword ads for the Amazon Fire TV" [ECF No. 206, p. 6], and Wreal does not dispute that Amazon did not buy keyword ads

13

for anything related to pornography or for keywords around Wreal's "FyreTV" name.

32.     Amazon prohibits pornographic apps for the Amazon Fire TV. [ECF No. 206, p. 6].

**Assessment of Purported Dispute**: Wreal claims that "[t]here are apps available on Fire TV that stream pornographic content, including Showtime." [ECF No. 273, p. 5]. But the cited record evidence mentions only Showtime, and the deponent admitted, "I don't know if we have after-hours content [the adult content] in the app." [ECF No. 275-16, p. 8]. The Undersigned thus takes as undisputed the proposition that Amazon prohibits "pornographic apps" on the Amazon Fire TV.[7]

33.     Amazon's content policies for both Amazon Instant Video (which streams on the Amazon Fire TV) and DVDs available on Amazon's website (whether sold by Amazon or third parties) prohibit pornography. [ECF No. 206, p. 7].

**Assessment of Purported Dispute**: Wreal does not dispute that the Amazon Instant Video policy -- which governs the Amazon Fire TV -- prohibits pornography. Wreal's only claimed dispute as to this fact relates to "Amazon's DVD content policy," which Wreal says "allows certain pornographic DVDs." [ECF No. 273, p. 5]. Wreal's additional fact, however, is not admissible; the Undersigned and Judge Lenard (including in the *Daubert* order) have consistently excluded as irrelevant evidence related to DVDs

---

[7]     The Undersigned will also discuss later whether the content on the Showtime app is akin to Wreal's FyreTV content.

for sale on Amazon.com. [*See, e.g.*, ECF No. 349, pp. 10–14]. In fact, Judge Lenard's *Daubert* order *excludes* the opinion by Dr. Williams that Wreal cites as record support. [ECF No. 349, p. 14]. Further, as Amazon notes in its reply, "[Wreal] cites the wrong policy. The Amazon Instant Video (AIV) content policy governing Amazon Fire TV content bars <u>all</u> 'pornography.'" [ECF No. 288, p. 4, n. 10].[8]

34.     The Amazon Fire TV "appears on Amazon's website, an Amazon-branded marketplace with other Amazon-branded products, such as the Kindle Fire, in a general consumer environment free from pornography." [ECF No. 206, p. 7].

**Assessment of Purported Dispute:** Wreal's claimed dispute cites only to an Amazon.com screenshot with several images from an earlier browsing history related to "adult" magazines. [ECF Nos. 263, p. 5; 275, p. 3; 275-20, pp. 2–4]. This screenshot, however, also has significant mainstream consumer content, such as "Black Friday" promotions and ads for running shoes, easily distinguishing it from the row upon row of pornography at FyreTV.com. Thus, the Undersigned takes it as undisputed that even if consumers had previously searched for pornographic magazines on Amazon.com, they would still be in a market environment with mainstream consumer content.

Further, Wreal does not dispute the assertion that Amazon's Fire TV appears "on

---

[8]     To be sure, Amazon's customer base includes those interested in shopping for pornography online, and Wreal put forth evidence that Amazon's customers shop for pornography. During a 9-month period in 2014, there were over 80,000 searches for "XXX" on Amazon's website, and Amazon conceded that people using that search term are looking for pornography. [ECF No. 275–35, p. 26].

Amazon's website, an Amazon-branded marketplace with other Amazon-branded products, such as the Kindle Fire." [ECF No. 206, p. 7]. The Undersigned also takes this part of Amazon's assertion -- related to the Amazon Fire TV appearing on Amazon.com in what is, in essence, a mainstream consumer environment saturated with the "Amazon" brand -- as undisputed.

39.      Differences between the FyreTV and Amazon Fire TV marks include: (a) one is red, the other yellow or orange; (b) one is two words, the other is one; (c) one includes a flame graphic, the other does not; (d) each has its own unique stylized font: one is with a "y" and the other with an "i"; and (e) one often has "Amazon" in front of it, and the other does not. [ECF No. 206, p. 8].

The following image is illustrative:



**Assessment of Purported Dispute:** Although Wreal claims this fact is disputed, its argument is actually about the *significance* of the differences; it does not (and cannot)

deny that the claimed differences exist. Wreal even concedes that "the parties currently use different fonts and graphics to depict the marks visually" and that the marks have a "slightly different spelling." [ECF No. 263, p. 6]. Instead of disputing what Amazon claims are differences (except for saying that the name Fire TV in Amazon's image appears to be one word), Wreal points out claimed *similarities,* namely, that "both combine a variant of the arbitrary word 'Fire' with the descriptive 'TV'" and that both "use colors associated with fire." [ECF No. 263, p. 6].

But simply pointing out that the marks share some similarities does not create a factual dispute as to what Amazon claims are differences. Phrased differently, Wreal does not actually dispute that one mark is "Fire" and one is "Fyre"; that the marks look different (Wreal actually concedes that the marks have different fonts and graphics); that, at least at times, Amazon's Fire TV is prefaced by "Amazon"; and that "Fire TV" is two words (as can be seen elsewhere in the evidentiary material).

For example, Amazon provided as evidence various screenshots showing how the Amazon Fire TV mark appears in commerce. [ECF No. 206-2, pp. 1–35]. This exhibit shows occasions when both the "Amazon" is before "Fire TV" and "Fire" and "TV" are two words. [*See, e.g.*, ECF No. 206-1, pp. 10 (a chart comparing the "Fire TV Family"); 16 (graphic from Amazon.com advertising how the "Amazon Fire TV" is "NOW BETTER THAN EVER")].

The Undersigned therefore takes the marks' similarities and differences as

undisputed and will discuss the significance of these similarities and differences later in this report.

40.     None of Wreal's 51,000 customers have contacted it about Amazon (other than customers asking if the FyreTV app will be available on Amazon's Fire TV). [ECF No. 206, pp. 8–9].

**Assessment of Purported Dispute:** Wreal claims this fact is disputed, but then says only: "Customers of FyreTV have asked Wreal about accessing FyreTV through Amazon, as noted by Amazon." [ECF No. 263, p. 6]. So rather than creating a factual dispute, Wreal is saying the same thing that Amazon is saying.

46.     A hardcore pornography site such as Wreal's FyreTV looks and feels very different to the viewer than a mainstream consumer site such as Amazon.com. [ECF No. 206, p. 10].

**Assessment of Purported Dispute:** Although Wreal claims that this fact is disputed, it does not cite any expert testimony to contradict the expert evidence Amazon cites, which includes an admission by **Wreal's** expert (Dr. Williams) that consumers "would not confuse" FyreTV.com with a mainstream consumer website. [ECF No. 232-38, p. 42 (emphasis added) ("Q. Do you agree that the visitor of the portal of a hardcore website like FyreTV.com is unlikely to think they are visiting a mainstream website that does not sell hardcore pornography? A. I agree that **they would not confuse the two**.")]. Instead, Wreal cites to a printout of what appears to be Amazon's website from a

customer named "Paul" who had apparently previously searched for pornographic magazines. [ECF No. 275-20, pp. 2–4]. Wreal's lone example still has plenty of mainstream consumer content, such as "Black Friday" promotions and ads for running shoes, easily distinguishing it from multiple rows of pornography at FyreTV.com.

The Undersigned thus takes it as undisputed that, as Wreal's own expert testified, a mainstream consumer website looks and feels very different to the viewer than a hardcore pornography site.

48.     Dr. Thomas Maronick, another expert retained by Wreal's counsel, conducted consumer surveys in April 2014 that showed "very low" consumer confusion. [ECF No. 206, p. 10].

**Assessment of Purported Dispute:** Wreal claims this fact is "[d]isputed and inadmissible." [ECF No. 263, p. 7]. The Undersigned will address Wreal's admissibility argument later. Concerning whether the fact is disputed, Wreal does not cite any record evidence that truly disputes Dr. Maronick's "very low consumer confusion" finding -- which Dr. Maronick testified to in the preliminary-injunction hearing. [ECF No. 202-3, p. 76]. Wreal states that Dr. Maronick's surveys were "pilot studies designed to test formatting and screening, not designed to reliably determine whether there is a likelihood of confusion." [ECF No. 263, p. 7]. But Dr. Maronick testified quite plainly that he did measure confusion: "I really didn't measure awareness particularly in my surveys. **I really measured confusion and found low levels of confusion**. . . ." [ECF No. 275-27,

p. 13 (emphasis added)].

The Undersigned thus takes it as undisputed that Dr. Maronick's surveys showed "low levels of confusion," as he testified.

49.     Dr. Maronick testified that "[i]f awareness is very low, there is going to be low or no confusion." [ECF No. 225, p. 10].

**Assessment of Purported Dispute:** Wreal claims to dispute this fact, but the record evidence Wreal cites to, as well as the following exchange, *support* Amazon's statement. [*See* ECF No. 275-27, p. 13 (emphasis added) ("Q. I think what you said earlier today was that if awareness is very low, confusion is not going to be present, it was very unlikely? A. T**hat's correct**. You can't assess it. If it's there you can't measure it -- not likely to measure it -- assess it, measure it **because it is not there or it's very, very low.**")].

## I.     Legal Standards

### A.     Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal citation and marks omitted).

If the movant establishes the absence of a genuine issue, then the non-movant must "do more than simply show that there is some metaphysical doubt as to the material

facts." *Matsushita Elec. Indus.*, 475 U.S. at 586. For issues on which the opposing party will have the burden of proof at trial, the movant can prevail by merely pointing out that there is an **absence of evidence to support the non-movant's case.** *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

"By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

## B.    Substantive Law

Wreal's primary argument can be summarized by the introduction it used in its proposed report and recommendations:

> Wreal alleges that Amazon's use of the Fire TV mark is likely to cause reverse confusion. Notably, Wreal does not allege that consumers will mistake Amazon's Fire TV for its FyreTV as being the same thing. It does not allege that consumers will visit Wreal's website and think they are visiting the amazon.com website. Instead, Wreal alleges, and there is sufficient evidence for a reasonable jury to conclude, that Amazon's use of Wreal's mark creates a likelihood that consumers will believe that Amazon is the *source* of Wreal's FyreTV service, much like Amazon is the source of organic groceries purchased at Whole Foods, even though consumers do not think Whole Foods and Amazon's website are the same thing.

21

[ECF No. 374-1, p. 2].

But **likelihood** of confusion is more than the mere *possibility* that some consumers may be confused at some point. Rather, likelihood of confusion requires a true, genuine "likelihood" that an "appreciable number of ordinarily prudent purchasers" will in fact be confused. *Custom Mfg.*, 508 F.3d at 651. As the Undersigned explained previously in the report recommending denial of Wreal's preliminary-injunction motion:

> The relevant test is *likelihood* of confusion, not mere *possibility* of confusion. "[R]ecovery under the Lanham Act requires, at a minimum, that confusion, mistake, or deception be 'likely,' not merely 'possible.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 651 (11th Cir. 2007) (internal quotation omitted). A plaintiff must show "a likelihood that *an appreciable number* of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Id.* at 651 (quoting *New Sensor Corp. v. CE Distrib. LLC*, 303 F. Supp. 2d 304, 310-11 (E.D.N.Y. 2004) (emphasis added)).

[ECF No. 130, p. 17].

But, as analyzed below, Wreal has shown, at best, a "mere possibility" of confusion -- the **speculative possibility** that somehow, somewhere, some not-yet-identified group of consumers will encounter Wreal's FyreTV hardcore pornography service and think that this service must be associated with Amazon. Yet there is no record evidence from which a reasonable fact-finder could conclude that "*an appreciable* number of ordinarily prudent purchasers" are likely to be confused.

That lack of evidence is fatal. For that reason alone, Amazon is entitled to summary judgment.

II.    **Analysis**

A.    *No Reasonable Fact-Finder Could Find Likelihood of Confusion.*

As Judge Lenard explained, Wreal's claims are premised on the allegation that Amazon is infringing on Wreal's trademark rights [ECF No. 177, pp. 6–7], and those claims require a showing of likelihood of confusion. *See Custom Mfg.*, 508 F.3d at 652–53 (state-law claims); *Ross Bicycles, Inc. v. Cycles USA, Inc.*, 765 F.2d 1502, 1503–04 (11th Cir. 1985) (federal-law claim). The Eleventh Circuit assesses likelihood of confusion by using seven factors:

> (1) distinctiveness of the mark alleged to have been infringed; (2) similarity of the infringed and infringing marks; (3) similarity between the goods or services offered under the two marks; (4) similarity of the actual sales methods used by the two parties, such as their sales outlets and customer base; (5) similarity of advertising methods; (6) intent of the alleged infringer to misappropriate the proprietor's good will; and (7) existence and extent of actual confusion in the consuming public.

*Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1360 (11th Cir. 2007).

The Eleventh Circuit has repeatedly held that "[a]lthough likelihood of confusion is a question of fact, it may be decided as a matter of law" on summary judgment. *Tana v. Dantanna's*, 611 F.3d 767, 775 (11th Cir. 2010); *see also All. Metals, Inc., of Atlanta v. Hinely Indus., Inc.*, 222 F.3d 895, 907 (11th Cir. 2000) (rejecting argument that likelihood of confusion is a jury issue and noting, "this court has decided likelihood of confusion as a matter of law in the first instance"). And the Eleventh Circuit has affirmed summary judgment for defendants in trademark cases where no reasonable fact-finder could

conclude an appreciable number of ordinarily prudent consumers were likely to be confused. *See, e.g., Tana*, 611 F.3d at 774-82; *Custom Mfg.*, 508 F. 3d at 648-52; *Welding Servs.*, 509 F.3d at 1360-61.

District courts in the Eleventh Circuit have also applied this rule and have granted summary judgment concerning likelihood of confusion. *See Schiappa v. CharityUSA.com, LLC*, No. 16-CV-81617, 2017 WL 2210274, at *9 (S.D. Fla. May 18, 2017) ("The likelihood that consumers nationwide will believe that [Defendant's] designs are meant to denote that Plaintiffs' company is the source of the apparel is extremely low. Under these circumstances, no reasonable jury could find a likelihood of confusion. Thus, summary judgment in [Defendant's] favor is appropriate."); *see also Phelan Holdings, Inc. v. Rare Hosp. Mgmt., Inc.*, No. 8:15-CV-2294-T-30TBM, 2017 WL 1135266, at *8 (M.D. Fla. Mar. 27, 2017) (granting summary judgment to defendants in reverse-confusion case).

Wreal acknowledges that summary judgment for defendants is sometimes available in a likelihood-of-confusion context but contends that this is permissible "only when there is undisputed evidence of some **unique fact** that makes confusion unlikely." [ECF No. 374-1, p. 12 (emphasis added)]. But the cases it cites contain no such restriction. Instead, those cases merely stand for the unremarkable point that "application of the *Frehling*[9] factors entails more than the mechanistic summation of the number of factors

---

[9]     *Frehling Enters., Inc. v. Int'l Select Grp.*, Inc., 192 F.3d 1330 (11th Cir. 1999). *Frehling* listed the first factor as "type of mark" and explained that "[c]lassifying the type of mark

on each side; it involves an evaluation of the 'overall balance.'" *Custom Mfg.*, 508 F.3d 649 (affirming summary judgment for defendant on trademark infringement claim even though the district court did not mention the seven *Frehling* factors at all). The mere fact that *Custom Manufacturing* holds that "a court must also take into account the unique facts of each case," *id.*, hardly means that a defense summary judgment is available only when there is a unique fact that makes confusion unlikely.

To the extent the presence or absence of unique facts means that each case "presents its own complex set of circumstances," then the Undersigned will assess the factors with the principle in mind that "the bottom line is the likelihood of consumer confusion." *Id.* at 649–50.

Summary judgment can be proper even when some of the likelihood-of-confusion factors weigh in the plaintiffs' favor. *See Tana*, 611 F.3d at 775–82 (affirming summary judgment for defendant despite "conceded similarity between the two marks (factor two)" and "undisputed similarity of the parties' sales methods (factor four)"); *Welding Servs.*, 509 F.3d at 1361 (affirming summary judgment for defendant despite "undisputed similarity of services offered, sales methods, and advertising methods").

Here, no reasonable fact finder could find likelihood of confusion. None of the

---

Plaintiff has determines whether it is strong or weak." *Id.* at 1335. As outlined in *Frehling*, there are four categories of marks: generic, descriptive, suggestive, and arbitrary. *Id.* These categories are based on the relationship between the name and service or good it describes, with arbitrary marks being the strongest. *Id.*

likelihood of confusion factors favor Wreal; rather, all favor Amazon (or, at best, are neutral).

### 1.    Distinctiveness/Strength of Marks

The parties do not dispute, as the Undersigned has previously found, that "Amazon," "FyreTV," and "Amazon Fire TV" are strong and distinctive marks. [ECF 130, p. 17]. There is no factual dispute that Amazon often (though not always) uses "Amazon" next to its products' brand names (such as "Echo," "Fire Phone," and "Fire TV"). [ECF Nos. 206, p. 5; 263, p. 4]. Even when Amazon does not use "Amazon" next to "Fire TV," the product still "appears on Amazon's website, an Amazon-branded marketplace with other Amazon-branded products." [ECF No. 206, p. 7].

Notably, when accepting the Undersigned's recommendation that Wreal's preliminary-injunction motion be denied, Judge Lenard found that "the use of Amazon's housemark next to its Fire TV mark, spelled and styled differently than FyreTV, could help **distinguish** the products." [ECF No. 177, p. 10 (emphasis added)]. Judge Lenard's observation is consistent with the Eleventh Circuit's observation in a forward-confusion case that a housemark can make confusion less likely. *Custom Mfg.*, 508 F.3d at 652 n.10. The presence of the highly distinctive "Amazon" housemark, either (1) as part of the "Amazon Fire TV" name or (2) when the product is simply "Fire TV" but marketed on Amazon.com in an Amazon-branded environment with other Amazon products, such as the Kindle Fire, helps *distinguish* the products and makes this factor weigh in Amazon's

favor. [ECF Nos. 206, p. 7; 263, p. 5; 275-20, pp. 2–4].

Wreal argues that Amazon's use of its housemark "Amazon" alongside the "Fire TV" trademark actually *aggravates*, rather than lessens, the likelihood of confusion. [ECF No. 261, p. 10]. As support, Wreal relies on two out-of-circuit cases for the proposition that a junior user linking its housemark with the challenged trademark worsens, rather than justifies, the use. [ECF No. 261, p. 10 (citing *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198 (3d Cir. 2000); *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992))].

In addition, although Wreal acknowledges that "some courts have found the opposite in reverse confusion cases," it says that this occurs "where **both** litigants used their respective housemarks." [ECF No. 261, p. 10 (emphasis added) (citing *Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2002); *Stuart J. Kaufman, M.D. & Assocs., P.A. v. Bausch & Lomb Inc.*, No. 8:13-CV-461-T-33EAJ, 2013 WL 6154166 (M.D. Fla. July 25, 2013), *report and recommendation adopted* 2013 WL 12123679 (M.D. Fla. Sept. 4, 2013))]. Wreal submits that the "opposite" analysis is inapplicable here because it never puts "Wreal" before FyreTV. [ECF No. 261, p. 10].

In a similar vein, Wreal argues that the analysis is somehow modified in reverse-confusion cases because the Court must be "mindful that the harm caused by reverse confusion differs from that caused by forward confusion." [ECF No. 374-1, p. 13]. Relying once more on two non-binding, out-of-circuit cases, Wreal contends that the first factor

(the strength or distinctiveness of the mark) becomes more important in a reverse-confusion case because the inquiry "focus[es] on the strength of the *junior* user's mark." [ECF No. 374-1, p. 13 (citing *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32 (1st Cir. 2006); *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127 (9th Cir. 1998))].

Wreal's counter-arguments are unpersuasive. Given Wreal's lack of on-point, binding authority, the Undersigned is not going to accept its proposed rule that the strength or distinctiveness of the mark always requires a different analysis in a reverse-confusion case. Moreover, the Undersigned notes that Judge Lenard previously distinguished *Attrezzi*, *Quaker Oats*, and *Sands* because the marks were identical in those cases (but are not here). [ECF No. 177, pp. 9–11].

Moreover, in *A&H Sportswear*, the Court did *not* determine which way the housemark on Victoria's Secret product -- the Miracle Bra, as opposed to the Miraclesuit -- weighed in the similarity-of-the-marks factor within the reverse-confusion analysis. 237 F.3d at 230. In addition, the *A & H Sportwear* Court emphasized that "[a]s in a direct confusion claim, the ultimate question in a reverse confusion claim is whether there is a likelihood of consumer confusion as to the source or sponsorship of a product." *Id.* at 229. That ultimate question is at the epicenter of the Undersigned's overall evaluation.

Finally, Judge Lenard did not embrace Wreal's argument when she adopted the Undersigned's recommendation that she deny Wreal's preliminary-injunction motion. In fact, Judge Lenard found that "the use of Amazon's housemark next to its Fire TV mark,

spelled and styled differently than FyreTV, could help **distinguish** the products. [ECF No. 177, p. 10 (emphasis added)].

### 2. Similarity of Marks

Judge Lenard's preliminary injunction opinion outlined the law governing this factor:

> "Similarity of appearance is determined on the basis of the **total effect** of the designation, rather than on a comparison of individual features." A court "must also consider the commercial impression created by the mark **as a whole**." Stated differently, "[i]n evaluating the similarity of marks, [the court] must consider the **overall impression** created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed."

[ECF No. 177, p. 10 (emphasis added and internal citations omitted)].

Although the parties dispute the *significance* of the similarities and differences between the marks, the similarities and differences themselves (i.e., the specific *facts* about the marks' presentation in commerce) are not disputed. [ECF Nos. 206, p. 8; 263, p. 6]. As the Undersigned previously noted at the preliminary-injunction stage, "the marks share *some* visual similarities," namely, "[t]hey both use the same word with a slightly different spelling, and use colors associated with fire." [ECF No. 130 at 21]. But there are also differences: "Fire" versus "Fyre" and "Fire TV" (sometimes prefaced by "Amazon") versus "FyreTV" (never prefaced by "Amazon"), for example. Moreover, Wreal concedes that "the parties currently use different fonts and graphics to depict the marks visually. . . ." [ECF No. 263, p. 6].

Wreal urges the Court to hold that the presence of *some* similarities creates a factual issue because "similarities carry more weight than differences." [ECF No. 261, p. 13]. But as Judge Lenard explained: "The fact that there are some similarities does not raise the issue to one of substantial confusion." [ECF No. 177, p. 11 (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259–60 (5th Cir. 1980) (comparing similarity of design as to "Domino Granulated Pure Cane Sugar" and "Domino's Pizza" and finding them distinguishable))]; *see also Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 317 (5th Cir. 1981) (reversing district court's similarity-of-design finding where two "Sun" bank names with orange colors were presented differently in commerce); *Tiger Direct, Inc. v. Apple Computer, Inc.*, No. 05-21136CIVLENARD, 2005 WL 1458046, at *16 (S.D. Fla. May 11, 2005) (finding dissimilar two uses of the word "Tiger" for computer-related products based on the marks' overall impression). Here, the "total effect of the designation" and the "overall impression" [ECF No. 177, p. 10] created by the marks is different: different words, different fonts, different colors.

The Undersigned must also consider not just the marks themselves but also "the manner in which they are displayed." [ECF No. 177, p. 10 (internal quotation marks and citation omitted)]. The effect of the marks *as the parties actually use them in commerce* could not be more different.

The parties do not dispute that a person can become a FyreTV customer *only* by first signing up for an account at Wreal's FyreTV.com website. [ECF Nos. 206, p. 2; 263,

p. 1]. The parties similarly do not dispute that Wreal's FyreTV.com website is a hardcore pornography website, which means that a customer opening a FyreTV account will *always* encounter several (undisputed) features: (1) exclusively pornographic content, not mainstream movies; (2) a mandatory opt-in screen that requires users to confirm they are 18 years of age and willing to view adult content before they can enter; (3) a FyreTV.com homepage with several rows of highly explicit pornographic images; and (4) a "Categories" page on the FyreTV.com website with images from many different lurid pornographic genres. [ECF Nos. 206, pp. 2–3; 263, p. 1].

Comparing the screenshots of Wreal's FyreTV.com website [ECF No. 232-1] with the screenshots of how Amazon's Fire TV appears in commerce [ECF No. 232-25] illustrates the point: the overall impression of how the parties use these marks in commerce could not be more different.

Significantly, even one of Wreal's experts, Dr. Williams, conceded this point:

Q. Do you agree that the visitor of the portal of a hardcore website like FyreTV.com is unlikely to think they are visiting a mainstream website that does not sell hardcore pornography?

A. **I agree that they would not confuse the two**.

[ECF No. 232-38, p. 42].

Wreal responds that "there is evidence that Amazon's mark, to the relevant consumers, also appears alongside pornography." [ECF No. 261, p. 12]. But as support for this, Wreal merely presents a printout of the search history of an unknown customer

named "Paul," who had apparently searched for pornographic magazines. [ECF No. 275-20, pp. 2–4]. But even this singular example contains a substantial amount of mainstream consumer content, such as "Black Friday" promotions and ads for running shoes, easily distinguishing it from the row upon row of pornography at FyreTV.com. [ECF Nos. 206, pp. 7, 10; 263, p. 5; 275-20, pp. 2–4].

At bottom, there is little similarity between how the parties use their respective marks in their respective commercial environments. To the contrary, there is an immediate and obvious and significant difference. This factor thus weighs in Amazon's favor.

### 3.    Similarity of Products

Wreal argues that the products are similar and are "complementary products that are typically put out by the same company." [ECF No. 261, p. 14]. In support, it notes that "Amazon and Wreal both use the mark to identify a streaming video service." *Id.* Wreal reasserted this argument in the supplemental filings the Undersigned required, arguing that the Amazon Fire TV should be considered a similar product to Wreal's FyreTV because the Amazon Fire TV is now available as preloaded software on certain smart television sets. [ECF No. 357, pp. 4-6].

The Amazon Fire TV, however, is a means through which a viewer can access multiple streaming services (Showtime, Amazon's own streaming service of Amazon Instant Video, ESPN, and more). [ECF Nos. 206, p. 5; 263, p. 4]. Wreal's FyreTV, on the

other hand, is a dedicated app for streaming hardcore pornography. [ECF Nos. 206, p. 2; 263, p. 1]. So the two products are not similar.

Moreover, the Eleventh Circuit has repeatedly rejected the proposition that *general* similarities in physical form make this factor weigh in favor of the plaintiff. To provide two illustrations, the Eleventh Circuit held this factor weighed in defendants' favor even when both products in question were bicycles, *Ross Bicycles*, 765 F.2d at 1507, or "fine-dining establishments serving meat and fish," *Tana*, 611 F.3d at 778.

Instead, the Eleventh Circuit has asked "whether the products are the kind the public attributes to a single source." *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (11th Cir. 1985). In other words, the question is whether the products are "so similar as to be likely to cause confusion," *Ross*, 765 F.2d at 1507, or whether consumers would be "unlikely to confuse the two [products]," *Tana*, 611 F.3d at 777–78.

Here, Wreal's opposition to summary judgment engages in pure speculation. Wreal argues that "consumers **may** assume that Amazon has put out two related (complementary) products, one to stream mostly mainstream movies and the other to stream mostly hardcore pornography. . . ." [ECF No. 357, pp 7–8 (emphasis added)]. Yet Wreal has adduced no actual **evidence** that "an *appreciable number* of ordinarily prudent purchasers" might make this assumption.

Where, exactly, is the evidence that "an *appreciable number* of ordinarily prudent

purchasers" -- which this Court has held (correctly) is the relevant standard -- might make this assumption?

Wreal's expert testimony from Dr. Williams merely establishes that perhaps there is some sense in which hardcore pornography could be "related" or "complementary" to (as Wreal argues) "a variety of material, including 'soft-core' pornography, R-rated movies, and mainstream content." [ECF No. 357, p. 7]. But as quoted previously, Dr. Williams admitted that when it comes to the crucial inquiry of whether consumers were likely to confuse FyreTV.com with a mainstream website, like Amazon's, consumers "**would not confuse the two**." [ECF No. 232-38, p. 42 (emphasis added)].

Wreal's own expert's concession that consumers are not likely to "confuse" FyreTV.com with Amazon's website is significant, and it shows why summary judgment in Amazon's favor is proper. *See Phelan Holdings*, 2017 WL 1135266, at *4, *8 (granting summary judgment in a reverse-confusion case between owners of LongHorn Steakhouse and Pinchers seafood restaurants, noting that plaintiff "essentially concedes this point: '[n]o one confuses a LongHorn Steakhouse with a Pinchers'").

The reason for this concession is obvious: regardless of whether in some market contexts (or in some academic sense) mainstream content and hardcore pornography could be considered "related," the undisputed fact on *this* evidentiary record about *these* marks for *these* products in *these* marketplaces is that mainstream content and hardcore pornography are kept apart from each other.

Wreal's FyreTV has an over-18 opt-in screen that warns about adult content, while Amazon's Fire TV does not. [ECF Nos. 206, p. 2; 263, p. 1]. Wreal has in the past advertised on adults-only websites, while Amazon does not, advertising instead on national broadcast television and at stores such as Best Buy and Staples (which Wreal does not use), for example. [ECF Nos. 206, pp. 4, 7; 263, pp. 3, 5]. Amazon has an entire content policy dedicated to keeping pornography **off** the Amazon Instant Video streams on the Amazon Fire TV, while Wreal obviously does not (pornography *is* its business). [ECF Nos. 206, p. 7; 273, p. 5]. Amazon's Fire TV has parental controls, which Wreal does not have. [ECF Nos. 206, p. 6; 263, p. 4]. And so on.

A clear and graphic way to see the fundamental difference is to compare Amazon's Amazon Instant Video anti-pornography policy [ECF No. 232-26] with the FyreTV.com homepage [ECF No. 232-1]. Everything Amazon's policy explicitly prohibits is graphically present on FyreTV.com. Wreal's use of the term "Netflix" as a descriptor for its service also demonstrates the point: Wreal calls itself the "Netflix of Porn" to illustrate that it is in a different market than a mainstream media company like Netflix. [ECF Nos. 206, pp. 4, 129; 263, p. 2].

Wreal's response is to assert that the Amazon Fire TV has content that is "pornographic or related to pornography," citing to Dr. Williams's summary of opinions from her report. [ECF No. 357, p. 7]. But "a party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record

to support its conclusory allegations." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). As noted earlier, the opinions from Dr. Williams that Wreal cites in an attempt to create a factual dispute on this point rely principally on the presence of allegedly pornographic DVDs for sale on Amazon's website. [ECF No. 273, p. 5]. The *Daubert* order specifically excludes these opinions as irrelevant. [ECF No. 349, pp. 10–14].[10]

Wreal has also argued that the Amazon Fire TV offers pornographic content because Amazon's Fire TV makes the Showtime cable app available. Wreal has also identified what it claims to be "several pornographic DVDs, books and magazines available for purchase on Amazon's website" and it contends that consumers "can stream pornography on Amazon's fire TV through apps like HBO Go and Showtime." [ECF No. 261, p. 11, n. 15]. But this connection is insufficient to overcome summary judgment for at least three independent reasons.

First, the Showtime and HBO Go apps are products of different companies that are not available through Amazon's own Amazon Instant Video streaming service. It is available only by using Amazon Fire TV as the means to access a range of services and apps, which include the Showtime service.

Second, even assuming a third-party app is somehow attributed to Amazon, the

---

[10]   Although the *Daubert* order was filed under seal, that was done to protect various supposedly confidential sections of the expert's opinions and the purportedly sensitive data upon which the opinions were based. But the order's under-seal status does not mean that this report cannot publicly mention, in a general, procedure-focused way, that the order specifically excluded those opinions.

one "soft-core" movie specifically identified on the Showtime app is part of a broader range of mainstream consumer offerings. Wreal has offered no evidence that any consumer would believe he would be accessing hardcore pornography by, for example, opening the Showtime app. (And, once more, Wreal's expert has conceded that a consumer "would not confuse" Wreal's FyreTV with a mainstream site. [ECF No. 232-38, p. 42].)

Third, the one "soft-core" movie that is as part of Amazon's broad range of mainstream offerings is different from Wreal's hardcore pornographic options. This single video is not the *hardcore* material that makes up most of Wreal's offerings [*see* ECF Nos. 206, p. 2; 263, p. 1], and Amazon takes aggressive steps to keep hardcore pornography *off* the Amazon Fire TV [*see* ECF Nos. 206, p. 7; 273, p. 5]. Indeed, Wreal has offered no evidence that a consumer who sees this Showtime "soft-core" offering in context would somehow think that the Amazon Fire TV service is itself pornographic.

This is not akin to wine and brandy, where brandy is "distilled from . . . wine" and both are products "originating in France." *E. Remy Martin & Co.*, 756 F.2d at 1530 (holding that "even . . . a sophisticated consumer from the drinking world . . . could easily conclude that Remy Martin had undertaken the production and sale of wine and that its name and goodwill therefore attached to Myers' product" where "cognac and brandy[] are distilled from Myers' type of product, wine," and "both products originat[e] in France"). Wreal cites *not a single case* where the Eleventh Circuit (or any other court) has held that products

kept separate in the marketplace can be considered "similar" for likelihood-of-confusion purposes.

This is why *Sunenblick v. Harrell*, 895 F. Supp. 616 (S.D.N.Y. 1995), *aff'd*, 101 F.3d 684 (2d Cir. 1996) -- which the Undersigned cited in the report and recommendations on the preliminary-injunction motion [ECF No. 130, p. 27, n. 10] but which Wreal does not even mention -- is particularly instructive. *Sunenblick* emphasizes (consistent with Eleventh Circuit law) that products are not "similar" if consumers do not perceive them as related because they are kept separate in the marketplace. *Sunenblick*, 895 F. Supp. at 628–29.

The undisputed facts regarding the separation of the products here are not present in the cases Wreal cites. *See Remy Martin*, 756 F.2d at 1530 (wine and brandy); *see also Frehling*, 192 F.3d at 1338 (two pieces of furniture that the Eleventh Circuit described as "furniture pieces, designed for the home . . . [with] the capability to house electronic equipment . . . [and] marketed as having an Italian design . . . .").

The Eleventh Circuit has affirmed summary judgment for defendants on likelihood of confusion in part because an "old-world-style Italian restaurant" is "strikingly dissimilar" and has "stark differences" from an "upscale sports restaurant" such that "consumers would be unlikely to confuse the two," even though both are restaurants. *Tana*, 611 F.3d at 777–78. The facts in this case present an even stronger case for a defense summary judgment: it is immediately obvious to a consumer, as the

admission/concession of Dr. Williams (Wreal's expert) demonstrates, that FyreTV markets a strikingly dissimilar type of content to the Amazon Fire TV, and the factual record regarding these marks in this market context demonstrates the myriad ways that these products are kept separate from one another.

### 4.   Similarity of Sales Outlets and Customer Base

Wreal does not dispute that FyreTV and Amazon Fire TV are not sold in the same retail outlets. [ECF Nos. 206, p. 9; 263, p. 6]. Wreal also concedes that "a customer must sign up for an account on Wreal's fyretv.com website. . . ." [ECF No. 263, p. 1]. And Wreal has offered no evidence that any consumer who visits its hardcore pornographic website would confuse it with Amazon. (Indeed, as previously discussed, Wreal's expert conceded the *opposite* -- that no consumer would confuse a hardcore website with a mainstream offering. [ECF No. 232-38, p. 42].)

Wreal nevertheless argues that Amazon's Fire TV customer base should be considered "similar" to Wreal's pornography customer base because "people that watch streaming online pornography" also "watch streaming mainstream content." [ECF No. 261, p. 18]. The Undersigned does not find this argument persuasive. This argument would mean that every customer base would be "similar" to another customer base.

For example, as demonstrated in a still-binding former Fifth Circuit case from

1980,[11] consumers who buy sugar might also buy pizza, and thus pizza customers and sugar customers would be "similar," except they are not for likelihood-of-confusion purposes. *See Domino's Pizza*, 615 F.2d at 255, 261–62 (reversing judgment for plaintiff because district court's decision was "fundamentally erroneous" when it was based on a finding of "likelihood of confusion between the use of 'Domino's Pizza' by defendants in connection with pizza store services and the use of 'Domino' by plaintiff in connection with the sale of sugar and individual packets of condiment items"); [*see also* ECF No. 177, p. 12 (rejecting "expansive interpretation" that would mean "the parties share the same customer base of internet shoppers and humans over eighteen years of age")].

The key inquiry here is whether Amazon markets the Amazon Fire TV to customers specifically in the market for streaming pornography. [*See* ECF No. 177, p. 12]. No reasonable fact-finder could draw this conclusion: Amazon did not buy internet keyword advertisements for anything related to pornography; Amazon prohibits pornographic apps on the Amazon Fire TV; Amazon's Fire TV content policy prohibits pornography; Amazon markets the Amazon Fire TV as a set-top box for general interest content -- "instant access to Netflix, Prime Instant Video, WatchESPN," and more -- including selections like "House of Cards" and "Dora the Explorer" for video and

---

[11]     Decisions of the United States Court of Appeals for the Fifth Circuit which were handed down by September 30, 1981 are binding precedent in the Eleventh Circuit, which was established on October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

"Pandora" for music; and Amazon markets the Amazon Fire TV's family-friendly features. [ECF Nos. 206, pp. 5–7; 263, p. 4; 273, p. 5; 288, p. 4, n. 10]

Wreal, by contrast, markets exclusively to pornography viewers. [ECF No. 206, p. 3; 263, p. 2]. Wreal's advertising slogan (that it is the "Netflix of Porn") emphasizes the difference: Wreal does not believe that this slogan infringes any trademarks because Wreal believes Netflix operates in a different market. [ECF No. 206, p. 4; 263, p. 2]. In fact, Wreal concedes that Wreal and Netflix "are not direct competitors." [ECF No. 263, p. 2]. This factor, too, favors Amazon.

### 5.      Similarity of Advertising

There is no dispute that Wreal does not now (and has not for several years) use the same advertising channels used by Amazon: the Amazon.com homepage, television, print media, and in-store displays. [ECF Nos. 206, p. 7; 263, p. 5]. Wreal claims its advertising is "constantly evolving" [ECF No. 261, p. 19], but it does not dispute that it stopped advertising in channels Amazon uses (such as print and TV) by no later than 2012. [ECF Nos. 206, p. 4; 263, p. 3].

Wreal's summary-judgment opposition argues that the Court should consider the advertising similar because both parties use "social media, email, and search engines" and "word-of-mouth" [ECF No. 261, p. 19]. But these methods are so broad as to make the advertising factor useless; nearly *every* mark in commerce uses these channels.

In *Frehling*, which Wreal cites [ECF No. 261, p. 19], both parties advertised in a

very specific targeted medium: interior design magazines -- *Design Times* and *House Beautiful* for one, and *Interior Design* and *Architectural Digest* for the other. *Frehling*, 192 F.3d at 1339-40. That scenario is inapplicable here. Thus, to use a hypothetical illustration, it is not as though Amazon advertises in *People* and Wreal advertises in *Us Weekly*. Instead, the advertising here is not similar. To continue with the hypothetical, Wreal does not advertise in magazines at all. This factor also favors Amazon.

### 6.  Intent

Explaining that "[c]ourts are divided on how to apply the defendants' intent in a reverse confusion case, with some applying a 'careless' standard, and others requiring intent to push the junior user out of the market" [ECF No. 261, p. 20], Wreal argues that a reasonable jury could find in its favor on the intent issue under either standard. But Judge Lenard summarized the Eleventh Circuit's construction of the intent requirement in forward-confusion cases as weighing against the defendant "[i]f a defendant purposefully used the same or confusingly similar mark as the plaintiff 'with the intent of deriving benefit from the reputation' of the plaintiff. . . ." [ECF No. 177, p. 13].

A district court in the Eleventh Circuit has adopted a similar approach to analyze intent in a reverse-confusion case like this case. *See Phelan Holdings*, 2017 WL 1135266, at *7 (internal citation omitted) ("It is unclear in the Eleventh Circuit whether intent remains a relevant factor in a reverse confusion case. The record is devoid of any evidence that [defendant] adopted its . . . mark in bad faith. Thus, if intent remains relevant in reverse

confusion cases, this factor weighs in [defendant's] favor because there is no evidence that [defendant] acted in bad faith or with the intent to force [plaintiff] out of business.").

Under this standard, the intent factor clearly weighs in Amazon's favor. There is no dispute that Amazon did not select the "Fire" brand for the Amazon Fire TV to confuse Wreal's customers or to drive Wreal out of business. Instead, it did so as a logical extension of its previous use of "Fire" on streaming media products, such as its tablets. [ECF Nos. 206, p. 5; 206-1, p. 219; 263, pp. 3–4].

As to Wreal's theory that it could prevail under both standards, the intent factor would *still* weigh in Amazon's favor under either theory. Wreal argues that Amazon was "careless," but Wreal does not explain why it was careless for Amazon to move forward with a different mark targeting a different market for a different product. Presumably, Wreal's theory is that Amazon was careless in progressing with a business plan to use Fire TV even though it was aware of Wreal's FyreTV mark. But it would not be careless if Amazon reasonably concluded that there would be no infringement because of the myriad factors already discussed here (and to be discussed below). Thus, Wreal's argument is circular, assuming the very point it is trying to make.

Wreal also argues that Amazon wanted to "push Wreal out of the market." [ECF No. 261, p. 20]. But the undisputed facts show the opposite: Amazon did *not* buy search terms around Wreal's "FyreTV" to direct Wreal's prospective customers to Amazon's Fire TV. [ECF Nos. 206, p. 6; 273, p. 5]. Rather, as the material Wreal cites makes clear [ECF

No. 273, p. 5], Amazon's only concern was that consumers searching for "Fire TV" or "Amazon Fire TV" (names in which Wreal has no trademark rights) would find the Amazon Fire TV and not end up on Wreal's pornographic website. [ECF No. 206, p. 6]. As Amazon's vice president of marketing testified: "My goal was customers . . . **if they search for Amazon FireTV, if they search for our product, I did not want them to first come across a porn site and have that experience**." [ECF No. 275-14, p. 8 (emphasis added)].

Wreal also argues that Amazon used the housemark Amazon "because Amazon was concerned that the Fire TV name would be associated with Wreal's FyreTV. . . ." [ECF No. 273, p. 8]. Yet this assertion (which Amazon contests [ECF No. 289, p. 2]) would weigh *in favor* of Amazon even in Wreal's version: it would show Amazon trying to *reduce*, rather than promote, any potential consumer confusion.

### 7.   Actual Confusion

No reasonable fact-finder could conclude that Wreal has shown actual confusion. Contrary to Wreal's incorrect contention, Wreal's customers did not contact it "expressing an association" between Amazon and Wreal. [ECF No. 261, p. 21]. Instead, they simply asked **if** Wreal's FyreTV app would be available on the Amazon Fire TV (and other services such as Google TV). [ECF Nos. 206, pp. 8–9; 263, p. 6]. That does not show any confusion as to source, affiliation, or sponsorship. It instead simply reveals that consumers were asking if Wreal's app would be available on Google TV, Amazon's Fire

44

TV, or elsewhere.

Wreal cites to a tweet that read: "Did you guys just merge with Amazon?" [ECF No. 263, p. 8]. But Wreal provides no other evidence from or about the author of the tweet. Wreal did not take the author's deposition to establish if the author/Tweeter was actually confused or making a joke or just sending a message for some other purpose.

Finally, Wreal references a single inquiry to Amazon, which Wreal describes as "a caller that contacted Amazon thinking he could access FyreTV®'s content on Fire TV." [ECF No. 261, p. 22]. This reference suffers from the same problem as Wreal's other example: there is no evidence that the caller was **actually confused** and believed Amazon is the source, affiliate, or sponsor of Wreal's FyreTV service (as opposed to simply asking whether Wreal's service is available on Amazon's product).

Judge Lenard already found that this single instance did not show confusion and then further observed, in the alternative, that "even if it did, [that] one inquiry out of 'tens of thousands of customer service inquiries related to Amazon's Fire TV' is <u>de minimis</u>." [ECF No. 177, p. 16 (emphasis added)].

Similarly, the Undersigned noted in the preliminary-injunction report that this instance was "insufficient to raise a fact issue." [ECF No. 130, p. 36]. Once more, there is no proof that anyone at all was actually confused. Instead, at best for Wreal, any confusion would be *de minimis* considering the tens of thousands of customer-service inquiries (or, in Wreal's preferred formulation, considering Wreal's 51,000 customers).

Wreal has not submitted any evidence or persuasive argument to change the earlier assessments made by Judge Lenard and the Undersigned. The Undersigned also previously stated, in the preliminary-injunction report, that "[t]he Eleventh Circuit has repeatedly dismissed occasional instances of actual confusion as *de minimis*, insufficient to raise a triable fact issue even on summary judgment . . . ." [ECF No. 130, p. 33 (collecting cases)].

The cases Wreal cites -- *Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931 (11th Cir. 2010) and *Ryder Systems, Inc. v. Storage & Moving Services, Inc.*, No. 13-61466-CIV, 2013 WL 3873231 (S.D. Fla. July 25, 2013) [ECF No. 261, pp. 21–22] -- involved actual confusion. *Caliber* involved car dealerships representing "a large portion of [plaintiff's] Georgia business." *Caliber*, 605 F.3d at 938 n.29. *Ryder* involved not just sworn testimony by a customer who detailed extensively how he hired the defendant while believing (incorrectly) that he had hired the plaintiff, but also sworn testimony by witnesses who testified about customer contacts where customers were very clearly actually confused. *Ryder*, 2013 WL 3873231, at *6. In fact, the customers in *Ryder* had complaints about the *defendant's* service, but they contacted the *plaintiff*, erroneously thinking that they had been dealing with the plaintiff. *Id.* at *3. There is no actual confusion like that in the evidentiary record here.

Finally, the Undersigned will address the survey evidence. Two separate surveys, conducted at two different times, found consumer confusion to be "very low" (Wreal's

Dr. Thomas Maronick) or "statistically insignificant" (Amazon's Dr. Dan Sarel). [ECF Nos. 206, p. 10; 263, p. 7]. Wreal makes several arguments about why the surveys should not compel summary judgment, but the arguments are not persuasive.

First, Wreal argues that Dr. Sarel's survey was run too early -- before awareness of the Amazon Fire TV was high enough to show confusion. [ECF No. 356, p. 3]. Second, Wreal argues that the Court should disregard Dr. Sarel's survey for summary-judgment purposes because the *Daubert* order held that Dr. Maronick's technical critiques of Dr. Sarel's survey were sufficiently reliable to go the jury, which, Wreal continues, means that Dr. Sarel's survey should have no weight at summary judgment. [ECF No. 357, pp. 3–4]. Third, and somewhat ironically, Wreal argues that its *own* expert's survey should be inadmissible for summary-judgment purposes. [ECF No. 263, p. 7].

But the Undersigned need not rely on *any* survey evidence to grant summary judgment to Amazon because the likelihood-of-confusion factors overwhelmingly favor Amazon. Amazon has no burden to present survey evidence to *disprove* confusion, so the entire discussion of survey evidence is, at best for Wreal, neutral. In other words, at trial it would be Wreal's burden to show likelihood of confusion; it is not Amazon's burden to show that confusion is *unlikely*.

Therefore, the Undersigned need not rely on survey evidence to support the conclusion that Amazon is entitled to summary judgment -- even though, contrary to Wreal's argument, it would be procedurally proper for the Court to consider the survey

by *Wreal's own expert* (showing no confusion). *See* Fed. R. Civ. P. 56(c)(1)(A) (allowing the parties to cite to "materials in the record," including "depositions" or "other materials," which would include Dr. Maronick's sworn testimony at the preliminary injunction stage and his later deposition).[12]

Wreal argues that the Court should disregard Dr. Sarel's survey because it was run "early" [ECF No. 356, p. 3], before consumer awareness of the Amazon Fire TV was high (or so Wreal claims). It similarly attempts to downplay Dr. Maronick's survey by dismissing it as only an early "pilot." [ECF No. 263, p. 7]. But, as this Court has previously noted, Dr. Maronick himself used the same survey format that he would later claim was inappropriate as too early when Dr. Sarel used it. [ECF No. 316, p. 28, n. 6].

Moreover, if Wreal is arguing that the surveys did not show confusion because consumers were not even aware of the Amazon Fire TV when the surveys were run, then

---

[12]    Wreal cites *LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, No. 08 C 242, 2010 WL 3766811 (N.D. Ill. Sept. 13, 2010) as support for its contention that Dr. Maronick's very-low-confusion survey is inadmissible. [ECF No. 263, p. 7]. In *LG Electronics*, however, Whirlpool, the party that originally retained the linguistics expert the other side later sought to use at trial, "did not list [the expert] in its Rule 26(a)(1) disclosures or its Rule 26(a)(2) expert disclosures." *LG Elecs. U.S.A.*, 2010 WL 3766811, at *1. But here, Wreal *did* identify Dr. Maronick as an expert witness for trial. [ECF No. 316, p. 41].

Wreal, in fact, argues extensively in its supplemental brief that Dr. Maronick's critiques of Dr. Sarel could be credited by a jury in a trial. [ECF No. 356, pp. 3–4]. Wreal presents no authority for the proposition that admissions by an expert disclosed by the party opposing summary judgment cannot be considered at summary judgment. To the contrary, courts commonly rely on admissions by the expert of the party opposing summary judgment to grant summary judgment. *See The Complaint of Bos. Boat III, LLC v. Galioto*, No. 13-62116-CIV, 2015 WL 5444162, at *8 (S.D. Fla. Sept. 16, 2015).

Wreal is contradicting its own complaint and factual allegations, which emphasized Amazon's saturation of the market immediately at the Amazon Fire TV launch, even before the surveys were conducted. [*See generally* ECF No. 1]; *see also Tiger Direct*, 2005 WL 1458046, at *21 ("Given the substantial press garnered by Apple's Tiger, the Court does not credit TigerDirect's argument that it is too early to assess whether there is actual confusion in the marketplace. . . .").

Even more fundamentally, however, Wreal's argument (that surveys did not show confusion because consumers were not aware of the Amazon Fire TV) would be an admission that Wreal cannot show reverse confusion as a matter of law. As the Undersigned has already held in the report on the *Daubert* motions, "a reverse confusion case requires a showing that consumers are aware of the junior mark: if they are not aware, then they cannot be confused." [ECF No. 316, p. 26].

As the Undersigned explained in that report:

> "Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark." *Sands, Taylor & Wood Co. v Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992). The injury results to the senior user because:

>> [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987).

A reverse confusion case requires a showing that the junior user has saturated the marketplace with advertising to an extent that consumers are likely to believe (incorrectly) that the junior user is responsible for the senior user's mark. *See Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 861 (9th Cir. 1996) (dismissing reverse confusion claim because plaintiff "failed to allege sufficient facts to state a claim for reverse confusion under the Lanham Act," including that plaintiff "does not contend that [defendant] saturated the market with advertising. . . .").

Thus, a reverse confusion case requires a showing that consumers are aware of the junior mark: if they are not aware, then they cannot be confused. McCarthy on Trademarks § 23:10 ("When few of the senior user's customers will be exposed to or familiar with the junior user's mark, there will be no 'overwhelming' or 'swamping' effect on the senior user's mark and good will. In that case, reverse confusion will be unlikely.") This is an area where Dr. Sarel, Dr. Maronick (Wreal's survey expert), and the relevant treatise authority are all in agreement. [ECF Nos. 229, Ex. 2 pp. 13 ("If there is no awareness, there can't be confusion."), 21; 221, Ex. 4, pp. 197-98 ("If no one knows about the Amazon Fire TV, then there is no confusion. . . .")].

[ECF No. 316, pp. 25–27].

Wreal is therefore in an illogical, untenable position. Wreal can acknowledge that its own expert's survey (and Dr. Sarel's survey, should that be considered) showed low confusion, which of course weighs against likelihood of confusion. **Or** Wreal can advance its summary-judgment-briefing argument: the surveys showed low confusion because consumers were not aware of Amazon's Fire TV. But if consumers were not aware of Amazon's Fire TV, then Wreal cannot show reverse confusion because the market saturation that must predicate a reverse-confusion case has not happened.

Thus, an argument that Dr. Sarel's or Dr. Maronick's surveys did not show

confusion because consumers are not sufficiently aware of the Amazon Fire TV is, for all practical purposes, an admission that reverse confusion does not exist. As Dr. Maronick testified: "If there is no awareness, there can't be confusion." [ECF No. 275-27, p. 5].

In short, Amazon is entitled to summary judgment *regardless* of the survey issues. Nevertheless, it is appropriate to rely on Dr. Maronick's surveys finding low confusion as further support for summary judgment in Amazon's favor, particularly when an assertion that these surveys were run too early (when consumers were not aware of the Amazon Fire TV) would be an implicit admission that reverse confusion cannot exist. Consequently, the actual-confusion factor favors Amazon whether or not the surveys are considered.

**B.** *No Need to Analyze Damages or Recoverable Profits*

The Lanham Act potentially makes available "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Amazon moved for summary judgment on the first two types of monetary recovery (Wreal's damages and Amazon's profits) because Wreal had presented no expert testimony that would provide a non-speculative basis for a fact-finder to award either.

But the Undersigned need not consider Amazon's argument as to why it is entitled to summary judgment on damages and recoverable profits because any monetary recovery requires a finding of liability, and the Undersigned has already concluded that Amazon is entitled to summary judgment on liability.

III.    **Conclusion**

For the foregoing reasons, the Undersigned respectfully recommends that the Court **grant** Amazon's summary-judgment motion [ECF No. 205] on all of Wreal's claims.

IV.    **Objections**

Under 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(b), the parties have 30 days after being served with a copy of this report and recommendations to serve and file written objections, if any, with the District Court. Each party may file a response to the other party's objection within 30 days of the objection.[13] Failure to timely file objections shall bar the parties from a *de novo* determination by the District Court of an issue covered in this report and recommendations and bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988), *cert. denied*, 488 U.S. 958 (1988).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on April 9, 2019.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

---

[13]    Given the length of this Report, the Undersigned is enlarging the 14-day deadlines for objections and responses to 30 days for each.

**<u>Copies furnished to</u>:**
The Honorable Joan A. Lenard
All Counsel of Record