## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 14-21385-CIV-LENARD/GOODMAN

**WREAL, LLC,**

        Plaintiff,

**v.**

**AMAZON.COM, INC.,**

        Defendant.

_____/

## ORDER ADOPTING REPORT AND RECOMMENDATIONS ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (D.E. 378) AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (D.E. 224)

**THIS CAUSE** is before the Court on the Report and Recommendation of Magistrate Judge Jonathan Goodman issued April 9, 2019, ("Report," D.E. 378), recommending that the Court grant Defendant Amazon.com, Inc.'s ("Amazon") Motion for Summary Judgment, ("Motion," D.E. 224). Plaintiff Wreal, LLC ("Wreal") filed Objections to the Report on May 9, 2019, ("Objections," D.E. 379), to which Amazon filed a Response on June 7, 2019, ("Response," D.E. 380). Upon review of the Report, Objections, Response, and the record, the Court finds as follows.

### I.    Background

####     a.    Undisputed Facts

Because Wreal does not object to Judge Goodman's recitation of Undisputed Facts, the Court repeats it here for consistency:

Wreal concedes the following facts from Amazon's statement of undisputed facts. Unless otherwise noted, the numbering below corresponds to the numbering in Amazon's statement of undisputed facts:

2.      Wreal's FyreTV exclusively offers pornographic content, not mainstream movies, and most of its offerings are hardcore pornography. [ECF Nos. 206, p. 2; 263, p. 1].

4.      Wreal's FyreTV.com website requires users to confirm that they are 18 years of age and willing to view adult content before they can enter. [ECF Nos. 206, p. 2; 263, p. 1].

5.      Wreal's FyreTV.com homepage shows several rows of highly explicit pornographic images. [ECF Nos. 206, p. 2; 263, p. 1].

6. The "Categories" page on Wreal's FyreTV.com website shows images from many different lurid pornography genres. [ECF Nos. 206, p. 3; 263, p. 1].

9. Wreal has never sold the Fyre BoXXX at any store or through any website other than FyreTV.com. [ECF Nos. 206, p. 3; 263, p. 1].

16. Wreal has lost money every year from its founding in 2007 to the present. [ECF Nos. 206, p. 4; 263, p. 3].

17. Wreal's revenues started declining in 2012, before the launch of the Amazon Fire TV. [ECF Nos. 206, p. 4; 263, p. 3].

22. In late 2012 and early 2013, Amazon was planning to introduce several new products, including a phone, a new generation of tablets, and a set-top box. [ECF Nos. 206, p. 5; 263, p. 4].[1]

---

[1]      Amazon also manufactures its own hardware, including e-readers under the "Kindle®" brand and tablets under the "Kindle Fire" name. [ECF No. 202-2, pp. 6–8]. By late 2012 or early 2013, Amazon began expanding its product line into new categories, including a streaming video device that would eventually become Fire TV. [ECF No. 202-2, p. 8]. Around the same time, Amazon started considering how it would brand its new streaming media player. Id. During those branding discussions, Amazon became aware of Wreal's FyreTV service. [ECF No. 202-2, p. 10]. Although Amazon knew of Wreal's marks, it decided on the Fire TV name anyway. [ECF No. 202-2, pp. 10–11]. Amazon did not contact Wreal about its plans to use the Fire TV name, which is why Wreal contends that it was shocked when it learned of Amazon's Fire TV. [ECF No. 202, p. 90].

25. Amazon Fire TV launched on April 2, 2014.[2] [ECF Nos. 206, p. 5; 263, p. 4].

26. Amazon markets the Amazon Fire TV as a set-top box for general interest content -- "instant access to Netflix, Prime Instant Video, WatchESPN," and more -- including selections like "House of Cards" and "Dora the Explorer" for video and "Pandora" for music. [ECF Nos. 206, p. 5; 263, p. 4].

27. Amazon markets the Amazon Fire TV's family-friendly features, advertising that the "FreeTime" service "revolutionizes parental controls – parents can choose what your kids see and set time limits for types of content and times of day." [ECF Nos. 206, p. 6; 263, p. 4].

35. The Amazon Fire TV does not have a DVD tray and cannot play DVDs. [ECF Nos. 206, p. 7; 263, p. 5].

37. Amazon advertises its Amazon Fire TV products through the Amazon.com homepage and other channels, including television, print media, and in-store displays at stores such as Best Buy and Staples. [ECF Nos. 206, p. 7; 263, p. 5].

---

[2]      According to Jason Gall, Amazon's Senior Manager, Product Management, Fire TV Business & Marketing, Amazon has expanded its use of the Fire TV mark to multiple products, including software pre-loaded on television sets. [*See* ECF No. 354-1]. Gall explained that, since 2015, the Amazon Fire TV has been available in the following forms: (a) Fire TV Streaming Media Player (multiple editions, including a box shape, pendant shape, Gaming Edition with a controller accessory, the Fire TV Stick, and the Fire TV Cube (with expanded functionality for Alexa)); and (b) Fire TV Edition (software preloaded on smart TV hardware from third party manufacturers Toshiba, Element, Westinghouse, and Insignia). [ECF No. 354-1, ¶ 2]. In addition, Amazon is accepting pre-orders for the Fire TV Recast (a DVR that lets one watch and record over-the-air TV (with an HD antenna) at home or on-the-go with a Fire TV, Echo Show, or compatible mobile device). [ECF No. 354-1, ¶ 3].

Galls' declaration (filed on October 11, 2018) also explains that there is an Amazon Fire TV app available for mobile devices (like tablets and smartphones). [ECF No. 354-1, ¶ 4]. This app functions as a remote control; it does not give access to any streaming content. Id. With the launch of the Amazon Fire TV Recast, the Amazon Fire TV app will allow the user to watch live or prerecorded content from an Amazon Fire TV Recast from over-the-air channels available through an HD antenna, such as ABC, CBS, FOX, NBC, PBS, and the CW. Id.

41. Amazon and Wreal do not offer one another's products on their respective websites: consumers cannot buy Amazon's Fire TV on Wreal's website, nor can they buy Wreal's FyreTV or Fyre BoXXX on Amazon's website. [ECF Nos. 206, p. 9; 263, p. 6].

42. Amazon offers Amazon's Fire TV through channels where consumers cannot purchase Wreal's FyreTV or Fyre BoXXX, including Amazon's own website, Best Buy, and Staples. Wreal has conceded that "the products are not sold at the same retail outlets." [ECF Nos. 206, p. 9; 263, p. 6].

43. Amazon has received tens of thousands of customer-service inquiries related to the Amazon Fire TV. [ECF Nos. 206, p. 9; 263, p. 6].

52. Dr. Jesse David, an expert retained by Wreal's counsel, has not performed an analysis quantifying Amazon's net profits on the Amazon Fire TV attributable to the alleged infringement, which he states is the proper method for analyzing recovery of profits. [ECF Nos. 206, p. 11; 263, p. 8].

Concerning the following facts, Wreal contends that they are "disputed." But the mere fact that Wreal says the facts are disputed does not mean that they are actually disputed or that the dispute concerns a material fact. For these so-called disputed facts, Wreal either (1) adds factual assertions that do not contradict (and in some cases support) Amazon's undisputed fact or (2) does not cite to any record evidence that creates a dispute. This strategy is problematic for Wreal and does not generate a factual dispute.

"The non-movant cannot defeat summary judgment by (a) resting upon mere allegations or denials, (b) simply <u>saying</u> the facts are in dispute, or (c) relying on evidence that is merely colorable or not significantly probative." <u>Katchmore Luhrs, LLC v. Allianz Global Corp. & Specialty</u>, No. 15-cv-23420, 2017 WL 432671, at *5 (S.D. Fla. Jan. 31, 2017) (internal quotation marks and citations omitted).

Thus, for the reasons explained below, the Undersigned also deems the facts that follow undisputed. The numbering corresponds to the format Amazon used in its statement of undisputed facts, with a brief explanation after each fact about how Wreal's responses fail to create a genuine dispute (such as by only slightly changing the undisputed fact in a non-material way).

1. Wreal's FyreTV is a pay-per-view streaming pornography service. Wreal describes its FyreTV service as "The Ultimate Adult Video On Demand Experience," a "porn pay per view service," and "the Netflix of Porn." [ECF No. 206, p. 2].

4

**Assessment of Purported Dispute**: Wreal does not actually dispute this fact; rather, Wreal adds only that "[i]t also offers subscription-based services." [ECF No. 263, p. 1].

3.  A person can become a FyreTV customer only by signing up for an account at the FyreTV.com website. [ECF No. 206, p. 2].

**Assessment of Purported Dispute**: Wreal adds only that a FyreTV customer can later buy content through any other device offering FyreTV, including Apple TV and Roku. [ECF No. 263, p. 1]. But Wreal does not dispute that a customer must first sign up for an account at FyreTV.com. In fact, Wreal prefaces its additional fact with the admission that "a customer must sign up for an account on Wreal's fyretv.com website. . . ." [ECF No. 263, p. 1].

12. Wreal's target market is pornography consumers. [ECF No. 206, p. 3].

**Assessment of Purported Dispute**: Although Wreal claims to dispute this fact, Wreal simply states, "Wreal targets people between the age of 20 and 50 with disposable income that are interested in purchasing pornography." [ECF No. 263, p. 2]. For our purposes, that amounts to the same thing that Amazon is saying.

13. Wreal does not believe its use of the "Netflix" mark infringes any trademarks because it believes Netflix operates in a different market. [ECF No. 206, p. 4].

**Assessment of Purported Dispute**: Wreal claims this fact is disputed, but Wreal then cites the same record testimony (from the December 30, 2014 preliminary-injunction hearing) that Amazon cites on this point and that plainly <u>supports</u> this factual assertion. [ECF No. 206, p. 129 ("Q. You call yourself the Netflix of porn because you are in a different market from Netflix, but both you and Netflix offer streaming video? A. Right."). Wreal even concedes that it and Netflix "are not direct competitors." [ECF No. 263, p. 2].

14. Wreal stopped all print, radio, trade show, and TV advertising by no later than 2012. [ECF No. 206, p. 4].

**Assessment of Purported Dispute**: Wreal "disputes" this fact by asserting that its advertising is in "constant flux" and that it "has advertised

5

through multiple mediums at different points in time, including television, radio, print, social media, search engines and trade shows." [ECF No. 263, p. 3]. Wreal, however, then candidly states that it "currently advertises on social media and through newsletters." Id. (emphasis added). Wreal does not say that it currently advertises in print, radio, at trade shows, or television, which is consistent with the record evidence that both it and Amazon rely on. [See ECF Nos. 232-17, p. 10 ("Q. . . You stopped investing in these other mediums in 2012, and then started focusing on tube sites; is that correct? [objection to form and scope] THE WITNESS: Yes. We -- We wanted to explore different ways to advertise."); 275-8, p. 6 ("Due to the nature of the content that is available now on our service, we limit our traditional print and television advertising. As a result, FyreTV markets its service primarily on the internet[.]")].

15. Wreal currently advertises online only on adult websites. [ECF No. 206, p. 4].

**Assessment of Purported Dispute**: Wreal's dispute of this fact, similar to its challenge of the previous undisputed fact, is that it "currently advertises on social media and through newsletters." [ECF No. 263, p. 3]. The Undersigned thus takes it as undisputed that Wreal, at one time, advertised on adult websites online but does not do so now, currently advertising only on social media and in newsletters.

20. Amazon selected the "Fire" brand in 2011 to show the evolutionary progression from the "Kindle" e-reader to the "Fire" tablets with streaming video capability. [ECF No. 206, p. 5].

**Assessment of Purported Dispute**: Wreal's claimed dispute relates solely to the functionality of the Kindle versus the Kindle Fire. [ECF No. 273, pp. 3–4]. Wreal does not dispute that Amazon chose the "Fire" name as a progression from the "Kindle" name.

23. Amazon decided to use the name "Fire" for all the new products (the phone, new generation of tablets, and set-top box), extending its previous use of "Fire" as its multimedia brand. [ECF No. 206, p. 5].

**Assessment of Purported Dispute**: Wreal simply says, "Disputed to the extent that Amazon used 'Fire' as a brand, rather than 'Kindle Fire.'" [ECF No. 263, p. 4]. Wreal, however, cites no record evidence for this assertion, and the record evidence Amazon cites clearly reflects that Amazon used "Fire" as a brand. [ECF No. 206-1, p. 219 ("Q. So what **brand** did Amazon decide to associate with this whole family of products? A. That would be the

Fire. Q. And why did Amazon decide to do [so]? A. Essentially, we had already started building a **brand.** We had a **brand** that we were leveraging called the Fire that meant multimedia. And that had we had [sic] been developing for multiple years, so we wanted to leverage that **brand** as we went into new categories.") (emphasis added)].

24. Amazon often markets its consumer electronics products with the "Amazon" name before its products' brand names: for example, the Amazon Echo, the Amazon Fire phone, and the Amazon Fire TV. [ECF No. 206, p. 5].

**Assessment of Purported Dispute**: Wreal simply adds that "Amazon does not consistently use its housemark when advertising its products." [ECF No. 263, p. 4]. But that added point does not contradict Amazon's assertion that it "often" -- and thus not necessarily always -- uses its housemark when advertising its products.

31. Amazon bought paid internet keyword ads for the Amazon Fire TV, but it did not buy ads for keywords around Wreal's FyreTV name or anything related to pornography. [ECF No. 206, p. 6].

**Assessment of Purported Dispute**: Wreal's claimed "dispute" is simply a claim that Amazon "bought Fire TV search terms on Google and Bing to ensure that Amazon's Fire TV was positioned first in the search results." [ECF No. 273, p. 5]. Therefore, both parties agree that Amazon "bought paid internet keyword ads for the Amazon Fire TV" [ECF No. 206, p. 6], and Wreal does not dispute that Amazon did not buy keyword ads for anything related to pornography or for keywords around Wreal's "FyreTV" name.

32. Amazon prohibits pornographic apps for the Amazon Fire TV. [ECF No. 206, p. 6].

**Assessment of Purported Dispute**: Wreal claims that "[t]here are apps available on Fire TV that stream pornographic content, including Showtime." [ECF No. 273, p. 5]. But the cited record evidence mentions only Showtime, and the deponent admitted, "I don't know if we have after-hours content [the adult content] in the app." [ECF No. 275-16, p. 8]. The Undersigned thus takes as undisputed the proposition that Amazon prohibits "pornographic apps" on the Amazon Fire TV.[3]

---

[3]     The Undersigned will also discuss later whether the content on the Showtime app is akin to Wreal's FyreTV content.

33. Amazon's content policies for both Amazon Instant Video (which streams on the Amazon Fire TV) and DVDs available on Amazon's website (whether sold by Amazon or third parties) prohibit pornography. [ECF No. 206, p. 7].

**Assessment of Purported Dispute**: Wreal does not dispute that the Amazon Instant Video policy -- which governs the Amazon Fire TV -- prohibits pornography. Wreal's only claimed dispute as to this fact relates to "Amazon's DVD content policy," which Wreal says "allows certain pornographic DVDs." [ECF 273, p. 5]. Wreal's additional fact, however, is not admissible; the Undersigned and Judge Lenard (including in the <u>Daubert</u> order) have consistently excluded as irrelevant evidence related to DVDs for sale on Amazon.com. [<u>See, e.g.</u>, ECF No. 349, pp. 10–14]. In fact, Judge Lenard's <u>Daubert</u> order <u>excludes</u> the opinion by Dr. Williams that Wreal cites as record support. [ECF No. 349, p. 14]. Further, as Amazon notes in its reply, "[Wreal] cites the wrong policy. The Amazon Instant Video (AIV) content policy governing Amazon Fire TV content bars <u>all</u> 'pornography.'" [ECF No. 288, p. 4, n. 10].[4]

34. The Amazon Fire TV "appears on Amazon's website, an Amazon-branded marketplace with other Amazon-branded products, such as the Kindle Fire, in a general consumer environment free from pornography." [ECF No. 206, p. 7].

**Assessment of Purported Dispute:** Wreal's claimed dispute cites only to an Amazon.com screenshot with several images from an earlier browsing history related to "adult" magazines. [ECF Nos. 263, p. 5; 275, p. 3; 275-20, pp. 2–4]. This screenshot, however, also has significant mainstream consumer content, such as "Black Friday" promotions and ads for running shoes, easily distinguishing it from the row upon row of pornography at FyreTV.com. Thus, the Undersigned takes it as undisputed that even if consumers had previously searched for pornographic magazines on Amazon.com, they would still be in a market environment with mainstream consumer content.

---

[4]     To be sure, Amazon's customer base includes those interested in shopping for pornography online, and Wreal put forth evidence that Amazon's customers shop for pornography. During a 9-month period in 2014, there were over 80,000 searches for "XXX" on Amazon's website, and Amazon conceded that people using that search term are looking for pornography. [ECF No. 275–35, p. 26].

Further, Wreal does not dispute the assertion that Amazon's Fire TV appears "on Amazon's website, an Amazon-branded marketplace with other Amazon-branded products, such as the Kindle Fire." [ECF No. 206, p. 7]. The Undersigned also takes this part of Amazon's assertion -- related to the Amazon Fire TV appearing on Amazon.com in what is, in essence, a mainstream consumer environment saturated with the "Amazon" brand -- as undisputed.

39. Differences between the FyreTV and Amazon Fire TV marks include: (a) one is red, the other yellow or orange; (b) one is two words, the other is one; (c) one includes a flame graphic, the other does not; (d) each has its own unique stylized font: one is with a "y" and the other with an "i"; and (e) one often has "Amazon" in front of it, and the other does not. [ECF No. 206, p. 8].

The following image is illustrative:





**Assessment of Purported Dispute:** Although Wreal claims this fact is disputed, its argument is actually about the <u>significance</u> of the differences; it does not (and cannot) deny that the claimed differences exist. Wreal even concedes that "the parties currently use different fonts and graphics to depict the marks visually" and that the marks have a "slightly different spelling." [ECF No. 263, p. 6]. Instead of disputing what Amazon claims are differences (except for saying that the name Fire TV in Amazon's image appears to be one word), Wreal points out claimed <u>similarities</u>, namely, that "both combine a variant of the arbitrary word 'Fire' with the descriptive 'TV'" and that both "use colors associated with fire." [ECF No. 263, p. 6].

But simply pointing out that the marks share some similarities does not create a factual dispute as to what Amazon claims are differences.

Phrased differently, Wreal does not actually dispute that one mark is "Fire" and one is "Fyre"; that the marks look different (Wreal actually concedes that the marks have different fonts and graphics); that, at least at times, Amazon's Fire TV is prefaced by "Amazon"; and that "Fire TV" is two words (as can be seen elsewhere in the evidentiary material).

For example, Amazon provided as evidence various screenshots showing how the Amazon Fire TV mark appears in commerce. [ECF No. 206-2, pp. 1–35]. This exhibit shows occasions when both the "Amazon" is before "Fire TV" and "Fire" and "TV" are two words. [See, e.g., ECF No. 206-1, pp. 10 *(*a chart comparing the "Fire TV Family"); 16 (graphic from Amazon.com advertising how the "Amazon Fire TV" is "NOW BETTER THAN EVER")].

The Undersigned therefore takes the marks' similarities and differences as undisputed and will discuss the significance of these similarities and differences later in this report.

40.     None of Wreal's 51,000 customers have contacted it about Amazon (other than customers asking if the FyreTV app will be available on Amazon's Fire TV). [ECF No. 206, pp. 8–9].

**Assessment of Purported Dispute:** Wreal claims this fact is disputed, but then says only: "Customers of FyreTV have asked Wreal about accessing FyreTV through Amazon, as noted by Amazon." [ECF No. 263, p. 6]. So rather than creating a factual dispute, Wreal is saying the same thing that Amazon is saying.

46.     A hardcore pornography site such as Wreal's FyreTV looks and feels very different to the viewer than a mainstream consumer site such as Amazon.com. [ECF No. 206, p. 10].

**Assessment of Purported Dispute:** Although Wreal claims that this fact is disputed, it does not cite any expert testimony to contradict the expert evidence Amazon cites, which includes an admission by **Wreal's** expert (Dr. Williams) that consumers "would not confuse" FyreTV.com with a mainstream consumer website. [ECF No. 232-38, p. 42 (emphasis added) ("Q. Do you agree that the visitor of the portal of a hardcore website like FyreTV.com is unlikely to think they are visiting a mainstream website that does not sell hardcore pornography? A. I agree that **they would not confuse the two**.")]. Instead, Wreal cites to a printout of what appears to be Amazon's website from a customer named "Paul" who had apparently previously searched for pornographic magazines. [ECF No. 275-20, pp. 2–4]. Wreal's

10

lone example still has plenty of mainstream consumer content, such as "Black Friday" promotions and ads for running shoes, easily distinguishing it from multiple rows of pornography at FyreTV.com.

The Undersigned thus takes it as undisputed that, as Wreal's own expert testified, a mainstream consumer website looks and feels very different to the viewer than a hardcore pornography site.

48.    Dr. Thomas Maronick, another expert retained by Wreal's counsel, conducted consumer surveys in April 2014 that showed "very low" consumer confusion. [ECF No. 206, p. 10].

**Assessment of Purported Dispute:** Wreal claims this fact is "[d]isputed and inadmissible." [ECF No. 263, p. 7]. The Undersigned will address Wreal's admissibility argument later. Concerning whether the fact is disputed, Wreal does not cite any record evidence that truly disputes Dr. Maronick's "very low consumer confusion" finding -- which Dr. Maronick testified to in the preliminary-injunction hearing. [ECF No. 202-3, p. 76]. Wreal states that Dr. Maronick's surveys were "pilot studies designed to test formatting and screening, not designed to reliably determine whether there is a likelihood of confusion." [ECF No. 263, p. 7]. But Dr. Maronick testified quite plainly that he did measure confusion: "I really didn't measure awareness particularly in my surveys. **I really measured confusion and found low levels of confusion**. . . ." [ECF No. 275-27, p. 13 (emphasis added)].

The Undersigned thus takes it as undisputed that Dr. Maronick's surveys showed "low levels of confusion," as he testified.

49.    Dr. Maronick testified that "[i]f awareness is very low, there is going to be low or no confusion." [ECF No. 225, p. 10].

**Assessment of Purported Dispute:** Wreal claims to dispute this fact, but the record evidence Wreal cites to, as well as the following exchange, support Amazon's statement. [See ECF No. 275-27, p. 13 (emphasis added) ("Q. I think what you said earlier today was that if awareness is very low, confusion is not going to be present, it was very unlikely? A. **That's correct**. You can't assess it. If it's there you can't measure it -- not likely to measure it -- assess it, measure it **because it is not there or it's very, very low**.")].

(Report at 5-20.)  The Court adopts this un-objected to recitation of Undisputed Facts.

### b.     Relevant Procedural History

On April 17, 2014, Wreal filed a Complaint against Amazon asserting claims for Trademark Infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a) (Count I); False Designation of Origin under the Lanham Act, 15 U.S.C. § 1125(a) (Count II); violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204 (Count III); Trademark Infringement under Florida law, Fla. Stat. 495.131, (Count IV); and Unfair Competition under Florida law, (Count V).  (D.E. 1.)

On September 22, 2014, Wreal filed a Motion for Preliminary Injunction, (D.E. 28), which the Court referred to Judge Goodman, (D.E. 35).  After holding an evidentiary hearing, (D.E. 118), Judge Goodman issued a Report recommending that the Court deny the Motion for Preliminary Injunction, (D.E 130).  On August 31, 2015, the Court entered an Order Adopting Judge Goodman's Report and denying Wreal's Motion for Preliminary Injunction.  (D.E. 177.)  Wreal appealed, and the Eleventh Circuit Court of Appeals affirmed the Court's Order in a published opinion.  Wreal, LLC v. Amazon.com, Inc., 840 F.3d 1244 (11th Cir. 2016).

At the close of discovery, the Parties filed several motions to exclude expert witness testimony and opinions under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), (D.E. 207-214), which the Court referred to Judge Goodman, (D.E. 238).  After holding an evidentiary hearing, (D.E. 299), Judge Goodman issued a Report recommending that the Court grant in part and deny in part the Daubert Motions, (D.E. 316).  On September 11, 2018, the Court adopted Judge Goodman's Report and granted in part and denied in part the Daubert Motions.  (D.E. 349.)

Also at the close of discovery, Amazon filed the instant Motion for Summary Judgment. (D.E. 205, 224.) The Court referred the Motion to Judge Goodman, (D.E. 341), who issued a Report recommending that the Court grant the Motion, (D.E. 378 at 52). Wreal has filed Objections, (D.E. 379), to which Amazon has filed a Response, (D.E. 380).

## II. Legal Standards

### a. Report and Recommendation

Upon receipt of the Magistrate Judge's Report and Petitioner's Objections, the Court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); accord Fed. R. Civ. P. 72(b)(3). The court must conduct a de novo review of any part of the Report that has been "properly objected to." Fed. R. Civ. P. 72(b)(3); see 28 U.S.C. § 636(b)(1) (providing that the district court "shall make a de novo determination of those portions of the [R & R] to which objection is made"). "Parties filing objections to a magistrate's report and recommendation must specifically identify those findings objected to. Frivolous, conclusive, or general objections need not be considered by the district court." Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988). Those portions of a magistrate's report and recommendation to which no objection has been made are reviewed for clear error. See Lombardo v. United States, 222 F. Supp. 2d 1367, 1369 (S.D. Fla. 2002); see also Macort. v. Prem, Inc., 208 F. App'x 781, 784 (11th Cir. 2006) ("Most circuits agree that [i]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.") (internal quotation marks

and citations omitted).  The Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

**b.     Summary Judgment**

On a motion for summary judgment, the Court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment can be entered on a claim only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In addition, under Federal Rule of Civil Procedure 56(f)(1), the Court may grant summary judgment for the non-moving party "[a]fter giving notice and a reasonable time to respond."  Fed. R. Civ. P. 56(f)(1); see also Gentry v. Harborage Cottages-Stuart, LLLP, 654 F.3d 1247, 1261 (11th Cir. 2011).  The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of [Rule 56] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (internal quotation omitted).  The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  A dispute about a material fact is genuine if the evidence is such that a reasonable fact-finder could return a verdict for the

14

nonmoving party.  Id. at 248; see also Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323.  Once the movant makes this initial demonstration, the burden of production, not persuasion, shifts to the nonmoving party.  The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324; see also Fed. R. Civ. P. 56(c).  In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  That party must demonstrate that there is a "genuine issue for trial." Id. at 587.  An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Id.

## III.   Discussion

Wreal alleges a reverse-confusion theory of trademark infringement.  (See Compl. ¶ 60.)  "Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user.  In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark."

15

Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 957 (7th Cir. 1992).  The

injury results to the senior user because

> [t]he public comes to assume that the senior user's products are really the
> junior user's or that the former has become somehow connected to the latter.
> The result is that the senior user loses the value of the trademark—its product
> identity, corporate identity, control over its goodwill and reputation, and
> ability to move into new markets.

Ameritech, Inc. v. Am. Info. Techs. Corp., 811 F.2d 960, 964 (6th Cir. 1987).  Based on

precedent from the former Fifth Circuit Court of Appeals,[5] "the reverse confusion doctrine

is presumed to apply in the Eleventh Circuit, but a state's substantive law may operate to

prevent its application."  Inmuno Vital, Inc. v. Golden Sun, Inc., 49 F. Supp. 2d 1344, 1352

(S.D. Fla. 1997) (citing Cap. Films Corp. v. Charles Fries Prods., 628 F.2d 387, 393 (5th

Cir. 1980)).

    To prevail on its trademark infringement and false designation of origin claims

under the Lanham Act (Counts I and II, respectively), Wreal must demonstrate that

Amazon's use of the Fire TV mark is likely to cause consumer confusion.  Custom Mfg.

& Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007) (false designation

of origin); Frehling Enters., Inc. v. Int'l Select Grp., Inc., 192 F.3d 1330, 1335 (11th Cir.

1999) (trademark infringement).  Wreal's state law claims are premised on its federal

trademark claims and rely on allegations of consumer confusion.  (See Compl. ¶¶ 75-96.)

"[T]he analysis of the Florida statutory and common law claims of trademark infringement

---

      [5]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh
Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit before
October 1, 1981.

and unfair competition is the same as under the federal trademark infringement claim."

Gift of Learning Found., Inc. v. TGC, Inc., 329 F.3d 792, 802 (11th Cir. 2003) (citing

Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 n. 4 (11th Cir. 2001);

Investacorp, Inc. v. Arabian Inv. Banking Corp., 931 F.2d 1519, 1521 (11th Cir. 1991)).

The Parties agree that the only element of Wreal's claims that is in dispute is the

likelihood of confusion element.  (See Mot. at 5; Resp. at 3.)   The likelihood of confusion

is assessed by analyzing the following factors:

> (1) distinctiveness of the mark alleged to have been infringed; (2) similarity
> of the infringed and infringing marks; (3) similarity between the goods or
> services offered under the two marks; (4) similarity of the actual sales
> methods used by the two parties, such as their sales outlets and customer
> base; (5) similarity of advertising methods; (6) intent of the alleged infringer
> to misappropriate the proprietor's good will; and (7) existence and extent of
> actual confusion in the consuming public.

Welding Servs. v. Forman, 509 F.3d 1351, 1360 (11th Cir. 2007) (citing Conagra, Inc. v.

Singleton, 743 F.2d 1508, 1514 (11th Cir. 1984)).   "The issue of likelihood of confusion is

not determined by merely analyzing whether a majority of the subsidiary factors indicates

that such a likelihood exists.  Rather, a court must evaluate the weight to be accorded the

individual factors and then make its ultimate decision."  AmBrit, Inc. v. Kraft, Inc., 812

F.2d 1531, 1538 (11th Cir. 1986).  "The appropriate weight to be given to each of these

factors varies with the circumstances of the case."  Id.

"Although likelihood of confusion is a question of fact, it may be decided as a matter

of law."  Tana v. Dantanna's, 611 F.3d 767, 775 n.7 (11th Cir. 2010) (citing Welding

Servs., 509 F.3d at 1361; Alliance Metal, Inc. v. Hinely Indus., Inc., 222 F.3d 895, 907

(11th Cir. 2000)).  Summary judgment is proper where no reasonable jury could find a

17

likelihood of confusion, Tana, 711 F.3d at 782, even if some of the factors weigh in the plaintiff's favor, see id. at 775-82 (affirming summary judgment for the defendant despite "conceded similarity between the two marks (factor two)" and "the undisputed similarity of the parties' sales methods (factor four)" because "these factors merely suggest a threshold potential for confusion"); Welding Servs., 509 F.3d at 1361 (affirming summary judgment for the defendant even though factors three, four, and five weighed in favor of the plaintiff).  "While there is no bright line test to determine the existence of a likelihood of consumer confusion, recovery under the Lanham Act requires, at a minimum, 'that confusion, mistake, or deception be 'likely,' not merely 'possible.''" Custom Mfg., 508 F.3d at 651 (quoting Sears Roebuck & Co. v. All States Life Ins. Co., 246 F.2d 161, 168 (5th Cir. 1957)).  In a reverse confusion case, the former Fifth Circuit approved the following standard: "likelihood of confusion occurs when a later user uses a tradename in a manner which is likely to cause confusion among ordinarily prudent purchasers or prospective purchasers as to the source of a product." Capital Films Corp. v. Charles Fries Prods., Inc., 628 F.2d 387, 393-94 (5th Cir. 1980) (citing Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 408 F. Supp. 1219 (D. Colo. 1976), modified on other grounds, 561 F.2d 1365 (10th Cir. 1977)); see also Custom Mfg., 508 F.3d at 651 (citing New Sensor Corp. v. CE Distribution LLC, 303 F. Supp. 2d 304, 310-11 (E.D.N.Y. 2004) (noting that a plaintiff must show "a probability, not just a possibility, of confusion," meaning "a likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question")).

Judge Goodman found that "no reasonable fact finder could find likelihood of confusion.  None of the likelihood of confusion factors favor Wreal; rather, all favor Amazon (or, at best, are neutral)."  (Report at 25-26.)

> Wreal has shown, at best, a "mere possibility" of confusion -- the **speculative possibility** that somehow, somewhere, some not-yet-identified group of consumers will encounter Wreal's FyreTV hardcore pornography service and think that this service must be associated with Amazon. Yet there is no record evidence from which a reasonable fact-finder could conclude that "an appreciable number of ordinarily prudent purchasers" are likely to be confused.

(Id. at 22.)  Accordingly, Judge Goodman concluded that Amazon is entitled to summary judgment on liability.  (Id.)  And because he concluded that Amazon is entitled to summary judgment on liability, he further concluded that he need not consider Amazon's arguments as to why it is entitled to summary judgment on damages.  (Id. at 51.)

For the reasons that follow, the Court finds that when viewing the facts in the light most favorable to Plaintiff, no reasonable jury could find a likelihood of confusion among ordinarily prudent or prospective purchasers—that is, Plaintiff has failed to establish a genuine issue of material fact as to whether ordinarily prudent or prospective purchasers are likely to be misled or confused as to the source of its product.

### a.    Distinctiveness of the mark alleged to have been infringed

This factor assesses the strength of the mark.  See Frehling, 192 F.3d at 1335 ("Classifying the type of mark Plaintiff has determines whether it is strong or weak.") (citing John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 973 (11th Cir. 1983)).

> The stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives.  See id. at 973. There are four categories of marks: (1) generic, (2) descriptive, (3)

suggestive, and (4) arbitrary.  See Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1182 (11th Cir.), cert. denied, 474 U.S. 845, 106 S. Ct. 134, 88 L. Ed. 2d 110 (1985).  The categories are based on the relationship between the name and the service or good it describes.  See John H. Harland Co., 711 F.2d 974.  Generic marks are the weakest and not entitled to protection—they refer to a class of which an individual service is a member (e.g., "liquor store" used in connection with the sale of liquor).  See Freedom Savings, 757 F.2d at 1182–83 n. 5.  Descriptive marks describe a characteristic or quality of an article or service (e.g., "vision center" denoting a place where glasses are sold).  See id.  "Suggestive terms suggest characteristics of the goods and services and require an effort of the imagination by the consumer in order to be understood as descriptive."  Dieter, 880 F.2d at 327 (internal quotation marks omitted).   For instance, "penguin" would be suggestive of refrigerators.  See Freedom Savings, 757 F.2d at 1182–83 n. 5.  An arbitrary mark is a word or phrase that bears no relationship to the product (e.g., "Sun Bank" is arbitrary when applied to banking services).  See id.  Arbitrary marks are the strongest of the four categories.  See id.

Also important in gauging the strength of a mark is the degree to which third parties make use of the mark.  See John H. Harland Co., 711 F.2d at 974–75; Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n, 651 F.2d 311, 316 (5th Cir. July 20, 1981).  The less that third parties use the mark, the stronger it is, and the more protection it deserves.  See John H. Harland Co., 711 F.2d at 975.

Finally, if a mark is "incontestable," that is, if it has been registered for five years with the Patent & Trademark Office, its holder has filed the affidavit required by 15 U.S.C. § 1065(3) with the Patent & Trademark Office, and the Patent & Trademark Office has accordingly declared the mark "incontestable," then the mark's incontestability serves to enhance its strength.  See Wilhelm Pudenz, GmbH v. Littlefuse, Inc., 177 F.3d 1204, 1208 (11th Cir. 1999); Dieter, 880 F.2d at 328–29.

Id. at 1335-36; see also Welding Servs., 509 F.3d at 1361.

Judge Goodman found (and it is undisputed that) Wreal's "FyreTV" mark is strong and distinctive.[6]  (Report at 26.)  However, he further found that "[t]he presence of the

---

[6]        Judge Goodman also found (and it is undisputed that) "Amazon" and "Amazon Fire TV" are strong and distinctive marks.  (Report at 26.)

highly distinctive 'Amazon' housemark, either (1) as part of the 'Amazon Fire TV' name or (2) when the product is simply 'Fire TV' but marketed on Amazon.com in an Amazon-branded environment with other Amazon products, such as the Kindle Fire, helps distinguish the products and makes this factor weigh in Amazon's favor." (Id. at 26-27.) Judge Goodman rejected Wreal's argument that Amazon's housemark alongside the "Fire TV" trademark actually aggravates the likelihood of confusion because Wreal does not also use its housemark alongside the "FyreTV" trademark. (Id. at 27.) He also rejected Wreal's argument that this factor is more important in a reverse-confusion case because the inquiry focuses on the junior user's mark. (Id. at 28.) Judge Goodman rejected these arguments because they relied on non-binding, out-of-circuit cases, and/or because the Court has previously rejected them in its Order denying Wreal's motion for a preliminary injunction.[7] (See id. at 26-28.)

In its Objections, Wreal argues that Judge Goodman (1) erroneously failed to address the commercial (as opposed to conceptual) strength of the marks, and (2) failed to properly assess the significance of Amazon's housemark—in this regard, Wreal argues that Judge Goodman should have adopted out-of-circuit authority to find that Amazon's use of

---

[7]    Wreal asserts a blanket objection to Judge Goodman's reliance on the Court's findings at the preliminary injunction stage. (Obj. at 2.) The Court agrees with Wreal that it is improper for a district court ruling upon a motion for summary judgment to rely on findings made during the preliminary injunction stage. Int' Bus. Machines, LLC v. BancTec, Inc., 459 F.3d 1186, 1192-93 (11th Cir. 2006). Therefore, to the extent that Judge Goodman relied on findings the Court made at the preliminary injunction stage, the Report is overruled. However, as discussed infra, the Court finds that this factor weighs in Amazon's favor under the proper summary judgment standard.

21

the Amazon housemark alongside the Fire TV trademark aggravates (rather than diminishes) the likelihood of confusion.  (Obj. at 5-7.)

In its Response, Amazon argues that Wreal did not present its "commercial strength" argument until it filed its proposed Report and Recommendations, which Judge Goodman ordered the Parties to file on December 19, 2018, (D.E. 360)—three years after the Parties had submitted their summary judgment briefs.  (Resp. at 7.)  Amazon further argues that the argument is meritless, and that the out-of-circuit authority that Wreal cites on the issue does not help Wreal.  (Id. at 7-8.)  Amazon further argues that Judge Goodman did properly assess the significance of the Amazon housemark—he simply rejected Wreal's arguments because:

> (1) Wreal's argument that a housemark aggravates confusion depends on non-binding, out-of-circuit cases such as A&H Sportswear[, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198 (3d Cir. 2000)] and Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947 (7th Cir. 1992); (2) this Court previously distinguished this authority by noting that in these cases (but not here) the marks were identical (see ECF No. 177 at 9–11); (3) by contrast, the Eleventh Circuit has observed in a forward confusion context that a housemark can make confusion less likely (see Custom Mfg., 508 F.3d at 652 n.10), and (4) thus similarly, in this reverse confusion context, Amazon's use of the housemark (either as part of the Amazon Fire TV name or when consumers encounter the product in an Amazon-branded environment with other Amazon products) makes confusion less likely because consumers will expect to see Amazon branding around the Amazon Fire TV product affiliated with Amazon.

(Id. at 8-9 (citing Report at 26-27).)

As an initial matter, the Court accepts the undisputed fact that Wreal's FyreTV mark is strong and distinctive.[8]

Next, the Court agrees with Amazon that Wreal failed to raise its "commercial strength" argument in its summary judgment briefing, (see D.E. 368 at 13), and first asserted the issue in its proposed Report and Recommendation, (D.E. 374 at 13-14).  By waiting to assert this argument until three years after it submitted its Response to Amazon's Motion for Summary Judgment, and by first asserting it in a proposed Report and Recommendation, Judge Goodman did not have the benefit of considering any reply from Amazon; Wreal was essentially asking Judge Goodman to issue findings of fact and/or conclusions of law that were not briefed.  Because the argument was not properly presented to the magistrate judge, the Court exercises its discretion to not consider it here.[9]  Williams

---

[8]    Although the Court's discussion of the "distinctiveness" factor could end here, the Eleventh Circuit has stated that "determining the strength of a mark requires a consideration of the mark's inherent distinctiveness." Tana, 611 F.3d at 776.  In this regard, Judge Goodman's Report, Wreal's Objections, and Amazon's Response address additional issues under the "distinctiveness" factor that may fall more squarely within the second factor—similarity of the marks.  To achieve uniformity with the Report, Objections, and Response, the Court addresses those additional issues in this subsection.

[9]    However, even if the Court were to consider the argument, it is meritless for the reason explained in Amazon's Response:

The out-of-circuit authority Wreal cites—A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198 (3d Cir. 2000)—says a court should evaluate commercial strength by looking at the junior and senior user's comparative commercial strength as well as "any advertising or marketing campaign by the junior user that has resulted in a saturation in the public awareness of the junior user's mark." Id. at 231.  Even though Wreal alleged in its Complaint that Amazon had saturated the market with advertising for the Amazon Fire TV (see, e.g., ECF No. 1 ¶ 33), Wreal quickly reversed course when consumer surveys by both Wreal's expert and Amazon's expert showed no confusion.  Wreal then argued that Amazon's survey—which was run several months after Amazon launched the Amazon Fire TV and Wreal filed its Complaint—showed no confusion because it

23

v. McNeil, 557 F.3d 1287, 1292 (11th Cir. 2009) ("[A] district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge.").

Next, the Court rejects Wreal's argument that Amazon's use of the Amazon housemark alongside the Fire TV trademark aggravates (rather than diminishes) the likelihood of confusion.  No reasonable juror could find that the use of Amazon's housemark next to its Fire TV mark—spelled and styled differently than FyreTV—creates (or aggravates) a likelihood of confusion as to the source of FyreTV.  Worthington Foods, Inc. v. Kellogg Co., 732 F Supp. 1417, 1440 (S.D. Ohio 1990) (finding, in a reverse confusion case, that "the house mark of a company tends to deemphasize the contested mark as a source of the goods or services[,]" and holding "that the display of a company's own familiar mark on a product reduces the likelihood of confusion which might stem from the simultaneous use of another's mark.") (citing Frisch's Rest., Inc. v. Shoney's Inc., 759 F.2d 1261, 1265 (6th Cir. 1985)); cf. Custom Mgf., 508 F.3d at 652 n.10 (observing, in a

---

was run too "early," before awareness of the Amazon Fire TV was high enough to show confusion. See ECF No. 356 at 3. This is a concession that the Amazon Fire TV mark did not have commercial strength because consumers were unaware of the mark.

Wreal now claims, however, that awareness has increased.  Yet Wreal cites no actual evidence to support its position.  See ECF No. 379 at 18 ("Certainly, there are cases where a larger, senior user fails to gain the attention of the market—but there's no evidence that this is the case here," following with factual assertions without any citation).  As Judge Goodman explained in the Report, Wreal's low-awareness argument is fatal to the reverse confusion theory (ECF No. 378 at 49–51).  It also demonstrates that Wreal cannot show commercial strength.

(Resp. at 7-8.)  Because there is no evidence of commercial strength, Wreal's objection is meritless.

forward confusion, case that where a mark appears alongside a house brand it reduces the likelihood of confusion) (citing <u>AutoZone, Inc. v. Tandy Corp.</u>, 373 F.3d 786 (6th Cir. 2004)).

For these reasons, the Court agrees with Judge Goodman and finds that this factor weighs in favor of Amazon.

### b.  Similarity of Marks

"Here, the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." <u>Frehling</u>, 192 F.3d at 1337 (citing <u>John H. Harland Co.</u>, 711 F.2d at 975-76).  "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features." <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 F.2d 252, 260–61 (5th Cir. 1980) (internal quotation marks omitted) (quoting <u>Restatement of Torts</u> § 729, cmt. B (1938)).  A court "must also consider the commercial impression created by the mark as a whole." <u>Id.</u> at 261 (collecting cases).  Stated differently, "[i]n evaluating the similarity of marks, [the court] must consider the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." <u>E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.</u>, 756 F.2d 1525, 1531 (11th Cir. 1985).

Judge Goodman found that although Wreal and Amazon's marks contain some similarities, the "'overall impression' created by the marks is different: different words, different fonts, different colors." (Report at 30.)  He further found that "[t]he effect of the

marks <u>as the parties actually use them in commerce</u> could not be more different." (<u>Id.</u>

(emphasis in original).)  For example:

> The parties do not dispute that a person can become a FyreTV customer <u>only</u> by first signing up for an account at Wreal's FyreTV.com website. [ECF Nos. 206, p. 2; 263, p. 1].  The parties similarly do not dispute that Wreal's FyreTV.com website is a hardcore pornography website, which means that a customer opening a FyreTV account will <u>always</u> encounter several (undisputed) features: (1) exclusively pornographic content, not mainstream movies; (2) a mandatory opt-in screen that requires users to confirm they are 18 years of age and willing to view adult content before they can enter; (3) a FyreTV.com homepage with several rows of highly explicit pornographic images; and (4) a "Categories" page on the FyreTV.com website with images from many different lurid pornographic genres. [ECF Nos. 206, pp. 2–3; 263, p. 1].
>
> Comparing the screenshots of Wreal's FyreTV.com website [ECF No. 232-1] with the screenshots of how Amazon's Fire TV appears in commerce [ECF No. 232-25] illustrates the point: the overall impression of how the parties use these marks in commerce could not be more different.

(Report at 30-31.)  Judge Goodman also quoted Wreal's expert, Dr. Linda Williams, who

testified at deposition that visitors to FyreTV.com "would not confuse" it with Amazon's

website. (<u>Id.</u> at 31.)  Judge Goodman was unpersuaded by Wreal's argument "that

Amazon's mark, to the relevant consumers, also appears alongside pornography." (<u>Id.</u> at

31.)  In this regard, Wreal submitted a screenshot from an Amazon customer named "Paul"

who had apparently searched Amazon.com for pornographic magazines—thus, in that

instance, the Amazon mark appeared alongside pornographic magazines. (<u>See</u> D.E. 275-

20.)  Judge Goodman found that "even this singular example contains a substantial amount

of mainstream consumer content, such as 'Black Friday' promotions and ads for running

shoes, easily distinguishing it from the row upon row of pornography at FyreTV.com."

(Report at 32.)  Thus, Judge Goodman concluded that "there is little similarity between

how the parties use their respective marks in their respective commercial environments. To the contrary, there is an immediate and obvious and significant difference." (Id. at 32.) As such, he found that this factor weighs in Amazon's favor.[10] (Id.)

In its Objections, Wreal argues that "[b]y crediting the portions of this analysis that show some differences, and ignoring the identical sound and meaning, Judge Goodman improperly weighed the evidence and failed to make the reasonable inference that, like in Dreamwerks [Prod. Grp., Inc. v. SKG Studio, 142 F.3d 1127, 1131 (9th Cir. 1998)], consumers could disregard the few differences and believe Amazon is the source of both." (Obj. at 8.)

Amazon argues that Wreal's position is "is inconsistent with Eleventh Circuit law and this Court's prior opinions[,]" and that Wreal has cited no authority supporting the proposition "that a fact issue exists whenever there is any similarity between two marks." (Resp. at 9.) It further notes that "Wreal simply ignores Judge Goodman's conclusion that the marks' presentation in commerce is overwhelmingly dissimilar." (Id. at 10.) It further notes that Wreal does not contest—or even mention—the concession by its own expert Dr. Linda Williams who testified that a visitor would not confuse a mainstream website like Amazon with the portal of a hardcore pornography website like Wreal. (Id.)

The Court finds that the fact that there are some similarities does not raise the issue to one of substantial confusion. See Domino's Pizza, 615 F.2d at 260-61 (comparing

---

[10]    To the extent that Judge Goodman relied on findings the Court made at the preliminary injunction stage, (see Report at 29), the Report is overruled. Int' Bus. Machines, 459 F.3d at 1192-93. However, as discussed infra, the Court finds that this factor weighs in Amazon's favor under the proper summary judgment standard.

similarity of design as to "Domino Granulated Pure Cane Sugar" and "Domino's Pizza," and finding them distinguishable).  The marks look different: they use different fonts and colors; the Parties spell the word Fire/Fyre differently; Wreal's mark is one word (FyreTV) while Amazon's is two words (Fire TV); and as discussed in the prior subsection, Amazon often uses its housemark alongside its Fire TV mark, which further distinguishes it from Wreal's mark.  Additionally, and importantly, as Judge Goodman observed, "[t]he effect of the marks <u>as the parties actually use them in commerce</u> could not be more different." (Report at 30.)  The fact that the marks sound the same does not overcome their obvious and substantial differences.  Accordingly, the Court agrees with Judge Goodman and finds that this factor weighs in favor of Amazon.  <u>See</u> <u>Sally Beauty Co., Inc. v. Beautyco, Inc.</u>, 304 F.3d 964, 972 (10th Cir. 2002) ("Although similarities are to be weighed more heavily than differences, the differences in this case are significant enough to lead us to conclude that this factor weighs in favor of Beautyco."); <u>Universal Money Ctrs., Inc. v. AT&T Co.</u>, 22 F.3d 1527, 1531 (10th Cir. 1994) (affirming district court's grant of summary judgment where similarity in marks' use of the term "universal" was greatly outweighed by significant differences in overall design of products); <u>Int'l Data Grp, Inc. v. J & R Elecs., Inc.</u>, 798 F. Supp. 135, 139 (S.D.N.Y. 1992) (finding, where the plaintiff used the registered mark "Computerworld" for a trade newspaper and the defendant used the logo "J & R Computer World" in connection with its retail electronics business, that "[t]he general impression created by the marks differs significantly, and there is no genuine issue of material fact on the issue of similarity of the marks and consumer confusion").

### c.      Similarity of Products

"This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties."  <u>Frehling</u>, 192 F.3d at 1338 (citing <u>E. Remy Martin</u>, 756 F.2d at 1530).

Judge Goodman found that the products were dissimilar.  (Report at 33.)  It rejected Wreal's argument that "consumers **may** assume that Amazon has put out two related (complementary) products, one to stream mostly mainstream movies and the other to stream mostly hardcore pornography" because it had "adduced no actual **evidence** that 'an <u>appreciable number</u> of ordinarily prudent purchasers' might make this assumption."  (<u>Id.</u>)

> Wreal's expert testimony from Dr. Williams merely establishes that perhaps there is some sense in which hardcore pornography could be "related" or "complementary" to (as Wreal argues) "a variety of material, including 'soft-core' pornography, R-rated movies, and mainstream content."  [ECF No. 357, p. 7].  But as quoted previously, Dr. Williams admitted that when it comes to the crucial inquiry of whether consumers were likely to confuse FyreTV.com with a mainstream website, like Amazon's, consumers "**would not confuse the two**." [ECF No. 232-38, p. 42 (emphasis added)].

> Wreal's own expert's concession that consumers are not likely to "confuse" FyreTV.com with Amazon's website is significant, and it shows why summary judgment in Amazon's favor is proper.  <u>See</u> <u>Phelan Holdings</u>, 2017 WL 1135266, at *4, *8 (granting summary judgment in a reverse-confusion case between owners of LongHorn Steakhouse and Pinchers seafood restaurants, noting that plaintiff "essentially concedes this point: '[n]o one confuses a LongHorn Steakhouse with a Pinchers'").

> The reason for this concession is obvious: regardless of whether in some market contexts (or in some academic sense) mainstream content and hardcore pornography could be considered "related," the undisputed fact on <u>this</u> evidentiary record about <u>these</u> marks for <u>these</u> products in <u>these</u> marketplaces is that mainstream content and hardcore pornography are kept apart from each other.

(Id. at 34.)  Judge Goodman went on to note that "Wreal's FyreTV has an over-18 opt-in

screen that warns about adult content, while Amazon's Fire TV does not"; "Amazon has

an entire content policy dedicated to keeping pornography **off** the Amazon Instant Video

streams on the Amazon Fire TV, while Wreal obviously does not (pornography is its

business)"; and "Amazon's Fire TV has parental controls, which Wreal does not have."

(Id. at 35.)

> A clear and graphic way to see the fundamental difference is to compare
> Amazon's Amazon Instant Video anti-pornography policy [ECF No. 232-
> 26] with the FyreTV.com homepage [ECF No. 232-1].     Everything
> Amazon's policy explicitly prohibits is graphically present on FyreTV.com.
> Wreal's use of the term "Netflix" as a descriptor for its service also
> demonstrates the point: Wreal calls itself the "Netflix of Porn" to illustrate
> that it is in a different market than a mainstream media company like Netflix.
> [ECF Nos. 206, pp. 4, 129; 263, p. 2].

(Id.)  Judge Goodman rejected Wreal's argument that Amazon Fire TV contains content

that is "pornographic or related to pornography" because it relied on expert testimony that

has been excluded.  (Id. at 35-36.)  Finally, he rejected Wreal's argument that Amazon Fire

TV offers pornographic content because it makes the HBO Go and Showtime apps

available, and customers can stream pornographic content through those third-party apps:

> First, the Showtime and HBO Go apps are products of different companies
> that are not available through Amazon's own Amazon Instant Video
> streaming service.  It is available only by using Amazon Fire TV as the means
> to access a range of services and apps, which include the Showtime service.
>
> Second, even assuming a third-party app is somehow attributed to Amazon,
> the one "soft-core" movie specifically identified on the Showtime app is part
> of a broader range of mainstream consumer offerings.  Wreal has offered no
> evidence that any consumer would believe he would be accessing hardcore
> pornography by, for example, opening the Showtime app.  (And, once more,

Wreal's expert has conceded that a consumer "would not confuse" Wreal's FyreTV with a mainstream site. [ECF No. 232-38, p. 42].)

Third, the one "soft-core" movie that is as [sic] part of Amazon's broad range of mainstream offerings is different from Wreal's hardcore pornographic options.  This single video is not the <u>hardcore</u> material that makes up most of Wreal's offerings [<u>see</u> ECF Nos. 206, p. 2; 263, p. 1], and Amazon takes aggressive steps to keep hardcore pornography <u>off</u> the Amazon Fire TV [<u>see</u> ECF Nos. 206, p. 7; 273, p. 5].  Indeed, Wreal has offered no evidence that a consumer who sees this Showtime "soft-core" offering in context would somehow think that the Amazon Fire TV service is itself pornographic.

(<u>Id.</u> at 36-37.)[11]  Ultimately, Judge Goodman found that "it is immediately obvious to a consumer, as the admission/concession of Dr. Williams (Wreal's expert) demonstrates, that FyreTV markets a strikingly dissimilar type of content to the Amazon Fire TV, and the factual record regarding these marks in this market context demonstrates the myriad ways that these products are kept separate from one another."  (<u>Id.</u> at 38-39.)

In its Objections, Wreal argues that "the fact that anyone can readily distinguish the only significant difference between the services – the content offered by each – is insufficient to show confusion is unlikely." (Obj. at 9.)  "The relevant question is whether consumers may think [the products] come from the same source, not whether they can readily distinguish them, a standard the Judge Goodman cites but fails to apply."  (<u>Id.</u> at 11.)  It argues that Judge Goodman disregarded evidence that both Wreal's FyreTV and Amazon's Fire TV are streaming video services, and "the complementary nature of the products makes confusion likely because consumers may assume that Amazon, a company

---

[11]    Judge Goodman also noted that Wreal "identified what it claims to be 'several pornographic DVDs, books and magazines available for purchase on Amazon's website.'" (Report at 36.)  However, the fact that Amazon.com sells some pornographic DVDs, books, and magazines is irrelevant to whether Amazon Fire TV is similar to Wreal's FyreTV.

that sells just about everything, puts out two complementary products, one to stream mainstream content, the other to stream adult content." (Id. at 9-10.) As evidentiary support, Wreal cites "testimony from Dr. Linda Williams, who this Court permitted to testify, that the content is complementary[,]" (id. at 10 (citing D.E. 130 at 24)), and "Amazon's expert, Dr. Peter Lehman, who said that major hotel chains offer both, and in evidence that large companies like Comcast stream both mainstream and pornographic content[,]" (id. at 11). Finally, Wreal argues that Judge Goodman improperly conflated this factor with the proximity factors. (Id. at 11-12.)

However, as Amazon points out in its Response, the Eleventh Circuit has found that the similarity-of-products factor weights in the defendant's favor when there are immediate and obvious differences between the products. (Resp. at 11 (citing Tana, 611 F.3d at 777-78; Ross Bicycles, Inc. v. Cycles USA, Inc., 765 F.2d 1502, 1057 (11th Cir. 1985); Amstar Corp., 615 F.2d at 261).) For example, in Tana the issue was whether the defendant's upscale Atlanta, Georgia sports restaurant, "Dantanna's," was confusingly similar to the plaintiff's Hollywood, California Italian restaurant, "Dan Tana's." 611 F.3d at 770. In addressing this factor, the Eleventh Circuit found that

> [a] comparison of the goods and services offered under the parties' marks (factor three) reveals overwhelming evidence that consumers would be unlikely to confuse the two restaurants. The goods and services provided in the parties' restaurants are strikingly dissimilar, and the record belies Plaintiff's assertion that Dantanna's in Atlanta provides "nearly identical" cuisine and ambiance to his Hollywood restaurant. In fact, the only apparent commonality between the two restaurants is that they are both fine-dining establishments serving meat and fish. Dan Tana's is an old-world-style Italian restaurant where mustached waiters dressed in tuxedos serve classic Italian dishes off a menu embellished with Italian language. The ambiance is cozy, intimate, romantic, low-lit, and the restaurant caters to Hollywood's

elite and to celebrities seeking a safe haven from paparazzi.  In stark contrast, Dantanna's in Atlanta is an upscale sports restaurant, targeting sports enthusiasts and serving contemporary American cuisine in a modern setting decorated with flat-screen televisions.

Id. at 777-78.

In Amstar Corp., the former Fifth Circuit disagreed with the district court's finding that the defendant's pizza was similar enough to the plaintiff's sugar and condiment products that this factor should weigh in favor of the plaintiff.  615 F.2d at 261.  "[W]e fail to see any great similarity between the respective parties' wares.  'About the only things they have in common are that they are edible.'"  Id. (quoting Cal. Fruit Growers Exchange v. Sunkist Baking Co., 166 F.2d 971, 973 (7th Cir. 1947)).

Finally, and perhaps most analogously, in Ross Bicycles, the Eleventh Circuit acknowledged that the products were similar—"both being bicycles"—but not so similar as to be likely to cause confusion.  765 F.2d at 1507.  Specifically, "[t]he size of the tubing, the style of wheels, pedals, seats, kickstands, and the difference in the frame angles on the Boss Cruiser and the Ross Diamond Cruiser are significant.  The bicycles not only look different, the evidence showed that they had different riding characteristics."  Id. Significantly, the Eleventh Circuit stated: "While the inherent degree of similarity between two bicycles is one factor to be evaluated in assessing the likelihood of confusion, Sun Banks of Fla., 651 F.2d at 318, obvious differences in the products must also be taken into account."  Id.  Accordingly, to the extent that Wreal assigns error to Judge Goodman's reliance on the products differences when analyzing this factor, the Court overrules the objection as inconsistent with Eleventh Circuit precedent.

33

And in this case, the differences between the products are at least as great as those in <u>Tana</u>, <u>Ross Bicycles</u>, and <u>Amstar Corp.</u>, if not greater: whereas Wreal offers <u>solely</u> pornographic content, the undisputed evidence demonstrates that Amazon goes to great lengths to keep hardcore pornography off of Amazon Fire TV.  It is undisputed that Amazon prohibits pornographic apps for the Amazon Fire TV, and Amazon's content policies for both Amazon Instant Video (which streams on the Amazon Fire TV) and DVDs available on Amazon's website (whether sold by Amazon or third parties) prohibit pornography.  (Pl.'s Facts ¶¶ 32-33.)

And despite evidence that the products are "complementary," there is no evidence from which a reasonable jury could conclude that the two products originate from a single source.  Cookies and milk are complementary products, but given their obvious differences, a reasonable jury would not conclude that they originate from the same source.  <u>See</u> <u>Tana</u>, 611 F.3d at 782 (finding that there was no likelihood of confusion because, inter alia, "[t]here are stark differences between the two restaurants' cuisine and ambiance").  Here, given the immediate and obvious differences between the Parties' products, the Court finds that no reasonable jury could confuse the two.  <u>Tana</u>, 611 F.3d at 777-78; <u>Ross Bicycles</u>, 765 F.2d at 1057; <u>Amstar Corp.</u>, 615 F.2d at 261.  Indeed, Wreal's expert witness testified as such.  (Williams Dep. at 164:13-14 (D.E. 232-38 at 42).)  Therefore, this factor weighs in favor of Amazon.

### d.     Similarity of the Sales Methods—e.g., sales outlets and customer base

"This factor takes into consideration where, how, and to whom the parties' products are sold."  <u>Frehling</u>, 192 F.3d at 1339.  "Direct competition between the parties is not

required for this factor to weigh in favor of a likelihood of confusion, though evidence that the products are sold in the same stores is certainly strong.  The parties' outlets and customer bases need not be identical, but some degree of overlap should be present." Id. (internal citation omitted).  "'Dissimilarities between the retail outlets for and the predominant customers of plaintiff's and defendant's goods lessen the possibility of confusion, mistake, or deception.'" Id. (quoting Amstar Corp., 615 F.2d at 262).

It is undisputed that FyreTV and Amazon Fire TV are not sold in the same retail outlets.  (Report at 39.)

> Wreal also concedes that "a customer must sign up for an account on Wreal's fyretv.com website. . . ." [ECF No. 263, p. 1]. And Wreal has offered no evidence that any consumer who visits its hardcore pornographic website would confuse it with Amazon. (Indeed, as previously discussed, Wreal's expert conceded the opposite -- that no consumer would confuse a hardcore website with a mainstream offering. [ECF No. 232-38, p. 42].)

(Id.)  Judge Goodman rejected Wreal's argument that Amazon's Fire TV customer base should be considered "similar" to Wreal's pornography customer base because "people that watch streaming online pornography" also "watch streaming mainstream content."

(Id.)

> The key inquiry here is whether Amazon markets the Amazon Fire TV to customers specifically in the market for streaming pornography. [See ECF No. 177, p. 12]. No reasonable fact-finder could draw this conclusion: Amazon did not buy internet keyword advertisements for anything related to pornography; Amazon prohibits pornographic apps on the Amazon Fire TV; Amazon's Fire TV content policy prohibits pornography; Amazon markets the Amazon Fire TV as a set-top box for general interest content -- "instant access to Netflix, Prime Instant Video, WatchESPN," and more -- including selections like "House of Cards" and "Dora the Explorer" for video and "Pandora" for music; and Amazon markets the Amazon Fire TV's family-friendly features. [ECF Nos. 206, pp. 5–7; 263, p. 4; 273, p. 5; 288, p. 4, n. 10]

Wreal, by contrast, markets exclusively to pornography viewers. [ECF No. 206, p. 3; 263, p. 2]. Wreal's advertising slogan (that it is the "Netflix of Porn") emphasizes the difference: Wreal does not believe that this slogan infringes any trademarks because Wreal believes Netflix operates in a different market. [ECF No. 206, p. 4; 263, p. 2]. In fact, Wreal concedes that Wreal and Netflix "are not direct competitors." [ECF No. 263, p. 2].

(Id. at 40-41.)  Thus, Judge Goodman found that this factor favors Amazon.  (Id. at 41.)

In its Objections, Wreal argues that the relevant inquiry "is whether the same people will be exposed to both marks[,]"and "there is ample evidence that Judge Goodman merely disregarded showing that the same relevant consumers are likely to encounter both marks." (Obj. at 12.)  "[T]he Court must consider that the infringer in this case is Amazon, one of the world's most dominant retailers.  This leads to the obvious inference that the parties share customers, and Wreal's customers are likely to be exposed to Amazon's infringing use of the mark."[12]  (Id. at 14.)

To begin with, Wreal cites no record evidence that the Parties share customers.  (See Wreal's Resp. to Mot. for Summ. J. (D.E. 274) at 13-14.)  In fact, although Wreal asserts that "that the infringer in this case is Amazon, one of the world's most dominant retailers," it cites no <u>evidence</u> establishing Amazon's dominance, and it does not ask the Court to take judicial notice of Amazon's alleged market dominance.  The only potentially relevant evidence that Wreal cites in its Response to Amazon's Motion for Summary Judgment is the following:

Wreal targets all adults over 20 with disposable income that are likely to pay for streaming online pornography.  SFD ¶ 12.  And Wreal's FyreTV® is

---

[12]    Wreal also argues that Judge Goodman erroneously analyzed the Parties' respective advertising methods, (id. at 12-13), but that is a separate factor and will be discussed in turn.

available on Roku, one of Amazon's top competitors, and yet another product that offers both mainstream and adult content, including Wreal's.  SFD ¶ 11, 30.

(Id. at 14.)   This evidence does not establish that the Parties share customers—if it establishes anything, it is that Wreal shares customers with Roku.  Nor does Wreal cite any evidence regarding the demographics of its customers compared to the demographics of Amazon's customers that would suggest that the Parties share customers.  Even if there is some overlap, the fact that the Parties share customers is insufficient, by itself, to tip this factor in Wreal's favor.  See Amstar Corp., 615 F.2d at 262 (finding "substantial" dissimilarities between sales methods and customer base of Domino's pizza and Domino sugar products).  However, without any evidence showing an overlap in customers, the Court must reject Wreal's argument.

And considering the substantial (and undisputed) dissimilarities in the Parties' sales methods, the Court agrees with Judge Goodman that this factor favors Amazon.  Briefly, the products are not sold in the same retail outlets: "Amazon offers Amazon's Fire TV through channels where consumers cannot purchase Wreal's FyreTV or Fyre BoXXX, including Amazon's own website, Best Buy, and Staples."  (D.E. 225 ¶ 42.)  Wreal does not sell the FyreTV through Amazon's website or any retail outlet in which Amazon's Fire TV is sold.  (Id.; D.E. 273 ¶ 9.)  Amazon's Fire TV appears on Amazon's website and Wreal's customers must sign up for an account on Wreal's fyretv.com website.  (D.E. 273 ¶ 3.)  After they sign up for an account on the fyretv.com website, Wreal's customers can purchase content through other devices where FyreTV is available, including Roku and Apple TV.  (Id.)

37

Because Wreal cites no evidence that the Parties share customers, and because there are substantial dissimilarities in the Parties' sales methods, the Court finds that this factor favors Amazon.

### e.    Similarity of Advertising

As the heading suggests, "[t]his factor looks to each party's method of advertising." Frehling, 192 F.3d at 1339 (citing John H. Harland Co., 711 F.2d at 976).  "Identity of periodicals is not required; the standard is whether there is likely to be significant enough overlap in the readership of the publications in which the parties advertise that a possibility of confusion could result."  Id.

According to the Report, it is undisputed "that Wreal does not now (and has not for several years) use the same advertising channels used by Amazon: the Amazon.com homepage, television, print media, and in-store displays.  [ECF Nos. 206, p. 7; 263, p. 5]. Wreal claims its advertising is 'constantly evolving' [ECF No. 261, p. 19], but it does not dispute that it stopped advertising in channels Amazon uses (such as print and TV) by no later than 2012. [ECF Nos. 206, p. 4; 263, p. 3]."  (Report at 41.)  Judge Goodman rejected Wreal's argument that the Court should consider the advertising similar because both parties use "social media, email, and search engines" and "word-of-mouth" because, according to Judge Goodman, "these methods are so broad as to make the advertising factor useless; nearly every mark in commerce uses these channels."  (Id.)

In its Objections, Wreal argues that Judge Goodman applied the wrong standard "by only considering evidence that the parties do not advertise through identical mediums, not whether there is significant overlap of the viewers of the advertisements 'such that

38

confusion could result.'"  (D.E. 379 at 12.)  Wreal concedes that "outside of the internet .

. . there is not much presently in the way of direct overlap with respect to advertising."

(Id.at 13.)  However, Wreal argues that Judge Goodman improperly discounted the fact

that both Parties advertise on the internet, through email, social media, and word-of-mouth.

(Id. at 12-13.)  It also argues that a reasonable jury could find a likelihood of confusion

based on the evidence that the Parties have advertised in "similar mediums" in the past,

and its "approach to advertising is constantly evolving."  (Id. at 13.)

The Court agrees with Judge Goodman and finds that the Parties do not use the same

advertising channels.  It is undisputed that Amazon advertises its Amazon Fire TV products

through the Amazon.com homepage and through other channels, including television, print

media, and in-store displays at stores such as Best Buy and Staples.  (Pl.'s Facts ¶ 37; Def.'s

Facts ¶ 37.)  On the other hand, Wreal currently advertises "on social media and through

newsletters[,]" and by word-of-mouth.  (Def.'s Facts ¶ 14.)  Wreal stopped all print, radio,

trade show, and TV advertising by no later than 2012.  (Pl.'s Facts ¶ 14.)  Wreal cites no

evidence, either in its Response to Amazon's Motion for Summary Judgment or its

Objections to Judge Goodman's Report, of any audience overlap in the Parties'

advertisements.

The Court rejects Wreal's argument that the fact that both Parties advertise on the

internet evinces a likelihood of confusion.  Wreal admits that it no longer advertises on the

internet, and when it did it was exclusively on adult websites.  (Id. ¶ 15.)  On the other

hand, Amazon's internet advertising is through the Amazon.com homepage.  (Id. ¶ 37.)

Amazon's internet marketing also included purchasing keywords for the Amazon Fire TV,

but it did not purchase ads for keywords pertaining to Wreal's FyreTV or anything related to pornography.  (Id. ¶ 31.)  The mere fact that Wreal at one time advertised on the internet is insufficient, by itself, to establish a likelihood of confusion.  See Tana, 611 F.3d at 778 ("[T]he only similarity in the advertising channels used by the two parties is their maintenance of websites on the World Wide Web.  This similarity would dispel rather than cause confusion, however, because the websites are separate and distinct, suggesting two completely unrelated business entities."); Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 637 (6th Cir. 2002) (finding that the "the availability of information about the parties' goods and services on the Internet" does not "automatically lead to the conclusion that they use common marketing channels").  And again, Wreal cites no evidence in its Response to Amazon's Motion or its Objections to Judge Goodman's Report of an overlap in viewership of the Parties' internet advertising.[13]

Likewise, to the extent that "word-of-mouth" can even be considered an "advertising channel" for purposes of the likelihood of confusion analysis, see Playmakers, LLC v. ESPN, Inc., 297 F. Supp. 2d 1277, 1283-84 (W.D. Wash. 2003) (finding that "word-of-mouth" is not marketing because it is not controlled by the promoter "and

---

[13]     In its Objections—but not in its Response to Amazon's Motion for Summary Judgment—Wreal states that it "put forth evidence that the parties share customers" and that "[t]heir respective target audiences are similar[.]"  (Obj. at 13.)  However, it fails to cite this evidence.  As the party opposing summary judgment, it is Wreal's burden to establish a genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other material." (emphasis added).  Wreal's failure to cite this evidence in its briefs is fatal.  It is not the Court's duty to mine the record—which in this case is extensive—to locate the evidence to which Wreal refers.

therefore cannot be used to establish a likelihood of confusion"), Wreal cites no evidence that Wreal's word-of-mouth audience overlaps with Amazon's word-of-mouth audience. See Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC, 680 F. Supp. 2d 1107, 1120 (N.D. Cal. 2010) (finding that this factor weighed against likelihood of confusion where, although both parties relied upon word-of-mouth referrals, there was no evidence that their word-of-mouth referrals involved the same demographic); Safeworks, LLC v. Spydercrane.com, LLC, No. 08–cv–0922–JPD, 2009 WL 4730821, at *8 (W.D. Wash. Dec. 7, 2009) (finding that this factor weighed against a likelihood of confusion where, although both parties marketed through word-of-mouth, "as do most businesses, there was no evidence at trial of any material overlap between the parties' respective relationships that they rely upon to sell their products"); see also Superior Consulting Servs., Inc. v. Shaklee Corp., Case No: 6:16–cv–2001–Orl–31GJK, 2017 WL 680076, at *5 (M.D. Fla. Feb. 21, 2017) (finding that this factor weighed "slightly in favor of likelihood of confusion" where there was evidence that word-of-mouth audience overlapped through the defendant's distributor network); cf. Newport Pac. Corp. v. Moe's Sw. Grill, LLC, No. 05–995–KI, 2006 WL 2811905, at *4 (D. Ore. Sept. 28, 2006) (discussing survey designed to measure likelihood of confusion in the context of "word-of-mouth advocacy" that found a 14% likelihood of confusion between Moe's Southwest Grill restaurants and Mo's Restaurants).

In sum: "While it is possible that some incidental overlap in marketing existed, the parties targeted largely different customers through different means. This factor suggests that confusion is unlikely." Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.,

41

186 F. Supp. 3d 741, 754 (W.D. Mich. 2016).  And because Wreal failed to cite any evidence of an overlap in audience, the Court finds that this factor weighs in favor of Amazon.

**f.    Amazon's Intent**

The Eleventh Circuit has explained that in a <u>forward</u> confusion case, "[i]f it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." <u>Frehling</u>, 192 F.3d at 1340.  However, as one court has observed: "In a reverse confusion case . . . the regular standard of intent does not apply because the much-larger defendant has no need to free ride on the goodwill of the lesser-known plaintiff." <u>Stuart J. Kaufman, M.D. & Assocs., P.A. v. Bausch & Lomb Inc.</u>, No. 8:13–CV–461–T–33EAJ, 2013 WL 6154166, at *9 (M.D. Fla. July 25, 2013) (citing 4 <u>McCarthy on Trademarks and Unfair Competition</u> § 23:10).  "The standard for intent in reverse confusion cases is an open question in this circuit." <u>Id.</u> at *10.  In reverse confusion cases, some courts apply a "carelessness" standard, <u>see</u> <u>Mars Musical Adventures, Inc. v. Mars, Inc.</u>, 159 F. Supp. 2d 1146, 1152 (D. Minn. 2001), while some courts require evidence of a "deliberate intent to push the senior user out of the market[,]" <u>Freedom Card, Inc. v. JPMorgan Chase & Co.</u>, 432 F.3d 463, 479 (3d Cir. 2005); <u>Phelan Holdings, Inc. v. Rare Hosp. v. Mgmt., Inc.</u>, CASE NO: 8:15–CV–2294–T–30TBM, 2017 WL 1135266, at *7 (M.D. Fla. Mar. 27, 2017).

Judge Goodman found that when analyzing this factor under the bad faith/intent standard it clearly favors Amazon because it is undisputed that "Amazon did not select the

'Fire' brand for the Amazon Fire TV to confuse Wreal's customers or to drive Wreal out of business.  Instead, it did so as a logical extension of its previous use of 'Fire' on streaming media products, such as its tablets." (Report at 43.)  He further found that this factor weighs in Amazon's favor under the "carelessness" standard because Amazon could reasonably conclude that there would be no infringement, as reflected by the other factors. (Id.)

In its Objections, Wreal argues that "[w]ith respect to bad faith, a reasonable jury may infer that Amazon took steps to purposefully drive Wreal out of the market." (Obj. at 18.)  As evidence, it cites the fact that Amazon purchased search terms from Google for Amazon Fire TV so that consumers would be routed to Amazon.  (Id.)

The undisputed evidence establishes that Amazon bought paid internet keyword ads for the Amazon Fire TV but did not purchase ads for Wreal's FyreTV name or anything related to pornography.  (Pl.'s Facts ¶ 31; see Prelim. Injunction Evid. Hr'g Tr. (D.E. 206-1) at 212:19 – 213:4.)  Amazon's vice-president of marketing testified at a deposition: "My goal was customers . . . if they search for Amazon Fire TV, if they search for our product I did not want them to first come across a porn site and have that experience."  (Neil Lindsay Depo. Tr. at 158:11-16 (D.E. 275-14 at 8).)  The Court rejects Wreal's argument that a reasonable jury could look at this evidence and conclude that Amazon purchased search terms around "Fire TV and "Amazon Fire TV"—which is the name of Amazon's product—with a bad faith (or other) intent to deceive consumers or drive Wreal out of the market.  See Alzheimer's Disease & Related Disorders Ass'n v. Alzheimer's Found. of Am., Inc., 307 F. Supp. 3d 260, 298 (S.D.N.Y. 2018) (finding that this factor favored the

defendant because the trial evidence pertaining to whether the defendant purchased keywords associated with the plaintiff's marks with the intent to deceive was "rare" and "circumstantial").

Wreal does not specifically object to Judge Goodman's finding that this factor weighs in favor of Amazon under a carelessness standard, and the Court finds that Judge Goodman's finding on that point is not clearly erroneous.

For these reasons, the Court finds that this factor favors Amazon.

### g.    Actual confusion

"[E]vidence of actual confusion is the best evidence of a likelihood of confusion." Frehling, 192 F.3d at 1340 (citing John H. Harland Co., 711 F.2d at 978); see also Tana, 611 F.3d at 779 ("[A]ctual confusion in the consuming public, is the most persuasive evidence in assessing likelihood of confusion.") (citing Alliance Metals, 222 F.3d at 907). "However, such evidence is not a prerequisite, and thus it is up to individual courts to assess this factor in light of the particular facts of each case." Id. (citing Amstar, 615 F.2d at 263).

In its Response to Amazon's Motion for Summary Judgment, Wreal cited the following evidence as "actual confusion": (1) "several instances of [Wreal's] customers that contacted [Wreal] expressing an association between Amazon and FyreTV[,]" (citing Def.'s Facts ¶ 40); (2) "an audio recording of a caller that contacted Amazon thinking he could access FyreTV's content on Fire TV." (Resp. at 22.)

In his Report, Judge Goodman found that "[n]o reasonable fact-finder could conclude that Wreal has shown actual confusion." (Report at 44.) He found that evidence that Wreal's customers contacted Wreal to ask if Wreal's FyreTV app would be available

on Amazon Fire TV (and other services) did not show any confusion as to source, affiliation, or sponsorship.  (Id.)  Likewise, he found that "there is no evidence that the caller was **actually confused** and believed Amazon is the source, affiliate, or sponsor of Wreal's FyreTV service (as opposed to simply asking whether Wreal's service is available on Amazon's product)."  (Id. at 45 (emphasis in original).)  He also notes that in its Order denying Wreal's Motion for Preliminary Injunction, the Court already found that this single caller did not show confusion and, "even if it did, [that] one inquiry out of 'tens of thousands of customer service inquiries related to Amazon's Fire TV' is de minimis."  (Id. (quoting D.E. 177 at 16).)  Judge Goodman agreed that any confusion evidenced by this one caller is de minimis "considering the tens of thousands of customer-service inquiries (or, in Wreal's preferred formulation, considering Wreal's 51,000 customers)."[14]  (Id.) Although Wreal did not cite it in its Response to Amazon's Motion for Summary Judgment, Judge Goodman also addressed a tweet that Wreal cited in its Statement of Additional Facts Which Wreal Contends are Material.  (See D.E. 263, 273 ¶ 53.)  The tweet asks: "Did you guys just merge with Amazon?"  (Id.)  Judge Goodman noted that Wreal provided no other evidence regarding this tweet such that one could conclude that its author was exhibiting actual confusion.  (Id.)

Furthermore, Judge Goodman distinguished the cases on which Wreal relied—

Caliber Automotive Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC, 605 F.3d 931

---

[14]     To the extent that Judge Goodman relied on findings the Court made at the preliminary injunction stage, the Report is overruled.  Int' Bus. Machines, 459 F.3d at 1192-93. However, as discussed infra, the Court finds that this factor weighs in Amazon's favor under the proper summary judgment standard.

(11th Cir. 2010) and <u>Ryder Systems, Inc. v. Storage & Moving Servs., Inc.</u>, No. 13-61466-CIV, 2013 WL 3873231 (S.D. Fla. July 25, 2013)—on the ground that those cases involved substantial evidence of actual confusion.  (<u>Id.</u> at 46.)  Finally, Judge Goodman addressed the survey evidence in this case which found consumer confusion to be "very low" (Wreal's expert, Dr. Maronick) or "statistically insignificant" (Amazon's expert, Dr. Sarel).  (<u>Id.</u> at 46-47.)

First, Wreal argues that Dr. Sarel's survey was run too early -- before awareness of the Amazon Fire TV was high enough to show confusion. [ECF No. 356, p. 3].  Second, Wreal argues that the Court should disregard Dr. Sarel's survey for summary-judgment purposes because the <u>Daubert</u> order held that Dr. Maronick's technical critiques of Dr. Sarel's survey were sufficiently reliable to go the jury, which, Wreal continues, means that Dr. Sarel's survey should have no weight at summary judgment. [ECF No. 357, pp. 3–4]. Third, and somewhat ironically, Wreal argues that its <u>own</u> expert's survey should be inadmissible for summary-judgment purposes. [ECF No. 263, p. 7].

But the Undersigned need not rely on <u>any</u> survey evidence to grant summary judgment to Amazon because the likelihood-of-confusion factors overwhelmingly favor Amazon.  Amazon has no burden to present survey evidence to <u>disprove</u> confusion, so the entire discussion of survey evidence is, at best for Wreal, neutral.  In other words, at trial it would be Wreal's burden to show likelihood of confusion; it is not Amazon's burden to show that confusion is <u>unlikely</u>.

Therefore, the Undersigned need not rely on survey evidence to support the conclusion that Amazon is entitled to summary judgment -- even though, contrary to Wreal's argument, it would be procedurally proper for the Court to consider the survey by <u>Wreal's own expert</u> (showing no confusion). <u>See</u> Fed. R. Civ. P. 56(c)(1)(A) (allowing the parties to cite to "materials in the record," including "depositions" or "other materials," which would include Dr. Maronick's sworn testimony at the preliminary injunction stage and his later deposition).[15]

---

[15]     Wreal cites <u>LG Electronics U.S.A., Inc. v. Whirlpool Corp.</u>, No. 08 C 242, 2010 WL 3766811 (N.D. Ill. Sept. 13, 2010) as support for its contention that Dr. Maronick's very-low-confusion survey is inadmissible. [ECF No. 263, p.

Wreal argues that the Court should disregard Dr. Sarel's survey because it was run "early" [ECF No. 356, p. 3], before consumer awareness of the Amazon Fire TV was high (or so Wreal claims). It similarly attempts to downplay Dr. Maronick's survey by dismissing it as only an early "pilot." [ECF No. 263, p. 7]. But, as this Court has previously noted, Dr. Maronick himself used the same survey format that he would later claim was inappropriate as too early when Dr. Sarel used it. [ECF No. 316, p. 28, n. 6]. Moreover, if Wreal is arguing that the surveys did not show confusion because consumers were not even aware of the Amazon Fire TV when the surveys were run, then Wreal is contradicting its own complaint and factual allegations, which emphasized Amazon's saturation of the market immediately at the Amazon Fire TV launch, even before the surveys were conducted. [See generally ECF No. 1; see also Tiger Direct, 2005 WL 1458046, at *21 ("Given the substantial press garnered by Apple's Tiger, the Court does not credit TigerDirect's argument that it is too early to assess whether there is actual confusion in the marketplace. . . .").

Even more fundamentally, however, Wreal's argument (that surveys did not show confusion because consumers were not aware of the Amazon Fire TV) would be an admission that Wreal cannot show reverse confusion as a matter of law. As the Undersigned has already held in the report on the Daubert motions, "a reverse confusion case requires a showing that consumers are aware of the junior mark: if they are not aware, then they cannot be confused." [ECF No. 316, p. 26].

As the Undersigned explained in that report:

---

7]. In LG Electronics, however, Whirlpool, the party that originally retained the linguistics expert the other side later sought to use at trial, "did not list [the expert] in its Rule 26(a)(1) disclosures or its Rule 26(a)(2) expert disclosures." LG Elecs. U.S.A., 2010 WL 3766811, at *1. But here, Wreal did identify Dr. Maronick as an expert witness for trial. [ECF No. 316, p. 41].

Wreal, in fact, argues extensively in its supplemental brief that Dr. Maronick's critiques of Dr. Sarel could be credited by a jury in a trial. [ECF No. 356, pp. 3–4]. Wreal presents no authority for the proposition that admissions by an expert disclosed by the party opposing summary judgment cannot be considered at summary judgment. To the contrary, courts commonly rely on admissions by the expert of the party opposing summary judgment to grant summary judgment. See The Complaint of Bos. Boat III, LLC v. Galioto, No. 13-62116-CIV, 2015 WL 5444162, at *8 (S.D. Fla. Sept. 16, 2015).

"Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark." Sands, Taylor & Wood Co. v Quaker Oats Co., 978 F.2d 947, 957 (7th Cir. 1992). The injury results to the senior user because:

> [t]he public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

Ameritech, Inc. v. Am. Info. Techs. Corp., 811 F.2d 960, 964 (6th Cir. 1987).

A reverse confusion case requires a showing that the junior user has saturated the marketplace with advertising to an extent that consumers are likely to believe (incorrectly) that the junior user is responsible for the senior user's mark.  See Murray v. Cable Nat'l Broad. Co., 86 F.3d 858, 861 (9th Cir. 1996) (dismissing reverse confusion claim because plaintiff "failed to allege sufficient facts to state a claim for reverse confusion under the Lanham Act," including that plaintiff "does not contend that [defendant] saturated the market with advertising. . . .").

Thus, a reverse confusion case requires a showing that consumers are aware of the junior mark: if they are not aware, then they cannot be confused. McCarthy on Trademarks § 23:10 ("When few of the senior user's customers will be exposed to or familiar with the junior user's mark, there will be no 'overwhelming' or 'swamping' effect on the senior user's mark and good will. In that case, reverse confusion will be unlikely.")  This is an area where Dr. Sarel, Dr. Maronick (Wreal's survey expert), and the relevant treatise authority are all in agreement.  [ECF Nos. 229, Ex. 2 pp. 13 ("If there is no awareness, there can't be confusion."), 21; 221, Ex. 4, pp. 197-98 ("If no one knows about the Amazon Fire TV, then there is no confusion. . . .")].

[ECF No. 316, pp. 25–27].

Wreal is therefore in an illogical, untenable position. Wreal can acknowledge that its own expert's survey (and Dr. Sarel's survey, should that

be considered) showed low confusion, which of course weighs against likelihood of confusion. **Or** Wreal can advance its summary-judgment-briefing argument: the surveys showed low confusion because consumers were not aware of Amazon's Fire TV. But if consumers were not aware of Amazon's Fire TV, then Wreal cannot show reverse confusion because the market saturation that must predicate a reverse-confusion case has not happened.

Thus, an argument that Dr. Sarel's or Dr. Maronick's surveys did not show confusion because consumers are not sufficiently aware of the Amazon Fire TV is, for all practical purposes, an admission that reverse confusion does not exist. As Dr. Maronick testified: "If there is no awareness, there can't be confusion." [ECF No. 275-27, p. 5].

(Id. at 47-51.)  Ultimately, Judge Goodman concluded that it was appropriate to rely on Dr. Maronick's survey finding low confusion, but that the actual confusion factor weighs in favor of Amazon whether or not the surveys are considered.  (Id. at 51.)

In its Objections, Wreal argues that a reasonable jury could conclude that the "confused caller" contacted Amazon about whether FyreTV could be accessed from Amazon's Fire TV because they were confused by the similar name. (Obj. at 16.) It further objects to Judge Goodman's finding that the tweet is not evidence of consumer confusion (even though it did not cite the tweet as evidence of consumer confusion in its Response to Amazon's Motion for Summary Judgment).  (Id.)  It further objects to Judge Goodman's finding that even if the caller and tweet are evidence of actual confusion, the evidence is de minimis.  (Id.)  In this regard, it argues that "it is a case where evidence of confusion by few is evidence of confusion by many."  (Id. at 17 (citing Ryder Sys., 2013 WL 3873231, at *6).  In a separate section of its Objections, Wreal argues that the Court should not consider the expert witnesses' surveys as evidence of non-confusion, and that a reasonable jury could conclude that Dr. Sarel's survey was methodologically flawed.  (Id. at 17-18.)

The Court agrees with Judge Goodman that no reasonable jury could conclude that the caller who contacted Amazon about whether FyreTV could be accessed from Amazon's Fire TV was actually confused as to source, affiliation, or sponsorship. The Court further agrees that the tweet does not evince any actual confusion. Armstrong Cork Co. v. World Carpets, Inc., 597 F.2d 496, 505-06 (5th Cir. 1979) (rejecting the defendant's argument that commentary in a trade magazine was evidence of actual confusion because it was "impossible to determine whether the author of the comments was actually confused, merely speculating, or attempting to be humorous about whatever it was he or she was writing about").

Even if the call and tweet evinced actual confusion, this factor would nevertheless weigh in Amazon's favor because one random tweet and one vague phone call out of approximately 65,000 customer service inquiries related to Amazon's Fire TV, (Prelim. Injunction Evid. Hr'g Tr. at 310:1), and 51,000 Wreal customers, (id. at 142:8-11), is de minimis. "De minimis evidence of actual confusion does not establish the existence of a genuine issue of material fact regarding the likelihood of confusion." Universal Money Ctrs., Inc. v. AT&T Co., 22 F.3d 1527, 1535 (10th Cir. 1994). See also George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 400 (4th Cir. 2009) ("[W]e are aware of no case where a court has allowed a trademark infringement action to proceed beyond summary judgment where two weak marks were dissimilar, there was no showing of a predatory intent, and the evidence of actual confusion was de minimis.");[16] Savin Corp. v. Savin Grp.,

---

[16]     The Court acknowledges that this case is distinguishable from George & Co. in that it is undisputed here that both marks are strong.

50

391 F.3d 439, 459 (2d Cir. 2004) ("A single 'anecdote[ ] of confusion over the entire course of competition,' however, 'constitute[s] <u>de minimis</u> evidence insufficient to raise triable issues.'") (quoting <u>Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.</u>, 269 F.3d 114, 124 (2d Cri. 2001)); <u>King of the Mountain Sports, Inc. v. Chrysler Corp.</u>, 185 F.3d 1084, 1092-93 (10th Cir. 1999) (concluding, where the plaintiff identified "at most, only seven examples of actual confusion," that "[t]his handful of anecdotal evidence is de minimis and does not support a finding of a genuine issue of material fact as to the likelihood of confusion, especially in light of the complete lack of similarity between the defendants' uses and plaintiff's mark"); <u>Water Pik, Inc. v. Med-Sys., Inc.</u>, 848 F. Supp. 2d 1262, 1275 (D. Colo. 2012) (finding that "actual confusion" factor weighed in favor of counter-defendant "because the undisputed evidence shows only de minimis actual confusion and a likelihood of confusion of 0.6%"), <u>aff'd</u> 726 F.3d 1136 (10th Cir. 2013).

Wreal did not object to Judge Goodman's finding that evidence that Wreal's customers contacted Wreal to ask if Wreal's FyreTV app would be available on Amazon Fire TV (and other services) did not show any confusion as to source, affiliation, or sponsorship. The Court finds that Judge Goodman's finding on that point is not clearly erroneous.

The Court need not decide whether Dr. Maronick's and Dr. Sarel's surveys may properly be considered as evidence of low confusion or no confusion, because Wreal has failed to carry its burden of producing any evidence of actual confusion. <u>See</u> <u>Celotex</u>, 477 U.S. at 322-23 ("[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."). As Judge Goodman

noted: "Amazon has no burden to present survey evidence to <u>disprove</u> confusion, so the entire discussion of survey evidence is, at best for Wreal, neutral.  In other words, at trial it would be Wreal's burden to show likelihood of confusion; it is not Amazon's burden to show that confusion is <u>unlikely</u>."  (Report at 47.)

In sum, upon analyzing all of the relevant factors in light of the summary judgment record in this case, the Court finds that no reasonable jury could find a likelihood of confusion between Wreal and Amazon's products.  At best, Wreal has shown a <u>possibility</u> of confusion.  However, "recovery under the Lanham Act requires, at a minimum, 'that confusion, mistake, or deception be 'likely,' not merely 'possible.'''  <u>Custom Mfg.</u>, 508 F.3d at 651 (quoting <u>Sears Roebuck & Co.</u>, 246 F.2d at 168).  Here, there is simply no evidence from which a reasonable jury could conclude that Amazon uses its Fire TV mark "in a manner which is likely to cause confusion among ordinarily prudent purchasers or prospective purchasers as to the source of a product."  <u>Capital Films Corp.</u>, 628 F.2d at 393-94; <u>see also</u> <u>Custom Mfg.</u>, 508 F.3d at 651 (citing <u>New Sensor Corp.</u>, 303 F. Supp. 2d at 310-11).  Therefore, summary judgment in favor of Amazon is proper.

## IV.    Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that;

1.     The Report and Recommendation of the Magistrate Judge issued April 9, 2019 (D.E. 378) is **ADOPTED** consistent with this Order;

2.     Amazon's Motion for Summary Judgment (D.E. 224) is **GRANTED**;

3.     Final Judgment will be entered separately;

4.     All pending motions are **DENIED AS MOOT**; and

    **5.**      This case is now **CLOSED**.

    **DONE AND ORDERED** in Chambers at Miami, Florida this 26th day of July, 2019.

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**

53