UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.  14-21385-CV-LENARD/Goodman

WREAL, LLC,
*a Florida limited
liability company*,

                    Plaintiff,

        vs.

                                        Miami, Florida
                                        April 30, 2015
AMAZON.com, Inc.,                       Pages 1-44
*a Delaware corporation*,

                    Defendant.
_____

TRANSCRIPT OF DISCOVERY HEARING
BEFORE THE HONORABLE JONATHAN GOODMAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE PLAINTIFF:
                    *WNF Law, PL*
                    BY:  **JOHN G. MARFOE, ESQ.**
                    1111 Brickell Avenue
                    Suite 2200
                    Miami,  Florida 33131

                    *Foreman Friedman, P.A.*
                    BY:  **PAUL T. BAGLEY, ESQ.**
                    2 South Biscayne Boulevard
                    Suite 2300
                    Miami, Florida 33131

FOR THE DEFENDANT:
                    *Susman Godfrey, LLP*
                    BY:  **PATRICK C. BAGEANT, ESQ.**
                    1201 Third Avenue
                    Suite 3800
                    Seattle, Washington 98101

1     *Hunton Andrews Kurth, LLP*
      **BY:  JAMIE ZYSK ISANI, ESQ.**
2     1111 Brickell Avenue
      Suite 2500
3     Miami, Florida 33131

4
      **TRANSCRIBED BY:**     **DAWN M. SAVINO, RPR**
5                             **Official Court Stenographer**
                              **400 N. Miami Avenue, 10S03**
6                             **Miami, Florida  33128**
                              **Telephone:  305-523-5598**
7
8     _____

                             P-R-O-C-E-E-D-I-N-G-S
9
10          COURTROOM DEPUTY:  All rise.  The US District Court for

11    the Southern District of Florida is now in session, the

12    Honorable Jonathan Goodman presiding.

13          Calling case 14-21385-civil-Lenard, Wreal LLC versus

14    Amazon.com, Inc.

15          THE COURT:  All right, folks.  Good afternoon.  Please

16    be seated and make yourself comfortable.  Start out please with

17    appearances starting first for the Plaintiff.

18          MR. MARFOE:  Good afternoon, Your Honor.  This is John

19    Marfoe representing Plaintiff Wreal, LLC and with me is Paul

20    Bagley, also representing Wreal, LLC.

21          THE COURT:  All right.  Good afternoon.  Defendants?

22          MR. BAGEANT:  Good afternoon, Your Honor.  This is

23    Patrick Bageant for Amazon.com and along with me is Jamie Isani.

24          THE COURT:  Mr. Bageant from Seattle?

25          MR. BAGEANT:  Yes, sir.

1       THE COURT:  I was in Seattle last week, Mr. Bageant,

2   for a federal magistrate judges seminar.  We were staying at the

3   Grand Hyatt Hotel on Pike and 7th Avenue.  How far is that from

4   your office?

5       MR. BAGEANT:  Pike and 7th is probably about four

6   blocks.  I wish I had known that, we could have convened this

7   hearing there.

8       THE COURT:  Perhaps.  But I was there with my wife for

9   the first part of it, I brought her along.  And then the second

10  part was the magistrate judges seminar.

11      So let's see, I had dinner at Etta's Seafood.

12      MR. BAGEANT:  I've never been.  I've heard of it, but

13  never been there.

14      THE COURT:  Place called Matt's in the Market.

15      MR. BAGEANT:  Been there a number of times.  That's a

16  great place.

17      THE COURT:  Excellent place.  Went to a place called, I

18  think, Ocean Acre or something like that, it's about a block and

19  a half from Grand Hyatt Hotel.

20      MR. BAGEANT:  Okay.

21      THE COURT:  And then of course within four square

22  blocks of our hotel there were probably eight Starbucks.  It's

23  unbelievable.

24      MR. BAGEANT:  Well naturally, yeah.  That's -- you're

25  very close to the nexus of the Starbucks empire right there.  I

1  think the first Starbucks is a couple of blocks from where you

2  were staying.

3       THE COURT:  The first Starbucks is down in the Pike

4  market, and we actually went there to the original Starbucks and

5  my wife bought a bunch of gift cards.  And the difference when

6  you buy a gift card at that Starbucks, it's the only place in

7  the world you can buy this gift card.  It is brown, not green.

8  The logo of the Starbucks mermaid is, shall we say, more graphic

9  and open than the traditional one.  Basically it's a topless

10  woman on this logo, and you can only get it at that Starbucks.

11       MR. BAGEANT:  Interesting.  I never noticed that.

12       THE COURT:  There's a long line of people there at the

13  Pike's Starbucks to get souvenirs.

14       But I digress.  So in any event, welcome.  And we're

15  here today on a discovery dispute, and I'm going to start off

16  asking my usual question, even though I suspect that I know the

17  answer, but I take it you haven't been able to resolve anything?

18       MR. MARFOE:  No, Your Honor.  We haven't,

19  unfortunately.

20       THE COURT:  All right.  Well listen, those things

21  happen.  So let me hear first from what would, for all practical

22  purposes, be the movant.  We don't allow discovery motions in

23  the case, but for all practical purposes you are moving to

24  compel or you're seeking to get a ruling requiring Amazon to

25  turn over certain information.  So in effect, you're the movant.

1    So let me hear from you first.

2              MR. MARFOE:  Okay.

3              THE COURT:  By the way, you can come up to the podium

4    or you can remain seated, whatever is your pleasure, sir.

5              MR. MARFOE:  Okay.  I actually would remain seated, I

6    think.  The podium was giving me problems last time.

7              THE COURT:  Sure.  Sure.

8              MR. MARFOE:  Things were slipping off.

9              THE COURT:  By the way, a lot of homeless people in

10   Seattle.

11             MR. BAGEANT:  It's true.

12             THE COURT:  And I managed to visit there and return

13   without getting any tattoos or body piercings, it's really

14   remarkable.

15             MR. BAGEANT:  That is a true achievement.  That's true.

16             THE COURT:  No nose rings.  One of the few people on

17   the streets with no nose rings.

18             Anyway Mr. Marfoe, let me hear from you.

19             MR. MARFOE:  Thank you, Your Honor.  Okay.  So we're

20   here today on a discovery hearing which is essentially, as Your

21   Honor said, would be a motion to compel if we were doing a

22   motion here, and it's related to -- I mean, everything is really

23   related to the production of Amazon's -- production and

24   discovery related to Amazon's sale of sex toys and related

25   items.  I believe we have three sets of discovery that we

1   noticed here.  There's a request for production, and

2   specifically Request for Production Number 8, there's a number

3   of 30(b)(6) topics to Amazon.com, topics five, six, seven, 14

4   and 15.  Amazon did not move for protective order on those, they

5   just did not produce a witness for those when we were there for

6   the deposition who was prepared to testify on issues as they

7   relate to sex toys, and then this request for admission that

8   Wreal recently served, the requests numbers one through 13.

9        Now, as to just the request for production, Amazon

10  objected on the grounds that it was overbroad, vague, unduly

11  burdensome and not reasonably calculated to lead to admissible

12  evidence.  I believe we resolved the overbroad objection, the

13  vague objection and I believe we absolved the unduly burdensome

14  objection.  We haven't discussed it since, I think, our initial

15  discussions.  I think all we're left here with is relevance.

16       Now, as the party resisting discovery, Amazon bears the

17  burden of showing how discovery is unreasonable or unrelevant

18  and here, it just cannot do that.  Amazon has not explained why

19  the document request is unduly burdensome and again, I think

20  they have dropped that, but I'll let them speak, obviously.

21  They don't object to the 30(b)(6) deposition as burdensome, nor

22  do they object to the *(unintelligible)* burdensome, so really

23  this all comes down to relevance.

24       The standard for relevance in discovery is much broader

25  than the standard for relevance at trial.  This court held that

1    discovery should ordinarily be allowed under the concept of

2    relevancy unless it is clear that the information sought has no

3    possible bearing on the subject matter of the action.  That's

4    from *Adelman versus Boy Scouts of America*, case number 10-22236.

5           THE COURT:  So you're citing back to me one of my own

6    cases, and whenever that happens, I always say don't you have

7    any good authority?

8           MR. MARFOE:  I thought it was well put in that case.

9           THE COURT:  I'm familiar with that case.

10          MR. MARFOE:  Having said that, you quoted the now

11   retired Magistrate Judge Linnea Johnson who in the --

12          THE COURT:  Right.

13          MR. MARFOE:  Who, in the *Donahay versus Palm Beach*

14   *Tourist and Transportation* case, 242 Frd 685, explains that, and

15   I'll quote, discovery is not limited to the issues raised by the

16   pleadings because discovery itself is designed to help clarify

17   the issues, closed quote.  Thus, Amazon must demonstrate that

18   the requested discovery does not come within the broad scope of

19   relevance defined by Rule 26 (b)(1), or it's of such marginal

20   relevance the potential harm would outweigh the presumption of

21   disclosure.  And this is paraphrasing this Court again in

22   *Adelman*.

23          THE COURT:  By the way, what's the citation to that?

24   Is there a Westlaw cite?

25          MR. MARFOE:  *Adelman*, I'm sorry, yes.  The Westlaw cite

```
1     is 2011 Westlaw 1930427.
2             THE COURT:  Adelman versus Boy Scouts, right?
3             MR. MARFOE:  Exactly.
4             THE COURT:  All right.
5             MR. MARFOE:  Adelman versus, yeah, the Boy Scouts of
6     America.
7             Now, in this case, it's a trademark infringement case,
8     I'm going to assume the Court is familiar with the facts of this
9     case.  I can provide a refresher if you would like, but --
10            THE COURT:  You know, I'm going to be 60 years old this
11    December.  And although I may from time to time have a senior
12    moment, I'm pretty sure that I have a pretty good feel for an
13    all day evidentiary hearing and the issues, and I don't remember
14    how many pages the report and recommendation was, it's got to be
15    at least maybe 20 pages, maybe more.  So took a lot of work to
16    prepare that.  So I have more than a vague recollection of the
17    issues.  But thank you for the offer, I think I'm going to take
18    a pass right now.
19            MR. MARFOE:  Okay.  Fine.  No problem.  Okay.
20            So in this -- the requests are relevant to at least two
21    of the factors that this Court considers under Fraling (ph) and
22    some of the other cases.  And in this circuit, the factors
23    themselves are questions of fact.  The ultimate question of fact
24    of whether there's likelihood of confusion is a question of fact
25    and the individual factors are kind of sub factors, sub
```

1    questions of fact that tend to show that.  And even within those

2    factors, there's factual issues that can tend to show those

3    factors.

4         Now, in the *Jellibeans* case, which I'll get you the

5    cite here, *Jellibeans* was an Eleventh Circuit case, it left open

6    the possibility that under certain factual scenarios, other

7    factors may be considered.  For example, courts apply the intent

8    factor differently in reverse confusion cases, and the Eleventh

9    Circuit hasn't specifically endorsed this, but the parties agree

10   that a different standard applies than in traditional trademark

11   infringement cases.

12        THE COURT:  What is the citation to the *Jellibeans*

13   case?

14        MR. MARFOE:  The *Jellibeans* case, I was getting that

15   for you.  I'm sorry, Your Honor.  It is 716 F.2d 833.

16        THE COURT:  What circuit?

17        MR. MARFOE:  11th, 1983 case.

18        THE COURT:  Thank you.

19        MR. MARFOE:  Okay.  So the -- you know, the *Jellibeans*

20   case left open the possibility that under certain factual

21   scenarios, other factors may be considered.  And, you know, as

22   an example of this, the intent factor is looked at differently

23   in reverse confusion cases, I think the parties agree on that.

24   We may disagree on what the standard is, but we agree there's a

25   different standard.  And, of course, the ultimate fact is

1    whether there is a likelihood of confusion.

2            Now, among the traditional factors, the traditional

3    factors, Amazon's sale of sex toys are relevant to at least two

4    of them and those are factor four -- I'm sorry.  Yes.  Factor

5    four, which is similarity of the Plaintiff and Defendant's

6    retail outlets and their customers, particularly the customers,

7    and factor, I believe it's six, which is the intent factor and

8    I'll take those one at a time here.

9            As to the fourth factor, similarity in customer base,

10   Wreal could put forth evidence that its consumers have a higher

11   propensity to purchase sex toys than other consumers.  Amazon

12   sells sex toys, they sell over 340,000 different types of sex

13   toys.  And this could mean, depending on the extent of Amazon's

14   sales, it's likely or even probable that a large portion of

15   Wreal's market also shops on Amazon's website.  Amazon also

16   advertises its Fire TV on the landing page of its website.

17           Now, as Amazon explained at the hearing -- I'll back up

18   a second.  Amazon, one of the reasons we think that Amazon sells

19   a large number of sex toys is that Amazon offers a discreet way

20   to purchase them.  They come in a brown Amazon box, and as

21   Amazon explained at the hearing, you know, CVS and Walgreens

22   sell certain personal massagers which are one type of sex toy on

23   their websites, and they may even sell them in the store.  But

24   you certainly don't see a large wall of dildos and masturbators

25   when you walk into a CVS and Walgreens.  But these types of

1    things are sold at Amazon.

2            THE COURT:  So let me just interrupt you for a minute.

3    When you say that Amazon sells these products which you say they

4    have 340,000 products that are offered, is it Amazon itself that

5    sells the product or is it the sort of third party vendors that

6    are sort of linked into Amazon, but it's not an actual Amazon

7    sale?

8            MR. MARFOE:  It's both, Your Honor.  There's some that

9    are third party vendors certainly, and there's a large number

10   that are actually shipped and sold by Amazon.  Listed, shipped

11   and sold by Amazon.com.  And Your Honor, I have some exhibits

12   and I put them in binders for you folks, if I may hand them out

13   now?

14           MR. BAGEANT:  I'll just make a brief objection, I

15   guess, that supporting materials, my understanding, were to be

16   filed with the notice of discovery hearing.  But at any rate,

17   we'll take a look at these and just leave my objection on the

18   record.

19           THE COURT:  All right.  Well, your objection, like all

20   objections and anything else that you say, is of course on the

21   record.

22           And the general rule is that supporting materials need

23   to be filed beforehand, which typically means the actual

24   discovery materials such as the requests for production,

25   requests for admissions, et cetera.  Not the actual case law or

1   that sort of thing.

2           However, I will make one comment, Mr. Marfoe, which is

3   you're now tendering this binder to defense counsel now.  How

4   long have you been here in this courtroom or this building?

5           MR. MARFOE:  We were here about ten minutes before and

6   we could have handed it to them beforehand.

7           THE COURT:  That would have been the professional thing

8   to do, okay.  So I view this as a somewhat fairly typical

9   tactic, usually seen in state court where you dump an exhibit on

10  the opposing counsel as you're handing it up to the judge, even

11  though I've had situations where lawyers have sat outside next

12  to each other for an hour and a half, and one lawyer has a

13  binder of exhibits and he or she never even mentions these

14  exhibits to the other lawyer, doesn't give them a copy, then

15  they get into the hearing and they hand a binder up to the court

16  and hand it to the opposing lawyer and there's no way that the

17  lawyer can adequately digest that material.  But he or she could

18  have if you give it to them earlier.

19          So please, in the future, at least when you're in front

20  of me, don't do that.  Give it to the opposing counsel if you

21  see him or her before the hearing.  Obviously if you both walk

22  in to court at the same time and there's no time, then give it

23  to them then when you walk in, and maybe they'll have ten or 15

24  minutes, maybe they could have been reviewing it for the past 16

25  minutes, who knows.  But I think you understand my point.

```
1              MR. MARFOE:  I certainly do, Your Honor.

2              THE COURT:  Okay.

3              MR. MARFOE:  May I approach to --

4              THE COURT:  You may.  You may.  And you have an extra

5    one for my law clerk?  Beautiful.  Beautiful.  Thank you.

6              MR. MARFOE:  Your Honor, I don't think that many of

7    these exhibits will come as too much of a surprise to Amazon.

8    Certain of them were things that we asked questions about on the

9    RFAs, specifically we asked them to admit certain things.

10             THE COURT:  Can you just talk a little more slowly?

11             MR. MARFOE:  Yes.

12             THE COURT:  If this transcript is ever ordered, the

13   court reporter is going to have a great deal of difficulty.

14             MR. MARFOE:  Sure thing.

15             THE COURT:  So you're going at 60 miles an hour, I

16   think we're in a 35 mile an hour zone right now.

17             MR. MARFOE:  Okay.  I'd be reckless talking, so I'll

18   slow it down a bit.

19             THE COURT:  There you go.

20             MR. MARFOE:  So I'd like to point Your Honor to Exhibit

21   B.

22             THE COURT:  B.

23             MR. MARFOE:  And Exhibit A was all the source

24   materials.

25             THE COURT:  Right.
```

PROCEEDINGS RECORDED BY DIGITAL AUDIO RECORDING
TRANSCRIPT PRODUCED BY MECHANICAL STENOGRAPHY
AND COMPUTER-AIDED TRANSCRIPTION

1      MR. MARFOE:  Exhibit B would be an example of some of

2    the sex toys that are sold at Amazon.  These go far beyond these

3    personal massagers as I was saying.  These are items -- and this

4    is just a very small sample, these are certain items that are

5    specifically designed for masturbation, and some of them are

6    personally endorsed by porn stars.  In fact, I believe the Doc

7    Johnson, the second one in the packet there, the Doc Johnson

8    Lexi Belle item is advertised as being molded directly from Ms.

9    Belle's lady parts, and I believe the same goes with the next,

10    the Doc Johnson Lily Labeau item.  So those are more than just

11    personal massagers or vibrators, things like that.

12      Now, people are going to shop for sex toys online and

13    they may do so because it's something that they want to buy

14    discreetly.  I think these items may provide an example of that.

15      THE COURT:  Remember, Mr. Marfoe, when you said you

16    were going to --

17      MR. MARFOE:  Talk slower?

18      THE COURT:  Go down to 30 miles an hour.

19      MR. MARFOE:  40.

20      THE COURT:  I think you're at about 45.

21      MR. MARFOE:  I'll still try to slow down into it.

22      THE COURT:  Thank you.

23      MR. MARFOE:  Didn't want to -- anyway, so now if

24    somebody wants to purchase one of these items online and they

25    don't already know that Amazon sells them, what are they likely

1    to do.  Well, for one, they may turn to Google to search.  If
2    you turn to Exhibit C, performed a number of Google searches for
3    items that are -- categories of items that are sold on Amazon's
4    website.  Just a couple of them made it in here.  You can see
5    that Amazon is number three for anal beads, number two for butt
6    plugs.  And if you search a lot of the other items, you'll see
7    Amazon is among the top couple search results, if you take out
8    the paid search results.
9         One interesting thing on the page search results, at
10   least with the butt plugs one, one of the bigger manufacturers
11   of sex toys is a company called Adam and Eve.  And if you flip
12   to Exhibit D, Adam and Eve sells some of the same items and they
13   also sell adult movies, pornography.  And actually behind
14   Exhibit D, looks like we have the vibrators and Amazon, again,
15   is number two there.  We have a company called Better Sex which
16   also sells sex toys, also one of the paid search results when
17   you search for these.  They sell sex toys and pornography.  Sex
18   Toy Warehouse, we have the same thing there, they sell sex toys
19   and pornography, quite a bit of it.  So that's what consumers
20   would come across these items in the marketplace.
21        Now, I think the point is here we won't know without
22   discovery from Amazon whether Wreal's consumers are more likely
23   to shop on Amazon than the ordinary consumer, because we don't
24   know how many sales of sex toys Amazon makes.  We don't know the
25   extent of it, we don't know -- there's quite a bit of

1   information that we don't know, but if that is the case, they're
2   more likely to be exposed to advertisements for Amazon's Fire
3   TV, and it may mean that they are more likely to own an Amazon
4   Fire TV.  If you're exposed to more advertisements for it, if
5   you shop on Amazon, you may be more likely to actually own an
6   Amazon Fire TV.  This is evidence that would make it more likely
7   than not that Wreal and Amazon share the same customers and
8   that's highly and directly relevant to the fourth factor, the
9   *Jellibeans* factor, which is whether the parties share the same
10  customer base.
11          Now, Amazon's sale of sex toys also goes to the intent
12  factor.  And a large part of it is based on arguments that
13  Amazon has made itself.  Go to exhibit -- skip ahead a little
14  bit here, if you go to Exhibit G, which is the transcript from
15  the preliminary injunction hearing, Ms. Bassie *(ph)* testified at
16  the hearing that Amazon was -- and it's on Page 211, starting at
17  Line 20, I'll wait for everybody to catch up, says we discussed
18  what potential negative connotations it could have if we were
19  associated with something that was pornographic since it was
20  very far away from what we do today.  So there were
21  conversations on it on if that would be bad for us and what
22  those potential implications would be.
23          THE COURT:  Who is it who is testifying here?
24          MR. MARFOE:  This is Ms. Elizabeth Bassie who was
25  testifying on behalf of Amazon.

```
 1              THE COURT:  Uh-huh, right.
 2              MR. MARFOE:  And she goes on, and she says we discussed
 3    those implications basically, we allayed our fears because we
 4    felt like Amazon was so far away from being anything related to
 5    porn or pornography that that would be something that we didn't
 6    have to deal with.  Exhibit H in her declaration, and this is
 7    the redacted version, Paragraph 4, this is again the declaration
 8    of Ms. Elizabeth Bassie that was submitted along with Amazon's
 9    response to Wreal's motion for preliminary injunction.  And at
10    Paragraph 4 she says when we were considering the Fire name,
11    someone on our team searched the internet and discovered the
12    FyreTV pornographic site.  We talked about the risk of bad
13    press, but we didn't think people would associate Amazon with
14    hard core pornography because it was so far away from what the
15    company stands for and the experience customers have every day
16    on our site.  She goes on to talk about some of the family
17    friendly aspects of Amazon, which Amazon is a very big store
18    essentially, and there are certainly some family friendly things
19    that are sold on Amazon, but that's not all.  This information
20    sought could be used to impeach Ms. Bassie's statement.  Sex
21    toys are related to pornography, they're complementary.  Ms.
22    Bassie's statement that pornography is so far from what Amazon
23    does may not be believable to a jury and may not be believable
24    to Wreal's target market, who may be more likely to purchase sex
25    toys and purchase sex toys on Amazon than the average consumer.
```

1    Most pornography, in fact, is purchased online.  I remember when

2    that wasn't the case.  It's also sold in hotels, people can rent

3    it from video stores, but it also used to be sold in brick and

4    mortar stores.

5         And so I'll jump into kind of another thing that makes

6    it relevant, and this is kind of the overarching factor and this

7    is where you have to step outside of the factors which

8    *Jellibeans* implies that district courts can do and look at well,

9    are consumers likely to be confused.  The ultimate issue in this

10   case is are consumers likely to think that Wreal's FyreTV and

11   Amazon's Fire TV come from the same source, and because it's a

12   reverse confusion case, the source is Amazon.  Because Amazon

13   puts its house mark next to Fire TV, consumers know at least

14   when they've heard Fire TV from Amazon's much larger advertising

15   campaign, that there's an association built between Amazon and

16   the name Fire TV.  So looking at this in an overarching

17   perspective, you know, consumers who know that Amazon sells sex

18   toys, who maybe purchased sex toys from Amazon, and we don't

19   know how many of those there are, could they see Wreal's FyreTV,

20   see that Amazon sells not just sex toys, but really everything

21   and think well, if Amazon is selling sex toys endorsed by Bree

22   Olsen who is a porn star; if Amazon is selling sex toys that are

23   molded from Ms. Lexi Belle, also a porn star, her lady parts; if

24   Amazon is selling sex toys that are -- some of them are put out

25   by a company called Vivid, which is a porn company itself, maybe

1    they do also put out a streaming device called FyreTV.

2         THE COURT:  F-Y-R-E.

3         MR. MARFOE:  F-Y-R-E TV.  Exactly.  If it sells dildos

4    featured in pornographic films, it may also market in adult

5    streaming video service called FyreTV.  And obviously just like

6    video stores used to keep their dirty movies behind a curtain,

7    Amazon would keep its adult Fire TV separate from its family

8    friendly Fire TV.

9         So at the end of the day, we're looking at relevance

10   for discovery purposes and under these circumstances, this

11   information is likely to lead to, I think, highly relevant, I

12   think it's admissible, I think it will be admissible, at the

13   very least there's a possibility of relevance and it's likely to

14   lead to the discovery of admissible evidence.

15        Thank you, Your Honor.  Unless you have any questions

16   for me...

17        THE COURT:  Let's hear from defense counsel first.

18   Mr. Bageant.

19        MR. BAGEANT:  Good afternoon, Your Honor.  This is

20   Patrick Bageant for Amazon.  Your Honor, what Wreal seeks here

21   is not really a motion to compel, but it's a motion for

22   reconsideration of your prior ruling that sex toys are not

23   relevant to any ultimate issue in this case.

24        THE COURT:  Well, I think actually my ruling was it

25   wasn't relevant to an issue at the preliminary injunction

1   hearing.  I don't know if I said it wasn't relevant to any issue

2   in the case.

3          MR. BAGEANT:  Fair enough.  So the issues in the

4   preliminary injunction hearing were whether there was a

5   substantial likelihood of success on the merits.  Nothing has

6   happened in this case since the preliminary injunction hearing.

7   There's been no additional discovery, no depositions --

8          THE COURT:  Really.

9          MR. BAGEANT:  No, Your Honor.  Wreal has been sitting

10  on its hands.  It hasn't done anything in the three months since

11  your order; certainly not anything in the ten days during which

12  it could have objected to your ruling that sex toys were not

13  relevant.  So the one piece of discovery we have are these

14  requests for admission upon which they're now moving.

15         THE COURT:  I'm sorry, let me interrupt for a minute.

16  I have a recollection that after my report was issued, that

17  Wreal did file objections to the report and recommendation.

18  Correct?

19         MR. BAGEANT:  Absolutely.

20         THE COURT:  What you're saying is yes, they objected

21  but they didn't object to the ruling or the language in the

22  report about the lack of relevance of sex toys.  I understand.

23         MR. BAGEANT:  That's exactly right.

24         THE COURT:  So other than -- other than filing

25  objections to the report, what else has happened in this case?

1    Have there been any depositions since the report?

2         MR. BAGEANT:  No, Your Honor.  Amazon has served some

3    requests for production of documents, Wreal has produced one

4    document.  Wreal has served some request for admission, Amazon

5    has responded to those requests for admissions.

6         THE COURT:  Those are the requests for admissions that

7    are at issue here in the hearing?

8         MR. BAGEANT:  Yes, Your Honor.

9         THE COURT:  All right.

10        MR. BAGEANT:  And now four weeks before the discovery

11   cut-off, the parties are beginning to talk in earnest about

12   scheduling the remaining depositions in the case which will be

13   taking place in May.  My point, Your Honor, is that nothing in

14   the record has changed since your ruling.

15        THE COURT:  I understand.

16        MR. BAGEANT:  The untimeliness of this motion goes more

17   -- is based on more than just the failure to object in the 10

18   day period.

19        Your Honor, as to the request for production, they're

20   moving on Request Number 8, which they served in September of

21   2014.  We served our objections in October.  It's been six

22   months.

23        THE COURT:  Okay.  Served requests for production, when

24   was that date in?

25        MR. BAGEANT:  September of 2014.

```
 1            THE COURT:  September, and the response with objections
 2   was filed in October?
 3            MR. BAGEANT:  Yes, Your Honor.
 4            THE COURT:  All right.  So you're making a reference to
 5   the local rule which requires discovery disputes to be raised
 6   within 30 days.
 7            MR. BAGEANT:  Absolutely, Your Honor.
 8            THE COURT:  All right.
 9            MR. BAGEANT:  We served our objections, we then met and
10   conferred.  Amazon explained its objections, including the
11   relevance objections at issue here, also overbredth and burden,
12   and Wreal dropped its request.  We invited them to bring a
13   motion for -- excuse me, a motion to compel, they didn't do it.
14   As you noted in your report and recommendation on the
15   preliminary injunction, to quote, Wreal dropped its requests for
16   documents on sex toys.  That's was six months ago.  Then three
17   months ago we have the report and recommendation, no objection
18   there.  And now four weeks before discovery closes, they're
19   moving to compel on those September 2014 requests.  So it's
20   certainly stale and time barred under the local rules, it's also
21   stale and time barred under the deadline to object to your
22   report and recommendation.  So that's the first point that we
23   want to make, it's just that this is incredibly untimely.
24            THE COURT:  Okay.  So when you say this is incredibly
25   untimely, so far you've talked about the request for production,
```

1    but there was also reference to a request for admissions which

2    as I hear the conversation this afternoon that was propounded

3    only recently.  So your staleness argument wouldn't apply to the

4    request for admissions, correct?

5         MR. BAGEANT:  I agree, to a certain extent, the request

6    for admissions -- you know, a motion to compel on the request

7    for admissions would be timely under the local rules at least as

8    to the deadline to file it.  On the merits though, the argument

9    is exactly the same as the one they've defaulted on first in

10   October and then again in January.

11        THE COURT:  Meaning the argument that sex toys is

12   relevant, and you're saying well Judge, you already ruled back

13   in your report that it's not relevant and they never objected so

14   that's the end of the story.

15        MR. BAGEANT:  Well, that's the first reason that's the

16   end of the story.

17        THE COURT:  I hear you.  All right.  Understood.

18   Please continue.

19        MR. BAGEANT:  Apart from the request for production

20   served in September of 2014 that they've done nothing with until

21   now, is a request for 30(b)(6) deposition topics.  Your Honor

22   may recall that you actually received briefing on this issue and

23   you may remember ruling on this issue.

24        THE COURT:  Correct.

25        MR. BAGEANT:  The ruling was that the topics, the same

1   topics they're seeking to move to compel on here, were not

2   relevant.  Their deadline to object to that ruling was in

3   January, they didn't do so.  They never moved to compel the

4   depositions in November of 2014 when we made our objection.

5   Instead, they've sat on their hands and waited until the close

6   of discovery to attempt to assert these new theories.  This is

7   exactly what the local rule and the deadlines to object to a

8   ruling of a magistrate judge are in place to prevent.

9           In some senses, this could be viewed as academic.  It

10  could be viewed like well, the deadline is here, the issues, et

11  cetera, et cetera.  It's not academic.  This is very important

12  to Amazon and part of the reason I'm here today is this

13  discovery is incredibly burdensome.  These requests are vastly

14  overbroad.  We attempted to meet and confer with them on this

15  back in 2014.  The requests seek, if you look at them on their

16  face, incredible volumes of information, and they're being now

17  finally moved upon right at the close of fact discovery.  It's

18  unfair, it's unduly burdensome, it's in violation of the local

19  rules that were put in place to prevent this kind of issue and

20  it's something, frankly, that if it were going to be pursued, we

21  could have pursued it back in October of 2014.

22          It bears emphasis that Wreal's complaint does not

23  mention sex toys.  Wreal's never amended its complaint.  You

24  noted that in your report and recommendation.  Wreal has not

25  offered any evidence that consumers for sex toys are consumers

1    for its pornographic product or service.  What you've heard is

2    attorney argument on that.  And so the final issue I want to

3    talk about is the actual relevance argument which should have

4    been brought six months ago.  We can certainly address it on the

5    merits now because it fails.  Wreal doesn't sell sex toys.  No

6    consumer of Wreal can buy sex toys at Wreal's website.  Amazon

7    doesn't sell pornography.  The products being accused in this

8    case, Amazon's hardware device, Wreal's hardware pornographic

9    service, both called fire TV with different spellings, neither

10   of them are sex toys.  Amazon has never been sued for selling

11   sex toys.

12         The inference or the argument that we heard today was

13   that well, the two goods are complementary.  Consumers of sex

14   toys are consumers of pornography, therefore they may be

15   confused about who makes fire TV.  That's a chain of inferences

16   that's not supported by any evidence.  Like I said, Wreal

17   doesn't sell sex toys, Amazon doesn't sell pornography, neither

18   fire TV product is a sex toy product, so there can't be any

19   connection there without some sort of evidence and none of it

20   has been offered.

21         As Your Honor said in the report and recommendation,

22   Wreal has not sued Amazon for selling sex toys, that has not

23   changed.  It has not sought to amend its complaint, Wreal does

24   not sell sex toys.  That has not changed either, Your Honor.

25   Wreal's theory, which is the one it advances here, is that

1    Amazon's website will lead consumers to believe that Amazon

2    sells hard-core pornography or that Amazon somehow offers

3    Wreal's products.  That theory is unchanged from the one that

4    you reject in the report and recommendation, the one that they

5    did not file an objection to.

6         Finally Your Honor, hard-core pornography is a film,

7    it's a genre, whereas a sex toy is a product.  Sex toys, the

8    product, are not at issue in this case.  Nobody has made any

9    allegations about sex toys.

10        So Your Honor, the heart of our opposition is first,

11   that we could have talked about this in October before it was

12   four weeks before the end of discovery.  It would be very, very

13   burdensome for Amazon to suddenly recollect and search its files

14   for all this information.  There's a local rules deadline in

15   place they haven't even mentioned.  It's put in place for a

16   reason, it's to prevent this issue.  They could have briefed the

17   issue in January when you ruled on it on the merits of the

18   arguments they're making today.  They didn't.  They waited three

19   months.  In those three months, nothing has changed.  The only

20   thing that changed is the discovery cut-off is coming.  The

21   timing of this is incredibly burdensome to Amazon.  The timing

22   of this is -- it's improper and defaulted under both the local

23   rules and the deadline to appeal from Your Honor's order.

24        And then on the merits, there still hasn't been any

25   showing as to why the fact that Amazon, like Walgreens and many

1  other companies, sells sex toys somehow makes Wreal's consumers

2  or other consumers more likely to confuse Wreal's pornography

3  with Amazon's Fire TV device.

4      THE COURT:  Thank you.

5      Mr. Marfoe, why did you wait so long to raise this

6  issue?  If the discovery request for documents was propounded

7  way back in September and the response or the objection was

8  October, why are you waiting here until the end of April,

9  shortly before the discovery deadline expires, to tee up the

10  issue?

11      MR. MARFOE:  Well, there's a number of reasons, Your

12  Honor.  I mean, the first was, you know, this was right as we

13  were gearing up on expedited discovery ahead of the motion for

14  preliminary injunction awaiting their response, our reply and

15  then a hearing.  And throughout that time, we were in constant

16  discussions.  I mean, there are a number of e-mails between

17  counsel, there were phone calls.  We were trying to work this

18  issue out.  Through all the way up until, I believe, the

19  depositions which took place, I want to say November 20th and

20  21st; 19th and 20th, around that time which actually put us past

21  the 30 days as we were still discussing, and I believe the local

22  rule allows for an exception to those 30 days if there's good

23  cause, if there's a good reason why we would do that.

24      So as to the RFPs, we were initially in the midst of

25  preliminary injunction.  We were also in the midst of

1    discussions with Amazon as to whether, you know, they were going

2    to allow discovery on this.  They did not file a motion for

3    protective order with respect to the 30(b)(6) topics, so we kind

4    of were not sure what was going to happen until we got to the

5    depositions themselves.

6            And, you know, as far as the report and recommendation

7    goes, you know, one thing I think -- and actually just to

8    address a couple other points, we did issue a set of RFAs.  We

9    actually contacted Amazon back on April 8th or 9th, it was about

10   three weeks ago, requesting deposition dates.  We're actually

11   still having trouble getting those depositions set before the

12   discovery cut-off period.  I believe it requested nine -- eight

13   different depositions, eight or nine different depositions.

14   We've had three set so far, we're having a little bit of trouble

15   with that.

16           So, you know, one of the reasons no discovery has been

17   taken is that, you know, we haven't gotten deposition dates from

18   Amazon.  We have served requests for admissions, we were serving

19   additional discovery shortly that will still be within the time

20   frame for of discovery.  So I don't think that we've waived

21   anything, and I think that good cause definitely exists to allow

22   this document production as far as the RFPs go.

23           THE COURT:  When was the 30(b)(6) deposition, when did

24   that take place?

25           MR. MARFOE:  That took place on, like I said, I believe

1    November 19th and 20th, about that time.  And as I said, Amazon

2    did not move for a protective order on those issues.  We

3    expected a witness to show up and one did not.

4              THE COURT:  Right.  Right.  So you propound your list

5    or your schedule of topics for 30(b)(6) deposition, they don't

6    file a motion for protective order or file a written objection.

7    You get ready for the deposition, you show up for the 30(b)(6)

8    deposition and lo and behold, their designee or designees is not

9    prepared to answer questions on those issues.  So that was way

10   back in November.  So why are you now waiting five months to tee

11   that issue up again?  I mean, you could have scheduled a hearing

12   back in November, you could have said Judge, we were ready for

13   this 30(b)(6) deposition; yes, we took it on some issues, but

14   they didn't have a witness prepared for these other issues.

15   That was never brought before me in a discovery dispute.

16             MR. MARFOE:  It wasn't.  It didn't become ripe.

17             THE COURT:  It was or was not?

18             MR. MARFOE:  It was not, no.  Certainly not as far as a

19   discovery dispute.  I mean, the issue was brought before the

20   Court on the December 30th hearing.  I mean, those 30 days were

21   between November 20th when the depositions were complete.  There

22   was an expedited briefing period then in preparation for a

23   preliminary injunction hearing that happened on December 30th.

24   I believe that also provides good cause.  Also the fact that we

25   were going to seek additional discovery on this, and this is

1    something that, you know, we wanted to have -- not necessarily

2    have done piecemeal but, you know, get our discovery out and get

3    a ruling on.

4          Now as far as this Court's ruling on the preliminary

5    injunction, I don't believe that was a discovery ruling, Your

6    Honor.  I believe that was a ruling that, you know, for the

7    purpose of the preliminary injunction which is a preliminary

8    hearing where there's limited amounts of evidence that's being

9    put forth, each side was limited, I believe, to three hours.  At

10   trial, I believe the parties asked for 10 days.  So we're trying

11   to put a bit more evidence on.  You know, we may not have

12   convinced Your Honor that sex toys are relevant to the issues at

13   the preliminary injunction hearing, but we -- the standard for

14   discovery is much, much lower.  The standard for discovery is

15   whether there's a possibility of relevance at trial, and I

16   believe we established that, we established that as to the -- as

17   to the similarity of consumer base.  It's likely to be relevant

18   to whether the parties share some of the same consumers.

19         As to intent, it cuts directly against some of Amazon's

20   arguments against intent, that they thought that there would be

21   no likelihood of confusion at the time that they named the

22   product.  They had no nefarious intent because it was so far

23   away from what Amazon does.  Well, this evidence shows

24   otherwise.

25         Just one other exhibit to point to, which is kind of in

1    response to their argument on -- well, first of all, our theory

2    is that consumers may believe that Amazon puts out a streaming

3    video service called Fire TV.  Mr. Bageant, I don't think,

4    correctly explained the theory of our case.  Consumers are

5    likely to be confused as to the source of the product of Wreal's

6    FyreTV.  They may think it emanates from Amazon.

7              THE COURT:  I understand.

8              MR. MARFOE:  Okay.  I just -- so, you know, one thing,

9    if you turn to exhibit -- Exhibit D, and on the second page of

10   that, Amazon's own vice president, Dave Clark --

11             THE COURT:  I'm sorry.  Exhibit D, Page 2?

12             MR. MARFOE:  I'm sorry.  Exhibit E as in E.

13             THE COURT:  Yes.

14             MR. MARFOE:  And I'm looking for it on here.  It's

15   towards the bottom.  It's an interview with Charlie Rose on 60

16   Minutes, and Mr. Clark said anything you want on Earth you're

17   going to get from us.  Charlie Rose clarified, anything you want

18   on Earth you're going to get from us?  Mr. Clark said yeah,

19   that's where we're headed, I believe.

20             If you turn to Exhibit F, I mean, Amazon is already

21   there.  Obviously they sell large numbers of sex toys, but

22   people -- this is another thing that makes this case unique, and

23   the facts of this case unique.  And under *Jellibeans*, you may

24   have to go outside the factors, even though I've already, I

25   think, established that within the factors there's relevance.

1    Amazon sells a wide range of products.  They sell coyote urine,
2    they sell large amounts of coyote urine.  They sell quilting
3    supplies, 37,000 different results there.  They sell bongs and
4    water pipes, about 1,500 different types.  They sell streaming
5    video players, streaming media players.  4,000 -- 14, it was cut
6    off by the hole there, but it's over 10,000.  So, you know, the
7    question is whether consumers would think that Amazon could put
8    out a streaming video service called Fire TV and consumers are
9    aware of Amazon's large selection of sex toys and other types of
10   products, especially the specific type that they sell,
11   masturbators specifically designed for the use in masturbation
12   which, I believe, Amazon's expert said in his declaration that
13   hard core pornography is designed primarily for masturbation.
14   These are endorsed by porn stars.  The likelihood that Wreal's
15   consumers and Amazon's consumers, Wreal and Amazon, share the
16   consumers is very high, and this evidence tends to make it
17   higher.
18        And so again, Your Honor, we believe it's highly
19   relevant for discovery purposes.
20        THE COURT:  So let's assume for the sake of discussion
21   that I agree with you, it's highly relevant.  Might even be
22   admissible at trial.  But you're still left with the fact that
23   these were discovery requests that you propounded many, many,
24   many, many months ago back in September or at a November
25   deposition.  Amazon took the position that it's beyond the scope

1    of discovery because it's not relevant, and not calculated to

2    lead to the discovery of admissible evidence.  And it's not

3    until now, four, five months later, shortly before the discovery

4    deadline is over, that you raise the issue.  So even if you're

5    right on the merits, being right on the merits doesn't address

6    the issue of the significant delay.  So talk to me about that.

7            MR. MARFOE:  Well again, under the circumstances given

8    that we were -- there was a preliminary injunction motion, there

9    was an extensive amount of briefing on both sides after the

10   preliminary injunction motion.  We wrote a lengthy proposed

11   report and recommendation.  Your Honor wrote, I believe, an even

12   lengthier actual report and recommendation.  We're still waiting

13   on a ruling from the District Court.

14           THE COURT:  I know.

15           MR. MARFOE:  Which has not come yet, and that is part

16   of the reason why we held off a bit on discovery, but the

17   deadline is coming up.

18           We also received, during October and November, 150 to

19   200,000 pages of documents from Amazon.  We certainly didn't

20   have time to review all of those ahead of the preliminary

21   injunction hearing, so discovery has been ongoing and has been

22   active between the two parties with requests and responses and

23   whatnot.  There's been a lot of activity.  The discovery cut-off

24   date has not come up yet.  We still have yet another month,

25   there's still time to serve new discovery, there's still time to

1    -- and of course, Wreal's RFAs remain ripe and remain within the

2    deadline.  And, you know, as I explained, I believe there's good

3    cause to make an exception to the local rule's 30 day

4    requirement here just given the circumstances of this case and

5    the way that it's procedurally evolved.

6         THE COURT:  So Mr. Bageant, I hear your argument about

7    the untimeliness and the waiver which would relate to the

8    request for production and which would relate to the 30(b)(6)

9    deposition.  But those arguments, untimeliness and waiver, would

10   not relate to the request for admission.

11        In addition, you're looking at me with a quizzical look

12   on your face.  Am I misstating something?

13        MR. BAGEANT:  Well, I'm just not quite sure I agree,

14   but maybe I can be heard when you're through.

15        THE COURT:  And the other arguments that you made

16   concerning the discovery request being brought now is that it

17   would be incredibly burdensome and it would require Amazon to

18   engage in a very significant effort in order to comply which,

19   under the circumstances, would be unreasonable given that the

20   discovery deadline is about to expire.  And I hear those

21   arguments concerning the requests for production of documents

22   and maybe a deposition.  But what about the request for

23   admissions?  They are complaining that you have improperly

24   objected to request for admissions one through 13.  And I've

25   read request for admissions one through 13, and they're about as

1    unburdensome as you can get.  What they basically say is admit

2    that on such and such a date, this product was advertised on the

3    Amazon website.  I don't view that as being something that would

4    require a Herculean effort to frame a response.  Yes or no.

5    They're not asking you to explain it, they're not asking you to

6    provide some sort of a narrative about whether sex toys have any

7    logical connection to adult movies.  All they're asking is yay

8    or nay, were these products advertised.  So I don't think the

9    burdensome argument would apply there.  You think that the

10   burdensome argument applies there?

11           MR. BAGEANT:  I agree, Your Honor, that it's not very

12   burdensome for, you know, our party to draft a yes or a no to a

13   request for admission, but our argument isn't that the requests

14   for admission are burdensome.  Our argument is that the issue in

15   the requests for admission are sex toys even relevant because

16   one, it was defaulted on.

17           THE COURT:  I understand.  You have several arguments.

18   One argument is a waiver and untimeliness.  Next argument was

19   burdensome.  Next argument was so irrelevant that it's not

20   within the broad scope of discovery.  I understand that argument

21   which still applies to the 13 requests for admissions.  But the

22   burdensome argument clearly would not, and I think you're taking

23   issue with me on whether the timeliness waiver argument would

24   also apply to the request for admission.  But request for

25   admissions are only recently propounded.  So why would you think

1    that it's untimely for them to raise it now?

2              MR. MARFOE:  Because, Your Honor, I don't believe that

3    you can -- that there's a straightforward way to make a ruling

4    on the relevance objection without revisiting an issue that's

5    been defaulted upon and forfeited.  So could a party, for

6    example, serve requests for production in September of 2014,

7    default on its obligation to bring a discovery motion and then

8    just reserve those requests for production at the close of

9    discovery and treat the issue as though it hadn't been defaulted

10   upon?  I don't think so.  This is the same kind of issue.

11             THE COURT:  So basically what you're suggesting is that

12   it is the same issue, and the mere fact that it is arising in a

13   slightly different arena, namely a request for admission,

14   doesn't mean that somehow the previous waiver is excused because

15   if that were the case, any time a party failed to timely raise a

16   discovery dispute, they could simply circumvent the waiver by

17   either re-serving the same discovery, or perhaps if they were

18   even craftier, come up with a different type of discovery but

19   covering the same basic issues.  That's your argument?

20             MR. BAGEANT:  Yes, Your Honor.

21             THE COURT:  All right.  I understand.

22             MR. BAGEANT:  Your Honor, the other brief point I

23   wanted to mention was that I haven't heard any good cause for

24   the delay here today.  The good cause I've heard was well, we

25   filed a motion for preliminary injunction and we were busy

1    preparing for that.  They fought tooth and nail to get that

2    motion heard as early as possible.  We objected repeatedly that

3    it's going to be difficult to conduct all the discovery we need

4    to get this motion heard, and they demanded that it be heard

5    early, so that's Issue Number 1.

6            Issue Number 2 is, you know, I'm not really sure that

7    hey, I was pretty busy, is an excuse to default on a deadline.

8            Issue Number 3 is that none of that has anything to do

9    with what's happened in the last three months.  I pointed out to

10   Your Honor that nothing has changed in the record in this case

11   since you issued your ruling on sex toys, and Mr. Marfoe

12   certainly didn't stand up and say no, Mr. Bageant is mistaken,

13   here's the thing that's changed.  The reason is that nothing has

14   changed --

15           MR. MARFOE:  Your Honor, if I may --  I didn't mean to

16   interrupt you.  I'm sorry.

17           MR. BAGEANT:  On the -- Your Honor made this

18   distinction between the procedural default that I think we all

19   agree has happened here, and then the merits of the relevance

20   issue.  I haven't heard anything that actually shows why sex

21   toys, which are sold in the health and wellness section of

22   Amazon.com, are relevant to the allegations about Fire TV, the

23   hardware device and the video device.  Amazon.com is a place

24   where you can buy coyote urine.  Fine.  What does that have to

25   do with why consumers would be confused and think that

1    Amazon.com sells hard core pornographic movies at Wreal's

2    website?

3              THE COURT:  So the sex toys are sold in the health and

4    --

5              MR. BAGEANT:  Health and wellness section of the

6    website.

7              THE COURT:  Wellness section.

8              MR. BAGEANT:  You can't access that section from a Fire

9    TV device.  They're completely different parts of the store,

10   they're not related goods or services.  That was the basis of

11   your ruling.

12             THE COURT:  When you say Fire TV device, you mean

13   F-I-R-E?

14             MR. BAGEANT:  Yes, Your Honor.  That's a fundamental

15   distinction that Your Honor drew in the preliminary injunction

16   briefing which was on the very same factors, same filing factors

17   that Mr. Marfoe points to here.  Your Honor ruled that goods and

18   services at issue here are simply not similar to sex toys.

19   Again, nothing in the record has changed.

20             Mr. Marfoe suggested that your order was not a

21   discovery ruling and that that shouldn't be read that way, but

22   that's not what your order says.  Your order says failure to

23   timely object shall bar the parties from a de novo determination

24   by the District Court of an issue covered in this report and

25   recommendation, and shall bar the parties from attacking on

1    appeal the factual findings contained herein.  That was an issue

2    that was covered in your report and recommendation, it's one you

3    received briefing on specifically, it's one you ruled upon.

4    They simply didn't bring any objection to it until today.

5            THE COURT:  Mr. Marfoe, I think you wanted to say

6    something further?

7            MR. MARFOE:  I did, and actually a couple things now.

8    I mean, first, again it was -- a ruling on a preliminary

9    injunction, the objections would go to that motion only.  It was

10   not -- did not become the law of the case.  The Court was not

11   presented with a full slate of evidence, and I don't believe

12   that we have to present evidence at a discovery hearing.  We

13   just have to show that there is a possibility of relevance of

14   this evidence, and I think we've shown far more than that.

15           Second, there's more good cause, I think Mr. Bageant

16   mentioned, and that is that especially during the, I think,

17   critical month of October when this issue first arose, we spent

18   the entire 30 day period talking with Amazon and trying to

19   resolve this issue all the way up until the deposition dates.

20   And this is an issue that we've tried to work out, and we've

21   spoken about it since over the last couple of months.  We spoke

22   about it, I believe, at the April 9th call where we tried to set

23   this hearing, may have been -- and there were some e-mails well

24   beforehand.  We tried to originally set this hearing for April

25   16th, then it was 23rd.  And I may be getting the dates mixed up

1    because we're on a Thursday now, so we certainly made an effort
2    to set this hearing earlier.
3            And again, as far as the relevance issue goes, highly
4    relevant because again, they go to two of the seven factors that
5    courts consider, and they really go to the overarching issues to
6    whether consumers will think that Wreal's FyreTV is put out on
7    Amazon.  And the fact that Amazon puts out everything from
8    coyote urine to sex toys molded from porn stars' parts is highly
9    relevant to that and likely.
10           THE COURT:  I have to tell you, this is really
11   unrelated to the merits of the hearing, but you folks have
12   piqued my curiosity.  I've heard this product name mentioned
13   several times, coyote urine.  What is the use of coyote urine?
14   What is it for?
15           MR. BAGEANT:  Your Honor, I grew up in rural north
16   Idaho, and I feel very qualified to answer that question.
17           THE COURT:  Please don't tell me it's cologne.
18           MR. BAGEANT:  It's -- you can use it as a cologne, but
19   I wouldn't recommend putting it on your body.  Typically used
20   for hunting and trapping.
21           THE COURT:  For hunting?
22           MR. BAGEANT:  Yes, Your Honor.
23           THE COURT:  What do you do with it?  Do you put it on
24   the ground to attract a coyote?
25           MR. BAGEANT:  People use it for that, and people use it

1    to try to hide their own scent.  Presumably it's very pungent

2    stuff.

3         THE COURT:  So you put it on your own body to hide your

4    own scent?

5         MR. BAGEANT:  People will put it -- this is Idaho, Your

6    Honor.  People will put it their shoes or their clothes to try

7    to conceal the human scent.

8         THE COURT:  Now you're in Seattle.  Imagine that.

9         MR. BAGEANT:  It's been a long time since I've opened

10   my coyote urine.

11        MR. MARFOE:  Still have a bottle.

12        Your Honor, there's one more point I wanted to bring up

13   because a burden came up here.  Amazon did not make a burdensome

14   objection to the 30(b)(6) topics, did not make a burdensome

15   objection to the RFAs.  To Request Number 8 of the RFPs, its

16   entire objection is Amazon objects to all as overbroad and to --

17   related to as vague.  Amazon objects to pornography, sex toys

18   and other similar adult-oriented products and any third party as

19   vague, unduly burdensome and not reasonably calculated to lead

20   to admissible evidence.  Amazon didn't explain the burden in its

21   objection, and I believe that this Court requires that, I

22   believe the local rules require that.  In fact, I still haven't

23   heard what the burden is.

24        THE COURT:  Any party have any further arguments to

25   make that have not already been made?  New arguments or gloss on

1    arguments already made?  In other words, no repeating arguments

2    that have already been articulated this afternoon.

3            Anything further, Plaintiff?

4            MR. MARFOE:  No, Your Honor.

5            THE COURT:  Defense?

6            MR. BAGEANT:  No, Your Honor.

7            THE COURT:  So I will be, in the next day or two or

8    three, issuing a written order on this, I'll try to get it out

9    fairly quickly.  I recognize you've got a discovery deadline

10   coming up, and I'm cognizant of that so we'll get this written

11   order out fairly soon.

12           So the other things that I did by the way in Seattle, I

13   toured the Boeing aircraft manufacturing plant about 45 minutes

14   out of town.  Have you done that tour yet?

15           MR. BAGEANT:  That's very much on my list.  I've heard

16   it's a good time.

17           THE COURT:  Fascinating.  Fascinating.  It's like the

18   largest building in the world.  Each aircraft is constructed in

19   a bay and the bay door is about 120 yards long which is longer

20   than a football field.  They have these six bays, six right

21   after each other, and it's just phenomenal.  Some of these

22   aircraft have two million parts to them.  Imagine trying to keep

23   2 million parts in inventory and knowing where to put them, it's

24   just fascinating.

25           Then we took a wine tasting tour.  Have you done that?

```
1              MR. BAGEANT:  In the Woodinville area?  Did you go up

2    north a little bit?

3              THE COURT:  It's about a half hour, 45 minutes.

4              And then we took a boat tour to the locks.  Have you

5    been to the locks?

6              MR. BAGEANT:  In Ballard, yes.

7              THE COURT:  All right.  Did that.  We took a city tour,

8    saw, you know, most of the major highlights including the REI

9    headquarters with the indoor climbing wall.

10             And then I probably had -- since I was there about six

11   days, I probably had, I don't know, 50 Starbucks coffees.  Did

12   my fair share of contributing to the local coffee economy.

13             So I know that they say it rains all the time in

14   Seattle.  We were there six days.  Five days, beautiful weather.

15             I went to a baseball game.

16             MR. BAGEANT:  Oh, good.  Well, please keep the weather

17   a secret.  It's kind of a myth that we like to propagate.

18             THE COURT:  It was beautiful.  It rained one night.

19   And the baseball stadium, Safeco Field has a retractable roof so

20   we were protected.  And I did what you're supposed to do at a

21   baseball game, I ate a hotdog, even though I'm not a big hotdog

22   guy, and I ate peanuts and I liked the stadium.  Very nice.

23             So in any event, folks, thank you for your arguments.

24   Good seeing all of you.  Have a safe trip back to Seattle; safe

25   trip back to Brickell Avenue, is it?
```

1        MS. ISANI:  Which may be more dangerous, Your Honor,

2    but we're all in the same building.

3        THE COURT:  You are all really?  How convenient.

4        That reminds me.  Many years ago, I had a case, my

5    office at the time was in what I still call to this day the

6    Southeast Bank Building, but I don't know what they call it

7    nowadays.  But you know the building I'm talking about, right?

8        So we were litigating against a firm, and the firm was

9    about 35 feet from our office on the same floor.  They were

10   literally around the corner on the same floor.  And whenever

11   they had to serve something, they would serve it by regular

12   snail mail.  So even though we were literally 25 feet away and

13   all they had to do was just walk the 25 feet, they would send it

14   in regular mail and sometimes it would take a week.  I'm not

15   suggesting that you all are involved in those sorts of

16   shenanigans being in the same building, but it did remind me of

17   that anecdote.

18        (PROCEEDINGS CONCLUDED)
                         * * * * *

19                   C E R T I F I C A T E

20   I certify that the foregoing is a correct transcript from the
     digital audio recording of proceedings in the above-entitled
21   matter.

22

     _____      /s/ Dawn M. Savino
23   Date                        DAWN M. SAVINO, RPR

24

25